# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MANSUR MAQSUDI<br>6 Queens Court<br>Morristown, N.J. 07963,<br><br>FARID MAQSUDI<br>1 Meadow Ct<br>Montville, N.J. 07045,<br><br>and<br><br>ABDUL RAUF MAQSUDI<br>3 Manchester Drive<br>Denville, N.J. 07834,<br><br>    Plaintiffs,<br><br>v.<br><br>GLOBALOPTIONS, INC.<br>1615 L Street, NW, Suite 300<br>Washington, D.C. 20036<br><br>and<br><br>ZEROMAX GMBH<br>Poststrasse 30<br>6300 Zug ZG<br>Switzerland<br><br>    Defendants. | Case No. |

## COMPLAINT FOR COMPENSATORY DAMAGES, PUNITIVE DAMAGES AND PERMANENT INJUNCTIVE RELIEF

## INTRODUCTION

Defendant, GlobalOptions, Inc., acting as an agent on behalf of Defendant Zeromax GmbH, posted a website containing false and defamatory statements about Plaintiffs Mansur Maqsudi, Farid Maqsudi, and Abdul Rauf Maqsudi. As a result, Plaintiffs, by and through their undersigned counsel, bring this action for defamation, libel *per se*, and false light invasion of privacy and seek compensatory and punitive damages, as well as permanent injunctive relief.

## PARTIES

1.      Plaintiff Mansur Maqsudi is an individual and at all times relevant to this complaint is a resident of New Jersey.  Mansur Maqsudi is an officer and director of ROZ Trading Ltd. ("ROZ").

2.      Plaintiff Farid Maqsudi is an individual and at all times relevant to this complaint is a resident of New Jersey.  Farid Maqsudi and Mansur Maqsudi are brothers.  Farid Maqsudi is an officer and director of ROZ.

3.      Plaintiff Abdul Rauf Maqsudi is an individual and at all times relevant to this complaint is a resident of New Jersey.  Abdul Rauf Maqsudi is Mansur Maqsudi's and Farid Maqsudi's father.

4.      Plaintiffs Mansur Maqsudi, Farid Maqsudi, and Abdul Rauf Maqsudi made all business decisions regarding the actions of ROZ and its affiliated business, Valuelink FZE. ROZ's interest in a lucrative soft-drink joint venture was stolen as a result of illegal activities undertaken by The Coca-Cola Export Corporation, the Republic of Uzbekistan, Gulnora Karimova, and Zeromax GmbH and its related entities, as detailed in *Roz Trading Ltd., et al. v. Zeromax Group Inc., et al.*, Case Number 1:06-cv-01040-CKK, a related case pending before this Court.

5.      Defendant GlobalOptions was initially formed in Delaware in 1998 as a limited liability company (LLC).  On January 24, 2002, it converted from an LLC to a corporation under Delaware law.  It remains incorporated in Delaware and has its principal place of business at 1615 L Street, NW, Suite 300, Washington, D.C. 20036.  According to its website, GlobalOptions "was conceived as a private CIA, Defense Department, Justice Department, and FBI, all rolled into one."  GlobalOptions describes itself as assisting "hundreds of corporations, celebrities, and even governments deal with the complexities and tribulations of the modern world."  *See* http://www.globaloptionsinternational.com/company_profile.htm.  GlobalOptions was hired by, and is an agent for, Defendant Zeromax GmbH ("Zeromax").

6.      Defendant Zeromax is a Swiss-registered company that was incorporated in July 2005.  Its partners are Miradil Djalalov and Fatima Makhmudovna Djalalova.  Defendant Zeromax is one of four Zeromax entities named as defendants in the related case, *Roz Trading Ltd., et al. v. Zeromax Group Inc., et al.*, Case Number 1:06-cv-01040-CKK, in which ROZ asserts breach of contract and tort claims against Zeromax for willfully depriving ROZ of its interest in CCBU.

7.      Upon information and belief, Gulnora Karimova exercises full control over Defendant Zeromax.

## JURISDICTION AND VENUE

8.      Jurisdiction over the subject matter of this case arises from 28 U.S.C. § 1332(a)(1), as the parties are diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Defendant GlobalOptions is subject to personal jurisdiction in this Court pursuant to D.C. Code §§ 13-334, 13-422, and 13-423.  Defendant GlobalOptions is subject to personal

jurisdiction under § 13-334 based on service of process on the agent of the corporation doing business in the District. Defendant GlobalOptions is subject to personal jurisdiction of this Court pursuant to D.C. Code § 13-422 because it maintains its principal place of business in Washington, D.C. Defendant is also subject to personal jurisdiction of this Court pursuant to D.C. Code §§ 13-423(a)(1) and 13-423(a)(3), respectively, because it has transacted business in the District and the claims for relief arise from this transaction of business, and because GlobalOptions caused tortious injury in the District of Columbia by an act in the District of Columbia. The exercise of personal jurisdiction by this Court over Defendant GlobalOptions does not offend traditional notions of fair play and substantial justice.

10.     Upon information and belief, Defendant Zeromax is subject to personal jurisdiction in this Court pursuant to D.C. Code § 13-423(a)(1) and 13-423(a)(3) on the basis that it has transacted business, either directly or by its agent GlobalOptions, Inc., in the District of Columbia, and the claims for relief arise from this transaction of business, and because Zeromax caused tortious injury in the District of Columbia by an act in the District of Columbia. The exercise of personal jurisdiction by this Court over Defendant Zeromax does not offend traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia.

## **ALLEGATIONS OF FACT**

12.     On June 6, 2006, ROZ filed a complaint in the United States District Court for the District of Columbia and simultaneously filed a Request for Arbitration with the International Arbitral Centre of the Austrian Federal Economic Chamber ("VIAC"), alleging damages arising from the events described  below:

a.    On June 16, 1993, ROZ entered into a commercial Joint Venture Agreement ("JVA") with The Coca-Cola Export Corporation ("TCCEC"), a wholly-owned subsidiary of The Coca-Cola Company, and with the Republic of Uzbekistan. The name of the joint venture was Coca-Cola Bottlers of Uzbekistan Ltd. ("CCBU").

b.    The joint venture was financially successful. In the 2000 annual audit, assets of CCBU were valued at approximately $150 million.

c.    During the formation and early years of the joint venture, Plaintiff Mansur Maqsudi, the Managing Director of ROZ, was married to Gulnora Karimova ("Karimova"), the daughter of Islam Abduganievich Karimov, the President of the Republic of Uzbekistan.

d.    In July 2001, Mansur Maqsudi told Karimova that he was separating from her, citing irreconcilable differences. This sparked a vicious and extreme reaction from Karimova which included kidnapping their two young children from their home in New Jersey and taking them to Uzbekistan, attacking members of the Maqsudi family in Uzbekistan and targeting the Maqsudi family's commercial business through office raids and sham judicial proceedings -- all of which caused serious physical and emotional harm to the Maqsudi family and eliminated ROZ's ability to exercise its contractual rights to manage and control the joint venture.

e.    Through unlawful means and their partnership with Karimova, Zeromax illegally acquired ROZ's interest in the soft-drink joint venture.

13.    Karimova and Zeromax's illegal actions with respect to the Maqsudis and ROZ did not stop there. Upon information and belief, in retaliation for ROZ's filing of a federal court complaint and a request for arbitration in Vienna and in furtherance of Karimova's campaign to terrorize the Maqsudis and ROZ, Zeromax, working with Karimova, turned to Defendant

GlobalOptions to further harm the business reputation and emotional well-being of the Maqsudis and their company, ROZ.

14.    On June 9, 2006, just three days after ROZ filed its complaint in this Court and the parallel request for arbitration in Vienna, the domain names "mansurmaqsudi.net" and "faridmaqsudi.net" were registered to an unidentified individual through Katz Global Domain Registration ("Katz"). Katz is a company that advertises complete privacy and anonymity for those who wish to register and manage websites but do not wish to be identified by Network Solutions, the company through which website domain registrations may be searched.

15.    The "faridmaqsudi.net" domain name automatically rerouted viewers to the "mansurmaqsudi.net" website, which published numerous false and defamatory assertions of fact concerning the Maqsudi family and ROZ, the company they own and manage. The false and defamatory statements published on the "mansurmaqsudi.net" website are described in further detail in paragraph 34.

16.    On July 6, 2006, the domain name "mansurmaqsudi.com" was registered to an unidentified individual through Domains by Proxy, Inc. ("Domains by Proxy"). Like Katz, Domains by Proxy guarantees its clients complete privacy from the Network Solutions database. "Mansurmaqsudi.com" also automatically directed viewers to the "mansurmaqsudi.net" website containing the defamatory statements.

17.    On August 25, 2006, the domain names "faridmaqsudi.com" and "abdulraufmaqsudi.com" were registered to an unidentified individual through Domains by Proxy. These domain names also automatically rerouted viewers to the "mansurmaqsudi.net" website containing the false and defamatory statements.

18.    The Maqsudis became aware of these websites in early October 2006.

19.    Zeromax Group, Inc., a related Zeromax entity named as a defendant in the VIAC arbitration proceeding, cited the content of "mansurmaqsudi.com" in its filing before the VIAC on October 25, 2006.

20.    Investigation into these websites led the Maqsudis to believe that GlobalOptions was the registrant of the domain names through Katz and Domains by Proxy.

21.    On December 1, 2006, through counsel, Plaintiffs sent a letter to Katz informing them of the false and defamatory statements published on the websites hosted by them, www.mansurmaqsudi.net and www.faridmaqsudi.net.  This letter was returned as "undeliverable," but was successfully resent on December 13, 2006.  Plaintiffs' letter called for each of these websites, and any related websites, to be taken down immediately.  In addition, Plaintiffs informed Katz that the allegations published on the sites were unfounded and without any truth.

22.    On December 1, 2006, through counsel, Plaintiffs sent a letter to Domains by Proxy informing them of the false and defamatory statements published on the websites hosted by them: www.mansurmaqsudi.com; www.faridmaqsudi.com; and www.abdulraufmaqsudi.com.  Plaintiffs' letter called for each of these websites, and any related websites, to be taken down immediately.  In addition, Plaintiffs informed Domains by Proxy that the allegations published on the sites were unfounded and without any truth.

23.    On December 1, 2006, through counsel, Plaintiffs also sent a letter to GlobalOptions regarding its registration of the following websites: www.mansurmaqsudi.com; www.faridmaqsudi.com; www.abdulraufmaqsudi.com.  Plaintiffs' letter called for each of these websites, and any related websites, to be taken down immediately.  In addition, Plaintiffs

informed GlobalOptions that the allegations published on the sites were unfounded and without any truth.

24.     Upon information and belief, GlobalOptions, in posting the websites containing the false and defamatory statements, was hired by and acted as an agent on behalf of Zeromax and Gulnora Karimova.  On January 3, 2007, ROZ's co-counsel, Allan Gerson, met with Neil Livingstone, then-Chairman and CEO of GlobalOptions, for the purpose of determining whether or not Zeromax was responsible for the false website reports and, whether GlobalOptions had in fact played a role in posting those websites.  Mr. Livingstone confirmed to Mr. Gerson that GlobalOptions did indeed post those websites at the express direction of Zeromax.  However, Mr. Livingstone threatened – implicitly, if not explicitly – the lives of both Farid and Mansur Maqsudi unless they dropped their lawsuit against Zeromax pending in this Court.  At Mr. Livingstone's January 11, 2007 meeting with Mr. Gerson, which was also attended by Mr. Gerson's assistant, Ms. Shannon Hogan, Mr. Livingstone confirmed the earlier threat by urging Mr. Gerson to advise ROZ to drop its case against Zeromax or face grave consequences.  Mr. Livingstone indicated that Zeromax is run by dangerous persons and that its owners are furious at the Maqsudis for suing them.  He told Mr. Gerson that Zeromax had informed the Department of Justice about the Maqsudis' supposed "bad activities."  He also described Zeromax's connections to mob leaders, including ex-KGB agents on errant missions.  He reiterated that Zeromax could make life miserable for the Maqsudis, and added that his client could now be expected to refrain from hostile actions not only if the Maqsudis drop the suit, but if an additional condition were met: that the Maqsudis pay a defined sum of two million dollars to Zeromax.

25.     Soon after the meetings with Mr. Livingstone, Plaintiffs' counsel notified the Federal Bureau of Investigation, and met with them regarding the threats to the Maqsudis' lives and personal safety in the context of concerted efforts in which the website defamation seemed as but one aspect of a larger campaign of intimidation.

26.     In a recent lawsuit arising out of Mr. Livingstone's departure from GlobalOptions, Mr. Livingstone confirmed that Zeromax is a client of Global Options.  In *GlobalOptions Inc. v. Neil Livingstone,* Civ. A. No. 1:07-cv-00608(PLF) (D.D.C.), Mr. Livingstone submitted an affidavit (attached as Exhibit A to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction (filed April 23, 2007)) in which Mr. Livingstone cites to and attaches correspondence from Tom Ondeck, an officer at GlobalOptions, stating that Zeromax is a client of GlobalOptions.

27.     On January 16, 2007, Plaintiffs received a response from Domains by Proxy indicating that it had asked "its customer" to contact Plaintiffs' counsel to resolve the situation. Domains by Proxy gave its customer until January 19, 2007 to do so.  The letter indicated that failure to make contact by the deadline would result in the lifting of the privacy service for the three websites registered to Domains by Proxy.  Neither Plaintiffs nor Plaintiffs' counsel were contacted by Domains by Proxy's customer.

28.     On January 26, 2007, Domains by Proxy informed Plaintiffs' counsel that it had been unsuccessful in attempting to contact its customer.  Because it did not respond to Domains by Proxy, the customer violated the terms of service.  As a result, Domains by Proxy canceled the privacy service for the three relevant websites: "mansurmaqsudi.com"; "abdulraufmaqsudi.com"; and "faridmaqsudi.com".

29.     Shortly thereafter, the Network Solutions database entries for these websites confirmed that the true registrant of the websites was in fact, GlobalOptions.

30.     To date, Plaintiffs have failed to receive any response from Katz regarding the websites registered through its privacy protection service.

31.     Upon information and belief, GlobalOptions is also the registrant of the websites operating under the privacy protection of Katz.

32.     Starting February 2, 2007, none of the websites were functional for a brief period of time.  Accessing any one of them resulted in redirection to a website stating:  "This Account Has Been Suspended.  Please contact the billing/support department as soon as possible."  The false and defamatory statements posted by GlobalOptions and Zeromax were still accessible during this time, however.  The first result of a "Google" search on Mansur Maqsudi was the website "www.mansurmaqsudi.net" and a click on the link to "Cached" information displayed the website's entire first page with the exception of the pictures.

33.     By March 2, 2007, all of the websites became functional again and remained functional until April 26, 2007.  Accessing the sites now results in a redirection to a website stating: "This Account Has Been Suspended.  Please contact the billing/support department as soon as possible."

34.     The false and defamatory statements posted on "mansurmaqsudi.net", and accessible through the four additional domain names:  "faridmaqsudi.net"; "mansurmaqsudi.com"; "faridmaqsudi.com"; and "abdulraufmaqsudi.com", falsely portray Plaintiffs as being involved in the following activities: criminal code violations, illegal registration of ROZ, charter fund fraud, fraudulent parallel trading, illegal profit-making, embezzlement, profit siphoning, tax evasion, smuggling cash out of Uzbekistan, oil embargo

violations, selling sugar on the black market, bribery, and money conversion violations. The home page of the website lists and links to further details about each of these criminal and disreputable activities.

35.     Many of the website's statements cite to highly unreliable documents issued by the Uzbek government that are dated no earlier than late 2001 – after Mansur Maqsudi's separation from Karimova. The Uzbek documents referenced on the "mansurmaqsudi.net" website relate to or are part of the sham audits and investigations initiated by Uzbekistan to intimidate and harass the Maqsudis and ROZ. It is well-documented that the courts and governmental agencies of Uzbekistan lack independence and are wholly subservient to the corrupt government headed by President Karimov and his family.

36.     The defamatory statements include, but are not limited to, the following:

        a.      That "[a]round April 2001, government auditors began to uncover illegal schemes involving CCBU and Roz Trading."

        b.      That "during a 'routine regular audit' of Coca-Cola Bottlers Uzbekistan Ltd. (CCBU) and Roz Trading, Ltd. 'serious violations of the law [were] revealed by Uzbekistan's tax agencies.'"

        c.      That the Maqsudis "'committed lots of misdeeds, like violations of tax law, violations in sales regulation, and violation of human rights in the plant here.'"

        d.      That "[f]or failing to pay back taxes and other offences, the joint venture was terminated in April 2005 and the remaining assets were liquidated."

<u>False and Defamatory Statements Regarding Criminal Code Violations</u>

        e.      That "[t]he Maqsudis were convicted of the following criminal

violations of the Criminal Code of the Republic of Uzbekistan:" larceny by embezzlement, taxes or other payment evasion, legalization of revenue from criminal activities, forgery in office, acceptance of bribes, and extortion.

f.    That Mansur Maqsudi also committed the following crimes: abuse of power or office, fraud, and illegal trading or intermediary activity.

False and Defamatory Statements Regarding Illegal Registration of Roz Company

g.    That "[o]n 12 May 1993, the Maqsudis falsely registered Roz Trading, Ltd. as a foreign enterprise in Uzbekistan."

h.    That "when registering the company, the Maqsudis 'presented forged documents to the authorities of Uzbekistan on the parent enterprise that had not yet been registered in the territory of Cayman Islands by that time.  Thus, the listed persons registered the foreign enterprise in the Republic of Uzbekistan by false statement.'"

False and Defamatory Statements Regarding a Charter Fund Fraud

i.    That the Maqsudis committed fraud with respect to a charter fund by listing the amount of the charter fund at $500,000, but "the fund was never created" and the "necessary resources and other property were not brought into the Republic."

j.    That "ROZ Trading Ltd. thus fraudulently reneged on its legal obligations to invest $500,000 in its start-up ventures."

k.    That "from 1995 to 2000, Roz Trading Ltd. failed to create a charter fund totaling $500,000.  Thus the company did not qualify for the tax privilege."

<u>False and Defamatory Statements Regarding Fraudulent Parallel Trading</u>

        l.        That "Roz Trading and its affiliated company Valuelink FZE in Dubai, UAE, defrauded their multinational partners, chiefly Proctor & Gamble and Alberto Culver, by contracting to sell personal-care products in Uzbekistan and then re-labelling the products and reselling them for larger profits in the U.S., United Kingdom, UAE, and African countries" and therefore engaged in "fraudulent parallel trading."

        m.      That "Roz Trading received up to a 30-percent discount on goods from its multinational partners, according to Uzbekistan Attorney General Rashitjon Kadirov."

        n.       That by "[u]sing false documents," the following goods "were supposed to be shipped to Tashkent for distribution in Uzbekistan and were instead shipped to the United States and sold in New Jersey, New York, and California: Alberto Carvel, Revlon, and Duracell, through distributors in Singapore and Russia; Crazy Glue in Ohio; Biore facial cream."

        o.       That "[t]he shipment of Crazy Glue never left a U.S. port and was sold through Maqsudi's firms in New York and New Jersey."

        p.       That "[w]ithout the knowledge of manufacturers, the goods were also distributed to other CIS countries and Russia."

        q.       That "[w]hen representatives of American companies wanted to personally view how their products were being sold, they were taken to Tashkent where samples of their products were hurriedly scattered onto stalls in the central market . . . . The foreign visitors were pleased by what they saw and did not

know they were 'witnesses of a well-staged show.'"

      r.      That "Procter & Gamble, its largest partner, and Gillette terminated their relationship with the Maqsudis and Roz Trading because of the fraudulent parallel trading activities."

<u>False and Defamatory Statements Regarding Illegal Profit-Making</u>

      s.      That "ROZ Trading Ltd. (Uzbekistan) violated Article 243 -- the 'legalization of profit received by criminal way.'"

      t.      That ROZ Trading Ltd. (Uzbekistan) is guilty of 'illegal profit-making from state budget money that was converted in the Republic of Uzbekistan for importing consumer goods.'"

      u.      That "[o]n 5 January 1994, an import contract was signed between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan) on the delivery of $200 million of consumer goods. Mansur Maqsudi signed the document on behalf of the Uzbekistan company and Farid Maqsudi signed the contract on behalf of the Cayman Islands company. The consumer goods included macaroni products, sugar, flour, chocolate products, children's nourishment, tea, cigarettes, chewing gum, among others. All payments related to the contract were made through Credit Swiss Bank in Switzerland. From 1995 to 1997, only '106,020,6 thousand U.S. dollars were delivered into Uzbekistan' [$106, 02060?]."

      v.      That "[o]n 12 August 1999, Mansur Maqsudi concluded a credit trade contract (No. 2/99) for consumer goods for '6.000.000 USD' [$6 million] between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan).

The contract was registered (No. 21902294) with the Ministry of Foreign
Economic Relations of the Republic of Uzbekistan on 13 September 1999."

### False and Defamatory Statements Regarding Embezzlement

w.    That "[t]he Maqsudi family embezzled funds" and "'purposefully
overestimated the cost of contracts for delivery of consumer goods in Uzbekistan
by including the expenditures for marketing and teaching services which factually
were not carried out.  By those contracts, they illegally received hard currency in
the amount of 33 million 992 thousand USD.'"

x.    That "[f]rom 1995 to 1997 the total amount of imported goods was
'11.122.06 thousand USD [$11.1 million].'" "Of this amount, Maqsudi
overestimated prices 'in the CCD' by 34 percent or '2,822.04 thousand USD
[$2.8 million].'  In other words, this amount was 'stolen' from the important
goods.  Maqsudi overstated the price of goods on customs declarations by 15
percent or '12.242, 31 thousand USD' [$12.2 million].  The total amount of
imported goods was '93.857,76 thousand USD' [$93.8 million]." "In total . . .
'15,064,35 thousand USD [$15 million] or 994,247.000 sum . . . was embezzled
from the state resources.'"

### False and Defamatory Statements Regarding Profit Siphoning

y.    That the Maqsudis "overcharged for imported goods and took
straightforward trading commission to 'siphon off' much of the profits of the
company and stashed the money in 'offshore accounts to avoid tens of millions of
dollars in taxes.'"

z.    That the Maqsudis "funnelled money under the 'pretext of

investments' through dummy firms, 'as a strategy to limit profit payments to other founders of CCBU.'"

aa.    That the Maqsudis "additionally smuggled a 'tremendous amount of undeclared dollars out of Uzbekistan.' During an inspection of Roz Trading Ltd., an 'undeclared cash amount of $199,900 was discovered.'"

### False and Defamatory Statements Regarding Tax Evasion

bb.    That "ROZ was involved in numerous schemes to avoid paying taxes to the governments of Uzbekistan and the United States."

cc.    That "[f]rom 1995 to 2000, Roz Trading evaded paying taxes in the amount of 438,032,000 soms [$5.1 million] based on a 'commodity turnover in the amount of 24,519,190,000 soms [$287.6 million].'"

dd.    That "[o]verall, the Maqsudis evaded taxes worth $17.6 million."

### False and Defamatory Statements Regarding Smuggling Cash Out of Uzbekistan

ee.    That the Maqsudis "'have smuggled a tremendous amount of undeclared cash dollars out of Uzbekistan.' During an inspection of Roz Trading's office in Uzbekistan, 'an undeclared cash amount of $199,000 was discovered.'"

### False and Defamatory Statements Regarding Oil Embargo Violations

ff.    That Valuelink, a company owned by the Maqsudi family, "purchased oil products 'from Middle Eastern countries, which are under economic sanctions by the World community.'"

gg.    That "Valuelink falsified documents to conceal the true origin of the oil products by stating the country of origin for the oil was Uzbekistan."

hh.    That a "total of 150,920 tons of oil products was illegally sold through Valuelink at a cost of $15,938,572.82."

False and Defamatory Statements Regarding Selling Sugar on the Black Market

ii.    That "[s]ince 1997, the Roz Trading company has sold sugar through the 'black market' and not paid profit tax for 7 billion soms (local currency), which is approximately $6 million."

jj.    That "[i]n the summer of 2000, Mansur 'developed a criminal plan' to sell the sugar at 'overestimated prices' to clients . . ."

False and Defamatory Statements Regarding Bribery

kk.    That the Maqsudis engaged in bribery, misappropriation, conversion, official forgery, and bribe taking.

## COUNT I

## DEFAMATION

37.    Paragraphs 1 through 36 are incorporated herein as if fully set forth.

38.    Defendants GlobalOptions and Zeromax made the false and defamatory statements cited above regarding the Maqsudis and their business, ROZ.

39.    GlobalOptions and Zeromax published the false and defamatory statements to the general public by posting them on the Internet, at "mansurmaqsudi.net", and by making them further accessible through four additional domain names: "faridmaqsudi.net"; "mansurmaqsudi.com"; "faridmaqsudi.com"; and "abdulraufmaqsudi.com".

40.    GlobalOptions and Zeromax published the false and defamatory statements with negligent disregard for the truth because they failed to act with ordinary care with respect to whether these statements were false. GlobalOptions and Zeromax also published the false and

defamatory statements with actual malice because they knew or acted with reckless disregard as to whether the statements were false.

41.     To the extent that GlobalOptions and Zeromax published or republished defamatory statements attributed to others, they are not shielded from liability because the sources on which they relied are unreliable and a result of the sham judicial proceedings triggered by Karimova in response to Mansur Maqsudi's separation from her.

42.     The defamatory statements are not privileged.

43.     The defamatory statements have been and are available to a large audience of individuals who understand GlobalOptions' and Zeromax's false assertions of fact to be about Plaintiffs and to impugn Plaintiffs in their trade, profession, community standing, and business ethics.

44.     GlobalOptions and Zeromax have injured the Maqsudis in their trade, profession, community standing, and business ethics.

45.     The statements published by GlobalOptions and Zeromax are actionable as a matter of law based on their inherently defamatory nature.

46.     As a direct and proximate result of the broad publication of the defamatory statements by GlobalOptions and Zeromax, Plaintiffs Mansur Maqsudi, Farid Maqsudi and Abdul Rauf Maqsudi have suffered significant loss of their reputation, shame, mortification, and injury to their feelings and occupation.

## COUNT II

## LIBEL PER SE

47.     Paragraphs 1 through 46 are incorporated herein as if fully set forth.

48.     Defendant GlobalOptions and Zeromax made the false and defamatory statements cited above regarding the Maqsudis and ROZ.

49.     GlobalOptions and Zeromax published the false and defamatory statements to the general public by posting them on the Internet, at "mansurmaqsudi.net", and by making them further accessible through four additional domain names:  "faridmaqsudi.net"; "mansurmaqsudi.com"; "faridmaqsudi.com"; and "abdulraufmaqsudi.com".

50.     GlobalOptions and Zeromax published the false and defamatory statements with negligent disregard for the truth because they failed to act with ordinary care with respect to whether these statements were false.  GlobalOptions and Zeromax also published the false and defamatory statements with actual malice because they knew or acted with reckless disregard as to whether the statements were false.

51.     To the extent that GlobalOptions and Zeromax published or republished defamatory statements attributed to others, they are not shielded from liability because the sources on which it relied are erroneous, unreliable and a product of the sham judicial proceedings triggered by Karimova in response to Mansur Maqsudi's separation from her.

52.     The defamatory statements are not privileged.

53.     The defamatory statements have been and are available to a large audience of individuals who understand GlobalOptions' and Zeromax's false assertions of fact to be about Plaintiffs and to impugn Plaintiffs in their trade, profession, community standing, and business ethics.

54.     GlobalOptions and Zeromax have injured the Maqsudis in their trade, profession, and community standing.

55.     The statements published by GlobalOptions and Zeromax are actionable as a matter of law based on their inherently defamatory nature.

56.     The statements made by GlobalOptions and Zeromax are libelous *per se* because they accuse Plaintiffs of several crimes and because of their direct and unavoidable tendency to bring Plaintiffs into hatred, ridicule, and disgrace, and to injure the Maqsudis in their business, profession and reputation.

57.     As a direct and proximate result of the broad publication of the defamatory statements by GlobalOptions and Zeromax, Plaintiffs Mansur Maqsudi, Farid Maqsudi and Abdul Rauf Maqsudi have suffered significant loss of their reputation, shame, mortification, and injury to their feelings and occupation.

## COUNT III

## FALSE LIGHT INVASION OF PRIVACY

58.     Paragraphs 1 through 57 are incorporated herein as if fully set forth.

59.     Defendant GlobalOptions and Zeromax made the false and defamatory statements cited above regarding the Maqsudis and ROZ.

60.     GlobalOptions and Zeromax published the false and defamatory statements to the general public by posting them on the Internet, at "mansurmaqsudi.net", and by making them further accessible through four additional domain names: "faridmaqsudi.net"; "mansurmaqsudi.com"; "faridmaqsudi.com"; and "abdulraufmaqsudi.com".

61.     In so doing, GlobalOptions and Zeromax placed Plaintiffs in a false light that would be highly offensive to a reasonable person.

62.     GlobalOptions and Zeromax had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed.

63.   As a direct and proximate result of these acts, Plaintiffs have been injured.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant judgment in their favor and against Defendants GlobalOptions and Zeromax, and grant Plaintiffs:

a) Compensatory damages in an appropriate amount to be determined at trial;

b) Punitive damages against Defendants in an appropriate amount to be determined at trial;

c) Permanent injunctive relief barring Defendants from publishing the false and defamatory content in the future and causing great and irreparable harm to Plaintiffs for which there is no adequate remedy at law;

d) Reasonable costs and expenses;

e) Reasonable attorneys' fees; and

f) Such other relief which this Court may determine to be just and equitable under the circumstances.

## JURY DEMAND

64.    Plaintiffs demand a trial by jury on all issues properly triable thereby.

Respectfully submitted,

Stuart H. Newberger, DC BAR #294793
Alan W.H. Gourley, DC BAR #358300
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
E-mail: snewberger@crowell.com
          agourley@crowell.com


Attorneys for Plaintiffs

Dated: July 11, 2007


Of Counsel:

Dr. Allan Gerson
2131 S Street, NW
Washington, DC 20008
Telephone: (202) 966-8557
E-mail: gerson@gilgintl.org

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Mansur Maqsudi, Farid Maqsudi, and Abdul Rauf Maqsudi. | GlobalOptions, Inc. and Zeromax GmbH. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____88888_____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____11001_____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Crowell & Moring, LLP
1001 Pennsylvania Ave. N.W.
Washington, DC  20004
(202)624-2500

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
    Plaintiff

○ 2 U.S. Government
    Defendant

○ 3 Federal Question
    (U.S. Government Not a Party)

◉ 4 Diversity
    (Indicate Citizenship of
    Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ◉ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

| ○ **A.** *Antitrust* | ○ **B.** *Personal Injury/ Malpractice* | ○ **C.** *Administrative Agency Review* | ○ **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ◉ **E.** *General Civil (Other)*   OR   ○ **F.** *Pro Se General Civil* | | | |
|---|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Defamation, Libel Per Se, False Light Invasion of Privacy

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ **JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☒  NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE  7/11/07    SIGNATURE OF ATTORNEY OF RECORD  _(signature)_

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.