# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
MANSUR MAQSUDI, *et al.*,                 )
                                          )
              *Plaintiffs*,               )
                                          )
      v.                                  )          1:07-CV-01252 RJL
                                          )
GLOBALOPTIONS, INC., *et al.*,            )
                                          )
              *Defendants*.               )
_____)

## DEFENDANT ZEROMAX GMBH'S MOTION TO DISMISS THE COMPLAINT

Defendant Zeromax GmbH ("Zeromax"), a Swiss-registered limited liability company with business activities in Uzbekistan, respectfully moves this Court for an order dismissing with prejudice Plaintiffs' Complaint in its entirety pursuant to (i) Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction; (ii) the act of state doctrine; and (iii) Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

In support of its motion, Zeromax respectfully submits the accompanying memorandum of points and authorities, and exhibits thereto.

Dated: October 30, 2007                Respectfully submitted,
       Washington, D.C.


                                       **WHITE & CASE**LLP


                                       / s / Carolyn B. Lamm
                                       _____
                                       Carolyn B. Lamm (D.C. Bar No. 221325)
                                       Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
                                       Nicole E. Erb (D.C. Bar No. 466620)
                                       701 Thirteenth Street, N.W.
                                       Washington, D.C. 20005
                                       Telephone: (202) 626-3600
                                       Facsimile: (202) 639-9355

Kevin T. Baine (D.C. Bar No. 238600)
Jonathan Kravis (D.C. Bar No. 973780)
**Williams & Connolly LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5010
Facsimile: (202) 434-5018

*Attorneys for Defendant Zeromax GmbH*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MANSUR MAQSUDI, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     1:07-CV-01252 RJL |
| | ) |
| GLOBALOPTIONS, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT ZEROMAX GMBH'S MOTION TO DISMISS THE COMPLAINT**

**WHITE & CASE** LLP

Carolyn B. Lamm (D.C. Bar No. 221325)
Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Nicole E. Erb (D.C. Bar No. 466620)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

Kevin T. Baine (D.C. Bar No. 238600)
Jonathan Kravis (D.C. Bar No. 973780)
**Williams & Connolly LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5010
Facsimile: (202) 434-5018

October 30, 2007                                    *Attorneys for Defendant Zeromax GmbH*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.     PLAINTIFFS' CLAIMS AGAINST ZEROMAX IN THE ROZ LITIGATION
       AROSE FROM THE SOVEREIGN ACTS OF UZBEKISTAN ...................................... 5

II.    PLAINTIFFS' CLAIMS IN THE VIENNA ARBITRATION AROSE FROM
       THE SOVEREIGN ACTS OF UZBEKISTAN .................................................................. 8

III.   THE CLAIMS IN THIS CASE ARISE FROM THE SAME SOVEREIGN ACTS
       OF UZBEKISTAN AT ISSUE IN THE ROZ LITIGATION AND VIENNA
       ARBITRATION ................................................................................................................. 9

IV.    PLAINTIFFS' ALLEGED ILLEGAL CONDUCT IN UZBEKISTAN HAS
       BEEN WIDELY REPORTED IN THE PUBLIC DOMAIN FOR YEARS .................... 12

ARGUMENT ....................................................................................................................... 14

I.     THE COURT LACKS PERSONAL JURISDICTION OVER ZEROMAX GMBH ....... 14

       A.     Plaintiffs Fail To Allege That Zeromax "Transacted Business" In The
              District Of Columbia .......................................................................................... 15

       B.     Plaintiffs Fail To Allege That They Have Been Injured In The District Of
              Columbia By An Act Committed In The District ............................................... 16

II.    THE ACT OF STATE DOCTRINE BARS PLAINTIFFS' CLAIMS ............................ 18

III.   PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE
       GRANTED ....................................................................................................................... 21

       A.     Choice Of Law ..................................................................................................... 21

       B.     The Complaint Fails To State Claims For Defamation And False Light
              Invasion Of Privacy ............................................................................................ 23

              1.     Plaintiffs' Claims Are Barred By The Fair Reporting Privilege ............... 24

              2.     The Complaint Is Barred By The Statute Of Limitations ......................... 30

CONCLUSION .................................................................................................................... 33

## TABLE OF AUTHORITIES

FEDERAL CASES                                                                                          Page(s)

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454 (D.C. Cir. 1995).....................30

*Atkinson v. McLaughlin*, 462 F. Supp. 2d 1038 (N.D. Dakota 2006)............................................32

*\*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ......................................................19

*Bao Ge v. Li Peng*, 201 F. Supp. 2d 14 (D.D.C. 2000)...................................................................20

*Barry v. TIME, Inc.*, 584 F. Supp. 1110 (N.D. Cal. 1984)..............................................................27

*Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323 (11th Cir. 2003) .........................................19

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...............................................................21

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ....................................................................24

*Cerasani v. Sony Corp.*, 991 F. Supp. 343, 354 nn.2-3 (S.D.N.Y. 1998).......................................4

*\*City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20 (D.D.C. 2007)..........................15

*Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26 (D.D.C. 1995)......................................24

*Crane v. Carr*, 814 F.2d 758 (D.C. Cir. 1987) ..............................................................................16

*DeRoburt v. Gannett*, 548 F. Supp. 1370 (D. Haw. 1982)........................................................20, 21

*Does I-III v. Dist. of Columbia*, 238 F. Supp. 2d 212 (D.D.C. 2000)..........................................4, 6

*Dowd v. Calabrese*, 589 F. Supp. 1206 (D.D.C. 1984) ................................................................22

*Edwards v. Nat'l Audubon Soc'y*, 556 F.2d 113 (2d Cir. 1977)....................................................27

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997)................................3

*\*First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375 (D.C. Cir. 1988) ...........................14, 15

*First Merchants Collection Corp. v. Republic of Argentina*,
     190 F. Supp. 2d 1336 (S.D. Fla. 2002) ..................................................................................20

*\*Friedman v. Israel Labour Party*, 957 F. Supp. 701 (E.D. Pa. 1997)......................25, 26, 29, 30

*\*Galu v. SwissAir*, No. 86 Civ. 5551 (CSH),
     1987 WL 15580 (S.D.N.Y. Aug. 3, 1987)........................................................................20, 21

*Geico v. Fetisoff*, 958 F.2d 1137 (D.C. Cir. 1992) ................................................................22, 23

*Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989).................................................................20

Page(s)

*GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000)........................14

*Harper v. Walters*, 822 F. Supp. 817 (D.D.C. 1993)..............................................................24, 25

*\*In re United Press Int'l*, 106 B.R. 323 (D.D.C. 1989).................................................................27

*Jankovic v. Int'l Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007) ............................................30, 32

*Kline v. Williams*, No. Civ. A. 05-01102 (HHK),
    2006 WL 758459 (D.D.C. Mar. 23, 2006)..........................................................................16

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir 1994) .................................................21

*Lee v. Dong-A Ilbo*, 849 F.2d 876 (4th Cir. 1988)..........................................................26, 27, 28

*\*Mallinckrodt Med., Inc. v. Sonus Pharms., Inc.*,
    989 F. Supp. 265 (D.D.C. 1998)..................................................................................16, 17

*Margoles v. Johns*, 483 F.2d 1212 (D.C. Cir. 1973)...................................................................16

*Medico v. TIME, Inc.*, 643 F.2d 134 (3d Cir. 1981) ...................................................................25

*Mittleman v. United States*, 104 F.3d 410 (D.C. Cir. 1997) ......................................................30

*Novak-Canzeri v. Al Saud*, 864 F. Supp. 203 (D.D.C. 1994) .....................................................15

*\*OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005).........................25

*Philippine Nat'l Bank v. U.S. Dist. Ct. of Hawaii*, 397 F.3d 768 (9th Cir. 2005) ......................19

*Prins v. Int'l Tel. & Tel. Corp.*, 757 F. Supp. 87 (D.D.C. 1991) ................................................23

*Raymen v. United Senior Ass'n*, 409 F. Supp. 2d 15 (D.D.C. 2006) ...........................................3

*Reuber v. Food Chem. News, Inc.*, 925 F.2d 134 (4th Cir. 1991)..............................................25

*\*ROZ Trading, Ltd. v. Zeromax Group, Inc.*, Civ. No. 06-1040 (CKK),
    2007 WL 2812760 (D.D.C. Sept. 28, 2007) ................................................................ passim

*\*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)...........................................................................19

*Sunlite, Inc. v. BfG Bank AG*, 849 F. Supp. 74 (D.D.C. 1994)...................................................15

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) ..................................................................18

*\*Trotter v. Jack Anderson Enters.*, 818 F.2d 431 (5th Cir. 1987) ..............................................29

*United States v. Merit*, 962 F.2d 917 (9th Cir. 1992) ................................................................19

Page(s)

*Van Buskirk v. New York Times Co.*, 325 F.3d 87 (2d Cir. 2003) .................................................31

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ...........................................24

*Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 458 (D.D.C. 1994) ................................................31

*\*World Wide Minerals, Ltd. v. Kazakhstan*, 296 F.3d 1154 (D.C. Cir 2002)...............3, 18, 19, 21

*Young Women's Christian Ass'n v. Allstate Ins. Co.*,
   275 F.3d 1145 (D.C. Cir. 2002).................................................................................................21

*Zschernig v. Miller*, 389 U.S. 429 (1968) ...................................................................................26


STATE CASES

*Abate v. Maine Antique Digest*,  No. 03-3758-JLS,
   2004 WL 293903 (Mass. Super. Jan. 26, 2004)........................................................................32

*Churchill v. New Jersey*, 876 A.2d 311 (N.J. Super. Ct. 2005) .....................................................30

*\*Darakjian v. Hanna*, 840 A.2d 959 (N.J. Super. 2004) ..............................................................24

*DeAngelis v. Hill*, 847 A.2d 1261 (N.J. Sup. Ct. 2004) ................................................................23

*Klayman v. Segal*, 783 A.2d 607 (D.C. 2001) ...............................................................................23

*Lawrence v. Bauer Publ'g & Printing Ltd.*, 396 A.2d 569 (N.J. Sup. Ct. 1979) .........................32

*Long v. Walt Disney Co.*, 10 Cal. Rptr. 3d 836 (Cal. Ct. App. 2004) ...........................................32

*Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296 (D.C. 2001)......................................30, 32

*Namerdy v. Generalcar*, 217 A.2d 109 (D.C. App. 1966)............................................................30

*Orso v. Goldberg*, 665 A.2d 786, (N.J. Super. Ct. App. Div. 1995)  ...........................................24

*Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78 (D.C. 1980)........................................24, 25

*Sedore v. Recorder Publ'g Co.*, 716 A.2d 1196 (N.J. Super. Ct. App. Div. 1998) ......................24

*Vaughan v. Nationwide Mut. Ins. Co.*, 702 A.2d 198 (D.C. 1997)...............................................22

*Walko v. Kean Coll. of New Jersey*, 561 A.2d 680 (N.J. Super. 1988) .........................................23


FEDERAL STATUTES

Fed. R. Civ. P. 12(b)(6).........................................................................................................3, 6, 21, 22

Page(s)

Fed. R. Civ. P. 44.1 ..................................................................................................6

Fed. R. Evid. 201 .................................................................................................4, 6

28 U.S.C. § 1605 (2002) .........................................................................................20


STATE STATUTES

D.C. Code § 13-423 (2001).........................................................................15, 16, 17

D.C. Code § 12-301 (2001).....................................................................................30

N.J.S.A. 2A: 14-3 (2000) ........................................................................................30


OTHER AUTHORITIES

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1309 (1990) ...............31

Restatement (Second) Conflict of Laws § 150 (1971)..............................................22

Restatement (Third) of Foreign Relations Law § 443 (1987).........................................6

Restatement (Second) of Torts § 568 (1977)...........................................................23

Restatement (Second) of Torts § 611 (1977)...........................................................24

1 Robert D. Sack, *Sack on Defamation: Libel, Slander and Related Problems*
§ 7.3.2.2.4 (3d ed. 2007) ........................................................................................25

Uzbekistan, U.S. Dep't. of State, Bureau of South and Central Asian Affairs
(Mar. 2007) *available at* http://www.state.gov/r/pa/ei/bgn/2924.htm ..........................................19

## INTRODUCTION

This case arises from a longstanding dispute between Plaintiffs Mansur Maqsudi, Farid Maqsudi, and Abdul Rauf Maqsudi (collectively, "Plaintiffs"), residents of New Jersey doing business until 2001 in Uzbekistan, and the government of the Republic of Uzbekistan ("Uzbekistan"). The dispute concerns Uzbekistan's alleged expropriation of Plaintiffs' interest in an Uzbek joint venture, Coca-Cola Bottlers Uzbekistan Ltd. ("CCBU"), and Uzbekistan's related investigation into alleged criminal activities committed by Plaintiffs in Uzbekistan. Plaintiffs' interest in CCBU was held through their off-shore companies ROZ Trading Ltd. ("ROZ Trading"), a Cayman Islands company, and ROZ Trading Ltd. (Uzbekistan) ("ROZ(U)"), a company organized, located, and liquidated in Uzbekistan (collectively "ROZ"). Through these companies, Plaintiffs have pursued separate litigation and arbitration proceedings arising from their dispute with Uzbekistan against a number of defendants, including Uzbekistan and Uzpishcheprom Association ("Uzpishcheprom"), an Uzbek State-owned entity; The Coca-Cola Export Corporation ("TCCEC"); Defendant Zeromax GmbH ("Zeromax"), a Swiss-registered company with business activities in Uzbekistan; and various dissolved U.S. Zeromax affiliates.[1] In each of these actions, Plaintiffs allege that Zeromax conspired with Uzbekistan to illegally acquire their CCBU interest.

This latest action by Plaintiffs involves claims that Plaintiffs have been defamed by a website allegedly posted in 2006 containing reports of the criminal charges leveled against them and ROZ by Uzbekistan in or around 2001 and 2002. Complaint ("Compl.") ¶¶ 15-17, 34-36.

---

[1] *See ROZ Trading Ltd. v. Coca-Cola Export Corp., Uzbekistan, Uzpishcheprom Assoc., & Zeromax Group, Inc.*, Case No. SCH-4986 (Int'l Arbitral Centre of the Austrian Fed. Econ. Chamber) ("Vienna Arbitration"); *ROZ Trading, Ltd. v. Zeromax Group, Inc.*, Civ. No. 06-01040 (D.D.C.) ("ROZ Litigation").

The website in question, however, merely collects, quotes and cites official documentation from the Uzbek government substantiating the 2001-2002 charges at issue, as well as certain reports of said charges authored by various reputable news organizations, including the Associated Press, *Financial Times*, *Forbes Magazine*, and *The New York Times* (to name but a few). Moreover, for nearly four years before the website existed, Plaintiffs were the subject of countless press articles covering the same or similar alleged criminal activity.

The Complaint must be dismissed in its entirety for several independent reasons:

First, Plaintiffs have failed to plead any facts to support this Court's exercise of personal jurisdiction over Zeromax.

Second, the act of state doctrine bars Plaintiffs' claims because they require this Court to inquire into the falsity of the charges made by the Uzbek government within Uzbekistan against Plaintiffs and their companies.

Third, the Complaint fails to state a claim upon which relief may be granted.

With respect to the first ground for dismissal, Plaintiffs allege that Zeromax is indirectly responsible for the website. Compl. ¶¶ 20, 24. However, Plaintiffs do not allege that Zeromax — a Swiss company operating in Uzbekistan — is subject to the Court's personal jurisdiction. The Complaint fails to allege that Zeromax or its purported agent, Defendant GlobalOptions, Inc. ("GlobalOptions"), carried out any acts within the District, let alone any acts by GlobalOptions carried out at the direction of Zeromax and within the scope of purported authority. In addition, Plaintiffs have failed to allege any presence of their own in the District that could support any allegation of injury here.

Regarding the second ground for dismissal, the act of state doctrine precludes this Court's adjudication of Plaintiffs' claims because such claims are predicated upon this Court's

determination that the charges made by Uzbekistan against Plaintiffs were themselves false, and thus that the State's related exercise of its sovereign police power was unlawful. The act of state doctrine bars such a determination as it would impinge upon principles of international comity and due respect for the sovereignty among nations. Indeed, the act of state doctrine mandates that this Court deem valid the official acts of Uzbekistan taken within its own territory. *See, e.g.*, *World Wide Minerals, Ltd. v. Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).

Regarding the third ground for dismissal, Plaintiffs failed to state any claims upon which relief may be granted as a matter of law. The website statements at issue are absolutely protected by the common-law fair reporting privilege because they provide a fair and accurate account of official governmental acts and criminal proceedings concerning Plaintiffs that have been in the public domain for years — complete with full disclosure of sources. Finally, the statute of limitations bars the claims at issue.

## **BACKGROUND**

As is evident from the face of Complaint, the website and source documents incorporated therein by reference, and numerous widely published news reports pre-dating the alleged posting of the website, Plaintiffs' claims in this action, the ROZ Litigation, and the Vienna Arbitration all arise ultimately from the alleged sovereign acts of Uzbekistan.[2] Indeed, Plaintiffs allege that

---

[2] To aid the Court in its consideration of this motion, Zeromax hereby submits a copy of http://www.mansurmaqsudi.net, as well as the source documents cited therein. *See* Declaration of Nicole E. Erb dated October 30, 2007 ("Erb Decl.") Ex. A (attaching website) & Ex. B (attaching source documents). In ruling on a motion to dismiss under Rule 12(b)(6), the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Because the website and source documents are incorporated by reference in the Complaint, the Court may properly consider these materials. *Id.*; *accord Raymen v. United Senior Ass'n, Inc.*, 409 F. Supp. 2d 15, 20 (D.D.C. 2006).

the website at issue in this case was created in furtherance of a larger "campaign" in Uzbekistan

by the Uzbek government to "terrorize the Maqsudis and ROZ."  Compl. ¶ 13.  This purported

"campaign" lies at the heart of this case and the other legal proceedings that Plaintiffs, through

ROZ, have pursued on two different continents against Uzbekistan, the Uzbek State-owned

entity Uzpishcheprom, TCCEC, Zeromax and certain Zeromax affiliates.

In each of the three proceedings, Plaintiffs, individually or through ROZ, allege that the

government of Uzbekistan "target[ed] the Maqsudi family's commercial business" in Uzbekistan

through "sham judicial proceedings" and investigations intended to harass Plaintiffs that resulted

in the removal of ROZ's interest in CCBU.  *See* Compl. ¶¶ 12(d)-(e); First Amended Complaint

¶¶ 28-31, *ROZ Trading, Ltd. v. Zeromax Group, Inc.*, Civ. No. 06-01040 (CKK) (D.D.C.) ("ROZ

Compl.") (Erb Decl. Ex. D); Statement of Claims ¶¶ 3.38, 3.44, *ROZ Trading Ltd. v. Coca-Cola

Export Corp.*, Case No. SCH-4986 (Int'l Arbitral Centre of the Austrian Fed. Econ. Chamber)

(Erb Decl. Ex. E).[3]  Plaintiffs further allege in each case that Zeromax conspired with Uzbekistan

---

In addition, Zeromax submits copies of numerous other widely published news articles that pre-
date the alleged posting of the website in June 2006, demonstrating that reports of this dispute
and the allegations of Plaintiffs' criminal activity have long been in the public domain.  *See* Erb.
Decl. Ex. C (attaching press reports).  The Court may consider these press reports because they
are matters of public record of which the Court may take judicial notice.  *See* Fed. R. Evid. 201;
*Cerasani v. Sony Corp.*, 991 F. Supp. 343, 354 nn.2-3 (S.D.N.Y. 1998) (taking judicial notice, in
defamation action, of criminal trial testimony and "widespread newspaper coverage").  We note
they are not offered for the truth of the matter asserted, but only to show that these matters were
widely reported.

[3] As a public court filing, the First Amended Complaint in the ROZ Litigation is a matter of
public record and thus may properly be considered by the Court on a motion to dismiss.  *See* Fed.
R. Evid. 201; *Does I-III v. District of Columbia*, 238 F. Supp. 2d 212, 216-17 (D.D.C. 2000)
(holding "it is well established that courts are allowed to take judicial notice of matters in the
general public record, including . . . records of prior litigation") (quotation omitted).  ROZ
Trading's Statement of Claims in the Vienna Arbitration likewise is a matter of public record
that the Court may consider, as ROZ attached it to the papers filed in opposition to Zeromax's
motion to dismiss in the ROZ Litigation.

to "illegally acquire[]" ROZ's former CCBU interest years later.  Compl. ¶ 12(e); ROZ Compl.

¶¶ 41-56 (Erb Decl. Ex. D); Statement of Claims ¶¶ 3.58-3.63 (Erb Decl. Ex. E).

On the basis of these allegations, Plaintiffs have pursued claims for monetary and

equitable relief against Zeromax in this Court and in the Vienna Arbitration.  *See* ROZ Compl.

¶¶ 57-83 (Erb Decl. Ex. D); Statement of Claims ¶¶ 5.1-6.0 (Erb Decl. Ex. E).  They now seek

additional relief as a result of the website at issue here, which on its face merely documents the

sovereign acts of Uzbekistan at the heart of this dispute by quoting, citing and attaching copies of

certain Uzbek government documents and reputable news reports detailing the State's actions

against Plaintiffs and ROZ in Uzbekistan for alleged violations of Uzbek law.

## I.    PLAINTIFFS' CLAIMS AGAINST ZEROMAX IN THE ROZ LITIGATION AROSE FROM THE SOVEREIGN ACTS OF UZBEKISTAN

In the separate ROZ Litigation, ROZ has initiated claims in this Court against Zeromax

GmbH and three dissolved U.S. Zeromax affiliates (Zeromax Group, Inc., Zeromax Logistics,

Inc. and Zeromax LLC) (collectively, the "Zeromax Defendants") for (i) breach of contract;

(ii) tortious interference; (iii) conspiracy to commit tortious interference; (iv) conversion;

(v) conspiracy to commit conversion; (vi) action to quiet title; (vii) unjust enrichment; and

(viii) fraudulent conveyance.  *See* ROZ Compl. ¶¶ 57-83 (Erb Decl. Ex. D).  ROZ seeks, *inter*

*alia*, US$666 million in damages, injunctive relief and declaratory relief to quiet title to ROZ's

purported ownership interest in CCBU.  *Id.* at 23.

The Zeromax Defendants moved to dismiss the ROZ Complaint on several independent

grounds, including: (i) the Court lacks personal jurisdiction over Zeromax GmbH; (ii) the act of

state doctrine precludes the Court's inquiry into the legality of the alleged sovereign acts of

Uzbekistan; and (iii) ROZ failed to state a claim upon which relief may be granted.[4]  In support

of their motion, the Zeromax Defendants submitted a declaration of Uzbek law by Azamat R.

Fayzullaev ("Fayzullaev Declaration") pursuant to Rule 44.1 of the Federal Rules of Civil

Procedure to assist the Court in its consideration of Uzbek legal issues.  *See* Erb Decl. Ex. F

(attaching Fayzullaev Declaration).[5]  The Fayzullaev Declaration attached the Uzbek judicial

decisions and executive decrees through which the State removed Plaintiffs' interest in CCBU

for violations of Uzbek law, and established that those official government documents were all

valid, final and binding as a matter of Uzbek law.  *See* Fayzullaev Decl. ¶¶ 13-25 & Exs. A-I.

In particular, the official Uzbek documents submitted with the Fayzullaev Declaration

demonstrate that ROZ's interest in CCBU was first reduced through Uzbek judicial proceedings

initiated by the State Committee for the Demonopolization and Development of Competition of

the Republic of Uzbekistan (the "State Anti-Monopoly Committee") for violations of the Uzbek

anti-monopoly laws.  *See* Fayzullaev Decl. ¶¶ 14-15 & Ex. F (attaching February 5, 2002

decision of the Supreme Economic Court of the Republic of Uzbekistan affirming reduction of

ROZ Trading's interest in CCBU for anti-monopoly law violations).  The Uzbek courts later

liquidated ROZ(U) for failure to satisfy its charter capital requirements in violation of Uzbek

---

[4] The Zeromax Defendants moved to dismiss the ROZ Complaint on the additional grounds of
lack of subject-matter jurisdiction, *forum non conveniens*, and lack of standing.

[5] The Fayzullaev Declaration, and exhibits attached thereto, as submitted in the ROZ Litigation,
are a matter of public record of which this Court may take judicial notice on a motion to dismiss
pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See* Fed. R. Evid. 201; *Does
I-III*, 238 F. Supp. 2d at 216-17.  The Court also may take judicial notice of these documents in
making its act of state determination because "[c]ourts in the United States may take judicial
notice of a document evidencing an act of state."  Restatement (Third) of Foreign Relations Law
§ 443 cmt. i (1987).  Further, the Declaration addresses foreign law and judicial decisions which
this Court can consider as a matter of law under Rule 44.1 of the Federal Rules of Civil
Procedure.

law, and to recoup ROZ(U)'s debts to the State resulting from unlawful actions by ROZ management. *See* Fayzullaev Decl. ¶ 16 & Ex. G (attaching September 11, 2002 decision of the Supreme Economic Court noting ROZ(U)'s failure to pay its US$500,000 charter fund and ROZ(U)'s considerable debt to the State stemming from various "illegal actions of its founders"). Finally, the Uzbek courts removed ROZ Trading's remaining participatory interest in CCBU to pay ROZ(U)'s outstanding debts to the State. *See* Fayzullaev Decl. ¶ 16 & Ex. G.

In addition to detailing the removal of Plaintiffs' interest in CCBU, the Uzbek government documents submitted with the Fayzullaev Declaration establish the State's subsequent, formal acquisition of the CCBU interest. *See* Fayzullaev Decl. ¶¶ 19-20 & Ex. H (attaching Decree No. 420 of the Cabinet of Ministers of the Republic of Uzbekistan, dated July 5, 2002, pursuant to which Uzbekistan, through Uzpishcheprom, acquired ROZ's former CCBU shares). The official Uzbek documents further reflect the State's sale of the CCBU interest, years later, to the Uzbek-registered limited liability company Muzimpex in accordance with Uzbek privatization law. *See* Fayzullaev Decl. ¶¶ 21-25 (describing Uzbek denationalization and privatization laws) & Ex. I (attaching September 13, 2004 order of the State Committee of the Republic of Uzbekistan on Management of State Property approving the sale of the State-owned participatory interest in CCBU to Muzimpex). Zeromax GmbH is a shareholder in Muzimpex and thus, contrary to Plaintiffs' allegations (Compl. ¶ 12(e)), was not the entity that acquired their former interest in CCBU. *See* Fayzullaev Decl. ¶ 11 & Ex. D (attaching Muzimpex corporate charter, dated October 11, 2005, identifying Zeromax GmbH as a member).

On September 28, 2007, the Court dismissed Zeromax GmbH for lack of personal jurisdiction. *See ROZ Trading*, Civ. No. 06-1040 (CKK), 2007 WL 2812760, at *1 ("[T]he

Court concludes that it lacks personal jurisdiction over Defendant Zeromax GmbH, and therefore must dismiss Defendant Zeromax GmbH from this action as well as all claims brought against Zeromax GmbH."). Finding Zeromax GmbH's jurisdictional objections "highly significant" because "Zeromax GmbH represents the connection between Defendants and [ROZ's] alleged former interest in CCBU," *id.* at *4, the Court held in abeyance the remainder of the motion to dismiss and ordered the parties to file status reports indicating "how they wish to proceed in this litigation in light of the dismissal of Zeromax GmbH." *Id.* at *11-12. In its status report, ROZ advised the Court that it plans to continue the litigation against the remaining U.S. Zeromax Defendants. The U.S. Zeromax Defendants, in turn, requested leave to revise and supplement their motion papers in light of Zeromax GmbH's dismissal. By Minute Order dated October 23, 2007, the Court set a briefing schedule as agreed by the parties.

## II.    PLAINTIFFS' CLAIMS IN THE VIENNA ARBITRATION AROSE FROM THE SOVEREIGN ACTS OF UZBEKISTAN

ROZ Trading's allegations in the Vienna arbitration are largely duplicative of those in the ROZ Litigation, and thus also arise from the alleged sovereign acts of Uzbekistan. *See* Statement of Claims ¶¶ 1.0-3.63 (Erb Decl. Ex. E); *see also* Compl. ¶ 12 (noting "simultaneous[]" filing of ROZ Litigation complaint and Request for Arbitration "alleging damages arising from" the same events described in ¶¶ 12(a)-(e)). In contrast to the ROZ Litigation, however, ROZ Trading has pursued its claims in arbitration against the sovereign defendants Uzbekistan and Uzpishcheprom, as well as against TCCEC and Zeromax Group, Inc. Further, ROZ Trading limited its arbitration claims against Zeromax Group, Inc. to US $15 million. Statement of Claims ¶ 6.0.

On or about April 11, 2007, several months after Zeromax Group, Inc. had filed a Memorandum in Reply to the Statement of Claims raising multiple defenses on jurisdiction and

the merits, ROZ Trading voluntarily withdrew its claims against Zeromax Group, Inc. with prejudice to further arbitration proceedings in Vienna. On June 24, 2007, the Tribunal issued a partial award terminating the proceedings as to Zeromax Group, Inc., with prejudice to further arbitration proceedings in Vienna, and awarding costs in favor of Zeromax Group, Inc. in the amount of € 155,000 plus US $285,000. The award called for ROZ Trading to make payment within one month. To date, ROZ Trading has ignored and failed to fulfill its obligations under this award.

Upon information and belief, ROZ Trading continues to pursue its claims in arbitration against Uzbekistan, Uzpishcheprom and TCCEC.

## III.   THE CLAIMS IN THIS CASE ARISE FROM THE SAME SOVEREIGN ACTS OF UZBEKISTAN AT ISSUE IN THE ROZ LITIGATION AND VIENNA ARBITRATION

Plaintiffs allege that the website http://www.mansurmaqsudi.net (and certain other domain names linking to that site) posted purportedly false and defamatory statements relating to Plaintiffs' alleged involvement in criminal activities in or around 2001 and 2002. *See, e.g.*, Compl. ¶ 34. Specifically, paragraph 36 of the Complaint identifies several categories of allegedly defamatory statements concerning particular criminal violations: (i) "Criminal Code Violations"; (ii) "Illegal Registration of Roz Company"; (iii) "Charter Fund Fraud"; (iv) "Fraudulent Parallel Trading"; (v) "Illegal Profit-Making"; (vi) "Embezzlement"; (vii) "Profit Siphoning"; (viii) "Tax Evasion"; (ix) "Smuggling Cash Out of Uzbekistan"; (x) "Oil Embargo Violations"; (xi) "Selling Sugar on the Black Market"; and (xii) "Bribery." *Id.* ¶¶ 36(a)-(kk).

Although Plaintiffs admit that "[m]any of the website's statements cite to" documents "issued by the Uzbek government" (*id.* ¶ 35), they otherwise fail to describe the extent to which the website attributes its content to government and media sources. Indeed, Plaintiffs

conspicuously *omit* from the Complaint the extensive language from the website that expressly attributes its content to specific sources. *See id.* ¶¶ 36(a)-(kk); *see also* Chart of Website Statements and Source Documents (listing the source from the website for each alleged defamatory statement and highlighting the language omitted from the Complaint), Erb Decl. Ex. I. As a result, the Complaint erroneously suggests, implicitly if not explicitly, that the website author is directly responsible for the statements in question. This simply is not the case.

As is evident from the face of the website, the statements published therein are extensively noted and attributed to, if not directly quoted from, various official Uzbek government documents and news reports from reputable media sources. Further, the website uses italicized and non-italicized text to differentiate between "the author's comments" — which often explicitly identify their source both in the text of the website and in the footnotes — and "direct quotation from official documents and public information sources." Erb Decl. Ex. A. All statements on the website relate to Uzbekistan's exercise of its sovereign police power to investigate and initiate proceedings relating to the alleged criminal activities of Plaintiffs and ROZ in Uzbekistan and to enforce its own laws.

The official Uzbek government documents identified and quoted on the website include (i) a November 6, 2002 Resolution on Placement in Custody and Announcement on Search for Mansur Maqsudi from the Office of the Attorney General of the Republic of Uzbekistan, which details the criminal proceedings against Mansur Maqsudi and ROZ; (ii) a November 18, 2002 letter from the Office of the Public Prosecutor of the Republic of Uzbekistan to U.S. Attorney General John Ashcroft informing him of the criminal proceedings against Mansur Maqsudi, Farid Maqsudi and Abdul Rauf Maqsudi; (iii) an August 29, 2001 letter from Uzbek Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli describing the criminal

investigation against Plaintiffs; (iv) a letter from the State Taxation Committee of the Republic of Uzbekistan to the U.S. Internal Revenue Service detailing various criminal activities, including tax evasion, by the Maqsudi family and ROZ, and requesting assistance in connection with the Uzbek criminal case; and (v) a February 8, 2003 letter from the Deputy Attorney General of the Republic of Uzbekistan to the Minister of Justice of the United Arab Emirates describing the criminal case against ROZ and its affiliate, ValueLink FZE, and requesting assistance. The website provides direct links to copies of all but one of the documents, allowing the website visitors to review and evaluate these sources for themselves.

The reputable news media sources similarly sourced, quoted or linked on the website include the Associated Press, *Insight Magazine*, *Forbes*, *Financial Times*, and *The New York Times*. The news articles range in date from 1995 to 2003 — years before the alleged publication of the website — and report on the removal of Plaintiffs' interest in CCBU and the Uzbek government's criminal proceedings against Plaintiffs and ROZ. Specifically, the news media sources describe Plaintiffs' alleged involvement in criminal activities including, *inter alia*, misappropriating funds, fraudulent parallel trading, profit siphoning, evading taxes, and using CCBU to purchase embargoed oil products from Iraq and Iran. *See, e.g.*, Paul Klebnikov, *Coke's Sinful World*, Forbes Magazine, Dec. 22, 2003, available at http://www.forbes.com/forbes/2003/1222/086.print.html ("Coke has watched a well-funded bottler that was to be its gateway to central Asia wither amid charges of misappropriated funds, tax dodges and cozy inside deals.") (Erb. Decl. Ex. A-20); Douglas Burton, *Divorce Drama Goes International*, UPI Insight Magazine, Sept. 1, 2003, at 50 (reporting on allegations that "the Maqsudis violated international sanctions by using the Coca-Cola Bottling Co. in Tashkent to purchase embargoed oil products from Iraq and Iran in 2001 and then exported them elsewhere")

(Erb Decl. Ex. B-6). The website provides a direct link to one of the news articles; most others remain to this date readily available to any internet reader performing a simple search on a search engine, such as Google.

## IV.    PLAINTIFFS' ALLEGED ILLEGAL CONDUCT IN UZBEKISTAN HAS BEEN WIDELY REPORTED IN THE PUBLIC DOMAIN FOR YEARS

The Complaint and the documents incorporated by reference therein, as well as news reports readily available in the public domain, demonstrate that the joint venture between Plaintiffs and Coca-Cola drew the attention of journalists long before the alleged defamatory statements at issue were published. Specifically, the joint venture drew public interest because of its potential implications for the future of foreign investment in post-Soviet Uzbekistan. *See, e.g.*, Patricia Kranz, *Uzbekistan's Strongman Means Business – Karimov Offers Foreign Companies Stability and Perks*, BusinessWeek, June 19, 1995, at 27 (reporting that the joint venture between the Maqsudis and Coca-Cola was one of the reasons that "foreign investors are beginning to notice the regime's stability") (Erb Decl. Ex. B-1); Kevin Done, *Coca Cola Plans Asian Fizz*, Financial Times Mandate, Feb. 26, 1997 (reporting joint venture between Maqsudis and Coca-Cola was part of an overall strategy to "create a modern soft drinks production and distribution system throughout . . . Central Asia") (Erb Decl. Ex. C).

Indeed, in the mid-1990s the familial relationship between Plaintiffs (who reportedly had no previous bottling experience), and the highest echelons of the Uzbek government aroused public suspicions that there was nepotism behind the joint venture. *See, e.g.*, Compl. ¶ 12(c) (stating that "[d]uring the formation and early years of the joint venture," Mansur Maqsudi was married to Gulnora Karimova); *Uzbekistan's Strongman Means Business* ("The Coca-Cola franchise in Tashkent also has good connections. Mansur Maqsudi, president of the venture, is married to Karimov's daughter, while Mansur's brother, Farid, is chairman. Sounds quite cozy,

but Farid swears he does not get special favors.") (Erb Decl. Ex. B-2); Richard C. Paddock, *Uzbekistan Villagers Still Waiting for the State to Save Them*, L.A. Times, June 20, 2000, at 8 ("[A] Coca-Cola bottling plant that has a near-monopoly on nonalcoholic drinks is run by the president's son-in-law, Mansur Rauf Maqsudi.") (Erb Decl. Ex. C). Further, as noted above, Plaintiffs' alleged involvement in criminal activities has been widely reported in the press since 2003. *See, e.g.*, *Coke's Sinful World*, ("Coke has watched a well-funded bottler that was to be its gateway to central Asia wither amid charges of misappropriated funds, tax dodges and cozy inside deals.") (Erb. Decl. Ex. A-20); Douglas Burton, *Divorce Drama Goes International*, UPI Insight Magazine, Sept. 1, 2003, at 50 (Erb Decl. Ex. B-4 to B-6).

As early as 2003, Plaintiffs themselves have used the media to publicize their own version of the events concerning their failed joint venture with Coca-Cola. *See, e.g.*, *Coke's Sinful World* (reporting that "Mansur Maqsudi counters that he and his family are victims of a political vendetta . . . . He says his companies never made any profits on the Coca-Cola venture and they played an indispensable role in keeping the CCBU operation afloat.") (Erb Decl. Ex. A-22); *Divorce Drama Goes International* (describing interview with Mansur Maqsudi where he defended himself against the Uzbek government's allegations of illegal conduct) (Erb Decl. Ex. B-7). They reportedly even hired the law firm of a former U.S. congressman to represent them in "publicity wars." *Divorce Drama Goes International* (Erb Decl. Ex. B-5).

In short, for years before the publication of the website, press reports have circulated widely in the public domain about the dispute between Plaintiffs and the government of Uzbekistan, including media sources that have interviewed Plaintiffs and recounted their version of events. Plaintiffs' disingenuous attempt now to attribute these allegations to Zeromax through selective quotation from the website fails in the face of their widespread publicity.

## ARGUMENT

## I.    THE COURT LACKS PERSONAL JURISDICTION OVER ZEROMAX GMBH

Plaintiffs acknowledge that Zeromax is a Swiss-registered entity (Compl. ¶ 6) doing business in, *inter alia*, Uzbekistan. Compl. ¶¶ 12(a)-(e), 13. They do not allege that Zeromax has any presence in the District of Columbia. Indeed, this Court has recently held that it lacks general personal jurisdiction over Zeromax. *ROZ Trading*, 2007 WL 2812760, at *1. Instead, Plaintiffs allege in purely conclusory fashion that Zeromax is subject to specific personal jurisdiction under the District of Columbia long-arm statute on the basis that (i) Zeromax "transacted business" in the District, either directly or by its purported "agent" GlobalOptions; and (ii) Zeromax caused tortious injury in the District of Columbia by an act committed in the District of Columbia. Compl. ¶ 10.

When examining personal jurisdiction over a nonresident defendant, a court "must engage in a two-part inquiry," determining first whether jurisdiction lies under the forum's long-arm statute and then whether a finding of jurisdiction satisfies the constitutional requirements of due process. *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). Under District of Columbia law, Plaintiffs bear the burden of making a "*prima facie* showing of the pertinent jurisdictional facts." *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988). Plaintiffs cannot satisfy this burden with "[c]onclusory statements" or "bare allegation[s]," *id.* at 1378-79, but rather "must allege specific acts connecting the defendant(s) with the forum." *ROZ Trading*, 2007 WL 2812760, at *3. Because Plaintiffs have not alleged *any* specific acts connecting Zeromax to the District of Columbia, they have failed to meet their burden.

### A.    Plaintiffs Fail To Allege That Zeromax "Transacted Business" In The District Of Columbia

Plaintiffs' sole allegation that Zeromax "transacted business" in the District of Columbia appears in paragraph 10 of the Complaint, which contains the bare and unsupported legal conclusion that Zeromax "transacted business, either directly or by its agent GlobalOptions, Inc., in the District of Columbia, and the claims for relief arise from this transaction of business." Compl. ¶ 10 (citing D.C. Code § 13-423(a)(1)).  Plaintiffs do not explain the basis for or describe any acts or transactions of business — by Zeromax or its purported agent — in the District of Columbia.  Moreover, the "bare allegation of . . . agency is insufficient to establish personal jurisdiction."  *First Chicago*, 836 F.2d at 1378-79; *see also Sunlite, Inc. v. BfG Bank AG*, 849 F. Supp. 74, 76 (D.D.C. 1994) (dismissing for lack of personal jurisdiction where, *inter alia*, plaintiff "provide[d] no specific evidence to back up this claim of agency").

In short, paragraph 10 of the Complaint "literally parrots the relevant statutory language, proffering no factual allegations whatsoever to demonstrate that Plaintiffs' claims for relief arise out of business transacted in the District of Columbia." *ROZ Trading*, 2007 WL 2812760, at *9; *see also Novak-Canzeri v. Al Saud*, 864 F. Supp. 203, 206 (D.D.C. 1994) (holding jurisdictional allegations insufficient where "conclusory statements [we]re followed by boiler-plate allegations regarding [d]efendants' purported business contacts with the District").  As a result, Plaintiffs have failed to make a *prima facie* showing that Zeromax is subject to specific personal jurisdiction under § 13-423(a)(1).  *See City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 34 (D.D.C. 2007) (granting motion to dismiss for lack of personal jurisdiction where, *inter alia*, "transacting business" allegation was "merely a conclusory assertion that lack[ed] factual particularity").

**B.    Plaintiffs Fail To Allege That They Have Been Injured In The District Of Columbia By An Act Committed In The District**

Section 13-423(a)(3) of the District of Columbia long-arm statute "clearly separates the act from the tortious injury and affords personal jurisdiction over non-residents only when ***both act and injury*** occur in the District." *Margoles v. Johns*, 483 F.2d 1212, 1214 (D.C. Cir. 1973) (quotation omitted, emphasis added). As discussed in the preceding section, Plaintiffs have not alleged that Zeromax committed "an act or omission in the District of Columbia" that potentially could confer jurisdiction under § 13-423(a)(3). Moreover, even if Plaintiffs had asserted some act or omission by Zeromax in the District, they have not alleged — and, indeed, cannot allege — that any such act or omission "caus[ed] tortious injury ***in the District of Columbia***." *See* D.C. Code § 13-423(a)(3) (emphasis added). Indeed, Plaintiffs do not allege any connection with, or presence in, the District of Columbia that might support any allegation of injury in the District. Instead, they allege they live in New Jersey and did business in Uzbekistan. Compl. ¶¶ 1-4, 12.

Courts traditionally have held that defamation and false light claims "are the kind in which the injury, foreseeably, is felt with greatest force in the place where the plaintiff lives." *Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987). Courts have extended this principle to the context of internet publication on the basis that "[t]here is no nationwide jurisdiction for defamation actions, and the advent of the Internet . . . does not change that fact." *Mallinckrodt Med., Inc. v. Sonus Pharms., Inc.*, 989 F. Supp. 265, 272-73 (D.D.C. 1998) (granting motion to dismiss internet defamation claims where "neither plaintiffs nor [defendant] reside in, have their headquarters in or are incorporated in the District"); *see also Kline v. Williams*, No. Civ. A. 05-01102 (HHK), 2006 WL 758459, at *3 (D.D.C. Mar. 23, 2006) (finding "no indication that [plaintiff] suffered any harm particular to the District of Columbia" where she "maintains that

she is a resident of Maryland and fails to mention any particular link between her and the District that would yield a distinct harm here").

Plaintiffs claim in conclusory fashion that they have been injured "in their trade, profession, community standing, and business ethics" (Compl. ¶ 44), and "in their trade, profession, and community standing" (*id.* ¶ 54), and have "suffered significant loss of their reputation, shame, mortification, and injury to their feelings and occupation" (*id.* ¶ 57).[6] However, they fail to allege that any such tortious injury occurred in the District of Columbia. Indeed, all three Plaintiffs allege that they were residents of New Jersey "at all times relevant to this complaint." *Id.* ¶¶ 1-3. Further, they do not allege that they transact business of any kind in the District of Columbia, and they describe the business activities of their company ROZ Trading as taking place in Uzbekistan.[7] *See id.* ¶¶ 4, 12. Accordingly, Plaintiffs have failed to make a *prima facie* showing that Zeromax is subject to personal jurisdiction under § 13-423(a)(3). *See Mallinckrodt*, 989 F. Supp. at 273 (granting motion to dismiss where "there is no indication that

---

[6] While the Maqsudis allege they have been injured in their trade and profession, Mansur Maqsudi recently submitted a declaration in the related ROZ Litigation attesting as its president that ROZ's "primary business activities" in New Jersey since 2001 are its "winding up" efforts through this lawsuit, the ROZ Litigation and the Vienna Arbitration. *See* Supplemental Declaration of Mansur Maqsudi ¶¶ 4, 8 (Erb Decl. Ex. G). It is, therefore, difficult to conjure what possible injury the disputed website could have caused to the Maqsudis' trade or profession in 2006, where their business has not engaged in any trade since 2001. In addition, Mansur Maqsudi affirmed in another declaration dated December 11, 2006, that ROZ was engaged in business in Central Asia and the Middle East. *See* Declaration of Mansur Maqsudi ¶ 7 (Erb Decl. Ex. H).

[7] Indeed, in holding that Zeromax GmbH was not subject to specific jurisdiction under § 13-423 in the ROZ Litigation, this Court found that "the Amended Complaint alleges that ROZ was organized under the laws of the Cayman Islands and has its principal place of business in New Jersey, and that ROZ(U) was organized under the laws of, and had its principal place of business in, Uzbekistan. As such, it is difficult to understand how either Plaintiff could have been injured in the District of Columbia (and the Amended Complaint does not include a specific allegation to that effect)." *ROZ Trading*, 2007 WL 2812760, at *9.

plaintiffs themselves suffered any injury in the District of Columbia that they could not have suffered or did not suffer in any state in the nation where someone may have read the [previously published internet] message and reacted negatively").

## II.    THE ACT OF STATE DOCTRINE BARS PLAINTIFFS' CLAIMS

Plaintiffs' claims turn upon the validity of criminal charges and proceedings brought against Plaintiffs by the Uzbek government in Uzbekistan.  Plaintiffs rely fundamentally upon the premise that the information on the website "relate[s] to or [is] part of the sham audits and investigations initiated by Uzbekistan" (Compl. ¶ 35), and that the criminal charges described on the website (and in the news reports and official Uzbek government documents presented and cited therein) are false.  *See, e.g.*, *id.* ¶ 34 (alleging that the website "falsely portray[s] Plaintiffs as being involved in . . . criminal and disreputable activities"); ¶ 35 ("Many of the website's statements cite to highly unreliable documents issued by the Uzbek government . . . .").

Plaintiffs have thus placed squarely at issue the legitimacy of Uzbekistan's criminal proceedings against them for criminal code violations, company registration violations, charter fund fraud, fraudulent parallel trading, illegal profit-making, embezzlement, profit siphoning, tax evasion, cash smuggling, oil embargo violations, selling sugar on the black market, and bribery. *See* Compl. ¶¶ 36(a)-(kk).  Adjudication of Plaintiffs' claims would require Plaintiffs to prove, and this Court to pass judgment on, the falsity of the Uzbek criminal charges and proceedings and therefore the unlawfulness of Uzbekistan's exercise of its sovereign police power forming the basis of the allegedly defamatory website statements.  *See, e.g.*, *Tavoulareas v. Piro*, 817 F.2d 762, 783 (D.C. Cir. 1987) (finding that plaintiff "was required to prove falsity at trial in order to prevail").

The act of state doctrine, however, "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its

own territory." *World Wide Minerals, Ltd. v. Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)).   Premised on principles of "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations," *World Wide Minerals*, 296 F. 3d at 1164 (quoting *Sabbatino*, 376 U.S. at 408), the act of state doctrine is not simply a doctrine of abstention.  Rather, it serves as "a rule of decision for the courts of this country, which requires that in the process of deciding a case, ***the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid***."  *World Wide Minerals*, 296 F.3d at 1165 (internal citations and quotations omitted) (emphasis added).

The exercise of state police power and regulatory authority at the heart of this case — i.e., the Uzbek government's criminal proceedings against Plaintiffs in Uzbekistan and the removal of Plaintiffs' interest in CCBU — represent quintessential sovereign acts of state.[8]  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) ("[A] foreign state's exercise of the power of its police has long been understood . . . as peculiarly sovereign in nature."); *Philippine Nat'l Bank v. U.S. Dist. Ct. of Hawaii*, 397 F.3d 768, 772-73 (9th Cir. 2005) (finding forfeiture action by Philippine government to recover property allegedly stolen from state treasury an act of state requiring application of act of state doctrine); *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326 (11th Cir. 2003) (holding that a government's regulation of the market, use of police power or other activities requiring state authority are public acts); *United States v. Merit*, 962 F.2d 917, 921 (9th Cir. 1992) (holding act of state doctrine precluded examination of South

---

[8] The United States has recognized the Republic of Uzbekistan as a sovereign state since December 25, 1991, following the breakup of the Soviet Union.  *See, e.g.*, *Background Note: Uzbekistan*, U.S. Department of State, Bureau of South and Central Asian Affairs (March 2007), *available at* http://www.state.gov/r/pa/ei/bgn/2924.htm.

Africa's failure to issue a warrant under its extradition statute, because "[e]ven if the Republic did disregard its own laws in failing to issue a warrant of extradition, this court cannot question the validity of South Africa's domestic actions"); *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 24 n.8 (D.D.C. 2000) (finding it "clear that the Act of State doctrine would apply to the actions of the Chinese government defendants" in case "aris[ing] out of an alleged abuse of China's police power"); *First Merchants Collection Corp. v. Republic of Argentina*, 190 F. Supp. 2d 1336, 1337, 1340 (S.D. Fla. 2002) (holding pursuant to act of state doctrine that court was "precluded from inquiring into the validity of Argentina's actions" where law enforcement officials had confiscated merchandise "pursuant to a criminal investigation").

Moreover, the act of state doctrine applies equally in the defamation context, thus precluding this Court from inquiring into or making any determination as to the truthfulness or falsity of the Uzbek criminal charges and documents at issue in this case. *See, e.g.*, *Galu v. SwissAir*, No. 86 Civ. 5551 (CSH), 1987 WL 15580, at *3 (S.D.N.Y. Aug. 3, 1987) (holding defamation plaintiff "precluded by the act of state doctrine from denying in this Court the truth of [a] condemnation by Swiss authority" and dismissing defamation claim where SwissAir employees called plaintiff a "criminal" in reliance upon government expulsion order describing "criminal investigation" against her); *DeRoburt v. Gannett*, 548 F. Supp. 1370, 1384 (D. Haw. 1982) (dismissing libel action because "proof of the elements of the libel cause of action invariably would require the court, with the finder of fact, to inquire into areas that would violate the policies of the act of state doctrine").[9]

---

[9] The application of the act of state doctrine in the defamation context is consistent with the preservation of immunity of foreign states for claims arising out of libel or slander and those based upon the exercise of a discretionary function of a government official. *See* 28 U.S.C. § 1605(a)(5)(A)-(B); *Gregorian v. Izvestia*, 871 F.2d 1515, 1522 (9th Cir. 1989) (affirming dismissal of libel claim against foreign sovereigns under § 1605(a)(5)(B)).

Indeed, under the act of state doctrine, the Court must deem valid the official acts of the Uzbek government carried out within its own sovereign territory. *See World Wide Minerals*, 296 F.3d at 1164; *Galu*, 1987 WL 15580, at *3; *DeRoburt*, 548 F. Supp. at 1384. Because Plaintiffs' claims would require Plaintiffs to prove, and this Court to find, that the criminal investigations, judicial proceedings, official decrees and documents executed by the Uzbek government in the exercise of its sovereign police power and regulatory authority were a fabricated "sham," the act of state doctrine bars adjudication of the Complaint.

## III. PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is appropriate when, as here, the complaint fails to state any claim for which relief may be granted. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). In determining whether Plaintiffs have stated a claim, the Court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Id*; *see also Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007) ("[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'") (citations omitted).

### A. Choice Of Law

In this diversity action, the Court must determine the proper law applicable to Plaintiffs' claims. *See Young Women's Christian Ass'n v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002) ("Because there is diversity of citizenship among the parties to this litigation, the law of the forum state supplies the choice of law standards."). To determine which state's law applies, the Court looks to the choice-of-law rules prevailing in the District of Columbia. *Id.* The

District of Columbia applies the governmental interest analysis. *See Vaughan v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 200 (D.C. 1997). When applied to a defamation action, the "weight of authority considers that the law to be applied is . . . [that of] the place where the plaintiff suffered injury by reason of his loss of reputation." *Dowd v. Calabrese*, 589 F. Supp. 1206, 1210 (D.D.C. 1984) (explaining that the weight of authority considers that the applicable law in federal diversity defamation action is not the place where the offending article was written, researched or published, but the place of claimed loss of reputation) (citing Restatement (Second) of Conflict of Laws § 150 cmt. e (1971)).

Plaintiffs have failed to allege, nor can they, that they suffered any loss to their reputation (or any injury whatsoever) in the District of Columbia (or for that matter, in any other jurisdiction). Rather, Plaintiffs state conclusorily that they have been "injured . . . in their trade, profession, community standing, and business ethics." Compl. ¶ 44. This conclusory allegation lacks any factual support and does not inform the choice-of-law analysis. Potentially applicable jurisdictions, however, would appear to be New Jersey, as Plaintiffs' alleged place of residence and admitted place of winding up their Uzbek business,[10] and the District of Columbia, as either the alleged place of business of Defendant GlobalOptions or as the default law of the forum state. The law of the District of Columbia and that of New Jersey, however, are substantially the same for the torts alleged for purposes of this motion to dismiss. Thus, for the Rule 12(b)(6) grounds of dismissal that turn on substantive state law issues, the choice-of-law analysis presents a false conflict and the Court may apply D.C. law to the state law issues. *See Geico v. Fetisoff*,

_____

[10] *See* Supplemental Declaration of Mansur Maqsudi ¶¶ 4, 8 (Erb Decl. Ex. G). We further note that the dispute arises out of ROZ and the Maqsudis' business activities in Uzbekistan which allegedly ceased in 2001, while the website at issue allegedly was posted in 2006.

958 F.2d 1137, 1141 (D.C. Cir. 1992) (holding that D.C. law applies as law of forum state where no true conflict exists among the laws of the potentially interested jurisdictions).

    **B.    The Complaint Fails To State Claims For Defamation And False Light Invasion Of Privacy**

Plaintiffs purport to allege three causes of action against Zeromax: (i) defamation; (ii) libel *per se*; and (iii) false light invasion of privacy.  As a preliminary matter, libel and slander are subcategories of defamation; there is no separate cause of action for defamation.  *See Prins v. Int'l Tel. & Tel. Corp.*, 757 F. Supp. 87, 90 (D.D.C. 1991) (citations omitted) (describing "defamation action" as "libel or slander") (citations omitted); *Walko v. Kean Coll. of New Jersey*, 561 A.2d 680, 687 (N.J. Super. Ct. Law Div. 1988) ("If there is no defamation, then by definition there is no libel"); *see also* Restatement (Second) of Torts § 568 cmt. b (1977) (describing "slander and libel" as "the two forms of defamation").  Therefore, Plaintiffs' Counts I and II must be converged into a single count.

To state a claim for defamation, a plaintiff must plead: (i) the assertion of a false and defamatory statement made by defendant concerning plaintiff; (ii) the unprivileged publication of that statement to a third party; and (iii) fault amounting at least to negligence by the publisher.  *Klayman v. Segal*, 783 A.2d 607, 613 n.4 (D.C. 2001); *DeAngelis v. Hill*,  847 A.2d 1261, 1267-68 (N.J. Sup. Ct. 2004).

To state a claim for false light invasion of privacy, a plaintiff must demonstrate that: (i) the false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (ii) the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.  *DeAngelis*,  847 A.2d at 1271.

Plaintiffs' claims of both defamation (libel *per se*) and false light invasion of privacy fail because the Complaint (i) is barred by the fair report privilege and (ii) is barred by the statute of limitations. *See Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) (finding that the privileges and defenses applicable to defamation also apply to false light invasion of privacy claims) (citing *White v. Fraternal Order* of Police, 909 F.2d 512, 518 (D.C. Cir. 1990)).

### 1.    Plaintiffs' Claims Are Barred By The Fair Reporting Privilege

The fair reporting privilege is an exception to the harsh common-law republication rule under which "the republisher of defamation is deemed to have adopted the underlying defamatory statements as his own." *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990). The privilege is grounded in the recognition that the public has both the right and the need to know what is being done and said in government. *See Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 31 (D.D.C. 1995); *Darakjian v. Hanna*, 840 A.2d 959 (N.J. Super. Ct. App. Div. 2004) (noting same). In particular, the privilege "extends broadly to the report 'of any official proceeding or agency of government.'" *White*, 909 F.2d at 527 (quoting Restatement (Second) of Torts § 611 cmt. d (1977)); *Sedore v. Recorder Publ'g Co.*, 716 A.2d 1196, 1204 (N.J. Super. Ct. App. Div. 1998) (noting same). Further, once a report is "deemed 'official,' an accurate publication of its contents is privileged, regardless of their veracity." *Harper v. Walters*, 822 F. Supp. 817, 824 (D.D.C. 1993); *Orso v. Goldberg*, 665 A.2d 786, 790 (N.J. Super. Ct. App. Div. 1995) (requiring only that the report provide a "substantially correct account"); *see also* Restatement § 611 cmt. f (noting same).

In recognition of the important public interest it serves, courts have applied an expansive interpretation of the fair reporting privilege. *See, e.g.*, *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 81-82 (D.C. 1980) (acknowledging expansive definition of "official proceeding" to extend privilege beyond judicial proceedings to "reports of any proceedings before any court . . .

and reports of bodies which are authorized to perform public duties, as well as reports of any official proceeding *or action taken by any officer or agency of government*") (emphasis added); *Harper*, 822 F. Supp. at 824 (holding fair report privilege protected news report of EEOC notices of adverse action involving allegations against plaintiff of sexual misconduct); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 713-14 (4th Cir. 1991) (holding that private research firm's reprimand letter to scientist qualified as a sufficiently official source for fair report protection); *Medico v. TIME, Inc.*, 643 F.2d 134, 138 (3d Cir. 1981) (holding magazine's summary of FBI report connecting plaintiff to organized crime was a protected "report of an official action or proceeding" even though the information did not lead to arrest or prosecution).

Case law addressing the applicability of the fair reporting privilege to reports of official acts or proceedings of foreign governments is sparse. *See* 1 Robert D. Sack, *Sack on Defamation: Libel, Slander and Related Problems* § 7.3.2.2.4, at 7-28 (3d ed. 2007) (noting same). Although neither the D.C. Circuit nor the D.C. Court of Appeals has addressed the issue, one district court judge in this jurisdiction has declined to extend the privilege. *See OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 42 (D.D.C. 2005) (Bates, J.) (declining to extend fair reporting protection to article detailing Russian criminal investigation). That court's rejection of the privilege, however, does not address any of the policy rationales that compel extension of the privilege to reports of foreign governmental acts or proceedings.

The better view is that the privilege should apply, because the public's need to be informed of such official acts or proceedings is no less great when those acts or proceedings are those of a foreign sovereign government. *See Friedman v. Israel Labour Party*, 957 F. Supp. 701, 712-13 (E.D. Pa. 1997) (applying fair report privilege to reports that the Israeli government had barred U.S. citizens from entering Israel because the public interest was served in "learning

important matters" of legitimate public concern).  The court in *Friedman* held that the policy rationales underlying the privilege supported its application to fair and accurate reports of foreign governmental acts.  *Friedman*, 957 F. Supp. at 712-713.  The court found that the public supervision rationale (i.e., the public's ability to potentially play a large role in the affairs of a foreign government through indirect supervision) and the informational rationale "loomed large" where, in that case, the disputed articles detailed official acts of a foreign government against U.S. citizens based on their alleged illegal conduct.  *Id.* at 713.  These policy rationales apply equally in this case where Plaintiffs, U.S. citizens, are the subject of detailed criminal charges involving their alleged corrupt activities in a foreign country.

In his dissent in *Lee v. Dong-A Ilbo*, Judge Kaufman also recognized a desire to strike the balance between the "need to protect an individual's reputation and the American public's need to have knowledge of the acts of foreign governments."  849 F.2d 876, 880 (4th Cir. 1988) (Kaufman, J., dissenting).  Indeed, the public's need to know about the acts of foreign governments would be unacceptably suppressed by outright rejection of the privilege simply because foreign governments are "not necessarily familiar, open, reliable or accountable" to the American public.  *Id.* at 881-882.[11]

Moreover, as Judge Kaufman opined, reliability determinations by U.S. courts concerning foreign governments might be eliminated where, as is the case here, an author properly attributes his sources.  *Id.*  Proper attribution establishes the transparency of a disputed

---

[11] Plaintiffs' assertion that the legitimate acts of a foreign state's governmental bodies should be summarily disregarded is entirely speculative and without probative value.  Courts in the United States are not permitted to disregard the operation of a foreign sovereign's laws or legal system on the basis of alleged corruption or authoritarian rule.  *See Zschernig v. Miller*, 389 U.S. 429, 440 (1968) (state court decisions refusing to acknowledge operation of laws in communist regimes or Nazi Germany improperly intrude into foreign policy arena left to the Executive Branch).

report, thus allowing the public the freedom to assess the credibility of the foreign source for itself. *Id.*[12]

This approach also minimizes the potential impact of the report on an individual's reputation where the public can and, as Judge Kaufman noted, likely will, discredit the foreign government source more often than not "when that government is perceived in this country as not treating its citizens fairly by American standards." *Id.* at 882. This principled approach — placing strong emphasis on the subject-matter of the material and de-emphasis on the openness and reliability of the foreign government in question — fosters the public's ability to have indirect supervision of foreign governments (i.e., promotes transparency) and to gain access to information that might not otherwise be available.[13] All of these reasons militate in favor of protecting reports of foreign government official acts and proceedings.

_____

[12] Indeed, in the context of the neutral reportage privilege, courts have held a source's "dubious reputation for reliability" to be irrelevant. *See, e.g., Barry v. TIME, Inc.*, 584 F. Supp. 1110, 1126 (N.D. Cal. 1984) (holding privilege does not depend on "trustworthiness" of individual or organization making the alleged defamatory remarks), cited with approval in *In re United Press Int'l*, 106 B.R. 323, 328 (D.D.C. 1989) (applying neutral reportage privilege where defendant had republished charges made by a local newspaper regarding plaintiff's alleged involvement in organized crime). In *Barry*, the source was a convicted felon. 584 F. Supp. at 1126. The neutral reportage privilege, like the fair reporting privilege, serves the "'public interest in being fully informed about controversies that often rage around sensitive issues'" and affords reporters the "'freedom to report such charges without assuming responsibility for them.'" *Barry*, 584 F. Supp. at 1124 (quoting *Edwards v. Nat'l Audubon Soc'y*, 556 F.2d 113, 117 (2d Cir. 1977)).

[13] Importantly, Judge Kaufman further observed that failing to strike the public interest balance in applying the privilege to foreign government acts and proceedings produces the untenable result that courts would find themselves in the situation of marshaling trials where plaintiffs endeavor to prove the falsity of those acts and proceedings. *Id.* at 882. As stated in Section II, *supra*, the act of state doctrine precludes precisely this type of judicial review. Judge Kaufman noted that, at a minimum, a qualified privilege — where a major criterion for its application focused on the "importance of the publication to the American reader" — may help to prevent the court from "violating principles of comity." *Id.*

Here, the website's allegedly defamatory statements are protected by the fair report privilege because they are a fair account of official acts of the Uzbek government in connection with alleged illegal activities in Uzbekistan. Those official governmental acts and proceedings include: (i) investigation of Plaintiffs' alleged illegal business activities and resulting criminal charges; (ii) the initiation and prosecution of judicial proceedings to redress charter fund fraud by Plaintiffs' company, ROZ, resulting in the ultimate removal by the State of ROZ's interest in CCBU; and (iii) requesting U.S. assistance to apprehend Plaintiffs. *See, e.g.*, Compl. ¶ 35 & Erb Decl. Ex. A-8 to A-11, A-13 to A-14, A-18 to A-19, A-31 to A-32 (attaching Uzbek government documents included on website); Erb Decl. Ex. E (attaching judicial decision regarding charter fund fraud as Ex. G to Fayzullaev Decl.).

Although the Complaint conspicuously omits the actual sources of the disputed website statements, replacing them in some instances with ellipses (e.g., Compl. ¶ 36c), the face of the website demonstrates that its author directly attributed its reports of the official government acts at issue to various Uzbek officials, including the Uzbek Deputy Foreign Minister Sadyk Safayev, Uzbek Ambassador Shavkat Khamrakulov and the Uzbek Deputy Attorney General Rashitijon Kadirov, as well as to Uzbek government documents. *See* Erb Decl. Ex. A-8 to A-11, A-13 to A-14, A-31 to A-32; *see also* Erb Decl. Ex. I (Chart of Website Statements and Source Documents) (highlighting language from the website omitted from the Complaint); *Lee*, 849 F.2d at 885 (Kaufman, J., dissenting) (stating that proper attribution of sources will tend to decrease risk of incidental defamation). Indeed, not only were the website author's foreign sources disclosed, but they were included as pages in the website that could be accessed and directly downloaded by the public. *See* Erb Decl. ¶ 3. Furthermore, the author cited and quoted reputable news organizations, including *Forbes Magazine*, *Insight Magazine* and the Associated

Press, which themselves had reported the Uzbek governmental acts and proceedings involving Plaintiffs' alleged illegal activities in Uzbekistan.  *See* Erb Decl. Exs. A-20 to A-23,  B-4 to B-8, B-56 to B-59 (attaching news articles).

Application of the fair report privilege to foreign documents is particularly appropriate in this case.  Here, the foreign governmental acts involve criminal charges against U.S. citizens in a frontier country for foreign investment doing business with a multi-million dollar American company, Coca-Cola, which has "attained an important place in American culture."  *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 435 (5th Cir. 1987) (holding labor disputes at Coca-Cola bottling plant in Guatemala were of public concern in context of "limited public figure" analysis); *see also Friedman*, 957 F. Supp. at 712 ("Information concerning a United States citizen who is allegedly planning 'illegal activities in Israel' is of legitimate and significant interest to the American public.").

Moreover, the public interest element is heightened when the foreign government in question, like Uzbekistan in this case, has sought the assistance of U.S. branches of government in connection with said criminal charges.  *See, e.g.*, Erb Decl. Ex. A-13 to A-14 (attaching Letter from O.B. Murodov, Office of Uzbekistan's Public Prosecutor to U.S. Attorney General John Ashcroft, United States Department of Justice (Nov. 18, 2002) (requesting U.S. assistance in Maqsudi criminal investigation)).

*    *    *

In sum, the mass media is one of the few sources through which the public can learn of the inner workings of other systems of government.  In many instances, such knowledge is crucial to inform the public debate on U.S. foreign policy concerns particularly involving U.S. multinationals and residents.  Depriving fair report protection to reports of official acts of foreign

governments "would effectively stand international reporting on its head" where such reporting would undoubtedly become inhibited by fear of tort liability. *Friedman*, 957 F. Supp. at 713. Accordingly, the website should be afforded fair report privilege and Plaintiffs' claims should be dismissed.

**2.     The Complaint Is Barred By The Statute Of Limitations**

As pleaded, Plaintiffs' claims are untimely and must be dismissed.  Defamation and false light invasion of privacy claims are governed by a one-year statute of limitations in the District of Columbia.  *See* D.C. Code § 12-301(4) (2001) (prescribing one-year for libel claims); *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1086 (D.C. Cir. 2007) (applying D.C. one-year statute of limitations to defamation and false light claims) (quoting *Mittleman v. United States*, 104 F.3d 410, 415 (D.C. Cir. 1997)); *see also* N.J.S.A. 2A: 14-3 (2000) (one-year limitations periods for libel).[14]

The District of Columbia, like most common-law jurisdictions, has adopted the "single publication" rule regarding the accrual of libel claims.  *Jankovic*, 494 F.3d at 1087 (citing *Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001) ("Defamation occurs on publication, and the statute of limitations runs from the date of publication.")); *Churchill v. New Jersey*, 876 A.2d 311, 319 (N.J. Super. Ct. App. Div. 2005) (same).  That is, "'for purposes of the statute of limitations in defamation claims, a book, magazine, or newspaper has one publication date, the date on which it is first generally available to the public.'"  *Jankovic*, 494 F.3d at 1087 (internal quotations omitted).  This rule applies to Internet publications.  *Id*;

---

[14] D.C. choice-of-law rules treat statute of limitations as procedural.  *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995).  Therefore, even if another state's or country's law were to apply to the substantive claims, D.C. choice-of-law principles mandate application of the District's own statute of limitations.  *Id.*; *Namerdy v. Generalcar*, 217 A.2d 109, 113 (D.C. 1966).

*Churchill*, 876 A.2d at 483 (holding that Internet defamation claims were barred by one-year statute of limitations under the single publication rule).[15]

Accordingly, to plead a claim for libel, the Complaint must allege the time and place of publication.  *See Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 458, 465 (D.D.C. 1994) ("All defamation averments must be pled with particularity.").[16]  Here, the Complaint fails to allege any date of publication and should be dismissed on this basis.  *See id*.

Instead, the Complaint alleges only that "mansurmaqsudi.net" and "faridmaqsudi.net" were registered on June 9, 2006, and that "'mansurmaqsudi.com' registered on July 6, 2006 automatically directed viewers to the 'mansurmaqsudi.net' website ***containing the defamatory statements***."  Compl. ¶¶ 14, 16 (emphasis added).  Thus, the Complaint effectively alleges that Plaintiffs' claims accrued on June 9, 2006 (or as of July 6, 2006) and became time-barred after June 9, 2007 (or July 6, 2007).  The Complaint, however, was not filed until July 11, 2007 — over one month later.[17]

Moreover, Plaintiffs' claims were not resurrected upon the alleged registration of two other domain names on August 25, 2006, because as alleged, those websites did not contain any defamatory statements (or any information).  Rather, as alleged, those websites simply re-routed

---

[15] *See also Van Buskirk v. New York Times Co.*, 325 F.3d 87, 89-90 (2d Cir. 2003) (holding that under the single publication rule, claim accrued on the date the challenged letter was posted on the Internet).

[16] *See also* 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1309 (1990) ("In libel and slander suits, the ***time*** and place of the publication should be specifically stated in the complaint.") (emphasis added).

[17] As pleaded, the defamatory statements were arguably published on June 9, 2006.  (Compl. ¶ 14.)  Otherwise, the Complaint can only be read as alleging that the defamatory statements were published by July 6, 2006, at the latest, when "'mansurmaqsudi.com' automatically directed viewers to the 'mansurmaqsudi.net' website ***containing the defamatory statements***."  Compl. ¶ 16 (emphasis added).

viewers back to the original publication on June 6, 2006. Compl. ¶ 16. Under the single-publication rule, the date of the original publication governs and the claims must be dismissed. *See Jankovic*, 494 F.3d at 1087.

Lastly, perhaps anticipating that their claims may be time-barred, the Complaint alleges that Plaintiffs "became aware of these websites in early October 2006." Compl. ¶ 18. This allegation presumably attempts to lay the foundation for application of the "discovery rule" to toll the statute of limitations. However, the D.C. Court of Appeals has expressly ruled that the discovery rule is inapplicable to defamation claims involving the mass media. *See Mullin*, 785 A.2d at 299 ("In defamation cases, at least where mass media are involved, the fact of . . . injury can be readily determined, and thus any resulting defamation claims will accrue for purposes of the statute of limitations at the time the injury actually occurs, i.e., publication") (internal quotation omitted); *Lawrence v. Bauer Publ'g & Printing Ltd.*, 396 A.2d 569, 375 (N.J. Sup. Ct. 1979) (same). Since the advent of Internet defamation claims, courts have routinely held that the mass media includes the Internet and flatly rejected application of the discovery rule to such claims.[18]    Accordingly, Plaintiffs' claims are time-barred, and the Complaint should be dismissed.

---

[18] *See, e.g.*, *Atkinson v. McLaughlin*, 462 F. Supp. 2d 1038, 1056 (N.D. Dakota 2006) (deciding that the discovery rule is inapplicable in website/internet defamation claims where the allegedly defamatory statements are publicly available); *Abate v. Maine Antique Digest*, No. 03-3758-JLS, 2004 WL 293903, at *2 (Mass. Super. Jan. 26, 2004) (rejecting plaintiff's argument that the court should apply the discovery rule to toll the statute of limitations for his internet defamation claim); *Long v. Walt Disney Co.*, 10 Cal. Rptr. 3d 836, 841-42 (Cal. Ct. App. 2004) (deciding that the discovery rule did not toll tort action's accrual against a company that posted plaintiffs' computer-altered childhood likenesses on the internet).

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should grant Zeromax's motion and dismiss the

Complaint in its entirety with prejudice.


Dated: October 30, 2007                    Respectfully submitted,
            Washington, D.C.

                                                        **WHITE & CASE** LLP

                                                        / s / Carolyn B. Lamm
                                                        Carolyn B. Lamm (D.C. Bar No. 221325)
                                                        Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
                                                        Nicole E. Erb (D.C. Bar No. 466620)
                                                        701 Thirteenth Street, N.W.
                                                        Washington, D.C. 20005
                                                        Telephone: (202) 626-3600
                                                        Facsimile: (202) 639-9355

                                                        Kevin T. Baine (D.C. Bar No. 238600)
                                                        Jonathan Kravis (D.C. Bar No. 973780)
                                                        **Williams & Connolly LLP**
                                                        725 Twelfth Street, N.W.
                                                        Washington, D.C. 20005
                                                        Telephone: (202) 434-5010
                                                        Facsimile: (202) 434-5018

                                                        *Attorneys for Defendant Zeromax GmbH*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                    )
MANSUR MAQSUDI., *et al.*,           )
                                    )
                *Plaintiffs*,         )
                                    )
        v.                          )          1:07-CV-01252 RJL
                                    )
GLOBALOPTIONS, INC., *et al.*,       )
                                    )
                *Defendants*.         )
_____)


## DECLARATION OF NICOLE ERB

I, Nicole Erb, declare as follows:

1.      I am an attorney with the law firm White & Case LLP, resident in Washington, D.C., and counsel for Defendant Zeromax GmbH ("Zeromax"). I submit this declaration in support of the Memorandum of Points and Authorities in Support of Zeromax's Motion to Dismiss the Complaint in this case.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the inactive website http://www.mansurmaqsudi.net, as accessed on October 24, 2006 (exhibit pages A-1 to A-36).

3.      Included as part of **Exhibit A** are true and correct copies of the following documents, which were included as pages of the website that could be accessed and downloaded directly:

    i.      Resolution on Placement in Custody and Announcement on Search for Mansur Maqsudi from the Office of the Attorney General of the Republic of Uzbekistan dated November 6, 2002 (exhibit pages A-8 to A-11);

    ii.     Letter from the Office of the Public Prosecutor of the Republic of Uzbekistan to U.S. Attorney General John Ashcroft dated November 18, 2002 (exhibit pages A-13 to A-14);

     iii.   Letter from the State Taxation Committee of the Republic of Uzbekistan to the U.S. Internal Revenue Service (exhibit pages A-18 to A-19); and

     iv.   Letter from the Deputy Attorney General of the Republic of Uzbekistan to the Minister of Justice of the United Arab Emirates dated February 8, 2003 (exhibit pages A-31 to A-32).

4.     Also included as part of **Exhibit A** is a true and correct copy of the following magazine article to which the website provided a direct link:

     i.   Paul Klebnikov, *Coke's Sinful World*, Forbes Magazine, Dec. 22, 2003, *available at* http://www.forbes.com/forbes/2003/1222/086.print.html (exhibit pages A-20 to A-23).

5.     Attached hereto as **Exhibit B** are true and correct copies of press reports and documents that are referenced as sources on the website http://www.mansurmaqsudi.net:

     i.   Patricia Kranz, *Uzbekistan's Strongman Means Business – Karimov Offers Foreign Companies Stability and Perks*, BusinessWeek, June 19, 1995, at 27, *available at* 1995 WLNR 3471600 (exhibit pages B-1 to B-3);

     ii.   Douglas Burton, *Divorce Drama Goes International*, UPI Insight Magazine, Sept. 1, 2003, at 50, *available at* 2003 WLNR 13925870 (exhibit pages B-4 to B-8);

     iii.   The Embassy of Afghanistan, *Afghan Businessmen Raise $20 Million for Rebuilding Afghanistan*, Oct. 3, 2005, *available at* http://www.embassyofafghanistan.org/embpress/pre7.html (exhibit pages B-9 to B-10);

     iv.   Website for the Afghanistan Reconstruction Company, LLC, *available at* http://www.afghanrc.com (exhibit pages B-11 to B-52);

     v.   Valeriy Shokhin, A*merican-Uzbek Swindlers are Wanted by Uzbekistan Authorities*, Novaya Gazeta, July 31, 2003, *available at* http://forum.arbuz.com/showthread.php?t=9518 (exhibit pages B-53 to B-55);

     vi.   The Associated Press, *Family Feud in Uzbekistan Hurts Coca-Cola*, Nov. 20, 2002 (exhibit pages B-56 to B-57);

    vii.   David Stern, *Uzbekistan Offers Rich Pickings for Leader's Daughte*r, FIN. TIMES, Aug. 19, 2003 at 8, *available at* 2003 WLNR 8157409 (exhibit pages B-58 to B-62);

    viii.   Richard Lezin Jones, *Judge Sets U.S. Court as Venue in International Custody Case*, N.Y. TIMES, Sept. 13, 2002, *available at* http://nytimes.com (exhibit pages B-63 to B-64); and

    ix.   Letter from Uzbekistan Ambassador Shavkat Khamrakulov to U.S. Senator Robert Torricelli dated August 29, 2001 (exhibit pages B-65 to B-66).

6.    Attached hereto as **Exhibit C** are true and correct copies of a selection of press reports available in the public domain:

    i.   Kevin Done, *Coca-Cola Plans Asian Fizz*, FIN. TIMES MANDATE, Feb. 26, 1997, *available at* 1997 WLNR 4766488 (exhibit page C1);

    ii.   Richard C. Paddock, *Uzbekistan Villagers Still Waiting for the State to Save Them*, L.A. TIMES, June 20, 2000 at 8, *available at* 2000 WLNR 8388234 (exhibit pages C-2 to C-5);

    iii.   *When the Cola Wars Came to Uzbekistan*, WALL ST. J., Aug. 30, 2001, *available at* http://archive.muslimuzbekistan.com/eng/ennews/2001/08/ennews30082001.html (exhibit pages C-6 to C-9);

    iv.   David Stern, *Marital Strife Leaves Coca-Cola Flat*, FIN. TIMES, July 19, 2002, *available at* 2002 WLNR 6747683 (exhibit pages C-10 to C-12);

    v.   David Stern, *Marital Strife Leaves Coca-Cola Flat*, FIN. TIMES U.K., July 20, 2002, *available at* 2002 WLNR 6788640 (exhibit pages C-13 to C-15);

    vi.   Richard Lezin Jones, *Love Divorce and the Hague Treaty; New Jersey Case is Really an International Dispute*, N.Y. TIMES, Sept. 12, 2002, *available at* http://nytimes.com (exhibit pages C-16 to C-18);

    vii.   Margaret Coker, *Family Feud in Uzbekistan Entraps Coke*, ATLANTA J. & CONST., Nov. 20, 2002 at A1, *available at* 2002 WLNR 4666067 (exhibit pages C-19 to C-22);

    viii.   Associated Press, *Caught Up in a Feud*, COLUMBUS LEDGER-ENQUIRER, Nov. 21, 2002 at B9, *available at* 2002 WLNR 1917264 (exhibit pages C-23 to C-24);

ix. Margaret Coker, *Divorce Takes Fizz Out of Coke in Uzbekistan*, PALM BEACH POST, Nov. 24, 2002 at 3F, *available at* 2002 WLNR 1984883 (exhibit pages C-25 to C-28);

x. Margaret McHugh, *Maqsudi Keeps International Custody Fight Alive*, THE STAR LEDGER, Jan. 5, 2004, *available at* http://archive.muslimuzbekistan.com/eng/ennews/2004/01/ennews050120 04a.html (exhibit pages C-29 to C-32);

xi. Mary Dejevsky, *The Runaway Princess*, HAMILTON SPECTATOR, Jan. 10, 2004, at 1, *available at* 2004 WLNR 5998354 (exhibit pages C-33 to C-42);

xii. Peter Baker, *Battle Royal*, THE WASH. POST, Apr. 13, 2004, at C01, *available at* http://www.washingtonpost.com/ac2/wp-dyn/A6874-2004Apr12?language=printer (exhibit pages C-43 to C-49);

xiii. Julian Conan, *Bitter Divorce Threatens Unlikely Alliance at the Heart of War on Terror*, TELEGRAPH NEWS, Apr. 18, 2004, *available at* http://www.telegraph.co.uk (exhibit pages C-50 to C-52);

xiv. Edward Alden, *Coke is Accused of Being Too Cosy with the Karimovs*, FIN. TIMES, June 13, 2006, *available at* 2006 WLNR 10300924 (exhibit pages C-53 to C-57);

xv. Edward Alden & Andrew Ward, *Coca-Cola Accused Over Uzbek Venture*, FIN. TIMES U.K., June 14, 2006, *available at* 2006 WLNR 10170402 (exhibit pages C-58 to C-60);

xvi. *Coca-Cola Accused of Conspiring with Uzbek Government*, TIMES CENT. ASIA, June 15, 2006, *available at* 2006 WLNR 10383577 (exhibit pages C-61 to C-62); and

xvii. Margaret McHugh, *Coke Accused of Abandoning Exec*, THE STAR LEDGER, June 21, 2006 at 19, *available at* 2006 WLNR 10710397 (exhibit pages C-63 to C-66).

7.      Attached hereto as **Exhibit D** is a true and correct copy of the First Amended Complaint dated and filed on September 1, 2006 in *Roz Trading, Ltd. v. Zeromax Group, Inc.*, No. 06-01040 (CKK) (D.D.C.) (Docket Entry No. 8).

8.      Attached hereto as **Exhibit E** is a true and correct copy of the Statement of Claims dated and filed on June 6, 2000 in *Roz Trading, Ltd. v. Coca-Cola Export Corp.*, Case No. SCH-4986 (Int'l Arbitral Centre of the Austrian Fed. Economic Chamber), and which was also filed as Exhibit 4 to Plaintiffs' Memorandum in Opposition to the Zeromax Defendants' Consolidated Motion to Dismiss the Amended Complaint in its Entirety in *Roz Trading, Ltd. v. Zeromax Group, Inc.*, No. 06-01040 (CKK) (D.D.C.) (Docket Entry No. 16-5).

9.      Attached hereto as **Exhibit F** is a true and correct copy of the Declaration and Exhibits A-I of Azamat R. Fayzullaev dated November 6, 2006 and filed as Attachments 1-10 to the Zeromax Defendants' Consolidated Motion to Dismiss the Amended Complaint in its Entirety in *Roz Trading, Ltd. v. Zeromax Group, Inc.*, No. 06-01040 (CKK) (D.D.C.) (Docket Entry No. 15-1 to 15-10).

10.     Attached hereto as **Exhibit G** is a true and correct copy of the Supplemental Declaration of Mansur Maqsudi dated September 26, 2007, which was filed as Exhibit 1 to the Plaintiffs' Response to the Court's Order Dated September 24, 2007 in *Roz Trading, Ltd. v. Zeromax Group, Inc.*, No. 06-01040 (CKK) (D.D.C.) (Docket Entry No. 22).

11.     Attached hereto as **Exhibit H** is a true and correct copy of the Declaration of Mansur Maqsudi dated December 11, 2006, which was filed as Exhibit 1 to the Plaintiffs' Opposition to the Zeromax Defendants' Consolidated Motion to Dismiss the Complaint in its Entirety in *Roz Trading, Ltd. v. Zeromax Group, Inc.*, No. 06-01040 (CKK) (D.D.C.) (Docket Entry No. 16-1).

12.     Attached hereto as **Exhibit I** is a Chart of Website Statements and Source Documents.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of October, 2007, in Washington, D.C.


/s/ Nicole Erb
Nicole Erb

Erb Declaration

Exhibit A

Mansur Maqsudi Interpol Warrant



# Mansur Maqsudi

Home

Family
Members

*This website contains information on Mansur Maqsudi and other members of the Maqsudi family. It documents the Maqsudi family's criminal activities according to official documents and public information sources.*

*Everything in italics on this website is the author's comments. Everything else is a direct quotation from official documents and public information sources.*

## Criminal Violations

- *Introduction*

- *Criminal Code Violations*

- *Roz Company Illegally Registered*

- *Charter Fund Fraud*

- *Fraudulent Parallel Trading*

- *Illegal Profit-Making*

- *Embezzlement*



## Text Information from
## Actual Interpol Warrant

## Wanted

A-1

Mansur Maqsudi Interpol Warrant

Page 2 of 3

**Mansur Maqsudi**
6 November 2002

## Legal Status

Present Family Name: MAQSUDI

Forename: MANSUR MAQSUDI

Sex: Male

Date of birth: 6 February 1967 (39 years old)

Place of birth: Republic of Afghanistan

Language spoken: Russian, English, Uzbek

Nationality: USA

## Physical Description

Height: n/a

Weight: n/a

Colour of eyes:n/a

Colour of

Hair:n/a

## Offences

Categories of Offences:

**Abuse one's power or official proxy committed with th[e]
of the particularly great damage. The official forgery,
committed on large scale. The plundering by appropri[ate]
embezzlement. The illegal trade or mediation activity
violation of the trade and service rules. The evasion f[rom]
payment of taxes or other payments. The legalisation
received by the criminal activity. The extortion.**

Arrest Warrant Issued by:
Republic of Uzbekistan

## IF YOU HAVE ANY INFORMATION CO[NCERNING]

YOUR NATIONAL OR LOCAL POLICE

- *Profits Siphoned Off*
- *Tax Evasion*
- *Cash Smuggled Out of Uzbekistan*
- *Oil Embargo Violations*
- *Selling Sugar on Black Market*
- *Bribery*
- *Size of Criminal Activity*
- *Money Conversion Violations*

10/24/2006

http://www.mansurmaqsudi.net/

A-2



**Home**

**Family Members**

# Family Members

*Mansur Maqsudi's brother is Farid Maqsudi and their father is Abdul Rauf Maqsudi.*

*Farid was the Vice President of Maqsudi Corporation and Chairman of the Coca-Cola Bottlers of Uzbekistan.[1] Farid is also a founding member and Vice Chairman of the Afghan Investment Company (AIC)[2] and President of the Afghanistan Reconstruction Company, LLC (ARC).[3]*

**"All of them are wanted by Interpol. The Uzbek authorities accuse the [former] owners of Roz Trading Ltd. on money laundering, extortion, office forgery, deliberate evasion from taxes, large-scale bribery and organizing of system of illegal transactions with the largest American companies by imitation of export of their production to Uzbekistan."[4]**

*According to Insight magazine,* **"the elder Maqsudi rose to riches on the tide of the Soviet invasion of Afghanistan in 1979. A. Zulfiqar, an opponent of the Karimov regime, published an op-ed in the newspaper ERK for Jan. 16, 1994, charging that Abdurauf Maqsudi had a long history of fraud and embezzlement. He allegedly was imprisoned in Afghanistan in 1972 for misusing funds lent to him by the government of Afghanistan and later allegedly stole millions of dollars from the regime installed in Kabul after the Soviet takeover in 1979."[5]**

**"According to Zulfiqar, Abdurauf Maqsudi began exporting fruit to the Soviet Union in the 1960s and after a time came under the wing of former Afghan prime minister Hoshim Sharq, who was believed to have ties to the Russian KGB. Maqsudi was installed by the Soviets as chairman of the Afghan-Soviet Council during the regime of Babrak Karmal, and in this capacity traveled frequently to Moscow, according to Zulfiqar's report and other sources contacted by Insight."[6]**

**"Zulfiqar claims the Soviets granted Maqsudi a bank credit worth $3 million with which he was supposed to purchase replacement parts for light machinery. They allegedly were left empty-handed when Maqsudi relocated to the United States and opened an electronic-equipment store in New York City."[7]**

**Click here to go back**

---

1. "Uzbekistan's Strongman Means Business." *Business Week.* June 19, 1995.

2. "Afghanistan Businessmen Raise $20 Million for Rebuilding Afghanistan." The Embassy of Afghanistan. October 3, 2005.

3. **www.afghanrc.com.**

4. "American-Uzbek Swindlers Are Wanted by Uzbekistan Authorities." Novaya Gazeta. July 31, 2003.
5. "Divorce Drama Goes International." Insight. September 1, 2003.
6. "Divorce Drama Goes International." Insight. September 1, 2003.
7. "Divorce Drama Goes International." Insight. September 1, 2003.

A-4



Home

Family
Members

# Introduction

*Coca-Cola Botting Uzbekistan (CCBU), established on 25 August 1993, was originally a joint venture involving three entities, each owning 33.3 percent of the company:*

1. *Roz Trading, Ltd - Mansur Maqsudi, Farid Maqsudi, and Ralf Abdul Maqsudi.*
2. *Coca-Cola Export Corporation.*
3. *Pishprom, an Uzbek state property committee.*

*Around April 2001, government auditors began to uncover illegal schemes involving CCBU and Roz Trading. As explained by Uzbekistan Ambassador Shavkat Khamrakulov, during a "routine regular audit" of Coca-Cola Bottlers Uzbekistan Ltd. (CCBU) and Roz Trading, Ltd. "serious violations of the law [were] revealed by Uzbekistan's tax agencies."[1]*

*According to Uzbek Deputy Foreign Minister Sadyk Safayev, the Maqsudis "committed lots of misdeeds, like violations of tax law, violations in sales regulations, and violations of human rights in the plant here."[2]*

*On 6 November 2002, Interpol issued a warrant for the arrest of Mansur Maqsudi.*

*For failing to pay back taxes and other offences, the joint venture was terminated in April 2005 and the remaining assets were liquidated.*

**Click here to continue to Criminal Code Violations**

**Return to go back**

---

1. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.
2. "Family Feud in Uzbekistan Hurts Coca-Cola." Associated Press. 20 November 2002.

A-5



Home

Family
Members

# Criminal Code Violations

*The Maqsudis were convicted of the following criminal violations of the Criminal Code of the Republic of Uzbekistan:*

- **Larceny By Embezzlement** (Article 167, Part 3, Point A) - "Larceny by way of embezzlement of property entrusted to or transferred to disposition of a guilty person shall be punished with a fine from one hundred to three hundred minimum monthly wages or correctional labour for up to two years or confinement for up [to] five years." Point A is Larceny by embezzlement in a "large amount."
- **Taxes or Other Payment Evasion** (Article 184, Part 3) - "Intentional concealment or understatement of profit (income) or other taxable objects as well as other evasion from taxes, duties, or other payments, established by the State, in large amount, after infliction shall be punished with fine up to one hundred and fifty minimum ... to three hundred minimum monthly wages, or correctional labour from two to three years, or imprisonment up to three years." Part 3 refers to a "large amount."
- **Legalization of Revenue from Criminal Activities** (Article 243) - "Legalization of revenue received from criminal activities that is a transfer, conversion, or exchange of property, which has been obtained [as a] result of criminal activities, as well as non-disclosure or concealment of original nature, source, location, way of disposal, movement, genuine rights in relation to the property or ownership thereof in the instance if such property has been obtained as a result of criminal activity shall be punished with imprisonment from ten to fifteen years.
- **Forgery in Office** (Article 209, Part I) - Forgery in office, that is, entering knowingly false information and notes to official documents, falsification or making and issuance of knowingly false documents from mercenary or other motives, result[ing] in significant damage to the rights or legitimate interests of individuals, or to [the] state or public interests shall be punished with [a] fine from one hundred to three hundred minimum monthly wages, or deprivation of certain rights up to five years, or correctional labour up to two years, or imprisonment up to three years.
- **Acceptance of Bribe** (Article 210, Part 3, Point A) - Acceptance of [a] bribe, that is, knowingly illegal acceptance of tangible valuables by an official, personally or through an intermediate person, or acquisition of pecuniary benefit for performance or nonperformance of certain action, which he must or could have officially performed, in the interests of the person giving a bribe shall be punished with imprisonment from five to ten years. Point A refers to the acceptance of a bribe of an "especially large amount."
- **Extortion** (Article 165, Part 3, Point A) - "Extortion, that is demand to transfer someone's property or the right to someone's property, or to provide property preferences, or to commit actions related to property under the threat of application of violence over a victim or his immediate persons, or of damage or destruction of property, or of disclosure of information which the victim and the said persons want to keep undisclosed, or by making the situation that compels the victim to transfer his property or the right thereto shall be punished with imprisonment from ten to fifteen years".[3]

**A-6**

*Mansur Maqsudi also committed the following crimes, according to the Deputy Attorney General of the Republic of Uzbekistan.*[4]

- **Abuse of Power or Office** (Article 205, Part 2, Points A, B, C) - "Abuse of power or office, that is, intentional use of office by an official, which caused large damage or significant damage to the rights or legally protected interests of individuals or to the state or public interests shall be punished with fine from three hundred to six hundred minimum monthly wages, or imprisonment up to five years and deprivation of certain rights." Point A is "with causing especially large damage." Point B is "in the interests of an organized group." And Point C is "by an authorized official."
- **Fraud** (Article 168, Part 3, Points A, B) - "Fraud, that is, acquisition of someone's property or the right thereto by deception or abuse or confidence shall be punished with fine from three hundred to six hundred minimum monthly wages, or correctional labour up to three years, or imprisonment from five to ten years. Point A is "in large amount" and Point B "by a special dangerous recidivist."
- **Illegal Trading or Intermediary Activity** (Article 188, Part 3, Points A, B) - "Performance of trading or intermediary activity with evasion from registration in compliance with the established procedures with the purpose of obtaining uncontrollable profit (income) committed: [Point] A in especially large amount; [Point] B by an organized group or in its interests - shall be punishable with fine from three hundred to six hundred minimum monthly wages and deprivation of certain right up to three years, or imprisonment for up to five years."

**Click here to continue to Roz Company Illegally Registered**

**Click here to go back**

---

3. Federal Criminal Code and Rules (1995 Edition).

4. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Click here to download full text**

Placement in custody and
on search for Maqsudi Mansur Ahmed

« Sanctioned"

by the Deputy Attorney General of the
Republic of Uzbekistan
Legal adviser
_____ _____ H.H.
November _06_ 20



## RESOLUTION
/on placement in custody and announcement on search /

November 6, 2002                                    city of Tashkent

Murodov O.B., the investigator of the Department on crimes investigations under the Office of Public Prosecutor of the Republic of Uzbekistan, the 2-d class lawyer has examined the materials of the criminal case N 119, and

### Decided:

Maqsudi Mansur Ahmed, the citizen of the USA, working since 01.01.1993 at the Foreign Enterprise "ROZ Trading LTD" (Republic of Uzbekistan) as a Chairperson, has joined the sustainable group organized by his father, Maqsudi Abdul Rauf, with intent to make illegal business.

Maqsudi Mansur Ahmed, knowing wittingly that according to the legislation of the Republic of Uzbekistan foreign enterprises with 100% of foreign investment are granted by considerable privileges on taxation, coverted to use that right with the intent of personal illegal enrichment, on May 12,1993 Maqsudi Mansur Ahmed together with his father Maqsudi Abdul Rauf and his brother Maqsudi Farid Ahmed presented forged documents of the Foreign Enterprise "ROZ Trading LTD" registered at offshore area at Cayman Island (United Kingdom) that had not yet been registered with the office of the Governor of Cayman Island at the moment of establishment the office.

Using these forged documents the above mentioned Foreign Company became a founder of a branch of foreign enterprise "ROZ Trading LTD" in the city of Tashkent. In constitutive documents on creation of enterprise Maqsudi Mansur Ahmed indicated the charter fund at an especially large scale of 500.000 US dollars.

During the period of his criminal activity Maqsudi Mansur Ahmed, from 1995 to 2000 as a member of the organized criminal group, without creation of a charter fund in the amount of 500.000 USD used the privileges of the foreign economic entity and within the indicated period intentionally evaded paying taxes in the amount of 438.032.000 sum having the commodity turnover in the amount of 24.518.190.000 sum, i.e. in an especially large volume.

On January 5,1994 an import contract on consignment terms for the delivery of consumer goods for the amount of 200 million USD was concluded between "ROZ

A-8

Trading LTD" (Cayman Island, United Kingdom) located in the offshore zone "ROZ Trading LTD" (Uzbekistan). It was signed by Maqsudi Mansur Ahmed on behalf of "ROZ Trading LTD" (Uzbekistan) and on behalf of "ROZ Trading LTD" (Cayman Island, United Kingdom) it was signed by his brother, Maqsudi Farid Ahmed who in his turn afterwords signed additional agreements for the delivery of macaroni products, sugar, flour, chocolate products, children's nourishment, tea, cigarettes, chewing gum and other consumer goods in this case on behalf of "ROZ Trading LTD" (Uzbekistan). In accordance with the contract all payments for goods bought by "ROZ Trading LTD" (Uzbekistan) were made by money transfer to the account of "ROZ Trading LTD" (Cayman Island, United Kingdom) at the Credit Swiss Bank (Switzerland). During contract period lasted from 1995 till 1997 the consumer goods for sum total of 106.020,6 thousand US dollars were delivered into Uzbekistan.

"ROZ Trading LTD" (Uzbekistan) possessed a license that provides the right of priority conversion of hard currency and the certificate of the participant of the foreign economic activity N EP-A/587 issued on July 7, 1993, and with the intent of embezzlement of property that was entrusted to the guilty and was at his possession, i.e. illegal profit-making from state budget money that was converted in the Republic of Uzbekistan for importing consumer goods, Maqsudi Mansur Ahmed used his official position and showed in a cargo customs declaration overestimated prices of imported goods of "ROZ Trading LTD" (Uzbekistan) at the rate of 15%-34% over the fixed prices indicated in the invoices for rendering the marketing services supposedly which factually were not carried out and served as a method of embezzlement of property.

Therefore, within the specified period by overestimating prices in the CCD by 34% 2.822,04 thousand USD had been stolen out of the received import goods in the the amount of 11.122,16 thousand USD. By means of overstating prices of goods in the customs declarations by 15 % 12.242,31 thousand USD had been stolen out of received import goods in the amount of 93.857,76 thousand USD. In total 15.064,35 thousand USD or 994.247.000 sum, i.e. in especially large size, was embezzled from the state resources.

On August 12, 1999 Maqsudi Mansur Ahmed, being a member of the above mentioned organized criminal group, used defraud means and concluded a credit trade contract № 2/99 for consumer goods in the amount of 6.000.000 USD between "ROZ Trading LTD" (Cayman Island, United Kingdom) and the Foreign Enterprise "ROZ Trading LTD" (Uzbekistan) with the intent of converting to his possession the property in especially large value and in the interests of the organized criminal group. On September 13,1999 this contract was registered at the Ministry of Foreign Economic Relations of the Republic of Uzbekistan under № 21902294.

In 2000 and the first half of 2001 according to the above mentioned contract and under the pretext of satiation of the market of the Republic of Uzbekistan by consumer goods, Maqsudi Mansur Ahmed imported 41.328.600 kgs of sugar in the amount of 14 459 500 USD (4.255.358.700 sum) into the Republic of Uzbekistan. The retail prices for the indicated sugar were at the rate of 161,62 – 294,02 sum and fixed by the administration of the Foreign Enterprise "ROZ Trading LTD"(Uzbekistan).

On summer 2000 Maqsudi Mansur Ahmed, developed a criminal plan to sell the above mentioned sugar at overestimated prices by deffaud and abuse of clients

A-9

not created factually by the founders and agreed share in the ____
resources and other property was not brought into the Republic.

On November 26, 2001 the activity of Foreign Enterprise "ROZ Trading
LTD" was terminated by the decision of the Economic Court and the procedure on
its elimination was appointed.

According to the decision of tax department dated December 29, 2001, due
to violation of tax and currency regulations in the course of its registration and
activity from 1995 till 2001, an additional tax payments and financial penalties in
the amount of 12.459.842,2 thousand sum were charged extra, from which    6
mln.138 thousand USD was concealed. In accordance with the legislation of the
Republic of Uzbekistan similar violations are qualified as tax evasion by mean of
concealment of income by an economic entity.

According to the decisions of the Economic Court dated, April 24, 2002 and
June 3, 2002 the Foreign Enterprise "ROZ TRADING LTD" was adjudged
bankrupt and with purpose of paying off its obligations with budget and other
creditors the share of "ROZ TRADING LTD" (Cayman Island), the founder of the
Joint Venture "Coca Cola Ichimligy Uzbekistan LTD", in the amount of 23,416%
(9.877.069,7 thousand sum) was separated from the property of the Joint Venture
"Coca Cola Ichimligy Uzbekistan LTD" for the benefit of "ROZ TRADING LTD"
(Uzbekistan). On October 22, 2002 the decisions on this share redistribution of
the Charter fund of the Joint Venture "Coca Cola Ichimligy Uzbekistan LTD" was
adopted by the General Meeting of its founders, including representatives of
"Coca Cola Corporation" (Atlanta, USA). Later procedure of corresponding
reregistration of  constituent documents at the Ministry of Justice of the Republic
of Uzbekistan was conducted.

According to the materials  of investigation Abdul Rauf Maqsudi being a
member of the criminal group organized by himself and by means of  fraud, bribe
taking and extortion  converted to his possession  the amount of 1,6 billion sum or
3 million 933 thousand USD.

Besides, the members of the Maqsudi family purposefully oversetimated the
cost of contracts for delivery of consumer goods to Uzbekistan  by including the
expenditures for marketing and teaching services which factually were not carried
out. By those contracts they illegally received hard currency in the amount of 33
million 992 thousand USD.

In the course of investigation of illegal activity of the Foreign Enterprise
"ROZ TRADING LTD" it was found that while doing  multiple transactions with
firm "VALUELINK FZE" registered at a free economic zone Jabel Ali Free Zone
P.O.Box 17502 Dubai, UAE, through that firm trade transactions of oil products
and cotton lint in the sum of 15.938.572,82 USD and 4.594.224,97 USD
correspondingly were made. As a  result  of accomplished operations in the

A-10

By his actions, Maqsudi Mansur Ahmed committed crimes stipulated by article 205, part 2, points "A,B and C"; Art. 209, part 1; Art. 210, part 3, point "A", Art. 168, part 3, points "A,B", Art. 167, part 3, points "A,B", Art. 188, part 3, points "A,B", Art. 189, part 3, Art. 184, part 3, Art 243, Art. 165, part 3, points "A,B" of the Criminal Code of the Republic of Uzbekistan.

Taking into the consideration the fact that Maqsudi Mansur Ahmed has committed serious crimes and is absconding, guided by articles 36, 236, 237, 240, 242-244, 365 of the Criminal Procedure Code of the Republic of Uzbekistan

## RESOLVED:

1. To choose placement in custody and announcement on search as a measure of restraint regarding Maqsudi Mansur Ahmed, born in 1967, Republic of Afghanistan, Uzbek by nationality, citizen of the USA, married, has higher education, has not previous criminal record, hold position of a Chairperson of the Foreign Enterprise "Roz Trading Ltd", private address: 3 Manchester, Denvil New Jersey 07834, USA.
2. The Ministry of Internal Affairs shall be responsible for the implementation of search measures according this Resolution.
3. To deport an accused Maqsudi Mansur Ahmed from the time of detention to UYA-64/IZ-1 GUIN of the Ministry of Internal Affairs of the Republic of Uzbekistan.
4. To send a copy of the present resolution to the Attorney General of the Republic of Uzbekistan.

The investigator of the crimes investigation under the Office of _____ of the Republic of Uzbekistan _____  O.B.Murodov

I am informed about the content of the resolution on_____2002

Accused                                    Maqsudi Mansur Ahmed

A-11



Home

Family
Members

# Roz Company Illegally Registered

*Mansur Maqsudi, Rauf Abdul Maqsudi, and Farid Maqsudi are charged by Uzbekistan authorities with the violation of Article 209, Part I regarding "official forgery."*

*On 12 May 1993, the Maqsudis falsely registered Roz Trading, Ltd. as a foreign enterprise in Uzbekistan.[5]*

*As explained by the Uzbekistan Office of Public Prosecutor, when registering the company, the Maqsudis "presented forged documents to the authorities of Uzbekistan on the parent enterprise that had not yet been registered in the territory of Cayman Islands by that time. Thus, the listed persons registered the foreign enterprise in the Republic of Uzbekistan by false statement."[6]*

**Click here to continue to Charter Fund Fraud**

**Click here to go back**

---

5. "Divorce Drama Goes International." Insight Magazine. 1 September 2003.

6. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002. **Click here to download full text**

A-12

From: the Office of Public Prosecutor
of the Republic of Uzbekistan
Uzbekistan, Tashkent Post code 700000,
66, Academic Gulamov Street

Attn.: Mr.John Ashcroft,
Attorney General of the USA

Re: Addition to the solicitation on
rendering legal assistance on criminal
case N 119, dated December 25,2001
registered under N18/5

November _18_ ", 2002
N 18/5-2002

Dear Mr.Ashcroft,

The Office of Public Prosecutor of the Republic of Uzbekistan expresses its
respect to the Office of Attorney General of the United States of America. In
addition to the earlier solicitation N18/5, dated December 25,2001 on rendering
legal assistance the Office of Public Prosecutor of the Republic of Uzbekistan
would like to inform about the results of the criminal case investigation against
citizens of the USA, namely: Abdul Rauf Maqsudi, Mansur Ahmed Maqsudi,
Farid Ahmed Maqsudi, against Article 167, part 3, point "A" (misappropriation by
organized group  of property intrusted to guilty by appropriation and
embezzlement in especiall large value), Article 168, part 3, point "A" (conversion
of property to his own possession in especially large value by fraud), Article 184,
part 3 (intent tax evasion in especially large value), Article 243 (legalization of
profit received by criminal way), Article 209, part 1 ( official forgery), Article 210,
part 3, point "A" (bribe taking in especially large value), Article 165, part 3, point
"A" (extortion in especially large value) of the Criminal Code of the Republic of
Uzbekistan. According to the Federal Criminal Code and Rules (1995 Edition,
supersedes 1994 Edition and Supplement), crimes therebefore correspond to the
crimes stipulated by Title 18 – Crimes and Criminal Procedure, Chapter 25 -
Counterfeiting and Forgery, Sec. 495, 513; Chapter 31 – Embezzlement and Theft,
Sec. 643,647,648,654,660

In the course of investigation it was determined that the citizens of the USA,
namely: Abdul Rauf Maqsudi, Mansur Ahmed Maqsudi,  Farid Ahmed Maqsudi
doing  business in the Republic of Uzbekistan,  while registrating the Foreign
Enterprise "ROZ TRADING LTD" presented forged documents to the authorities
of Uzbekistan on the parent Enterprise that had not yet  been registered in the
territory of Cayman Island by that time. Thus, the listed persons registered the
Foreign Enterprise in the Republic of Uzbekistan by false statement.

Furthermore, according to the Charter of the  Enterprise set up in Uzbekistan
the size of its constituent fund was defined in the sum of 500,000 USD  but it

A-13

We would be very much obliged if the representatives of law enforcement agencies of the USA in the course of interrogation of Abdul Rauf Maqsudi, Mansur Ahmed Maqsudi, Farid Ahmed Maqsudi received the answers to the qestions put in the earlier solicitation, as well as explanations as concerns the above mentioned facts related to the activity of the Foreign Enterprize "ROZ TRADING LTD" beyond the territory of the Republic of Uzbekistan that would be a priceless assistance in investigation of the present criminal case.

Availing myself of this opportunity, I would like to express the confidence in further strengthening and development of mutual cooperation between the law enforcement agencies of our states.

Yours sincerely,

**Attorney General**
**of the Republic of Uzbekistan**                                      **Rashitjon Kadirov**

(Please, find) enclosed:

A-14



Home

Family
Members

# Charter Fund Fraud

*Foreign investors in Uzbekistan are granted favourable privileges on taxation. When the Maqsudis registered Roz Trading Ltd., they listed the amount of the charter fund at "$500,000." However, the fund was never created. As explained by Uzbekistan authorities, the necessary resources and other property were not brought into the Republic.[7]*

*ROZ Trading Ltd. thus fraudulently reneged on its legal obligations to invest $500,000 in its start-up ventures.[8]*

*As explained by O.B. Murodov, Deputy Attorney General of the Republic of Uzbekistan, from 1995 to 2000, Roz Trading Ltd. failed to create a charter fund totalling $500,000. Thus the company did not qualify for the tax privilege.[9]*

**Click here to continue to Fraudulent Parallel Trading**

**Click here to go back**

---

7. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002. **Click here to download the full text**

8. "Divorce Drama Goes International." Insight Magazine. 1 September 2003.

9. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Click here to download the full text**

A-15



Home

Family
Members

# Fraudulent Parallel Trading

*Roz Trading and its affiliated company Valuelink FZE in Dubai, UAE, defrauded their multinational partners, chiefly Proctor & Gamble and Alberto Culver, by contracting to sell personal-care products in Uzbekistan and then re-labelling the products and reselling them for larger profits in the U.S., United Kingdom, UAE, and African countries, according to Uzbek Deputy Prosecutor General Khamidjon Nematov.[10] The fraudulent activity is known as "parallel trading."*

*The Uzbekistan State Taxation Committee uncovered the fraudulent activity by the Maqsudis and alerted U.S. authorities in a letter sent to the U.S. Internal Revenue Service (IRS) and to then Attorney General John Ashcroft.*

*Roz Trading received up to a 30-percent discount on goods from its multinational partners, according to Uzbekistan Attorney General Rashitjon Kadirov.[11]*
*Using false documents, the Taxation Committee explained the goods below were supposed to be shipped to Tashkent for distribution in Uzbekistan and were instead shipped to the United States and sold in New Jersey, New York, and California:*

- *Alberto Carvel, Revlon, and Duracell, through distributors in Singapore and Russia.*
- *Crazy Glue in Ohio.*
- *Biore facial cream.*

*The shipment of Crazy Glue never left a U.S. port and was sold through Maqsudi's firms in New York and New Jersey, the Taxation Committee stated.[12]*

*Without the knowledge of manufacturers, the goods were also distributed to other CIS countries and Russia.[13]*

*When representatives of American companies wanted to personally view how their products were being sold, they were taken to Tashkent where samples of their products were hurriedly scattered onto stalls in the central market, news articles reported. The foreign visitors were pleased by what they saw and did not know they were "witnesses of a well-staged show."[14]*

*The news report said Procter & Gamble, its largest partner, and Gillette terminated their relationship with the Maqsudis and Roz Trading because of the fraudulent parallel trading activities.[15]*

*Uzbek authorities allege that from 1998 to 2001, "almost $100 million was wired from Uzbekistan to Maqsudi affiliates" that include ValueLink FZE. [16]*

**Click here to continue on to Illegal Profit-Making**

**A-16**

**Click here to go back**

---

10. "Divorce Drama Goes International." Insight Magazine. 1 September 2003.

11. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002. **Download the full text**

12. Letter from State Taxation Committee of the Republic of Uzbekistan to the Internal Revenue Service. 7 August 2001 **Download the full text**

13. "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003.

14. "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003.

15. "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003.

16. "Coke's Sinful World." **www.forbes.com/forbes/2003/1222/086_print.html**.

A-17



| ŌZBEKISTON | | RESPUBLIKASI |
|---|---|---|
| DAVLAT | SOLIQ | QOMITASI |
| ГОСУДАРСТВЕННЫЙ НАЛОГОВЫЙ КОМИТЕТ РЕСПУБЛИКИ УЗБЕКИСТАН | | STATE TAXATION COMMITTEE OF THE REPUBLIC OF UZBEKISTAN |

700195 Toshkent shahri, Abay kochasi 4. Tel.: (3712) 417697. Faks: (3712) 418220, 418215, 417803.
Ozbekiston Respublikasi Tashqi iqtisodiy faoliyat milliy bankining Markaziy amaliyot bolimi, MFO 00882, Hisob-kitob raqami 20204000700600317001

№ _1973 - 4027_

200___ yil _08 . 07_     son

4. Abay str., 700195, Tashkent

To: Internal Revenue Service
of the Ministry of Finance of the
United States of America

The State Tax Committee of the Republic of Uzbekistan expresses its respects to Internal Revenue Service of the Ministry of Finance of the United States of America and according to Paragraph 2 of Article XIV "Consultations" of the Agreement of Trade Relations between the Republic of Uzbekistan and USA from 5 of November, 1993, asks you to assist on below-mentioned questions.

We ask you to check up completeness of payment of the taxes by the citizens of USA: Maqsudi Mansur, Maqsudi Abdul Rauf, Maqsudi Farid, Maqsudi Mehnaz, having commercial activity in territory of Republic of Uzbekistan and representing the private companies "ROZ Trading LTD" (Cayman Islands), "ROZ Trading LTD" (Tashkent) and "Value Link " (Dubai, Jebel Ali Free Zone).

The following moments of activity of these persons can be presented as the information for check:

a) registration of transit of the goods in wholesale trade, which ostensibly, should be directed through USA, for example, to Africa, and in a reality the sale them was carried out in New Jersey, New York and California through the firms in USA (Sours for Value);

b) order of the goods in Dubai , Singapore and other countries through the firms, for example "Value Link", and shipment of these goods in USA, that is illegal inflow washing up of means;

АСПТПХ-9кр-К-7700-15000-2000 г.

A-18

c) abusing by presence numerous distributor's rights on various kinds of the goods, which were made out on "ROZ Trading LTD" (Tashkent). So, the goods of such firms as "Alberto Carvel", "Revlon", "Duracell" (through the distributors in Singapore and Russia), "Crazy Glue" (Ohio), production of "Biore", were shipped under the false documents to Tashkent, but actually any delivery was made not in Uzbekistan and the goods by containers were shipped in USA, partially to Dubai. In this connection according to the checked information there were also rough infringements in registration of the goods, for example, production Crazy Glue under the documentation of the firm - manufacturer should be made out under export to Uzbekistan, but coming in New York, did not leave port of departure, and was realized through firms Maqsudi in New York and New Jersey, about what the manufacturer in Ohio did not know.

d) the special moment is connected to the accounts in Greece and Turkey where the means not having relations to official business under a kind anywhere of not reflected interests were forwarded, or transfer them to the name of the suppliers of share parts of production of drinks of "Coca-Cola", about what the head company "Coca-cola" had no the information. as the production management "Coca-Cola" in Uzbekistan in the private coordination was transferred to Maqsudi's family.

Established by the State large export of the discounted cash means abroad Uzbekistan by the members of Maqsudi's family, causes the special fear in the conditions which have received a wide circulation of world experience of washing up of a cash, including the terrorist actions appeared in a world. The sum of the not brought in taxes and payments in the State budget of Uzbekistan of firm "ROZ Trading LTD" (Tashkent) makes more than 13 billion Uzbek soums or equivalent 17,6 million US dollars.

It is necessary especially to take into account, that family Maqsudi - peasant of birth from Afghanistan and, on the informal data, always supported commercial contacts with various including informal groupings of former military Afghanistan.

It was established that the members of Maksudi's family for the period of their activity in infringement of the tax laws of Republic of Uzbekistan illegally had received the large money resources which were transferred in various foreign banks. On the informal data only on the accounts in various banks of Greece, Dubai, Singapore, Cyprus, Lithuania and others banks the sums of total over hundred millions US dollars in Credit Swiss Bank Place Bel Air № 21711 Geneva 2 Switzerland is present 52519,9 thousand US dollars.

In this connection we ask you to give the official information on conducting IRS about the sizes taxable base of the members of Maqsudi's family .

A-19

Forbes.com - Magazine Article



Companies, People, Ideas

# Coke's Sinful World

Paul Klebnikov, 12.22.03

**Islamic fundamentalists, cozy ties to strongman dictators, rogue bottlers--this is a growth opportunity?**

**By the Numbers**
**The Red Empire**
Coca-Cola is the most ubiquitous brand in history.

**9 million**  Estimated retail outlets worldwide served by Coke (not including bars and restaurants).

**1.2 billion**  Number of 8-oz. servings of Coca-Cola soft drinks consumed daily around the world.

**18%**  Coke's share of the global nonalcoholic, ready-to-drink beverage market.

**$60 billion**  Estimated global sales of Coca-Cola and all of its bottling partners.

Coca-Cola Co. has "arguably the strongest and most pervasive marketing and distribution system in the world," Chairman Douglas Daft told investors at the annual shareholder meeting in April. And it does. The Coke empire stretches to more parts of the globe than any other enterprise in the world. The soda is served in more than 200 nations; it's easier to list the markets where Coke isn't:Myanmar, Cuba, Iraq and Syria. Everywhere else--including such tricky markets as Pakistan, Cambodia, Liberia, Zimbabwe and Colombia--Coke is a beloved consumer staple. Nine million stores sell Coke, serving up some 1.2 billion servings a day around the world.That's why overseas sales account for two-thirds of Coke's revenue (expected to total $21 billion this year) and three-quarters of operating income (forecast at $5.8 billion total) and over 90% of the giant brand's profit growth. After a rough patch from 1998 to 2001 Coke is back. In the first nine months of this year Coke has reported a robust 4% rise in volume (the most-watched indicator of the company's health), a 6% increase in revenue and a 12% rise in net income--numbers as good as any Coke has posted since 1997.

But here's the part Douglas Daft left out: Building business overseas requires dealing with the devil and other questionable characters--relatives of dictators in the Middle East, Latin American bottlers who allegedly work with assassination squads and Marxist rebels in Colombia.

Coke has had to endure that and more as it expands relentlessly into the globe's last nooks and crannies. Since 1999 it has taken charges totaling upward of a billion dollars related to overseas markets and deals gone awry. In February the company was shaken by the murder of a Coke executive in Colombia. It has been sued in a class action accusing it of forcing "unneeded" beverage concentrate on bottlers to stoke its growth numbers. And Coke has watched a well-funded bottler that was to be its gateway to central Asia wither amid charges of misappropriated funds, tax dodges and cozy inside deals.

Coke's chief executive, Daft, declined to be interviewed for this story, and the company refused to make other top executives available. Yet Coke has little choice but to keep prospecting overseas. In the U.S. decades of market dominance have made Coke a low-growth staple: The ten-year compound annual unit-case growth in the U.S. is only 4%.

Foreign markets are less flooded with the syrupy soda. The North Africa and Eurasia/Middle East divisions now are among Coke's fastest-growing units, with sales rising two to three times as rapidly as in the U.S. Coke now has hundreds of bottlers outside the U.S. (it doesn't have an exact figure). Historically, it has tried to merge its smaller partners into big "anchor" bottlers, but its success in under-developed markets often depends on small local outfits that know the terrain.

And with each such partner it embraces, Coke risks tarnishing its clean-cut image by associating with businesses that may partake in local traditions that can include bribing local officials, paying retailers to shun rival brands and resorting to other unorthodox tactics. "Both Coke and Pepsi try to do business as ethically as possible, but when you have local partners who are not subject to the same governance and scrutiny as in the U.S., then sometimes local behaviors take place," says one former Pepsi executive who worked in Latin America.

So far the main thing sparing Coke from a true debacle is the strength of the brand itself. Even the anti-American

**A-20**

backlash that swept the Islamic world in recent years has hardly stymied Coke's onward march. French Muslims roll out a politicized anti-Coke called Mecca-Cola, to no noticeable effect on sales. Egypt is swept by a bizarre rumor that the Coca-Cola label (read backwards in Arabic) says "No to Mohammad, No to Mecca." Coke counters by getting the grand mufti of Egypt to issue a fatwa declaring that this is nonsense. And the brand has survived just fine after blows that might have killed another:reports in 1999 in Belgium that a batch of Coke products was giving kids headaches and nausea; and worries in India last August about supposedly high levels of pesticide in the drink.

It seems that people who curse the U.S. and condemn it to eternal damnation still want to take time out from politics for the pause that refreshes. The company's fizzy foreign expansion touches thousands of small private businesses--from bottlers and distributors (whom it helps to equip and capitalize) to local grocery stores and roadside vendors (whom it supplies with coolers, shiny display cases and signs).

But the linchpin of the success of the business is the far-flung network of independent bottlers who make up the "Coke system." Coke is almost wholly dependent on the bottlers for its own results. They buy secret concentrate from Coca-Cola Co. and add water and sugar to turn it into the world's best-known soda, distributing it in cans and bottles across the world's next developing markets.

The biggest bottlers aren't subsidiaries of Coke, nor are they completely independent. Coke effectively controls them by maintaining big equity stakes and a heavy presence on their boards, and by providing their main source of business. Yet it keeps its stakes in the bottlers below 50%, thereby avoiding getting hit with their piles of debt and any unpleasant liabilities.

In Brazil price wars are so cutthroat that Coke competes with itself:Its local bottlers use independent distributors that undercut one another to raid retail accounts. It's why a 2-liter bottle of Coke sells for half the price that it does in Mexico. Meanwhile, Pepsi has filed a government complaint in Brazil against Coke for allegedly bugging local Pepsi planning meetings, among other supposed misdeeds. An earlier accusation that a Coke-affiliated brewer had bribed Brazilian antitrust officials to block the merger of two Pepsi-affiliated breweries was never substantiated--because it was never investigated.

In Colombia the company has become unwillingly involved in the long-running civil war between the government and Marxist rebels. Coke's Colombian bottlers have allegedly conspired with right-wing death squads to target six trade union activists at their plants--one was actually assassinated--and intimidate dozens more since 1990. That accusation is laid out in a lawsuit filed in 2001 in U.S. court in Miami by the Colombian food-and-drink union, Sinaltrainal. Earlier this year the judge dismissed the charges against Coca-Cola Co. but allowed the suit against the bottlers to proceed. In February Luisa Fernanda Solarte, a marketing manager for Coke, was killed in a terrorist bombing.

In Coke's Eurasia/Middle East division, successful market entry has often meant teaming up with the cronies of the local political boss. When Coke entered Iran in 1990, it teamed up with a relative of Iranian president Ali Akbar Hashemi Rafsanjani. Entering the Israeli-occupied West Bank in 1998, Coke jumped into bed with Yasir Arafat's Palestinian Authority.

And in Uzbekistan, the historic centerpiece of Central Asia and its most densely populated market, Coke teamed up with a son-in-law of strongman President Islam Karimov--and came to regret it. Coke saw the former Soviet state as its gateway to the entire region. So in 1993 it signed a deal with one Mansur Maqsudi, an Afghan-American living in New Jersey. He had no previous bottling experience--but he was married to the Uzbek president's eldest daughter, Gulnara Karimova. Together they opened Coca-Cola Bottlers Uzbekistan (CCBU), owned in equal parts by Coke's export subsidiary, Coca-Cola Export Corp., a Maqsudi family trading company and the government of Uzbekistan.

Maqsudi brought in his older brother to help run the operation. CCBU, headquartered in Tashkent, found all doors open to it. Pepsi, which had owned the market in Soviet times, was pushed out, and all of Uzbekistan was soon covered with red Coke logos. In the next eight years CCBU invested over $100 million in new bottling plants, warehouses and a nationwide distribution network. By 1997 the operation was raking in $118 million in sales and recording net profit margins of 29%. CCBU was twice selected by Coke as "Bottler of the Year" for the Eurasia/Middle East region.

Then in the summer of 2001 things began to fall apart. Maqsudi's marriage broke up. His estranged wife left New Jersey and took their two children back to Uzbekistan. Maqsudi, still president of CCBU, remained in New Jersey. In August 2001 the Uzbek tax police came calling, unearthing the disturbing fact that CCBU conducted almost all

A-21

its transactions through companies owned by the Maqsudi brothers.

Most of the goods CCBU imported (sugar, bottling equipment, plastic preforms, labels, caps, etc.) went through the Maqsudi-owned companies. And while Coke was paid, often late, in wobbly Uzbek currency that couldn't be taken out of the country, Maqsudi's properties got preferential treatment; they were paid in hard currency, often in advance. From 1998 to 2001, while Coke was struggling to get paid, almost $100 million was wired from Uzbekistan to Maqsudi affiliates, including a Dubai-based trading firm, Valuelink FZE, and various offshore affiliates of Roz Trading (the Maqsudi company that held the family's CCBU stake), according to Uzbek Central Bank records.

The Uzbek prosecutor general's office now claims that by overcharging for these imports and taking straightforward trading commissions, the Maqsudis siphoned off much of CCBU's profits and stashed it in offshore accounts to avoid tens of millions of dollars in taxes. In 2002 the Uzbek authorities confiscated the Maqsudis' equity share in CCBU.

Mansur Maqsudi counters that he and his family are victims of a political vendetta launched by his ex-wife. He says his companies never made any profits on the Coca-Cola venture and that they played an indispensable role in keeping the CCBU operation afloat. Since CCBU became engulfed in scandal, however, its business has slowed down; this summer it finally stopped altogether. That has hurt Coke's business in Uzbekistan, which had anchored its sales in the entire region.

From a purely financial perspective, however, Coke's downside was minuscule, in part because the Uzbek business was tiny on the soda giant's $20 billion-a-year scale. From 1997 to 2000 CCBU made $82 million in net profits, letting Coke add a mere $27million to its own bottom line. But most of Coke's equity income was reinvested in CCBU, and as much as $40 million was left in an Uzbek bank account, mired in nonconvertible Uzbek *soums*. "We simply didn't know what to do with the money; we had no place else to put it," says Maqsudi.

An internal Coke report compiled by PricewaterhouseCoopers that was rushed out in two weeks pegged Coke's "quantifiable loss" in the Uzbek affair at a mere $3 million, but said the real sum could be much higher; it also made note of possible attempts by a CCBU official to impede the investigation.

But Coke continued to do business with CCBU. Maqsudi cites the company's need to keep posting respectable growth. "The pressure at Coke was huge for every division to keep volumes growing, and they understood that this is what they had to do to make their numbers," he says. By the time he left CCBU in 2001, "we had a year's worth of concentrate in stock," recalls Maqsudi. By contrast, Coke bottlers in the U.S. rarely keep more than a few weeks' supply of concentrate in stock; in remote markets, up to three months' worth is the norm.

Similar allegations of channel-stuffing emerged in Japan, which accounts for nearly a fifth of Coke's total worldwide sales, and elsewhere. Some of the details came to light in a shareholder lawsuit filed in U.S. District Court in Atlanta in October 2000. Suing on behalf of several pension funds, lawyers at Milberg Weiss Bershad Hynes & Lerach charged that Coke inflated its 1999 revenue by $600 million and boosted pretax earnings by $400 million by overloading bottlers in Japan, the U.S., Europe and South Africa with "unneeded" concentrate. The lawsuit was filed after Coke reported $1.5 billion in writeoffs and, in the first quarter of 2000, recorded its first quarterly loss in memory.

In August the U.S. District Court in Atlanta dismissed the channel-stuffing charges but allowed other parts of the lawsuit to proceed. The law firm has since submitted a much more detailed complaint about channel-stuffing, which the judge is now considering. (The Justice Department is also investigating the matter.)

The suit contends Coke induced its Japanese bottlers to take $233 million worth of "excess, unwanted and unneeded" concentrate in 1999; it compensated them with rebates and extra funds to cover marketing and the installation of thousands of new vending machines in underserved locations. Instead of including these payments as a cost in the income statement, Coke spread out the cost over a longer period, classifying it as an investment in retailing assets. In 1999 Coke wrote off its "impaired" Japanese assets. It denies all charges of channel-stuffing.

Today signs of a Coke rebound continue on its long march to conquer the world. Coke has built its booming overseas business by teaching thousands of bottlers, distributors and retailers how to sell the world's best-known soda. Now if only the company could teach its overseas partners a thing or two about ethics.

**I'd Like to Buy the World a Coke...**

A-22

Forbes.com - Magazine Article

Even though Coke is everywhere, the soft drink titan is counting on emerging markets to provide most of its future growth.

Per capita annual consumption of Coca-Cola beverages (in 8-oz. servings)

| | |
|---|---|
| Mexico (pop. 103 million) | 487 |
| United States (pop. 291 million) | 436 |
| Britain (pop. 59 million) | 203 |
| Japan (pop. 127 million) | 170 |
| Brazil (pop. 175 million) | 146 |
| France (pop. 59 million) | 112 |
| Africa (pop. 794 million) | 34 |
| Eurasia/Middle East (pop. 700 mil, est.) | 18 |
| China (pop. 1.3 billion) | 10 |
| India (pop. 1.1 billion) | 6 (est.) |

*Sources: United Nations Monthly Bulletin of Statistics; Coca-Cola; Forbes estimates.*

**Sidebars**
Pepsi's Chinese Torture
-

**A-23**



Home

Family
Members

# Illegal Profit-Making

*Roz Trading Ltd. (Uzbekistan) violated Article 243 - the "legalization of profit received by criminal way."[17] According to Uzbek Attorney General Rashitjon Kadirov, the company is guilty of "illegal profit-making from state budget money that was converted in the Republic of Uzbekistan for importing consumer goods."[18]*

*On 5 January 1994, an import contract was signed between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan) on the delivery of $200 million of consumer goods.*

*Mansur Maqsudi signed the document on behalf of the Uzbekistan company and Farid Maqsudi signed the contract on behalf of the Cayman Islands company. The consumer goods included macaroni products, sugar, flour, chocolate products, children's nourishment, tea, cigarettes, chewing gum, among others. All payments related to the contract were made through the Credit Swiss Bank in Switzerland. From 1995 to 1997, only "106,020,6 thousand U.S. dollars were delivered into Uzbekistan" [$106,020.60?], the Attorney General stated.[19]*

*On 12 August 1999, Mansur Maqsudi concluded a credit trade contract (No. 2/99) for consumer goods for "6.000.000 USD" [$6 million] between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan). The contract was registered (No. 21902294) with the Ministry of Foreign Economic Relations of the Republic of Uzbekistan on 13 September 1999.[20]*

**Click here to continue to Embezzlement**

**Click here to go back**

---

17. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002. **Download the full text**

18. Attorney General of the Republic of Uzbekistan Rashitjon Kadirov. Resolution. 6 November 2002

19. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Download the full text**

20. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002.

A-24



Home

Family
Members

# Embezzlement

*The Maqsudi family embezzled funds, according to Rashitjon Kadirov, Attorney General of the Republic of Uzbekistan.* "The members of the Maqsudi family," *he stated,* "purposefully overestimated the cost of contracts for delivery of consumer goods in Uzbekistan by including the expenditures for marketing and teaching services which factually were not carried out. By those contracts, they illegally received hard currency in the amount of 33 million 992 thousand USD."[21]

*From 1995 to 1997 the total amount of imported goods was* "11.122.06 thousand USD [$11.1 million]," *Attorney General Kadirov said. Of this amount, Maqsudi overestimated prices* "in the CCD" *by 34 percent or* "2,822.04 thousand USD [$2.8 million]." *In other words, this amount was* "stolen" *from the important goods."[22]

*Maqsudi overstated the price of goods on customs declarations by 15 percent or* "12.242,31 thousand USD" *[$12.2 million]. The total amount of imported goods was* "93.857,76 thousand USD" *[$93.8 million].[23]*

*In total, Attorney General Kadirov stated that* "15.064,35 thousand USD [$15 million] or 994.247.000 sum ... was embezzled from the state resources."[24]

**Click here to continue to continue to Profits Siphoned Off**

**Click here to go back**

---

21. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002.

22. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Download the full text**

23. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002.

24. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002.

A-25

Profits Siphoned Off | Mansur Maqsudi Interpol Warrant                                     Page 1 of 1



### Home

### Family Members

# Profits Siphoned Off

*The Maqsudis had the controlling interest in the Coca-Cola Bottlers Uzbekistan (CCBU). They overcharged for imported goods and took straightforward trading commission to* "siphon off" *much of the profits of the company and stashed the money in* "offshore accounts to avoid tens of millions of dollars in taxes," *according to the Uzbek prosecutor general's office.*[25]

*The Maqsudis, news reports stated, also funnelled money under the* "pretext of investments" *through dummy firms,* "as a strategy to limit profit payments to other founders of CCBU."[26]

*Uzbek Ambassador Shavkat Khamrakulov said the Maqsudis additionally smuggled a* "tremendous amount of undeclared dollars out of Uzbekistan." *During an inspection of Roz Trading Ltd., an* "undeclared cash amount of $199,900 was discovered."[27]

**Click here to continue to Tax Evasion**

**Click here to go back**

---

25. "Coke's Sinful World." Forbes. 23 December 2003.

26. "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003.

27. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

A-26



Home

Family
Members

# Tax Evasion

*Roz Trading was involved in numerous schemes to avoid paying taxes to the governments of Uzbekistan and the United States, according to Uzbek authorities.*

*Roz Trading* "continuously and for quite a long time" *failed to pay taxes on tens of millions of dollars, stated Uzbek Ambassador Shavkat Khamrakulov.* "Moreover," *he asserted,* "the company, having been engaged in illegal business activities, concealed its sales income from taxation."[28]

*Because Roz Trading Ltd. did not set up a charter fund totalling $500,000, the company also failed to qualify for tax privileges it was taking, according to O.B. Murodov, Deputy Attorney General of the Republic of Uzbekistan.*[29]

*Roz Trading Ltd. also sold sugar on the* "black market" *in which it failed to pay a profit of 7 billion soms or approximately $6 million, according to Uzbekistan Ambassador Shavkat Khamrakulov.*[30]

*From 1995 to 2000, Roz Trading evaded paying taxes in the amount of 438,032,000 soms [$5.1 million] based on a* "commodity turnover in the amount of 24,519,190,000 soms [$287.6 million]."[31]

*Due to violations of tax and currency regulations in the course of its registration and activity from 1995 until 2001, Attorney General Rashitjon Kadirov stated* "additional tax payments and financial penalties" *were levied.*[32]

*Overall, the Maqsudis evaded taxes worth $17.6 million, according to Utkir Kamilov, Uzbekistan's top tax officer.*[33]

**Click here to continue to Cash Smuggled Out of Uzbekistan**

**Click here to go back**

---

28. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

29. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Download the full text**

30. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

31. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002.

32. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18

A-27

November 2002. **Download the full text**

33. "Uzbekistan Offers Rich Pickings for Leader's Daughter." Financial Times. 19 August 2003.

**A-28**



## Home

## Family Members

# Cash Smuggled Out of Uzbekistan

*Uzbekistan Ambassador Shavkat Khamrakulov stated that,* "according to preliminary data, the Maqsudis...have smuggled a tremendous amount of undeclared cash dollars out of Uzbekistan."[34]

*During an inspection of Roz Trading's office in Uzbekistan,* "an undeclared cash amount of $199,000 was discovered," the Ambassador disclosed.[35]

**Click here to continue to Oil Embargo Violations**

**Click here to go back**

---

34. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

35. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

**A-29**



## Home

## Family Members

# Oil Embargo Violations

*Uzbekistan Deputy Attorney General Khamidjon Nematov disclosed that Valuelink purchased oil products "from Middle Eastern countries, which are under economic sanctions by the World community."[36] Insight magazine reported the countries that supplied the oil in 2001 were "Iraq and Iran."[37]*

*Attorney General Nematov conveyed the information in a letter to UAE Minister of Justice Muhammad al-Zaheri on 8 February 2003. Attorney General Nematov also declared that Valuelink falsified documents to conceal the true origin of the oil products by stating the country of origin for the oil was Uzbekistan.[38]*

*Among others, the oil was sold to the following buyers:*

- Bakaitechnologies GMBH (Germany).
- AO PHS "Farvarding" (Latvia).
- KP "Signal P" (Riga).
- "Elited Oil" 9 Dubai.
- Petrobart Ltd. (Switzerland).
- Interlik Overseas Corporation" (Great Britain).

*A total of 150,920 tons of oil products was illegally sold through Valuelink at a cost of $15,938,572.82, according to Attorney General Nematov.[39]*

**Click here to continue to Selling Sugar on Black Market**

**Click here to go back**

---

36. Letter from Uzbekistan Deputy Attorney General to UAE Minister of Justice Muhamman al-Zaheri. 8 February 2003. **Download the full text**

37. "Divorce Drama Goes International." Insight Magazine. 1 September 2003.

38. Letter from Uzbekistan Deputy Attorney General to UAE Minister of Justice Muhamman al-Zaheri. 8 February 2003.

39. Letter from Uzbekistan Deputy Attorney General to UAE Minister of Justice Muhamman al-Zaheri. 8 February 2003.

**A-30**

FROM : 0489200688-DCA.                          PHONE NO. :                   Jul. 25 2003 02:55PM P4

Office of the Attorney General
Of the Republic of Uzbekistan
Uzbekistan, Tashkent Post code 700000
66, Academic Gulamov Street

08 February 2003

Minister of Justice
Of the United Arab Emirates
Honorable Muhammad al-Zaheri

Dear Mr. Muhammad al-Zaheri!

The Office of Public Prosecutor of the Republic of Uzbekistan expresses its respect to the
Ministry of Justice of the United Arab Emirates and asks to revisit the issue about
rendering legal assistance with the criminal case processed by the department of criminal
investigations of the General Prosecutor Office of the Republic of Uzbekistan.

During the investigation of illegal activities of the foreign firm "Roz Trading Ltd" it was
discovered that during numerous joint operations with the firm "Valuelink FZE"
registered in the free economic zone Jabel Ali Free Zone P.O. Box 17502 Dubai, UAE,
150920 tons of oil products totaling $15 938 572, 82 US dollars were sold through this
company.

A previous petition on this issue was filed for legal assistance with investigation of the
above mentioned company's activities beyond Uzbekistan and collection from company
"Valuelink FZE" taxes in the amount of $2087695 US Dollars unpaid on the territory of
the Republic of Uzbekistan.

At the present time, it is it is determined that Director General of "Valuelink FZE" Mike
Mustafa provided power of attorney to the employee of JV "Coca Cola Ichimligi
Uzbekistan Ltd" Farhod Ahmedov, who from August 2000 through February 2001 resold
oil products to various buyers ( "Bakaitechnologies GMBH" ( Germany), AO PHS
"Farvarding" ( Latvia) , KP "Signal P" ( Riga) , "Elite Oil" 9 Dubai), Petrobart Ltd" (
Switzerland), "Interlik Overseas Corporation" ( Great Britain), and so on.

According to available information, simultaneously with the abovementioned operations,
company "Valuelink" purchased oil products from Middle Eastern countries, which are
under economic sanctions by the World community. With the purpose of concealment of
the true origin the oil products, by falsification of documents, Uzbekistan was identified
as the country of origin.

**A-31**

Based on the above, we are persuasively asking you to provide assistance with receiving response to earlier request for thorough investigation of the firm "Valuelink FZE" by the authorities of the United Arab Emirates and taking appropriate actions in regards to this company.

Taking this opportunity, I am expressing my gratitude and certainty in further strengthening of mutual cooperation between our countries.

Sincerely,

Deputy Attorney General                    Khamidjon Nematov
Of the Republic of Uzbekistan

**A-32**



## Home

## Family Members

# Selling Sugar on Black Market

"[S]ince 1997, the Roz Trading company has sold sugar through the 'black market' and not paid profit tax for 7 billion soms (local currency), which is approximately $6 million."[40]

*In the summer of 2000, Mansur "developed a criminal plan" to sell the sugar at "overestimated prices" to clients...*[41]

**Click here to continue to Bribery**

**Click here to go back**

---

40. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

41. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Download the full text**

A-33



Home

Family
Members

# Bribery

*Article 167, part 3, point "A" - "misappropriation by organized group of property intrusted (sic) to guilty by appropriation and embezzlement in especially (sic) large value). Article 168, part 3, point "A" - "conversion of property to his own possession in especially large value by fraud). Article 209, part I - "official forgery." Article 210, part 3, point "A" - "bribe taking in especially large value."*[42]

**Click here to continue to Size of Criminal Activity**

**Click here to go back**

---

42. Office of Public Prosecutor letter to then Attorney General John Ashcroft. 18 November 2002. **Download the full text**

Size of Criminal Activity | Mansur Maqsudi Interpol Warrant                    Page 1 of 1



Home

Family
Members

## Size of Criminal Activity

"According to the material of investigation of Abdul Rauf Maqsudi, being a member of the
criminal group, organized by himself and by means of fraud, bribe taking, and extortion,
converted to his possession the amount of 1,6 billion sum or 3 million 933 thousand USD."[43]

**Click here to continue to Money Conversion Violations**

**Click here to go back**

_____

43. Letter. Uzbekistan Office of Public Prosecutor to then Attorney General John Ashcroft. 18 November 2002.
**Download the full text**

A-35



Home

Family
Members

# Money Conversion Violations

"Most of the goods [Coca-Cola Bottling Uzbekistan] imported (sugar, bottling equipment, plastic performs, labels, caps, etc.) went through the Maqsudi-owned companies," *according to a Forbes article.*

*While Coke made payments,* "often late, in wobbly Uzbek currency that couldn't be taken out of the country, Maqsudi's properties got preferential treatment; they were paid in hard currency, often in advance. From 1998-2001, while Coke was struggling to get paid, almost $100 million was wired from Uzbekistan to Maqsudi affiliates, including a Dubai-based trading firm, Valuelink FZE, and various offshore affiliates of Roz Trading...according to Uzbek Central Bank records."[44]

*In late 2001,* "the Maqsudi family lost control of the Coca-Cola plant, the government ordered liquidation of the other business [ROZ Trading Group, Ltd.], and two cousins and an uncle of Mr. Maqsudi's were convicted on tax-violation and money-conversion charges."[45]

**Click here to return to the homepage**

---

44. "Coke's Sinful World." Forbes. 23 December 2003.

45. "Judge Sets U.S. Court as Venue in International Custody Case." The New York Times. 13 September 2002.

# Erb Declaration

# Exhibit B

6/19/95 BUSWK 27                                                          Page 1

6/19/95 Bus. Wk. 27
1995 WLNR 3471600

                              BusinessWeek
                  Copyright 1995 The McGraw-Hill Companies

                              June 19, 1995

                              Issue 3429

## UZBEKISTAN'S STRONGMAN MEANS BUSINESS
### Karimov offers foreign companies stability and perks

                         By Patricia Kranz in Tashkent

In the dusty, mineral-rich state of Uzbekistan, there's only one boss: President Islam A. Karimov. He rules like a khan, repressing opponents and dispensing favors to allies. Ordinary citizens need no reminder of who runs the show. In the sprawling capital of Tashkent, traffic cops stand on every corner and the secret police are as active as the Soviet-era KGB.

    Karimov certainly won't win any human-rights awards. But foreign investors are beginning to notice the regime's stability. ``Karimov is definitely in control and definitely committed to a free market," says John Selby, finance director of BAT Central Asia Ltd. Last November, London-based BAT Industries bought control of the state tobacco company. Like BAT, plenty of other multinationals are now moving into Uzbekistan, making it one of the hottest investment areas in the former Soviet Union.

TAX HOLIDAY. Taking a cue from China's leaders, Karimov is trying to create a market economy from the top down. He supports a go-slow approach, hoping to avoid the economic chaos that has gripped neighboring Russia. Few state enterprises have been privatized yet, but the government is constructing hundreds of buildings to lease out to private retailers. And Karimov has already mandated laws to attract foreign investment, including a five-year tax holiday on profits. As a result, joint ventures generated some $610 million in business in 1994.

    To be sure, companies such as Newmont Mining Corp. and BAT would not bother with Uzbekistan unless it had something to offer. The Central Asian country is one of the world's largest producers of gold and cotton and has deep reserves of oil and gas. But Karimov's iron grip gives investors a degree of confidence that the rules of the game won't be changed overnight, as they can be in Russia, Kazakhstan, or Ukraine. Newmont and others have even persuaded the government to codify the terms of their joint venture in presidential decrees. Says Steve Edds, Newmont's controller: ``In Russia, you can't get a meeting with a high-level official to negotiate a decree, and if you do, a lower branch of government might not re-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-01252-RJL    Document 15-4    Filed 10/30/2007    Page 3 of 67

spect it."

   Karimov has ensured that he plays the leading role in shaping policy. The top
Communist official at the time of the Soviet Union's breakup, he was recently
reelected president in a referendum that offered no other candidates. Karimov has
banned the opposition party, whose leaders, according to Moscow papers, were im-
prisoned on charges of plotting a coup. He also sits on the press, but many Uzbeks
support him for his swift executions of gangsters.

SECOND THOUGHTS. Karimov sometimes nudges deals along himself. When BAT wanted a
controlling stake in the tobacco monopoly, company managers balked. But Karimov,
who hoped to use the $300 million BAT deal as an investment showpiece, persuaded
them to change their minds. Says Selby: ``With (Karimov's) support, we pushed
through a number of sticking points."

   It's no surprise that relationships are vitally important for new businesses
here. Lonrho PLC, the London-based mining company, has hired the son of former
Uzbek Communist boss Sharaf Rashidov to head its Tashkent office. ``He understands
the business culture here, so he's a huge asset to us," says Darren Stock, Lon-
rho's financial manager. The Coca-Cola Co. franchise in Tashkent also has good
connections. Mansur Maqsudi, president of the venture, is married to Karimov's
daughter, while Mansur's brother, Farid, is chairman. Sounds quite cozy, but Farid
swears he does not get special favors. To start up a Coca-Cola business, ``it took
us 18 months to negotiate and finalize the deal," he says.

   With Uzbekistan so steady, even cautious bankers and insurance companies are
moving in. The European Bank for Reconstruction & Development and Barclays Bank
PLC arranged a $135 million syndicated loan for Newmont's gold project. And the
American International Group has formed a joint venture to provide commercial risk
insurance in Uzbekistan.

   However, potential investors would do well to remember that in Uzbekistan, you
cross the authorities at your peril. One foreign engineering company was booted
out of the country after two of its employees went drinking and picked a fight
with some policemen. No one, Uzbek or Westerner, is exempt from Karimov's law and
order.

UZBEKISTAN AT A GLANCE

POPULATION 21.5 million

GDP GROWTH Down 17%

since 1991

GOLD RESERVES 4,000 tons

OIL RESERVES 350 million tons

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**B-2**

Case 1:07-cv-01252-RJL     Document 15-4     Filed 10/30/2007     Page 4 of 67

DATA: REPUBLIC OF UZBEKISTAN

photograph:Photograph: TASHKENT MOSQUE: Uzbeks applaud the crackdown on organized
crime

PHOTOGRAPH BY GAMMA-LIAISON

photograph:Photograph: KARIMOV: Reelection was a snap; no opponents

CHIP HIRES/GAMMA-LIAISON

                      ---- INDEX REFERENCES ----

COMPANY: LONRHO PLC ADR; BARCLAYS BANK PLC; COCA COLA CO (THE); AMERICAN INTERNA-
TIONAL GROUP INC; NEWMONT MINING CORPORATION HOLDING CO; LONRHO AFRICA PLC

NEWS SUBJECT:  (World Organizations (1IN77); CIS (1CI65))

REGION:  (United Kingdom (1UN38); Central Asia (1CE93); Europe (1EU83); England
(1EN10); Eastern Europe (1EA48); Russia (1RU33); Western Europe (1WE41); Asia
(1AS61); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (AMERICAN INTERNATIONAL GROUP; BARCLAYS BANK PLC; BAT; BAT CENT-
RAL ASIA LTD; CENTRAL ASIAN; CHIP; COCA COLA; COCA COLA CO; EUROPEAN BANK FOR RE-
CONSTRUCTION DEVELOPMENT; GDP; GLANCE; KGB; LIAISON; LONRHO; LONRHO PLC; NEWMONT;
NEWMONT MINING CORP; PHOTOGRAPH; UZBEK; UZBEK COMMUNIST)  (Darren Stock; Farid;
Islam A. Karimov; John Selby; Karimov; Mansur Maqsudi; Ordinary; Selby; Sharaf
Rashidov; Sounds; Steve Edds)  (Business Week International Editions: Internation-
al Business: UZBEKISTAN)

Word Count: 938
6/19/95 BUSWK 27
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.          **B-3**

Westlaw.                                                                    **News**Room

9/1/03 INSGHT 50                                                            Page 1

9/1/03 Insight Mag. 50
2003 WLNR 13925870

UPI Insight Magazine
Copyright 2005 News World Communications

September 1, 2003

Section: THE WORLD

### Divorce    Drama    Goes    International

Douglas Burton, INSIGHT

A nasty domestic dispute between a wealthy immigrant to the United States and the daughter of Uzbekistan's president could complicate matters in the war on terror.

For two years a long-running divorce battle between a mega-wealthy New Jersey immigrant and the daughter of the president of Uzbekistan has intrigued readers of the East Coast tabloids as a case of "Daddy's Money vs. Daddy's Government." But this War of the Roses domestic dispute now has emerged as a sensitive foreign-policy and international criminal matter with potentially significant implications both for the United States and an exotic region still in turmoil but vital in the war against terrorism.

Scant attention was given to such geopolitical matters when Mansur Maqsudi won a custody battle in a New Jersey court to claim custody of his two children and divorce the daughter of the president of Uzbekistan, Islam Karimov.

Maqsudi had been the president and majority shareholder of the Coca-Cola Bottling Co. in Tashkent. But when the marriage started to break up in the summer of 2001, the one-time golden eagle for Coke in Central Asia seemed to have become an albatross around the company's neck, with repeated visits from the Uzbek tax police preceding a shutdown of the Coca-Cola plant there for four months in 2002 as top management fled the country.

In the meantime stories about the domestic warfare between the Uzbek couple have included accounts, real or imagined, of a foreign government's retribution against a rich man whose spurned former wife has excited the full fury of descendants of the Mongol chiefs of Tamerlane, including the wrath of her father, the president of Uzbekistan. Indeed, an investigation by Insight has uncovered allegations of corruption, tax evasion, international oil deals and the bilking of millions of dollars of investments through phony transactions and shady deals virtually on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9/1/03 INSGHT 50                                                    Page 2

all sides.

From Maqsudi's side, which refuses to go tit for tat on Uzbekistan's allegations,
are claims of money laundering, extortion and corruption, including allegations
against the Karimov family and government. He promised full details  though not by
Insight's deadline.

On the other side, Uzbekistan's attorney general, Rashitjon Kadirov, claims that
Maqsudi owes millions in taxes, cheated his U.S. suppliers of consumer products he
had contracted to sell in Uzbekistan but didn't and traded for oil from Saddam
Hussein's Iraq  to name but a few of the charges underpinning an Interpol arrest
warrant for Maqsudi, his brother and his father.

The charges have caught the attention of Rep. Curt Weldon (R-Pa.), a leader on the
House Armed Services Committee. He tells Insight he wants Attorney General John
Ashcroft to cooperate with the Uzbek government's request to question Maqsudi in
connection with a growing assortment of allegations of criminal conduct, including
alleged Uzbek tax dodging equivalent to $17 million. Weldon says flatly, "I would
support the Department of Justice's investigation of the business dealings of Mr.
Maqsudi, and I have shared my position on the matter with Attorney General
Ashcroft. The allegations brought to my attention that I believe warrant a
thorough investigation range from extremely troubling business practices to fraud
and tax evasion."

Weldon is a congressional leader for normalizing trade relations with Russia and
other former members of the Soviet Union and is cochairman of the recently formed
U.S.-Uzbekistan Congressional Working Group.

But the wealthy Maqsudi, a naturalized U.S. citizen, has his own friends on
Capitol Hill. In August 2001, then-senator Robert Torricelli (D-N.J.) wrote to
President Karimov to complain about reports that Maqsudi's parents had been
harassed and strip-searched by government agents at the airport as they fled
Uzbekistan. And Maqsudi has hired former New Jersey congressman Richard Zimmer, a
well-connected Republican, to represent his side in publicity wars surrounding the
divorce struggle.

Maqsudi tells Insight in a brief telephone interview that "all those actions taken
against me are because I divorced the president's daughter." And, he says, in an
Uzbeki equivalent of so's your old man: "All the things the [Karimov] government
accuses me of doing is what they are doing themselves."

Although he won a court order from a New Jersey judge granting him custody of his
two children in January, they remain with their mother in Tashkent where he cannot
get them. Maqsudi tells Insight that at least 21 U.S. congressmen and senators
have sent letters on his behalf to Karimov. Several of these letters provided to
this magazine by Maqsudi's attorneys are from congressmen urging Karimov to
release three of Maqsudi's relatives from jail and to help resolve his
child-custody dispute with Karimov's daughter, Gulnara.

Zimmer tells Insight that all the charges against his client are phony or
otherwise trumped up by a corrupt and dictatorial government. He also says that
while officials of the U.S. Department of Justice did request that his client

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-5**

cooperate with the Uzbek investigation, "We responded that we were not going to cooperate, and they did not pursue it." Zimmer's law firm wrote to the Justice Department in February declaring that its clients "are victims of a vicious terror campaign by Uzbek authorities, who have targeted the Maqsudis ever since Mansur Maqsudi's marriage to Uzbekistan President Islam Karimov's daughter collapsed."

But Uzbekistan's top tax officer, Utkir Kamilov, claims Maqsudi evaded taxes worth $17.6 million. And documents from the Justice Ministry in Uzbekistan charge that Maqsudi concealed various trades and deals while running the Coca-Cola bottling plant and unrelated companies by trading upon his family relationship with the Uzbek president until government auditors uncovered the alleged illegal schemes around April 2001. Uzbek officials sent an official request to Ashcroft in late 2001 asking for formal Justice Department assistance to question Maqsudi, his father Abdurauf and his elder brother Farid on a wide range of questions relating to their company ROZ Trading Ltd., which was the major partner in the Coca-Cola venture.

A year later, the Uzbek government sent an addendum to the request, shortly after it had issued an Interpol arrest warrant for all three. A Justice Department spokesman tells Insight that its communications with foreign governments are privileged and that it cannot comment on whether or how it may have complied with the official Uzbek petition to Ashcroft.

Documents and interviews obtained by Insight nevertheless show there has been much behind-the-scenes activity churning charges and countercharges of fraud, deception and corruption. For example: Depositions by former managers of ROZ Trading and a letter from the attorney general of Uzbekistan to the minister of justice of the United Arab Emirates allege that the Maqsudis violated international sanctions by using the Coca-Cola Bottling Co. in Tashkent to purchase embargoed oil products from Iraq and Iran in 2001 and then exported them elsewhere.

The deputy prosecutor general of Uzbekistan, Khamidjon Nematov, states in one letter to the minister of justice of the United Arab Emirates that, "by falsification of documents, Uzbekistan was identified as the country of origin" for said oil products exported to Germany, Latvia, Switzerland and the United Kingdom.

According to an undated deposition given by Farhod Inogambaev, a ROZ Group manager from 1994 to 2001, the Maqsudis violated the trade license of their company, known as Valuelink FZE and based in Dubai, by using the firm to trade for oil, some of which was purchased from Saddam Hussein's Iraq. Inogambaev further stated in his deposition to Uzbek authorities: "The oil/ petroleum-products operations included the purchase of Uzbek oil products from Coca-Cola Bottlers in Uzbekistan Ltd. and exported outside Uzbekistan. To my knowledge the company was buying diesel of Iraqi origin."

Nematov tells Insight that, "Financial crimes have become the mechanism of exporting worldwide terror, and we are pleased with the cooperation we have received from the U.S. government [the Justice Department and the IRS] on the case of Mansur Maqsudi, a U.S. citizen who is a wanted criminal in Uzbekistan for international financial crimes." Nematov adds: "It is our hope that, with the cooperation of the United States, Mr. Maqsudi will soon be brought to justice."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-6**

The letters from the Uzbek justice ministry and the tax office further claim that ROZ Trading Ltd. fraudulently chartered ROZ Trading Ltd. in Uzbekistan and reneged on its legal obligation to invest $500,000 in its startup ventures. Nematov claims ROZ defrauded its multinational partners, chiefly Procter & Gamble and Alberto Culver, by contracting to sell personal-care products in Uzbekistan, then relabelling the products and reselling them for larger profits in the United States, the United Kingdom, the United Arab Emirates and African countries. This is a largely illegal practice known as "parallel trading."

Maqsudi denies all these charges and claims they have been fabricated by the Uzbek government at the instigation of his former wife. He tells Insight in a faxed statement: "My family and our business scrupulously complied with the laws of Uzbekistan. The criminal charges against us are false. They are the direct result of an outrageous vendetta by my ex-wife and her father that has brutally victimized my extended family and our business associates." He continues: "No wrongdoing has ever been alleged against us by the government of the United States of which we are citizens and in which we have lived and done business for more than 20 years."

So who are these people around whom all this international intrigue is whirling? Until the divorce battle surfaced two years ago, they kept a low profile in their elegant family compounds in New Jersey. Most were born in Afghanistan of Uzbek ethnicity. Mansur's father, Abdurauf Maqsudi, 71, reportedly was born a peasant in Uzbekistan and moved with his family to Afghanistan where he helped his own father and other family members run a shop until the mid-1960s. The family patriarch reportedly has a fifth-grade education but today presides over a multinational financial empire based in the Cayman Islands, the United Arab Emirates, the United States and, until two years ago, Uzbekistan.

Sources contacted by Insight claim that the elder Maqsudi rose to riches on the tide of the Soviet invasion of Afghanistan in 1979. A. Zulfiqar, an opponent of the Karimov regime, published an op-ed in the newspaper ERK for Jan. 16, 1994, charging that Abdurauf Maqsudi had a long history of fraud and embezzlement. He allegedly was imprisoned in Afghanistan in 1972 for misusing funds lent to him by the government of Afghanistan and later allegedly stole millions of dollars from the regime installed in Kabul after the Soviet takeover in 1979.

According to Zulfiqar, Abdurauf Maqsudi began exporting fruit to the Soviet Union in the 1960s and after a time came under the wing of former Afghan prime minister Hoshim Sharq, who was believed to have ties to the Russian KGB. Maqsudi later was installed by the Soviets as chairman of the Afghan-Soviet Trade Council during the regime of Babrak Karmal, and in this capacity traveled frequently to Moscow, according to Zulfiqar's report and other sources contacted by Insight.

Zulfiqar claims the Soviets granted Maqsudi a bank credit worth $3 million with which he was supposed to purchase replacement parts for light machinery. They allegedly were left empty-handed when Maqsudi relocated to the United States and opened an electronic-equipment store in New York City. Mansur Maqsudi emigrated to the United States with his siblings and parents in 1979; that same year his elder brother Farid entered college in the United States. Mansur met his future wife in Tashkent in 1991 and the two were married that same year. Both earned graduate degrees from Harvard University.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-7**

All this is as fascinating as it is byzantine. But, whatever the truth, this divorce drama has wide implications for the newfound U.S.-Uzbek alliance in the war on terror. Uzbekistan emerged in early 2002 as a prized U.S. ally in its war on the Taliban in Afghanistan. President Karimov, the former Communist Party boss of Uzbekistan when it was part of the Soviet Union, welcomed U.S. troops onto his nation's air bases, where many still are stationed today. And Karimov widely is regarded as the foremost friend of the United States among the so-called "-stans" of Central Asia, as attested by his meeting with President George W. Bush last year at the White House.

As this twisted story of Dynasty on the high plains of Central Asia unfolds, it is apparent the ties that once bound a power couple at Harvard have devolved into a Gordian knot for U.S. officials who assuredly do not need further complications in that part of the world.

Douglas Burton is an associate editor for Insight magazine.

---- INDEX REFERENCES ----

COMPANY: PROCTER AND GAMBLE CO (THE); COCA COLA BOTTLING COMPANY CONSOLIDATED

NEWS SUBJECT: (Legal (1LE33); Social Issues (1SO05); Divorces (1DI23); Police (1PO98); Judicial (1JU36); Legislation (1LE97); Government (1GO80); Personal & Family Law (1PE02); World Organizations (1IN77); CIS (1CI65))

INDUSTRY: (Consumer Packaged Goods (1CO27); Personal Care & Beauty Aids (1PE87); Security (1SE29); Consumer Products & Services (1CO62))

REGION: (North America (1NO39); Europe (1EU83); Russia (1RU33); Eastern Europe (1EA48); Iraq (1IR87); Arab States (1AR46); Western Asia (1WE54); Afghanistan (1AF45); Central Asia (1CE93); Americas (1AM92); New Jersey (1NE70); United Arab Emirates (1UA66); Asia (1AS61); Uzbekistan (1UZ71); Middle East (1MI23); USA (1US73))

Language: EN

OTHER INDEXING: (AFGHAN; AFGHAN SOVIET TRADE COUNCIL; AFGHANISTAN; BABRAK KARMAL; COCA COLA; COCA COLA BOTTLING CO; DEPARTMENT OF JUSTICE; ERK; FZE; HARVARD; HARVARD UNIVERSITY; HOUSE ARMED SERVICES COMMITTEE; INSIGHT; IRAQ; IRS; JUSTICE DEPARTMENT; JUSTICE MINISTRY; MAQSUDIS; MONGOL CHIEFS OF TAMERLANE; PROCTER GAMBLE; REPUBLICAN; ROSES; ROZ; ROZ GROUP; ROZ TRADING LTD; SADDAM HUSSEIN; SADDAM HUSSEINS IRAQ; SOVIETS; TRADING; TRADING LTD; US UZBEKISTAN CONGRESSIONAL WORKING GROUP; US DEPARTMENT OF JUSTICE; UZBEK; UZBEKISTAN; UZBEKISTAN LTD; VALUELINK; WHITE HOUSE) (A. Zulfiqar; Abdurauf; Abdurauf Maqsudi; Alberto Culver; Ashcroft; Curt Weldon; Daddy; Douglas Burton; Drama; Farhod Inogambaev; George W. Bush; Gulnara; Hoshim Sharq; Inogambaev; Islam Karimov; John Ashcroft; Karimov; Khamidjon Nematov; Mansur; Mansur Maqsudi; Maqsudi; Nematov; Rashitjon Kadirov; Richard Zimmer; Robert Torricelli; Scant; Utkir Kamilov; Weldon; Zimmer; Zulfiqar)

Word Count: 2612
9/1/03 INSGHT 50
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-8**

The Embassy of Afghanistan, Washington, DC



# The Embassy of Afghanistan
## WASHINGTON DC

**Media Center**

Embassy Press Releases

Government Press Releases

Embassy in the News

Contacts for Media

your email here




## Embassy Press Releases

**Afghan Businessmen Raise $20 Million for Rebuilding Afghanistan**
**The Embassy of Afghanistan**

10/03/2005

Washington, D.C. – Members of the Afghan Business Council-Dubai, Afghan-American Chamber of Commerce, and Afghanistan International Chamber of Commerce met on September 26, 2005 in Dubai to invest personally in the economic future of Afghanistan. The participants endorsed investment in the economic opportunities of Afghanistan by creating a company which will issue stock for the price of $500,000 per share. The "founding members" adopted the name, Afghan Investment Company (AIC), to be registered in Afghanistan. With enormous enthusiasm, an initial equity capital of $20 million was raised to bring large scale investment into Afghanistan.

The founding members have elected prominent international businessmen Nassrullah Rahmat as Chairman, Farid Maqsudi and Sherkhan Farmood as Vice Chairmen, and Mahmood Karzai as the Spokesman of AIC for the first year of operation. Chairman Rahmat said, "We just decided that certain things needed to happen were not happening and that we needed to do them quickly." "We appreciate the work of the donor nations, NGOs and the government, but it is difficult for them to move fast and Afghanistan does not have time to spare," he added.

The establishment of the Afghan Investment Company has already attracted over 80 Afghan businessmen investing a minimum of $500,000 each for economic development in Afghanistan. Spokesman Karzai stated: "We have just started. Our goal is a $100 million fund. That's already a lot of private money for Afghanistan." He added, "If one begins to consider the leveraging effect of that money with banks and international financial institutions, the final investment could be well over $500 million dollars."

The Afghan Investment Company's first decision is to stimulate investment of over $100 million in two related areas: coal mining and cement. It will build the first modern and high-capacity cement plant in Afghanistan. The coal would fuel the cement plant. Currently almost all cement and coal are imported as Afghanistan is in the midst of a construction boom.

Contact:
M. Ashraf Haidari

The Embassy of Afghanistan, Washington, DC

(202) 483-6410, (Ex-811)
Haidari@embassyofafghanistan.org

# # #

Home | Contact Us | Sitemap

© 2006 Embassy of Afghanistan and GlobeScope Inc. All Rights Reserved.

10/11/2007

http://www.embassyofafghanistan.org/embpress/pre7.html

ARC: About Us

**ARC** Afghanistan Reconstruction Company, LLC

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

## Working to Rebuild Afghanistan

Afghanistan Reconstruction Company, LLC ("ARC") is bringing international resources together with Afghan business and nonbusiness leaders to help rebuild Afghanistan's economy. ARC has attracted a core of experienced businessmen committed to reconstructing Afghanistan's physical infrastructure and reviving Afghan business and commercial institutions. ARC is currently establishing an extensive network throughout the country founded on maximizing local Afghan participation.

ARC is controlled by several members of the Afghan diaspora in USA, Europe and Middle East with a distinguished Afghan heritage. ARC has already deployed a large amount of capital through several projects. ARC fully intends to deploy additional capital of its own and to attract both public and private capital to the rebuilding task ahead.

● **ARC CONSTRUCTION COMPANY, LLC.**

Together with one of Turkey's largest construction companies, ARC has established ARC Construction Company LLC to perform infrastructure reconstruction throughout Afghanistan. ARC Construction has a wide range of heavy construction equipment as well as stone crushing plants, asphalt plant, concrete batching plants, and trained personnel in Afghanistan and is currently engaged in major projects including the Kabul-Kandahar road project. Together with local contractors, ARC Construction aims to bridge local content with global resources by using its extensive country knowledge and capability. ARC Construction is committed to bringing the expertise and resources necessary during the reconstruction process.

● **AFGHANISTAN INTERNATIONAL BANK.**

Afghanistan International Bank has commenced operations in March 2004 out of its headquarters in Kabul. Dutch bank ING is managing Afghanistan International Bank (AIB) and is providing senior management executives. An ARC affiliated project, AIB has initially been capitalized at US $10 million and is comprised of a consortium of Afghan and American Investors. The **Asian Development Bank (ADB)** has also shown interest to take a stake as a potential partner in the bank. Afghanistan International Bank is one of the first home-grown Afghan commercial banks to be set up in the last 23

years. The bank aims to become a model bank in Afghanistan, established and managed in accordance with international best practices. Afghanistan International Bank expects to evolve into a fully operational commercial bank, and initially will provide trade finance services, payment transfers and take deposits from small and medium sized enterprises. The bank will also introduce lending products for both foreign corporations and local small and medium sized enterprises.

- **LIA GROUP INTERNATIONAL**

ARC has joined forces with Limak and Ictas, both recognized industry leaders to form LIA Group International, it's most recent project, includes the Kabul- Doshi road, of which LIA will repair the section from Salang - Doshi. Repair work on the 175 kilometer Kabul- Doshi road has started under the World Bank- financed **Emergency Transport Rehabilitation Project.** Under the project, which will be largely completed by the end of October, 2004, and fully completed by February 2005, around 800 Afghans including engineers and laborers will find employment opportunities.

These are only examples of the projects currently being pursued by ARC. Afghanistan's economy and infrastructure have been largely destroyed and virtually everything needs to be rebuilt. ARC therefore intends to undertake projects across a broad spectrum. In carrying out its activities, ARC will seek to employ and train Afghan citizens and help build viable local institutions that can contribute to the goals of a peaceful and democratic Afghan society.

ARC : Management

**ARC** Afghanistan Reconstruction Company, LLC

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

## Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team brings strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

| | |
|---|---|
| **President:** | **Farid Maqsudi** |
| **Executive Vice President:** | **M. Zaher Yaqubie** |
| **Vice President:** | **Glenn Simpson** |
| **Business Development Director:** | **Gokhan Erkal** |



ARC: Projects

 Afghanistan Reconstruction Company, LLC

**ARC Projects**

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us



**Kabul-Kandahar
Highway Project**



**Asphalt Plant**



**Stone Crushing
Plant**



**ARC Foundation**



**Afghanistan
International Bank**

 

**Kabul-Doshi
Highway Project**

ARC: Foundation

**ARC** Afghanistan Reconstruction Company, LLC



Community

Social Responsibility

**ARC** Foundation

*"Helping Afghanistan Rebuild to Prosper"*

**ARC Foundation** values the opportunity to participate in the rebuilding of Afghanistan and to serve the communities in which ARC Companies operate. At ARC, helping to rebuild for the future is one of the founding principals of our company and our involvement with the communities that surround our projects and offices is a critical component of our work.

Investments in our communities and education started with the inception of our company, and with the creation of ARC Foundation have continued to grow. We are proud of our employee's participation in efforts to help local Afghan

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

B-15

communities through the volunteering of their time and knowledge, as well as with the support of resources from ARC Foundation. We consider it a privilege to serve our communities and invite you to learn more about our community involvement programs that include **Education Partnerships and Gifts for Higher Education, Youth Recreational Projects, Clean Water Initiatives, Community Development & Public Infrastructure Improvement Programs.**

**Education:**

- ARC at the very beginning of it's inception recognized that a quality education ushers a lifetime of opportunities, and that Afghanistan's educational institutions would be the main factor in making sure that Afghanistan would be able to help it's own people rebuild and sustain long term development. ARC has taken an active role, contributing to assist the Ministry of Higher Education to strengthen development for teachers and build the capacity of schools, universities and communities to educate the citizens and workforce of tomorrow.

- As construction was first started on the Kabul- Kandahar highway near the town of Durani, ARC recognized that ARC Construction and the local Afghan community would both be able to work together to help in the reconstruction process. The current ARC camp site was built at Durani and features a new building with 11 rooms, modern facilities w/ kitchens and bathrooms, and at the close of project completion is to be been donated to the local school district to be used as a girl's school.

**Youth Recreational Projects:**

- Three main high schools in Kabul are currently undergoing improvements to it's recreational facilities, with the addition of new equipment and sports facilities. ARC Foundation recognizes the importance of helping to assist Afghanistan's educational institutions, and at the same time is happy to implement projects that will allow kids to just "have fun". Improvements such as basketball courts or playgrounds will allow the youth attending these schools to have access to facilities previously unavailable.

**Clean Water Initiatives:**

- Clean Drinking water continues to be a major concern in Kabul and surrounding areas of Afghanistan that have recently faced years of drought. ARC foundation has committed to assist local communities to address this problem, with work beginning in a local village in Kabul on a new deep well with pumps to provide a clean and reliable source water.

- Local Villages throughout Afghanistan, a clean and reliable source of water is vital to the well being of individuals. Along areas of the Kabul- Kandahar highway, ARC Foundation is pleased to be able to assist in the cleaning and rehabilitation of natural streams that are used by local villages.

**Community Development and Public Infrastructure Programs:**

- A wide range of activities are taking place to help communities in Afghanistan unite and to assist with highly needed improvements to surrounding public infrastructure. These activities include the construction or renovation of mosques, to educate and take a role as community centers in areas close to ARC locations in Kabul as well as near the highway construction site,

- The construction of a new sewage septic tank for waste water and bath houses in the Microyan neighborhood of

ARC: Foundation

Kabul, with construction completion expected through summer.

- Paving and rehabilitation of sections of road in Kabul, expected to begin and continue through the summer season, allowing ARC to use it's expertise and facilities to help in the improvement of the public infrastructure,

- Renovations and Painting to buildings or sections of buildings in Kabul.

ARC Foundation will continue with it's best efforts to practice a proactive philanthropy that develops innovative, pace-setting programs that have an unlimited multiplier effect, and continues to see innovative ways to respond to pressing needs that deliver tangible results. Please free feel to contact us at **contact@afghanrc.com** to discuss any ideas or opportunities to help in any of the above mentioned fields or to discuss working with ARC Foundation in any other activities that will assist to make communities stronger in Afghanistan and all over the world.

**B-17**

ARC : Images

**ARC** Afghanistan Reconstruction Company, LLC

## Images of ARC Activities in Afghanistan



About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us
















ARC :: News

 Afghanistan Reconstruction Company, LLC

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

## News

## US Agency for International Development (USAID) -
Date: 10 Nov 2002

### ...for **Kabul-Kandahar-Herat** highway reconstruction project

Kabul, AFGHANISTAN - On Sunday, November 10, Afghanistan's President Hamid Karzai and U.S. Ambassador Robert P. Finn officiated a ground breaking ceremony to mark the first day of construction of Afghanistan's main highway, known as Highway 1, from Kabul to Kandahar to Herat. U.S. Agency for International Development (USAID) Mission Representative in Kabul, Elisabeth Kvitashvili, attended, as well as representatives of co-funding partners Saudi Arabia and Japan will attend.

Reconstruction of the more than 1,000 kilometer highway will take an estimated 36 months to complete and will employ thousands of Afghans. The project will cost an estimated $250 million; $180 million has been pledged to date from the United States, Japan and Saudi Arabia.

### The U.S. Commitment

The United States will provide $80 million through the USAID. This includes USAID funding for de-mining efforts along the highway, which will be carried out by the United Nations Mine Action Center.

"We'll help develop a modern infrastructure so that Afghan entrepreneurs will be able to move products from one city to the next, and so that people will be able to find work, they'll be able to put food on the table," pledged U.S. President George Bush. Afghan President Hamid Karzai has stated that reconstruction for the country's principal road system is key to Afghanistan's economic recovery.

The U.S. - supported reconstruction begins south of Kabul. When winter weather conditions require suspension of work on the Kabul to Kandahar portion, USAID will commence work on the Kandahar to Herat portion. This will allow for year-round construction.

***Engineering design and supervision services are provided by the Louis Berger Company. Afghan Reconstruction Company (ARC) is responsible for construction of the initial 49 kilometers of the road.***

ARC :: News

## A Collaborative Effort

In collaboration with the Islamic Transitional Government of Afghanistan, the United States, Japan, and the Kingdom of Saudi Arabia agreed in September to reconstruct the highway. The Japanese government is expected to contribute $50 million and the Kingdom of Saudi Arabia $50 million. The Japanese government will begin its reconstruction operations from Kandahar to Kabul by the end of the year.

*For more information on USAID activities in Afghanistan, please visit www.usaid.gov/afghanistan.*

*The U.S. Agency for International Development has provided economic and humanitarian assistance worldwide for more than 40 years.*

*Contact: USAID Press Office*
*WASHINGTON, DC 20523*
*(202) 712-4320*

----------------------

## Afghanistan hopes new road will boost trade, discourage bandits

Associated Press
November 10, 2002
By Todd Pitman

Kabul, Afghanistan - Construction of a major new road linking Afghanistan's capital to the far west of the country began Sunday - a long-awaited project President Hamid Karzai said was expected to boost regional trade and discourage banditry.

The United States has pledged $80 million to help rebuild the 745-mile road from Kabul to the southern city of Kandahar and on to Herat in the west. Saudi Arabia and Japan pledged $50 million each.

Rebuilding Afghanistan's highways, along with providing electricity and education, has been a government priority ever since international donors pledged $4.5 billion in January, Karzai said.

"The strongest of these priorities was the reconstruction of highways, and I'm glad that we've done something today about that," Karzai said under a tent set up by the roadside at Durani, 26 miles from Kabul.

"It will take less time for people to travel, and the bandits won't have time to stop the cars or rob them," Karzai said.

**B-21**

The road, known as Highway 1, is expected to take three years to complete and cost a total of $250 million. The government is hoping donors will chip in the remaining $70 million.

**The Afghan Reconstruction Company** *is responsible for building the first 30 miles of the road, while the Louis Berger Group, a U.S. engineering firm, will provide engineering design and supervision services.*

Diplomats from the United States, Saudi Arabia and Japan, along with Finance Minister Ashraf Ghani, attended Sunday's ceremony, held under tight security.

U.S. Ambassador Robert P. Finn said America has repaired 2,360 miles of roads in Afghanistan since December, shortly after the Taliban regime was overthrown in the U.S.-led war on terror.

"Over the next three years, this project will employ thousands of Afghans and improve the lives of millions more," Finn said. "The different parts of the Afghan family will draw closer together and opportunities for trade, communication and industry will increase."

The Kabul-to-Herat road was repaved 36 years ago. But it was destroyed in fighting that began with the Soviet invasion in 1979, Finn said.

Roads are of particular importance to Afghanistan because the country is landlocked and has no other way to trade with its neighbors.

Italy pledged $50 million to rebuild a key road from Kabul to the central city of Bamiyan, and the European Union has started work on a road from Kabul to Jalalabad in the east, Karzai said.

Iran was building a road that runs west from Herat toward the Iranian border, while the Asian Development Bank was helping to finance a road from Kandahar to Spinboldak on the Pakistan border, Karzai said.

ARC : Links

**ARC** Afghanistan Reconstruction Company, LLC

*As part of ARC's ongoing commitment to assisting in the rebuilding of Afghanistan, we have compiled a list of some resourceful links.*

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

**U.S. Government**
Council of Foreign Relations
Overseas Private Investment Corporation
U.S. Agency for International Development
U.S. Department of State
U.S. Trade and Development Agency
Export - Rebuilding Afghanistan
Export-Import Bank of the United States
Afghanistan Engineer District

**Afghan Government**
A New Constitution, A New Challenge
Afghan Assistance Coordination Authority
Embassy of Afghanistan in Washington, DC
Ministry of Communications

**International Organizations**
Asian Development Bank
World Bank
United Nations Development Programme

**News**
Afgha Press Agency
e-Ariana

**B-23**

**Afghan Daily**
**Afghan News Channel**
**CNN - Rebuilding Afghanistan**
**The Washington Post - Afghanistan**

## Maps

**Afghanistan Maps, Geography, and Data**
**Afghanistan Refugee and Migration Map**
**City, country, thematic maps of Afghanistan**

## Other

**U.S.-Afghan Women's Council** - *The Council seeks to help reintegrate women into Afghan society and to prepare them for positions of management and leadership.* "new"

**Development Gateway - Afghanistan Reconstruction** - *Includes a comprehensive database on projects in Afghanistan and links to resources about Afghanistan.*

ARC : Employment Opportunities

 Afghanistan Reconstruction Company, LLC

**Employment Opportunities**

**Finance Manager - Kabul Afghanistan - International**
**HR Manager - Kabul Afghanistan - International**
**COO - Kabul Afghanistan - International**

**About Us**
**Management**
**Projects**
**ARC Foundation**
Images
News
Links
**Employment**
**Contact Us**

**B-25**

Contact Information

ARC Afghanistan Reconstruction Company, LLC

**About Us**
**Management**
**Projects**
**ARC Foundation**
**Images**
**News**
**Links**
**Employment**
**Contact Us**

**Contact Us**

**Main Office:**
Afghanistan Reconstruction Company, LLC.
230 Park Ave., Suite 1525
New York, NY 10169

tel:      212.682.9130
fax:     212.682.9133
email:   **contact@afghanrc.com**

**Kabul Office:**
ARC Construction Company, LLC.
Wazir Akbar Khan
Street 10, House 53
Kabul, Afghanistan

tel:      (93)20.210.0035
fax:     (93)20.210.0036

*Mr. Zaher Yaqubie - Executive Manager*
*tel:       (93)70.27.9512*
*e-mail:  Zaher.Yaqubie@afghanrc.com*
*Mr. Gokhan Erkal - Business Development Director*
*tel: (93).70.28.9942*
*e-mail:  Gokhan.Erkal@afghanrc.com*

ARC : Bank Project : 1

**ARC** Afghanistan Reconstruction Company, LLC

back

الـبـنـك الـدولـي الأفغانـي
AFGHANISTAN INTERNATIONAL BANK

AIB
managed by ING

## ING Says Afghanistan International Bank Starts Operations

DOW JONES NEWSWIRES
Edited Press Release
AMSTERDAM -- Dutch bank and insurer ING Groep NV (ING) said Friday that the Afghanistan International Bank has commenced operations after receiving an approved business licence on March 22, 2004. The bank is managed by ING-IGA on behalf of the consortium.

Operating from its headquarters in Kabul, the bank will initially provide facilities for inward and outward remittances as well as cashier services, current account and checking facilities. Within a few months, the bank intends to make available trade finance and short/medium term loans to corporate clients. In the second half of this year, customers will be able to access their accounts through an ATM network and enjoy e-banking facilities.

John Haye, Chief Executive Officer of the Afghanistan International Bank, stated: "We will be managing the bank according to international best practice and the highest standards of corporate governance. In providing exclusive services such as lending and e-banking to our local customers, in addition to the more traditional banking products, the Afghanistan International Bank is looking not only to support multilateral and international agencies operating in Afghanistan and the local business community, but also provide for the financing needs of overseas-based Afghan nationals, as they look to repatriate money from around the world."

ING-IGA is mandated to manage the bank for an initial three-year period, providing senior management executives, including a Chief Executive Officer and Chief Operating Officer. Initially capitalised at US$10 million, the consortium of Afghan and American business group operating investors includes Afghanistan Reconstruction Companies, Rahmat Group, and Mohib Group, while the Asian Development Bank is also interested in taking an equity stake in the bank. The Overseas Private Investment Corporation is currently in negotiations with the Afghanistan

ARC : Bank Project : 1

International Bank to provide a supporting role to the bank's operations.
Company website: http://www.ing.com

## Dutch bank sets up shop in Kabul

BBC NEWS

*Dutch banking group ING has become the third foreign bank to open a branch in the Afghan capital, Kabul.*
ING is setting up and managing the Afghanistan International Bank on behalf of a consortium of Afghan and US investors. Initially the AIB will provide current account services and offer remittances, adding a further legal channel for Afghans to receive money from abroad.

Pakistan National Bank and Standard Chartered already operate in Kabul.

"AIB is looking not only to support multilateral and international agencies and the local business community, but also provide for the financing needs of overseas-based Afghan nationals as they look to repatriate money from around the world," said John Haye, the bank's chief executive.

The bank opened its doors on 26 March, having received a licence earlier that week.

**Plans**

ING's initial responsibility to the investors - who are capitalising the AIB at $10m with the possibility of further money from the Asian Development Bank - is a three-year commitment to running the bank and providing senior executives.

Later in 2004, the bank hopes to open ATMs and offer online banking facilities, which may again reduce the demand for informal hawaladars, or remittance merchants. After the first year, the plan is to add further branches outside Kabul, although that may depend on the security situation.

ING has long experience of running banks on behalf of governments and other bodies in developing countries, via its Institutional and Government Advisory Group. The group is already working in Indonesia, Mongolia and Vietnam, among other countries.

ARC : Management

**ARC** Afghanistan Reconstruction Company, LLC

back

## Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team bring strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

**Dr. M. Ishaq Nadiri,** Chairman : emigrated from Afghanistan to the United States at the age of 19 and received his B.S. from the University of Nebraska, and his M.A. and Ph.D. from the University of California, Berkeley. He has taught at UC Berkeley, Northwestern University, University of Chicago, and Columbia University. He joined New York University in 1970 and has been the chairperson of the Economics Department and director of the C V. Starr Center for Applied Economics. He is currently a Jay Gould Professor of Economics at New York University. Professor Nadiri was a signatory of the 2001 Bonn meetings where the interim government of Afghanistan was created; a participant in the Tokyo meetings focused on funding Afghanistan's reconstruction, the White House and UN Security Council meetings during Hamid Karzai's visit in January 2002, and the Loya Jirga in Kabul in June 2002 that resulted in Hamid Karzai's election as president. Professor Nadiri serves as Senior Economic Advisor to President Karzai.
email:    **INadiri@ARCcompanies.com**

**Mr. Timothy M. Lane,** Vice Chairman : is an experienced international businessman, having served as CEO of PepsiCo Restaurants International for Asia and the Middle East, a business which he expanded from $200 million to $2.5 billion from the late 80's to the mid 90's. Later he served as CEO of Holiday Inn Worldwide.
e-mail: **TLane@ARCcompanies.com**

**Farid A. Maqsudi,** President : is an Afghan-born, naturalized American citizen with an MBA from the University of Chicago. Mr. Maqsudi has over 18 years of business experience in the US and developing countries. For the past decade, he has run a successful Central Asian trading and investment company.
e-mail: **FMaqsudi@ARCcompanies.com**

**B-29**

**M. Zaher Yaqubie,** Executive Vice President : is an Afghan born, naturalized American citizen. For the past 20 years, Mr. Yaqubie has been able to compliment Eastern business philosophy with Western resources to successfully manage a diversified international trading company. In addition to the vast global business experience, Mr. Yaqubie is also a well-respected member of the greater Afghan population. He serves on the Board of several organizations, including a non-profit organization promoting greater cultural awareness for Afghan-Americans.
e-mail: **ZYaqubie@ARCcompanies.com**

**Glenn Simpson,** Vice President : has 20 years of financial and executive management experience with six years in Central Asian and Russia. Mr. Simpson was Vice President and Chief Financial Officer of ZCorum, Inc. an internet technology company in Atlanta, Georgia. Prior to this Mr. Simpson was Vice President and Chief Financial Officer of Coca-Cola Bottlers and its holding company, ROZ Group, in Uzbekistan. Mr. Simpson, a Certified Public Accountant, received an MBA from Columbia University.
e-mail: **GSimpson@ARCcompanies.com**

**Gokhan Erkal,** Business Development Director : has a good banking and finance experience in financial institutions in London, emerging markets, particularly Central Asia and Middle East. He is specialized in project finance and development. He worked as a consultant in CIS for international banking and development projects with institutions like EBRD, TACIS and has good understanding of emerging markets. He also worked in London, Luxembourg as banker. He was a vice president for Project Finance at Garanti Bank before joining ARC and worked closely with construction companies, investors and international institutions. He graduated from French high school and has a civil engineering degree and MBA degree on finance and marketing.
email:     **GErkal@ARCcompanies.com**

tel: +93 70289942
int. mobile: +90 532 5666342
dubai mobile: +971 505521347

**B-30**

**B-31**

ARC : Management

**ARC** Afghanistan Reconstruction Company, LLC

**back**

## Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team brings strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

**Dr. M. Ishaq Nadiri,** Chairman : emigrated from Afghanistan to the United States at the age of 19 and received his B.S. from the University of Nebraska, and his M.A. and Ph.D. from the University of California, Berkeley. He has taught at UC Berkeley, Northwestern University, University of Chicago, and Columbia University. He joined New York University in 1970 and has been the chairperson of the Economics Department and director of the C.V. Starr Center for Applied Economics. He is currently a Jay Gould Professor of Economics at New York University. Professor Nadiri was a signatory of the 2001 Bonn meetings where the interim government of Afghanistan was created; a participant in the Tokyo meetings focused on funding Afghanistan's reconstruction, the White House and UN Security Council meetings during Hamid Karzai's visit in January 2002, and the Loya Jirga in Kabul in June 2002 that resulted in Hamid Karzai's election as president. Professor Nadiri serves as Senior Economic Advisor to President Karzai.
email:    **INadiri@ARCcompanies.com**

**Mr. Timothy M. Lane,** Vice Chairman : is an experienced international businessman, having served as CEO of PepsiCo Restaurants International for Asia and the Middle East, a business which he expanded from $200 million to $2.5 billion from the late 80's to the mid 90's. Later he served as CEO of Holiday Inn Worldwide.
e-mail: **TLane@ARCcompanies.com**

**Farid A. Maqsudi,** President : is an Afghan-born, naturalized American citizen with an MBA from the University of Chicago. Mr. Maqsudi has over 18 years of business experience in the US and developing countries. For the past decade, he has run a successful Central Asian trading and investment company.
e-mail: **FMaqsudi@ARCcompanies.com**

B-32

**M. Zaher Yaqubie**, Executive Vice President : is an Afghan born, naturalized American citizen. For the past 20 years, Mr. Yaqubie has been able to compliment Eastern business philosophy with Western resources to successfully manage a diversified international trading company. In addition to the vast global business experience, Mr. Yaqubie is also a well-respected member of the greater Afghan population. He serves on the Board of several organizations, including a non-profit organization promoting greater cultural awareness for Afghan-Americans.

e-mail: **ZYaqubie@ARCcompanies.com**

**Glenn Simpson**, Vice President : has 20 years of financial and executive management experience with six years in Central Asian and Russia. Mr. Simpson was Vice President and Chief Financial Officer of ZCorum, Inc. an internet technology company in Atlanta, Georgia. Prior to this Mr. Simpson was Vice President and Chief Financial Officer of Coca-Cola Bottlers and its holding company, ROZ Group, in Uzbekistan. Mr. Simpson, a Certified Public Accountant, received an MBA from Columbia University.

e-mail:  **GSimpson@ARCcompanies.com**

**Gokhan Erkal**, Business Development Director : has a good banking and finance experience in financial institutions in London, emerging markets, particularly Central Asia and Middle East. He is specialized in project finance and development. He worked as a consultant in CIS for international banking and development projects with institutions like EBRD, TACIS and has good understanding of emerging markets. He also worked in London, Luxembourg as banker. He was a vice president for Project Finance at Garanti Bank before joining ARC and worked closely with construction companies, investors and international institutions. He graduated from French high school and has a civil engineering degree and MBA degree on finance and marketing.

email:  **GErkal@ARCcompanies.com**

tel: +93 70289942
int. mobile: +90 532 5666342
dubai mobile: +971 505521347

ARC : Management

**B-34**

ARC : Management

**AR Afghanistan Reconstruction Company, LLC**

back

## Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team bring strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

**Dr. M. Ishaq Nadiri**, Chairman : emigrated from Afghanistan to the United States at the age of 19 and received his B.S. from the University of Nebraska, and his M.A. and Ph.D. from the University of California, Berkeley. He has taught at UC Berkeley, Northwestern University, University of Chicago, and Columbia University. He joined New York University in 1970 and has been the chairperson of the Economics Department and director of the C V. Starr Center for Applied Economics. He is currently a Jay Gould Professor of Economics at New York University. Professor Nadiri was a signatory of the 2001 Bonn meetings where the interim government of Afghanistan was created; a participant in the Tokyo meetings focused on funding Afghanistan's reconstruction, the White House and UN Security Council meetings during Hamid Karzai's visit in January 2002, and the Loya Jirga in Kabul in June 2002 that resulted in Hamid Karzai's election as president. Professor Nadiri serves as Senior Economic Advisor to President Karzai.
email:    **INadiri@ARCcompanies.com**

**Mr. Timothy M. Lane**, Vice Chairman : is an experienced international businessman, having served as CEO of PepsiCo Restaurants International for Asia and the Middle East, a business which he expanded from $200 million to $2.5 billion from the late 80's to the mid 90's. Later he served as CEO of Holiday Inn Worldwide.
e-mail: **TLane@ARCcompanies.com**

**Farid A. Maqsudi**, President : is an Afghan-born, naturalized American citizen with an MBA from the University of Chicago. Mr. Maqsudi has over 18 years of business experience in the US and developing countries. For the past decade, he has run a successful Central Asian trading and investment company.
e-mail: **FMaqsudi@ARCcompanies.com**

B-35

**M. Zaher Yaqubie**, Executive Vice President : is an Afghan born, naturalized American citizen. For the past 20 years, Mr. Yaqubie has been able to compliment Eastern business philosophy with Western resources to successfully manage a diversified international trading company. In addition to the vast global business experience, Mr. Yaqubie is also a well-respected member of the greater Afghan population. He serves on the Board of several organizations, including a non-profit organization promoting greater cultural awareness for Afghan-Americans.

e-mail: **ZYaqubie@ARCcompanies.com**

**Glenn Simpson**, Vice President : has 20 years of financial and executive management experience with six years in Central Asian and Russia. Mr. Simpson was Vice President and Chief Financial Officer of ZCorum, Inc. an internet technology company in Atlanta, Georgia. Prior to this Mr. Simpson was Vice President and Chief Financial Officer of Coca-Cola Bottlers and its holding company, ROZ Group, in Uzbekistan. Mr. Simpson, a Certified Public Accountant, received an MBA from Columbia University.

e-mail: **GSimpson@ARCcompanies.com**

**Gokhan Erkal**, Business Development Director : has a good banking and finance experience in financial institutions in London, emerging markets, particularly Central Asia and Middle East. He is specialized in project finance and development. He worked as a consultant in CIS for international banking and development projects with institutions like EBRD, TACIS and has good understanding of emerging markets. He also worked in London, Luxembourg as banker. He was a vice president for Project Finance at Garanti Bank before joining ARC and worked closely with construction companies, investors and international institutions. He graduated from French high school and has a civil engineering degree and MBA degree on finance and marketing.

email: **GErkal@ARCcompanies.com**

tel: +93 70289942
int. mobile: +90 532 5666342
dubai mobile: +971 505521347

**B-37**

ARC : Management

**AR C** Afghanistan Reconstruction Company, LLC

**back**

## Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team brings strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

**Dr. M. Ishaq Nadiri**, Chairman : emigrated from Afghanistan to the United States at the age of 19 and received his B.S. from the University of Nebraska, and his M.A. and Ph.D. from the University of California, Berkeley. He has taught at UC Berkeley, Northwestern University, University of Chicago, and Columbia University. He joined New York University in 1970 and has been the chairperson of the Economics Department and director of the C. V. Starr Center for Applied Economics. He is currently a Jay Gould Professor of Economics at New York University. Professor Nadiri was a signatory of the 2001 Bonn meetings where the interim government of Afghanistan was created; a participant in the Tokyo meetings focused on funding Afghanistan's reconstruction, the White House and UN Security Council meetings during Hamid Karzai's visit in January 2002, and the Loya Jirga in Kabul in June 2002 that resulted in Hamid Karzai's election as president. Professor Nadiri serves as Senior Economic Advisor to President Karzai.
email:    **INadiri@ARCcompanies.com**

**Mr. Timothy M. Lane**, Vice Chairman : is an experienced international businessman, having served as CEO of PepsiCo Restaurants International for Asia and the Middle East, a business which he expanded from $200 million to $2.5 billion from the late 80's to the mid 90's. Later he served as CEO of Holiday Inn Worldwide.
e-mail: **TLane@ARCcompanies.com**

**Farid A. Maqsudi**, President : is an Afghan-born, naturalized American citizen with an MBA from the University of Chicago. Mr. Maqsudi has over 18 years of business experience in the US and developing countries. For the past decade, he has run a successful Central Asian trading and investment company.
e-mail: **FMaqsudi@ARCcompanies.com**

**B-38**

ARC : Management

**M. Zaher Yaqubie**, Executive Vice President : is an Afghan born, naturalized American citizen. For the past 20 years, Mr. Yaqubie has been able to compliment Eastern business philosophy with Western resources to successfully manage a diversified international trading company. In addition to the vast global business experience, Mr. Yaqubie is also a well-respected member of the greater Afghan population. He serves on the Board of several organizations, including a non-profit organization promoting greater cultural awareness for Afghan-Americans.
e-mail: **ZYaqubie@ARCcompanies.com**

**Glenn Simpson**, Vice President : has 20 years of financial and executive management experience with six years in Central Asian and Russia. Mr. Simpson was Vice President and Chief Financial Officer of ZCorum, Inc. an internet technology company in Atlanta, Georgia. Prior to this Mr. Simpson was Vice President and Chief Financial Officer of Coca-Cola Bottlers and its holding company, ROZ Group, in Uzbekistan. Mr. Simpson, a Certified Public Accountant, received an MBA from Columbia University.
e-mail: **GSimpson@ARCcompanies.com**

**Gokhan Erkal**, Business Development Director : has a good banking and finance experience in financial institutions in London, emerging markets, particularly Central Asia and Middle East. He is specialized in project finance and development. He worked as a consultant in CIS for international banking and development projects with institutions like EBRD, TACIS and has good understanding of emerging markets. He also worked in London, Luxembourg as banker. He was a vice president for Project Finance at Garanti Bank before joining ARC and worked closely with construction companies, investors and international institutions. He graduated from French high school and has a civil engineering degree and MBA degree on finance and marketing.
email: **GErkal@ARCcompanies.com**

tel: +93 70289942
int. mobile: +90 532 5666342
dubai mobile: +971 505521347



ARC : Projects : Kabul-Kandahar Highway Project

## Afghanistan Reconstruction Company, LLC

About Us
Management
• Projects
ARC Foundation
Images
News
Links

Employment
Contact Us

### Kabul Kandahar Highway Project

Work has begun on the road construction, with grading and compacting, as well as base preparation under way that has already significantly reduced travel times and are essential parts to completing and delivering high quality road for the use of the Afghan people. We can also say that much needed infrastructure equipment that did not previously exist in Kabul, such as state of the art Asphalt Plants and Stone Crushing Plants have been recently assembled and will be an integral part to allow road construction to progress and be completed, and also to assist in the long term development of road infrastructure in Afghanistan with the plants providing much needed capacity to be able to produce stones for road bases and asphalt for surfaces.

Essential road preparation works will continue for ARC's portion of the 1st 49 kilometers of the Kabul Kandahar highway and asphalting progress during the summer and be completed by the end of 2003.



## Afghanistan Reconstruction Company, LLC

**Asphalt Plant**










About Us
Management
● Projects
ARC Foundation
Images
News
Links
Employment
Contact Us



**Afghanistan Reconstruction Company, LLC**

**Stone Crushing Plant**








About Us
Management
● Projects
ARC Foundation
Images
News
Links
Employment
Contact Us



ARC : Bank Project : 1

Afghanistan Reconstruction Company, LLC

back



AIB
managed by ING
AFGHANISTAN INTERNATIONAL BANK

## ING Says Afghanistan International Bank Starts Operations

DOW JONES NEWSWIRES
Edited Press Release
AMSTERDAM -- Dutch bank and insurer ING Groep NV (ING) said Friday that the Afghanistan International Bank has commenced operations after receiving an approved business licence on March 22, 2004. The bank is managed by ING-IGA on behalf of the consortium.

Operating from its headquarters in Kabul, the bank will initially provide facilities for inward and outward remittances as well as cashier services, current account and checking facilities. Within a few months, the bank intends to make available trade finance and short/medium term loans to corporate clients. In the second half of this year, customers will be able to access their accounts through an ATM network and enjoy e-banking facilities.

John Haye, Chief Executive Officer of the Afghanistan International Bank, stated: "We will be managing the bank according to international best practice and the highest standards of corporate governance. In providing exclusive services such as lending and e-banking to our local customers, in addition to the more traditional banking products, the Afghanistan International Bank is looking not only to support multilateral and international agencies operating in Afghanistan and the local business community, but also provide for the financing needs of overseas-based Afghan nationals, as they look to repatriate money from around the world."

ING-IGA is mandated to manage the bank for an initial three-year period, providing senior management executives, including a Chief Executive Officer and Chief Operating Officer. Initially capitalised at US$10 million, the consortium of Afghan and American business group operating investors includes Afghanistan Reconstruction Companies, Rahmat Group, and Mohib Group, while the Asian Development Bank is also interested in taking an equity stake in the bank. The Overseas Private Investment Corporation is currently in negotiations with the Afghanistan

**B-44**

ARC : Bank Project : 1

International Bank to provide a supporting role to the bank's operations.

Company website: http://www.ing.com

### Dutch bank sets up shop in Kabul

BBC NEWS

*Dutch banking group ING has become the third foreign bank to open a branch in the Afghan capital, Kabul.*

ING is setting up and managing the Afghanistan International Bank on behalf of a consortium of Afghan and US investors. Initially the AIB will provide current account services and offer remittances, adding a further legal channel for Afghans to receive money from abroad.

Pakistan National Bank and Standard Chartered already operate in Kabul.

"AIB is looking not only to support multilateral and international agencies and the local business community, but also provide for the financing needs of overseas-based Afghan nationals as they look to repatriate money from around the world," said John Haye, the bank's chief executive.

The bank opened its doors on 26 March, having received a licence earlier that week.

### Plans

ING's initial responsibility to the investors - who are capitalising the AIB at $10m with the possibility of further money from the Asian Development Bank - is a three-year commitment to running the bank and providing senior executives.

Later in 2004, the bank hopes to open ATMs and offer online banking facilities, which may again reduce the demand for informal hawaladars, or remittance merchants. After the first year, the plan is to add further branches outside Kabul, although that may depend on the security situation.

ING has long experience of running banks on behalf of governments and other bodies in developing countries, via its Institutional and Government Advisory Group. The group is already working in Indonesia, Mongolia and Vietnam, among other countries.

**B-45**

ARC : Projects : Kabul-Doshi Highway Project

**ARC** Afghanistan Reconstruction Company, LLC

**About Us**
**Management**
  ● **Projects**
**ARC Foundation**
**Images**
**News**
**Links**

**Employment**
**Contact Us**

## Kabul-Doshi Highway Project

Repair work on the 175 kilometer Kabul- Doshi road has started under the World Bank- financed **Emergency Transport Rehabilitation Project.** The road from Kabul through the Salang pass to Doshi covers a critical section of the highway that connects Kabul and the southern provinces with eight northern provinces, and connects the country of Afghanistan to both Uzbekistan via Hairatan port and Tajikistan via Sher Khan Bander port. The road to the north and north-east through Doshi is one of Afghanistan's six international links to its neighboring countries that can enhance economic and social recovery through improved physical access to goods, markets, and administrative and social services.

The project is estimated to be largely completed by the end of October, 2004, and fully completed by February 2005. ARC along with partners in LIA Group International will repair a 75 kilometer section of the road, from Wolang- Doshi.

ARC : Finance Manager - Kabul Afghanistan - International


Afghanistan Reconstruction Company, LLC

**About Us**
**Management**
**Projects**
**ARC Foundation**
**Images**
**News**
**Links**

**Employment**
**Contact Us**

### Finance Manager - Kabul Afghanistan - International

Company Profile:

ARC Companies is bringing international resources together to rebuild Afghanistan's economy. ARC has attracted a core of experienced businessmen committed to reconstructing Afghanistan's physical infrastructure and reengineering Afghan business and commercial institutions into world class entities.

### PROFESSIONAL/PERSONAL SKILL REQUIREMENTS

- Six years of financial management experience preferable in an international environment and or public accounting
- Good understanding of mid range accounting and control programs like Great Plains
- Established track record of building teams and processes with the finance and accounting area
- Ability to direct internal audits and work closely with major CPA firms
- Demonstrated academic and professional achievement with an advanced degree and CPA or Chartered Accountant designation

### Personal characteristics/management style

- Business-minded with strong analytical and problem solving skills
- Demonstrated comfort in asking tough questions to achieve compliance and profit targets

### The right candidate will:

- Report directly to the Managing Director-Kabul and the CFO-NYC
- Establish effective decision processes for capital expenditures and new business activities
- Improve audit practices and reporting mechanisms
  - Lead financial and operations performance initiatives

**B-47**

ARC : Finance Manager - Kabul Afghanistan - International

- Oversee annual financial and operational audits
- Provide independent financial advice
- Mange capital structure and risk
- Improve financial department skills

http://www.afghanrc.com/id93.htm (2 of 2)10/11/2007 10:59:47 AM

ARC : HR Manager - Kabul Afghanistan - International



**AFC** Afghanistan Reconstruction Company, LLC

About Us
Management
Projects
ARC Foundation
Images
News
Links

Employment
Contact Us

## HR Manager - Kabul Afghanistan - International

Company Profile:

ARC Companies is bringing international resources together to rebuild Afghanistan's economy. ARC has attracted a core of experienced businessmen committed to reconstructing Afghanistan's physical infrastructure and reengineering Afghan business and commercial institutions into world class entities.

### PROFESSIONAL/PERSONAL SKILL REQUIREMENTS

- Five years of human resource management experience preferable in an international environment and or public accounting
- Good understanding of organization development and staffing methods
- Established track record of recruiting
- Ability to develop compensation and benefit programs
- Demonstrated academic and professional achievement

### Personal characteristics/management style

- Business-minded with strong analytical and problem solving skills as well as people skills
- Demonstrated comfort in making difficult decisions

### The right candidate will:

- Report directly to the Managing Director-Kabul
- Establish human resource polices and procedures including compensation levels
- Recruit and develop programs to retain key staff
  - Have as strong desire to work in challenging international markets
    - Leading the HR team

ARC : HR Manager - Kabul Afghanistan - International

- ◆ Oversee learning programs
- ◆ Provide independent HR advice
- ◆ Mange all staffing needs Improve
- ◆ Manage employment contract process
- ◆ Farsi language skills a plus

ARC : COO - Kabul Afghanistan - International

**ARC** Afghanistan Reconstruction Company, LLC

**About Us**
**Management**
**Projects**
**ARC Foundation**
**Images**
**News**
**Links**
**Employment**
**Contact Us**

## COO - Kabul Afghanistan - International

Company Profile:

ARC Companies is bringing international resources together to rebuild Afghanistan's economy. ARC has attracted a core of experienced businessmen committed to reconstructing Afghanistan's physical infrastructure and reengineering Afghan business and commercial institutions into world class entities.

### PROFESSIONAL/PERSONAL SKILL REQUIREMENTS

- Ten years of increasing management experience five of which should have been in the construction industry preferable in an international environment
- Ability to recruit and develop staff to sustain projected growth rates
- Ability to provide significant input into the develop compensation and benefit programs
- Demonstrated academic and professional achievement

### Personal characteristics/management style

- Business-minded with strong analytical and problem solving skills as well as people skills
- Demonstrated comfort in making difficult complex decisions

### The right candidate will:

- Report directly to the Managing Director-Kabul and the President New York
- Direct all construction projects in Afghanistan
- Recruit and develop programs to retain key staff
    - Have as strong desire to work in challenging international markets
        - Manage all construction projects
        - Have significant input into the purchase of heavy construction equipment

**B-51**

ARC : COO - Kabul Afghanistan - International

♦ Manage an organization with very high growth

📃 08-01-2003, 10:29 AM                                                                #2

Valeriy Shokhin                    **American-Uzbek swindlers are wanted by Uzbekistan authorities**



                                   /Valeriy Shokhin, Novaya Gazeta, Issue #55, July 31, 2003/

Gender not set                     A new scandal is about to happen in the United States
Posts: n/a                         - some the largest American companies, such as Coca-
                                   Cola, Philip Morris, Procter&Gamble, and others have
                                   fallen a victim to swindle. However, Europeans are
                                   also in the list of victims. For example, Swiss company
                                   Nestle.
                                   Heads of the export-import company Roz Trading Ltd.,
                                   - US citizens of the Uzbek origin: Mr. Abdul Rauf
                                   Maqsudi and his sons - Mansur Akhmed and Farid
                                   Akhmed. Now, all of them are wanted by Interpol. The
                                   Uzbek authorities accuse the owners of Roz Trading
                                   Ltd. on money laundering, extortion, official forgery,
                                   deliberate evasion from taxes, large-scale bribery and
                                   organizing of system of illegal transactions with the
                                   largest American companies by imitation of export of
                                   their production to Uzbekistan. Official documents on
                                   this criminal case are handed to the US Attorney
                                   General.
                                   One of the used swindle schemes is rather interesting,
                                   though it is simple. Operating as a purely Uzbek
                                   company, Roz Trading Ltd. made favorable contracts
                                   with the American companies on delivery of their
                                   production to Uzbekistan. In doing so they managed to
                                   achieve very serious discounts: transnational "giants"
                                   traditionally give a price reduction for the new or
                                   developing markets. Further, without the knowledge of
                                   manufacturers, the consignments successfully passed
                                   by Uzbekistan, getting in other Republics of the former
                                   USSR, Dubai, or were sold directly on a place, in
                                   territory of the United States. And discounts left to the
                                   Maqsudis.
                                   According to the Uzbek Office of Prosecutor, fraud was
                                   a basis of the Maqsudis' business. One could only
                                   imagine, how this business prospered when Roz
                                   Trading Ltd. was receiving up to 30% discounts for top
                                   saleable goods. When representatives of the American
                                   companies wanted to be personally convinced on how
                                   their goods are sold, they were carried to Tashkent
                                   where samples of production of the appropriate
                                   companies were in an extra hurry scattered on stalls
                                   of the central market. Foreign visitors usually were
                                   very pleased and didn't guess at all that they became
                                   witnesses of well-staged show.
                                   The interesting information on violations of the clan
                                   was given with the letter of Ahmet Bozer, Director of
                                   the Eurasia and Near East branch of Coca-Cola,
                                   addressed to the Uzbek Prime Minister (the editors has

**B-53**

a copy of letter). The letter - as a matter of fact, is the respond to inquiry of the Uzbek authorities concerning Roz Trading Ltd. activity, which was the holder of a controlling packet of shares of American - Uzbek JV Coca-Cola Bottlers of Uzbekistan.

The information of Mr. Bozer sheds light on how business has been done in Coca-Cola Bottlers of Uzbekistan. It was found out that as soon as Roz Trading Ltd. set up a joint venture with Coca-Cola in Uzbekistan and Mr. Mansur Maqsudi became its manager, an American partner was regularly deceived. After receiving control packet of shares Maqsudis almost completely pushed their partners out of the business management and started to control it almost solely. Americans had to hire an audit company that discovered a number of violations in activities of the major shareholder. Now Coca-Cola is alienating itself from the scandal motivating this that it did not have a chance to influence activities the JV.

It proves to be true by the words of the Coca-Cola Bottlers of Uzbekistan company's employee Irina, who in telephone conversation with our correspondent has told that the Maqsudis were always stating that it was their family business, but not business of Coca-Cola. Under a pretext of reinvestments through dummy firms they took the most part of the profit to themselves, and other founders practically did not get any profit. Irina asked us not to publish her surname because, according to her words, the Maqsudis have informers in Uzbekistan. She said that all employees were afraid of them, they were very tough and any violation of rules were punished, even if it was highly skilled professional.

Deputy General Prosecutor of Uzbekistan, Mr.Khamidjan Nematov in interview given to our correspondent stated that the Uzbek side is ready to cooperate with anyone who suffered from activities of the Maqsudis - both father and brothers. The list includes not only Americans, we already mentioned Swiss company Nestle. In Deputy General Prosecutor's opinion the Maqsudis clan have used all types of fraud invented and disseminated on the territory of the former USSR.

The investigation in Uzbekistan steadily brings more and more interesting results. Recently ex-employee of Roz Group Mr. Farkhod Inogambaev stated that fraud was the aim of company's founders. He added that the "lofty words about the strategy of the company appeared to be false... they affirmed that the major aim of the company was to deliver high quality goods to the people of Uzbekistan, but in reality they illegally re-exported those goods to the neighboring countries. It was the only reason why Procter&Gamble, their biggest partner, ceased relationship with them...

**B-54**

Lately, the cooperation with Gillette also came to an end".

Similar situation occurred in the other companies owned by the Roz Group, especially Valuelink. In Valuelink, there was well-developed system of parallel trading according to which goods ordered for Uzbekistan were sold in Dubai, US and even Africa. When representatives of producing companies (like "Colgate", "Alberto-Culver") wanted to visit Uzbekistan to investigate marketing outlets, Valuelink and Roz played well-prepared show.

In another statement Mr. Inogambaev insists that large amounts of cash that was illegally taken out of Uzbekistan to Dubai, Roz Group purchased goods for re-export to the United States, in that way laundering all the illegal cash.

Authorities declared an international inquiry for the Maqsudis (farther and both brothers) and looking forward for their fast capture and extradition to Uzbekistan. Anyway, if the clan decided to disappear, it's necessary to search for them not only in a country of their citizenship - the United States, but rather in the United Arab Emirates or in Republics of former Soviet Union.



**B-55**

Westlaw.                                                          NewsRoom

11/20/02 APWORLD 00:00:00                                        Page 1


11/20/02 AP Worldstream 00:00:00

                              AP WORLDSTREAM
            Copyright © 2004 The Associated Press. All rights reserved.

                             **November 20, 2002**

          **Family    feud  in  Uzbekistan    hurts   Coca - Cola**


   ATLANTA (AP) -- A divorce within the first family of Uzbekistan led to a four-
month shutdown of Coca-Cola production and a takeover of Coke's bottling company in
this central Asian country.

   Atlanta-based Coca-Cola had a partnership with Mansur Maqsudi, the son-in-law of
Uzbek President Islam Karimov. But the president's daughter, Gulnora Karimova, filed
for divorce this year and Coke became ensnared in the fight.

   Uzbek authorities jailed some members of Maqsudi's family and deported others to
their native Afghanistan in apparent retaliation for the humiliation suffered by the
president's daughter.

 Maqsudi fled to the United States, where he has lived for much of the previous
decade.

   As word of the divorce spread, the Uzbek government announced that Maqsudi owed
$9 million in taxes. Maqsudi denied it, but the government went after his assets,
including his minority stake in Coca-Cola Bottlers of Uzbekistan.

   The company's other two owners are the government of Uzbekistan and Coca-Cola.

 The incident halted Coke production for months, partly because Maqsudi had managed
the bottling operation and it had difficulty operating without him.

   Coke spokesman Steve LeRoy refused to comment on the Maqsudi matter. While
acknowledging production problems, he said he was optimistic about Coke's future in
Uzbekistan.

   "We believe that if the Uzbek government opens up to the U.S., that will only
create more transparency, a favorable business climate and create a more level
playing field," LeRoy told The Atlanta Journal-Constitution in a phone interview
from his offices in Vienna.

   Having confiscated Maqsudi's shares in the plant, the Uzbek government possessed
a majority. In September, the Uzbeks installed new management at the plant --
officers widely believed to have ties to business rivals of Maqsudi.

   Uzbek Deputy Foreign Minister Sadyk Safayev said in September that the new
management would ensure "smooth sailing" for Coke in the future.

   "The previous management of Coke committed lots of misdeeds, like violations of
tax law, violations in sales regulations and violations of human rights in the plant
here," Safayev said. "Both Coke and the Uzbek government lost out because of these
misdeeds. We are sure the new team will clear up these things. We are doing our
utmost to make sure Coke won't have any more problems."

   Coke spokesman LeRoy said Safayev's allegations of misdeeds are untrue.

   Coca-Cola jumped into the Uzbek market after the Soviet empire dissolved in
1991. The company hoped an extensive bottling and distribution system in Uzbekistan,
the most populous Central Asian country, could serve as a launching pad to

        ©  2007 Thomson/West. No Claim to Orig. US Gov. Works.

neighboring countries.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (World Organizations (1IN77); CIS (1CI65))

INDUSTRY:  (Beverages (1BE22); Non-Alcoholic Beverages (1NO38); Soft Drinks (1SO77);
Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); USA (1US73); Americas (1AM92); North America
(1NO39); Asia (1AS61); Georgia (1GE15); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (COCA; COCA COLA; COKE; COLA; UZBEK DEPUTY FOREIGN)  (Gulnora
Karimova; Islam Karimov; LeRoy; Mansur Maqsudi; Maqsudi; Sadyk Safayev; Safayev;
Steve LeRoy; Uzbek)

Word Count: 538
11/20/02 APWORLD 00:00:00
END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. US Gov. Works.

**Westlaw.**                                                    **News**Room

8/19/03 FTI 8                                                    Page 1


8/19/03 Fin. Times 8
2003 WLNR 8157409

Financial Times UK
Copyright (c) 2003 Financial Times Ltd. All rights reserved.

August 19, 2003

Section: ASIA-PACIFIC


ASIA-PACIFIC: **Uzbekistan** **offers** **rich** **pickings** for **leader's
daughter** : SPECIAL INVESTIGATION: Her father is a key ally in George W. Bush's war
on terror, but the US has a warrant out for her arrest. David Stern examines how
Gulnora Karimova has become wealthy in a very poor country

DAVID STERN

Diversified Industrials, Diversified Industrials

Gulnora Karimova has a lot going for her.

Prodigiously rich, tall with striking looks, a blackbelt in martial arts and a
degree from Harvard Business School, Ms Karimova has one other invaluable
attribute: she is the elder daughter of Islam Karimov, president of Uzbekistan.

At 31, she is considered one of the most powerful business people in the
strategically pivotal ex-Soviet central Asian republic that neighbours
Afghanistan. But the origins of her wealth and extent of her influence have
remained shrouded in speculation.

Now the Financial Times has uncovered evidence that Ms Karimova has over the past
two years acquired a business empire far more substantial than previously known.
It includes key stakes in the country's largest mobile telephone provider and a
big cement factory, as well as property and trading activities.

The investigation provides the first real glimpse into the inner workings of one
of the ruling clans that came to power across central Asia following the break-up
of the Soviet Union. It also raises uncomfortable questions about the nature of
some of her deals and about western, especially US, support for the Uzbek ruling
family.

Mr Karimov, who has dominated Uzbekistan since it became independent in 1991, is
believed to be seriously ill. According to Martha Brill Olcott, a central Asia

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

expert with the Carnegie Foundation, the expansion of Ms Karimova's business
empire could be viewed as an attempt to smooth the family's exit as her father
departs the political scene. Or it could be a means of holding on to power.

If the intention is to create a Karimov dynasty, says Ms Olcott, this would be
"potentially very disturbing", as the possibility of instability in the country of
25m people could be high.

In spite of resources including gold and oil, the country is one of the poorest in
the former Soviet Union. Most Uzbeks get by on less than Dollars 30 (Euros 27,
Pounds 19) a month while doctors and teachers make as little as Dollars 10.

Ms Karimova's upbringing was comfortable rather than opulent. Though her father
held a series of high posts in Soviet-era Uzbekistan, including finance minister
and head of the state planning commission, he rose to the republic's top job only
in 1989.

At her 19th birthday party in July 1991 she met Mansur Maqsudi, scion of a
prominent Uzbek-Afghan family that resides in New Jersey. They married that
November, a month before her father was elected president of independent
Uzbekistan.

Twelve years on, the marriage is over and a custody battle over her two children
with her now ex-husband, a US citizen, means she is unable to travel to most
western countries.

A US court has issued an arrest warrant against her for defying a court order to
return her two children. Ms Karimova was awarded custody of the children by an
Uzbek judge, but Mr Maqsudi sued in a New Jersey court and this year won his own
claim. Last month the New Jersey judge issued the warrant for Ms Karimova for
non-compliance with its decision. Ms Karimova risks detention and loss of her
children if she travels to any country enforcing deportation agreements with the
US.

That a US court has called for the arrest of the eldest daughter of one of
Washington's closest allies has caused much embarrassment between the two
countries. But officials on both sides say relations are strong enough to override
such setbacks. The Uzbeks, US officials say, are discreet enough not to mention
the matter in their discussions.

For their part, the Uzbek authorities say they have extensive documentation
proving illegal activities by the Maqsudis. The family, which ran Roz Trading, an
import-export business, allegedly failed to pay some Dollars 12m in taxes as well
as committing other economic crimes. Mr Maqsudi denies the accusations.

In August 2001, shortly after Mr Maqsudi announced he wanted a divorce,
authorities descended on the offices of Coca-Cola Bottlers Uzbekistan, in which
the family had a 55 per cent stake. The Uzbek government subsequently liquidated
Roz Trading's interest to pay the back taxes, and arrested or expelled members of
the Maqsudi family.

After the marital break-up Ms Karimova recruited as a top aide Farhod Inogambayev,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-59**

who was working for Mr Maqsudi in the United Arab Emirates but was summoned to Tashkent by the president's daughter.

Soon afterwards, Mr Inogambayev and Ms Karimova travelled to the UAE and in November 2001 set up Revi Holdings in the Sharjah free trade zone, which would act as parent company for Ms Karimova's various businesses and collect the revenues from their activities.

Registration documents and share certificates for Revi, since renamed Camfed, list Ms Karimova as owner and single stock holder. Enquiries also reveal that Ms Karimova is director of a London offshoot called Revi UK, located in New Bond Street and incorporated in October 2001.

Mr Inogambayev was established as Ms Karimova's main representative in Dubai. Soon afterwards, he says, "large amounts of funds in US dollars started arriving to the companies' accounts from Uzbekistan".

Some of the money arrived from Uzdunrobita, Uzbekistan's largest mobile telephone company. According to an internal company report, Ms Karimova acquired controlling interest of the mobile operator in two stages at the beginning of 2002. Revi Holdings received first 20 per cent from International Communications Group, a Georgia, US-based shareholder, and then 31.4 per cent from the Uzbek government.

Bekhzod Akhmedov, Uzdunrobita's general director, describes Ms Karimova's interest in the company as "just a rumour". However, Dun and Bradstreet, the independent business research group, confirms Revi's interest in the company.

Later, Uzdunrobita made a bank transfer to Revi Holdings for Dollars 330,000 for "consultation services of the contract without number on 31.07.2002", according to documents seen by the FT.

Mr Inogambayev, who has left Ms Karimova's employment, says Revi was also the final recipient of Dollars 1m from Huawei Technologies, a Chinese telecommunications company that had been engaged by Uzdunrobita to create a GSM network outside Tashkent.

As part of the contract, Huawei hired Global Communications, a Caribbean offshore company, paying it just over Dollars 1m for GSM equipment. Global, however, turned around and hired Revi, depositing the same amount into Revi's bank account.

Bank documents show the amount being passed on in November 2002, first from Huawei to Global's Citibank account in Dubai, and then to Revi Holdings. Huawei representatives declined to comment.

Most recently, Ms Karimova, through another Sharjah offshore company, United International Group (Uning), acquired at least a 44.5 per cent interest in Quvasay Cement Factory, one of the country's prime industrial assets. For that holding, documents show that on March 12 this year she paid a modest Dollars 172,853.

After Mr Inogambayev stopped working with Ms Karimova, he kept a suitcase of documents detailing her financial dealings. The former Revi general director took with him scores of Ms Karimova's bank transfers and credit card statements, which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-60**

8/19/03 FTI 8                                                        Page 4

provide a glimpse of the large sums of money the president's daughter enjoys at her personal disposal.

Transactions include:

* Two transfers to her Citibank account on March 25 and April 13 2002, for Dollars 950,000 and Dollars 800,000 respectively for "consultancy fees".

* An HSBC account in Jersey receiving Dollars 362,000 on March 10 2002.

* An account established at HSBC in the name of Islam Karimov, her 10-year-old son, with a balance of Dollars 1.4m.

Ms Karimova was not available for comment, though numerous attempts were made to reach her. A spokesman for the Uzbek foreign ministry - where Ms Karimova works as adviser to Sadiq Safayev, foreign minister - likewise declined to comment, saying the ministry did not maintain information on the holdings of its employees.

Western diplomats and business people have become increasingly concerned over Ms Karimova's expanding business empire. For some, it is possible evidence that Uzbekistan is finally preparing to liberalise its Soviet-style economy. Ms Karimova, according to this version, wants to be well placed when long-standing currency restrictions are removed and western investors arrive in greater numbers.

Others, however, say she is accumulating what she can while her father is still in power. A recent law passed by the country's parliament, granting the president and his family immunity from prosecution should he step down, is also seen as suggesting his imminent departure.

To this can be added Ms Karimova's purchase of a three-storey apartment in Moscow for more than Dollars 1m. Russia is one of the few countries she can travel to without risking arrest.

The US has remained cautiously supportive of the Tashkent regime, thanking Uzbekistan regularly for its support for the war on terrorism, but at the same time drawing attention to its atrocious record on human rights.

Washington bases some 1,800 troops at an air base near the southern Uzbek city of Karshi for operations in Afghanistan. In May, a 38- year-old Karshi resident died while in police custody, apparently a victim of torture.

He was the eighth known death in official custody in the past 10 months, say human rights groups. A United Nations special rapporteur called the practice of torture in the country "systematic and widespread".

Still, for some the most striking fact is that Ms Karimova is one of the few to have prospered in post-Soviet Uzbekistan. Multilateral agencies say the country is becoming more impoverished by the day.

---- INDEX REFERENCES ----

COMPANY: HSBC HOLDINGS PLC; HONGKONG AND SHANGHAI BANKING CORPORATION LTD (THE);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-61**

8/19/03 FTI 8                                                              Page 5


HONGKONG AND SHANGHAI BANKING CORP (THE); HUAWEI TECHNOLOGIES; HSBC BANK PLC

NEWS SUBJECT:  (Business Management (1BU42); Business Strategy (1BU97); United
Nations (1UN54); Corporate Strategy & Strategic Planning (1XO03); World
Organizations (1IN77); CIS (1CI65); Mergers & Acquisitions (1ME39); Corporate
Groups & Ownership (1XO09))

INDUSTRY:  (Theoretical Analysis (1TH79); Banking (1BA20); I.T. in Banking
(1IT59); Financial Services (1FI37); I.T. in Financial Services (1IT24); I.T.
(1IT96); Science & Engineering (1SC33); Networking Markets (1NE31); Business
Theory (1BU14))

REGION:  (North America (1NO39); Europe (1EU83); Gulf States (1GU47); Eastern
Europe (1EA48); Russia (1RU33); Arab States (1AR46); Western Asia (1WE54);
Afghanistan (1AF45); Central Asia (1CE93); Sharjah (1SH72); Americas (1AM92); New
Jersey (1NE70); United Arab Emirates (1UA66); Asia (1AS61); Uzbekistan (1UZ71);
Middle East (1MI23); Dubai (1DU43); USA (1US73))

Language:  EN

OTHER INDEXING:  (Karimova, Gulnora)  (CARNEGIE FOUNDATION; COCA COLA BOTTLERS
UZBEKISTAN; FT; GLOBAL; GLOBAL COMMUNICATIONS; GSM; HARVARD BUSINESS SCHOOL; HSBC;
HUAWEI; HUAWEI TECHNOLOGIES; INTERNATIONAL COMMUNICATIONS GROUP; ISLAM KARIMOV;
KARSHI; MARTHA BRILL OLCOTT; SHARJAH; UAE; UNITED INTERNATIONAL GROUP; UNITED
NATIONS; UZBEK; UZBEKISTAN; UZBEKS)  (Bekhzod Akhmedov; Bradstreet; Cement
Factory; David Stern; Diversified Industrials; Dun; Enquiries; Farhod Inogambayev;
George W. Bush; Gulnora Karimova; Inogambayev; Islam Karimov; Karimov; Karimova;
Mansur Maqsudi; Maqsudi; Maqsudis; Multilateral; Olcott; Prodigiously;
Registration; Revi; Revi Holdings; Revi UK; Roz Trading; Sadiq Safayev;
Transactions; Western)  (Government News (GN); International Affairs (GN08))
(United States of America (US); Uzbekistan (UZ); Americas (QA); Commonwealth of
Independent States (XV); Former USSR (QC); North America (XB); Pacific Rim (QG))

PRODUCT: International Affairs; Management of Companies & Enterprises; Private
Households

NAICS CODE: 92812; 55111; 81411

EDITION: London Ed1

Word Count: 1916
8/19/03 FTI 8
END OF DOCUMENT


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-62**

**The New York Times**

nytimes.com

September 13, 2002

# Judge Sets U.S. Court as Venue In International Custody Case

**By RICHARD LEZIN JONES**

A State Superior Court judge ruled today that an international custody dispute between a New Jersey man and his wife in Uzbekistan should be decided in an American courtroom.

The ruling set the stage for formal divorce and custody proceedings for the man, Mansur Maqsudi, and his wife, Gulnara Karimova-Maqsudi, who fled with the couple's two children in July 2001 to her native Uzbekistan, where her father, Islam Karimov, is president.

Mr. Maqsudi, 35, a naturalized American citizen of Uzbek descent, had sought to have the case heard in an American court because, he said, the Uzbek court system would be biased in favor of his wife.

In court testimony here this summer, Mr. Maqsudi testified that officials with President Karimov's authoritarian regime had closed one of his businesses there, ordered the liquidation of another and sentenced three of Mr. Maqsudi's relatives to jail terms for what was termed corporate corruption. Those actions, he testified, were retaliation after he announced plans for divorce.

In her ruling, Judge Deanne M. Wilson ordered that Ms. Karimova-Maqsudi, 32, return with the children to the United States within the next month so that the case could proceed. "This custody matter must be resolved by this court expeditiously," Judge Wilson said.

The judge also ordered that Ms. Karimova-Maqsudi allow telephone contact between the children -- Islam, 9, and Iman, 4 -- and their father within the week and allow them to talk at least every other day until she and the children returned to the United States. The ruling also rejected an October finding by an Uzbek court that granted Ms. Karimova-Maqsudi a divorce and full custody of the children. The judge said Mr. Maqsudi had not received proper notification that proceedings would be held in Uzbekistan.

Enforcement of Judge Wilson's ruling may be difficult, legal experts said, because Uzbekistan is not among the 61 nations that have agreed to cooperate with one another on matters of international civil law under the Hague conventions.

B-63

"This could be a Pyrrhic victory," said Lynne Z. Gold-Bikin, a divorce lawyer in Norristown, Pa., and a past president of the American Bar Association's family law division. "She could totally disregard all this because the law, unfortunately, doesn't stretch to her home country."

Pyrrhic or not, Mr. Maqsudi's legal team welcomed Judge Wilson's ruling. Edward J. O'Donnell, Mr. Maqsudi's lawyer, would not entertain the possibility that Ms. Karimova-Maqsudi might refuse to return to the United States. "I'm hopeful that Gulnara is going to do what's right and what's in the best interests of the children," Mr. O'Donnell said.

John P. Paone Jr., Ms. Karimova-Maqsudi's lawyer, said he and his client would discuss whether to appeal the judge's ruling. He said he had not yet told Ms. Karimova-Maqsudi of the ruling.

Mr. Paone, who argued that the case should have been heard in Uzbekistan because that is where the children have lived most of the past two years, said, "Ultimately, we're left with a standoff unless the parties can resolve this matter amicably."

Copyright 2007 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Back to Top

**B-64**

FRI 14:29 FAX 202 228 0367        SEN. TORRICELLI                                    ☒002



OʻZBEKISTON ELCHIXONASI

EMBASSY OF THE REPUBLIC OF UZBEKISTAN
TO THE UNITED STATES OF AMERICA

1746 Massachusetts Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 887-5300
· Fax: (202) 293-6804

ELCHI

AMBASSADOR

August 29, 2001

The Honorable Robert Torricelli
Senator
The United States Senate
113 Dirksen Senate OB
Washington, DC 20510

Dear Mr. Senator,

First of all, I would like to express my gratitude for your interest in Central Asia and Uzbekistan in particular, as you wrote in your letter dated August 23. While being well aware of the role and significance of the United States Senate in shaping and implementing the American foreign policy and being deeply interested in strengthening the relations between our countries, the Government of Uzbekistan welcomes and highly appreciates the dialogue with such a prominent US politician as you, Mr. Senator.

Both our nations have a lot of common concerns and problems that necessitate advanced cooperation. Among those is the fight against international terrorism, islamic extremism, narco-aggression, i.e. transnational threats taking root from the regions neighboring Central Asia. There is no doubt that, as future chairman of the Subcommittee on Central Asia, your personal role in developing this cooperation with the region of tremendous geopolitical significance is invaluable. In this respect, I sincerely hope to be in continuous contact with you.

Mr. Senator,

In your letter you touched upon an issue of the activities of the Coca-Cola Bottlers Uzbekistan, Ltd. and the Roz Trading, Ltd. companies. During a routine regular audit of these enterprises' activities serious violations of the law have been revealed by Uzbekistan's tax agencies. In this connection, I am forwarding you a preliminary information on these violations.

**B-65**

14:29 FAX 202 228 0367        SEN. TORRICELLI

I would like to particularly note that the representatives of the Coca-Cola Company's regional office have been closely collaborating with the government agencies of Uzbekistan, and share their position that the current audit of the joint venture's documentation is lawful and that the violations of the law by the joint venture's administration, being conducted by the Maksudis, have, indeed, took place.

Despite the Coca-Cola Bottlers Uzbekistan administration's sabotage of the official audit, and also its attempts to cease the production, the Coca-Cola company has insisted on keeping the factory line working and taken all measures, due to which the factory continues to work properly.

As apparent from the presented materials, the Roz Trading company has continuously and for quite a long time not been paying profit tax for tens of millions of US dollars. Moreover, the company, having been engaged in illegal business activities, concealed its sales income from taxation. For instance, since 1997 the Roz Trading company has sold sugar through the "black market" and not paid profit tax for 7 billion soms (local currency), which is approximately $6 million.

According to preliminary data, the Maksudis, who you mentioned in your letter, have smuggled a tremendous amount of undeclared cash dollars out of Uzbekistan.

During the inspection of the Roz Trading's branch office, an undeclared cash amount of $199.900 was discovered.

The examination of the both companies' financial activities is yet under way. I would like to assure you, Mr. Senator, that the examination is being conducted in accordance with the law and international norms. We keep close contact with the headquarters of the Coca-Cola Company, and you should have no doubts of Uzbekistan Government's sincere interest in having the company continue working in our country.

Dear Mr. Senator, I hope that your experience will allow you to come to an unbiased knowledge of the situation and cut short any attempts of all appealing citizens to falsify the information and politicize this issue.

Thanking you in advance, I rely on your understanding and your further assistance.

Sincerely,

Shavkat Khamrakulov

B-66

Erb Declaration

Exhibit C

Westlaw.                                                          NewsRoom

2/26/97 FINTMAND (No Page)                                          Page 1


2/26/97 Fin. Times Mandate (Pg. Unavail. Online)
1997 WLNR 4766488

Financial Times Mandate
Copyright © 2004 Financial Times Business Limited. All rights reserved.

February 26, 1997

News: World Trade: **Coca** - **Cola** **plans** **Asian** fizz: World Trade News Digest

By KEVIN DONE **Coca** - **Cola** **plans** **Asian** fizz

 Coca-Cola, the world's largest soft drinks producer, is accelerating its capital
investment in Uzbekistan, the most populous country in central Asia. The group,
together with its local bottling partners, will have spent around Dollars 130m in
the four years from 1994 to the end of 1997 as part of a programme to create a
modern soft drinks production and distribution system throughout the central Asia
and Caucasus region. Coca-Cola Bottlers Tashkent, its local Uzbek joint venture,
is investing Dollars 55m to build a greenfield bottling and distribution facility
at Koyluk, near Tashkent.

 Construction will begin next month and is expected to be completed by the end of
the year. The plant will triple Coca-Cola's soft drinks production in Uzbekistan
and will create around 550 jobs.

 The Uzbek joint venture, Coca-Cola Bottlers Tashkent, is majority owned and oper-
ated by ROZ Trading, controlled by the Maqsudi family, with a shareholding of 55
per cent. Coca-Cola Export Corporation holds 33 per cent and Pishprom, a local
state company, 12 per cent. The group, which opened its first plant in Tashkent in
1994, inaugurated its third bottling plant in Uzbekistan last week. Kevin Done,
East Europe Correspondent Page 6; Edition International Edition 1; Copyright 1997:
Financial Times Group

---- INDEX REFERENCES ----

COMPANY: COCA COLA  EXPORT CORP

NEWS SUBJECT:  (Finance Management (1FI66); World Organizations (1IN77); CIS
(1CI65); International Issues (1IN59); World Trade (1WO85); Economics & Trade
(1EC26))

INDUSTRY:  (Beverages (1BE22); Non-Alcoholic Beverages (1NO38); Soft Drinks
(1SO77); Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Asia (1AS61); Uzbekistan (1UZ71))

Language:  EN

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.
**C-1**

Westlaw.                                                    NewsRoom

6/20/00 LATIMES 8                                              Page 1

6/20/00 L.A. Times 8
2000 WLNR 8388234

Los Angeles Times
Copyright 2000 Los Angeles Times

June 20, 2000

Section: Main News

**Uzbekistan   Villagers**  Still Waiting for the State to Save Them
Central Asia: Soviet-era mentality lives on in hamlet, where residents scratch out
a living amid soaring inflation and dwindling resources.
RICHARD C. PADDOCK
TIMES STAFF WRITER

SHAMURAD, Uzbekistan Legend has it that the powerful emir of Bukhara, desperate to
have a son, came to this desert village hundreds of years ago to visit a woman
famous for her fertility.

The emir, following the superstition of the day, sat under her dress for several
minutes, according to the legend. Returning to his walled city, he was soon
blessed with a son he named Shakh Murad. The village took the same name, and when
the prince became emir, he exempted the village from taxes forever.

Today, that tax exemption is long gone, but life here goes on much as it always
has. The Muslim villagers herd sheep in the desert and live in houses made of mud.
Women fetch water from the village spring and burn cow dung for cooking.

No longer favored by the government--any government--the lonely village of 400
people is struggling to survive in a changing society. Uzbekistan gained independ-
ence with the 1991 collapse of the Soviet Union but is mired in poverty and isol-
ated from the outside world. Its prolonged economic slump has taken the greatest
toll in rural areas.

The same pattern has been repeated across the former Soviet Union, where communit-
ies built up in remote regions under communism are no longer economically viable.
The end of state subsidies has triggered an exodus over the past decade from im-
poverished villages and distant outposts in Siberia, the Far East and the extreme
north.

"With each year, there are fewer and fewer sheep that run in our flock," said Es-
tam Umarzakov, 40, who has lived in Shamurad all his life. "If this continues, the
whole village will go bankrupt. I don't know how people will survive. I just try
not to think about it."

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-01252-RJL    Document 15-5    Filed 10/30/2007    Page 4 of 67

Uzbekistan, an authoritarian Central Asian state headed by former Communist leader Islam Karimov, has proved unable to build a successful market economy. Many of its Soviet-era factories have closed, output has fallen, and unemployment has risen. Inflation, according to official statistics, is running about 25% a year.

The average monthly salary is the equivalent of $12. Pensions amount to as little as $3.50 a month. Villagers migrate to the cities in search of employment. Some leave Uzbekistan to find work in other countries.

"The economic situation in the republic is so dire that many people go to North Korea in search of jobs and a better life," said Vitaly Ponomarev, a Moscow-based expert on Central Asia.

Uzbekistan, the largest nation in the region with 25 million people, is in a tough neighborhood. It shares borders with the totalitarian state of Turkmenistan as well as Afghanistan and Tajikistan, both plagued by civil wars with Muslim extremists.

Local businessmen say the economy is tightly controlled by the autocratic Karimov. For example, a Coca-Cola bottling plant that has a near-monopoly on nonalcoholic drinks is run by the president's son-in-law, Mansur Rauf Maqsudi.

Uzbeks call their nation "doubly landlocked" since goods must pass through at least two countries in any direction to reach an international port.

Uzbekistan also is hampered by a currency that is not convertible--stifling its prospects for foreign investment. The government has set an official value of 233 sums to the dollar, but few places are willing to exchange money at that rate. The true value of the sum, as determined by the black market, is about 700 to the dollar.

During the years of independence, inflation has been so high that the biggest bill in circulation, a 200-sum note, is now worth less than 30 cents. Changing $100 into sums can easily mean carrying around a wad of 500 worn and tattered bills--giving new meaning to the term "lump sum."

The village of Shamurad, where donkeys outnumber cars by more than 10 to 1, illustrates some of the difficulties facing the country.

During Soviet times, the government adopted a policy of subsidizing far-flung villages such as Shamurad whether they were economically viable or not. The village's business of sheepherding was taken over by a collective farm, and whatever individual initiative that existed was stamped out.

The Communists brought a school, electricity and television to Shamurad--although phone service never arrived. Many such villages grew so large that they could not support themselves without government assistance.

With the breakup of the Soviet Union, the subsidies ended, and rural areas were

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-3

Case 1:07-cv-01252-RJL     Document 15-5     Filed 10/30/2007     Page 5 of 67

largely left to their own devices--a pattern repeated from Armenia to the Bering
Strait. The population of Shamurad, once greater than 500, has fallen by more than
20% as families move out in search of work.

"There's quite a number of villages that have been abandoned by people moving to
the cities because life has become impossible," said Mahmudkul Shodiyev, 47, the
village chief.

More trouble lies ahead for Shamurad. Its flock of sheep has shrunk from a high of
86,000 in Soviet times to 7,000 today.

Villagers say the decline is largely due to mismanagement after the breakup of the
collective farm. Thinking only of short-term survival, the villagers sold many of
the sheep and ate the rest--indeed, the men of Shamurad look as if they haven't
missed a meal in some time. At the current rate, however, the village's main asset
will soon vanish.

"In the past, under the Soviets, life was much better," said Umarzakov, a hefty
man in tattered pants who was attempting to repair the gearbox of a dilapidated
15-year-old Zil truck.

"Under Soviet rule, the state farm organized our work," he said. "With the col-
lapse of the Soviet Union, everything fell apart."

The village has been declared a hardship area by the Karimov government, but that
means only a few extra sums for the handful of people lucky enough to hold govern-
ment jobs. Teachers at the village school are paid the most--the equivalent of $10
a month.

The spring is the center of life in the village. People come throughout the day to
fetch water in buckets, wash their hands or let their animals drink. The supply of
water is sufficient to grow some fruits and vegetables but not to plant crops in
any great quantity.

"There's enough to drink, so we don't die, but there's not enough to farm," Shodi-
yev said.

The village is a closed society, locked in a tradition of multi-generational
households where women do much of the hard work. One of the women's jobs is to
make kizyak, a fuel of cow dung mixed with straw and wheat chaff that is pressed
and then dried in the sun. There are stacks of it all over the village.

The last time a foreigner visited was three years ago, when a group of Americans
explored the possibility of a joint cattle-raising venture. Nothing ever came of
the idea.

Most of the men wear clothes that are torn and frayed. A boy carries his prize
possession: a soccer ball that lost its leather cover long ago and is now only
rags.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                    **C-4**

The Russian language is fading into the past because villagers prefer to speak Uzbek. The people are Muslim but not deeply religious--the village has no mosque.

Thanks to communism, however, the villagers have televisions. They get three stations--two state-controlled channels from Uzbekistan and one from Russia. When someone arrives with a new video, the villagers gather to watch it in one of the three homes that have a VCR.

On the wall of the school, in cracked and fading paint, is a saying of the president: "Uzbekistan will become a powerful state in the future."

Even after eight years of independence, the people of the village have not shaken their Soviet mentality--they still count on the government to save them.

"We hope that finally the country will rise to its feet and the state will find an opportunity to help its people who live in need like this," said Shodiyev, the village chief. "It doesn't depend on the people. It depends on the state."

---- INDEX REFERENCES ----

COMPANY:  COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Religion (1RE60); World Organizations (1IN77); CIS (1CI65); Social Issues (1SO05); Islam (1IS02))

INDUSTRY:  (Agriculture (1AG63); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Europe (1EU83); Eastern Europe (1EA48); Russia (1RU33); Western Asia (1WE54); Asia (1AS61); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (AFGHANISTAN; COCA COLA; COMMUNIST; COMMUNISTS; MUSLIM; UZBEK-ISTAN; **UZBEKISTAN VILLAGERS**; ZIL)  (Central Asian; During; Estam Umarzakov; Islam Karimov; Karimov; Local; Mahmudkul Shodiyev; Mansur Rauf Maqsudi; Pensions; Returning; Shodiyev; Teachers; Umarzakov; Uzbeks; Vitaly Ponomarev)

KEYWORDS: UZBEKISTAN -- ECONOMY; STANDARD OF LIVING; QUALITY OF LIFE; RURAL AREAS; UZBEKISTAN -- INDUSTRY

EDITION: Home Edition

Word Count: 1541
6/20/00 LATIMES 8
END OF DOCUMENT



# Muslim Uzbekistan

### The political analytical Islamic site

Arabic   Russian   Uzbek

## ▤ Domestic & Regional News

### August 30, 2001

### "WHEN THE COLA WARS CAME TO UZBEKISTAN..."

The Wall Street Journal
December 21, 2001.

When the cola wars came to Uzbekistan in the mid-1990s, Coca-Cola Co. emerged the big winner. Many Uzbeks and foreigners concluded that the reason was a not-so-secret weapon: a partnership with the son-in-law of President Islam Karimov.

But last month, the president's 29-year-old daughter, Gulnora Karimova-Maqsudi, separated from her husband, Mansur Maqsudi, 34, president of Coke's local bottling company. And since then, the cola giant's fortunes in Uzbekistan have abruptly changed. Tax inspectors, fire inspectors, customs inspectors, and even an antinarcotics official, have descended on Coke's maibottling plant in the Uzbek capital of Tashkent. A week ago, authoritis detained the bottling company's local general manager for 24 hours, while investigators tore through his office and that of the manager of the Maqsudi family's trading company in Tashkent, according to officials with the two companies.

Government investigators have taken away piles of documents from the companies and questioned about 10 current and former employees of the bottling concern, company officials said. The authorities also have temporarily detained some local Coke truck drivers and verbally harassed some merchants selling the soft drink, bottling company officials added. The Tashkent offices of Coca-Cola itself, a separate entity from the bottler, have been undisturbed.

Coke officials at the company's Atlanta headquarters are trying to be diplomatic, stressing their desire to cooperate with the sudden, sweeping investigation. It remains to be seen whether the Uzbek government comes up with evidence of wrongdoing, but the Maqsudi family has already concluded that something else is driving the government's behavior.

"You have a powerful [woman] who, rather than following traditional divorce proceedings in court, is exerting her power in government," said Patrizia Zita, a family friend and New Jersey public-relations executive to whom the Maqsudis have referred all questions.

Mansur Maqsudi, who lives in New Jersey, where his family's trading company has an office, declined to comment. Ms. Karimova-Maqsudi, who had been living in New Jersey with her husband and two children until shortly before the

separation, couldn't be reached for comment.

Officials with the Uzbek Foreign Ministry and state news agency, which serves as the official conduit for all press inquiries, didn't respond to more than a dozen requests for comment on the government investigation and the status of the Maqsudi-Karimova marriage. In private conversations with foreign diplomats, Uzbek officials have strongly denied the investigation has any connection to Mr. Maqsudi's relationship with the president's daughter, according to the diplomats.

However it is resolved, Coke's predicament illustrates the route to success that many local and foreign businesses have taken in the former Soviet Union -- a partnership with top government officials or people close to them. And if there is indeed a connection between the Maqsudi-Karimova separation and the government investigation, Coke's experience also demonstrates one potential peril of that strategy.

Not long after the 1991 Maqsudi-Karimova marriage, Mr. Maqsudi and his older brother, Fareed, approached Coca-Cola, offering to bottle the company's products in Uzbekistan. Coke at the time considered the possibility that a partnership with an in-law of the top Uzbek leader could be risky, according to a person close to the company.

But that worry was outweighed by the company's eagerness to establish itself in a region long known as a stronghold of rival PepsiCo Inc. With 25 million people, Uzbekistan is the largest nation in Central Asia, although it is poor, and its cotton- and gold-based economy has been declining. Critics say that President Karimov's brutal crackdown against alleged Muslim extremists has led to a broadened insurgency by guerrillas based in Afghanistan. The Maqsudis, ethnic Uzbeks who had emigrated to the U.S. from Afghanistan, are unusual in having both substantial capital and an intimate knowledge of this dicey market.

Apart from their Uzbek interests, the brothers operated a family electronics-export company in Manhattan. After their wedding in Tashkent, Mansur Maqsudi and his bride had flown to a reception in New York for their American friends, according to the family spokeswoman, Ms. Zita. Coke and the Maqsudis formed a joint venture in 1994, investing about $1.7 million each. Mansur Maqsudi was named president of the new company, Coca-Cola Bottlers Uzbekistan. Through the family-owned Roz Trading Group Ltd., the Maqsudis eventually acquired a controlling 55% share of the venture, with Coke owning the rest.

Ahmet Bozer, president of Coca-Cola's Eurasian division, said Coke never received any special favors because of its ties to the president's family. "The relationship with the government has been kept at arm's length and has always been pure," he said.

The new venture was bad news for Pepsi, though. The Uzbek government ended a multiyear relationship with the Coke rival in 1994 and gave Coke access to the only big bottling plant in Tashkent that met the American companies' standards. Coke quickly became a consumer hit with Uzbeks, and Pepsi soon ceased production in the country. A Pepsi spokesman declined to comment.

Since 1994, Coca-Cola has invested more than $100 million in Uzbekistan, making it one of the country's largest foreign investors. Coke and other Coca-Cola soft drinks, such as Fanta, Sprite and an apple-flavored version of Fresca,

**C-7**

appeared on store shelves there. The bottler, run day-to-day by Maqsudi- employed managers, expanded production to three plants. In 1998, Ms. Karimova-Maqsudi entered a masters-degree program in Central Asian studies at Harvard University in Cambridge, Mass., while her husband simultaneously enrolled at Harvard's Kennedy School of Government. Described as glamorous and intelligent by former classmates, Ms. Karimova-Maqsudi encountered skepticism on the generally liberal Ivy League campus about her father's human-rights and political policies. "She is very savvy" and skillfully defended those policies, said one classmate, Jonathan Phillips.

At some point, the marriage hit the rocks. The couple officially separated in July, according to Ms. Zita, the family spokeswoman. A few days after word of the separation spread in Tashkent, a government official there telephoned the bottling company to postpone a concert of foreign and local entertainers the company had planned to sponsor in early September, botting-company managers said. Police also began stopping Coca-Cola trucks for no apparent reason, the company officials said. Then, last Monday at about 6 p.m., men from the Uzbek intelligence and security agency, known as the SNB, arrived at the Maqsudis' Roz Trading office in Tashkent and announced there would be a search, according to company officials. Four hours later, the security men returned with an official letter, authorizing an examination of the company's books and the confiscation of company property. The SNB took away most of the office's 20 computers, said a company official who witnessed the scene.

Meanwhile, a small army of government officials arrived at the main bottling plant in another part of Tashkent. Tax inspectors led the plant's top two managers away. Other inspectors carted off files from the company's finance, procurement and purchasing departments, according to executives who were there.

Managers of the two companies telephoned the U.S. and British embassies. (Roz Trading is registered in the Cayman Islands, a British colony.) Company employees also alerted the Maqsudi brothers, who from their Montville, N.J., office launched a lobbying blitz. The Maqsudis contacted local congressmen and the State apartment.

Separately, a Coke lobbyist in Washington met with the Uzbek ambassador to the U.S., Shavkat Khamrakulov, and phoned the State and Commerce departments. Last Tuesday, U.S. diplomats in Tashkent delivered a message to the Uzbekistan Foreign Ministry that the U.S. was concerned about the situation and expected the government not to hold any of the detainees for long periods, according to people familiar with the situation.

Within 36 hours of being detained, the Maqsudi employees were released.

But the scrutiny continued. An officer with the national antinarcotics force even examined the cola syrup at the plant, suggesting that he was looking for some kind of drug contamination, company officials said. Managers shut down production for about 24 hours at one point, having decided they couldn't operate under such conditions. By Friday, production had resumed, and the multifaceted inspection was continuing during normal working hours. At the Roz Trading office in Tashkent, though, the government men left the company's ransacked computers in a heap. One senior Maqsudi employee said the officials told him they were conducting a criminal investigation but weren't more specific.

Coca-Cola officials said the American company in recent days has received a letter from Uzbek tax authorities, officially informing Coke that the bottler's books would be audited for evidence of possible violations of law. The Coke officials stressed their desire to accommodate the Uzbek probe.

"Uzbekistan is an important country for us," said the company's Mr. Bozer. "We have a good relationship with the Uzbek government, and I don't see what has happened as taking away from that."

◂ ◂ **Home**                    ▴ ▴ ▴ **Top**                    **Next** ▸ ▸

Mirror: www.ummah.com/uzbekistan

Copyright ©2000-2002 "Muslim Uzbekistan". All rights reserved.
webmaster@muslimuzbekistan.com | mail@muslimuzbekistan.com | uzbekistan786@yahoo.com

**About site**

Westlaw                                                          NewsRoom

7/19/02 FTCOM (No Page)                                            Page 1


7/19/02 Fin. Times - FT.com (Pg. Unavail. Online)
2002 WLNR 6747683

                              FT.com
             Copyright (c) 2002 Financial Times Ltd. All rights reserved.

                           July 19, 2002


                Marital strife leaves Coca-Cola flat

                          DAVID STERN

20020719 190937 Divorce can be costly. Coca-Cola is finding out the hard way that
in Uzbekistan even a global drinks giant can become like the child trapped in a
custody battle while the estranged parents fight it out.

The saga began last year, when Coca-Cola's main Uzbek partner, **Mansur    Maqsudi**
, separated from his wife of 10 years, Gulnora Karimova. Perhaps that would hardly
have mattered had she not been the daughter of Islam Karimov, the Uzbek president.

Coca-Cola International, along with Mr Maqsudi's company, Roz Trading, and the
Uzbek state property committee were co-owners of Coca-Cola Bottlers Uzbekistan,
the bottling and distribution enterprise.

The break-up of Mr Maqsudi and Ms Karimova was by all accounts acrimonious. In a
development that Uzbek authorities said was not related to the divorce, Mr Maqsudi
was said to owe the government $9m in back taxes. Mr Maqsudi resides in the US and
has said he will not return to Uzbekistan, for fear of prosecution.

As the atmosphere soured, Coca-Cola was paid visits by the tax police, fire in-
spectors and other government officials. The heat became so intense that the gen-
eral manager left the country.

The Uzbek government then sought to take over Roz Trading's share of the company
in lieu of the taxes allegedly owed by Mr Maqsudi, leading to the company's multi-
million-dollar state-of-the-art factory outside the capital Tashkent ceasing oper-
ations for four months. The bottling company was at one point liquidated, although
Coca-Cola appealed against the ruling.

"Coca-Cola thought that they had the ultimate 'in' with the government, which
would smooth the way for their business here. Unfortunately they didn't take into
account the president's daughter divorcing their contact," said one western busi-
nessman. Or, as one western diplomat familiar with the case, put it: "Hell hath no
fury like a woman scorned."

The case occurs at a sensitive moment. The Uzbek government, which provided the US
with extensive military facilities during the war in Afghanistan, has promised the

            © 2007 Thomson/West. No Claim to Orig. US Gov. Works.        **C-10**

International Monetary Fund to liberalise its Soviet-style economy. Paul O'Neill, the US treasury secretary, lauded President Karimov this week for undertaking necessary reforms.

But the Coca-Cola affair, which many say shows the true side of business in Uzbekistan, has now taken another twist. The US company is threatening to close down the factory again - the first voluntary shutdown in the multinational's history.

Coca-Cola resumed operations at the beginning of the year after the closure but soon found that because of Uzbekistan's draconian restrictions on hard currency exchanges it could not buy enough raw materials to produce its soft drinks. Supplies will last until July 31, officials say.

So far Uzbek authorities have refused to grant Coca-Cola a sufficient quota of hard currency. As a result it is sitting on perhaps as much as $30m in sum, the local currency. "We have probably more sum than the Uzbek government," says Peter Rosema, head of Coca-Cola's Uzbekistan representative office.

Those familiar with the case say that Uzbek authorities are trying to press Coca-Cola into taking their side in the dispute with the Maqsudi family. Uzbek officials were not available for comment.

---- INDEX REFERENCES ----

COMPANY: COCA COLA CO (THE); COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (World Organizations (1IN77); CIS (1CI65); Financially Distressed Companies (1FI85); Bankruptcies (1BA08))

INDUSTRY:  (Consumer Packaged Goods (1CO27); Consumer Products & Services (1CO62); Beverages (1BE22); Non-Alcoholic Beverages (1NO38); Soft Drinks (1SO77); Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Western Asia (1WE54); Asia (1AS61); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (COCA COLA; COCA COLA BOTTLERS UZBEKISTAN; COCA COLA INTL; INTERNATIONAL MONETARY FUND; ISLAM KARIMOV; MARITAL; UZBEK; UZBEKISTAN)  (Karimova; Mansur Maqsudi; Maqsudi; Paul O'Neill; Peter Rosema; Roz Trading; Supplies) (Uzbekistan (UZ); Commonwealth of Independent States (XV); Former USSR (QC))

COMPANY TERMS: COCA COLA CO Company Number: (CALAB00000)

PRODUCT: Executive Offices

NAICS CODE: 92111

Word Count: 649

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.       **C-11**

7/19/02 FTCOM (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                **C-12**

Westlaw                                                          NewsRoom

7/20/02 FTI 4                                                    Page 1


7/20/02 Fin. Times 4
2002 WLNR 6788640

Financial Times UK
Copyright (c) 2002 Financial Times Ltd. All rights reserved.

July 20, 2002


Section: INTERNATIONAL ECONOMY & THE AMERICAS


INTERNATIONAL ECONOMY & THE AMERICAS: Marital strife leaves  Coca-Cola  flat: The
drinks giant's Uzbek operation suffers from a family's conflict, writes David
Stern

DAVID STERN

Beverages, Soft Drinks

Divorce can be costly.  Coca-Cola  is finding out the hard way that in Uzbekistan
even a global drinks giant can become like the child trapped in a custody battle
while the estranged parents fight it out.

The saga began last year, when Coca-Cola's main Uzbek partner,     **Mansur     Maqsudi**
, separated from his wife of 10 years, Gulnora Karimova. Perhaps that would hardly
have mattered had she not been the daughter of Islam Karimov, the Uzbek president.

Coca-Cola International, along with Mr Maqsidi's company, Roz Trading, and the
Uzbek state property committee were co-owners of Coca-Cola Bottlers Uzbekistan,
the bottling and distribution enterprise.

The break-up of Mr Maqsidi and Ms Karimova was by all accounts acrimonious. In a
development that Uzbek authorities said was not related to the divorce, Mr Maqsidi
was said to owe the government Dollars 9m in back taxes. Mr Maqsudi resides in the
US and has said he will not return to Uzbekistan, for fear of prosecution.

As the atmosphere soured, Coca-Cola was paid visits by the tax police, fire in-
spectors and other government officials. The heat became so intense that the gen-
eral manager left the country.

The Uzbek government then sought to take over Roz Trading's share of the company
in lieu of the taxes allegedly owed by Mr Maqsidi, leading to the company's multi-
million-dollar state-of-the-art factory outside the capital Tashkent ceasing oper-
ations for four months. The bottling company was at one point liquidated, although
Coca-Cola appealed against the ruling.

"Coca-Cola thought that they had the ultimate 'in' with the government, which

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-13**

would smooth the way for their business here. Unfortunately they didn't take into account the president's daughter divorcing their contact," said one western businessman. Or, as one western diplomat familiar with the case, put it: "Hell hath no fury like a woman scorned."

The case occurs at a sensitive moment. The Uzbek government, which provided the US with extensive military facilities during the war in Afghanistan, has promised the International Monetary Fund to liberalise its Soviet-style economy. Paul O'Neill, the US treasury secretary, lauded President Karimov this week for undertaking necessary reforms.

But the Coca-Cola affair, which many say shows the true side of business in Uzbekistan, has now taken another twist. The US company is threatening to close down the factory again - the first voluntary shutdown in the multinational's history.

Coca-Cola resumed oper-ations at the beginning of the year after the closure but soon found that because of Uzbekistan's draconian restrictions on hard currency exchanges it could not buy enough raw materials to produce its soft drinks. Supplies will last until July 31, officials say.

So far Uzbek authorities have refused to grant Coca-Cola a sufficient quota of hard currency. As a result it is sitting on perhaps as much as Dollars 30m in sum, the local currency. "We have probably more sum than the Uzbek government," says Peter Rosema, head of Coca-Cola's Uzbekistan representative office.

Those familiar with the case say that Uzbek authorities are trying to press Coca-Cola into taking their side in the dispute with the Maqsudi family. Uzbek officials were not available for comment.

---- INDEX REFERENCES ----

COMPANY: COCA COLA CO (THE); COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Economic Policy & Policymakers (1EC69); World Organizations (1IN77); CIS (1CI65); Financially Distressed Companies (1FI85); Economics & Trade (1EC26); Bankruptcies (1BA08))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Food & Beverage Production (1FO79); Consumer Packaged Goods (1CO27); Consumer Products & Services (1CO62); Beverages (1BE22); Soft Drinks (1SO77); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Asia (1AS61); Uzbekistan (1UZ71); Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (COCA COLA; COCA COLA BOTTLERS UZBEKISTAN; COCA COLA INTL; INTERNATIONAL MONETARY FUND; ISLAM KARIMOV; UZBEK; UZBEKISTAN) (David Stern; INTERNATIONAL ECONOMY; Karimova; Mansur Maqsudi; Maqsudi; Paul O'Neill; Peter Rosema; Roz

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Trading; Soft Drinks; Supplies)  (Company Management (CN02); Company News (CN);
Government News (GN); Taxation (GN16))  (United States of America (US); Uzbekistan
(UZ); Americas (QA); Commonwealth of Independent States (XV); Former USSR (QC);
North America (XB); Pacific Rim (QG))

COMPANY TERMS: COCA COLA CO Company Number: (CALAB00000)

PRODUCT: Soft Drink Mfg

NAICS CODE: 312111

EDITION: USA Ed2

Word Count: 649
7/20/02 FTI 4
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**C-15**

**The New York Times**
nytimes.com

September 12, 2002

# Love, Divorce and the Hague Treaty; New Jersey Custody Case Is Really an International Dispute

**By RICHARD LEZIN JONES**

Between them, there seemed to be love enough for two weddings. First, Gulnara Karimova and Mansur Maqsudi were married in their native Uzbekistan. Then it was off to New York for another ceremony.

After their union more than a decade ago, their lives -- both in the United States and in Uzbekistan -- were filled with children and country clubs, PlayStation and Pokémon. And when Mr. Maqsudi wanted to open a new Coca-Cola bottling plant in Uzbekistan, well, it didn't hurt that his father-in-law was Islam A. Karimov, the nation's president.

Didn't hurt, that is, until Mr. Maqsudi filed for divorce.

Since then, he has testified at court hearings over the last two months, his wife has fled to Uzbekistan with their two children, one of his family's businesses in his homeland has been lost and another is in limbo, and three of his relatives have been sentenced to jail terms as long as 10 years for what the Uzbek authorities say was corporate corruption.

Now, Mr. Maqsudi, who had settled with his family in nearby Mendham, has asked a New Jersey Superior Court judge here to assume jurisdiction in the case so that he can pursue a custody claim for their children. In Uzbekistan, he says, he would not get a fair hearing because of the influence of his wife and father-in-law. A ruling is expected on Thursday.

The case has unfolded in court here as a drama that mixes Eastern-bloc intrigue with the melodrama of a daytime soap opera, the intricacies of the Hague conventions governing international law and a bitterness that transcends even the normal rancor of custody disputes. The backdrop is just as complicated: the collision between democratic strivings, capitalistic ambitions and lingering authoritarianism in a former Soviet republic.

Neither Mr. Maqsudi, 35, who is an American citizen, nor Ms. Karimova-Maqsudi, 30, who has a green card, would agree to be interviewed. But according to court testimony, Mr. Maqsudi said that after one fight too many, he told his wife in July 2001 that he wanted a divorce, and she left for Uzbekistan the next day with their children, Islam, 9, and Iman, 4.

Mr. Maqsudi testified that on Aug. 1, his parents notified him from Uzbekistan that she was demanding that $5.5 million be deposited in her Swiss bank account, and that she be given half the proceeds from the sale of their Mendham home and full ownership of their home in the Uzbek capital, Tashkent. If those demands were met, he testified, she had offered to work out a joint custody arrangement for the children.

What would she do if they were not met? In court papers, Mr. Maqsudi cited the end of a largely apologetic note that Ms. Karimova-Maqsudi left for him before she returned to Uzbekistan. "There's an interesting movie," she wrote, listing the day, channel and time. "I hope you'll get a chance to see it again."

The film? "The War of the Roses," the 1989 film about a contentious divorce that culminates with the couple's death.

To Mr. Maqsudi, the threat was obvious. "Destroy the Maqsudi family, destroy the Maqsudi businesses," he testified, "and she did that."

Mr. Maqsudi went ahead and filed for divorce, anyway, last October.

But what he characterized as ransom, her lawyer described as nothing more than the kind of monetary settlement and financial distribution that couples commonly discuss in divorce proceedings.

"I think what he's trying to do is utilize the economic aspects of this case and turn it into a ransom demand, which is something we categorically deny," said the lawyer, John P. Paone Jr. "It's just that he controls all the assets and any final settlement would likely include a payment."

Mr. Paone also said that any wounds suffered by Mr. Maqsudi's two businesses in Uzbekistan were largely self-inflicted. Mr. Paone said that the businesses -- Coca-Cola Bottling Uzbekistan and the ROZ Trading Group Ltd., a related company -- were the subject of legitimate investigations by the Uzbek authorities. Late last year, Mr. Maqsudi lost control of the Coca-Cola plant, the government ordered liquidation of the other business, and two cousins and an uncle of Mr. Maqsudi's were convicted on tax-violation and money-conversion charges.

Mr. Paone said Mr. Maqsudi was using the custody issue as a way to pressure President Karimov's administration into allowing him to reopen his businesses.

Although Mr. Maqsudi contends that his wife took their children illegally when she returned to Uzbekistan in July 2001, Mr. Paone said that she had merely gone home on a previously planned trip.

**C-17**

"He's trying to portray that as abduction," he said. "In my view, she went back to Uzbekistan with her children. He chose not to come."

Mr. Maqsudi has not returned to Uzbekistan, his wife has not returned to this country, and the couple cannot agree on a neutral meeting site.

The legal issues at play are not subject to Hague conventions governing international civil law because Uzbekistan is not one of the 61 nations that have signed the Hague treaty. Even if Judge Deanne M. Wilson rules that her court has jurisdiction in the case, Mr. Maqsudi's victory may be an empty one because the court may later decide to grant custody to his wife, anyway.

Still, he has appealed to the New Jersey court because he feels his chances of receiving equal treatment under Uzbekistan's law are slim -- especially in the turbulent political atmosphere since the Sept. 11 attacks.

Uzbekistan, a nation of 25 million that borders Afghanistan, has become a valuable ally of the United States in its war on terrorism. The authoritarian regime of President Karimov has frequently drawn the ire of human rights groups; one of them, Humans Rights Watch, says that over the last several years more than 7,000 Muslims have been arrested by the government.

"I don't think that President Karimov would like to admit it, but I think that in a case with such a high profile, the courts would try to ensure a favorable outcome for his daughter," said John S. Schoeberlein, director of the Program on Central Asia and the Caucasus at Harvard University.

Mr. Maqsudi's lawyer, Edward J. O'Donnell, said that 19 members of Congress had written letters to the Uzbek government on his client's behalf, seeking information on the charges against Mr. Maqsudi's relatives and seeking help in arranging a meeting between Mr. Maqsudi and his children. Mr. O'Donnell said that after months of negotiations, State Department officials were allowed to see the children in Uzbekistan last spring, but that Mr. Maqsudi had not seen them for more than a year.

Professor Schoeberlein said that Uzbekistan's recent moves toward democratization had often butted up against its despotic past. And, he suggested, Mr. Maqsudi may be trying to beat a system of which he was once part.

"It's widely held that the government acted in retaliation against him after the divorce," Professor Schoeberlein said. "But the other side of the story is that he may not have been able to do business there without his connection to the president. In a sense, then, he gained by the same mechanism with which he lost."

Copyright 2007 The New York Times Company  | Home  | Privacy Policy  | Search  | Corrections  |  XML  |  Help  | Contact Us  | Work for Us  | Back to Top

C-18

Westlaw.                                                          NewsRoom

11/20/02 ATLNTAJC A1                                              Page 1


11/20/02 Atlanta J. - Const. A1
2002 WLNR 4666067

              Atlanta Journal and Constitution (GA)
              Copyright 2002 Atlanta Newspapers Inc.

                        November 20, 2002


                        Section: News


            FAMILY FEUD IN UZBEKISTAN ENTRAPS COKE

          MARGARET COKER; Cox Moscow Correspondent

Tashkent, Uzbekistan --- Coca-Cola has learned a painful lesson in this former So-
viet bastion: Blood is thicker than soda.

   What started as a quiet dispute within the first family of Uzbekistan escal-
ated to jailings, deportations, a bill for $9 million in back taxes and a four-
month shutdown of Coca-Cola production.

      Before that unfortunate turn of events, Coke appeared to have a textbook re-
cipe for international business success: Strike a partnership with the Uzbek pres-
ident's son-in-law to gain government access, smooth the start-up process and gain
quick market penetration.

      But after President Islam Karimov's daughter filed for divorce this year,
Coke's partnership became a nightmarish liability.

      Last month, in a soap-opera-style takeover, the government ousted Coke's
ally and installed new management at the bottling plant.

      Uzbekistan long has been regarded as unfriendly to foreign business. But the
shake-up in plant management has raised doubts among Western business leaders in
the region about whether the Florida-sized country, which borders Afghanistan, de-
serves to be praised by Washington as a prized ally in the war against terrorism.

      ''Rewarding a government like this?" said a longtime U.S.-based investor in
Central Asia. "It's not the usual American way.''

      When the divorce drama between first daughter Gulnora Karimova and **Mansur
Maqsudi** got nasty, Coke quickly became ensnarled.

      In apparent retaliation for the humiliation suffered by the president's
daughter, authorities jailed some members of Maqsudi's family and deported others
to their native Afghanistan.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.      **C-19**

Case 1:07-cv-01252-RJL    Document 15-5    Filed 10/30/2007    Page 21 of 67

The timing of the deportations helped twist the knife: They occurred last autumn, while fighting raged between U.S.-backed Afghan forces and the Taliban.

Saying he was afraid for his life, Maqsudi fled to the United States, where he had lived for much of the previous decade.

As often happens in the rough-and-tumble economies of the former Soviet republics, the personal dispute spilled over into business. As word of the divorce hit the bustling streets of the Uzbek capital of Tashkent, the government announced that Maqsudi owed $9 million in taxes.

Maqsudi denied it, but the government went after his assets, including his minority stake in the Coca-Cola Bottlers of Uzbekistan. The company's other two owners are Uzbekistan's government and Coca-Cola.

The power grab halted Coke production for months, partly because Maqsudi had managed the bottling operation and it had difficulty operating without him.

"Coke thought that they had the ultimate 'in,' " said a Western diplomat based in Tashkent. "They never figured that the president's daughter would divorce their man."

Coke spokesman Steve LeRoy refused to comment on the Maqsudi matter. While acknowledging production problems, he expressed optimism about Coke's future in Uzbekistan.

''We believe that if the Uzbek government opens up to the U.S., that will only create more transparency, a favorable business climate and create a more level playing field,'' LeRoy said in a phone interview from his offices in Vienna.
 Closed business culture

Uzbekistan was shunned by businessmen and human rights groups alike for the past decade. Karimov, a former Communist Party boss, has run the country as a personal fiefdom since the days when it was part of the Soviet Union. He muscles opponents and critics at will.

Only the largest multinational companies even considered trying to crack Uzbekistan's business culture after the Soviet empire dissolved in 1991.

But Coca-Cola jumped into the market, hoping that an extensive bottling and distribution system in Uzbekistan --- with about 30 million people, the most populous Central Asian country --- could serve as a launching pad to neighboring countries.

The soft drink giant chose Karimov's son-in-law as a local partner, offering co-ownership in the bottling plant to the Uzbek government and Maqsudi's company, Roz Trading.

Uzbekistan was never considered a place to get rich easily. The International

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**C-20**

Case 1:07-cv-01252-RJL    Document 15-5    Filed 10/30/2007    Page 22 of 67

Monetary Fund and Western business leaders have routinely criticized Karimov for
subsidizing favorite industries and enforcing a draconian foreign currency conver-
sion law that penalizes international companies by making them keep profits in
local currency.

But the Sept. 11 terrorist attacks drastically changed Uzbekistan's interna-
tional profile. A month later, Karimov agreed to provide the Pentagon with a base
from which to launch its military campaign and covert operations in neighboring
Afghanistan. In return, the White House in May signed a mutual defense agreement
with Karimov that said any threat to his regime would be met as a threat to the
United States.

In July, during a trip to Tashkent to continue the cheerleading campaign for
the new U.S. ally, Treasury Secretary Paul O'Neill praised Karimov for ''turning
the corner'' on economic reform, despite the fact that a long-promised repeal of
the foreign currency law had not been implemented.
 One shutdown averted

At the time of O'Neill's visit, Coke had warned that another shutdown was pos-
sible because the currency laws were preventing it from importing materials it
needed to manufacture more soft drinks.

The summer shutdown was averted, but only after intense discussions with the
government, company officials said.

The problems did not end there.

Having confiscated Maqsudi's shares in the plant, the Uzbek government pos-
sessed a majority of the shares. In September, after long negotiations with Coke,
the Uzbeks installed new management at the plant --- officers widely believed to
have ties to business rivals of Maqsudi.

But the new management would ensure ''smooth sailing'' for Coke in the future,
Deputy Foreign Minister Sadyk Safayev assured in a September interview.

''The previous management of Coke committed lots of misdeeds, like violations
of tax law, violations in sales regulations and violations of human rights in the
plant here," Safayev said. "Both Coke and the Uzbek government lost out because of
these misdeeds. We are sure the new team will clear up these things. We are doing
our utmost to make sure Coke won't have any more problems.''

Coke spokesman LeRoy said Safayev's allegations of misdeeds are untrue.

U.S. Embassy officials in Tashkent, meanwhile, said that while they were con-
cerned with the treatment of Coke in the past, they were confident that the en-
hanced U.S.-Uzbek relationship would help implement economic reforms in the coun-
try.

Photo

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-21

Map

The divorce of Uzbek President Islam Karimov's daughter turned a Coke deal flat.
 Map shows location of Uzbekistan; inset map shows area of detail / DALE E. DODSON
/ Staff

ILLUST:
Photo Map

                  ---- INDEX REFERENCES ----

COMPANY: PENTAGON LTD; COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Government (1GO80); World Organizations (1IN77); CIS (1CI65))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Food & Beverage Production (1FO79);
Consumer Packaged Goods (1CO27); Consumer Products & Services (1CO62); Beverages
(1BE22); Soft Drinks (1SO77); Agriculture, Food & Beverage (1AG53))

REGION:  (Afghanistan (1AF45); Central Asia (1CE93); Americas (1AM92); North Amer-
ica (1NO39); Asia (1AS61); Uzbekistan (1UZ71); USA (1US73); Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (AFGHANISTAN; COCA COLA; COMMUNIST PARTY; PENTAGON; TREASURY; US
EMBASSY; UZBEK; UZBEKS; WHITE HOUSE)  (Coke; DALE E. DODSON; FAMILY FEUD; Gulnora
Karimova; Islam Karimov; Karimov; LeRoy; Mansur Maqsudi; Maqsudi; O'Neill; Paul
O'Neill; Roz Trading; Sadyk Safayev; Safayev; Steve LeRoy)

EDITION: Home

Word Count: 1350
11/20/02 ATLNTAJC A1
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-22

Westlaw.                                                          NewsRoom

11/21/02 LEDGERENQ B9                                              Page 1


11/21/02 Columbus Ledger-Enquirer (GA) B9
2002 WLNR 1917264

Columbus Ledger-Enquirer, Ga
Copyright (c) 2002, R. W. Page Corp.

November 21, 2002


Section: BUSINESS

CAUGHT UP IN A FEUD

Associated Press

ATLANTA - A divorce within the first family of Uzbekistan led to a four-month shutdown of Coca-Cola production and a takeover of Coke's bottling company in the central Asian country.

 Atlanta-based Coca-Cola had a partnership with **Mansur    Maqsudi**, the son-in-law of Uzbek President Islam Karimov. But the president's daughter, Gulnora Karimova, filed for divorce this year and Coke became ensnarled in the fight.

     Uzbek authorities jailed some members of Maqsudi's family and deported others to their native Afghanistan in apparent retaliation for the humiliation suffered by the president's daughter.

     Maqsudi fled to the United States, where he has lived for much of the previous decade.

     As word of the divorce spread, the Uzbek government announced that Maqsudi owed $9 million in taxes. Maqsudi denied it, but the government went after his assets, including his minority stake in Coca-Cola Bottlers of Uzbekistan.

     The company's other two owners are the government of Uzbekistan and Coca-Cola.

     The incident halted Coke production for months, partly because Maqsudi had managed the bottling operation and it had difficulty operating without him.

     Coke spokesman Steve LeRoy refused to comment on the Maqsudi matter. While acknowledging production problems, he said he was optimistic about Coke's future in Uzbekistan.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (World Organizations (1IN77); CIS (1CI65))

INDUSTRY:  (Beverages (1BE22); Non-Alcoholic Beverages (1NO38); Soft Drinks

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

(1SO77);  Food & Beverage Production (1FO79);  Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); USA (1US73); Americas (1AM92); North America (1NO39); Asia (1AS61); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (CAUGHT; COCA; COCA COLA; COKE; COLA)  (Gulnora Karimova; Islam Karimov; Mansur Maqsudi; Maqsudi; Steve LeRoy; Uzbek)

EDITION: LEDGER-ENQUIRER

Word Count: 267
11/21/02 LEDGERENQ B9
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                **C-24**

Westlaw.                                                          NewsRoom

11/24/02 PALMBCHPST 3F                                                    Page 1


11/24/02 Palm Beach Post 3F
2002 WLNR 1984883

Palm Beach Post (FL)
Copyright (c) 2002, The Palm Beach Post

November 24, 2002


Section: BUSINESS

DIVORCE TAKES FIZZ OUT OF COKE IN UZBEKISTAN

MARGARET COKER Palm Beach Post-Cox News Service

TASHKENT, UZBEKISTAN It sounded like a textbook recipe for international business success: Strike a partnership with a family member of a nation's leader to ensure government access, smooth the start-up process and gain quick market penetration.

Yet this strategy left Coca-Cola's business in Uzbekistan flat after the daughter of President Islam Karimov filed for divorce earlier this year from her husband, one of Coke's partners in its local bottling company. Then, last month, the government installed new management at the plant.

Call it a hostile takeover, soap-opera style.

Uzbekistan has long been regarded as unfriendly to foreign business. But the move to install new plant management has raised doubts among some Western business leaders in the region about whether the Florida-sized country, which borders Afghanistan, should be touted by Washington as a highly-prized ally in the war against terror.

"Rewarding a government like this? It's not the usual American way," said a longtime U.S.-based investor in Central Asia.

The divorce drama between Gulnora Karimova and **Mansur Maqsudi** started last year as a quiet family dispute - albeit one that involved the powerful first family of this former Soviet bastion. It quickly got nasty.

In apparent retaliation for the scorn and humiliation suffered by the first daughter, authorities jailed some members of Maqsudi's family and deported others to their native Afghanistan.

The timing of the deportations helped twist the knife: They occurred at the same time that fighting raged last autumn between U.S.-backed Afghan forces and the Taliban. Saying he was afraid for his life, Maqsudi fled to the United States, where he had been living for much of the previous decade with the benefit of a green card.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-25**

As often happens in the rough-and-tumble economies of the former Soviet Union, personal revenge quickly spilled over into business. As word about the divorce hit the bustling street markets around the Uzbek capital of Tashkent, the government announced that Maqsudi owed $9 million in taxes - an accusation that Maqsudi denied.

To satisfy the alleged debt, the government went after the divorced man's assets, including his minority stake in the Coca-Cola Bottlers of Uzbekistan. The Uzbek company's other two owners, which also held minority stakes, include Uzbekistan's government and Coca-Cola.

The power grab caused a four-month shutdown in production, in part because the Coca-Cola operation had difficulty functioning once Maqsudi, who managed the bottling plant, was forced out.

"Coke thought that they had the ultimate 'in.' They never figured that the president's daughter would divorce their man," said one Western diplomat based in Tashkent. "The scandal has been terrible PR for a country that already has a full plate of bad PR."

Coke spokesman Steve LeRoy refused to comment on issues related to Maqsudi. While acknowledging production problems, he expressed optimism about Coke's future performance in Uzbekistan.

"We believe that if the Uzbek government opens up to the U.S., that will only create more transparency, a favorable business climate and create a more level playing field," said LeRoy in a phone interview from his offices in Vienna, Austria.

For the past decade, Uzbekistan was shunned by businessmen and human rights groups alike. A former Communist Party boss, Karimov has run the country as a personal fiefdom since the days when it was part of the Soviet Union, muscling opponents and critics at will.

Only the largest multinational companies even considered trying to crack Uzbekistan's insider business culture after the Soviet empire dissolved in 1991. Coca-Cola International jumped into the market, hoping that an extensive bottling and distribution system in Uzbekistan, the most populous Central Asian country with about 30 million people, could serve as a launching pad to neighboring countries.

The soft drink giant chose Karimov's son-in-law as a local partner, offering co-ownership in the bottling plant to the Uzbek government and Maqsudi's company, Roz Trading, which also acted as management at the facility.

Uzbekistan was never considered a place to get rich easily. The International Monetary Fund and Western businessmen have routinely criticized Karimov for subsidizing favorite industries and enforcing a Draconian foreign currency conversion law that penalizes international companies by making them keep profits in local currency but helps Uzbek companies buy hard currency cheaply.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-26**

Case 1:07-cv-01252-RJL    Document 15-5    Filed 10/30/2007    Page 28 of 67

But the Sept. 11 attacks drastically changed Uzbekistan's international pro-
file. A month after the terrorist attacks, Karimov agreed to provide the Pentagon
with a base from which to launch its military campaign and covert operations in
neighboring Afghanistan. In return, the White House in May signed a mutual defense
agreement with Karimov that said any threat to his regime would be met as a threat
also to the U.S.

In July, during a trip to Tashkent to continue the cheerleading campaign for
the new ally, Treasury Secretary Paul O'Neill praised Karimov for "turning the
corner" on economic reform, despite the fact that a long-promised repeal of the
foreign currency law had not been implemented.

At the time of O'Neill's visit, Coke had warned that another shutdown was pos-
sible because the currency laws were preventing it from importing materials it
needed to manufacture more soft drinks.

The summer shutdown was averted, but only after intense discussions with the
government, company officials said.

Problems did not end there. Having confiscated Maqsudi's shares in the plant,
the Uzbek government possessed a clear majority of shares. In September, after
long negotiations with Coke, the Uzbeks installed new management at the plant, of-
ficers that were widely believed to have ties to business rivals of Maqsudi.

The new management would ensure "smooth sailing" for Coke in the future, Deputy
Foreign Minister Sadyk Safayev said.

Photo
Map
1. ANVAR ILYASOV/The Associated Press\Islam Karimov is the president of Uzbek-
istan. The soft drink giant chose his son-in-law as a local partner - which worked
swell until the divorce.\2. STAFF GRAPHIC\Location of Bukhara, Samarkand, and
Tashkent, Uzbekistan.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (HR & Labor Management (1HR87); Legal (1LE33); Social Issues
(1SO05); Business Management (1BU42); Divorces (1DI23); Strikes & Work Stoppages
(1ST12); Personal & Family Law (1PE02); World Organizations (1IN77); CIS (1CI65))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Consumer Packaged Goods (1CO27);
Beverages (1BE22); Soft Drinks (1SO77); Food & Beverage Production (1FO79); Con-
sumer Products & Services (1CO62); Agriculture, Food & Beverage (1AG53))

REGION:  (North America (1NO39); Western Europe (1WE41); Austria (1AU39); Europe
(1EU83); Central Europe (1CE50); Russia (1RU33); Eastern Europe (1EA48); Western
Asia (1WE54); Afghanistan (1AF45); Central Asia (1CE93); Americas (1AM92); Asia
(1AS61); Uzbekistan (1UZ71); USA (1US73))

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Language:  EN

OTHER INDEXING:  (AFGHANISTAN; ANVAR; COCA COLA; COKE; COMMUNIST PARTY; DIVORCE;
PENTAGON; STAFF; TREASURY; UZBEKS; WHITE HOUSE)  (Gulnora Karimova; Islam Karimov;
Karimov; LeRoy; Mansur Maqsudi; Maqsudi; O'Neill; Paul O'Neill; Roz Trading; Sadyk
Safayev; Steve LeRoy)

EDITION: FINAL

Word Count: 1251
11/24/02 PALMBCHPST 3F
END OF DOCUMENT

**C-28**

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

::: MAQSUDI KEEPS INTERNATIONAL CUSTODY FIGHT ALIVE :::



Muslim Uzbekistan
The political analytical Islamic site

Arabic   Russian   Uzbek





■ Analysis & Facts

::: Analysis & Facts :::

**January 5, 2004**

## MAQSUDI KEEPS INTERNATIONAL CUSTODY FIGHT ALIVE

### Lobbies State Department to return his children from Moscow

*By: Margaret McHugh*
*Uploaded/Updated: 07/17/2005 08:29:28*

When Mansur Maqsudi first met Gulnara Karimova in 1991, he was immediately drawn to the tall, red- haired young woman with the powerful father.

She was 19 and the daughter of Islam Karimov, the Communist leader of Uzbekistan who went on to become the former Soviet republic's president. Maqsudi was 24 and the New Jersey-raised scion of a prominent Uzbek family.

Maqsudi and Karimova married four months later and spent the next decade living the moneyed life of an international power couple, dividing time between New Jersey and Tashkent, the Uzbek capital.

But for Maqsudi, the good life ended 2 1/2 years ago, when he told Karimova he wanted a divorce and she left New Jersey with their son, Islam, 11, and daughter, Iman, 5. He has not seen the children since.

So began a custody case of international legal and political scope. Sixteen months ago, a Morris County judge ordered the children returned to Maqsudi. Karimova continues to defy that order from her home in Moscow, where she lives with the children under the shield of diplomatic immunity.

Maqsudi is lobbying the U.S. State Department for help in getting his children returned to Mendham Township and the $2.3 million home they once shared as a family.



Mansur Maqsudi with his son and daughter
*Photo: Centrasia.Ru*

Maqsudi has preserved his children's bedrooms as they were the day they left, with neatly made queen- sized beds, and toys and books in place.

"This home is the memory they have of their childhood," said Maqsudi, who wants a custody-sharing arrangement with his ex-wife. "If it's in two years, if it's in seven years, if they have no connection to New Jersey, to Mendham, they'll walk into their rooms and remember."

But a speedy return of the children is unlikely.

Although a Morris County judge has ordered Karimova's arrest for failing to return the children, it is an unenforceable order.

Karimova, a karate black-belt with a Harvard degree, recently became an Uzbek diplomat in Moscow and is immune from arrest in Russia, which has no treaty with the United States on child custody matters.

Maqsudi's one hope is that the criminal charge filed in Morris County could lead to his wife's inclusion on Interpol's wanted list. If that were to happen, Karimova could be arrested if she were to travel to a country that has an extradition treaty with the U.S.

"In a way, she's in a box," Maqsudi said. "She loves to travel. She loves the luxurious lifestyle."

Maqsudi, a venture capitalist who came to New Jersey with his family in 1979, is also on the Interpol list. After he filed for divorce, Uzbek officials alleged he and his father and brother cheated that government of $12 million in taxes and committed other financial crimes. Maqsudi denies the charges, and a U.S. State Department official told a congressional hearing the listing was politically motivated.

Soon after Karimova took the children, Maqsudi said his assets in Uzbekistan were seized by the government, 25 relatives were expelled and two uncles and a cousin were sentenced to long prison terms.

One of his wife's former financial advisers, Farhod Inogambaev, said Karimova has amassed more than $100 million in assets since leaving New Jersey.

In addition, Karimova now controls a Coca-Cola bottling plant in Uzbekistan, which Maqsudi won rights to operate in 1994 and built into the nation's biggest employer.

Maqsudi has won over at least one powerful ally in Washington in his quest to get his children back: New Jersey Rep. Chris Smith (R-4th Dist.), the vice chairman of the House Committee on International Relations.

Smith wants to ensure that the State Department is willing to use diplomatic pressure to intervene in Maqsudi's case, if necessary. He intends to make the Maqsudi case the focus of a congressional hearing on Uzbekistan next month, and then raise it at an international winter conference on security in Vienna.

::: MAQSUDI KEEPS INTERNATIONAL CUSTODY FIGHT ALIVE :::

Smith says Uzbekistan is guilty of human rights abuses and systemic government corruption. The Islamic nation, which borders Afghanistan, has received more than $300 million since Sept. 11, 2001, and has been lauded by the Bush Administration as a crucial ally in the war on terror.

Smith and others have appealed directly to President Karimov and asked Secretary of State Colin Powell to intervene. An assistant secretary last month discussed the case with the Uzbek foreign minister while in that country, the State Department confirmed.

Although Karimova could not be reached by telephone or fax in Moscow, Maqsudi said he sometimes receives angry phone calls from his former wife.

He won't change his telephone number, though, because it is the one his son knew.

"'I'm hoping that one day, he's going to call," Maqsudi said. "I know it's a matter of time."

**Margaret McHugh** *covers the Morris County courts. She can be reached at mmchugh@starledger.com or (973) 539-7119.*

*This article was originally appeared on* **Star-Ledger**

<span style="color:red">**Read also:**</span>

- Karimov's daughter under fire in child custody case
- Uzbekistan: the mean business of Karimov's daughter
- Uzbek gold in "reliable hands" of Islam Karimov
- Safe h(e)aven for Uzbek strongman's daughter
- Rich pickings for Uzbek leader's daughter
- Things are moving or dark tricks in the White Palace of Uzbek President
- Will the conjugal unit with top diplomat guarantee diplomatic immunity to the daughter of Uzbek president?
- Details to Portrait of Uzbek "Princess" Gulnora Karimova
- Arrest Warrant for Karimov's Kin
- Is the next step for Karimov's daughter arrest?
- Karimov's shameless daughter
- Uzbek mom not immune, court rules
- Karimova "unable to deal with her environment"
- Judge gives Karimov's daughter one last chance
- Stay denied to Uzbek mother
- Uzbek mom partially fills court order
- Maqsudi fearful of his father-in-law's dictatorship
- Karimov's daughter must return kids
- Judge to rule on jurisdiction in custody case

Contact Us

^^^

Home || Analysis || Genocide || Human Rights || Links || Archive

Copyright ©2000-2004 "Muslim Uzbekistan". All rights reserved.

About site

C-32

*Westlaw.*                                                          NewsRoom

1/10/04 HAMILTONSPEC 1                                              Page 1


1/10/04 Hamilton Spectator 1
2004 WLNR 5998354

Hamilton Spectator
Copyright © 2004 TDNG Inc. All rights reserved.

January 10, 2004


Section: Focus

The Runaway Princess; She's the jet-setting daughter of Uzbekistan's notorious
dictator and married into one of the nation's wealthiest families. But her bitter
divorce could even have repercussions for the U.S. war on terror.

Mary Dejevsky

The Independent

Focus

She's known as the Uzbek Princess, a powerful businesswoman tipped by many to suc-
ceed her father as ruler of the largest country in Central Asia.

But Gulnara Karimova has been branded a harridan, a wicked witch, a dragon lady.

Her bitter divorce has spiralled into an international scandal, involving accusa-
tions of kidnapping, corruption and dirty politics. It may even have significant
implications for the United States' "war against terrorism."

When I meet her in the café of a smart Moscow hotel, the 31-year-old seems an un-
likely source of such controversy. She wishes to reply to her critics, she tells
me. Yet she appears quiet, almost shy, but very beautiful.

In a city full of new-rich exhibitionists, she is modestly dressed, with almost
no make-up and her hat pulled far down over her forehead.

But this fugitive from U.S. justice, accused of "kidnapping" her children, is de-
termined to set the record straight.

"It is all a terrible mess," she says. "I didn't want it to turn out like this. I
just wanted a normal, civilized divorce."

Karimova's predicament derives from an extraordinary set of circumstances that re-
flect extraordinary times. A Harvard-educated martial-arts black belt, she's the
elder daughter of Islam Karimov, the former Communist Party leader and now Presid-
ent of Uzbekistan -- the United States' key strategic foothold in Central Asia.

Many would describe Karimov as a dictator. With a population of 25 million, the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-33**

former Soviet state has an estimated 6,000 political prisoners and in 2002 a UN investigator found that the use of torture there was "systemic."

At the age of 19, the president's daughter was married to a man she scarcely knew.

**Mansur Maqsudi** was the brother of a family friend, from a wealthy clan of long-time Uzbek emigrants who lived and made money in the United States.

She had met him, aged 19, when she was working as a conference interpreter in the Uzbek capital, Tashkent.

After their marriage in 1991, she lived the life of a minor jetsetter, dividing her time between studies in New York and Boston and homes in New Jersey and Tashkent.

Meanwhile, her husband's business enterprises flourished. He established a local bottling plant for Coca-Cola in the Uzbek capital. And it was here that Karimova gave birth to her first child, a boy called Islam. Six years later, after a spell working at the UN in New York, she had a girl, Iman.

By 2000, though, the marriage was in difficulty; the couple was spending more and more time apart and the following summer, her husband announced that he wanted a divorce. At this point Karimova took off for Tashkent with the children and the trouble really began.

Maqsudi filed for divorce in the U.S. courts, claiming he would not receive a fair hearing in Uzbekistan. The New Jersey Superior Court agreed to proceed and ordered Karimova to return before the hearing.

She describes this as a period of round-the-clock torment: the days spent studying the small print of lawyers' letters and faxes, the nights -- because of the time difference -- in anguished phone calls with her now estranged husband, arguing over custody and finances.

"It was all such a mess," she says again. "After a while, I just decided not to react."

In his legal submissions to the divorce court, Maqsudi claims that, following his split from his wife, his business interests in Uzbekistan were crippled.

A month after their separation, a series of raids began on Coca-Cola's local bottling plant -- by tax inspectors, fire inspectors, customs inspectors, and even an anti-narcotics official. It culminated in a four-month shut-down.

Uzbekistan's attorney general also issued a warrant for the arrest of Maqsudi, his brother and his father, accusing them of tax evasion, corruption and trading oil for Saddam Hussein. The Uzbeki authorities deny that there was any connection between these actions and the divorce proceedings of the President's daughter.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.    **C-34**

In the summer of 2002, the couple's case was heard in New Jersey.

Maqsudi was awarded sole custody of the children. Karimova, still in Tashkent, did not attend the court or comply with the custody order; a warrant was then issued for her arrest, although this remains unenforceable in Uzbekistan as the necessary international agreements are not in place.

"I didn't ignore the court," she said, "but physically I wasn't capable of going. For a civilized country and a civilized court, I found it very strange that they did not take this into account."

Karimova said that she considered appealing. But "there was a question about where to get the huge sums needed to pay the lawyers".

With a wry smile, she added: "It doesn't matter whose daughter you are. You still have to be transparent about where you got the money."

If she had the necessary $300,000 to spare, she said, she would rather spend it on her children than on U.S. lawyers.

Karimova's detractors, behind whom she sees her ex-husband and his lawyers, claim she is an extravagantly wealthy woman who has made a fortune on the back of privatization and public contracts in Uzbekistan obtained through her family connections.

They claim that her assets include $6 million Cdn worth of jewellery, $15 million in bank and investment holdings in Geneva and Dubai, a $13-million retail complex, nightclubs worth $5.5 million and a $17-million resort in Uzbekistan.

She denied this angrily: "All this stuff about a fortune, with hotels, complexes, etc., is rubbish. Yes, I have a lot of friends who have things like restaurants and hotels and who restore buildings. But that does not mean that these things are mine."

She claims two interests of her own: a major share in Uzdunrobita, the country's main mobile-phone company, which she claims she personally built up to 150,000 subscribers, and jewellery design, which she says she does largely as a hobby and which brings in little money.

Maqsudi has asserted that his wife sought $8 million of his own considerable fortune as a divorce settlement, but Karimova insists she doesn't want a penny of his money: "I felt that if you even touch something that doesn't belong to you, it will stain you for good."

If he wants to send money to the children, she said, that must be between him and them. "The two things must run on separate scripts." Karimova said that she has jewellery and personal effects still in the United States that cannot be sent to her until a final settlement is agreed. After the formal divorce proceedings were over, she said, "they cancelled all my credit cards. Ten years of marriage was

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.    **C-35**

Case 1:07-cv-01252-RJL     Document 15-5     Filed 10/30/2007     Page 37 of 67

over, as though it had never been.

"I had maybe $2,700 in my account. Basically, I had no money."

The divorce and its aftermath became a political issue in the United States that
even found its way to Congress.

"His is a big family," she said, "and if you cross it, you're not just an enemy of
the family, but of the whole community, the clan."

She said they made representations to the congressional committees concerned with
human rights in Uzbekistan with a view to getting the children sent to the United
States. She suspects, too, that they were instrumental in having her diplomatic
passport cancelled, and with it her immunity from prosecution while outside Uzbek-
istan.

A further complication is the U.S. military presence in Uzbekistan following the
intervention in Afghanistan and the war in Iraq. Uzbekistan borders Afghanistan
and is strategically important to the Americans who have the use of a former So-
viet air base there.

This, she hazards, may eventually work to her advantage. With its troops stationed
in the region, the U.S. administration does not want to get mixed up in anything
that could cause friction with the Uzbek leadership -- which means Gulnara's fath-
er.

And President Karimov, who has no son to anoint as his successor, is staunchly be-
hind his daughter. "He told me that no daughter of his would be put in a position
where she would have to take money from a man," she said of her marriage break up,
adding that he encouraged her in her incipient diplomatic career.

"He said you've got to take the knocks and build an independent career and see
what you can do." Since her time at the UN in New York, she has worked on disarma-
ment at the Uzbek mission to the UN in Geneva and is now at her country's embassy
in Moscow.

"It was very hard at the start, but he told me: "Don't disappoint me by running
away.'"

Gulnara's bond with her father is clearly stronger than that with her mother, whom
she describes as a traditional wife and mother.

The elder of two sisters, she sees herself as her father's daughter. "He is a
fighter," she said, "a professional, and he gave me his sense of family. He is my
life's mentor."

He is also one reason why she did not apply, as she could have done, for a U.S.
green card and U.S. citizenship after her marriage.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                        **C-36**

"In my position, it would have been difficult. It might have embarrassed my father."

She has travelled enough to be well aware of his, and her country's, dubious reputation.

"Yes, he has made mistakes," she said, "and you can disagree with some things and with some of the people he chooses, and maybe we take different approaches on some things."

She said human rights is a difficult area -- "I have my own view of these issues" -- but she insisted that with the triple threat of Islamic fundamentalist violence, the illicit arms trade and drugs, the situation in Uzbekistan is complicated, and any leader of the fledgling nation has a tightrope to walk.

=

 The Independent

Focus

She's known as the Uzbek Princess, a powerful businesswoman tipped by many to succeed her father as ruler of the largest country in Central Asia.

But Gulnara Karimova has been branded a harridan, a wicked witch, a dragon lady.

Her bitter divorce has spiralled into an international scandal, involving accusations of kidnapping, corruption and dirty politics. It may even have significant implications for the United States' "war against terrorism."

When I meet her in the café of a smart Moscow hotel, the 31-year-old seems an unlikely source of such controversy. She wishes to reply to her critics, she tells me. Yet she appears quiet, almost shy, but very beautiful.

 In a city full of new-rich exhibitionists, she is modestly dressed, with almost no make-up and her hat pulled far down over her forehead.

But this fugitive from U.S. justice, accused of "kidnapping" her children, is determined to set the record straight.

"It is all a terrible mess," she says. "I didn't want it to turn out like this. I just wanted a normal, civilized divorce."

Karimova's predicament derives from an extraordinary set of circumstances that reflect extraordinary times. A Harvard-educated martial-arts black belt, she's the elder daughter of Islam Karimov, the former Communist Party leader and now President of Uzbekistan -- the United States' key strategic foothold in Central Asia.

Many would describe Karimov as a dictator. With a population of 25 million, the former Soviet state has an estimated 6,000 political prisoners and in 2002 a UN

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.            **C-37**

investigator found that the use of torture there was "systemic."

At the age of 19, the president's daughter was married to a man she scarcely knew.

**Mansur Maqsudi** was the brother of a family friend, from a wealthy clan of long-time Uzbek emigrants who lived and made money in the United States.

She had met him, aged 19, when she was working as a conference interpreter in the Uzbek capital, Tashkent.

After their marriage in 1991, she lived the life of a minor jetsetter, dividing her time between studies in New York and Boston and homes in New Jersey and Tashkent.

Meanwhile, her husband's business enterprises flourished. He established a local bottling plant for Coca-Cola in the Uzbek capital. And it was here that Karimova gave birth to her first child, a boy called Islam. Six years later, after a spell working at the UN in New York, she had a girl, Iman.

By 2000, though, the marriage was in difficulty; the couple was spending more and more time apart and the following summer, her husband announced that he wanted a divorce. At this point Karimova took off for Tashkent with the children and the trouble really began.

Maqsudi filed for divorce in the U.S. courts, claiming he would not receive a fair hearing in Uzbekistan. The New Jersey Superior Court agreed to proceed and ordered Karimova to return before the hearing.

She describes this as a period of round-the-clock torment: the days spent studying the small print of lawyers' letters and faxes, the nights -- because of the time difference -- in anguished phone calls with her now estranged husband, arguing over custody and finances.

"It was all such a mess," she says again. "After a while, I just decided not to react."

In his legal submissions to the divorce court, Maqsudi claims that, following his split from his wife, his business interests in Uzbekistan were crippled.

A month after their separation, a series of raids began on Coca-Cola's local bottling plant -- by tax inspectors, fire inspectors, customs inspectors, and even an anti-narcotics official. It culminated in a four-month shut-down.

Uzbekistan's attorney general also issued a warrant for the arrest of Maqsudi, his brother and his father, accusing them of tax evasion, corruption and trading oil for Saddam Hussein. The Uzbeki authorities deny that there was any connection between these actions and the divorce proceedings of the President's daughter.

In the summer of 2002, the couple's case was heard in New Jersey.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-38**

Maqsudi was awarded sole custody of the children. Karimova, still in Tashkent, did not attend the court or comply with the custody order; a warrant was then issued for her arrest, although this remains unenforceable in Uzbekistan as the necessary international agreements are not in place.

"I didn't ignore the court," she said, "but physically I wasn't capable of going. For a civilized country and a civilized court, I found it very strange that they did not take this into account."

Karimova said that she considered appealing. But "there was a question about where to get the huge sums needed to pay the lawyers".

With a wry smile, she added: "It doesn't matter whose daughter you are. You still have to be transparent about where you got the money."

If she had the necessary $300,000 to spare, she said, she would rather spend it on her children than on U.S. lawyers.

Karimova's detractors, behind whom she sees her ex-husband and his lawyers, claim she is an extravagantly wealthy woman who has made a fortune on the back of privatization and public contracts in Uzbekistan obtained through her family connections.

They claim that her assets include $6 million Cdn worth of jewellery, $15 million in bank and investment holdings in Geneva and Dubai, a $13-million retail complex, nightclubs worth $5.5 million and a $17-million resort in Uzbekistan.

She denied this angrily: "All this stuff about a fortune, with hotels, complexes, etc., is rubbish. Yes, I have a lot of friends who have things like restaurants and hotels and who restore buildings. But that does not mean that these things are mine."

She claims two interests of her own: a major share in Uzdunrobita, the country's main mobile-phone company, which she claims she personally built up to 150,000 subscribers, and jewellery design, which she says she does largely as a hobby and which brings in little money.

Maqsudi has asserted that his wife sought $8 million of his own considerable fortune as a divorce settlement, but Karimova insists she doesn't want a penny of his money: "I felt that if you even touch something that doesn't belong to you, it will stain you for good."

If he wants to send money to the children, she said, that must be between him and them. "The two things must run on separate scripts." Karimova said that she has jewellery and personal effects still in the United States that cannot be sent to her until a final settlement is agreed. After the formal divorce proceedings were over, she said, "they cancelled all my credit cards. Ten years of marriage was over, as though it had never been.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                    **C-39**

"I had maybe $2,700 in my account. Basically, I had no money."

The divorce and its aftermath became a political issue in the United States that even found its way to Congress.

"His is a big family," she said, "and if you cross it, you're not just an enemy of the family, but of the whole community, the clan."

She said they made representations to the congressional committees concerned with human rights in Uzbekistan with a view to getting the children sent to the United States. She suspects, too, that they were instrumental in having her diplomatic passport cancelled, and with it her immunity from prosecution while outside Uzbekistan.

A further complication is the U.S. military presence in Uzbekistan following the intervention in Afghanistan and the war in Iraq. Uzbekistan borders Afghanistan and is strategically important to the Americans who have the use of a former Soviet air base there.

This, she hazards, may eventually work to her advantage. With its troops stationed in the region, the U.S. administration does not want to get mixed up in anything that could cause friction with the Uzbek leadership -- which means Gulnara's father.

And President Karimov, who has no son to anoint as his successor, is staunchly behind his daughter. "He told me that no daughter of his would be put in a position where she would have to take money from a man," she said of her marriage break up, adding that he encouraged her in her incipient diplomatic career.

"He said you've got to take the knocks and build an independent career and see what you can do." Since her time at the UN in New York, she has worked on disarmament at the Uzbek mission to the UN in Geneva and is now at her country's embassy in Moscow.

"It was very hard at the start, but he told me: "Don't disappoint me by running away.'"

Gulnara's bond with her father is clearly stronger than that with her mother, whom she describes as a traditional wife and mother.

The elder of two sisters, she sees herself as her father's daughter. "He is a fighter," she said, "a professional, and he gave me his sense of family. He is my life's mentor."

He is also one reason why she did not apply, as she could have done, for a U.S. green card and U.S. citizenship after her marriage.

"In my position, it would have been difficult. It might have embarrassed my father."

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**C-40**

She has travelled enough to be well aware of his, and her country's, dubious reputation.

"Yes, he has made mistakes," she said, "and you can disagree with some things and with some of the people he chooses, and maybe we take different approaches on some things."

She said human rights is a difficult area -- "I have my own view of these issues" -- but she insisted that with the triple threat of Islamic fundamentalist violence, the illicit arms trade and drugs, the situation in Uzbekistan is complicated, and any leader of the fledgling nation has a tightrope to walk.

Karimova is also aware that she has a similarly thin line to tread personally. "I'm an independent person," she said. "I'm not a typical Arab woman, sitting in Tashkent, afraid to open my mouth. I'm educated, I have a career. But my husband could pursue me from country to country."

Her immediate concern is that if the court order is not rescinded soon, her hopes of sending her elder child to public school in Britain could be thwarted. She fears her ex-husband might try to "kidnap" him back.

Make of Gulnara Karimova's story what you will.

You can see her as a privileged brat whose life fell apart when it crashed into harsh reality.

You can see her as an aggrieved mother, sheltering her children, or as a manipulative go-getter, exploiting her contacts for financial gain.

Or you can see her as an innocent at large, marooned between a host of competing expectations and ambitions -- her own and those of her father, her family and her former husband.

There is probably truth in all these versions. What is certain is that Karimova is the product of a unique moment in history, her fate caught up between two ages and cultures: between Soviet Communism and its chaotic, free-market successor, between Asia and the West.

Photo: SPECIAL TO THE SPECTATOR / Gulnara Karimova ... her bitter divorce has spiralled into an international scandal with accusations of kidnapping and dirty politics.; Photo: Alexander Zemlianichenko, / Uzbek President Islam Karimov, shown in this Oct. 11, 1998 photo, rules the largest country in Central Asia, daughter Gulnara, tipped to succeed him, is caught in a bitter divorce dispute.

Copyright © 2004 TDNG Inc., All Rights Reserved

---- INDEX REFERENCES ----

NEWS SUBJECT: (Divorces (1DI23); Forecasts (1FO11); Parents & Parenting (1PA25);

Health & Family (1HE30); Women's Businesses (1WO64); Personal & Family Law
(1PE02); CIS (1CI65); Legal (1LE33); Social Issues (1SO05); Judicial (1JU36); Pop-
ulation Demographics (1PO77); Islam (1IS02); Religion (1RE60); Legislation
(1LE97); Government (1GO80); World Organizations (1IN77))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Aerospace & Defense (1AE96); Consumer
Packaged Goods (1CO27); Defense (1DE43); Beverages (1BE22); Soft Drinks (1SO77);
Military Forces (1MI37); Food & Beverage Production (1FO79); Consumer Products &
Services (1CO62); Agriculture, Food & Beverage (1AG53))

REGION:  (Western Europe (1WE41); Europe (1EU83); Eastern Europe (1EA48); New York
(1NE72); United Arab Emirates (1UA66); Asia (1AS61); Uzbekistan (1UZ71); Massachu-
setts (1MA15); USA (1US73); North America (1NO39); Central Europe (1CE50); Russia
(1RU33); Iraq (1IR87); Arab States (1AR46); Western Asia (1WE54); Afghanistan
(1AF45); Central Asia (1CE93); Americas (1AM92); New Jersey (1NE70); New England
(1NE37); Middle East (1MI23); Dubai (1DU43); Switzerland (1SW77))

Language:  EN

OTHER INDEXING:  (COCA; COCA COLA; COLA; CONGRESS; HARVARD; INC; ISLAM; ISLAM
KARIMOV; KARIMOV; NEW JERSEY SUPERIOR COURT; SADDAM HUSSEIN; SPECTATOR; UZBEK;
UZBEK PRESIDENT ISLAM KARIMOV; UZBEK PRINCESS; UZBEKI)  (Basically; Focus; Gul-
nara; Gulnara Karimova; Karimova; Mansur Maqsudi; Maqsudi; Ten)

EDITION: Final

Word Count: 4114
1/10/04 HAMILTONSPEC 1
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Advertisement



**washingtonpost.com**
# Battle Royal

The Daughter of Uzbekistan's President Took Her Children and Ran, Opening a Custody War That Has Entangled Two New Allies

By Peter Baker
Washington Post Foreign Service
Tuesday, April 13, 2004; Page C01

MOSCOW

The day she left for good, she packed up her things and decamped from their New Jersey home with her two children, two nannies, two bodyguards and a driver.

On a table she left a note for her husband. She mentioned an old movie playing on cable -- "The War of the Roses," the 1989 dark comedy featuring Michael Douglas and Kathleen Turner as hate-driven spouses whose divorce turns into an orgy of revenge. She jotted down the time the show would air and pointedly suggested he watch.

Whether that was prophecy or threat, a war soon broke out. It turns out that divorcing Gulnora Karimova, known as "the Uzbek princess," is no simple matter. Her father is Islam Karimov, president of Uzbekistan and autocrat nonpareil, who rules over a repressive Central Asian country where prisoners have been boiled alive. He also happens to be a key ally in America's war on terrorism.

Karimova took the kids in 2001 and has been ducking an arrest warrant issued by a New Jersey judge ever since, hiding out in Moscow, where she knows officials won't cross her father. As for her husband, Mansur Maqsudi, an Afghan American businessman, he has learned the price of crossing his powerful father-in-law. Since Maqsudi and his wife split up, the Uzbek government has effectively taken away his Coca-Cola bottling plant, imprisoned three of his relatives and deported 24 more of them at gunpoint to war-torn Afghanistan.

"She said if I do divorce her she was going to destroy my family, destroy my business and make sure I could never see my kids," Maqsudi, 37, says by telephone from New Jersey. "And if you look at it, that's exactly what happened."

Karimova, 31, offers the mirror-opposite interpretation. She only stayed with Maqsudi so long, she says, because she feared he would use a breakup against her family politically. "He said that it would be a huge scandal and all this would come to your father and his name would be abused," she says. "I never want to disappoint my father."

This tabloid drama threatens to complicate U.S. relations with its important new friend in a volatile region. The State Department, Justice Department, Internal Revenue Service, Interpol and various courts, embassies and congressional committees have all been drawn into the fray. Teams of American lobbyists have been recruited to fight the ground war. As New Jersey Superior Court Judge Deanne M. Wilson said at a court hearing last year, "This is not just a garden-variety custody case."

The allegations fly back and forth -- kidnapping, tax evasion, forgery, smuggling, embezzlement, blackmail, money laundering and fraud. She accuses him of illegally selling Saddam Hussein's oil. He accuses her of shipping Uzbek girls to prostitution rings in Dubai. She describes him as a moralistic Muslim who once warned her she would burn in Hell for wearing a bikini. He depicts her as a spoiled rich girl who partied until the middle of the night, stumbling home drunk.

"It was a simple question of divorce," she says, in a considerable understatement, "but it was politicized from the very beginning."

**No Fairy-Tale Romance**

She slips into the restaurant, statuesque and fashion-model thin, wearing boots a bit too stylish for the Russian snow and a skirt a bit too short for the Russian winter. Her bodyguard, tall and imposing, checks out the room in an instant, then discreetly disappears.

She rarely does interviews. Only after months of negotiations brokered by her father's foreign minister does she finally agree to talk, in hopes of rebutting the most sensational allegations flying around Washington that can only hurt her father's ties with the world's only superpower.

In person, Gulnora Karimova does not come across as the hardhearted, domineering figure her husband's partisans depict. "That's not me," she insists over tea. Speaking softly, she presents herself as a Harvard-educated diplomat and businesswoman, albeit one with a black belt in karate. She tells the story of her marriage and its collapse from the standpoint of a hurt woman.

The two met at her birthday party in Tashkent, the Uzbek capital, in July 1991. Karimova was turning 19. "The world had just opened up for me," she recalls. "I'd just graduated from school and started the university, and everything was sort of pink skies." Mansur Maqsudi was 24, an Afghan native who immigrated to the United States as a child and became a naturalized citizen. "He was from a different world, he spoke a different language," she says.

It wasn't much of a romance. They met in person only one other time before they got married, the night he asked for her hand. Maqsudi insisted their parents negotiate the marriage, she recalls, and declined at first to share a drink to celebrate. They married in Tashkent a month later, in November 1991, followed by a reception she now describes as "quite boring." A week later, they went to New Jersey, where they married again.

As she was starting a new life, so was her homeland. Uzbekistan was emerging from the wreckage of the Soviet Union as an independent state, and her father, the republic's Communist boss, made a seamless transition to president of the new nation within weeks of Karimova's wedding.

**C-44**

An arid, cotton-producing country where Tamerlane once ruled a mighty empire, Uzbekistan with its 25 million people is the most populous and politically muscular of the five Central Asian states. Tashkent still feels Soviet, a well-ordered, uninspiring capital filled with drab, boxy apartment buildings and barely a taste of the dynamic new economy of far-away Moscow.

Under President Karimov, it has also become a terrifying place for some people, particularly observant Muslims who eschew government-controlled mosques. While Gulnora Karimova was at Harvard in 1999, a radical group called the Islamic Movement of Uzbekistan set off bombs in Tashkent that killed 16 people. Her father's secular government cracked down on political Islam, targeting even ordinary Muslims whose only crime appeared to be wearing a beard as a sign of faith.

About 7,000 people remain in prison for political or religious beliefs, and often they are beaten, choked, raped and punished with electric shocks, according to the State Department's human rights report. A U.N. special rapporteur has concluded that "torture or similar ill treatment is systematic." Human Rights Watch has found "human rights abuses on a massive scale."

At the notorious Jaslyk prison camp, built for religious prisoners in a desert where temperatures rise to 120 degrees, two men were submerged in boiling water and killed in 2002. The 62-year-old mother of one was arrested after protesting her son's death and sentenced to six years of hard labor for "attempted encroachment on the constitutional order." After an international outcry, Uzbekistan released her in February just hours before a visit by Secretary of Defense Donald Rumsfeld.

Rather than snuff out Islamic extremism, however, Karimov's tactics may have only radicalized more young Muslims. A series of suicide bombings and other attacks two weeks ago left 47 people dead, a wave of violence tied by the government to al Qaeda-trained Uzbeks.

Karimova offers no apologies for her father. "He came from the strong old system with his own views, with his own standpoint and with his own rules of the game. So you can argue about new vision, new ability, but he is a professional and I prefer to think about him as a professional," she says. "Some people might like it, some people might not. But in the situation where we are geopolitically and geographically . . . you have to be strong to be able to rule."

**Meet the In-Laws**

The newlyweds split their time between New Jersey and the presidential residence in Tashkent. A year after the wedding they had a son, Islam, named for his grandfather. A few years later, a daughter, Iman, came along.

Maqsudi's place in the presidential family certainly didn't hurt his expanding business empire. Soon he was running the lucrative Coca-Cola bottling factory in Uzbekistan as well as other enterprises.

But from the beginning, there were problems with the in-laws.

Two or three times a week, she says, they would go to his mother's house, where Karimova found traditional Afghan family life stultifying.

Case 1:07-cv-01252-RJL    Document 15-5    Filed 10/30/2007    Page 47 of 67

"It was really difficult because I was from a small family and used to more open relations, and in their family it's more like, if this one talks, you are not supposed to talk, that one is a relative of this relative, you are not supposed to speak with the aunt."

At New Year's, the most festive holiday in former Soviet republics, the Maqsudis barely celebrated. "'They sat on the floor and ate on the floor," she says. When midnight came and no one got excited, "I sat and cried next to the TV."

If she found his family too quiet, he found hers too noisy. "When you argued with him," Maqsudi says, referring to President Karimov, "the loudest would win the argument. It wasn't about facts, it wasn't about arguments. It was about who could shout the loudest."

As he describes it, the Karimovs were flush with power and money. In the office next to the president's bedroom, Maqsudi says, was a five-foot safe. He walked in once, Maqsudi says, and "I saw the first lady sitting on the floor counting a lot of cash."

During a trip to London, he says, Karimova decided to buy $230,000 worth of jewels. "I told Gulnora this is very expensive," he says. "She said she could buy them herself. . . . She unzipped her bag and pulled out a few hundred thousand dollars, cash. I was shocked. I asked her, 'Where did you get this?' She said, 'Oh, it's from my mother.'"

For all the money, Karimova grew restless. "I was crying nonstop," she says. "Imagine, you sit all day alone, and with my very active life, when I used to go not just to the university but for languages, sport -- I was dying." That's not how Maqsudi remembers it. "She would come home at 3 in the morning, sometimes drunk. Sometimes she wouldn't remember where she was."

Finally, she enrolled in Harvard for graduate studies on Central Asia. She says she had to persuade him to let her go back to school. He says he hoped "it would have a positive impact" and end her partying ways, but it didn't. They fought over other things. "I was not supposed to swim in the pool with my son because I was in a separate swimming suit," she says, meaning a bikini. "And he was, like, 'If you ever enter this swimming pool, you are not my son. And she will be burnt [in Hell] and you be burnt'. . . . He would make my son swim in a T-shirt."

Maqsudi angrily denies this. "Was she drunk that morning when you saw her?" he asks. "Was she sober? Honestly, these comments are so ridiculous, they don't deserve a reply." He says he objected to his wife's skimpy swimwear only when the hired help was around. "Gulnora was swimming with a G-string, not even a bathing suit, and these two bodyguards were lying there sunbathing."

But he rejects the implication that he is a religious fundamentalist. To prove it, Maqsudi e-mails pictures of his son scampering around outside without a shirt and another showing his wife in a virtually see-through shirt, noting her visible nipples. "I go to tailgate parties on Sundays to New York Jets football games," Maqsudi adds. "That should cover that."

In the summer of 2001, they were in Tashkent and preparing to head back to New Jersey, but the end was near. "The last months we were completely leading our own lives," she says. "It was clear that we were strangers by that time."

"That," he says, "was when all hell broke loose."

## The Breakup

Maqsudi knew it was serious when his wife's bodyguards had him pinned against the wall. It was July and Karimova was furious. She had taken the children to Six Flags Great Adventure amusement park in New Jersey in a chauffeured car from the Uzbek U.N. delegation, only to discover at the ticket booth that her husband had canceled her credit cards. "When I came back home, he was there having tea as always in a big room with a happy face looking at us," she recalls. "I said that we could not carry on. That was the end."

Maqsudi acknowledges suspending the credit cards. "Every time Gulnora and I would have an argument, her retaliation -- I guess she learned it from watching TV -- she would put $20,000 to $30,000 in shopping charges on the credit cards."

As the fight escalated, he says, her bodyguards blocked him from leaving. "They had me cornered in a room and Gulnora was threatening, saying whatever she could at the time. She was throwing things around the room." He managed to bolt, spent the night at his mother's house and came home for a few hours the next morning to play with the children while Karimova slept. "That was the last time I saw the kids," he says. A few hours later, she telephoned from the airport as she and the children were leaving the country.

He says it was child abduction and a New Jersey court agrees. She denies it. "He knew perfectly that I was leaving with the kids," she says. He considered her note about "The War of the Roses" a threat. She says she only meant they should avoid the craziness that consumed the movie characters. "I wrote it with tears," she says. "It was a very personal letter."

Within days, Maqsudi's Afghan emigre family in Tashkent felt repercussions. A cousin and an uncle were arrested and thrown into prison. Maqsudi's businesses were raided, workers at his Coke plant harassed, the firms eventually confiscated. By October 2001, another uncle was behind bars. His parents were strip-searched at the airport.

Then one night in December, security forces raided three family houses and rounded up 24 relatives at gunpoint, including Maqsudi's 85-year-old grandmother, an Uzbek citizen. The relatives, nearly all women and children, were driven 13 hours to the Afghan border and dumped on the other side.

"They said, 'None of you will live in this country. This is our country,' " Maqsudi says.

Karimova denies any involvement and says that officials may have simply taken advantage of the moment because Maqsudi's family had long flouted passport requirements. "Most of his relatives -- and there were a lot of them -- did not have proper papers," she says. If it were her choice, she added, "I could have deported them later. I would have been much more sophisticated."

Both of the estranged spouses went to court. An Uzbek judge granted Karimova a divorce, while a New Jersey jurist granted one to Maqsudi. Maqsudi faces arrest if he sets foot in Uzbekistan and Karimova if she sets foot in the United States. Since both warrants are filed with Interpol, neither can safely travel to Europe. "A civilized divorce," Danny DeVito's character says in "The War of the Roses," "is a contradiction in terms."

**C-47**

Case 1:07-cv-01252-RJL    Document 15-5    Filed 10/30/2007    Page 49 of 67

**The Larger Relationship**

In recent months, both sides in the Uzbek divorce war have enlisted lobbyists and lawmakers in Washington to hurl charges and deflect countercharges. Karimova's camp accuses Maqsudi's firms of import-export shenanigans and various illegal practices. The most sensational allegation is that Maqsudi family companies shipped oil from Iraq while Saddam Hussein was in charge.

One key witness for Karimova, however, was former Maqsudi employee Farhod Inogambaev, who has since fled Uzbekistan and recanted his statements. "Everything was lies," he says now in an interview from New Jersey.

After her separation from her husband, Karimova sent for him, Inogambaev says, and told him, "Forget about Mansur. Now let's do business together." Afraid for his family, he says, he went to work for her. She sent over men to have him swear out affidavits against her estranged husband. "I blindly signed, I blindly typed whatever they said. I just wanted them to leave me."

Not only does Inogambaev now disavow the charges, he also alleges that Karimova siphoned tens of millions of dollars out of Uzbekistan through various channels, including her own Citibank account. And he claims that she took over a tourism firm that arranges visas for Uzbek travelers and used it to control the flow of Uzbek prostitutes to Dubai.

Karimova dismisses the allegations, calling them "more than crazy and more than stupid," and contends that Inogambaev only "says that for money."

Maqsudi's Washington lobbyists, led by Richard A. Zimmer, a Republican former congressman from New Jersey, have gained some traction. Rep. Shelley Berkley (D-Nev.) raised the Interpol arrest warrant against Maqsudi during an October hearing, calling it "an abuse of power by the Uzbek president." In February, Rep. Christopher Smith (R-N.J.) asked Secretary of State Colin Powell to look into the prostitution allegations, saying, "We ought to be following it up very rigorously."

On the other side, Rep. Curt Weldon (R-Pa.) has taken up Karimova's cause, requesting that Attorney General John Ashcroft investigate allegations made against Maqsudi in Uzbekistan.

Asked about the case in private, uncomfortable U.S. officials decline to say much. For the record, they call it "an international child abduction case" and say they have told Tashkent "that these issues are unnecessary irritants in the U.S.-Uzbek relationship," according to a written State Department response to congressional inquiries last year.

Uzbek officials appear no more eager to talk about it. "It's a very complicated issue, and I think we should be very sensitive in touching this very delicate issue," Foreign Minister Sadyk Safayev said in an interview in Tashkent last fall. The two countries' relationship has burdens enough. The United States wants to keep the military base it opened in Uzbekistan after the terrorist attacks of Sept. 11, 2001. Yet under increasing pressure from human rights groups, the Bush administration warned recently that it may cut off financial aid if Karimov's record does not improve.

It's possible the question may ultimately fall to his daughter. Analysts in Tashkent suspect that the 66-year-old president is ill and speculate that Karimova is positioning herself to succeed him. Others assume she is setting herself up in business with assets abroad in case the family has to flee.

Maqsudi believes that his ex-wife has the ambition to try to take over the country. "She's tasted power and what power can bring in Uzbekistan," he says. "At times I would say to her, when we would have arguments, 'You're drunk with your father's power.' They don't want to relinquish or give up the power they have."

© 2004 The Washington Post Company

**C-49**

# Bitter divorce threatens unlikely alliance at the heart of war on terror

**By Julian Coman in Washington**
Last Updated: 12:20am BST 18/04/2004

Divorce is never easy. But divorcing the daughter of one of the world's most notorious dictators throws up unusual challenges, as Mansur Maqsudi, a 37-year-old Afghan-American businessman, can testify.

Thirteen years ago, Mr Maqsudi married the beautiful Gulnora Karimova, daughter of Islam Karimov, the president of Uzbekistan, after meeting her during a business trip to Tashkent. Since divorcing her in 2001, he has become the subject of an international arrest warrant, signed by President Karimov, and faces never seeing his two children again, despite winning a custody order in an American court.

Mr Karimov's strong-arm style is well-documented. Human rights groups say prisoners of his regime have been boiled alive and a United Nations report judged that under his rule, "torture or similar ill treatment is systematic". His attitude towards erring sons-in-law has been only a little less severe.

About 24 of Mr Maqsudi's relatives have been deported from Uzbekistan. Three members of his family are now in prison. His Coca-Cola bottling plant in Tashkent has been taken over. Mr Maqsudi's elderly parents, before fleeing to the United States, were humiliated by strip-searches at Tashkent Airport.

"The treatment of this American citizen by the Uzbeki regime has been vindictive," said Dick Zimmer, a former Republican congressman. Although the case has become something of a cause celebre on Capitol Hill, few will hold out hopes of concessions from Tashkent.

"The war on terror," said Mr Zimmer, and "Uzbekistan's key place in it, makes it difficult to place too much pressure on Karimov". The US sees the Uzbeks as vital allies. Uzbekistan was one of the first countries in Central Asia to offer practical help to President Bush when he attacked the Taliban regime in Afghanistan.

advertisement

American troops were sent into Afghanistan from the Khanabad base in the Uzbekistan desert in 2001 and US aid to the country rose to almost $90 million a year soon after.

The country's leading role in the war on terror has also inflamed Islamic hardliners within Uzbekistan. Last month, at least 42 people died in suicide bomb attacks.

Mr Maqsudi has offered glimpses of life as the dictator's son-in-law, telling the Washington Post: "When you were arguing with him, the loudest would win the argument. It wasn't about facts, it wasn't about arguments. It was about who could shout the loudest." Otherwise he is refusing to speak to the media.



**President Islam Karimov**

REUTERS

http://www.telegraph.co.uk/core/Content/displayPrintable.jhtml;jsessionid=5J0KJ4DAI0NFHQFIQMFSFFWAVCBQ0IV0?x...    10/10/2007

C-50

A close friend of Mr Maqsudi, Farhod Inogambaev, told the Telegraph: "I think that he wishes he had done some things differently now."

In 1991, for any up-and-coming entrepreneur, the 18-year-old Ms Karimova was undoubtedly the most attractive marriage prospect in Uzbekistan. The Soviet Union was collapsing and Ms Karimova's father was the local communist strongman, perfectly placed to seize regional power.

President Karimov has ruled ever since, but, much to his indignation and anger, his daughter's marriage did not last as long. Mansur and Gulnora stayed together for 10 years and had a daughter, Imman, and a son, Islam. Both were brought up in the US, although the family spent long periods in Tashkent.

Ms Karimova, 31, claims that her ex-husband tried to impose an oppressive Muslim way of life on her, even objecting when she wore a bikini in her own swimming pool. "I was not supposed to swim in the pool with my son because I was in a separate swimming suit [bikini]," she told the Washington Post. He disputes her version of events and offers his own, in which his objection to her wild living and excessive spending caused the break down.

The final straw came in the summer of 2001, when Ms Karimova was furious to discover, on taking the children to an amusement park in New Jersey, that her husband had cancelled their joint credit cards. In the row which followed, Mr Maqsudi found himself pinned against the wall by his wife's bodyguards. "They had me cornered in a room and Gulnora was threatening," he said.

The next morning he played with his children for what turned out to be the last time: a few hours later, Gulnora telephoned him from the airport to say that she was leaving the country with the children. Whatever the truth of their disagreements, it has been no ordinary separation. The Uzbeki arrest warrant issued in Mr Maqsudi's name, which cites "import-export fraud", has been described by one congressman as "an abuse of power by the Uzbek president".

The US State Department - one of a string of American government departments sucked into the dispute - says that the fall-out from the separation is an "unnecessary irritant in the US-Uzbek relationship".

Meanwhile, Mr Maqsudi has not been allowed to speak to his children. "He has been told by Gulnora that the harassment will continue, unless he stops seeking custody," said Mr Inogambaev.

Three years ago, a New Jersey district court awarded custody in Mr Maqsudi's favour. But Ms Karimova had already moved to Uzbekistan and then on to Moscow. An international arrest warrant in her name, this time American, is also filed with Interpol. Meanwhile, their allegations against each other have escalated: she says that he illegally sold Saddam Hussein's oil, while he accuses her of shipping Uzbek girls to Dubai to work in prostitution rings. Both deny the claims.

Mr Inogambaev, who has worked as an employee for both Mr Maqsudi and Ms Karimova, has seen the aftermath of the couple's divorce at first hand. "The behaviour has been malevolent," said Mr Inogambaev, who has only spoken out since fleeing Uzbekistan for the US. "But the Karimovs care only about power and money, and they will never give up their power in any situation. It must have been very, very difficult to spend years inside this family."

"I think that Mr Maqsudi knew that the presidential family would retaliate if he instigated a break-up, but it would have been wrong to carry on in the marriage because of that."

Information appearing on telegraph.co.uk is the copyright of Telegraph Media Group Limited and must not be reproduced in any medium without licence. For the full copyright statement see Copyright

Westlaw.                                                                NewsRoom

6/13/06 FTCOM (No Page)                                                    Page 1


6/13/06 Fin. Times - FT.com (Pg. Unavail. Online)
2006 WLNR 10300924

                              FT.com
                  Copyright 2006 Financial Times Ltd.

                          June 13, 2006


          Coke is accused of being too cosy with the Karimovs

                      Edward Alden in Washington

20060613 182014 For nearly a decade, Coca-Cola's bottling plant in Uzbekistan was
a shining example of the successful strategy that has seen the company expand into
more than 200 countries around the world.

The plant on the outskirts of the capital Tashkent, set up in 1992 and run under a
joint venture with ties to the family of Islam Karimov, the Uzbek strongman, was
twice selected as Coke's "bottler of the year" in its Eurasia and Middle East re-
gion and was highly profitable, with volume growth of about 10 per cent annually.

But all that began to unravel five years ago, when the marriage between **Mansur
Maqsudi**, Coke's main partner in the plant, and Gulnora Karimova, the president's
Harvard-educated daughter, fell apart  in recriminations that are still being felt
by the couple, their children and the Coca-Cola company.

Mr Maqsudi last week filed for binding arbitration at an Austrian tribunal, under
a provision of the original joint-venture agreement with Coke, seeking more than
$100m (GBP54m, ?79m) in damages from the company. He alleges that it "undertook to
conspire with Uzbekistan" to strip him of his share in the plant. Coke insists it
did not collaborate with the government, saying the arbitration will vindicate
that.

At the heart of the case is the question of what obligations a multinational faces
in operating in countries where human rights abuses are common and there are few
legal protections. The issue of what Coke should or should not have done in Uzbek-
istan will also focus fresh scrutiny on the company's conduct around the world and
provide new ammunition for its numerous critics.

Coke is already facing a US lawsuit brought by labour rights groups over allega-
tions that it turned a blind eye to the murder of union leaders at its bottling
plants in Colombia by rightwing paramilitaries. A similar case was filed last year
in Turkey involving the alleged intimidation and beating of union activists at a
Coke bottling plant.

The company denies wrongdoing in both cases but the allegations, together with

                © 2007 Thomson/West. No Claim to Orig. US Gov. Works.           **C-53**

claims of environmental abuses in India, have fuelled a student boycott against
Coke in the US and Europe. New York University and Rutgers in New Jersey are among
several campuses where Coke products have been banned.

The suit comes at an awkward time, when Coke is seeking to improve its image by
rebutting allegations of wrongdoing more strongly and trumpeting initiatives to
make it a better corporate citizen. In March, the company signed up to the United
Nations Global Compact, a voluntary code of conduct for international businesses,
designed to promote human rights, protect the environment and tackle corruption.
"This is a natural evolution of our company's long-held commitment to responsible
corporate citizenship," said Neville Isdell, Coke's chief executive.

The Maqsudi story is one the company would rather went away. The son of a wealthy
Afghan family of Uzbek descent, Mr  Maqsudi is a naturalised US citizen. The fam-
ily had business and political connections in Uzbekistan, cemented by his 1991
marriage to Ms Karimova, and he was a logical partner for Coca-Cola as it eyed
markets in the former Soviet Union.

But in August 2001, it all went badly awry after the marriage disintegrated and Ms
Karimova returned to Uzbekistan from the US with the couple's two children. In a
telephone interview Mr Maqsudi said that, despite winning a custody order from
courts in New Jersey, where he lives, he has not seen his children again.

The arbitration claim alleges that following the separation "Ms Karimova and her
father directed the full power  of the government of the Republic of Uzbekistan at
destroying Mr Maqsudi's investment in Uzbekistan", particularly his majority stake
in the Coke bottling operation. Within 10 months of the relationship breaking up,
the Uzbek courts confiscated Mr Maqsudi's share in the plant, to liquidate debts
allegedly owed by Roz Trading, his Cayman Islands company that held 55 per cent of
the bottling operation. Much of that stake would later end up in the hands of com-
panies with close ties to Ms Karimova, who has built a business empire since her
return.

Coke endured an 18-month shutdown of the plant that ended only last year but, des-
pite attempts by the Uzbek government to gain control of its share as well, the
company has managed to retain its stake in the operation. The filing alleges that,
rather than coming to the aid of its joint-venture partner, the company collabor-
ated with the Uzbek government and discouraged US authorities from intervening on
Mr Maqsudi's behalf.

"Coke made a corporate decision that they were going to save their interests in
Uzbekistan," says Stuart Newberger of Crowell & Moring, the lead lawyer on the
case. Allan Gerson, a Washington lawyer who led the first suit against Libya on
behalf of victims of the Lockerbie bombing and is also counsel on the case, says
the company should have helped Mr Maqsudi. "Coca-Cola fully understood this was
vengeance," he adds.

Coca-Cola denies those charges and says in a statement that "there was no collab-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                    **C-54**

oration and we are confident this will be upheld in any court or arbitration pro-
ceedings". Throughout the dispute, Coca-Cola Export Corporation, its export arm,
has been a minority shareholder and "is not responsible for the dispute between
Roz Trading and the government of Uzbekistan".

The Uzbek government, the third shareholder in the plant, is also named as a party
to the arbitration claim. It did not respond to calls to its embassy in Washing-
ton. In a response last month to notification that a claim might be filed  at the
Vienna tribunal, the Uzbek government told Mr Maqsudi's lawyers: "Your statement
that your client's participation in management was effectively impeded and also
that any actions against your client have been performed illegally was a surprise
for us."

Mr Karimov, a former Communist party boss, has ruled Uzbekistan since 1991. Human
Rights Watch has called the regime's record "disastrous", citing torture and
crackdowns on human rights groups.

In the aftermath of the September 11 attacks, the US government overlooked that
record because Mr Karimov was seen as an important ally. He allowed the US to use
an air base in the country as a staging ground for the war in Afghanistan. But re-
lations have deteriorated since the government suppressed an uprising in the town
of Anizhan last year, killing hundreds. Mr Karimov recently banned many western
non-governmental organisations and expelled some US troops.

Coke says in its statement that it has "a strict Code of Business Conduct that is
applicable everywhere we do business", adding that it "adheres to the local laws
and regulations of each country as well as applicable US  laws".

The case alleges that the company, while it may have obeyed local laws, violated
its joint-venture obligations to Mr  Maqsudi in order to protect its investment.
Mr Newberger says he believes the decision was made at the highest levels of
Coke's management in Atlanta.

A 2004 US Supreme Court decision in a case involving Intel opened the door to
plaintiffs demanding documents from the headquarters of American companies for
cases involving foreign proceedings. Mr Maqsudi's lawyers may thus be able to get
their hands on minutes of directors' meetings and other internal correspondence to
try to demonstrate Coke's complicity.

One key to making that case will be an exchange of letters in September 2001,
which appears to show that top management and directors at Coke were well aware of
the dispute. Farid Maqsudi, Mansur's older brother and partner  in Roz Trading,
wrote to Douglas Daft, then Coke's chairman and chief executive, following a raid
on the plant that came just days after Ms Karimova returned home.

The letter said that agents of the Uzbekistan government "systematically detained,
harassed, interrogated and terrorised the management and employees" at the Coke
bottling operation. Nick Evangelopolous, the plant's general manager at the time,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.  **C-55**

Case 1:07-cv-01252-RJL     Document 15-5     Filed 10/30/2007     Page 57 of 67

was held for 24 hours by the police and later said he had fled the country in fear of his life.

In the letter to Mr Daft, Farid Maqsudi pleaded for the company to weigh in against the abuses, saying that "for the Coca-Cola company to sit by and permit these police-state tactics to victimise the employees of CCBU, let alone collaborate with the perpetrators, is to betray the business principles that have made Coca-Cola one of the world's most respected brands".

Two weeks later, Mr Daft wrote back expressing regret and saying that the Maqsudis' personal turmoil was "undoubtedly disheartening. . . However, I believe it is conducive to our long-term business interests to separate  the issues". In a later letter, the company called the dispute "a family matter in which we are not involved and do not wish to become involved". The Maqsudis' efforts to enlist Coke directors of the time, such as Warren Buffett, were similarly rebuffed.

Much of the case could turn on events shortly after the August 2001 raid on the plant. The suit includes a letter that appears to show that Coke, instead of challenging the raid and questioning the legitimacy of the tax audit, told the US embassy in Tashkent that the audit was legitimate. That reassurance helped to keep the US government from intervening at a time when, Mr Maqsudi says, pressure on the Karimov government might have been effective.

Coke is likely to argue that it was caught in the middle of a dispute between the Maqsudis and the Uzbek government.  Like many of Coke's bottling plants around the world, the Tashkent plant bought concentrate from Coca-Cola but largely managed its own affairs. The company also points out that it, too, suffered significant losses because of the shutdown of the bottling facility.

Sonya Soutus, vice-president of Coca-Cola International, says the group's reputation is being sullied by an affair over which it had little control. "Taking into account the difficulty of our situation, there is quite a bit of evidence that proves we did everything we possibly could in the best interests of our stakeholders and the business in Uzbekistan."

Yet whatever its outcome, as Coke seeks to present itself globally as a good corporate citizen, the dispute is likely to serve as a reminder to it and other multinationals of the perils of doing business with autocrats.

Additional reporting by Andrew Ward

---- INDEX REFERENCES ----

COMPANY: COCA COLA CO (THE); INTEL CORP; COCA COLA EXPORT CORP; COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Legal (1LE33); Social Issues (1SO05); Business Lawsuits & Settlements (1BU19); Business Litigation (1BU04); Judicial (1JU36); Arbitration & Mediation (1AR68); Liability (1LI55); Financially Distressed Companies (1FI85); Bank-

Case 1:07-cv-01252-RJL    Document 15-5    Filed 10/30/2007    Page 58 of 67

ruptcies (1BA08); Government Litigation (1GO18); World Organizations (1IN77); CIS (1CI65))

INDUSTRY: (Non-Alcoholic Beverages (1NO38); Legal Services (1LE31); Beverages (1BE22); Accounting, Consulting & Legal Services (1AC73); Soft Drinks (1SO77); Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION: (North America (1NO39); Western Europe (1WE41); Austria (1AU39); Europe (1EU83); Central Europe (1CE50); Western Asia (1WE54); Afghanistan (1AF45); Central Asia (1CE93); Americas (1AM92); New Jersey (1NE70); Asia (1AS61); Uzbekistan (1UZ71); USA (1US73))

Language: EN

OTHER INDEXING: (CCBU; COCA COLA; COCA COLA EXPORT CORP; COCA COLA INTL; COMMUNIST; INTEL; ISLAM KARIMOV; NEW YORK UNIVERSITY; SUPREME COURT; UNITED NATIONS GLOBAL COMPACT; UZBEK) (Additional; Allan Gerson; Andrew Ward; Coke; Daft; Douglas Daft; Farid Maqsudi; Gulnora Karimova; Karimov; Karimova; Mansur; Mansur Maqsudi; Maqsudi; Maqsudis; Neville Isdell; Newberger; Nick Evangelopolous; Roz Trading; Sonya Soutus; Stuart Newberger; Warren Buffett) (Uzbekistan; Asia; Former USSR)

KEYWORDS: (Company News); (Formations); (Joint Ventures); (Strategy)

COMPANY TERMS: COCA COLA CO

PRODUCT: Executive Offices; Executive, Legislative, Public Finance & General Government; Public Administration; Soft Drink Mfg

NAICS CODE: 92111; 9211; 92; 312111

Word Count: 2060
6/13/06 FTCOM (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                    C-57

Westlaw.                                                    NewsRoom

6/14/06 FTI 25                                                    Page 1

6/14/06 Fin. Times 25
2006 WLNR 10170402

Financial Times UK
Copyright 2006 Financial Times Ltd.

June 14, 2006

Section: COMPANIES THE AMERICAS

COMPANIES THE AMERICAS: Coca-Cola accused over Uzbek venture

By EDWARD ALDEN and ANDREW WARD

WASHINGTON and ATLANTA Coca-Cola has been hit with an arbitration claim seeking
more than Dollars 100m in damages, alleging that the world's largest soft drinks
maker conspired with the government of Uzbekistan against a joint venture partner
who fell out of favour with the country's authoritarian ruler, Islam Karimov.

The claim was made by a company owned by **Mansur Maqsudi**, an American of
Afghan descent who was married to Mr Karimov's daughter, Gulnora, until a messy
separation in 2001.

It alleges that Coke "undertook to conspire with the government of Uzbekistan" to
strip Mr Maqsudi's majority share in Coke's bottling facility in Tashkent, the
largest incentral Asia.

The case was filed last week before an arbitration tribunal in Austria, under the
terms of the 1992 joint venture between Coke, Mr Maqsudi's trading company ROZ
Limited, and the Uzbek government.

Central Asia is among the world's least developed soft drink markets, but Coke is
expanding aggressively in the region as it seeks fresh growth to offset slowing
sales in the US and Europe.

The claim comes as the company is already trying to repair its image in the face
of lawsuits from labour groups in the US over allegations that it turned a blind
eye to human rights abuses at its bottling plants in Colombia and Turkey. Those
charges have fuelled student boycotts in the US and Europe, and prompted Coke to
rebut more aggressively charges of wrongdoing.

The Uzbek case will raise similar issues. "Coke did more than just stand by with
arms folded," said Stuart Newberger of Crowell & Moring, the lead lawyer on the
arbitration. "They were affirmatively working with the government of Uzbekistan."

Coke strongly denied the charge, saying in a statement that "this allegation is

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-01252-RJL     Document 15-5     Filed 10/30/2007     Page 60 of 67

categorically false. Unequivocally, there was no collaboration and we are confident this will be upheld in any court or arbitration proceedings."

Mr Maqsudi went into business with Coke in 1992 to help the company open its first bottling plant in Tashkent. By 1997 the plant was generating Dollars 118m in annual sales and was twice selected by Coke as its"bottler of the year."

But the relationship began to sour in 2001 following Mr Maqsudi's separation from his wife, when she left their New Jersey home with the couple's two children and later defied a court order to return.

Following the separation, agents for the country's national security service, the successor to the KGB in Uzbekistan, raided the bottling plant under the guise of a tax audit. Within 10 months, the Uzbek courts had stripped ROZ of its share in the bottling plant.

---- INDEX REFERENCES ----

COMPANY: COCA COLA CO (THE); COCA COLA ENTERPRISES INC

NEWS SUBJECT: (Legal (1LE33); Joint Ventures (1JO05); Business Lawsuits & Settlements (1BU19); Business Litigation (1BU04); World Organizations (1IN77); CIS (1CI65); Arbitration & Mediation (1AR68); Corporate Groups & Ownership (1XO09))

INDUSTRY: (Legal Services (1LE31); Non-Alcoholic Beverages (1NO38); Food & Beverage Production (1FO79); Consumer Packaged Goods (1CO27); Consumer Products & Services (1CO62); Beverages (1BE22); Accounting, Consulting & Legal Services (1AC73); Soft Drinks (1SO77); Agriculture, Food & Beverage (1AG53))

REGION: (Central Asia (1CE93); Asia (1AS61); Uzbekistan (1UZ71); Europe (1EU83); Western Asia (1WE54))

Language: EN

OTHER INDEXING: (COCA COLA; KGB) (Central Asia; Gulnora; Islam Karimov; Karimov; Mansur Maqsudi; Maqsudi; Stuart Newberger; Unequivocally) (United States of America; Uzbekistan; Americas; Commonwealth of Independent States; Former USSR; North America; Pacific Rim)

KEYWORDS: (Company News); (Joint Ventures); (Law & Legal Issues); (Shareholdings); (Strategy)

COMPANY TERMS: COCA COLA CO

PRODUCT: Soft Drinks; Soft Drink Mfg

SIC: 2086

NAICS CODE: 312111

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-59**

EDITION: London Ed1

Word Count: 512
6/14/06 FTI 25
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**C-60**

Westlaw.                                                        NewsRoom

6/15/06 TIMESCTLASIA (No Page)                                    Page 1

6/15/06 Times Cent. Asia (Kyrg.) (Pg. Unavail. Online)
2006 WLNR 10383577

Times of Central Asia, The (Kyrgyzstan)
Copyright 2006 Asia Pulse Pte Ltd.

June 15, 2006

Coca-Cola Accused of Conspiring with Uzbek Government

MOSCOW, June 15 (TCA): Coca-Cola has been hit with an arbitration claim seeking
more than $100m in damages. The claim alleges that the world's largest soft drink
maker conspired with the government of Uzbekistan against a joint venture partner
who fell out of favor with the country's authoritarian ruler, Islam Karimov, The
Financial Times reported Wednesday.

The claim was made by a company owned by   **Mansur    Maqsudi** , an American of
Afghan descent who was married to Karimov's daughter, Gulnora, until a messy sep-
aration in 2001.

The suit alleges that Coke "undertook to conspire with the government of Uzbek-
istan" to strip Maqsudi of his majority share in Coke's bottling facility in
Tashkent, the largest in Central Asia.

The case was filed last week before an arbitration tribunal in Austria, under the
terms of the 1992 joint venture between Coke, Maqsudi's trading company ROZ Lim-
ited, and the Uzbek government.

Central Asia is among the world's least developed soft drink markets, but Coke is
expanding aggressively in the region as it seeks fresh growth to offset slowing
sales in the US and Europe.

The claim comes as the company is already trying to repair its image in the face
of lawsuits from labor groups in the US over allegations that it turned a blind
eye to human rights abuses at its bottling plants in Colombia and Turkey. Those
charges have fueled student boycotts in the US and Europe, and prompted Coke to
refute more aggressive charges of wrongdoing.

The Uzbek case will raise similar issues. "Coke did more than just stand by its
with arms folded," said Stuart Newberger of Crowell & Moring, the lead lawyer on
the arbitration. "They were willingly working with the government of Uzbekistan."

Coke strongly denies the charge, saying in a statement that "this allegation is
categorically false. Unequivocally, there was no collaboration and we are confid-
ent this will be upheld in any court or arbitration proceedings."

Maqsudi went into business with Coke in 1992 to help the company open its first

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

bottling plant in Tashkent. By 1997 the plant was generating $118m in annual sales and was twice selected by Coke as its "bottler of the year."

But the relationship began to sour in 2001 following Maqsudi's separation from his wife, when she left their New Jersey home with the couple's two children and later defied a court order to return to the US.

Following the separation, agents for the country's national security service, the successor to the KGB in Uzbekistan, raided the bottling plant under the guise of a tax audit. Within 10 months, the Uzbek courts had stripped ROZ of its share in the bottling plant.

(THROUGH ASIA PULSE)

15-06 2006

---- INDEX REFERENCES ----

COMPANY: COCA COLA ENTERPRISES INC

NEWS SUBJECT: (Legal (1LE33); Joint Ventures (1JO05); Business Lawsuits & Settlements (1BU19); World Organizations (1IN77); Business Litigation (1BU04); CIS (1CI65); Arbitration & Mediation (1AR68); Corporate Groups & Ownership (1XO09))

INDUSTRY: (Legal Services (1LE31); Non-Alcoholic Beverages (1NO38); Food & Beverage Production (1FO79); Beverages (1BE22); Accounting, Consulting & Legal Services (1AC73); Soft Drinks (1SO77); Agriculture, Food & Beverage (1AG53))

REGION: (Central Asia (1CE93); Asia (1AS61); Uzbekistan (1UZ71); Europe (1EU83); Western Asia (1WE54))

Language: EN

OTHER INDEXING: (COCA; COCA COLA; COLA; KGB; UZBEK) (Gulnora; Islam Karimov; Karimov; Mansur Maqsudi; Maqsudi; Stuart Newberger; Unequivocally)

Word Count: 534
6/15/06 TIMESCTLASIA (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**C-62**

Westlaw                                                    NewsRoom

6/21/06 STLGRN 19                                              Page 1


6/21/06 Star-Ledger (Newark N.J.) 19
2006 WLNR 10710397

Star-Ledger, The (Newark, NJ)
Copyright 2006 The Star-Ledger. All Rights Reserved. Used by NewsBank with Permission.

June 21, 2006


Section: MORRIS


Coke accused of abandoning exec: Morris resident seeks $125 million for takeover by Uzbek regime

MARGARET McHUGH

A New Jersey businessman who helped bring Coca-Cola to Uzbekistan in the early 1990s charges the multinational beverage company left him flat when the authoritarian government seized his majority ownership in the three bottling plants.

Saying the Coca-Cola Co. conspired with Uzbekistan to steal his company's 55 percent share, **Mansur Maqsudi**, former son-in-law of Uzbekistan's president, is seeking more than $125 million through international arbitration.

"Coca-Cola stabbed their business partner in the back," said Maqsudi's attorney, Stuart Newberger. Newberger filed a claim June 6 with the International Arbitral Centre of the Austrian Federal Economic Chamber in Vienna.

Coca-Cola, Maqsudi's Roz Trading Ltd. and Uzbekistan agreed that disputes over their joint venture, Coca-Cola Bottlers Uzbekistan Ltd., would be resolved under Austrian law in English, Newberger said. Maqsudi says the Uzbekistan government began a campaign of retaliation right after he told his wife, Gulnara Karimova, he wanted a divorce in July 2001.

Karimova left the couple's 10,000-square-foot home in Mendham Township and took their children to Uzbekistan, a former Soviet republic in Central Asia ruled by her father, Islam Karimov. Though it is technically a republic, the U.S. State Department says Karimov holds almost absolute power.

Maqsudi, a naturalized U.S. citizen of Uzbek descent, has not seen his children since, despite New Jersey court rulings ordering Karimova to return them. Neither he nor his relatives can travel to Uzbekistan without risking their lives, the complaint said.

In August 2001, about 20 Uzbekistan National Security Service officers raided the Tashkent headquarters of Coca-Cola Bottlers Uzbekistan under the guise of an

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.    **C-63**

audit, the complaint said. The company's managing director was held in isolation
for 24 hours, while the deputy managing director was confined for two to three
days, according to the complaint.

 Afterward, relatives of Maqsudi's were sentenced to long prison terms, even
though they had nothing to do with the business's day-to-day operations, Maqsudi
said. Maqsudi's mother's home was demolished, and 25 relatives were expelled and
left at the Afghan border in December 2001, during the U.S. invasion.

 Shortly after the raid, Maqsudi's Roz Trading wrote to Douglas Daft, chairman and
CEO of Coca-Cola, asking the company to condemn the abusive treatment of Coca-Cola
Bottlers Uzbekistan employees, according to the complaint. Daft answered that the
matter was "personal" and that Coca-Cola would not get involved.

 While Maqsudi's company tried to get the U.S. government to intervene, the re-
gional manager of Coca-Cola Eurasia Division "deliberately misled the U.S. Depart-
ment of State by stating the nature of the audit was not unusual," the complaint
said.

 Coca-Cola "was well aware from previous tax audits that this tax audit was unlike
the others in its scope, duration and treatment of CCBU employees," according to
the complaint.

 Coca-Cola's lack of support "emboldened Gulnara and her father to carry out these
aggressive actions," Maqsudi said.

 "It's clear . . . whose side they took. Had Coca-Cola stood up and defended the
joint venture, if they had spoken up, the U.S. government would have gotten in-
volved," he said.

 Because the State Department didn't intervene for a year, "it cost me access to
my children," Maqsudi said.

 The Coca-Cola Export Corp., which continues to own a 43 percent share in Coca-
Cola Bottlers Uzbekistan, denied the allegations.

 "Unequivocally, there was no collaboration, and we are confident this will be up-
held in any court or arbitration proceedings," the company said in a written
statement.

 Coca-Cola "is and has always been a minority shareholder of Coca-Cola Bottlers of
Uzbekistan and is not responsible for the dispute between Roz Trading and the gov-
ernment of Uzbekistan," the statement also said.

 Coca-Cola officials said the company "challenged the judicial process undertaken
by the Uzbekistan government against CCBU at every level."

 The Coca-Cola Export Corp. had urged the government to allow the Uzbekistan oper-
ation to continue in the interests of all stakeholders, including the employees

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.    **C-64**

and shareowners, but by May 2003, all three plants were shut down. One reopened in December 2004.

 "What started as a family squabble morphed into a human rights issue and now into a commercial dispute," Newberger said.

 Newberger noted Coca-Cola has tried to paint itself as a victim, but it continues to do business in Uzbekistan with the government. Coca-Cola operates in more than 200 countries.

 Another company, Zeromax Group Inc., bought Roz Trading's shares in the bottling company from the Uzbekistan government in 2004. Zeromax, which Maqsudi claims in his court papers is affiliated with his ex-wife, also is named as a defendant.

 Maqsudi has left the children's rooms in his home as they were five years ago. He and his family marked his daughter Iman's eighth birthday Saturday with a party, he said.

 Maqsudi hopes news of what happened with his Uzbekistan business will reach his son, Islam, who is now 13.

 "Maybe they (his children) will start asking questions . . . they'll understand that they were lied to," Maqsudi said. Hopefully, they will be able to reach out to me somehow."

---- INDEX REFERENCES ----

COMPANY: COCA COLA CO (THE); COCA COLA EXPORT CORP; COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Legal (1LE33); Business Management (1BU42); Major Corporations (1MA93); Joint Ventures (1JO05); Government (1GO80); World Organizations (1IN77); CIS (1CI65); Corporate Globalization (1XO29); Corporate Groups & Ownership (1XO09))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Manufacturing (1MA74); Beverages (1BE22); Soft Drinks (1SO77); Food & Beverage Production (1FO79); Consumer Products & Services (1CO62); Agriculture, Food & Beverage (1AG53))

REGION:  (North America (1NO39); Western Europe (1WE41); Austria (1AU39); Europe (1EU83); Central Europe (1CE50); Western Asia (1WE54); Central Asia (1CE93); Americas (1AM92); New Jersey (1NE70); Asia (1AS61); Uzbekistan (1UZ71); USA (1US73))

Language:  EN

OTHER INDEXING:  (AUSTRIAN FEDERAL ECONOMIC CHAMBER; CCBU; COCA; COCA COLA; COCA COLA BOTTLERS OF UZBEKISTAN; COCA COLA BOTTLERS UZBEKISTAN; COCA COLA BOTTLERS UZBEKISTAN LTD; COCA COLA CO; COCA COLA EURASIA DIVISION; COCA COLA EXPORT CORP; COLA; ROZ TRADING; ROZ TRADING LTD; STATE DEPARTMENT; US DEPARTMENT OF STATE; US STATE DEPARTMENT; UZBEKISTAN; UZBEKISTAN NATIONAL SECURITY SERVICE; ZEROMAX; ZERO-

MAX GROUP INC)  (Coke; Daft; Douglas Daft; Gulnara; Islam; Islam Karimov; Karimov; Karimova; Mansur Maqsudi; Maqsudi; Newberger; Stuart Newberger; Unequivocally)

EDITION: MORRIS

Word Count: 1056
6/21/06 STLGRN 19
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**C-66**

# Erb Declaration

# Exhibit D

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

| | |
|---|---|
| ROZ TRADING LTD.<br>Elizabeth Square<br>P.O. Box 847<br>Grand Cayman<br>Grand Cayman Islands<br>British West Indies<br><br>and<br><br>ROZ TRADING LTD. (UZBEKISTAN)<br><br>               Plaintiffs,<br><br>v.<br><br>ZEROMAX GROUP, INC.<br>1310 Double Gate Ct.<br>Davidsonville, MD 21035;<br><br>ZEROMAX LOGISTICS, INC.<br>1310 Double Gate Ct.<br>Davidsonville, MD 21035;<br><br>ZEROMAX LLC<br>800 Delaware Ave.<br>Wilmington, DE 19801;<br><br>and<br><br>ZEROMAX GMBH<br>Poststrasse 30<br>6300 Zug ZG<br>Switzerland<br><br>               Defendants. | Case No. 1:06-cv-01040-CKK |

## FIRST AMENDED COMPLAINT FOR COMPENSATORY DAMAGES, PUNITIVE DAMAGES, TEMPORARY INJUNCTIVE RELIEF, AND PERMANENT INJUNCTIVE RELIEF

## INTRODUCTION

Plaintiffs had an ownership interest in a lucrative joint venture in the quickly growing soft drink industry in Uzbekistan. Defendants and others have willfully and deliberately deprived the Plaintiffs of that interest, worth hundreds of millions of dollars. Plaintiffs, by and through their undersigned counsel, bring this action for breach of contract and in tort seeking compensatory and punitive damages, as well as injunctive relief, arising out of the Defendants' conduct.

## PARTIES

1.      Plaintiff ROZ Trading Ltd. ("ROZ") is a limited liability company, located at Elizabeth Square, P.O. Box 847, Grand Cayman, Grand Cayman Islands, British West Indies. ROZ is organized under the laws of the Cayman Islands, British West Indies, and its principal place of business is Morristown, New Jersey.

2.      Plaintiff ROZ Trading Ltd. (Uzbekistan) ("ROZ (Uzbekistan)") was a wholly-owned subsidiary of ROZ organized under the laws of Uzbekistan, until it was purportedly dissolved as part of the wrongful conduct relating to this civil action. Until its dissolution, ROZ (Uzbekistan)'s principal place of business was Uzbekistan.

3.      Defendant Zeromax Group, Inc. was incorporated in Delaware on September 4, 2002. During the relevant period, its principal place of business was located at 1725 I Street, NW, Suite 300, Washington, DC 20006. To this day, Zeromax Group holds itself out as maintaining its principal place of business and U.S. headquarters at 1725 I Street, NW, Suite 300, Washington, DC 20006. Upon information and belief, in connection with the events at issue in this case, Zeromax Group filed a certificate of dissolution with the state of Delaware, on August 2, 2005. On February 2, 2006, Zeromax Group established a business address at 1310

Double Gate Ct., Davidsonville, MD, the home of Harry Eustace, Sr. The directors and officers last in office were Harry Eustace, Sr. and Miradil Djalalov.

      4.      Defendant Zeromax Logistics, Inc. was incorporated in Delaware on December 6, 2002. Zeromax Logistics was a wholly-owned subsidiary of one of the Zeromax entities. Upon information and belief, Zeromax Logistics operated out of 1725 I Street, NW, Suite 300, Washington, DC 20006, the U.S. headquarters and principal place of business of Zeromax Group, Inc. It filed a certificate of dissolution on August 2, 2005. The directors and officers last in office were Harry Eustace, Sr. and Miradil Djalalov.

      5.      Defendant Zeromax LLC was formed in Delaware on September 20, 1999. On June 4, 2002, Zeromax LLC amended its Certificate of Formation and vested management of the company in a single member, Miradil Djalalov. In 2003, Zeromax LLC and Tijorat, an Uzbekistani state-owned food distribution company, formed a joint venture called Muzimpex. Upon information and belief, Zeromax LLC operated out of 1725 I Street, NW, Suite 300, Washington, DC 20006, the U.S. headquarters and principal place of business of Zeromax Group, Inc. Zeromax LLC cancelled its certificate of formation on September 28, 2005.

      6.      Defendant Zeromax GmbH is a Swiss-registered company that was incorporated in July 2005 – shortly before the other Defendants were dissolved. Its partners are Miradil Djalalov and Fatima Makhmudovna Djalalova. Upon information and belief, its prior partners included Harry Eustace, Sr. and Zeromax Holdings AG. After Zeromax LLC was dissolved, Zeromax GmbH acquired its interest in Muzimpex. As of December 2005, Zeromax GmbH holds an 87.5% interest in Muzimpex. Muzimpex currently holds a 57.1% interest in Coca-Cola Bottlers of Uzbekistan ("CCBU"). Thus, on information and belief, for purposes of this suit, Zeromax GmbH is the successor in interest to the other Defendants and party to a transfer of an

interest in CCBU designed to frustrate the ability of Plaintiffs and the courts of the United States to recover Plaintiffs' interest or assets from other Defendants.

7.      Upon information and belief, Gulnora Karimova exercises full control over Defendants.

## JURISDICTION AND VENUE

8.      Jurisdiction over the subject matter of this case arises from 28 U.S.C. § 1332, as the parties are diverse in citizenship and more than $75,000 is at stake.

9.      Upon information and belief, Defendants are subject to personal jurisdiction in this Court pursuant to D.C. Code §§ 13-334, 13-422, and 13-423. Defendants are subject to personal jurisdiction under § 13-334 because they are engaged in regular, systematic and continuous business activities in D.C. through their agent or alter ego, Defendant Zeromax Group, Inc., which maintains, and for the relevant period maintained, its principal place of business in Washington, D.C., as reflected on its website and signage at the office building. The exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. This is consistent with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, which provides that service of a summons is effective to establish jurisdiction over a defendant who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located.

10.      Defendants are subject to personal jurisdiction in this Court pursuant to D.C. Code § 13-422 because Defendant Zeromax Group, Inc. maintains, and for the relevant period maintained, its principal place of business in Washington, D.C., as reflected on its website and signage at the office building. The exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. Upon information and belief, Zeromax Group, Inc. is

an agent or alter ego of the remaining Defendants in that the activities of Zeromax Group, Inc. were of such a character as to amount to doing the business of the other entities and in such a way as to disregard their separate corporate structures. Accordingly, its contacts in the District of Columbia may be attributed to the affiliated parties for jurisdictional purposes.

11.    Upon information and belief, Defendants are subject to personal jurisdiction in this Court pursuant to D.C. Code § 13-423(a)(1) since they have transacted business in the District of Columbia, either directly or by an agent, and the claims for relief arise from this transaction of business. Defendants also are subject to personal jurisdiction in this Court pursuant to D.C. Code § 13-423(a)(4) because they caused tortious injury in the District of Columbia by an act or omission outside of the District of Columbia. Upon information and belief, Defendants caused tortious injury in the District of Columbia in that Plaintiffs' interest in the joint venture were owned and held in the District of Columbia. Upon information and belief, Zeromax GmbH, Zeromax Logistics and Zeromax LLC engaged in a persistent course of conduct, or derived substantial revenue from goods used or consumed, or services rendered in the District of Columbia by and through their agent or alter ego, Zeromax Group, Inc., which maintains, and for the relevant period maintained, its principal place of business in Washington, D.C., as reflected on its website and signage at the office building.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## ALLEGATIONS OF FACT

### Introduction: Formation of the Joint Venture

13.    On June 16, 1993, ROZ entered into a commercial Joint Venture Agreement ("JVA") with The Coca-Cola Export Corporation ("TCCEC"), a wholly-owned subsidiary of The Coca-Cola Company, and with the government of Uzbekistan. According to the JVA, the

purpose of the joint venture was to "engage in and maximize the profitable growth of the business of the preparation, packaging, distribution and sale of [Coca-Cola] Beverages in authorized containers" pursuant to a Bottler's Agreement between the joint venture and The Coca-Cola Company.

14.     The joint venture was originally called Coca-Cola Bottlers Tashkent Ltd., but, in or around 1996, due to its expanded sales territory, the name was changed to Coca-Cola Bottlers of Uzbekistan Ltd. ("CCBU").

15.     Effective December 1, 1993, CCBU and The Coca-Cola Company entered into a Bottler's Agreement allowing CCBU to use Coca-Cola's Authorized Beverage Containers and to distribute and sell the beverages using The Coca-Cola Company's trademarks for five years.

16.     During the first three years of operation, CCBU needed additional capital in order to permit it to expand by, among other things, purchasing a more productive facility.   By the end of 1996, ROZ had contributed $8,152,000 of the total $14,807,000 capital infusion necessary to make these improvements.

17.     In October 1997, The Coca-Cola Company and CCBU executed a new Bottler's Agreement valid through November 30, 2003, with the option to renew for an additional five-year term.

18.     The joint venture was financially successful.  In the 2000 annual audit, assets of CCBU were valued at approximately $150 million.  Indeed, in terms of beverage production, CCBU was among The Coca-Cola Company's top 35 bottlers from over 200 countries worldwide.  CCBU was also the first bottler to receive the "Bottler of the Year" award from The Coca-Cola Company two years in a row.

19.     During the formation and early years of the joint venture, Mansur Maqsudi

("Maqsudi"), Managing Director of ROZ, was married to Gulnora Karimova ("Karimova"), the

daughter of Islam Abduganievich Karimov, the President of Uzbekistan.  President Karimov had

ruled Uzbekistan while it was part of the Soviet Union; he was "elected" President after its

independence, a position he continues to hold.

20.     In July 2001, Maqsudi told Karimova that he was separating from her, citing

irreconcilable differences.  This sparked a vicious and extreme reaction from Gulnora Karimova,

giving rise, *inter alia*, to this lawsuit.

**Divorce Led to Seizure of Plaintiffs' Interest in CCBU (July 2001 – September 2002)**

21.     Gulnora Karimova, with the support of her father, the President of Uzbekistan,

immediately initiated attacks on Maqsudi's family and commercial business, using the apparatus

of the state when convenient.

22.     Immediately after learning of Maqsudi's intent to divorce her, Gulnora Karimova

kidnapped their two young children from their home in New Jersey and fled to Uzbekistan.  She

attempted to extort money from Maqsudi and threatened him and his family with harm and even

death.

23.     Maqsudi has not seen his children since Gulnora Karimova kidnapped them and

took them to Uzbekistan over five years ago.  Maqsudi believes his children remain in

Uzbekistan, but does not know their exact whereabouts.

24.     In December 2001, some of Maqsudi's family members were taken in the middle

of a winter night from their homes in Uzbekistan to the border of Afghanistan and simply left

there with no belongings.  His elderly grandmother was forced to leave her home without her

diabetes medication.  Other family members were taken hostage in Uzbekistan and some remain

imprisoned today. Further, Maqsudi's mother's home was demolished. Neither Mr. Maqsudi

nor his immediate family can travel to Uzbekistan without risking their lives.

25.     In September 2002, the Superior Court of New Jersey found that it had

jurisdiction under the Uniform Child Custody Jurisdiction Act to hear the custody dispute over

the Maqsudi children. After hearing the case, the court ordered Gulnora Karimova to return the

children to New Jersey and to arrange immediate telephone contact between the children and

their father. *See Maqsudi v. Maqsudi*, 830 A.2d 929 (N.J. Super. Ch. 2002).

26.     Gulnora Karimova has refused to comply with these court orders and Maqsudi has

had no contact with his children – by phone, in person, or otherwise – since the court's decision.

27.     In addition to having his children kidnapped and several family members

imprisoned, Maqsudi's business also was targeted. Beginning on August 13, 2001 and lasting

several days, agents from Uzbekistan's feared National Security Service (the successor to the

KGB in Uzbekistan), under the guise of a "tax audit," raided both ROZ's and CCBU's offices in

Tashkent and seized company documents and employees. CCBU's Managing Director and his

Deputy were both taken away by the Secret Police and held in isolation for interrogation for

more than 24 hours. There was no legal or factual justification for these raids, which were

nothing more than intimidation and harassment of Mr. Maqsudi and Plaintiffs' interest in CCBU.

28.     As part of Gulnora Karimova's and President Karimov's assault on Plaintiffs'

business interest, Uzbekistan initiated a series of sham proceedings to eliminate the ability of

Plaintiffs, its commercial business partners, to exercise their contractual rights to manage and

control the joint venture.

29.     First, Uzbekistan arbitrarily confiscated a significant amount of Plaintiffs' shares

in CCBU through a sham action begun at the Economic Court of Tashkent and ultimately

summarily affirmed by the Supereme Economic Court of Uzbekistan on February 5, 2002.

Through this sham procedure, Plaintiffs' total holdings in the joint venture were reduced from

55.118% to 23.416% without any compensation to Plaintiffs for their loss of shares or for their

investments and capital contributions to the joint venture. At this time, CCBU was worth over

$150 million.

30.     The second set of sham proceedings were deliberately initiated by Uzbekistan, at

the direction of the Karimovs, to completely purge Plaintiffs from any further participation and

management of the joint venture. To obtain the remainder of Plaintiffs' interest in CCBU, the

Ministry of Justice claimed that in forming ROZ(U), ROZ had failed to comply with its charter

funding requirements (even though Uzbekistan's tax committee had acknowledged eight months

earlier that the charter funds had, in fact, been properly paid). The Ministry of Justice petitioned

the Tashkent Economic Court to liquidate ROZ(U) and the Court approved its liquidation on

December 26, 2001, without allowing Plaintiffs counsel or an opportunity to participate in the

proceedings.

31.     On June 3, 2002, the Economical Court of Tashkent ordered that ROZ's 23.416%

share in CCBU be "liquidated" and used to pay the debts of ROZ (Uzbekistan). On September

11, 2002, days after Zeromax Group was incorporated, the Supreme Economic Court of

Uzbekistan approved both the liquidation of ROZ (Uzbekistan) and the seizure of ROZ's

remaining interest in CCBU, allegedly in satisfaction of ROZ (Uzbekistan)'s "debts," including

those arising from alleged inadequate charter funding. Apart from the fact that Uzbekistan's

own tax committee had acknowledged that ROZ (Uzbekistan)'s charter funding had indeed been

adequate, the sham nature of these proceedings is demonstrated by the foreign court's reliance on

false and inaccurate financial calculations to show a "debt", when, in fact, ROZ (Uzbekistan) had

over $50 million in cash and unencumbered net assets on hand, including land, automobiles, warehouses, offices, and rental property. These sham proceedings did not relate to any proper governmental functions, but instead were intended solely to benefit the private, commercial interests of Gulnora Karimova, the Government of Uzbekistan (a partner in the Joint Venture) and Defendants. It is well documented that the courts of Uzbekistan lack judicial independence and are wholly subservient to the corrupt government headed by President Karimov and his family, who have complete authority to appoint and remove judges at will.

32.     Soon after the beginning of Uzbekistan's reign of terror, TCCEC, with the active encouragement and participation of its parent company, The Coca-Cola Company, undertook to conspire with Gulnora Karimova to exclude Plaintiffs permanently from further participation in CCBU.

33.     The Coca-Cola Company was well aware from previous tax audits that this tax audit of CCBU was unlike any others in its scope, duration, and treatment of CCBU employees. The Coca-Cola Company nonetheless told the U.S. Department of State that the nature of the audit was not unusual, thereby undermining Plaintiffs' efforts to obtain protection and assistance from the United States government.

34.     As acknowledged in a letter dated August 29, 2001 from the Uzbekistani Ambassador to the United States to a United States Senator, "the representatives of the Coca-Cola Company's regional office have been closely collaborating with the government agencies of Uzbekistan, and share their position that the current audit of the joint venture's documentation is lawful . . . ." The letter further stated that the government of Uzbekistan keeps in "close contact with the headquarters of the Coca-Cola Company."

35.      In January 2002, Plaintiffs' joint venture partners scheduled a general meeting of the participants of CCBU in Uzbekistan, knowing that no one from ROZ could safely travel there to participate.  At the meeting, a former employee of The Coca-Cola Company, Derek Willshee, was appointed President of CCBU and given the duties and authority previously held by Mr. Maqsudi, without any input or approval from Plaintiffs.

36.      In practice, Willshee was only a figurehead with no independent authority to manage CCBU.  CCBU was actually managed by Irena Avtaiknia, a close ally of Karimova.  Avtaiknia formally succeeded Willshee after approximately six months.  TCCEC was fully aware that by appointing Willshee in name only, they were allowing Gulnora Karimova to control CCBU through her subordinate, Avtaiknia.

37.      In or about January 2002, Ahmet Bozer, President of The Coca-Cola Eurasia Division, met secretly with Avtaiknia and Karimova's then-assistant, Farhod Inogambaev, at the Intercontinental Hotel in Tashkent to set into motion arrangements under which Gulnora Karimova could formalize her control over and profit from CCBU.  As discussed in further detail below, this meeting was followed by further negotiations which culminated in a commercial agreement that allowed Defendants to obtain Plaintiffs' former interest in CCBU by unlawful means.

38.      By this time, Gulnora Karimova had formed companies within Uzbekistan and a company in Dubai, United Arab Emirates, called Revi Holdings, FZE, that were doing business with CCBU.  Karimova used these companies, in part, to further ROZ's and ROZ (Uzbekistan)'s exclusion from CCBU.

39.      Upon information and belief, Defendants, acting alone or in concert with Karimova, Uzbekistan, TCCEC and The Coca-Cola Company, furthered Plaintiffs' exclusion

from CCBU. Defendants have had close business and personal ties with Karimova for many years.

40.    Defendants are involved in a shell game, creating, blending and destroying corporate identities in order to deprive Plaintiffs of their interest in CCBU while also avoiding the rule of law.

a.    Zeromax Group was incorporated on September 4, 2002. The addresses and contact information for Zeromax GmbH's representative offices in Uzbekistan, Russian Federation, and Ukraine are the same as those listed on the Zeromax Group website for the Zeromax Group representative offices. The logo for Zeromax is also the same for both companies' websites.

b.    The website for Zeromax Group lists "Bentonite" as one of its joint ventures. Bentonite was created in February 2002 (about eight months before Zeromax Group was even incorporated). In fact, it was Zeromax LLC that in February 2002 partnered with Uzgeoburneftegazdobycha, a subsidiary Uzbekneftegaz (Uzbek Oil and Gas), to create an Uzbek-American joint venture called "Bentonite."

c.    The Zeromax Group website, however, indicates that it was formed in 1999 and that it worked on the construction of the Shurtan - Sherabad gas pipeline that was completed in September 2003. Zeromax GmbH, which was created in 2005, also boasts this accomplishment. The website for Zeromax GmbH not only states that it was founded in 2000, but also states that "[i]n 2003 Zeromax was commissioned by Cabinet of Ministers of Uzbekistan to build a 193-kilometer gas pipeline system with diameter of 720-mm, running through extremely rugged terrain from the Shurtan Gas and Chemical Complex to the gas-main of Kelif-Dushanbe pipeline."

d.      Zeromax Logistics was incorporated on December 6, 2002 as a wholly-owned subsidiary of Zeromax Group or one of the other Defendant entities.   It is affiliated with another company called Temiryul-Khizmat, which is a wholly-owned freight-forwarding subsidiary of Zeromax GmbH.

e.      On August 2, 2005, Zeromax Logistics and Zeromax Group filed their certificates of dissolution with the State of Delaware.  Zeromax LLC was also dissolved and its cancellation certificate was filed on September 28, 2005.

f.      As these entities were dissolving, Zeromax GmbH was incorporated in Switzerland in July 2005.  As part of the unlawful acts designed to deprive Plaintiffs of their interests in CCBU, Zeromax GmbH acquired the interest formerly held by Zeromax LLC in Muzimpex once Zeromax LLC was dissolved.  Upon information and belief, Zeromax GmbH is the successor in interest to the other Defendants.

### Post-Seizure Furtherance of Transfer of Plaintiffs' Interest in CCBU

41.     At a follow-up meeting to the Bozer – Avtaiknia – Inogambaev meeting of January 2002, The Coca-Cola Company, on behalf on TCCEC, at a meeting in Switzerland in 2003 proposed the elimination of Plaintiffs as shareholders in CCBU.  The Coca-Cola Company also proposed a Management Contract between CCBU and a company owned and controlled by Gulnora Karimova; this Management Contract would strip Plaintiffs of any participation in the joint venture.  These negotiations ultimately culminated in a commercial agreement that allowed Defendants, companies closely associated with and/or controlled by Ms. Karimova, to take Plaintiffs' former interest in CCBU.

42.     In February 2003, Zeromax LLC and Tijorat, an Uzbekistani state-owned food distribution company, formed a private, commercial joint venture called Muzimpex.  Upon

information and belief, Karimova and Defendants act in concert to control the activities of

Muzimpex and CCBU. Upon information and belief, Muzimpex does not have independent

management aside from that provided by Defendants, who direct all activities and operations of

Muzimpex. Harry Eustace, Sr., who was the Chief Operating Officer for Zeromax Group and an

officer or director for Zeromax Logistics before they were both dissolved, is also the person to

whom the website for Muzimpex is registered. Muzimpex is listed on the website for Zeromax

Group as a joint venture. In 2005, ownership of Zeromax LLC's interest in Muzimpex passed to

Zeromax GmbH. As the successor to Zeromax LLC, Zeromax GmbH now holds or controls the

interest in CCBU that belongs to Plaintiffs.

43.    In the Spring of 2003, Karimova assisted Defendants in obtaining a multi-million

dollar contract with Uzbekistan for the construction of the Shurtan-Sherabad natural gas pipeline.

On March 3, 2003, Uzbekistan's Cabinet of Ministers approved this contract. Upon information

and belief, shortly thereafter, Defendants deposited a $1 million payment in Karimova's personal

account in the Rietumu Bank in Riga, Latvia. In March 2003, Defendants entered into a contract

with a company called OA Stores, owned by Karimova.

44.    After fleeing Uzekistan and being granted political asylum in the United States,

Farhod Inogambaev, Gulnora Karimova's former assistant, sought out Mansur Maqsudi to

inform him of the actions taken against Maqsudi, ROZ, and ROZ (Uzbekistan) to complete their

exclusion from CCBU. These actions at the behest of Karimova include the transfer of

Plaintiffs' interest in CCBU to Defendants, and preventing Plaintiffs from exercising ownership

rights under the JVA.

45.    In or about late 2004, Plaintiffs' interest in CCBU was transferred or sold to

Defendants without notice to Plaintiffs, as required by the JVA. Nonetheless, ROZ learned

through news reports in late 2004 of the possible transfer to Defendants of its interest in CCBU.

Plaintiffs immediately formally protested the transfer or sale by writing to the State Property

Committee of the Republic of Uzbekistan. Despite these protests, Defendants proceeded with

the purchase of Plaintiffs' interest in the joint venture. Indeed, Defendants' "ownership interest"

in CCBU is confirmed by two of Defendants' websites which announced that "Coca-Cola

Bottlers of Uzbekistan is an investment made by the Zeromax subsidiary, Muzimpex, with a

57.1% interest via a share purchase contract with the Case-by-Case Privatization Bureau." Upon

information and belief, the Case-by-Case Privatization Bureau is an entity of the corrupt

Uzbekistani Government, which was acting solely to further the private, commercial interests of

Defendants. Defendants, through Karimova, were well aware that their holding of an interest in

CCBU was the product of the wrongful exclusion of Plaintiff from CCBU.

46.    Not only were Plaintiffs' interests in CCBU transferred to Defendants, but their

involvement further prevented ROZ from exercising its rights under the JVA. For example,

Defendants have knowingly deprived ROZ of its management rights and of its termination rights

under the JVA.

47.    As the successor in interest to Plaintiffs' interest, Defendants, reportedly through

their joint venture, Muzimpex – now run CCBU, along with Uzbekistan and TCCEC. Under

Article 5.5 of the JVA, Defendants, as a third party purchasing shares in CCBU, are required to

agree to be bound by the JVA. Thus, as the successor in interest and assignee of Plaintiffs'

interest in CCBU, each of the provisions of the JVA apply to Defendants.

48.    Once Defendants took control of Plaintiffs' interest in CCBU, Plaintiffs were

finally and completely barred from exercising its property and management rights in CCBU.

Section 12.2.3.6 of the JVA provides that Plaintiffs could terminate the Joint Venture if impeded

from exercising their rights of management. In light of Plaintiffs' deprivation of their management rights in CCBU and the sale of their shares to Defendants, Plaintiffs provided a notice of termination to Uzbekistan, through its representative Uzpishcheprom, and to TCCEC on April 11, 2005. TCCEC responded by letter on May 10, 2005, denying that it was liable to Plaintiffs for any amount or for an accounting of Plaintiffs' interest. Uzbekistan, represented by Uzpishcheprom, responded by letter dated May 10, 2005, professing "surprise" at Plaintiffs' assertion that it had, in effect, been precluded from participation and management in CCBU; disagreeing with Plaintiffs' position on termination; and, for the first time, notifying Plaintiffs of the transfer of Plaintiffs' interest in CCBU (but without naming the recipient). Plaintiffs provided notice to Defendants on August 5, 2005. Defendants did not respond to the notice of termination. Nonetheless, under Article 12.2.1, the joint venture was terminated on May 11, 2005, thirty days after the issuance of the notice of termination.

49.  Under Article 12.1 of the JVA, once a party terminates the agreement, "the Parties hereto agree to call a Parties' Assembly and to adopt a Parties' resolution by virtue of which the Joint Venture shall be liquidated . . . ." The liquidation is to be conducted in accordance with Uzbekistani law and any proceeds are first to be used to pay any debts of the joint venture and expenses associated with the liquidation, per Articles 12.4.1 and 12.4.4. Then, "[t]he balance shall be distributed between the Parties in proportion to their share ownership, it being agreed that any Hard Currency left shall be used to satisfy the part of the liquidation proceeds due to TCCEC and ROZ." JVA, Article 12.4.5.

50.  Defendants, working with Karimova, TCCEC and Uzbekistan, breached the JVA by failing to call this mandated Parties' Assembly or to initiate liquidation proceedings as required under the JVA, or otherwise compensating Plaintiffs for its interest in CCBU.

51.    Upon receiving Uzbekistan's notice that another party had assumed Plaintiffs' position in the joint venture, Plaintiffs promptly forwarded notice of termination to Defendants on August 5, 2005. Defendants' joint venture partners, TCCEC and Uzbekistan, had already received notice of the termination, as acknowledged by them in their letters dated May 10, 2005. Upon information and belief, Defendants had already learned of the notice of termination from TCCEC and Uzbekistan prior to receiving notice of termination from Plaintiffs on August 5, 2005, and had begun dissolving (as described in preceding paragraphs) as a way to try and evade and avoid the rule of law.

52.    Specifically, on August 2, 2005, Zeromax Logistics and Zeromax Group filed their certificates of dissolution with the State of Delaware. Zeromax LLC also was dissolved and its cancellation certificate was filed on September 28, 2005 (*after* notice of termination of the JVA had been sent to Defendants).

53.    Just as these entities were dissolving, Zeromax GmbH was incorporated in Switzerland in July 2005, and, as part of the unlawful acts designed to deprive Plaintiffs of their interests in CCBU, Zeromax GmbH acquired the interest formerly held by Zeromax LLC in Muzimpex.

54.    Under Section 278 of the General Corporation Law of the State of Delaware, Zeromax Logistics and Zeromax Group remain in existence for a term of at least three years from their date of dissolution for the purpose of defending suits and enabling them to gradually settle their business. 8 Del. C. § 278.

55.    Similarly, Zeromax LLC is required under the Limited Liability Company Act in Delaware to make provisions that will be sufficient to provide compensation for claims that may not have arisen but that, based on facts known to the LLC, are likely to arise or become known to

the LLC within 10 years after the date of dissolution. 6 Del. C. § 18-804. Accordingly, Zeromax Group, Zeromax Logistics and Zeromax LLC remain liable to Plaintiffs despite their dissolution.

56.     On June 6, 2006, ROZ Trading Ltd. filed for arbitration against TCCEC, Uzbekistan, the Uzpishcheprom Association (an agency, instrumentality, and representative of Uzbekistan), and Zeromax Group, Inc. in the International Arbitral Centre of the Austrian Federal Economic Chamber under a provision of the original JVA. *ROZ Trading Ltd. vs. The Coca-Cola Export Corporation, Uzbekistan, Uzpishcheprom and Zeromax Group, Inc.* (Case No. SCH-49806). Zeromax Group, Inc. has filed an initial objection to jurisdiction in that arbitration, which is currently pending.

## COUNT I

## BREACH OF CONTRACT

57.     Paragraphs 1 through 56 are incorporated herein as if fully set forth.

58.     Defendants, as a third party who purchased an interest in CCBU, are bound by the Joint Venture Agreement. The JVA requires that once a party terminates the agreement, as Plaintiffs did, the parties must call a Parties' Assembly and conduct liquidation proceedings so that the balance (once any debts or expenses of the JV are paid) shall be distributed between the Parties in proportion to their ownership.

59.     Defendants, working with Karimova, TCCEC and Uzbekistan, breached the JVA by failing to call this mandated Parties' Assembly or to initiate liquidation proceedings as required under the JVA, or otherwise compensating Plaintiffs for its interest in CCBU.

60.     As a direct and proximate result of these acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of SIXTY MILLION DOLLARS ($60,000,000.00).

## COUNT II

### TORTIOUS INTERFERENCE

61.     Paragraphs 1 through 60 are incorporated herein as if fully set forth.

62.     Defendants, acting alone or in concert, knew of the business relationship that ROZ and ROZ (Uzbekistan) had with CCBU, and they acted intentionally to deprive Plaintiffs of their ownership interest, contractual rights, and economic advantage associated with CCBU.

63.     As a direct and proximate result of these malicious acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000.00).

## COUNT III

### CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE

64.     Paragraphs 1 through 63 are incorporated herein as if fully set forth.

65.     Defendants, acting alone or in concert, wrongfully conspired with others to interfere with Plaintiffs' interest in CCBU.  In furtherance of the conspiracy, these parties reached and executed an agreement to formalize ROZ's and ROZ (Uzbekistan)'s exclusion from the ownership and management of CCBU.

66.    The willful, wrongful, intentional, and reckless acts of Defendants constituted conspiracy to interfere with the Plaintiffs' ownership, economic interests, and management rights.

67.    As a direct and proximate result of these acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of SIXTY MILLION DOLLARS ($60,000,000.00).

## COUNT IV

## CONVERSION

68.    Paragraphs 1 through 67 are incorporated herein as if fully set forth.

69.    With full knowledge of the illegal steps to deprive Plaintiffs of their interests in CCBU, Defendants, acting alone or in concert, have unlawfully exercised ownership, dominion, and control of Plaintiffs' property, thus denying Plaintiffs' their rights to that property. As a result, Defendants have achieved great financial benefit, whereas the Plaintiffs have experienced financial ruin.

70.    The willful, wrongful, intentional, and reckless acts of Defendants constituted conversion of the Plaintiffs' assets.

71.    As a direct and proximate result of these acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of EIGHTY MILLION DOLLARS ($80,000,000.00).

## COUNT V

## CONSPIRACY TO COMMIT CONVERSION

72.    Paragraphs 1 through 71 are incorporated herein as if fully set forth.

73.    Defendants wrongfully conspired with others to obtain illegal ownership of Plaintiffs' interest in CCBU.  In furtherance of the conspiracy, several entities reached and executed an agreement to formalize the transfer of ownership to Defendants.

74.    The willful, wrongful, intentional, and reckless acts of Defendants constituted conspiracy to convert the Plaintiffs' assets.

75.    As a direct and proximate result of these acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of SIXTY MILLION DOLLARS ($60,000,000.00).

## COUNT VI

## ACTION TO QUIET TITLE

76.    Paragraphs 1 through 75 are incorporated herein as if fully set forth.

77.    Plaintiffs have a present ownership interest in the CCBU property.

78.    Defendants, acting alone or in concert, claim a property interest that is adverse to the Plaintiffs.  Defendants' claim is without right, and Defendants have no right or lawful interest to such property.

WHEREFORE, Plaintiffs demand that Defendants shall be required to set forth the nature of its claim to the CCBU property.  Any and all adverse claims to this property shall be determined by a decree of this Court.  The decree shall adjudge that the Plaintiffs are the true and rightful owners of the property and that Defendants have no right to this interest.  This decree shall permanently enjoin Defendants from asserting any adverse claim to the ownership of the Plaintiffs' property.

## COUNT VII

### UNJUST ENRICHMENT

79.    Paragraphs 1 through 78 are incorporated herein as if fully set forth.

80.    Defendants, acting alone or in concert, have wrongfully obtained a substantial and valuable benefit from Plaintiffs by acquiring Plaintiffs' property interest in CCBU without payment or compensation to Plaintiffs.  Defendants have knowledge of the benefit conferred as a result of owning this interest in property.

81.    Defendants acquired and retained the property interest in CCBU under such circumstances as to make it inequitable for them to retain the benefit without the payment of its value to Plaintiffs.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of FIFTY THREE MILLION DOLLARS ($53,000,000.00).

## COUNT VIII

### FRAUDULENT CONVEYANCE

82.    Paragraphs 1 through 81 are incorporated herein as if fully set forth.

83.    Upon information and belief, Defendants, acting alone or in concert, have sold or transferred their property interest in CCBU to their joint venture, Muzimpex, with actual intent to hinder, delay, or defraud creditor Plaintiffs.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of FIFTY THREE MILLION DOLLARS ($53,000,000.00); that Defendants' conveyance of their property interest in CCBU to Muzimpex be set aside and avoided; that the transferred property interest in CCBU be attached; and that

Defendants, its agents, employees, and subsidiaries be enjoined from transferring possession or control of the CCBU property.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) pray that this Court grant judgment in their favor and against Defendants, jointly and severally, on Counts I through VII, and grant Plaintiffs:

a) Compensatory damages as demanded in Paragraphs 60, 63, 67, 71, 75, 78, 81, and 83;

b) Appropriate Declaratory Relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 to quiet title as demanded in Paragraphs 76 through 78;

c) Appropriate Declaratory Relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 to set aside the conveyance from Defendants to Muzimpex as demanded in Paragraph 83;

d) Attachment of property interest transferred by Defendants as demanded in Paragraph 83;

e) Punitive damages against Defendants in an appropriate amount to be determined at trial;

f) Preliminary and Permanent injunctive relief. The wrongful conduct of Defendants, unless enjoined by an order of this Court, will continue to cause great and irreparable harm to the Plaintiffs. Plaintiffs have no adequate remedy at law for the injuries they have suffered. Plaintiffs request that this Court order Defendants and all of it agents, employees, and subsidiaries to immediately return full possession and control of the CCBU property to the Plaintiffs;

g) Preliminary injunctive relief.  Plaintiffs request issuance of a preliminary

injunction preventing the Defendants and their agents, employees, and

subsidiaries from transferring possession or control of the CCBU property

interest;

h) Declaratory judgment.  Pursuant to the Declaratory Judgment Act, 28 U.S.C.

§§ 2201, 2202, Plaintiffs request declaration that Defendants knowingly deprived

Plaintiffs of their interest in CCBU by "purchasing" Plaintiffs' interest in CCBU;

i) Reasonable costs and expenses;

j) Reasonable attorneys' fees; and

k) Such other relief which this Court may determine to be just and equitable under

the circumstances.

## JURY DEMAND

84.    Plaintiffs demand a trial by jury on all issues properly triable thereby.

Respectfully submitted,

Stuart H. Newberger, DC BAR #294793

Alan W.H. Gourley, DC BAR #358900
Clifton S. Elgarten, DC BAR #366898
Alyssa Gsell, DC BAR #490395
Sobia Haque, DC BAR # 483440
Peter J. Eyre
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
E-mail: snewberger@crowell.com
        agourley@crowell.com
        agsell@crowell.com
        shaque@crowell.com
        peyre@crowell.com

Attorneys for ROZ Trading Ltd. and
ROZ Trading Ltd. (Uzbekistan)

Dated:  September 1, 2006


Of Counsel:

Dr. Allan Gerson
2131 S Street, NW
Washington, DC 20008
Telephone:  (202) 966-8557
E-mail: gerson@gilgintl.org

# Erb Declaration
# Exhibit E

# EXHIBIT 4

**In the**
## INTERNATIONAL ARBITRAL CENTRE OF THE
## AUSTRIAN FEDERAL ECONOMIC CHAMBER

| | |
|---|---|
| ROZ TRADING LTD., | ) |
| | ) |
| | ) |
| | ) |
| Claimant | ) |
| | ) |
| v. | ) |
| | ) |
| | ) Case No. _____ |
| THE COCA-COLA EXPORT CORPORATION, | ) |
| | ) |
| REPUBLIC OF UZBEKISTAN, | ) |
| | ) |
| OZIQOVQATSANOAT, | ) |
| | ) |
| and | ) |
| | ) |
| ZEROMAX GROUP, INC. | ) |
| | ) |
| Respondents | ) |
| | ) |

*HALBSCHRIFT*

INTERNATIONALES
SCHIEDSGERI
der Wirtschaftskammer C
EIN   - 6. Juni 2006

### STATEMENT OF CLAIMS

### 1.0    INTRODUCTION

1.1    Claimant ROZ Trading Ltd. (hereafter "ROZ" or "Claimant") hereby requests the institution of arbitration proceedings against Respondents, The Coca-Cola Export Corporation (hereafter "TCCEC"); the Republic of Uzbekistan (hereafter "Uzbekistan") and its agency, instrumentality, and representative, OZIQOVQATSANOAT, also known as the Uzpishcheprom Association (hereafter "Uzpishcheprom"); and Zeromax Group, Inc. (hereafter "Zeromax"). This arbitration results from disputes between ROZ and its former partners, and assigns, arising out of or in connection with the Joint Venture

Agreement (hereafter "JVA") executed by the parties and attached hereto as Exhibit 1. This Statement and the attached Exhibits set forth the parties, claims, amounts in dispute, number of arbitrators, and Claimant's nomination of an arbitrator.

1.2    The jurisdiction of the International Arbitral Centre of the Austrian Federal Economic Chamber is founded on each party's consent to the arbitration clause in the JVA which provides:

> [i]n the event that amicable settlement shall not obtain within 90 days following written notice by one Party to the other(s) of the existence of any such dispute, all such disputes shall be finally settled under the rules of arbitration and conciliation of the International Arbitral Centre of the Federal Economic Chamber in Vienna, Austria ("Vienna Rules"), by three arbitrators appointed in accordance with these rules.

JVA, Article 5.2. (Exhibit 1).

## 2.0   DESIGNATION OF THE PARTIES

2.1    Claimant ROZ is a limited liability company organized and existing under the laws of the Cayman Islands, British West Indies. At times relevant to the acts at issue here, ROZ operated in Uzbekistan, in part, through a subsidiary, ROZ Trading Ltd. (Uzbekistan) (hereafter "ROZ(U)"). ROZ(U) was originally established in or about May 1993 as a limited liability society and registered with the Finance Ministry of Uzbekistan by order No. IP-28. In September 1999, ROZ(U) was reregistered with the Ministry of Justice as a company with foreign investment. (Exhibit 2). Mansur Maqsudi, an American citizen living in New Jersey, is the Managing Director of ROZ, which is involved in the manufacture, trade, and distribution of consumer goods in numerous countries. He signed the Joint Venture Agreement and the Addenda (described below) on behalf of ROZ, with full authority to bind ROZ to its terms, including the arbitration clause. ROZ's address is:

- 2 -

Elizabeth Square
P.O. Box 847
Grand Cayman, Grand Cayman Islands
British West Indies

Claimant is a subsidiary of ROZ Group, Inc., which is located at:

P.O. Box 9068
Morristown, New Jersey  07963
United States of America

Communications to Claimant ROZ regarding this matter should be directed as follows:

Stuart H. Newberger
Alan W.H. Gourley
Alyssa Gsell
Sobia Haque
Peter J. Eyre
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
United States of America
Telephone:     202-624-2500
Facsimile:      202-628-5116
E-mail:          snewberger@crowell.com
                     agourley@crowell.com
                     agsell@crowell.com
                     shaque@crowell.com
                     peyre@crowell.com

Dr. Rudolf K. Fiebinger
DDr. Karina Hellbert
Fiebinger, Polak, Leon & Partner
Am Getreidemarkt 1
A-1060 Vienna
Austria
Telephone:     43-1-58-2-58-0
Facsimile:      43-1-58-2-58-2
E-mail:          r.fiebinger@fplp.at
                     k.hellbert@fplp.at

2.2     Respondent The Coca-Cola Export Corporation (hereafter "TCCEC") is a corporation

organized and existing under the laws of the State of Delaware, United States of America.

- 3 -

It is a subsidiary of the worldwide corporation, The Coca-Cola Company (hereafter "Coca-Cola"), which is engaged in the manufacture and sale of certain concentrates, beverage bases, and syrups used in the production of certain non-alcoholic beverages.[1] Muhtar Kent, Senior Vice-President, Coca-Cola International, executed the JVA and the Addenda on behalf of TCCEC, with full authority to bind TCCEC to its terms, including the arbitration clause. The Coca-Cola Export Corporation is co-located with Coca-Cola at:

> One Coca-Cola Plaza, NW
> P.O. Drawer 1734
> Atlanta, Georgia 30313
> United States of America

2.3    Respondent Uzbekistan is a country located in Central Asia which obtained independence from the former Union of Soviet Socialist Republics (hereafter "Soviet Union") in or about September 1991, but remains a Soviet-styled authoritarian government in the Stalinist tradition, where all state authority is concentrated in the President and exercised through his personally appointed and controlled Cabinet of Ministers. The government owns and controls, to a significant degree, much of the economic enterprise in the country, including the production and sale of non-alcoholic beverages. The address for the government of Uzbekistan is:

> The Republic of Uzbekistan Cabinet of Ministers
> Mustaqillik Maydoni
> House of Government
> Tashkent 700078
> Republic of Uzbekistan

---

[1]    Although TCCEC is the named party to the JVA, Coca-Cola was the party in interest and its employees made all of the principal decisions. Claimant therefore reserves the right formally to add Coca-Cola as a Respondent in this action, should it establish that TCCEC is merely the alter ego or agent of Coca-Cola without independent substance.

Respondent Uzpishcheprom, acting in its own name and as the Republic of Uzbekistan's representative, is the agency responsible for regulation and operation of the food industry within Uzbekistan. (Exhibits 3, 4). Uzpishcheprom was established by Presidential decree (Exhibit 5),[2] and in carrying out its responsibilities, Uzpishcheprom has remained entirely subservient to the will of the President of Uzbekistan, Islam Karimov, who can direct its activities, including the acts that injured ROZ here. (Exhibit 6). Indeed, while Uzpishcheprom is officially an independent and separate entity from the Government of Uzbekistan, it operates as the state-created representative with control over matters relating to the food industry. (Exhibit 6). Throughout the events described below, then, Uzpishcheprom acted on behalf of the Republic of Uzbekistan. The JVA was originally executed on behalf of Uzbekistan by Timor Karimov, the Director of the government-owned Tashkent Soft Drink Plant at Beshaghash ("Beshaghash"), a bottling facility operated and controlled by Uzpishcheprom. In reviewing and approving the JVA on behalf of the President and the Cabinet of Ministers (described in more detail below), the Uzbekistan State Property and Privatization Management Committee, by decree dated August 25, 1993 (Exhibit 7), directed that Uzpishcheprom, as the government agency representing Uzbekistan, would sign the JVA on behalf of Uzbekistan. On the next day, August 26, 1993, Husnidden Usmonov, Chief of Uzpishcheprom's soft drink department, executed, under seal, an Addenda and Clarification to the JVA, with full authority to bind

---

[2]   Claimant does not have a copy of the original Decree, but the attached 1994 decree establishes the President and Cabinet's full control over Uzpishcheprom.

formally Uzpishcheprom and Uzbekistan to the terms of the JVA, including the
arbitration clause. (Exhibit 8).[3] Uzpishcheprom's address is:

> The Republic of Uzbekistan Uzpishcheprom Association
> 7 Navoi Street
> Tashkent 700038
> Republic of Uzbekistan

2.4   Respondent Zeromax Group, Inc. is a corporation organized and existing under the laws
of the State of Delaware, United States of America. Zeromax is engaged, directly and
through various affiliates which it controls and directs, including Muzimpex, in various
oil and gas projects and other businesses in Uzbekistan and elsewhere in the former
Soviet Republics of Central Asia. Zeromax became a party to the joint venture in or
about 2004 or 2005 when it obtained from Uzbekistan shares in the joint venture,
knowing that those shares had been stolen from ROZ, with TCCEC's assistance, through
the actions described below. Under the terms of the JVA (Article 5.5), Zeromax, as a
"Third Party transferee" had to "agree in writing to be bound by" the JVA. Zeromax
therefore consented to the arbitration clause of the JVA for resolution of disputes arising
from its actions in excluding ROZ from active participation in the joint venture and in
failing to terminate the Joint Venture in accordance with the terms of the JVA. Zeromax
operates its affiliates as a unitary entity and its address is:

---

[3]   Uzpishcheprom has been involved in a long series of reorganizations and restructurings, including a merger
in 2003. (Exhibit 6). During this reorganization, Uzpishcheprom was merged with Maslojirtabakprom (the
"Association of Edible Oil and Tobacco Industries"), pursuant to a Presidential decree. (Exhibit 9). The
product of this merger was the Association of Edible Oil and Food Industry of the Republic of Uzbekistan,
also known as OziqOvqatSanoat. This entity is responsible for all obligations of prior entities using the
name Uzpishcheprom. (Exhibit 6). Therefore, Uzpishcheprom remains a viable entity and is a proper
respondent to these Claims, as the representative of Uzbekistan during the events described herein.
(Exhibit 6)

1725 I Street, NW
Suite 300
Washington, DC 20006
United States of America

### 3.0    **BACKGROUND OF CLAIMS**

*A.    The Formation of the Joint Venture*

3.1    In or about late 1992, representatives of ROZ and TCCEC approached Uzbekistan about investing in Uzbekistan by acquiring government-owned bottling facilities for use in the preparation, packaging, marketing, distribution, and sale of non-alcoholic beverages in Uzbekistan.   On or about February 8, 1993, ROZ, TCCEC, and Uzbekistan jointly executed a Letter of Intent to establish within Uzbekistan a joint venture company for these purposes.[4]

3.2    On April 6, 1993, Muhtar Kent, Senior Vice President of Coca-Cola International, sent a letter on TCCEC letterhead to President Karimov and the Cabinet of Ministers explaining the parties' intention to form the joint venture and seeking certain assurances from the government which would help facilitate the success of the joint venture.  (Exhibit 10). Specifically, Mr. Kent sought approval to deposit the initial joint venture cash contributions into a foreign bank and a guarantee that all disputes be resolved by international arbitration.  Mr. Kent also sought the President's and Cabinet of Ministers' guarantee that all necessary government approvals would be forthcoming, including approval of the "competent governmental entity" to the transfer of land use rights for the bottling facility. Although ROZ does not currently have a copy of any response, it

---

[4]    As described more fully below, because of the acts of Respondents Uzbekistan, Uzpishcheprom, and TCCEC, ROZ and the Maqsudi family have been effectively banished from Uzbekistan and involuntarily barred from access to many ROZ and CCBU records related to the formation and operation of the joint venture.

understands that Uzbekistan responded favorably, including approval by the President
and the Cabinet of Ministers for the joint venture between ROZ, TCCEC, and Uzbekistan
to proceed.

3.3   On June 16, 1993, ROZ, TCCEC, and Uzbekistan, through Beshaghash, entered into the
Joint Venture Agreement. (Exhibit 1). The purpose of the joint venture was to "engage
in and maximize the profitable growth of the business of the preparation, packaging,
distribution and sale of [Coca-Cola] Beverages in authorized containers" pursuant to a
bottler's agreement between the joint venture and Coca-Cola. JVA, Article 1.1. The
joint venture was originally called Coca-Cola Bottlers Tashkent Ltd., but in or around
1996, the name was changed to "Coca-Cola Bottlers Uzbekistan Ltd." after Coca-Cola
expanded the joint venture's territory from only the Tashkent area to the entire country
(hereafter "CCBU" refers to both entities).

3.4   In accordance with the JVA and the President's and the Cabinet of Ministers'
commitment to ensure all necessary government approvals, the parties submitted the JVA
to the Uzbekistan State Property and Privatization Management Committee, also known
as Goskomimuschestov (hereafter "State Property Committee"), the "competent
governmental entity" for disposition and use of Uzbekistan state-owned property. On
August 25, 1993, the State Property Committee issued Directive No. 545k-PR formally
permitting Uzpishcheprom to enter the joint venture as the representative of Uzbekistan
and delegating to Uzpishcheprom the right to use government-owned property.
(Exhibit 7). The State Property Committee further decreed that Uzpishcheprom, as the
government agency representing Uzbekistan, not Beshaghash, the government-owned
enterprise, was to be the signatory to the joint venture and responsible for managing the

government's direct ownership interest, subject to notification to the State Property Committee of any changes in the capital contributions by any of the parties. The State Property Committee retained ultimate control and authority over the Uzbekistan-owned property contributed to the joint venture and over any disposition of assets. The State Property Committee was given the authority, exercised independently or in tandem with the Cabinet of Ministers and the President, to oversee the reorganization of existing entities, and it has the right to invest state entities with the right of management or administration of state property. It also has the right to approve plans of privatization and to alienate state property to private entities. (Exhibit 6).

3.5     On the next day, August 26, 1993, the parties executed an Addenda and Clarification to both the JVA and CCBU's Articles of Association formally transferring Beshaghash's interest to Uzpishcheprom, and making Uzpishcheprom, in its own name and on behalf of Uzbekistan, the party to the JVA. (Exhibit 8). These documents were signed under seal and registered with the relevant government authorities, including the Ministry of Finance.

3.6     Upon formation of CCBU and in anticipation of obtaining all Uzbekistani approvals needed to commence operation, each party contributed $1,769,000 in cash or in-kind property deemed to be of equivalent value. As authorized by Uzbekistan in response to Mr. Kent's April 6, 1993 letter, TCCEC and ROZ opened an account at the Creditanstalt Bankverein in Vienna for deposit of their initial cash capital contributions. On July 30, 1993, TCCEC forwarded to ROZ Creditanstalt Bankverein's confirmation that capital contributions had been made and were available for use. (Exhibit 11). Each party – ROZ, TCCEC, and Uzbekistan – owned a 33.33% share of CCBU.

**B.    *The Parties' Rights and Obligations under the Joint Venture***

3.7    The JVA became effective in or about October 1993, after all Uzbekistani approvals for commencement of operation had been obtained, the CCBU Articles of Association and Charter had been filed with the Ministry of Finance, and Uzbekistan had signed with CCBU an unrestricted and irrevocable lease to the Beshaghash facility with a term of no less than 50 years.   JVA, Articles 3 and 7.   The JVA was purposefully of unlimited duration and could only be terminated in accordance with its express terms.   The long term lease reflected the mutual expectations of the parties that CCBU would operate the Coca-Cola franchise in Uzbekistan indefinitely.   In fact, based on its knowledge and Coca-Cola's history with other bottlers, ROZ reasonably expected that CCBU would retain the Coca-Cola bottling franchise for at least the 50 years of the lease (and likely longer), even though Bottler's agreements are typically negotiated for five year terms.

3.8    As sought by Mr. Kent's April 6, 1993 letter, the JVA specified that Uzbekistan, through its representative, Uzpishcheprom, retained the obligation to initiate and obtain all necessary government "approvals, permits, consents, authorizations and licenses" for effecting "all other transactions and activities" contemplated by the JVA.   JVA, Article 3.2.   In fact, from the formation through the first eight years of the joint venture's existence, CCBU obtained all necessary approvals and registrations without incident, including (as described in more detail below) for example, State Property Committee review and approval of increases in CCBU's charter capital and the corresponding changes in the parties' ownership stakes, and Ministry of Justice acceptance of corporate re-registrations that occurred over time.

3.9    The JVA recognized that additional capital might be needed in order to expand CCBU's production capacity or otherwise foster the success of the business. Such capital increases had to be approved by the Parties' Assembly (*see* JVA, Article 4.3.1) which, under the JVA, was vested with supreme authority over operation of the joint venture. JVA, Article 6.1. If the Parties' Assembly approved an increase in the joint venture's capital, each party had a right to contribute a percentage of the total new capital proportionate to its current ownership share, and thereby maintain its proportional interest in the joint venture. If a party chose not to contribute, the ownership shares of the contributing parties would correspondingly increase, whereas the non-contributing party's share would correspondingly decrease. JVA, Article 4.3.

3.10   The JVA also contemplated that the parties might wish to transfer their shares in the joint venture. Consistent with Uzbekistani law and the assurances received from the President and Cabinet of Ministers in response to Mr. Kent's April 6, 1993 letter, after the expiration of an initial two-year period, each party had the right to transfer its shares to third persons subject to notice and a right of first refusal by the other parties. JVA, Article 5. Also after that initial two-year period, ROZ and TCCEC could freely, and without further restriction, transfer shares to each other or to one of their own affiliates. The JVA designated Ernst & Young, London, as the final arbiter of the value of the shares should the transferee and the seller be unable to agree. The JVA required that any third party transferee of shares in CCBU agree, in writing, to be bound by the JVA (including the arbitration clause). JVA, Article 5.5.

3.11   The JVA mandated that the Managing Director of CCBU be responsible for the preparation and maintenance of monthly, quarterly, and annual books and records,

including financial performance, balance sheets, cash flow reports of receipts and disbursements, and any other financial data reasonably requested by any of the parties. JVA, Article 8.5. Furthermore, the JVA required that the books and records of CCBU be maintained in accordance with internationally recognized accounting methods and "be audited annually by an internationally recognized auditing company." JVA, Article 8.4. Each party is entitled to "have access to the complete books of account and the records of the Joint Venture and all supporting documentation at all reasonable times and shall be entitled to make photocopies or extracts thereof." JVA, Article 8.4.3.

3.12    The JVA established the circumstances under which a party – such as ROZ – may terminate the joint venture including:

> the breach by any other Party of any material term of this Agreement if not cured within 60 days after receipt by the purported breaching Party of written notice of such breach from . . . ROZ, which notice shall set forth in reasonable detail the facts forming the basis of the breach.   JVA, Article 12.2.3.1.

ROZ is further entitled to terminate the agreement if it is:

> [e]ffectively impeded from exercising its rights of management in the Joint Venture due to causes beyond its control, . . . JVA, Article 12.2.3.6.

3.13    The JVA further explains that it "shall terminate 30 days after issuance of a Termination Notice . . . ." (JVA, Article 12.2.1), and that upon liquidation, each party is entitled to a share of proceeds in proportion to their ownership share. JVA, Article 12.4.5. Upon termination of the JVA, the parties must "call a Parties' Assembly and [agree] to adopt a Parties' resolution by virtue of which the Joint Venture shall be liquidated . . . ." JVA, Article 12.1. After liquidation, the debts of the joint venture are to be paid first and the remaining proceeds are to be distributed to the parties, in proportion to their ownership share. JVA, Article 12.4.5.

3.14    As noted above, all disputes arising out of or in connection with the JVA that cannot be settled amicably, "shall be finally settled under the rules of arbitration and conciliation of the International Arbitral Centre of the Federal Economic Chamber in Vienna, Austria ("Vienna Rules"), by three arbitrators appointed in accordance with these rules." JVA, Article 15.2. The language of the arbitration is to be English (JVA, Article 15.3) and "the applicable law shall be the substantive law of Austria, excluding choice of law rules." JVA, Article 15.5.

C.    *The Operation and Success of the Joint Venture*

3.15    Effective December 1, 1993, CCBU and Coca-Cola entered into a Bottler's Agreement entitling CCBU to use Coca-Cola's Authorized Beverage Containers and to distribute and sell the same using Coca-Cola's trademarks for five years. (Exhibit 12). In October 1997, Coca-Cola and CCBU entered into a new Bottler's Agreement valid through November 30, 2003 and renewable for an additional five-year term. (Exhibit 13).

3.16    As contemplated in the JVA, during its first three years of operation, CCBU did in fact require additional capital infusions in order to permit CCBU to expand and prosper by, among other things, purchasing a better and more productive facility. JVA, Article 4.3. As detailed in the paragraphs that follow, ROZ was the principal contributor, and in accordance with the terms of the JVA set forth above, made additional capital contributions totaling $6,383,000, such that, by December 23, 1996, ROZ had contributed $8,152,000 of the total $14,807,000 capital contribution in CCBU. Corresponding changes in the relative shares of CCBU reflected ROZ's additional contributions, as well as some lesser additional contributions by TCCEC. Each of the

additional capital contributions and share transfers were unanimously approved by the Parties' Assembly with notice given to the State Property Committee.

3.17    By Parties' Assembly and Supervisory Board Resolution dated April 6, 1995 (Exhibit 14), the parties agreed to accept an additional ROZ contribution of $2,000,000 in cash for CCBU.  After making this contribution, ROZ owned a 51.58% share interest in CCBU, TCCEC owned 24.21%, and Uzpishcheprom, Uzbekistan's representative, owned 24.21%.   The Chairman of the Supervisory Board was authorized to implement the resolution based upon the opinion received from Deloitte & Touche CIS dated March 30, 1995.

3.18    By Parties' Assembly Resolution dated January 30, 1996 (Exhibit 15), the parties agreed to accept an additional capital contribution of $4,000,000 in order to purchase an additional bottling facility known as Kibrai PET.   Of this amount, ROZ contributed $1,500,000 and TCCEC contributed $2,500,000.  Uzbekistan, through its representative, Uzpishcheprom, elected not to make a contribution.  Accordingly, the shares in the joint venture were again readjusted such that ROZ owned 46.60%, TCCEC owned 37.555%, and Uzpishcheprom owned 15.645% of CCBU.

3.19    By Parties' Resolution dated December 23, 1996 (Exhibit 16), the parties agreed to increase CCBU's capital by an additional $3,500,000.  Again, Uzbekistan, represented by Uzpishcheprom, elected not to contribute.  ROZ contributed $2,883,000 while TCCEC contributed $617,000.  After these contributions, ROZ owned 55.055%, TCCEC owned 32.998%, and Uzpishcheprom, representing Uzbekistan, owned 11.947% of CCBU.

3.20    In mid-1997, Uzbekistan, represented by Uzpishcheprom, sought to reduce its stake in CCBU.  ROZ agreed to invest further and purchase 9.947% of the Uzbekistan-owned

shares in CCBU for $7,658,830, reflecting a market value for CCBU of $76,996,381. ROZ and Uzpishcheprom, representing Uzbekistan, presented this proposed sale, as well as the three prior share adjustments resulting from the additional capital contributions, to the State Property Committee. By Directive No. 242k-PR, dated December 31, 1997 (Exhibit 17), the State Property Committee approved the prior share adjustments that had resulted in ROZ holding a 55.055% share, TCCEC holding a 32.998% share, and Uzpishcheprom, as Uzbekistan's representative, holding a 11.947% share.

3.21    It also approved Uzpishcheprom's proposed sale of 9.947% of the CCBU shares to ROZ, through ROZ's "branch establishment," ROZ(U). Significantly, for purposes of this approval, the State Property Committee treated this purchase as increasing ROZ's share in CCBU to 65.002% while correspondingly decreasing Uzpishcheprom's share to 2%. The State Property Committee, with copies to the Ministries of Justice and Finance, reaffirmed that it retained authority over disposition of Uzbekistan-owned property and noted that the Ministry of Finance controlled payment and use of any dividends on the Uzbekistani shares. Reflecting Uzbekistan's ownership of the shares in the joint venture, the Directive specified that the proceeds of the sale (authorized by the Directive to be paid in Soum) were to be paid into the Uzbekistani government's bank accounts controlled by the State Property Committee.

3.22    By Protocol dated March 12, 1998 (Exhibit 18), the parties to the joint venture agreed to ROZ's acquisition of the shares held by Uzbekistan (represented by Uzpishcheprom) and to various amendments to the JVA and the Charter to reflect the contributions by and the allocation of shares among the parties. The parties directed the Acting General Manager of CCBU to ensure registration of the changes with the Ministry of Justice and to prepare

new drafts of the JVA and Charter. On March 17, 1998, the Ministry of Justice accepted registration of the changes to the JVA, Charter, and Articles of Association. (Exhibit 19). The State Property Committee approved ROZ's actual purchase of these shares by Directive No. 49k-PR dated April 24, 1998. (Exhibit 20).

3.23    In acquiring the shares held by Uzpishcheprom, as the representative of Uzbekistan, ROZ acted through its Uzbekistani subsidiary, ROZ(U), which entered into the agreement with Uzpishcheprom, Uzbekistan's representative. ROZ(U)'s payment in Soum was accomplished by bank transfer to bank accounts of the Government of Uzbekistan.

3.24    There was no further adjustment in the ownership shares until early 2001. In late 2000, ROZ and TCCEC began negotiating over the sale of a portion of ROZ's interest in CCBU to TCCEC. These negotiations produced many preliminary documents that reflect how the parties intended to structure the deal. (Exhibit 21). A significant part of the negotiations revolved around accounts receivable owed to Coca-Cola by CCBU and CCBU's inability to pay those accounts receivable in dollars. CCBU owed Coca-Cola approximately $12 million in accounts receivable for concentrate. CCBU had the funds to pay Coca-Cola, but only in Uzbek soum and not in U.S. dollars. Like most companies in Uzbekistan, CCBU did not have the ability to convert soum into dollars and Coca-Cola required payment in dollars. In order to raise the dollars, ROZ, on behalf of CCBU, sought and received permission from the Uzbekistani government to purchase, in soum, raw materials, including oil and cotton, from the government. CCBU sold them to one of ROZ's subsidiaries, Valuelink, for dollars. Valuelink then sold these commodities on the international market. CCBU used the dollars it received to pay the Coca-Cola accounts receivable. Under this arrangement, Coca-Cola profited by having its outstanding

invoices paid and the Republic of Uzbekistan profited by receiving taxes on the sale of the goods.

3.25    On February 8, 2001, Uzpishcheprom, acting in its own name and on behalf of Uzbekistan, formally declined the opportunity to purchase a pro rata portion of these shares and approved TCCEC's purchase of the entire interest. (Exhibit 22). On February 16, 2001, by Decision R-05/5, the Uzbekistan Committee for Demonopolization and Development of Competition (hereafter "Anti-Monopoly Committee") approved ROZ's then contemplated sale of an 11.4% interest to TCCEC concluding:

> Considering that the proposed transfer involves only a redistribution of interests among the founders, without effect on the commodity market in question or change in the entity's production orientation, and guided by Article 15 of the Republic of Uzbekistan Law, "On Competition and Limitation of Monopolist Activity in Commodity Markets,"
>
> The Expert Council has *decided*:
>
> > 1. To give its consent . . .

(Exhibit 23).

3.26    On March 27, 2001, there was a general meeting of the participants in CCBU at which the parties to the JVA ratified two adjustments in the shares. First, the parties approved ROZ(U)'s formal participation in the JVA by virtue of the 9.947% stake it had purchased on ROZ's behalf from Uzbekistan's representative, Uzpishcheprom. Second, the parties approved TCCEC's purchase from ROZ of a 9.9884% interest in CCBU. (Exhibit 24). The interest purchased by TCCEC had declined from the level initially approved by the Anti-Monopoly Committee because, after further negotiations, ROZ and TCCEC had settled on a valuation of CCBU of $117,000,000. The purchase price remained approximately $11,564,280.

3.27    The parties also resolved to make corresponding changes in the JVA and the Charter to reflect the two transactions, and these changes were in fact made and attached to the meeting Protocol which was signed, under seal, by representatives of each of the parties. (Exhibit 24 at 4 and Annexes A and B).  The parties directed CCBU's General Manager "to conduct and complete all necessary registration formalities and procedures at the Ministry of Justice and other relevant local authorities in order to effect registration of the fourth participant; the two transfers of share; [and] the final structure of participatory shares and their percentages . . ." (Exhibit 24 at ¶ 5).  With these transfers, ROZ held 45.171% directly and 9.947% indirectly through ROZ(U); TCCEC held 42.882%; and Uzbekistan, through its representative, Uzpishcheprom, held 2%.

3.28    To ensure that there could be no question of appropriate approval, the parties presented these changes to all the relevant agencies.   On April 17, 2001, the State Property Committee approved this sale.  (Exhibit 25).  The next day, April 18, 2001, the Anti-Monopoly Committee acknowledged receipt of the Protocol and consented to TCCEC's purchase.  (Exhibit 26).  The Ministry of Justice approved the amended JVA and Charter on April 19, 2001.  (Exhibit 27).

3.29    After the sale from ROZ to TCCEC was completed, ROZ used the dollars it received to purchase supplies and equipment for CCBU, including sugar, PET resin for plastic bottles, and carbon dioxide equipment.  Because of the events, described below, that excluded ROZ from further participating in the joint venture, CCBU never reimbursed ROZ for these purchases of supplies and equipment or credited ROZ with the resulting contribution made to the joint venture.

3.30   By all accounts, the joint venture was financially successful.  In the annual independent audit performed by Arthur Anderson, as of December 2000, the total shareholder equity (total assets minus current liabilities) in CCBU was approximately $109 million. (Exhibit 28).  Indeed, in terms of production volume, CCBU was among the Coca-Cola Company's top 35 bottlers from over 200 countries worldwide.  CCBU was the first bottler to receive the "Bottler of the Year" award from Coca-Cola for two years in a row. The Bottler of the Year award is based on the bottler's sales growth, quality of the product produced, and the continued improvement in its operations.   Coca-Cola recognized these significant accomplishments by inviting Mr. Maqsudi and his brother to an honorary dinner with its Chief Executive Officer, presenting them with an award, and flying the Uzbekistani flag over Coca-Cola headquarters in Atlanta.  (Exhibit 29).

**D.   The Exclusion by Uzbekistan and TCCEC of ROZ from Management and Ownership of the Joint Venture**

   **(1)   Background**

3.31   During the formation and early years of the joint venture, Mansur Maqsudi, Managing Director of ROZ, was married to Gulnora Karimova, the daughter of Islam Abduganievich Karimov, the President of Uzbekistan.   Mr. Karimov had ruled Uzbekistan while it was part of the Soviet Union and was "elected" President after its independence, a position he continues to hold to this day.

3.32   In July 2001, Mr. Maqsudi told Ms. Karimova that he was separating from her.  Ms. Karimova's response was extreme, and included absconding with their two young children from their home in the United States to Uzbekistan; attempting to extort money from Mr. Maqsudi; and threatening Mr. Maqsudi and his family.  To this day, Mr.

Maqsudi has not seen his children since Ms. Karimova left the United States with them nearly five years ago.

3.33    In September 2002, the Superior Court of New Jersey found that it had jurisdiction over the Maqsudi children to hear the custody dispute under the Uniform Child Custody Jurisdiction Act, which applies to jurisdictional custody issues between states in the United States and foreign countries.    After hearing the case, the court ordered Ms. Karimova to return the children to New Jersey and to arrange immediate telephone contact between the children and their father.    *See Maqsudi v. Maqsudi*, 830 A.2d 929 (N.J. Super. Ch. 2002) (Exhibit 30).  Ms. Karimova has defiantly refused to comply with these court orders and Mr. Maqsudi has had no contact with his children – by phone, in person, or otherwise – since the court's decision.

### (2)    Uzbekistan's Intentional Acts to Exclude ROZ from CCBU

3.34    As a direct result of the separation, Ms. Karimova and her father directed the full power of the Government of the Republic of Uzbekistan at destroying Mr. Maqsudi's investment in Uzbekistan, including ROZ's ownership, operation, and management of CCBU.    Beginning on August 13, 2001 and lasting several days, agents from Uzbekistan's feared National Security Service (the successor to the KGB in Uzbekistan) (hereafter "Secret Police"), under the guise of a "tax audit," raided both ROZ's and CCBU's offices in Tashkent and seized company documents and employees from each. CCBU's Managing Director and his Deputy were both taken away by the Secret Police and held in isolation for interrogation for more than 24 hours.

3.35    It is widely reported by such organizations as Human Rights Watch that the Uzbekistani police detain individuals and have held "them incommunicado and used torture, threats,

and other pressure to coerce confessions during the investigation." (Exhibit 31). Such "voluntary" appearances do not trigger any time restrictions on the detention or the right to counsel. Detained individuals are threatened and deprived of food, water, and sleep in order to obtain confessions to whichever "crimes" the police choose to assert. The United States Department of State has found that "the police force and the intelligence service use torture as a routine investigation technique." (Exhibit 32). Further, after an extensive investigation, the Special Rapporteur on Torture for the United Nations Commission on Human Rights found that "the pervasive and persistent nature of torture throughout the investigative process cannot be denied." (Exhibit 33 at ¶ 68).

3.36   The CCBU employees experienced these tactics first hand. The Secret Police, for example, held the CCBU Managing Director hostage for twenty-four hours and coerced him into executing a document in Russian – a language he neither speaks nor understands – to "authorize" further search of CCBU and seizure of its financial records. They separately held the Deputy Managing Director hostage for two or three days. The Deputy Managing Director was more familiar with the tactics of the Secret Police and may have been able to assist the Managing Director, had they been able to communicate. Ultimately, the Secret Police released them, but the threats and intimidation were such that, fearing a second indefinite detention, both fled the country.

3.37   Thus began Uzbekistan's campaign of terror and intimidation to exclude its joint venture partner, ROZ, from any further involvement in CCBU – a campaign that continues to this day. Another well-documented tactic of the Secret Police is to detain, threaten, and torture family members of those persons it seeks to intimidate. Relatives of Mr. Maqsudi have been, and continue to be, threatened and harassed by Uzbekistan in retaliation for

Mr. Maqsudi's separation from Ms. Karimova and subsequent initiation of divorce proceedings in the United States. For example, in December 2001, some of Mr. Maqsudi's family members were taken in the middle of a winter night from their homes in Uzbekistan to the border of Afghanistan and simply left there with no belongings. His elderly grandmother was forced to leave her home without her diabetes medication. Other family members were taken hostage and remain imprisoned. Indeed, their exact whereabouts are still unknown today. Further, Mr. Maqsudi's mother's home was demolished. Neither Mr. Maqsudi nor his immediate family can travel to Uzbekistan without risking their lives. Former employees of CCBU have been provided asylum in the United States and other western countries. Family members who remain in Uzbekistan remain subject to detention, intimidation, and torture.

3.38   President Karimov was not satisfied with mere intimidation and terror as a means to exclude ROZ from further participation in CCBU. He used his control of Uzpishcheprom and Uzbekistan to formalize the exclusion by initiating and manipulating sham proceedings in the Uzbekistani courts. In the first of these proceedings, initiated on September 28, 2001,[5] the Anti-Monopoly Committee brought an action in the Economic Court of Tashkent against CCBU, the Ministry of Justice, and the State Property Committee,[6] insisting that some or all of the post-1993 reallocations of shares in the joint venture were null and void because it had not approved these reallocations. (Exhibit 34). The Anti-Monopoly Committee argued that without the Anti-Monopoly Committee's

---

[5]   Significantly, this was the very date on which Gulnora Karimova purportedly initiated divorce proceedings against Mr. Maqsudi in Tashkent courts – proceedings which U.S. courts found, if they occurred at all, failed entirely to provide adequate notice and opportunity to be heard. (Exhibit 30 at Section II).

[6]   Due to translation differences, the State Property Committee is also referred to as "The State Committee for Assets of RU."

approval, the Ministry of Justice should not have approved the share reallocations, after which ROZ owned more than 35% of the shares of CCBU.  (Exhibit 34).  This assertion is demonstrably false and ridiculous for a number of reasons.  First, less than six months earlier, the Anti-Monopoly had expressly approved the final adjustment in share allocation that it was now challenging.  Second, at the time of the initial approval in February 2001 (*see* Exhibit 26 at ¶ 3), the Anti-Monopoly Committee had expressly acknowledged that the internal reallocations of shares among the joint venture partners could not have an effect on whether or not CCBU – as the entity engaged in bottling – had a monopolistic effect on the beverage industry.  Finally, the relevant anti-monopoly law at issue only had come into existence on or about December 27, 1996, well after CCBU had been established and had been operating.  It should not have been applied retroactively to companies that had been formed prior to this law's existence.

3.39    As numerous independent outside experts, including the United States Department of State and Human Rights Watch, have observed, the courts of Uzbekistan are wholly subservient to President Karimov, Gulnora Karimova's father.  He has complete authority to appoint and to remove the judges, who have no guaranteed tenure or independence.  (Exhibits 32, 33).  In the divorce proceeding initiated by Ms. Karimova in Uzbekistan, "notice" was given to Mr. Maqsudi by mailing the notice, only two days before the hearing, to an incorrect and incomplete address in Uzbekistan, despite the fact that all parties knew Mr. Maqsudi was living in his home in the United States.  This lack of opportunity to be present and heard was noted by the judge in Mr. Maqsudi's United States divorce proceeding in finding that the Uzbekistani divorce decree should not be recognized or enforced.  (Exhibit 30).  Furthermore, with respect to ROZ, the Economic

Court immediately accepted the Anti-Monopoly Committee's case and scheduled a hearing less than two weeks later, despite the fact that Mr. Maqsudi and other high-level ROZ personnel were not even in the country or able to travel there to participate. The Economic Court arbitrarily rejected CCBU's request for a continuance and ruled that the orders issued by the State Property Committee and the Protocols issued by the Ministry of Justice approving the share reallocations were invalid.

3.40 In its written decision, the Economic Court treated ROZ's and ROZ(U)'s shares as a unitary holding, which, together, owned 55.118% of CCBU.[7] The Economic Court invalidated the various approvals of share reallocation, without guidance as to how the parties were to proceed to readjust the ownership interests in accordance with this decision or how to unwind the transaction. (Exhibit 35).

3.41 Both CCBU and TCCEC appealed this decision to the Tashkent Municipal Commercial Court. ROZ was unable to participate directly because the Maqsudis were effectively banned from returning to Uzbekistan to defend their interests. In fact, Uzbekistan denied their lawyers' visas, making it impossible for them to participate. (Exhibit 36). The United States Department of State then requested visas on their behalf and this request was repeatedly denied. On appeal, the Court set aside the lower court's invalidation of the directives and protocols solely with respect to TCCEC's interest and restored TCCEC to its 42.882% share in the joint venture based upon the Anti-Monopoly Committee's February and April 2001 approvals described above. This Court refused to restore ROZ's shares, even though the very same approvals had acknowledged ROZ and ROZ(U)'s

---

[7]    The court refers to ROZ's percentage ownership share of CCBU as 55.055% and not 55.118%. This difference, however, is immaterial.

combined interests.    (Exhibit 37).    Such an inconsistent court decision is hardly

surprising, given that Uzbekistan and TCCEC were conspiring to exclude ROZ from

further participation in CCBU.

3.42    Thus, after this court decision, ROZ's total interest was first reduced to 33.3%, its

original investment.    Then, the sale of 9.884% of ROZ's shares to TCCEC was given

effect, leaving ROZ with a 23.416% interest.    TCCEC then added the 9.884% interest to

its previous 32.998% interest, totaling its 42.882% share.    Neither Uzbekistan nor

TCCEC compensated ROZ for the diminution of its interest in the joint venture or took

the required steps (*e.g.,* convening a Parties' Assembly) to implement this decision.

3.43    On February 5, 2002, the Supreme Economic Court of Uzbekistan summarily affirmed

the Tashkent Municipal Commercial Court's judgment.    (Exhibit 38).    Thus, ROZ's total

holdings in the joint venture were immediately reduced from 55.118% to 23.416%.    Like

the previous court decisions, this order did not allow for compensation to ROZ for its loss

of shares or for its investments and capital contributions in the joint venture.    No court

specified whether it was ROZ's and/or ROZ(U)'s shares that had to be relinquished.

3.44    The second set of sham proceedings was deliberately initiated by Uzbekistan (at the

direction of the Karimovs) to purge ROZ completely from any further participation in the

joint venture.    To obtain the remainder of the ROZ holdings, the Ministry of Justice

claimed that in forming ROZ(U), ROZ had failed to comply with its charter funding

requirements.    (Exhibit 39).    The Ministry of Justice only notified ROZ of this alleged

deficiency on November 26, 2001, a mere eight months after Uzbekistan's tax committee

had acknowledged that the charter funds had, in fact, been properly paid.    (Exhibit 40).

Nonetheless, on December 4, 2001, the Ministry of Justice ordered ROZ(U) to self-

liquidate or face liquidation proceedings unilaterally initiated and enforced by the Ministry of Justice. (Exhibit 41). Under the July 3, 1999 directive of the Cabinet of Ministers of Uzbekistan (Directive No. 327), ROZ(U) should have had two weeks to decide whether to liquidate voluntarily or to face liquidation proceedings. Prior to the expiration of the two-week period, however, the Ministry of Justice petitioned the Tashkent Economic Court to liquidate ROZ(U). Without further consultation with, or notification to, ROZ or ROZ(U), the Tashkent Economic Court approved the liquidation of ROZ(U) on December 26, 2001. In violation of Uzbekistani law, during the liquidation proceeding, the court denied counsel for ROZ or ROZ(U) an opportunity to participate in the proceedings. The timing of these proceedings – simultaneous with the expropriation proceedings described above and the divorce proceedings in the United States – and the speed at which they went forward, demonstrate that the proceedings were simply retribution against ROZ and Mr. Maqsudi for the dissolution of his marriage.

3.45    On June 3, 2002, the Economical Court of Tashkent formally ordered that ROZ's 23.416% share in CCBU be liquidated and used to pay the debts of ROZ(U). On September 11, 2002, the Supreme Economic Court of Uzbekistan formally approved both the liquidation of ROZ(U) and the seizure of ROZ's remaining interest in CCBU, allegedly in satisfaction of ROZ(U)'s "debts," including those arising from inadequate charter funding. (Exhibit 42). Apart from the fact that Uzbekistan's own tax committee had acknowledged that ROZ(U)'s charter funding had indeed been adequate, the sham nature of these proceedings is demonstrated by the court's reliance on false and inaccurate financial calculations to show a "debt", when, in fact, ROZ(U) had over $50 million in cash and unencumbered net assets on hand, including land, automobiles,

warehouses, offices, and rental property. (Exhibit 43). Through these proceedings, Uzbekistan not only stole the remainder of ROZ's interest in CCBU and other assets, but also eliminated CCBU debt owed to ROZ, thereby benefiting Uzbekistan and its partner in these unlawful acts, TCCEC.

> (3)  **TCCEC Joined With Uzbekistan in a Conspiracy to Exclude ROZ from CCBU**

3.46   At the beginning of Uzbekistan's reign of terror, TCCEC was content simply to stand by and allow Uzbekistan's retribution against ROZ, its joint venture partner. Quickly, however, TCCEC, with the active encouragement and participation of its parent company, Coca-Cola, undertook to conspire with Uzbekistan to exclude ROZ permanently from further participation in CCBU.

3.47   Initially, TCCEC and personnel from its parent, Coca-Cola, claimed to be merely concerned bystanders. In September 2001, shortly after the "tax audit," ROZ wrote to Douglas Daft, the Chairman and CEO of Coca-Cola, seeking specific assistance from Coca-Cola in asking it "to expressly condemn the abusive treatment of Coca-Cola joint venture employees." (Exhibit 44). In this same letter, ROZ requested a meeting with Daft to "formulate a joint plan of action" to deal with the upheaval at CCBU. Daft dismissively responded that the issue was "personal;" that Coca-Cola would not get involved in a private matter; and, with the self-interest of Coca-Cola in mind, counseled ROZ personnel against publicizing these issues any further. (Exhibit 45).

3.48   Daft's denial of involvement, however, is contradicted by a letter from the Uzbekistani Ambassador to the United States to a United States Senator. In that letter dated August 29, 2001 – prior to Daft's response to ROZ's letter – Ambassador Khamrakulov acknowledged TCCEC's and Coca-Cola's active participation in Uzbekistan's unlawful

acts by writing that "the representatives of the Coca-Cola Company's regional office have been closely collaborating with the government agencies of Uzbekistan, and share their position that the current audit of the joint venture's documentation is lawful . . . ." (Exhibit 46). Coca-Cola, however, was well aware from previous tax audits that this tax audit was unlike the others in its scope, duration, and treatment of CCBU employees. In the same letter, the Ambassador further wrote that the government of Uzbekistan keeps in "close contact with the headquarters of the Coca-Cola Company." (Exhibit 46).

3.49    Failing to obtain a truthful response from its joint venture partner, ROZ then wrote to Warren Buffet, a director of Coca-Cola, telling him in detail about the financial problems and general upheaval at CCBU and about the role that Coca-Cola was playing in helping Uzbekistan prosecute its reign of terror. ROZ requested a meeting to address these important issues. (Exhibit 47). Mr. Buffet declined ROZ's plea for assistance and deferred to the discretion of Coca-Cola's CEO, Douglas Daft, who had already refused to assist ROZ and had falsely denied working with Uzbekistan. (Exhibit 48).

3.50    In addition, ROZ requested from Coca-Cola a number of specific types of assistance including security; assistance with currency conversion; and funds to pay the salaries of CCBU employees, which ROZ had ensured were paid after the tax audit. (Exhibits 49- 52). Although they had other employees in Uzbekistan (including country manager, Horst Dammann-Heublein) and in neighboring countries, TCCEC and Coca-Cola, deliberately and in complete disregard of the obligation under the JVA to act in good faith to preserve the assets of the joint venture, did nothing to assist CCBU and its employees during or immediately after the tax audit.

3.51    Consistent with the public statements of the Uzbekistani Ambassador, TCCEC and Coca-Cola actively undermined ROZ's efforts at obtaining protection and assistance from the United States government. While ROZ was seeking to convince the United States of the irregularities and unlawfulness of the tax audit, Coca-Cola representatives, including Ahmet Burak, Regional Manager of the Coca-Cola Eurasia Division, deliberately misled the U.S. Department of State by stating that the nature of the audit was not unusual. Approximately one year later – only after the Uzbekistani government threatened to liquidate TCCEC's shares – did Coca-Cola use its influence to convince the U.S. Department of State to intervene, and TCCEC was able to appeal its portion of the liquidation order. By this time, the damage to ROZ was irreversible.

3.52    Unaware of TCCEC's and Coca-Cola's treachery, shortly after the tax audit, Mr. Maqsudi and his brother traveled to London twice to meet with Ahmet Bozer, who, at the time was President of the Coca-Cola Eurasia Division, in order to encourage TCCEC to live up to its commitments to the joint venture. Shockingly, Bozer, acting on behalf of TCCEC, neither expressed concern for what had already occurred at CCBU nor committed to fulfilling TCCEC's duties to preserve assets and affirmatively avoid actions to hinder ROZ or the joint venture. Instead, Bozer denied that there was anything out of the ordinary with the tax audit. Rather than committing to use Coca-Cola's influence to communicate concerns over the human rights abuses and business calamities that had occurred at CCBU, Bozer instead suggested that TCCEC take over operation of the joint venture by installing one of his own employees as the Managing Director of CCBU. Mr. Maqsudi objected because he became suspicious of TCCEC's involvement with Uzbekistan in eliminating it from the joint venture. After unsuccessfully seeking

assistance from Coca-Cola to use its vast resources and influence to "stop the harassment and intimidation of our joint venture" ROZ justifiably could not trust that Coca-Cola would safeguard the interests of CCBU. (Exhibit 50).

3.53   In October 2001, Mr. Maqsudi met with Cem Kozlu, President, Coca-Cola Central Europe, Eurasia, and Middle East Group, to discuss CCBU's situation. Mr. Kozlu commented that Coca-Cola might be in a position to purchase ROZ's shares in CCBU. Such an offer to purchase the shares, however, never materialized.

3.54   In fact, TCCEC and Uzpishcheprom, representing Uzbekistan, jointly pursued substituting ROZ management with new, more compliant management. TCCEC proposed allowing the former Coca-Cola country manager of Uzbekistan, Horst Dammann-Heublein, to serve as CCBU's Acting Managing Director with full authority. ROZ countered by agreeing to have Mr. Dammann-Hueblein serve as Acting Managing Director, but with limited duties and authority. (Exhibit 53). Neither TCCEC nor Uzpishcheprom agreed to ROZ's proposal. Then, in January 2002, TCCEC and Uzpishcheprom called for a general meeting of the participants of CCBU. (Exhibit 54). They intentionally scheduled this meeting in Uzbekistan, knowing that no one from ROZ could safely travel there to participate. TCCEC and Uzpishcheprom conspired to select Derek Willshee, a former Coca-Cola employee, as President of CCBU, without any input or approval from ROZ. (Exhibit 55). Mr. Willshee was appointed with the same duties and authority as Mr. Maqsudi, CCBU's previous President. TCCEC and Uzpishcheprom knew that Mr. Willshee would follow their direction and continue to prevent ROZ from participating in CCBU. Indeed, acknowledging the permanent exclusion of Mr. Maqsudi, one of Mr. Willshee's first actions as President was to write to Mr. Maqsudi, asking him

where to send the personal items that remained in Mr. Maqsudi's office. (Exhibit 56). Mr. Willshee sent Mr. Maqsudi all of the personal items in his office, except for the photographs of his children. TCCEC and Uzpishcheprom continued thereafter to exclude ROZ by calling for and holding meetings in Uzbekistan, where no one from ROZ could participate. (Exhibits 57, 58).

3.55    In practice, though, Mr. Willshee was only a figurehead with no independent authority to manage CCBU. The real authority resided with Irena Avtaiknia, a close ally of Gulnora Karimova, President Karimov's daughter. In fact, Ms. Avtaiknia formally succeeded Mr. Willshee when he was forced to resign after approximately six months. TCCEC was fully aware that by appointing Mr. Willshee in name only, they were allowing Ms. Karimova to control CCBU through her subordinate, Ms. Avtaiknia. Knowing that they were breaching the duty of good faith, TCCEC and Coca-Cola personnel repeatedly denied to ROZ that they were working with Ms. Karimova and Ms. Avtaiknia (Exhibits 59, 60), even while planning and holding meetings with both of them in order to replace ROZ permanently in the joint venture with a company under Karimova's control. In or about January 2002, at the Intercontinental Hotel in Tashkent, Ahmet Bozer secretly met with both Ms. Avtaiknia and Ms. Karimova's then assistant, Farhod Inogambaev, to discuss arrangements by which Ms. Karimova could formalize her control over and profit from the joint venture. By this time, Ms. Karimova had already formed companies within Uzbekistan and a company in Dubai, United Arab Emirates, called Revi Holdings, FZE, that were doing business with CCBU. (Exhibit 61).

3.56    Following this discussion, as well as at a meeting in Switzerland in 2003, Coca-Cola, on behalf of TCCEC, proposed a new charter between TCCEC and Uzpishcheprom,

representing Uzbekistan; this proposal would eliminate ROZ as a shareholder in CCBU. Coca-Cola also proposed a Management Contract between CCBU and a company owned and controlled by Ms. Karimova; this Management Contract would strip ROZ of any participation in the joint venture. (Exhibit 62). Uzbekistan's then First Deputy Foreign Minister, Sodiq Safaev, represented both Uzbekistan and Ms. Karimova in these negotiations with Coca-Cola. These negotiations ultimately culminated in an agreement, discussed more fully below, that allowed Respondent Zeromax, a company closely associated with and/or controlled by Ms. Karimova, to take ROZ's former shares in CCBU. Thus, Uzbekistan, TCCEC, and Coca-Cola successfully conspired to eliminate ROZ from CCBU, while maintaining their own stake in this successful and lucrative enterprise.

3.57    Throughout this period, Coca-Cola and TCCEC knew and approved of other CCBU transactions with Ms. Karimova's companies, including Revi Holdings and United International Group, that dissipated and looted CCBU's assets and allowed Ms. Karimova to siphon profits from these companies into her personal bank accounts in Dubai and elsewhere. Her status as daughter of the President gave her companies nearly unlimited access to hard currency – a rarity in Uzbekistan. Ms. Karimova, through her companies, sold sugar, plastic, and other raw materials to CCBU at inflated prices and required payment in advance, so there was no risk of non-payment. Soon after the transactions were complete, Ms. Karimova transferred money from her companies into her personal bank accounts. For example, on January 14, 2003, CCBU made two deposits into Revi Holdings' primary bank account, totaling $467,477.44. (Exhibit 63). One week later, on January 21, 2003, Ms. Karimova transferred $350,000 from the Revi

Holdings account into her personal bank account designated as a "payment to shareholder." (Exhibit 64). Similarly, on April 6, 2003, CCBU made a $399,958.19 payment to Revi Holdings. (Exhibit 63). On the same day, $350,000 was transferred from Revi Holdings to Ms. Karimova's United International Group. (Exhibit 65). Three days later, on April 9, 2003, Ms. Karimova transferred $362,000 from United International Group to her personal bank account as payment for a "management contract." (Exhibit 66). Between January 23, 2002 and April 9, 2003, Ms. Karimova transferred at least $8,042,000 from her companies to her personal accounts. These transactions, labeled as dividends, bonuses, consulting fees, management fees, return of capital, or corporate bonus repayments, gave her personal access to significant liquid assets in hard currency. (*See as examples,* Exhibit 67).

**E.**   ***Respondent Zeromax Joins the Conspiracy to Exclude ROZ from CCBU***

3.58   In or about late 2004, with TCCEC's full knowledge and approval, but without notice to ROZ as required by the JVA, Uzbekistan transferred ROZ's former shares in the joint venture to Respondent Zeromax Group, Inc., or one of its controlled affiliates. Nonetheless, ROZ learned through news reports in late 2004 of Uzbekistan's possible transfer to Zeromax of its own shares plus those illegally seized from ROZ. ROZ immediately formally protested the transfer or sale by writing to the State Property Committee. (Exhibit 68). Despite these protests, Uzbekistan proceeded with the sale to Zeromax, which purchased the ROZ shares in CCBU with full knowledge that they had been stolen from ROZ. As the successor in interest to ROZ's shares, Zeromax – reportedly through its subsidiary, Muzimpex – now runs CCBU, with Coca-Cola. (Exhibit 69). Under Article 5.5 of the JVA, Zeromax, as a third party purchasing shares

in CCBU, was required to agree to be bound by the JVA, including the agreement to arbitrate all disputes relating to the JVA. Thus, as the successor in interest and assignee of ROZ's shares in CCBU, each of the provisions of the JVA, including the arbitration clause, applies to Zeromax.

3.59    Once Zeromax took control of ROZ's shares in CCBU, ROZ was finally and completely barred from exercising its property and management rights in CCBU.

3.60    Furthermore, according to recent news reports, Ms. Karimova is part owner of Zeromax. (Exhibits 70, 71). Zeromax, for a number of years, has had close business and personal ties with Ms. Karimova, including paying her in or about the Spring of 2003 for assistance in securing a very large multi-million dollar contract with Uzbekistan for construction of the Shurtan-Sherabad natural gas pipeline. Shortly after the March 3, 2003 announcement of the Uzbekistani Cabinet of Ministers' approval of this deal, Zeromax deposited a $1 million installment in Ms. Karimova's account in the Rietumu Bank in Riga, Latvia.

3.61    These Coca-Cola and Zeromax transactions for the benefit of Ms. Karimova are particularly egregious insofar as during the Maqsudi New Jersey divorce proceedings in 2001-2002, Ms. Karimova had formally and publicly taken the position that she was an official of the Uzbekistani government entitled to diplomatic immunity. (Exhibits 72, 73).

### F.    *Notice of Termination*

3.62    In light of the deprivation of ROZ from its rights of management in CCBU and the sale of its shares to Zeromax, ROZ provided a notice of termination to Uzbekistan, through its representative Uzpishcheprom, and TCCEC on April 11, 2005. (Exhibit 74). ROZ

provided notice to Zeromax on August 5, 2005. (Exhibit 75). TCCEC responded by letter on May 10, 2005, denying that it was liable to ROZ for any amount or for an accounting of ROZ's shares. (Exhibit 76). Uzbekistan, represented by Uzpishcheprom, responded by letter also "dated" May 10, 2005, but not mailed until July 14, 2005. Uzpishcheprom professed "surprise" at ROZ's assertion that it had, in effect, been precluded from participation and management in CCBU; disagreed with ROZ's position on termination; and, for the first time, notified ROZ that it had, in fact, transferred ROZ's shares (but without naming the recipient). (Exhibit 77). Zeromax did not respond to the notice of termination. Nonetheless, by its express terms, the JVA was terminated on May 11, 2005, thirty days after the issuance of the notice of termination. JVA, Article 12.2.1.

3.63 Under the JVA, once a party terminates the agreement, "the Parties hereto agree to call a Parties' Assembly and to adopt a Parties' resolution by virtue of which the Joint Venture shall be liquidated . . . ." JVA, Article 12.1. The liquidation is to be conducted in accordance with Uzbekistani law and any proceeds are first to be used to pay any debts of the joint venture and expenses associated with the liquidation. JVA, Articles 12.4.1, 12.4.4. Then, "[t]he balance shall be distributed between the Parties in proportion to their share ownership, it being agreed that any Hard Currency left shall be used to satisfy the part of the liquidation proceeds due to TCCEC and ROZ." JVA, Article 12.4.5. TCCEC, Uzbekistan, and Zeromax have further breached the JVA by failing to call this mandated Parties' Assembly or to initiate liquidation proceedings as required under the JVA, or otherwise compensating ROZ for its share in CCBU. ROZ reserves the right to add Ms. Karimova as a party to this arbitration should it determine that Ms. Karimova is now, by virtue of her ownership or control of Zeromax or any other entity, a party to the JVA.

## 4.0   **EVIDENCE**

4.1   Claimant relies on the exhibits cited to above and attached to this Statement of Claims. ROZ will produce additional exhibits, as necessary, throughout this proceeding.

4.2   ROZ acknowledges that it has not supplied an exhaustive and complete set of exhibits. When the actions described above occurred, Mr. Maqsudi was in the United States. ROZ personnel were forced to flee Uzbekistan, in fear of their personal safety and lives. Mr. Maqsudi's family members who were living in Uzbekistan were forced out of the country or imprisoned. As a result, and due to circumstances well beyond Mr. Maqsudi's or ROZ's control, many documents were left in Uzbekistan and Mr. Maqsudi (or anyone else connected to ROZ) cannot safely travel there to collect them, if such documents still exist. Claimant believes that many important documents are in the possession of one or more of the Respondents or Coca-Cola.

4.3   The threats and retaliatory actions detailed above have prevented Mr. Maqsudi and ROZ from traveling to Uzbekistan, learning the full scope of the actions taken by Uzbekistan and TCCEC to deprive ROZ of its investment in CCBU, or obtaining access to the various documents that support its claims. ROZ was effectively unable to bring any claims against Uzbekistan and TCCEC until the Maqsudis had exhausted all available means to protect as many of the Maqsudi family members and former CCBU and ROZ employees as possible from the acts of intimidation and retribution. The following claims are all premised on the intentional and deliberate acts of Uzbekistan, TCCEC, and Zeromax to harm ROZ and deprive it of its share in CCBU without providing compensation.

4.4    ROZ intends to rely further on witness testimony, including from those individuals identified in the above paragraphs and additional witnesses identified as this proceeding moves forward.

## 5.0    STATEMENT OF CLAIMS

5.1    Uzbekistan, Uzpishcheprom, acting in its own name and on behalf of Uzbekistan, and Zeromax, intentionally and wrongfully excluded ROZ permanently from any further participation in CCBU.   While doing so, Uzbekistan, Uzpishcheprom, and Zeromax unlawfully acquired ROZ's interest in CCBU.   Moreover, Zeromax was completely aware that ROZ was intentionally excluded from CCBU; that ROZ was never compensated after the Economic Court declared the earlier share transfers invalid; and that Uzbekistan wrongfully obtained the remainder of the ROZ and ROZ(U) shares. Therefore, Zeromax obtained ROZ and ROZ(U)'s shares in bad faith.   Accordingly, Uzbekistan, Uzpishcheprom, and Zeromax are liable to ROZ for the value of ROZ's 45.171% interest in CCBU, or $52.85 million, based upon the March 2001, $117 million valuation of CCBU, with Zeromax's maximum liability being $15 million, the price it paid for ROZ's shares. Because Uzbekistan, Uzpishcheprom, and Zeromax acted jointly, it is impossible to attribute to Uzbekistan, Uzpishcheprom, and Zeromax the individual shares of harm they each inflicted on ROZ.   Consequently, because these individual shares cannot be attributed, Uzbekistan, Uzpishcheprom, and Zeromax shall be held jointly and severally liable, with Zeromax liable to ROZ for a maximum of $15 million. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by Uzbekistan,

Uzpishcheprom, and Zeromax on ROZ according to their individual contributions to the damages.

5.2    TCCEC is liable for the permanent exclusion of ROZ from any participation in CCBU because it took affirmative steps to conspire with Uzbekistan and Uzpishcheprom to eliminate ROZ from CCBU and substitute Gulnora Karimova for ROZ, either directly or indirectly through her shill, Zeromax.  Accordingly, TCCEC is liable to ROZ for the value of ROZ's 45.171% interest in CCBU, or $52.85 million, based upon the March 2001, $117 million valuation of CCBU.  TCCEC, Uzbekistan, and Uzpishcheprom deliberately and intentionally worked together to eliminate ROZ from CCBU.  Because of this joint effort, it is impossible to attribute to TCCEC, Uzbekistan, and Uzpishcheprom their individual contributions to the harm they inflicted on ROZ. Claimant therefore asks that TCCEC, Uzbekistan, and Uzpishcheprom be held jointly and severally liable for the amount specified in Claim 5.1. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by TCCEC, Uzbekistan, and Uzpishcheprom on ROZ according to their individual contributions to the damages.

5.3    *In eventu*, if the Tribunal does not find for Claimant in Claims 5.1 or 5.2, Claimant seeks damages from Uzbekistan and Zeromax.  Uzbekistan deliberately acted together with Zeromax in order to obtain ROZ and ROZ(U)'s shares and, as a result harmed ROZ. Zeromax knowingly obtained ROZ and ROZ(U)'s shares in bad faith.  Thus, ROZ is entitled to the value of the shares at the time that Zeromax took them, totalling $15 million.  Because Uzbekistan and Zeromax acted jointly, it is impossible to attribute to them the individual shares of harm they each inflicted on ROZ.  Consequently, because

- 38 -

these individual shares cannot be attributed, Uzbekistan and Zeromax shall be held jointly and severally liable. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by Uzbekistan and Zeromax on ROZ according to their individual contributions to the damages.

5.4    By virtue of their malicious acts in excluding ROZ and ROZ(U) from participation in CCBU and in mismanaging CCBU through Gulnora Karimova and Coca-Cola personnel, Uzbekistan and TCCEC intentionally and wrongfully prevented CCBU from paying ROZ for the accounts receivable generated from ROZ's delivery of supplies and services to CCBU.  Thus, Uzbekistan and TCCEC are liable for reimbursing ROZ in the amount of $9.9 million for supplies and services that were provided.  Also, because of the joint efforts of Uzbekistan and TCCEC, the various harm contributed by each and inflicted on ROZ cannot be individually attributed to Uzbekistan and TCCEC.  Therefore, Uzbekistan and TCCEC shall be held jointly and severally liable. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by TCCEC and Uzbekistan on ROZ according to their individual contributions to the damages.

5.5    Uzbekistan and Uzpishcheprom, acting in its own name and on behalf of Uzbekistan, in furtherance of the retribution against Mr. Maqsudi and ROZ, destroyed ROZ's subsidiary, ROZ(U), by illegally acquiring its shares, excluding it from CCBU, and dissolving it through bankruptcy proceedings that falsely valued ROZ(U)'s assets.  These intentional acts damaged ROZ in the amount of ROZ(U)'s shares in CCBU and other assets of ROZ(U) that were taken through the sham bankruptcy proceedings.  These

damages include $11.64 million for the value of the ROZ(U) interest in CCBU and $52 million for ROZ(U)'s assets that were seized. Uzbekistan and Uzpishcheprom were acting jointly in their efforts to harm ROZ. Because of these joint efforts, the shares of the damages cannot be attributed individually to Uzbekistan and Uzpishcheprom. Consequently, Uzbekistan and Uzpishcheprom shall be held jointly and severally liable. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by Uzbekistan and Uzpishcheprom on ROZ according to their individual contributions to the damages.

5.6   *In eventu*, if the Tribunal does not find for Claimant in one or more of the claims cited above, Claimant seeks damages for Uzbekistan's, Uzpishcheprom's (acting in its own name and on behalf of Uzbekistan), TCCEC's, and Zeromax's failure to terminate the joint venture, as outlined in the JVA. Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax have breached the JVA and are liable for the damages to ROZ resulting from their failure to distribute to ROZ its share of the CCBU assets upon the termination of the joint venture under Article 12, including any waste and diminution in the value of the shares resulting from the wrongful acts of Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC in excluding ROZ from further participation in the management and operation of the joint venture and in permitting Ms. Karimova to siphon off profits and assets after August 2001. These damages are $52.85 million, representing the market value of ROZ's shares as measured by the joint venture's earning capacity over its life as reasonably expected by the parties. Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC acted jointly to harm intentionally ROZ by not initiating the contractually required liquidation procedure. In addition, the various contributions to the damages cannot be

attributed individually to Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC. Claimant therefore asks that Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC be held jointly and severally liable. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC on ROZ according to their individual contributions to the damages.

5.7    Claimant seeks to recover the damages cited above plus statutory interest, as well as attorneys' fees and costs incurred in the prosecution of this arbitration.

## 6.0    RELIEF SOUGHT

The Arbitral Tribunal shall render the following Award:

1.    Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax (with Zeromax up to an amount of $15 million) shall be liable to ROZ for $52.85 million and statutory interest from August 13, 2001 until July 31, 2002, in the amount of 5% p.a., and as of August 1, 2002 and onwards statutory interest according to Article 1333 para. 2 of the Austrian Civil Code (ABGB), or such other amount as the Arbitral Tribunal may find appropriate, for all losses and damages suffered as a consequence of Uzbekistan's, Uzpishcheprom's, TCCEC's, and Zeromax's breaches of the JVA and/or for all other unlawful acts. Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax shall be held jointly and severally liable, with Zeromax's liability capped at $15 million; *in eventu*, the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax in accordance with their individual contributions. Should the above claim be dismissed, the Arbitral Tribunal shall hold Uzbekistan and Zeromax liable to ROZ for $15 million and statutory interest from November 4, 2004 onwards

according to Article 1333 para. 2 of the ABGB; or such other amount as the Arbitral Tribunal may find appropriate, for damages suffered as a consequence of Uzbekistan's and Zeromax's illegal sale and purchase of ROZ's share in CCBU. Uzbekistan and Zeromax shall be held jointly and severally liable; *in eventu* the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan and Zeromax in accordance with their individual contributions;

2. Uzbekistan and TCCEC shall be liable to ROZ for $9.9 million and statutory interest from August 13, 2001 until July 31, 2002, in the amount of 5% p.a., and as of August 1, 2002 and onwards statutory interest according to Article 1333 para. 2 of the ABGB or such other amount as the Arbitral Tribunal may find appropriate, for damages suffered as a consequence of Uzbekistan's and TCCEC's efforts to prevent CCBU from reimbursing ROZ for services and supplies provided. Uzbekistan and TCCEC shall be held jointly and severally liable; *in eventu* the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan and TCCEC in accordance with their individual contributions; and

3. Uzbekistan and Uzpishcheprom shall be liable to ROZ for $63.64 million and statutory interest from September 11, 2002 onwards according to Article 1333 para. 2 of the ABGB or such other amount as the Arbitral Tribunal may find appropriate, for damages suffered as a consequence of Uzbekistan's and Uzpishcheprom's illegal acquisition of ROZ(U)'s shares. Uzbekistan and Uzpishcheprom shall be held jointly and severally liable; *in eventu* the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan and Uzpishcheprom in accordance with their individual contributions.

4.   *In eventu*, if the Arbitral Tribunal rejects one or more of the Reliefs Sought mentioned above, Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax shall be liable to pay ROZ $52.85 million and statutory interest from May 30, 2005 onwards according to Article 1333 para. 2 of the ABGB or such other amount as the Arbitral Tribunal may find appropriate, for damages suffered as a consequence of Uzbekistan's, Uzpishcheprom's, TCCEC's, and Zeromax's refusal to initiate the liquidation procedure as required by the JVA. Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax shall be held jointly and severally liable; *in eventu*, the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax in accordance with their individual contributions.

In addition, the Arbitral Tribunal shall award Claimant the following compensation:

1.   AWARDING Claimant its legal, expert, executive, and other costs incurred in connection with this arbitration.

2.   AWARDING that Respondents are ordered to make all these payments within 14 days.

3.   AWARDING Claimant such other and further relief as the Arbitral Tribunal may deem appropriate under Austrian law.

## 7.0   **NUMBER OF ARBITRATORS**

7.1   According to Article 15.2 of the JVA, three arbitrators are to be appointed in accordance with the Vienna Rules.

## 8.0   NOMINATION OF ARBITRATOR

8.1    Claimant nominates The Honorable (Retired) Thomas Penfield Jackson as an arbitrator.

His contact information is as follows:

The Honorable Thomas Penfield Jackson (Retired)
Jackson & Campbell, PC
One Lafayette Center, South Tower
1120   20th Street, NW
Washington, DC  20036-3437
Phone:  (202) 457-1600
Facsimile:  (202) 457-1678

Respectfully submitted,

Stuart H. Newberger
Alan W.H. Gourley
Alyssa Gsell
Sobia Haque
Peter J. Eyre
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
United States of America
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
E-mail:  snewberger@crowell.com
agourley@crowell.com
agsell@crowell.com
shaque@crowell.com
peyre@crowell.com

Attorneys for ROZ Trading, Ltd.


Dr. Rudolf K. Fiebinger
DDr. Karina Hellbert
Fiebinger, Polak, Leon & Partner GmbH
Am Getreidemarkt 1
A-1060 Vienna
Austria
Telephone:  43-1-58-2-58-0
Facsimile:  43-1-58-2-58-2
E-mail:  r.fiebinger@fplp.at
k.hellbert@fplp.at

Attorneys for ROZ Trading, Ltd.


Of Counsel:
Dr. Allan Gerson
2131 S Street, NW
Washington, DC  20008
United States of America
Telephone:  (202) 966-8557
E-mail:  gerson@gilgintl.org


Date:   June 1, 2006

- 44 -

# Erb Declaration

# Exhibit F (Part I of II)

**Leges Advokat**

*Адвокатская фирма / Law Firm*

Город Ташкент, 700003, улица Тураб Тула, 1
Turob Tula str., 1, Tashkent, 700003
Tel.:    (998 71) 132 62 24, (998 71) 132 62 21
Fax:    (998 71) 139 15 92
Web site: www.leges.uz  E-mail: info@leges.uz

## DECLARATION OF MR. AZAMAT R. FAYZULLAEV

I, Azamat R. Fayzullaev, declare as follows:

1.      I have been asked to prepare this declaration of Uzbek law in connection with the case of *ROZ Trading Ltd. et al. v. Zeromax Group, Inc. et al.*, No. 06-CV-01040-CKK in the United States District Court for the District of Columbia.

2.      I am the founder and Director of the law firm "Leges Advokat" in Tashkent, Uzbekistan.  I have been practicing law in Uzbekistan since 1994.  My license to practice law in Uzbekistan was issued by the Ministry of Justice of Uzbekistan under Number 1090.  A copy of my curriculum vitae, which describes my professional experience and educational background in more detail, is attached to this declaration (**Exhibit A**).  I am familiar with Uzbek corporate law and routinely advise foreign corporations doing business in Uzbekistan.  In particular, I have experience in forming joint ventures between foreign corporations and Uzbek corporations and Uzbek State-owned entities.

3.      I speak, read and write the English language.  I am over 21 years of age and am making this declaration in English of my own free will and with a full understanding of its contents.

## I.      STATE REGISTRATION REQUIREMENTS FOR UZBEK COMPANIES WITH FOREIGN INVESTMENT

4.      The Government of Uzbekistan has issued specific decrees and enacted specific legislation governing Uzbek companies with foreign investment.  In particular, Decree of the President of the Republic of Uzbekistan № УП–1652 dated 30 November 1996 ("Decree No. 1652"), as amended, requires companies with foreign investment (i) to register with the Ministry of Justice, (ii) to establish a charter fund of at least USD 150,000 (or its equivalent in local currency)[1] within one year of the date of State registration, unless otherwise specifically provided by government decree, and (iii) to have at least one foreign entity as the shareholder of the company with a share in the company's charter fund of at least 30 percent.  The procedures for State registration of commercial entities are regulated by the specific Regulation approved by the Resolution of the Cabinet of Ministers of the Republic of Uzbekistan No. 357 dated 20 August 2003.

5.      Under the Law of the Republic of Uzbekistan "On Limited and Additional Liability Companies," No. 310-II dated 6 December 2001 ("LLC Law"), documents required for the establishment and registration of a limited liability company include the foundation agreement and charter (together, the "Foundation Documents").  The foundation agreement is a

---

[1] For the Uzbek companies with foreign investments being established in the Republic of Karakalpakstan (an autonomy within the jurisdiction of Uzbekistan) and in Khorezm region the charter fund requirement is USD 75,000.

contract made between the company's shareholders which regulates their respective rights and obligations. The charter is the document of the company itself, defining, *inter alia*, the shareholders, their respective share ownership, and the company's charter fund amount.

6. Pursuant to the LLC Law, only those individuals and legal entities listed in the Foundation Documents are considered participants, or shareholders, of the limited liability company. Under Uzbek law, a limited liability company and its shareholders maintain separate legal identities. Any property acquired by a limited liability company is owned solely by the company, and cannot be deemed to be held by the shareholders. Further, shareholders of a limited liability company generally cannot be held liable for the acts of the company unless, pursuant to Article 48 of the Civil Code of the Republic of Uzbekistan, they cause the company's insolvency through unlawful conduct.

7. State registration of a limited liability company is carried out by the Ministry of Justice of the Republic of Uzbekistan. Upon review of a limited liability company's application for registration, which includes original copies of the Foundation Documents, the Ministry of Justice issues a Certificate of State Registration and certifies the company's Foundation Documents by seal of the Ministry. Following State registration, the registered company becomes a legal entity.

8. Under the LLC Law, any changes and amendments to the Foundation Documents, including a change in an entity's constituent members, are also subject to State registration. Amendments become valid and enforceable at the time of State registration, and replace any prior version of the Foundation Documents. Following State registration of the amendments, any prior version of the Foundation Documents becomes null and void under Uzbek law.

9. I have reviewed Letter No. 21 of the Ministry of Justice of the Republic of Uzbekistan, Department of Justice of the Tashkent Region ("Ministry of Justice"), dated 21 February 2003, and the accompanying Certificate of State Registration No. 13 (attached hereto as **Exhibit B**). These are official Uzbek company registration documents issued by the Ministry of Justice. These documents demonstrate that Muzimpex was registered with the State on 28 February 2003, as an Uzbek-American joint venture in the form of limited liability company under Certificate of State Registration No. 13.

10. I have reviewed the Charter of Muzimpex dated 21 February 2003 (attached hereto as **Exhibit C**). The Charter of Muzimpex is duly registered by the Ministry of Justice as reflected by the Ministry of Justice stamp on the front page of the charter and the registration date and number.

11. I have reviewed the New Edition of the Charter of Muzimpex dated 11 October 2005 (attached hereto as **Exhibit D**). The charter of Muzimpex is duly registered by the Ministry of Justice as reflected by the Ministry of Justice stamp on the front page of the charter and the registration date and number.

12. I have reviewed Certificate of State Registration No. 13, dated 9 November 2005 (attached hereto as **Exhibit E**). This is an official Uzbek company registration document issued by the Ministry of Justice. This document demonstrates that Muzimpex was re-registered with

the State on 9 November 2005, as an Uzbek-Swiss joint venture in the form of limited liability company under Certificate of State Registration No. 13.

## II.    VALIDITY, FORCE AND EFFECT OF THE FEBRUARY 5, 2002 DECISION OF THE SUPREME ECONOMIC COURT OF THE REPUBLIC OF UZBEKISTAN

13.    Under the Constitution of the Republic of Uzbekistan, the Supreme Economic Court is the highest court in Uzbekistan authorized to hear commercial disputes.  The Supreme Economic Court is a court of last resort, and deals exclusively with commercial cases involving foreign and local legal entities and individuals.  Decisions of the Supreme Economic Court are legally valid, binding and enforceable in Uzbekistan.

14.    I have reviewed the Supreme Economic Court's decision of 5 February 2002  in Case No. 2494/01-t (attached hereto as **Exhibit F**), which was initiated by the State Committee for Demonopolization and Development of Competition for violations of the Uzbek Law "On Competition and Limitation of Monopolist Activity on Commodity Markets."  In this decision, the Supreme Economic Court upheld the ruling of the Economic Court of Tashkent dated 4 December 2001 to invalidate a series of capital contribution and share purchase transactions by ROZ Trading Ltd. ("ROZ") and ROZ Trading Ltd. (Uzbekistan) ("ROZ (Uzbekistan)") (together, "ROZ Trading"), thereby reducing ROZ Trading's participatory interest in CCBU.

15.    The 5 February 2002 decision of the Supreme Economic Court is final, legally binding, valid and enforceable under Uzbek law.

## III.    VALIDITY, FORCE AND EFFECT OF THE SEPTEMBER 11, 2002 DECISION OF THE SUPREME ECONOMIC COURT OF THE REPUBLIC OF UZBEKISTAN

16.    I have reviewed the 11 September 2002 decision of the Supreme Economic Court in Case No. 10-0207/1409 (attached hereto as **Exhibit G**).  In this decision, the Court upheld the ruling of the Economic Court of Tashkent dated 3 June 2002 to remove the participatory interest of ROZ in CCBU to pay ROZ (Uzbekistan)'s debt to the State budget.  The Supreme Economic Court acknowledged that ROZ (Uzbekistan) had been liquidated for, *inter alia*, failing to pay its charter capital in violation of Uzbek law.  In addition, the Court cited a 29 April 2002 Economic Court bankruptcy ruling that ROZ (Uzbekistan) was over 13.225 billion soum in debt to the State.  Finally, the Supreme Court determined that ROZ (Uzbekistan)'s debt to the State was the result of unlawful actions of ROZ management and, accordingly, that ROZ's shares in CCBU could be removed under Uzbek law to pay ROZ (Uzbekistan)'s debt to the State.

17.    The 11 September 2002 decision of the Supreme Economic Court is final, legally binding, valid and enforceable under Uzbek law.

## IV.    VALIDITY, FORCE AND EFFECT OF DECREE NO. 420-ф OF THE CABINET OF MINISTERS OF THE REPUBLIC OF UZBEKISTAN

18.    Under Article 98 of the Constitution of the Republic of Uzbekistan, resolutions and decrees of the Cabinet of Ministers have binding legal effect and are enforceable throughout Uzbekistan.  As such, resolutions and decrees of the Cabinet of Ministers are binding on all State authorities, enterprises, organizations, State officials and private individuals.

19.     I have reviewed Decree No. 420-ф of the Cabinet of Ministers dated 5 July 2002 (attached hereto as **Exhibit H**).  Pursuant to this Decree, ROZ's participatory interest in CCBU, which had been removed by the courts to pay ROZ (Uzbekistan)'s debts to the State budget, was formally transferred to the State, through the State-owned entity Uzpishcheprom.

20.     Decree No. 420-ф of the Cabinet of Ministers is a valid, binding and enforceable decree of the Cabinet of Ministers under Uzbek law.  By virtue of Decree No. 420-ф, title to the CCBU shares formerly held by ROZ passed to the State, along with all the rights attendant to ownership.  In addition, since the CCBU shares were transferred from ROZ to the State by virtue of the enforcement of the final and binding judicial decisions discussed above, transfer of title to the CCBU shares formerly held by ROZ to the State was free and clear of any claims by ROZ or any other third party.

## V.     UZBEKISTAN'S STATE DENATIONALIZATION AND PRIVATIZATION LAWS AND PROCEDURES

21.     The primary law governing matters related to the privatization of State property in Uzbekistan is the Law "On Denationalization and Privatization," No. 425-II dated 19 November 1991. This law defines the legal concept of privatization in Uzbekistan as the acquisition by citizens and private legal entities of State-owned facilities or shares in State-owned joint-stock companies.

22.     The State Committee of the Republic of Uzbekistan on Management of State Property ("State Property Committee") is the principal Uzbek government body responsible for the privatization of State property.  The State Property Committee derives its authority from the Constitution and the laws of Uzbekistan, decrees and orders of the President of Uzbekistan, and decrees and resolutions of the Cabinet of Ministers.  In this respect, it remains accountable to the Cabinet of Ministers.

23.     The State Property Committee's mission is to promote economic growth, foreign investment and competition, particularly in the production and services industries.  Its functions include selling State property and State-owned shares of enterprises, establishing starting prices for the sale of State-owned property, and acting on behalf of the State in the capacity of shareholder or constituent member of enterprises in which the State holds shares.  Decisions issued by the State Property Committee are binding upon ministries, departments, concerns, associations, organizations (conglomerations), institutions, and local government authorities.

24.     I have reviewed State Property Committee Order No. 120k-по, dated 13 September 2004 "Concerning the sale of 57,118 percent of State owned participatory interest in the Charter capital of [CCBU]" (attached hereto as **Exhibit I**).  This Order is the official form of order issued by the State Property Committee, and was issued by virtue of the powers and authorities granted to the State Property Committee under Uzbek law.  Pursuant to Order No. 120k-по, the State Property Committee approved the sale of the State-owned participatory interest in CCBU to Muzimpex and outlined the terms of the sale.

25.    State Property Committee Order No. 120k-no is legally valid, binding and enforceable under Uzbek law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Tashkent, Uzbekistan, this 6th day of November, 2006.

Mr. Azamat R. Fayzullaev

5

Fayzullaev Declaration

Exhibit A

### Mr. AZAMAT R. FAYZULLAEV

| | |
|---|---|
| **ADDRESS:** | Law Firm "Leges Advokat"<br>Turab Tula str., 1<br>Tashkent - 700003<br>Republic of Uzbekistan |
| **PHONE:** | (99871) 132-62-24 - office<br>(99871) 187-25-73 - mobile |
| **FAX:** | (99871) 139 15 92 |
| **E-MAIL:** | afayzullaev@leges.uz<br>azamatf@hotmail.com |
| **WEB SITE:** | www.leges.uz |
| **NATIONALITY:** | Uzbekistan |
| **DATE OF BIRTH:** | May 25, 1973 |
| **MARITAL STATUS:** | Married |
| **OCCUPATION:** | Attorney at Law (License issued by the Ministry of Justice of Uzbekistan under # 1090) |
| **EDUCATION:** | The John Marshall Law School<br>Chicago, USA<br>LL.M. in Comparative Legal Studies, June 1998<br><br>The University of World Economy and Diplomacy<br>Tashkent, Republic of Uzbekistan<br>Bachelor of Jurisprudence, July 1996 |

| | |
|---|---|
| **EXPERIENCE:** | **LAW FIRM "LEGES ADVOKAT"** |

December 2004 -
till present

**Founder and Director:**

provide assistance to the clients on various issues of legislation (specifically, issues related to corporate, commercial, labour law, securities and secured transactions);

assist the clients in drafting various legal documents;

represent the clients in the process of various transactions, including mergers and acquisitions, sale of securities, lending and borrowing operations and etc;

manage and control the activities of the Firm and its employees.


**ERNST & YOUNG / ANDERSEN**

December 1999
till December 2004

**Senior Attorney:**

provided assistance to the clients on various issues of legislation (specifically, issues related to corporate, commercial, labour law, securities and secured transactions);

assisted the clients in drafting various legal documents;

performed due diligence investigations and prepared due diligence reports for the clients (for example, performed comprehensive due diligence investigation of UzDaewoo Bank, "Uzmetcombinat" metallurgical plant, "Daewoo Unitel" mobile phone operator);

represented the clients in the process of various transactions, including mergers and acquisitions, sale of securities, lending and borrowing operations and etc.

Have practical experience of working in Almaty, Kazakhstan (three months) and Kyrgyz Republic (on a project base).

**NATIONAL BANK OF UZBEKISTAN:**

September 1998 -        **Head of the Contracting Department:**
December 1999

negotiated and prepared the documentation for international transactions to which the National Bank was a party, including the transactions with IBRD, EBRD, IFC, ADB;

negotiated and prepared loan agreements, guarantee agreements and related financing documents for international financing projects;

participated in several complex international financing projects (for example, Boeing aircraft leasing structure initiated by the Government of Uzbekistan for the National Aviation Company);

supervised the Department's activities and its staff of twelve counsels.

January 1997-        **Head of Division of Investment Projects:**
September 1998

consulted the management of the Bank on all aspects of Uzbek and certain aspects of international law;

drafted the package of documentation related to investment projects financed by the Bank;

supervised the Division's activity and its staff of three counsels.

August 1994 -        **Legal counsel:**
January 1997

Performed research on various legal issues;
Drafted letters and other legal documentation related to operations of the Bank and its clients.

**SKILLS:**        Experienced with the following computer applications:
Windows XP, Lotus Notes, WESTLAW, PRAVO, JURIST, TOKTOM Legal Databases

**LANGUAGES:**        Uzbek, Russian and English.

Fayzullaev Declaration

Exhibit B

**Unofficial Translation**                                          **Fayzullaev Decl., Ex. B**

= Letterhead =

## MINISTRY OF JUSTICE OF THE REPUBLIC OF UZBEKISTAN
## DEPARTMENT OF JUSTICE OF THE TASHKENT REGION

Attn: **K.A. Mukhamedkhodjaev**
Director of "MUZIMPEX" JV
Zangiota district

Date:  February 21, 2003
Re:    No. 21

In response to your application dated February 17, 2003:

Extract from the Minutes of Meeting No.6 dated February 21, 2003 of the Committee specializing in "State Registration of Companies and Markets with Foreign Investments" of the Department of Justice of Tashkent Region:

Resolved in compliance with the resolution of Membership Meeting held on February 12, 2003 that "MUZIMPEX" Uzbek-American JV located at Zangiota district, Tashkent region shall be registered with the State and given certificate No.13.

**Deputy Chairman of the Committee**
**Head of the Department of Justice**
                                                          **A.H. Sattarov**

*Seal of the*
*Department of*
*Justice of the*
*Tashkent Region*

# CERTIFICATE

## of State Registration of the Legal Entity

Registration number  No.__13_____No.176

__February 28, 2003_____

This certificate has been given to ___"MUZIMPEX" Ltd. Uzbek-American Joint Venture_____

_____"MUZIMPEX" M.Ch.J. QK___("MUZIMPEX" Ltd. JV )_____

(Full and abbreviated names of the Company)

__in accordance with the resolution adopted by the Committee of the Department of Justice of_____

__Tashkent Region on February 21, 2003, Minutes No.6._____

| | |
|---|---|
| Type of Legal Formation: | 1153 |
| Type of Ownership: | 161 |
| Address: | 1727237836 |
| Code of Legal Entity: | 18651838 |
| Industry Code: | 21140 |
| Identification Number of Tax Payer: | 204397527 |
| Additional Information | |

**Head of Authorized Body**

**Z.M. Azimova**

*Seal of the*
*Department of*
*Justice of the*
*Tashkent Region*

O'ZBEKISTON
RESPUBLIKASI
ADLIYA VAZIRLIGI

TOSHKENT
VILOYATI HOKIMIATI
ADLIYA BOSHQARMASI



MINISTRY OF JUSTICE
OF THE REPUBLIC
OF UZBEKISTAN

DEPARTMENT OF
JUSTICE OF THE
TASHKENT REGION

Toshkent shahar  U.Nosir ko'chasi  93-uy     tel: 53-61-25      93, U. Nosir street  Toshkent City

"__" февраль 2003 йил
____ - сон

Зангиота туманида жойлашган
"MUZIMPEX" қўшма корхонаси
рахбари
К.А.Мухамедходжаевга

Сизнинг 17.02.2003 йилдаги аризангизга:

Тошкент вилояти Адлия бошқармаси "Хорижий инвестициялар иштирокидаги корхоналарни ва бозорларни давлат рўйхатидан ўтказиш комиссияси" нинг 2003 йил 21 февралдаги 6-сонли баённомасидан кўчирма:

Тошкент вилояти, Зангиота туманида жойлашган масъулияти чекланган жамият шаклидаги "MUZIMPEX" Ўзбекистон-Америка агросаноат қўшма корхонаси иштирокчиларининг 12.02.2003 йилдаги йиғилиш қарорига асосан, корхона давлат рўйхатига олинсин ва 13-сонли гувоҳнома берилсин.

Комиссия раиси муовини
бошқармада бўлим бошлиғи                                              А.Х.Саттаров



Юридик шахсни давлат руйхатидан утказиш тугрисида

# ГУВОХНОМА

Рессдраат тартиб раками № 13                    № 176

2005 йил        28 феврал

Мазкур гувохнома фирма номи       Mas uliyati cheklangan jamiyat shakli degi
MCHJ MPFX O'zbekiston-Amerika agrosanoat qo'shma korxonasi
MCHJ MPFX M-GHROK                                         булган юридик

(обектидаги тулик ракказсатирилган фирма номи)

шахсга

Узбекистон Республикаси Адлия Вазирлиги
Тошкент вилояти         Адлия бошкармаси ва идоралари
                                 нинг карорига асосан берилди

Ташкилий хукукий шакли                                    ТХШ

Мулкчилик шакли                                              МШ

Почта индекси ва манзили                              17 123785

Юридик шахс коди                                        1K613838

Тармок коди                                                  ТИФ

Солик туловчининг идентификаци раками          203497527

Кушимча маълумотлар

МЕУ

Ваколатли орган рахбари                              З.М.Азимова



Fayzullaev Declaration

Exhibit C

Unofficial Translation                                    Fayzullaev Decl., Ex. C

"CONFIRMED"                          "REGISTERED"

By the General Meeting                   Department of justice

of participants of the                   of Tashkent region of the

                                         Republic of Uzbekistan

joint venture

Minutes of general meeting              № 13
№ 1 dated 12 February 2003              dated 21 February 2003


# CHARTER

## OF THE UZBEK-AMERICAN AGROINDUSTRIAL JOINT VENTURE

### "MUZIMPEX"

#### Limited liability Company


**Tashkent 2003**

**Article 1. General Provisions.**

These articles of association of the Uzbek-American agro industrial Joint Venture "Muzimpex" –Limited Liability Company, hereinafter referred to as the JV ,established 12 February 2003 in accordance with laws of the Republic of Uzbekistan "About limited liability companies"dated March,1 2002 ,"About foreign investments", "About guarantees and measures on protection of rights of foreign investors" dated April,30 1998 on the territory of the Republic of Uzbekistan in Tashkent among the following entities:

- "Zeromax LLC" company, established under the laws of the United States in the State of Delaware ,the registered office in Delaware at King street, suite 555,City of Wilmington, New Castle County, Delaware.

- "RTPF-TIJORAT" public corporation, registered by # 733 dated 3 June 1998 by the decree of khokim of Yunus-Abad district of Tashkent, with registered office is located at: 25, Navoi street, Shaihantohur district, Tashkent.

**Article 2. The name and postal address of the JV**

2.1. The name of the JV
2.1.1. The full name of the JV:

- In Uzbek: Masuliati cheklangan jamiyat shaklidagi "MUZIMPEX" Ozbekiston- -America agrosanoat qoshma korxonasi;

- In Russian: Узбекско-американское агропромышленное совместное предприятие «МУЗИМПЕКС» в форме общества с ограниченной ответственностью.

- In English: Uzbek-American agro industrial joint venture "MUZIMPEX", LTD.

2.1.2. Abbreviation of the joint venture:

In Uzbek: "MUZIMPEX" KK;
In Russian: СП "MUZIMPEX"
In English: "MUZIMPEX"JV

2.1.3. The postal address and location of the JV: 11, Loyihachi street, Nazarbek, Zangiota district, Tashkent region, Republic of Uzbekistan , 702043.

**Article 3. Objectives, powers and operation of the company.**

3.1. The primary purpose of the JV shall be the development of high technologies in sphere of production of manufactured products, and market saturation with high-quality consumer goods and cultivating, manufacturing, processing, storage and sales of agricultural products, rendering of service and carrying out works in the interests of incorporators and the JV.

3.2. The main kind of business activities of the JV are as follows:

- Management of the warehouse depots (customs warehouse), farm-houses; production, processing, and sale of the agricultural production, freezing of fruits and vegetables;

- Production and sale of the manufactured goods and foodstuffs via its own shops;

- Production and sales of package and furniture;

- Renovation and reconstruction of the living quarters, improvement and finishing works;

- Production, sales and maintenance of the sanitary engineering;

- Execution phase on application of the achievements of IT science to production, rendering of services in the sphere of IT;

- Rendering of marketing, leasing, representative, dealers and other kinds of services;

- Performance of the exhibitions and trade fairs;

- Setting up of the medical institutions, hospitals and polyclinics, rendering of the medical and stomatological services to the people, opening of the dentists' offices;

- Setting up and organization of the activity of the pharmacies, collecting, processing and sale of the medicinal herbs;

- Construction and maintenance of the hotels, camping-sites, etc;

- Construction, rent, maintenance of car parks, market-places, car-washing facilities ;

- Organizing of the various cultural events, show-programs, discos, drawing of the lotteries,etc;

- Purchase and sale of vehicles, and maintenance;

- Delivery of oil products, opening and maintenance of gas stations,selling of the oil products;

- Installation, repair, construction works, architectural and roadway maintenance works;

- Production and sale of the confectionery and bakery products ( cookies,bisquits,etc.)

- Growing, storage and sale of the poultry products and meat and milk products;

- Setting up and running of the laundries;

- Production and sale of ready-made garments, knit works, and working clothes;

- Production and technical goods, production of finish goods ;

- Setting up and putting into operation the public catering  facilities ( restaurants,bars,cafes, clubs)
- Activities in the sphere of the international and local tourism;
- Production and repairs of the footwear and  leather goods;
- Freight forwarding of goods and passengers transportation by railway transport, air transport, and motor transport;
- Lease of warehouses for trade, industrial and other organizations;
- Production and sale of ironmongery, woodworking, producing and sale of woodwork;
- Production and sale of the soft drinks and ice-cream
- Performing of  dealers activities;
- Certification of services, customs declaration service via customs agents and brokers;
- Advertising activity
- Rendering of finance assistance
- Import-export operations

3.3. Foreign economic activity of the JV is being executed in accordance with the existing laws of the Republic of Uzbekistan.

3.4. In case if the JV will need to get a license from the State agencies, this kind of activity will be carried out only after getting of this license granted.


**Article 4. Governing organs**

4.1. The joint venture shall have the following governing bodies:
- The General Meeting of the Participants
- General Director
- Inspection Commission

4.2. The highest governing body of the joint venture is the General Meeting of the Participants. Every Participant can revoke the appointed member of the General meeting at any time. The Director General can take part in the General Meeting without the right of voting. A legal entity (the participant of the enterprise) is represented by its director or by any other person, acting on the basis of the Power of Attorney, issued by the Participant of the Joint venture. The Participant reserves the right to replace the member of the General Meeting appointed earlier.

4.3. In case if the member of the General Meeting is not able to attend the meeting, he has the right to appoint his representative to participate in the meeting. His authority must be confirmed by the POA, given by the Participant of the joint venture. The representative will enjoy the equal rights with the other Participants of the Meeting.

4.5. The General meeting is authorized to make decisions in every aspect of the JV activities.

**4.6. The General Meeting's terms of reference cover:**

4.6.1. The definition of the main activities of the Joint venture, ratification of plans and reports on its execution.

4.6.2. Alteration and amendment to the Charter of the joint venture.

4.6.3. Election, dismissal of the members of executive board and inspection commission and and approval of the order of their activities .

4.6.4. Approval of the annual results of the economic activities of the enterprise, including it's subsidiaries, and also the reports and certificates of the inspection commission, the order of reward distribution, dividends, and replacement of damages.

4.6.5. The establishing, reorganization and dissolution of the subsidiaries, representations, ratification of the statutes of these structures with the Charter Fund exceeding 30% of the Charter fund of the joint venture.

4.6.6. Making decisions on bringing to the property accountability of the officers of the JV, changes in the Charter Fund, acceptance of new participants, determination of the work conditions of the officials of the governing body of the enterprise, its subsidiaries and representations, dissolution of the enterprise, designation of the liquidation commission, ratification of the liquidation balance, establishing of size, form and order of contribution of the "additional" payments, acquisition of the participatory interests by the joint venture, affiliation or dismissal of the Participant to and from the enterprise, in accordance with the art.34, 36 of the law of Uzbekistan "About the limited liability companies"

4.7. The General meeting is authorized to pass some issues, related to the competence of the general meeting, for consideration of the board of directors of the JV, consisting of 4 persons and are being elected for the period of 5 years.

4.8. The board of directors presides the current activities of the joint venture and the head of the board of directors is the Director General and his first deputy.

4.9. The Director General is being appointed by the decision of the General Meeting and resides the activities of the joint venture within the framework of its competence and rights, determined by the Charter and decisions of the General meeting.

4.10. **Director General of the Joint venture**

- organizes a preparation  and execution of the decisions of the General meeting and submits reports about  execution of these decisions
- disposes of the JV, including its assets in limits ,determined by the General meeting
- signs agreements without POA on behalf of the JV, employs and dismisses the employees and workers
- other functions arising from this Charter
- represents the JV at all institutions,organizations and enterprises,including the official organs of countries-participants on all issues of the JV activities within the limit of competence of the present Charter.

     The Director General has a right to make decisions on any other issues of the JV out of the General meeting's terms of reference

4.11. **The JV Inspection Commission**

4.11.1. The finance and economic activities of the JV is controlled by the Inspection commission, consisting of 3 members, appointed for 5 years.

4.11.2. The Chairman and members of the Inspection commission are appointed by the General Meeting. The Inspection commission is liable for submission of the reports on its activities and annual reports to the General Meeting.

4.11.3. Members of the Board of directors can not be the members of the Inspection commission. The Inspection commission has a right to claim the submission of all necessary documents, including the accounting documents.

4.11.7. An unscheduled inspection can be carried out on demand of one of the Participants or the General meeting.

4.11.8. The financial audit of the JV will be arranged by invited auditing service, tax and finance organs.

**Article 5.  Order and consequences of the withdrawal of the Participant**
**The order of passing of the interest to another person**

5.1. The participant shall meet conditions in accordance with the laws of the Republic of Uzbekistan and constituent documents of the JV when he makes a decision to withdraw.
5.2. The Participants can pass their interests to one or several individuals or to the third party.In this case the third person becomes the successsor , including the obligations.
5.3. The participatory interest ,paid in full, might be acquired by the JV with a condition of obligatory passing of this interest to the Participant or to the third person. In this period quorum and voting are being made without taking into consideration of the interest acquired by the JV.
5.4. When the Participant withdraws he is reimbursed in:

- The property pro rata its interest. All payments are being made in accordance with the report for the year when the participant left the JV. The revenue is being paid from the part of income before the date of the withdrawal. The property , which was contributed to the JV will be recovered au naturel.

**Article 6. Charter fund (Chartered capital).**

6.1. The Joint venture sets up the a charter fund by means of contributions from the Participants in the amount of four million US dollars($4, 000 .000).
6.2. The contributions to the Charter fund are made by the Participants of the joint venture in accordance with the order established in the joint venture Agreement:
- The foreign Participant "Zeromax LLC" (USA) contributes cash assets and property (goods) in the amount of two million forty thousand US dollars ($ 2 040 000) which is 51% in terms of participatory interest percentage in the Charter fund.
- Uzbek participant –OAO "RTPF-TIJORAT" contributes property, its subsidiary UP "Muzimpex-Tijorat" in the amount of One million nine hundred and sixty thousand US dollars ($1 960 000), which is equal to 49% of the Charter fund of the agro industrial JV "Muzimpex",which is the successor of the UP "Muzimpex-Tijorat" ,which was reorganized by affiliation to the JV and it is the successor of all rights and obligations of UP "Muzimpex-Tijorat" , which was reorganized in accordance with the laws of the Republic of Uzbekistan.
6.3. To the moment of registration the participants shall make the contribution of 30% of the Charter Fund. The Charter Fund is being formed within a year from the moment of the registration in accordance with established procedure.
6.4. The Charter fund of the JV may be increased due to the profits from the economic activity of the JV, and  in case of the necessity, by means of additional investments from its Participants or by attracting of new participants.
6.5. The Participant of the joint venture, who made his contribution in full, will get the certificate which does not belong to the category of securities.
6.6. The JV Participants do not possess the severalty for the objects, which are the part of property of the Joint venture, including those kinds of property (or goods) being contributed by the Participants as the investment to the Charter Fund.
6.7. The Participants, who violate obligations on contribution to the Charter Fund, are subject to the property accountability in accordance with the law.

**Article 7.Setting up of subsidiaries and separate subdivisions.**

7.1. The joint venture reserves the right to set up its subsidiaries and branches on the territory of countries of Participants as well as in other countries with corporate privilege and the right to open a checking and settlement accounts with the Charter fund up to 30% from the Charter fund of the Joint venture.

7.2. All subsidiaries, branches and divisions are acting on the basis of Charters, approved by the Director General of the joint venture.

7.3. The Joint venture reserves the right to set up its representative offices in the Republic of Uzbekistan and abroad.

**Article 8. Allocation of revenues, damage settlement and setting up of funds.**

8.1. The revenue of the Joint venture is being used for setting up of the special funds of the enterprise, for payments to the State budget, and distribution among the Participants.

8.2. The joint venture forms the reserve fund in the amount of not less than 15% from the Charter Fund. The amount of annual allocations to the reserve fund can not be less than 5% of the net profit  .

8.3. The joint venture has a right to establish other kinds of funds necessary for carrying out its economic activities.

8.4. The JV profits existing after the JV pays its expenses to pay all taxes due and capital expenditures, shall be income of the Participants and are subject to distribution pro rata to its interest percentage in the Charter Fund.

8.5. The portion of the profit subject to distribution is to be paid to the Participants of the JV in in terms fixed by the General Meeting of the Participants of the JV in the end of the fiscal year.

8.6. Losses and damages which may occur during the JV operation are covered by the Reserve Fund of the joint venture. If the Reserve Fund is insufficient to cover all losses and damages, the General Meeting will determine the source for covering of these expenses.

**Article 9. Financial activity and accounting**

9.1. The financial activity of the Joint venture is being made on the basis of the annual  financial plans. The financial year is a calendar year.
9.2. The accounting is being made in soums, national currency of the Republic of Uzbekistan, and in the foreign currency when it is necessary.
9.3. On completion of every financial year the board of management makes an annual report of its economic and financial activities, annual balance sheet in national currency of the Republic and in foreign currency, on its profits and losses.

9.4. The annual report on economic and financial activities and the report of profits and losses are submitted to the Inspection commission and to the members of the General meeting of the joint venture.

**Article 10. Labour relations and remuneration of labour**
10.1. The Joint Venture Agreement shall determine the remuneration of labour in forms consistent with the legislation of the Republic of Uzbekistan.
10.2. Working day schedules consistent with the legislation of the Republic of Uzbekistan, for local staff and foreign staff, but the salary, the leave and allowances are being determined in separate agreements with each of them.

**Article 11. Insurance**
11.1. The JV Participants have the right to insure the property of the JV in accordance with the existing laws of the Republic of Uzbekistan.
11.2. The JV risk insurance can be arranged if necessary.

**Article 12. Effectiveness of the JV Agreement and dispute resolution.**

12.1. The Joint Venture Agreement shall become effective upon its State registration.
12.2. All amendments and alterations in the Agreement are being made in writing, signed and stamped by the authorized persons and registered in the accordance with the applicable law.
12.3. This constituent Agreement is drawn up in Uzbek and Russian languages, in four copies, with each copy having the equal legal effect.

**Signatures and seals of the participants:**

"Zeromax LLC" – the authorized person is Mr. Gulomjon Gafurkulovich Imanazarov,
Director General of "RTPF-Tijorat" – Mr. Fazilnazar Yakhyaevich Ibragimov

Seal of RTPF-Tijorat





"УТВЕРЖДЕН"

Общим Собранием Учредителей
Совместного предприятия

Протокол Собрания №
от " 12 " февраля 2003 г.

"ЗАРЕГИСТРИРОВАН"

Управлением Юстиции
Ташкентской области
Республики Узбекистан

№
от " __ " февраля 2003 г.

# У С Т А В

## УЗБЕКСКО - АМЕРИКАНСКОГО
## АГРОПРОМЫШЛЕННОГО СОВМЕСТНОГО ПРЕДПРИЯТИЯ

# "MUZIMPEX"

## В ФОРМЕ ОБЩЕСТВА С ОГРАНИЧЕННОЙ
## ОТВЕТСТВЕННОСТЬЮ

Ташкент 2003 г.

## Ст. 1. Общие положения.

Настоящий Устав Узбекско-Американского агропромышленного совместно предприятия "MUZIMPEX" в форме общества с ограниченной ответственность именуемое далее (СП) учрежден "12" февраля 2003 года в соответствии с Закона Республики Узбекистан «Об обществах с ограниченной и дополнительно ответственностью» от 1 марта 2002 года, «Об иностранных инвестициях», «О гаранти и мерах защиты прав иностранных инвесторов» от 30 апреля 1998 года. территории Республики Узбекистан в городе Ташкенте следующими юридически лицами:

- "ZeroMaxLLC", зарегистрированное в соответствии с Законом "О компании ограниченной ответственностью" штата Делавер США, зарегистрированный адр компании:
- State of Delaware is King street, Suite 555, in The City of Wilmington, County of Ne Castle, Delawer.

- Акционерное Общество Открытого типа «RTPF-TIJORAT», зарегистрирован за 733 от 3 июня 1998 года Хокимом Юнус-Абадского района. г. Ташкент расположенного по адресу:
- г. Ташкент, Шайхантахурский район, улица Навои, торговые ряды, магазин № 11

## Ст.2. Наименование Совместного предприятия, почтовый и юридический адрес.

2.1.Наименование Совместного предприятия /СП/:

2.1.1.Полное наименование предприятия:

• На узбекском языке:Ma"suliyati cheklangan jamiyat shaklidagi "MUZIMPEX" O"zbekiston–Amerika agrosanoat go"shma korxonasi;

• На русском языке: Узбекско-Американское агропромышленное совместное предприятие "MUZIMPEX" в форме общества с ограниченной ответственностью.

• На английском языке: Uzbekistan-Amerika agroindastril Joint Venture "MUZIMPEX" i The Form of Ltd;

2.1.2.Сокращенное наименование совместного предприятия:

На узбекском языке: "MUZIMPEX" KK;

На русском языке: СП "MUZIMPEX";

На английском языке: "MUZIMPEX" JV;

2.1.3.Почтовый адрес и местонахождение Совместного предприятия: 7020 Республика Узбекистан Ташкентский вилоят Зангиатинский туман поселок Назарб улица Лойихачи 11.

## Ст.3. Цель создания и предмет деятельности.

3.1.Совместное предприятие создается с целью развития высоких технологий области производства товаров промышленного, научно-технического назначени насыщения рынка Республики Узбекистан высококачественными товарами народно потребления, выращивание, производство, заготовки, переработки и хранения также реализация сельскохозяйственной продукции. Производства ТНП, оказан услуг и проведение работ для получения прибыли в интересах учредителей и СП.

3.2.Основными видами и направлениями деятельности /СП / является:

Для достижения своих целей «СП» осуществляет следующие виды деятельности:

• Организация грузовых дворов (таможенный склад), фермерских хозяйст заготовка, производство, переработка и реализация сельскохозяйственн продукции, замораживание фруктов и овощей;

• Производство и реализация товаров промышленного и продовольственно назначения, также через свои фирменные магазины;

• Производство и реализация тары, промышленной и бытовой мебели;

- Ремонт и реконструкция ........ .............. устроительные и отделочные работы;
- Производство, реализация и ремонт сантехники;
- Выполнение работ по внедрению и эксплуатации электронной и вычислителья техники, оказание услуг в области информатики;
- Оказание маркетинговых, лизинговых, холдинговых, представительск дилерских и других услуг;
- Проведение выставок и ярмарок;
- Открытие медицинских учреждений, больниц и поликлиник, оказание медицинск помощи, стоматологических услуг населению, открытие стоматологическ пунктов;
- Открытие и организация деятельности аптек, сбор, переработка и реализа лекарственных трав;
- Строительство и эксплуатация гостиниц, кемпингов, и т.п.;
- Строительство, аренда, организация охраны и обслуживание автостоянок, рынк техническое обслуживание и мойка автомашин;
- Организация и проведение культурно-массовых, спортивно-зрелищн мероприятий, различных шоу-программ, дискотек, открытие и организация клуб игорных домов, проведение лотерей и т.п.;
- Купля-продажа, аренда транспортных средств, ремонт и техническ обслуживание;
- Организация завоза нефтепродуктов, открытие и эксплуатация автозаправочн станций и пунктов замены масла, продажа нефтепродуктов;
- Монтажные, ремонтные, строительные, архитектурные и дорожные работы;
- Производство и реализация кондитерских и хлебобулочных изделий (пече бисквитов и.т.д.);
- Выращивание, заготовка и реализация продукции птицеводства и мясомолочн продукции;
- Организация и эксплуатация прачечных;
- Ремонт продажа аудио, видеотехники и другой бытовой аппаратуры, эксплуата электрооборудования;
- Производство и реализация швейных, трикотажных изделий и спец. одежды; ι
- Организация студий звукозаписи, кабельного телевидения и устано спутниковых антенн, прокат кино-видео продукции и услуг по прокату;
- Производство товаров народного потребления, торговая, торгово-закупочн посредническая деятельность, организация магазинов, закупка товаров за с собственных и привлеченных средств, а также на условиях комис (консигнации);
- Проведение проектных, научно-исследовательских и опытно-конструкторск ремонтных, монтажных, пуско-наладочных работ и испытаний;
- Производство продукции производственно технического назначения производс столярных и плотницких производств;
- Заготовка и переработка вторичного сырья, неликвидов и отходов производства
- Организация и эксплуатация пунктов общественного питания (ресторан, бар, ка клубы);
- Художественно-оформительские работы, дизайнерские работы;
- организация авто сервиса, автоспецстанков и спец-борудования для автосервис
- Деятельность в сфере международного и местного туризма;
- Производство и ремонт обуви, кожгалантерейных изделий;
- Перевозка грузов и пассажиров железнодорожным, воздушным, и автомобилье транспортом;
- Организация и аренда складов для торговых, промышленных и дру организаций;

- Производство и реализация ~~изд~~
  реализация изделий из дерева;
- Изготовление и реализация прохладительных напитков и мороженого;
- Тиражирование различных видов печатной продукции, полиграфические рабо[ты]
  все виды редактирования и художественного оформления печатной продукц[ии]
  переплетные и картонажные работы;
- Открытие фирменных магазинов и торговых точек, оптово-розничная торговля;
- Осуществление дилерской деятельности;
- Сертификация продукции и услуг, осуществление услуг декларирования товаров
  договорной основе (таможенный посредник, агент, брокер);
- Рекламная деятельность;
- Оказание финансовой помощи;
- Импортно-экспортные операции;

3.3.Внешнеэкономическая деятельность « СП » осуществляется в соответствии
действующим законодательством Республики Узбекистан.

3.4 В случае, если для осуществления какого-либо вида деятельности Совместно[му]
предприятию необходимо будет получить разрешение (лицензию) государственн[ых]
органов, то такая деятельность не будет проводиться до получения разрешен[ия]
(лицензии).

### Ст.4 Органы управления и контроля совместным предприятием.

4.1.Органами управления и контроля Совместного предприятия является:
- Общее собрание:
- Дирекция:
- Ревизионная комиссия:

4.2.Высшим руководящим органом Совместного предприятия является Обг[ее]
собрание. Каждый из Участников в любое время может отозвать назначенного чл[ена]
Общего собрания. В Общее собрание может входить по должности Генеральн[ый]
директор без права голосования. Юридическое лицо (участника предприят[ия]
представляет в Общем собрании его руководитель или иное лицо, на основан[ии]
доверенности, выданной Участником Совместного предприятия. Участник им[еет]
право в любое время заменить ранее назначенного члена Общего собрания.

4.3.В случае, если член Общего собрания не в состоянии присутствовать на заседан[ии]
Общего собрания, то он вправе назначить для участия на заседании сво[его]
представителя. Полномочия представителя должны быть подтвержде[ны]
доверенностью, выданной Участником Совместного предприятия. Представит[ель]
пользуется равными правами с другими Участниками Собрания.

4.4.Право вносить вопросы на рассмотрение общего собрания принадлеж[ит]
представителям Участников в Собрании, Генеральному директору СП, Председат[елю]
Ревизионной комиссии и руководителям обособленных подразделений, являющи[мся]
юридическими лицами с предупреждением в письменном виде за 30 дней.

4.5.Общее собрание правомочно принимать решения по любым вопро[сам]
деятельности Совместного предприятия.

4.6.Исключительной компетенцией Собрания являются:

4.6.1.Определение основных направлений деятельности СП, утверждение его плано[в]
отчетов об их выполнении:

4.6.2. Изменение и дополнение устава Совместного предприятия:

4.6.3. Избрание, отзыв членов исполнительного органа и ревизионной комисси[и]
утверждение порядка их деятельности:

4.6.4. Утверждение годовых результатов деятельности предприятия, включая
филиалы, а также отчетов и заключений ревизионной комиссии, поря[док]
распределения дохода, дивидендов, и возмещения убытков:

представительств, утверждение положения о них, о величине Уставного фонда Совместного предприятия:

4:6.6.Принятие решений о привлечении к имущественной ответственности должностных лиц органов управления СП, утверждении правил процедуры и других внутренних документов, определение организационной структуры, изменении Уставного капитала, принятии новых Участников, определение условий труда должностных лиц органов управления предприятием, его филиалов и представительств, прекращении деятельности предприятия, назначении ликвидационной комиссии, утверждении ликвидационного баланса, установлении размера, формы порядка внесения Участниками "дополнительных" взносов, приобретении Совместным предприятием доли Участника, принятии в состав, исключении Участника из состава предприятия, в порядке ст.34,36 Закона РУз «Об обществах с ограниченной дополнительной ответственностью»;

4.7.Общее собрание правомочно передавать на решение дирекции СП, избираемой в срок 5 лет, в составе 4 человек в порядке ст. 40 Закона отдельные вопросы, отнесенные настоящим Уставом к компетенции Общего собрания.

4.8.Руководство текущей деятельностью Совместного предприятия осуществляется Дирекцией, назначаемой на контрактной основе, возглавляемой Генеральным директором и его первым заместителем, в порядке, определенном настоящим Уставом Совместного предприятия.

4.9.Генеральный директор назначается решением Общего собрания и осуществляет руководство деятельностью Совместного предприятия в рамках компетенции и прав, определенных Уставом и решениями Общего собрания.

**4.10. Генеральный директор СП:**

• организует подготовку и выполнение решений Общего собрания и представляет отчеты об их выполнении:

• распоряжается имуществом СП, включая его денежные средства, в пределах, определенных Общем собранием;

• заключает договора без доверенности от имени СП, принимает на работу и увольняет сотрудников и рабочих, поощряет отличившихся работников, налагает дисциплинарные взыскания;

• выполняет другие функции, вытекающие из настоящего Устава;

• представляет СП в отношении с организациями, предприятиями и учреждениями, а также с государственными органами стран Участников и третьих стран по всем вопросам деятельности СП в пределах компетенции, определенной настоящим Уставом.

Генеральный директор вправе принимать решения по всем другим вопросам деятельности СП, не отнесенных к компетенции Общего собрания.

• Документы общества хранятся в дирекции и могут быть представлены по требованию участников общества и других лиц с компетенции генерального директора.

4.11. Ревизионная комиссия СП:

4.11.1.Контроль за финансовой и хозяйственной деятельностью СП осуществляет Ревизионной комиссией, состоящей из 3 членов, назначаемых на 5 лет.

4.11.2.Председатель и члены Ревизионной комиссии назначаются Общем собранием Ревизионная комиссия отвечает за свою деятельность перед Общим собранием и представляет ему отчеты о проведенных ревизиях, а также заключения по годовым отчетам.

4.11.3.Члены Дирекции не могут быть членами ревизионной комиссии. Ревизионная комиссия вправе требовать от должностных лиц СП представления всех необходимых материалов, бухгалтерских, иных документов, личных объяснений.

быть проведены внеплановые ревизии.

4.11.8.Проверка финансовой и производственной деятельности СП производ привлеченными для этого аудиторскими службами, налоговыми и финансов органами;

## Ст.5 Порядок и последствия выхода Участника из общества, порядок перехода доли Участника другому лицу.

5.1.Участник выходит из состава СП с соблюдением условий и поря предусмотренных Законодательством Республики Узбекистан и учредительн документами общества.

5.2.Участники СП по взаимному согласию могут передавать свои доли одному нескольким участникам или третьим лицам. В этом случае третье лицо станов правопреемником, в том числе по обязательствам.

5.3.Полностью внесенная доля участника может быть приобретена СП, с усло обязательной передачи её в течении одного года участнику или третьему лицу. В период кворум и голосование производятся без учета приобретенной СП доли.

5.4. При выходе участника из СП ему возмещаются:

• Имущество, пропорционально доли. Выплаты производятся после отчета за го котором участник вышел из СП. Причитающийся ему доход выплачивается из ч дохода до дня его выхода. Имущество, внесенное в СП возвращается в натурал виде.

## Ст.6 Уставный капитал и доли участников.

6.1.Для обеспечения деятельности Совместного предприятия создается Устав капитал за счет вкладов Участников в размере 4000000 (четыре миллиона) долл США.

6.2.Вклады в Уставной фонд вносятся Участниками совместного предприяти установленном Учредительном договором порядке:

• Иностранный Участник "ZeroMaxLLC" /США/ в счет своей доли вносит денеж средства, имущества (товары) на сумму 2040000 (два миллиона срок тысяч) долл США, что составляет (51%) Уставного капитала.

• Узбекский Участник-ОАО «RTPF-TIJORAT» в счет своей доли вносит имуществен комплекс дочернее предприятие УП «Muzimpeks-Tijorat» на сумму 1960000 (с миллион девятьсот шестьдесят тысяч) долларов США, что составляет (49%) Устав капитала СП агросаноат «MUZIMPEX», который является правоприемником «Muzimpeks-Tijorat» реорганизованного путем присоединения в СП, котор переходят все права и обязанности УП «Muzimpeks-Tijorat» реорганизованно соответствии с законодательством Республики Узбекистан.

6.3. К моменту регистрации Участники обязаны внести 30% Уставного капит Уставной капитал СП формируется в течении года с момента регистраци установленном порядке.

6.4.Уставной капитал СП может увеличиваться за счет прибыли от хозяйствен деятельности СП, а при необходимости за счет дополнительных вкладов Участников или путем привлечения новых Участников.

6.5.Участнику СП, полностью внесшему свой вклад, выдается свидетельство, кот не относится к категории ценных бумаг.

6.6.Участники СП не располагают обособленным правом на отдельные объек входящие в состав имущества СП, в том числе на объекты, имущества (това внесенные Участниками в качестве вклада в Уставной капитал.

6.7.Участники, нарушившие обязательства по взносу долей несут материальну имущественную ответственность в порядке установленном законом.

## Ст.7 Представительство и филиалы общества.

7.1.Совместное предприятие имеет право создавать на территории стра Участников, а также в третьих странах дочерние предприятия с прав юридического лица, а также филиалы, отделения с правом открытия текущих и

7.1.Совместное предприятие имеет право создавать на территории с
участников, а также в третьих странах дочерние предприятия с п
юридического лица, а также филиалы, отделения, отделения с правом открытия теку
расчетных счетов с Уставным фондом до 30% от Уставного фонда Совме
предприятия.

7.2.Дочерние предприятия, филиалы, отделения действуют на основе Устав
Положений о них, утвержденных Генеральным директором
предприятия.                                                          Совме

7.3.Совместное предприятие вправе создавать также и представительства,
Республике так и за рубежом.

## Ст.8. Распределение продукции, прибыли и покрытие убытко образование фондов.

8.1.Доход, получаемый СП в результате его хозяйственной деятельности, исполь
для создании специальных фондов предприятия, расчетов с государств
бюджетом и распределяется между Участниками.

8.2. Совместное предприятие образует резервный фонд размером не менее 1
Уставного капитала. Размер ежегодных отчислений в резервный фонд не може
менее 5% от чистой прибыли до достижения установленного размера.

8.3. Совместное предприятие вправе образовывать и другие фонды, необходим
его деятельности, которые находятся в полном его распоряжении.

8.4.Прибыль СП, за вычетом сумм налогов и иных платежей в бюджет и
направляемых на создание и пополнение фондов, распределяется между Участни
пропорционально долевому участию в Уставном фонде.

8.5.Распределяемая часть прибыли подлежит выплате Участникам Совмес
предприятия в сроки, установленные Собранием СП по окончанию финансового
3.6.Убытки, которые могут возникнуть в ходе деятельности СП, покрывается за
его резервного фонда. При недостатке средств резервного фонда для пок
убытков Собранием СП принимается решение об определении источников пок
убытков.

## Ст.9.Финансовая деятельность, бухгалтерский учет и отчетно

9.1.Финансовая деятельность Совместного предприятия осуществляется на о
годовых финансовых планов. Финансовым годом является календарный год.

9.2.Оперативный бухгалтерский учет и отчетность ведется как в сумах, в дене
единице Республики Узбекистан, а при необходимости и в иностранной валюте.

9.3.По окончании каждого финансового года Дирекция составляет годовой отч
экономической и финансовой деятельности и финансовому положению СП
частности годовой баланс в денежной единице РУз и иностранной валюте (СІ
отчет по прибылям и убыткам.

9.4.Годовые отчеты по экономической и финансовой деятельности и финансо
положению, отчет по прибылям и убыткам вручается Ревизионной комиссии и чл
Общего собрания Совместного предприятия.

## Ст.10.Оплата труда и социальные гарантии трудовому коллект

10.1.С учетом прав граждан, указанных в Законах Республики Узбекистан
самостоятельно определяет заработную плату, материальное стимулирование
формы и размеры, применяет порядок приема на работу и увольнение.

10.2.Труд и отдых граждан определяется трудовым законодательством Республ
Узбекистан, что распространяется и на иностранцев, но зарплата, отпуска и пос
определяются в отдельных соглашениях с каждым из них.

Участники СП вправе производить страхование риска предприятия в соответствии с действующим законодательством Республики Узбекистан.

2.При необходимости может производиться страхование рисков Совместного предприятия.

## Ст. 12. Вступление Устава в силу.

1.Настоящий Устав вступает в силу со дня его государственной перерегистрации в установленном законом порядке.

2.Изменения и дополнения к Уставу должны оформляется в письменной форме, подписываться уполномоченными на то лицами и регистрироваться в установленном порядке.

2.3.Устав составлен на узбекском и русском языках, в 4-х экземплярах, имеющих одинаковую юридическую силу.

"ZeroMaxLLC"                          Иманазаров Гуламжан Гафуркулович

ОАО«RTPF-TIJORAT»                     Генеральный директор
                                      Ибрагимов Фазилназар Яхъяевич.



Fayzullaev Declaration

Exhibit D

**Unofficial Translation**                                              **Fayzullaev Decl., Ex. D**

"CONFIRMED"                        "REGISTERED"


By the General Meeting                 Department of justice

of participants of the                 of Tashkent region of the

                                       Republic of Uzbekistan

joint venture

Minutes of general meeting             № 13
№ 13 dated 11 October 2005             dated 7 November 2005


# CHARTER

## OF THE UZBEK-SWISS AGROINDUSTRIAL JOINT VENTURE


## "MUZIMPEX"


### Limited liability Company


**Tashkent 2005**

**Article 1. Constitutors of Joint Venture.**

Uzbek-Swiss agro industrial Joint Venture "Muzimpex" –Limited Liability Company, established in accordance with laws of the Republic of Uzbekistan regarding "Limited Liability and Additional Liability Companies, "Foreign Investments", and "Guarantees and Measures on Protection of Foreign Investors Rights" by the following entities:

- "Zeromax GmbH", established under the laws of Switzerland, with registered address at Bahnhofstrasse 7, CH-6300 Zug, Switzerland.

- "RTPF-TIJORAT" public corporation, registered by # 733 dated 3 June 1998 by the decree of khokim of Yunus-Abad district of Tashkent, with registered office is located at: 25, Navoi street, Shaihantohur district, Tashkent.


**Article 2. The name and postal address of the JV**


2.1. The name of the JV
2.1.1. The full name of the JV:

- In Uzbek: Masuliati cheklangan jamiyat shaklidagi "MUZIMPEX" Ozbekiston- - Shveysariya  agrosanoat qoshma korxonasi;

- In Russian: Узбекско - Швейцарское агропромышленное совместное предприятие «МУЗИМПЕКС» в форме общества с ограниченной ответственностью.

- In English: Uzbek-Swiss agro industrial joint venture "MUZIMPEX", LTD.


2.1.2. Abbreviation of the joint venture:

In Uzbek: "MUZIMPEX" KK;
In Russian: СП "MUZIMPEX"
In English: "MUZIMPEX"JV

2.1.3. The postal address and location of the JV: 11, Loyihachi street, Nazarbek, Zangiota district, Tashkent region, Republic of Uzbekistan , 702043.

**Article 3. Objectives, powers and operation of the company.**

3.1. The primary purpose of the JV shall be the development of high technologies in sphere of production of manufactured products, and market saturation with high-quality consumer goods and cultivating, manufacturing, processing, storage and sales of agricultural products, rendering of service and carrying out works in the interests of incorporators and the JV.

3.2. The main kind of business activities of the JV are as follows:

- Management of the warehouse depots (customs warehouse), farm-houses; production, processing, and sale of the agricultural production, freezing of fruits and vegetables;

- Production and sale of the manufactured goods and foodstuffs via its own shops;

- Production and sale of still and sparkling drinking water

- Production and sales of packages/containers and furniture;

- Renovation and reconstruction of the living quarters, improvement and finishing works;

- Production, sales and maintenance of the sanitary engineering;

- Increasing various press products, editing, artistically decorating, binding/boarding, carton and polygraphy works;
- Opening Company stores and setting up distribution network through which to engage in wholesale and retail;
- Certification of products and services, customs declaration services (brokers, agents, customs intermediary);
- Advertising activity;
- Rendering of financial assistance;
- Import-export operations.

3.3. Foreign economic activity of the JV is conducted in accordance with the existing laws.

3.4. In case if the JV will need to get a license from the State agencies, this kind of activity will be carried out only after getting of this license granted.


**Article 4. Governing organs**

4.1. The joint venture shall have the following governing bodies:
- The General Meeting of the Participants
- Supervisory Board (Board of Directors)
- Audit Committee

4.2. The highest governing body of the joint venture is the General Meeting of the Participants. Every Participant can revoke the appointed member of the General meeting at any time. The Director General can take part in the General Meeting without the right of voting.

4.3. A legal entity (the participant of the enterprise) can be represented in a meeting directly by its director or by any other person, acting on the basis of the Power of Attorney, issued by the Participant of the Joint venture. The Participant reserves the right to replace the member of the General Meeting appointed earlier.

4.4. The General meeting is authorized to make decisions in every aspect of the JV activities.

**Absolute Authorities/Sole Competence of General Meeting:**

- The determining the main activities of the Joint venture;
- Making amendments to the Charter capital of JV;
- Making amendments to the constituent documents of JV;
- Forming the executive bodies of JV and terminating their powers beforehand;
- Electing auditing committee and terminating its powers beforehand;
- Approval of annual reports and financial statements;
- Making decisions regarding the distribution of dividends to the participants of JV;
- Creating and approving regulating documents (bylaws), governing the activities of JV bodies;
- Making decisions regarding the reorganization or dissolution of JV.

4.5. General Executive Body

General Executive Body of JV is General Director who is elected by the General Meeting of the Participants for the term of five years. General Director is responsible for the management of daily operations of JV.

General Director is responsible for the management of the following:

- Conducting business activities on behalf of JV without Power of Attorney, which includes representing the interests of JV and concluding contracts on its behalf;
- Implementing the application of IT and communications technology, rendering IT services;
- Marketing, leasing, holding, representative, dealer and other type of services;
- Organization of exhibitions and trade fairs;
- Setting up medical institutions, hospitals, polyclinics, and stomatology clinics, rendering medical and stomatological services;
- Engagement in pharmacy activities, collecting, processing and sale of the medicinal herbs;
- Construction and maintenance of hotels, camping-sites, etc;
- Construction, rent, and security of automobile parking spaces, maintenance of automobiles, including car-washing services;
- Organization of various cultural and sport events, show-programs, discos, lottery games, and billiard clubs and games;
- Purchase, sale, rent, and  maintenance of vehicles;
- Delivery and sale of  oil products, opening petrol and lube stations;
- Montage, repair, construction, architectural, and roadway maintenance works;
- Production and sale of confectionery and bakery products (cookies, biscuits, etc.)
- Production and sale of meat, milk, and poultry products;
- Setting up and running laundry facilities;
- Repair and usage of audio, video and other home appliances, electrical equipment;

- Production of apparel, knitted garments, and special uniforms;
- Organization of cable TV broadcasting, installation of satellite dishes (antennas), and video rental stores;
- Production of consumer goods, organization of trading and intermediary activities, purchase of goods for stores' own and outsourced funds on consignment basis;
- Conducting engineering, scientific research, test designing, repair, montage, implementation, adjusting and testing works;
- Production of technical and woodworks;
- Processing of waste, secondary raw material, and useless products;
- Setting up public catering facilities, such as: restaurants, bars, cafes, and clubs;
- Artistic works — decorative and designing works;
- Setting up automobile service centers, repair of special equipment, and rendering technical service;
- Activities in the sphere of international and local tourism;
- Production and repair of footwear and leather goods;
- Transportation of passengers and goods by railway, air, and motor transport;
- Organization of warehouses for trade, industrial and other organizations;
- Production and metal products, woodworking, and production and sale of woodwork;
- Production and sale of the soft drinks and ice-cream;

Also, General Director:
- is in charge of cash and other assets of JV;
- concludes and terminates employment contracts with employees, applies motivating incentives and disciplinary punishments to employees;
- issues Power of Attorney to act on behalf of JV;
- has a right make decisions regarding any other issue of JV which is not in the sole competence of General Meeting.

ratification of plans and reports on its execution.

4.6.2. Alteration and amendment to the Charter of the joint venture.

4.6.3. Election, dismissal of the members of executive board and inspection commission and approval of the order of their activities .

4.6.4. Approval of the annual results of the economic activities of the enterprise, including it's subsidiaries, and also the reports and certificates of the inspection commission, the order of reward distribution, dividends, and replacement of damages.

4.6.5. The establishing, reorganization and dissolution of the subsidiaries, representations, ratification of the statutes of these structures with the Charter Fund exceeding 30% of the Charter fund of the joint venture.

4.6.6. Making decisions on bringing to the property accountability of the officers of the JV, changes in the Charter Fund, acceptance of new participants, determination of the work conditions of the officials of the governing body of the enterprise, its subsidiaries and representations, dissolution of the enterprise, designation of the liquidation commission, ratification of the liquidation balance, establishing of size, form and order of contribution of the "additional" payments, acquisition of the participatory interests by the joint venture, affiliation or dismissal of the Participant to and from the enterprise, in accordance with the art.34, 36 of the law of Uzbekistan "About the limited liability companies"

4.7. The General meeting is authorized to pass some issues, related to the competence of the general meeting, for consideration of the board of directors of the JV, consisting of 4 persons and are being elected for the period of 5 years.

4.8. The board of directors presides the current activities of the joint venture and the head of the board of directors is the Director General and his first deputy.

4.9. The Director General is being appointed by the decision of the General Meeting and resides the activities of the joint venture within the framework of its competence and rights, determined by the Charter and decisions of the General meeting.

4.10. **Director General of the Joint venture**

- organizes a preparation  and execution of the decisions of the General meeting and submits reports about  execution of these decisions
- disposes of the JV, including its assets in limits ,determined by the General meeting
- signs agreements without POA on behalf of the JV, employs and dismisses the employees and workers
- other functions arising from this Charter
- represents the JV at all institutions,organizations and enterprises,including the official organs of countries-participants on all issues of the JV activities within the limit of competence of the present Charter.

  The Director General has a right to make decisions on any other issues of the JV out of the General meeting's terms of reference


4.6. <u>The Audit Committee</u>

4.6.1. The financial and economic activities of the JV are controlled by the Audit Committee. Consisting of 3 people, members of the Audit Committee are appointed by the General Meeting for the term of 5 years.

4.6.2. The Audit Committee is responsible to submit to the General Meeting its report on conducted audit and its conclusion on annual reports.

4.6.3. Members of the Supervisory Board can not be the members of the Audit Committee.

The Audit Committee has a right to request the submission of all necessary documents, including accounting documents and explanatory letters from responsible officers of JV.

4.6.4. An unscheduled audit can be conducted on demand of one of the Participants or the General meeting.

4.6.5. The audit of financial and production activities of JV will be performed by invited auditors, also tax and finance authorities.

**Article 5. The Rights and Obligation of the JV Participants**

5.1. The JV Participants Have the Following Rights:

- Participating in the performance of social works as duly established by the law and constituent documents;
- Getting a report on activities of JV, also reviewing accounting and other documents;
- Participating in the process of profit division;
- Sale or transfer by other means whole or some portion of its own participating interest in the Charter capital of JV to one or more participants as stipulated in the law and constituent documents;
- Withdraw from the JV regardless the consents of other participants in accordance with the law and constituent documents;
- In case of dissolution of JV, the Participant is entitled to get appropriate portion of assets or their cost after the settlement of creditors debt;
- And other rights as stipulated in the law.

5.2. The JV Participants Have the Following Obligations:

- Contribute in the amount, manner and term in compliance with the law and constituent documents;
- Not to disclose confidential information about the business activities of JV;
- Perform other obligations in compliance with the law and constituent documents.


**Article 6. Charter Capital**

6.1. In order to support the business activities of JV, Charter capital is formed through contributions of the Participants in the amount of $10,376,300 (ten million and three hundred seventy six thousand and three hundred US dollars).

6.2. The contributions to the Charter capital are made by the Participants of the joint venture in accordance with the order established in the joint venture Agreement:

- The foreign Participant "Zeromax GmbH" (Switzerland) contributes cash and other assets (in kind) in the amount of $8,415,300 (eight million and four hundred fifteen thousand and three hundred US dollars) which constitutes 81.11% of participatory interest in the Charter capital.
- Uzbek participant – "RTPF-TIJORAT" JSC Republic of Uzbekistan contributes property, (in kind) in the amount of $1,960,000 (one million and nine hundred sixty thousand US Dollars) which constitutes 18.89% of participatory interest in the Charter capital.


6.3. The Charter capital of the JV may be increased by contributing whole or some potion of profits from the economic activity of the JV, and in case of the necessity, by means of additional investments from its Participants or by joining new participants.

6.4. The Participant of the joint venture, who made his contribution in full, will get a certificate which does not belong to the category of securities.

6.7. The Participants, who violate obligations on contribution to the Charter capital, are subject to the property accountability in accordance with the law.

**Article 7. The Participants Withdrawal Procedures from JV, Transfer of Participatory Interest to another Person**

7.1. The participant withdraws from JV in compliance with the laws of the Republic of Uzbekistan and constituent documents of the JV.

7.2. By reaching mutual agreement, the Participants can transfer their interests to other Participants or to third parties. In case of a third party transfer, a third party becomes the successor of all rights and obligations of a transferor.

7.3. When the Participant withdraws his participatory interest in the Charter capital will be reimbursed in natural form, or its equal value will be paid. Reimbursements will be made after the submission of annual reports.

**Article 8. Representations and Subsidiaries of JV**

8.1. The joint venture is entitled to establish its subsidiaries and branches on the territory of countries of Participants as well as in other countries with corporate privilege and the right to open a checking and settlement accounts with the Charter fund up to 30% from the Charter fund of the Joint venture.

8.2. All subsidiaries, branches and divisions shall act in accordance with the Charters or bylaws, approved by the General Director of the joint venture.

8.3. The Joint venture is entitled to establish its representative offices in the Republic of Uzbekistan and abroad.

**Article 9. Allocation of revenues, settlement of losses and establishment of funds.**

9.1. The profits of the Joint venture are used for forming special funds of the JV, for payments to the State budget, and distribution among the Participants.

9.2. The joint venture forms the reserve fund in the amount of not less than 15% of the Charter capital. Annually, not less than 5% of the net profit will be allocated to the reserve fund.

9.3. The joint venture has a right to establish other kinds of funds necessary for carrying out its business activities.

9.4. Rest of the net profit of JV, after all payments to the State budget and other obligatory payments are made, necessary allocations to existing funds are made, are distributed among Participants on pro rata basis in accordance with their participatory interest in the Charter capital.

9.5. The portion of the profit subject to distribution is paid to the Participants of the JV in terms, fixed by the General Meeting of the Participants of the JV at the end of the fiscal year.

9.6. Losses which may occur during the JV operation are covered by the Reserve Fund of the joint venture. If the Reserve Fund is insufficient to cover all losses, the General Meeting will determine the other source for covering these expenses.

**Article 10. Financial activity and accounting**

10.1. The financial activity of the Joint venture is conducted on the basis of the annual financial plans. The financial year is a calendar year.

10.2. The accounting is done in soums, national currency of the Republic of Uzbekistan and in the foreign currency when it is necessary.

10.3. At the end of every financial year the board of management prepares an annual report on its economic and financial activities, including its annual balance sheet, profits, and losses in national currency of the Republic and in foreign currency.

10.4. The annual report on economic and financial activities and the report on profits and losses are submitted to the Audit Committee and to the members of the General meeting of the joint venture.

**Article 11. Labour Remuneration and Social Guarantees**

11.1. The Joint Venture shall determine the forms and amount of remuneration of labour independently taking into account the lowest levels of labour rights and guarantees in accordance with the legislation of the Republic of Uzbekistan.

11.2. Working and off days of employees are determined in accordance with the labour law of the Republic of Uzbekistan.

11.3. The rights and guarantees of employees for additional/over time work are determined according to social contracts, other local documents, and also employment contracts between employer and employee.

**Article 12. Effectiveness of the JV Charter**

12.1. This Charter shall become effective upon its duly State registration.

12.2. All amendments and alterations to the Charter are made in writing, signed and stamped by the authorized persons and registered in accordance with the applicable law.

12.3. The Charter is drawn up in Uzbek and Russian languages, in four copies,
with each copy having the equal legal effect.

**Signatures and seals of the participants:**

"Zeromax GmbH" – the First Deputy CEO, Gulomjon Gafurkulovich Imanazarov,
And
"RTPF-Tijorat" – General Director, Mr. Radjapov Bakhrom Yusupovich

Тошкент  вилояти
Адлия бошқармаси томонидан
2005 йил "__" __ябрда
№ __ билан
РЎЙХАТГА ОЛИНГАН

Қўшма  корхона
Иштирокчиларнинг
2005 йил "__" октябрдаги
№ __  баённомаси билан

ТАСДИҚЛАНГАН

МАСЪУЛИЯТИ  ЧЕКЛАНГАН  ЖАМИЯТ  ШАКЛИДАГИ

## "MUZIMPEX"
## ЎЗБЕКИСТОН – ШВЕЙЦАРИЯ
## АГРОСАНОАТ  ҚЎШМА  КОРХОНАСИНИНГ

# УСТАВИ
(Янги таҳрири)

Тошкент – 2005 йил

### 1-Модда. Қўшма корхонанинг муассеслари

Масъулияти чекланган жамият шаклидаги "MUZIMPEX" Ўзбекистон – Швейцария агросаноат қўшма корхонаси Ўзбекистон Республикасининг "Масъулияти чекланган ҳамда қўшимча масъулиятли жамиятлар тўғрисида", "Чет эллик инвесторлар ҳуқуқларининг кафолатлари ва уларни ҳимоя қилиш чоралари тўғрисида"ги қонунларига мувофиқ қуйидаги юридик шахслар томонидан тузилди:

- Компания «ZEROMAX GmbH» Швейцария қонунчилиги асосида рўйхатга олинган. Манзили:  Bahnhofstrasse 7, CH – 6301, Zug, Switzerland.
- «RTPF – TIJORAT» ОАЖ  / Ўзбекистон Республикаси / Тошкент ш. Юнусобод тумани Хокимининг 1998 йил 3 июндаги 733 сонли қарори билан рўйхатга олинган. Жойлашган жойи:  Тошкент ш., Шайхонтохур тумани, Навоий кўчаси, 25.

### 2-Модда. Қўшма корхонанинг номи  ва почта  манзили

2.1.Қўшма корхонанинг номи:

2.1.1.Тўлиқ номи:

- Ўзбек тилида: Masuliyati  cheklangan jamiyat shaklidagi «MUZIMPEX» Ozbekiston – Shveysariya agrosanoat qoshma korxonasi.
- Рус тилида: Узбекско- Швейцарское агропромышленное совместное предприятие «MUZIMPEX» в форме общества с ограниченной ответственностью.
- Инглиз тилида: Uzbekistan – Switzerland  agroindastril  Joint Venture «MUZIMPEX» in The Form of Ltd.

2.1.2. Корхонанинг қисқартирилган номи:

Ўзбек тилида:

- «MUZIMPEX» ҚК

Рус тилида:

- СП «MUZIMPEX»

Инглиз тилида:

- «MUZIMPEX» JV

2.1.3. Қўшма корхонанинг адреси ва жойлашган жойи:

702043, Ўзбекистон Республикаси, Тошкент вилояти, Зангиота тумани, Назарбек қўрғони, Лойиҳачи кўчаси, 11- уй.

### 3-Модда. Тузиш мақсади ва фаолият турлари

3.1. Қўшма корхона саноат товарлари ишлаб чиқариш соҳасида юқори технологияларни ривожлантириш, ички бозорни юқори сифатли халқ истеъмол товарлари билан бойитиш, қишлоқ хўжалиги маҳсулотларини  етиштириш, тайёрлаш, қайта ишлаш, сақлаш, реализация қилиш, хизматлар кўрсатиш ва фойда олиш учун фаолиятнинг бошқа турлари билан шуғулланиш мақсадида тузилган.

3.2. Қўшма корхона фаолиятининг асосий турлари ва йўналишлари бўлиб қуйидагилар ҳисобланади:

- Юк саройлари (божхона омборлари), фермер хўжаликлари тузиш, қишлоқ хўжалик маҳсулоларини етиштириш, тайёрлаш ва қайта ишлаш, мева ва сабзавотларни музлатиш;
- Озиқ-овқат ва саноат молларини, маҳсулотларини ишлаб чиқариш ва фирма дўконлари орқали сотиш;
- Газли ва газсиз сув ичимликлари қадоқлаш ишларини амалга ошириш, ишлаб чиқариш ва маҳсулотини сотиш;
- Уй ва саноат мебелларини, тараларни ишлаб чиқариш ва сотиш;
- Уй ва ишлаб чиқариш биноларини таъмирлаш, реконструкция қилиш, ободончилик ва ишлов бериш ишларини қилиш;
- Сантехникани ишлаб чиқариш, таъмирлаш ва сотиш;

- Барча турдаги босма махсулотларни кўпайтириш, тахрирлаш, бадиий безаш, мукавалаш ва картонлаш ишлари, полиграфия ишлари;
- Фирма дўконлари ва савдо шахобчалари очиш ва улар воситасида улгуржи-чакана савдо фаолиятини олиб бориш;
- Махсулот ва хизматларни сертификациялаш, товарларни шартнома асосида декларациялаш хизматини кўрсатиш (брокер, агент, божхона воситачиси)
- Реклама фаолияти;
- Молиявий ёрдам кўрсатиш;
- Импорт-экспорт операциялари;

3.3. Қўшма корхона ташки иктисодий фаолиятни амалдаги конунларга мувофик амалга оширади.

3.4. Жорий конунларга мувофик рухсат олиниши шарт бўлган фаолият турларини корхона белгиланган тартибда тегишли рухсатнома олингандан кейингина амалга оширишга хаклидир.

### 4- Модда. Қўшма корхонанинг бошкарув ва назорат органлари

4.1. Қўшма корхонанинг бошкарув ва назорат органлари куйидагилардан иборат:
- Жамият иштирокчиларининг умумий йиғилиши;
- Кузатув кенгаши;
- Яккабошчилик асосидаги ижро этувчи орган – Бош директор;
- Тафтиш комиссияси.

4.2. Қўшма корхонанинг олий органи бўлиб иштирокчиларнинг Умумий йиғилиши хисобланади. Хар бир иштирокчи истаган пайтда Умумий йиғилишга тайинланган дъзосини чакириб олиши мумкин. Йиғилишда, овоз бериш хукукисиз, лавозимига биноан корхона Бош директори хам катнашиши мумкин.

4.3. Умумий йиғилишда иштирокчи хисобланадиган юридик шахс рахбари бевосита ўзи ёки Қўшма корхона иштирокчиси томонидан берилган ишончномага асосан бошка шахс вакил бўлиб иштирок этиши мумкин. Хар бир иштирокчи илгари Умумий йиғилишга тайинланган вакилини истаган пайтда алмаштириши мумкин.

4.4. Умумий йиғилиш Қўшма корхона фаолиятининг барча масалаларини хал килишга хаклидир.

#### Йиғилишнинг мутлак ваколатига куйидагилар киради:
- Қўшма корхона фаолиятининг асосий йўналишларини белгилаш;
- Қўшма корхона Устав фонди (Устав капиталининг) микдорини ўзгартириш;
- Қўшма корхона таъсис хужжатларига ўзгартириш ва қўшимчалар киритиш;
- Қўшма корхонанинг ижро этувчи органларини тузиш ва уларнинг ваколатларини муддутидан олдин тугатиш;
- Қўшма корхона тафтиш комиссиясини сайлаш ва унинг ваколатларини муддатидан олдин тугатиш;
- Йиллик хисоботларни ва йиллик бухгалтерия балансларини тасдиклаш;
- Қўшма корхонанинг соф фойдасини иштирокчилар ўртасида таксимлаш тўгрисида карор кабул килиш;
- Қўшма корхона органларининг фаолиятини тартибга солувчи хужжатларни тасдиклаш (кабул килиш);
- Қўшма корхонани кайта ташкил этиш ёки тугатиш тўгрисида карор кабул килиш;

4.5. Яккабошчилик асосида ижро этувчи орган

Қўшма корхонанинг яккабошчилик асосида фаолият кўрсатадиган ижрочи органи Бош директордир. У иштирокчиларнинг Умумий йиғилиши томонидан 5 йил муддатга сайланади.

Бош директор қўшма корхонанинг кундалик фаолиятига рахбарлик килади.

Бош директор:
- Қўшма корхона номидан ишончномасиз иш юритади, шу жумладан унинг манфаатларини ифодалайди ва битимлар тузади;

- Электрон- хисоблаш ва коммуникация техникасини жорий килиш ва ишлатиш бўйича ишларни бажариш, информатика сохасида хизмат кўрсатиш;
- Маркетинг, лизинг, холдинг, вакиллик, дилерлик ва бошка турдаги хизматлар кўрсатиш;
- Кўргазмалар ва ярмаркалар ўтказиш;
- Ахолига тиббий ёрдам кўрсатиш , тиббиёт – даволаш муассасалари, поликлиника ва шифохоналар очиш, стаматология хизматлари кўрсатиш,стаматология шахобчаларини очиш;
- Аптекалар фаолиятини ташкил этиш, доривор ўт йигиш, кайта ишлаш ва савдосини ташкил этиш;
- Мехмонхоналар, кемпинглар куриш ва ишлатиш;
- Автомобил тўхтаб туриш жойларини куриш, ижарага олиш, уларни кўриклаш ва автомобилларга техник хизмат кўрсатиш ва ювиш;
- Маданий хордик, спорт – томоша тадбирларини, шоу программаларини, дискотекалар уюштириш, бильярд ўйинларини, клубларини, ўйингохларни ва лотерея ўйинларини ташкил этиш;
- Автомашиналарни савдо – сотиги, ижарасини ташкиллаштириш ва автомашиналарга техник хизмат кўрсатиш ва таъмирлаш;
- Нефт махсулотларини олиб келиш ва автомобилларга ёкилги куйиш, мой алмаштириш шахобчаларини очиш ва сотиш;
- Монтаж, таъмирлаш, курилиш, меъморчилик ва йўл ишлари;
- Нон, кандолатчилик махсулотларини ишлаб чикариш, сотиш (бисквит, печенье ва бошкалар);
- Гўшт – сут ва уй паррандалари махсулотларини етиштириш, тайёрлаш ва сотиш;
- Кир ювиш корхоналарини ташкил этиш ва ишлатиш;
- Аудио, видео техникаси ва бошка маиший аппаратураларни, электр жихозларни таъмирлаш ва ишлатиш;
- Тикувчилик, трикотаж махсулотлари ва махсус кийим ишлаб чикариш;
- Кабел телевидениеси студияларини уюштириш ва йўлдош антенналарини ўрнатиш, киновидеомахсулотлар прокати шахобчаларини уюштириш ва ишини амалга ошириш;
- Халк истеъмол молларини ишлаб чикариш, савдо, савдо-харид, воситачилик фаолияти, дўконларнинг ўз маблаглари ва четдан жалб этилган маблаглар хисобига, шунингдек комиссия (консигнация) шароитларида моллар харид килишини ташкил этиш;
- Лойиха, илмий-тадкикот ва тажриба-конструкторлик, таъмирлаш, монтаж, ишга тушириш, созлаш ишларини ва синовларни бажариш;
- Ишлаб чикариш – техникавий махсулотларини ишлаб чикариш ишлари, ёгочдан дурадгорлик махсулотларини ишлаб чикариш;
- Ишлаб чикариш чикиндиларини, иккиламчи хом-ашё ва нокерак махсулотларни тайёрлаш ва кайта ишлаб чикариш;
- Умумий овкатланиш корхоналарини, ресторан,бар, кафе, клублар ташкил этиш ва ишлатиш;
- Рассомлик –безатиш ишлари, дизайнерлик ишлари;
- Автосервис ташкил килиш, махсус асбобларни таъмирлаш ва техника хизмати кўрсатиш;
- Халкаро ва махаллий туризм сохасидаги фаолият;
- Пойафзал, чармдан килинган махсулотлар ишлаб чикариш ва таъмирлаш;

- Йўловчиларни ва юкларни темир йўл, хаво хамда автомобиль транспортида ташиш;
- Савдо,саноат ва бошка ташкилотлар учун омборларни ташкил килиш;
- Металлдан махсулотлар ишлаб чикариш, ёгочни кайта ишлаш, ёгочдан махсулот ишлаб чикариш ва сотиш;
- Салкин ичимликлар ва музкаймок ишлаб чикариш ва сотиш;

- Корхонанинг мулки ва пул маблағларини тасарруф қилади;
- Корхона ходимлари билан мехнат шартномалари тузади ва уларни бекор қилади, ходимларга нисбатан рағбатлантириш чораларини ва интизомий жазоларни қўллайди;
- Корхона номидан вакиллик қилиш ҳуқуқи учун ишончномалар беради;
- Иштирокчиларнинг умумий йиғилиши ваколатига кирмайдиган бошқа масалаларни ҳал қилади:

### 4.6. Тафтиш комиссияси

4.6.1. Корхонанинг молиявий фаолияти устидан назорат Тафтиш комиссияси томонидан амалга оширилади. Тафтиш комиссияси иштирокчилар Умумий йиғилиши томонидан 3 кишидан иборат таркибда 5 йил муддатга сайланади.

4.6.2. Тафтиш комиссияси Умумий йиғилиш олдида хисоб беради ва унга ўзи ўтказган тафтишлар хакида, шунингдек йиллик хисобот бўйича хулосаларни тақдим қилади.

4.6.3. Корхона маъмурияти вакиллари тафтиш комиссияси таркибига кириши мумкин эмас.

Тафтиш комиссияси корхонанинг мансабдор шахсларидан зарур материалларни, бухгалтерлик ва бошқа хужжатларни тақдим этишни, шахсий тушунтириш хатлари бериши талаб қилишга хақлидир.

4.6.4. Иштирокчилардан бирининг талаби бўйича ёки умумий йиғилиш қарорига асосан режадан ташқари тафтишлар ўтказилиши мумкин.

4.6.5. Корхонанинг молиявий ёки ишлаб чиқариш фаолиятини текшириш жалб қилинган аудиторлик хизматлари, шунингдек солиқ ва молия органлари томонидан амалга оширилади.

### 5-Модда. Қўшма корхона иштирокчиларининг ҳуқуқлари ва мажбуриятлари

#### 5.1. Қўшма корхона иштирокчиларининг хуқуқлари:

- Қонунда ва таъсис хужжатларида белгиланган тартибда жамият ишларини бажаришда иштирок этиш;
- Корхона фаолияти тўғрисида ахборот олиш ҳамда бухгалтерия дафтарлари ва бошқа хужжатлар билан танишиш;
- Фойдани тақсимлашда иштирок этиш;
- Корхонанинг устав фондидаги ўз улушини ёхуд унинг бир қисмини Қонунда ва таъсис хужжатларида назарда тутилган тартибда бир ёки бир нечта иштирокчига сотиш ёки ўзга тарзда уларга ўтказиб бериш;
- Бошқа иштирокчиларнинг розилигидан катъи назар Қонунда ва таъсис хужжатларида назарда тутилган тартибда исталган вақтда жамиятдан чиқиш;
- Корхона тугатилган тақдирда, кредиторлар билан хисоб-китоб қилинганидан кейин қолган мол-мулкнинг бир қисмини ёки унинг қийматини олиш;
- Қонунчиликда кўзда тутилган бошқа хуқуқлар.

#### 5.2. Иштирокчиларнинг мажбуриятлари:

- Қонунда ва таъсис хужжатларида назарда тутилган тартибда, микдорда, усулларда ва муддатларда хисса қўшиш;
- Корхона фаолияти тўғрисидаги сир тутиладиган ахборотни ошкор қилмаслик;
- Қонунларда ва таъсис хужжатларида кўзда тутилган бошқа мажбуриятларни бажариш.

### 6-Модда. Устав фонди (Устав капитали)

6.1. Қўшма корхонанинг фаолиятини таъминлаш учун иштирокчилар улушлари хисобидан 10.375.300 (ўн миллион уч юз етмиш беш минг уч юз) АҚШ доллари микдорида Устав фонди ташкил этилади.

6.2. Қўшма корхона иштирокчиларининг улушлари Устав фондига таъсис шартномасида ўрнатилган тартибда киритилади:

- Чет эллик иштирокчи - «ZEROMAX GmbH» (Швейцария) компанияси ўз улуши хисобига Устав фондига 8.415.300 (саккиз миллион тўрт юз ўн беш минг уч юз) АҚШ

доллари миқдорида пул воситаларини ва мулк (товарлар) киритади, бу Устав капиталининг 81,11 % ни ташкил этади.

- Ўзбекистонлик иштирокчи- «RTPF–TIJORAT»ОАЖ /Ўзбекистон Республикаси/ Устав фондига ўз улуши ҳисобига 1.960.000 (бир миллион тўққиз юз олтмиш минг) АҚШ доллари миқдорида мулк киритади, бу Устав капиталининг 18,89 % ни ташкил этади.

6.3.Қўшма корхонанинг Устав капитали корхонанинг хўжалик фаолиятидан олинган тушум ҳисобидан, зарур ҳолларда иштирокчиларнинг қўшимча бадаллари эвазига ёки янги иштирокчиларни жалб қилиш йўли билан ҳам оширилиши мумкин.

6.4. Ўз бадалини тўлиқ киритган Қўшма корхона иштирокчисига  қимматли қоғозлар сирасига кирмайдиган гувоҳнома берилади.

6.5. Қўшма корхона иштирокчилари корхона мулкига кирувчи айрим объектларга, шунингдек иштирокчилар томонидан Устав капиталига бадал сифатида киритилган объектларга нисбатан алоҳида ҳуқуққа эга эмаслар.

6.6.Иштирокчилар ҳиссаларини қўшиш бўйича мажбуриятларини бузганлик учун қонунда ўрнатилган тартибда  моддий ва мулкий жавобгарликка тортиладилар.

## 7-Модда. Иштирокчининг жамият таркибидан чиқиш тартиби, иштирокчи улушининг бошқа шахсга ўтиши

7.1. Иштирокчи Қўшма корхона таркибидан Ўзбекистон Республикасининг қонунлари ва корхонанинг таъсис ҳужжатларида белгиланган шартлар асосида ва тартибда чиқади.

7.2. Қўшма корхона иштирокчилари ўзаро келишиб  ўз улушларини  бошқа иштирокчиларга ёки учинчи шахсларга беришлари мумкин. Бундай ҳолда учинчи шахс унинг барча мажбуриятлари ва ҳуқуқлари бўйича ҳуқуқий ворис бўлиб қолади.

7.3. Иштирокчи Қўшма корхона сафидан чиқса, унга корхонанинг Устав фондидаги улуши натура ҳолида қайтариб берилади ёки унинг қиймати тўланади. Тўловлар йиллик ҳисоботдан сўнг амалга оширилади.

## 8-Модда. Жамият ваколатхоналари ва филиаллари

8.1. Қўшма корхона иштирокчилар мамлакатлари ҳудудларида, шунингдек учинчи давлатлар ҳудудида юридик шахс мақомига эга бўлган, Қўшма корхона Устав фондининг 30 % фоизидан кўп бўлмаган миқдорда Устав фондига эга бўлган шуъба корхоналар, ўз жорий ва ҳисоб рақамларига эга бўлган филиаллар ва бўлимларни очишга ҳақли.

8.2. Шуъба корхона, филиаллар, бўлимлар Қўшма корхонанинг Бош директори томонидан тасдиқланган Устав ёки Низомлар асосида ҳаракат қиладилар.

8.3.Ўзбекистон Республикасида, шунингдек чет элда Қўшма корхона ўз ваколатхона – ларини очиш ҳуқуқига эга.

## 9-Модда. Фойданинг тақсимланиши, зарарларнинг қопланиши, ташкил қилинадиган фондлар

9.1. Қўшма корхонанинг хўжалик фаолиятидан олинган фойда корхонанинг махсус фондларини тузишга, давлат бюджети билан ҳисоб-китоб қилишга ва иштирокчилар ўртасида тақсимлаш учун сарфланади.

9.2. Қўшма корхона Устав капиталининг 15 % идан кам бўлмаган миқдорда захира фойди ташкил қилади. Захира фондига ҳар йили соф фойданинг 5 % идан  кам бўлмаган миқдорда маблағ ажратилади.

9.3. Қўшма корхона ўз фаолияти учун зарур бўлган ва ўз ихтиёрида бўладиган бошқа фондларни ҳам ташкил қилишга ҳақли.

9.4. Қўшма корхонанинг соф фойдаси , давлат бюджетига солиқлар ва бошқа мажбурий тўловлар амалга оширилгандан, фондларни тўлдириш учун маблағлар ажратилгандан сўнг корхона иштирокчилари ўртасида уларнинг Устав капиталидаги улушларига мутаносиб равишда тақсимланади.

9.5. Фойданинг тақсимланадиган қисми Иштирокчиларга молия йили тугагандан сўнг, Қўшма корхона иштирокчиларининг Умумий йиғилиши томонидан белгиланган муддатда тўланади.

9.6. Қўшма корхонанинг фаолияти давомида вужудга келган зарарлар захира фойди хисобидан қопланади. Зарарни қоплаш учун захира фойдининг маблағлари етмаса, бошқа манбаларни аниклаш учун Умумий йиғилиши қарор қабул қилади.

## 10-Модда. Молиявий фаолият, хисоб ва хисобот

10.1 Қўшма корхонанинг молиявий фаолияти йиллик молиявий режа асосида амалга оширилади. Календарь йили молия йили деб хисобланади.

10.2. Амалий бухгалтерия хисоби ва хисобот Ўзбекистон Республикасининг пул бирлигида, зарурият туғилганда эса хорижий валютада хам олиб борилади.

10.3. Молиявий йил тугагач Дирекция Қўшма корхонанинг молиявий ахволи ва иқтисодий фаолияти тўғрисида йиллик хисобот, жумладан Ўзбекистон Республикаси пул бирлигида ва хорижий валютада йиллик баланс, фойда ва зарарлар бўйича хисобот тузади.

10.4. Қўшма корхонанинг иқтисодий ва молиявий фаолияти тўғрисидаги йиллик хисобот, даромад ва зарарлар хақидаги хисобот Тафтиш комиссиясига ва Қўшма корхона иштирокчилари Умумий йиғилиши аъзоларига тақдим этилади.

## 11-Модда. Мехнатга хак тўлаш ва мехнат жамоаси учун ижтимоий кафолатлар

11.1. Ходимларнинг Ўзбекистон Республикаси қонунларида кўрсатилган мехнат ҳуқуқлари ва кафолатларининг энг паст даражасини хисобга олган холда, Қўшма корхона иш хақи ва моддий рағбатлантиришнинг шакллари ва миқдорларини мустақил равишда белгилайди.

11.2. Ходимларнинг мехнат қилиш ва дам олиш масалалари Ўзбекистон Республикасининг мехнат қонунчилиги бўйича амалга оширилади.

11.3. Қонун хужжатларидагига нисбатан қўшимча мехнат ҳуқуқлари ва кафолатлари жамоа шартномаси, бошқа локал хужжатлар, шунингдек ходим ва иш берувчи ўртасида тузилган мехнат шартномалари ва келишувлари билан белгиланади.

## 12-Модда. Уставнинг кучга кириши

12.1. Мазкур Устав қонунда ўрнатилган тартибда давлат рўйхатидан ўтган кундан бошлаб кучга киради.

12.2. Уставга киритиладиган қўшимчалар ва ўзгартиришлар ёзма равишда бўлиши, томонларнинг ваколатли шахслари томонидан имзоланиши ва ўрнатилган тартибда рўйхатдан ўтказилиши шарт.

12.3 Устав бир хил юридик кучга эга бўлган ўзбек ва рус тилларида тўрт нусхада тузилган.

«PYROMAX GmbH» Компанияси _____ Ижрочи директорнинг биринчи
                                                ўринбосари

                                                Имамназаров Гуламжан Гафуркулович

«_____» ОАЖ _____ Бош директор

                                                Раджапов Бахром Юсупович



Республика Узбекистан
город Ташкент                    *ноября* 2005 г.
Я, *Содиков И.*, нотариус нотариальной конторы
*года Ташкента, свидетельствую подлинность подписи гр.*
*Каримова Шухрат*, которая сделана в моем присутствии.
Личность подписавшего документ установлена.
Зарегистрировано в реестре за № *1-2076?*
Взыскано по установленной ставке          *970*
Нотариус

**ЛИЦЕНЗИЯ**
**TN № 000101**
**ВЫДАНА 08.10.1998 ГОДА**
**УПРАВЛЕНИЕМ ЮСТИЦИИ**
**ГОРОДА ТАШКЕНТА**

"*08 ноября*" 200*5* й. Мен,
тумян хусусий амалиёт билан шугулланувчи нотариус
"*Косирш*"ни хужжатнинг аслига тўгри эканлигин гувохла бераман, учириб ёзиш, қушиб
ёки бирилмай тузатилган сўзлар ёки октиборга тортувчи алохида хозатлар учрамади.

**ПУЛАТОВ. Х.**

Реестр № *8493* билан қайд қилинди.
Тариф *3200* сўм ундирилди.
Нотариус

# Erb Declaration

# Exhibit F (Part II of II)

Fayzullaev Declaration

Exhibit E

Unofficial Translation                                        **Fayzullaev Decl., Ex. E**

# CERTIFICATE

## of State Registration of the Legal Entity

Registration number  No.__13_____No.176

__November 9, 2005_____

This certificate has been given to ___"MUZIMPEX" Ltd. Uzbek-Swiss Joint Venture_____

_____"MUZIMPEX" M.Ch.J. QK __("MUZIMPEX" Ltd. JV )_____
(Full and abbreviated names of the Company)

___in accordance with the resolution adopted by the Committee of the Department of Justice of_____

__Tashkent Region on November 7, 2005, Minutes No.42._____

| | |
|---|---|
| Type of Legal Formation: | 1153 |
| Type of Ownership: | 161 |
| Address: | 1727237836 |
| Code of Legal Entity: | 18651838 |
| Industry Code: | 21140 |
| Identification Number of Tax Payer: | 204397527 |
| Additional Information | |

**Head of Authorized Body**                                   **B. Atamatov**

*Seal of the*
*Department of*
*Justice of the*
*Tashkent Region*



Yuridik shaxsni davlat ro'yxatidan o'tkazish to'g'risida

# GUVOHNOMA

Reestrdagi tartib raqami № 13        № 176

2005 y. "9 " ноябр

Mazkur guvohnoma firma nomi   Mas'uliyati cheklangan jamiyat shaklidagi

"MUZIMPEX" O'zbekiston-Shvesariya qo'shma korxonasi

"MUZIMPEX" M.Ch. J. QK

(O'zbek tildagi to'liq va qisqartirilgan firma nomi)

shaxsga Тошкент вилоят Адлия бошқармасида ташкил
(Toshkent viloyati adliya boshqarmasi)

этилган комиссиянинг 7 ноябр 2005 йилдаги

42-сонли баённ

ning qaroriga asosan berildi.

| | |
|---|---|
| Tashkiliy-nuquqiy shakli: | 1153   THSH |
| Mulkchilik shakli: | 161   MSH |
| Pochta manzili: | 1727237 36   M.JOBT |
| Yuridik shaxs kodi: | 18651833   KTUT |
| Tarmoq kodi: | 21140   XXTUT |
| Soliq to'lovchining identifikatsiya raqami: | 204397527   STIR |

Qo'shimcha ma'lumotlar:

Vakolatli organ rahbari:   В. Атамагов

(Imzo)

"29" ноябрь 200 5 н. Мен,_____ Заявлэл
түмэн хүүгэй шилжин төлөн үргэлжүүлэн налуруул_____ зургэ
_____ нь орд ийнхан хой _____ з алнэ улэн зуд буранд бирхан, фирмэй банк, хэлэй
_____ бригад. хуруулэлгэ - бэдрээлгэл алэрэвн нуургэ узэхэд дэтэлгэр юлэлзэр узэнэрэв.

гр № 5430 н оо пайдэлэмэл.
"170" эй узэрэлэл.
Нотлоруул:

Fayzullaev Declaration

Exhibit F

**Unofficial Translation**                                                                                                      **Fayzullaev Decl., Ex. F**

SUPREME ECONOMIC COURT
OF THE REPUBLIC OF UZBEKISTAN
*700097, Tashkent City, 6 Chuponata st.*
tel: 77-82-61

## DECREE

February 5, 2001/2                          **Tashkent**                          Case No. 2494/01-t

The judicial college of the Supreme Economic Court of the Republic of Uzbekistan, composed of: chairman Ubaidulloev K.I., judges Zakirova L.G. and Anortaev E., with participation of the representatives of the parties: for plaintiff - a head of department Dubrovskaya V.K. and lawyer Sultanov J.N.; for defendants: Ministry of Justice RU - leading counsel Farikov F.G.; State Property Committee - head of the legal department Gunin V.I. and head of inspectorate Imomaliev A.M.; JV "Coca-Cola Ichimligi Uzbekistan Ltd" – attorneys Tretyakova S.E. and Cherkashina T.E.; Company "Coca-Cola Export Corporation" – representative Askarov D.A., reviewed in judicial sitting cassational complaints of Company "Coca-Cola Export Corporation" (USA) and JV "Coca-Cola Ichimligi Uzbekistan Ltd" based on the decision of October 17, 2001 and decree of the appeal instance of the Economic Court of Tashkent city of December 4, 2001 on case N0. 2494/01-t, on petition of The State Committee for Demonopolization and Development of Competition of the Republic of Uzbekistan to the Ministry of Justice of the Republic of Uzbekistan, State Property Committee of the Republic of Uzbekistan and JV "Coca-Cola Ichimligi Uzbekistan Ltd" on acknowledgment of the acts of the State agencies as invalid,

has determined:

The Antimonopoly Agency addressed the Economic Court of Tashkent City with the petition to the State Property Committee of the Republic of Uzbekistan (hereafter "GKI RU"), Ministry of Justice of the Republic of Uzbekistan (hereafter "Minuyst RU") and JV "Coca-Cola Ichimligi Uzbekistan Ltd" on acknowledgment of orders of GKI RU No 242k-PR of 12.31.1997, No. 49 k-PR of 04.24.1998 and No. 78 k-PR of 04.17.2001, as invalid, and also, acknowledgment as invalid of protocols of Minuyst RU No. 318 of 03.17.1998 and No.638 of 04.19.2001 in part, concerning amendments in bylaws of the JV "Coca-Cola Ichimligi Uzbekistan Ltd."

The court's decision of 10.17.2001 (judge Tadjiev I.I.) satisfied petitioner's claims in full. Court also issued a private determination addressed to GKI RU, which entrust the State

Property Committee, in accordance with the accepted decision, to audit the shares of the cofounders in Charter fund of the JV.

The decree of the appeal instance of 12.04.2001 (chairman Umarov A.K, judges Boimakov B.M. and Danilova I.E.) reversed the decision. Decision of the court, in part of acknowledgment as invalid of the Orders of the GKI RU and Protocols of the Minuyst RU in parts addressing the changes in shares (in per cent correlation) of the "Coca-Cola Export Corporation" in Charter fund of the JV "Coca-Cola Ichimligi Toshkent Ltd" was annulled. All other parts of the decision were left without changes.

Disagreeing with the decision and the decree of the appeal instance, "Coca-Cola Export Corporation" (USA) and the JV "Coca-Cola Ichimligi Toshkent Ltd" addressed to Supreme Economic Court the cassational complaints, in which the JV "Coca-Cola Ichimligi Toshkent Ltd" asks to reverse all existing judicial acts issued in this case and to fully dismiss plaintiff's petition, and "Coca-Cola Export Corporation" (USA) asks to make the resolutative part of the decree of the appeal instance more specific, especially by providing what parts of the Orders of the GKI RU and the Protocols of the Minuyst RU were acknowledged as invalid by the decree of the appeal instance. After listening to the judge Zakirova L.G's report, and explanations of the representatives of the parties, study of the materials of the case, discussion of the claims of the cassational complaints, the judicial college finds the complaints unsupported, and does not find the basis to reverse the issued judicial acts.

As can be seen from the materials of the case, on August 25, 1993, the GKI RU issued the Order No. 545k-PR on establishments, on the basis of Tashkent soft drink plant together with the companies "Coca-Cola Export Corporation" and "Roz Trading Ltd" (Cayman Islands, UK), of a joint venture on manufacturing, bottling and wholesale of soft drinks in form of a limited liability company. In accordance with this Order, Tashkent soft drink plant, "Coca-Cola Export Corporation" (USA) and "Roz Trading Ltd" (Cayman Islands, UK) signed an Agreement on incorporation of JV "Coca-Cola Ichimligi Toshkent Ltd" and approved a charter according to which the chartered fund agreed to be equal to 5,307,000.00 USD, and allocated among the participants in equal shares (i.e. 33.33% per each). The bylaws of the established JV were registered by the Ministry of Finance of RU in October 8, 1993.

Based on the inquiries made by "Roz Trading Ltd" of 07.30.1997 and Association "Pisheprom" of 09.04.1997 No.6/10-182, and also minutes of the meetings of cofounders of the JV of 04.06.1995; 01.30.1996 and 12.23.1996, the GKI RU on 12.31.1997 issued the Order No. 242 k-PR, where the GKI RU gave its consent to the increase of the charter fund of JV to 14,807,000.00 USD, and it was noted that the shares of the cofounders of the JV "Coca-Cola Ichimligi Toshkent Ltd" in its charter fund were re-allocated as follows:

- Association "Pisheprom"          – 1,947%
- "Coca-Cola Export Corporation"   – 32,998%
- "Roz Trading Ltd"                – 55,055%

It was instructed pursuant to p. 3 of this Order to sell a part of state share in the JV charter fund equal to 9,947% to a subsidiary of "Roz Trading Ltd," a foreign enterprise "Roz Trading Ltd" Uzbekistan, registered in the Republic of Uzbekistan, and pursuant to p.6 of the same Order it was established, that following the above mentioned sale the allocation of the shares in the charter fund would be as follows:

- Association "Pisheprom"          – 2%
- "Coca-Cola Export Corporation"   – 32,998%
- "Roz Trading Ltd"                – 65,002%

Therefore, according to the Order No.242k-PR, the share of the foreign company "Roz Trading Ltd" Uzbekistan (in the amount of 9,947%) was included in the share of "Roz Trading Ltd" and consists of 65,002%.

In pursuance of the above Order the JV participants held a general meeting on March 9, 1998, thereby they resolved to amend the JV bylaws. At the same meeting it was decided to increase the charter fund of JV to 14,807,000.00 USD with the following allocation of the shares:

- Association "Pisheprom"          – 2% (or 296,140.00 USD)
- "Coca-Cola Export Corporation"   – 32,998% (or 4,886,014.00 USD)
- "Roz Trading Ltd"                – 65,002% (or 9,624,846.00 USD)

During the same meeting, Tashkent soft drinks plant was re-named to Association "Pisheprom."

The above said amendments to the JV' s bylaws were registered by the Ministry of Justice of the Republic of Uzbekistan on March 17, 1998 (protocol No.318).

The State Property Committee was informed and issued Order No.49k-PR of 04.24.1998 based on the sale and purchase agreement signed by Association "Pisheprom", State Property Committee and a foreign enterprise "Roz Trading Ltd" on acquisition of 9,947% of the state share in the charter fund of JV "Coca-Cola Ichimligi Toshkent Ltd" and Association "Pisheprom", together with the cofounders of the JV recommended to make as appropriate changes to the JV bylaws.

Later, in accordance with the decision of a general meeting of the cofounders of the JV "Coca-Cola Ichimligi Toshkent Ltd" of March 27, 2001, a part of the share of "Roz Trading Ltd" in chartered fund of JV, in the amount of 9,884% was sold to "Coca-Cola Export Corporation," and also EP (foreign enterprise) "ROZ Trading Ltd" (Uzbekistan) was admitted with a share, purchased from Association "Pisheprom" and equal to 9,947%, in the JV's charter fund.

Based on the given resolution of the cofounders of April 17, 2001, the State Property Committee of the Republic of Uzbekistan issued Order No. 78k-PR "On amendments to the orders of the GKI of 12.31.1997 No.242 k-PR and of 04.24.1998 No.49 k-PR," which acknowledged that the chartered fund of the JV "Coca-Cola Ichimligi Toshkent Ltd" was allocated as follows:

- Association "Pisheprom"          - 2% (or 296,140.00 USD)
- "Coca-Cola Export Corporation"   - 42,882% (or 6,349,538.00 USD)
- "ROZ Trading Ltd"                - 45,171% (or 6,688,470.00 USD)
- EP "ROZ Trading Ltd"             - 9,947% (or 1,472,852.00 USD)

The above said amendments to the bylaws of the JV were registered by the Ministry of Justice RU on April 19, 2001 (protocol No.638).

Believing that the above said acts of the State Property Committee and the Ministry of Justice of the Republic of Uzbekistan on alteration of the shares in the JV "Coca-Cola Ichimligi Toshkent Ltd" charter fund were issued without consent of the Anti-monopolistic Agency and in violation of Article 15 of the Law of the Republic of Uzbekistan "On Competition and Restriction of Monopolistic Activity in the Commodities Markets," the Anti-Monopoly Agency petitioned the court demanding the invalidation of the above acts.

Article 15 of the Law of the RU "On Competition and Restriction of Monopolistic Activity in the Commodity Markets" provides that with the preliminary consent of the State Antimonopoly Agency, and on the basis of the petition of the managing subject:

- a person or a group of persons shall purchase stocks, shares with voting rights in the authorized capital of the managing subject, which gave such a person or a group of persons the option to dispose of more than 35% of the specified stocks, shares;

- acquisition by a person or group of persons of any rights, including those arising out of agreements, contracts, or by virtue of any commission and by any other way, allowing a legal entity to determine terms of conduction its business activity or to

perform executive functions.

Although "Coca-Cola Export Corporation" and "ROZ Trading Ltd" shares in the JV "Coca-Cola Ichimligi Toshkent Ltd" made up to more than 35%, the State Property Committee of the Republic of Uzbekistan has issued the Orders No.242k-PR of 12.31.1997, No.49k-PR of 04.24.1998 and No.78k-PR of 04.17.2001, and the Ministry of Justice of the Republic of Uzbekistan registered the amendments to the bylaws of the JV "Coca-Cola Ichimligi Toshkent Ltd" without taking into consideration the above mentioned requirements, and the Anti-Monopoly Agency' consent was not obtained.

In accordance with Article 3 of the Law of RU "On Competition and Restriction of Monopolistic Activity in the Commodity Markets" a group of persons is deemed to be that of persons to whom one or several conditions are applicable:

> - a person or several persons together by virtue of an agreement or concerted actions amongst them have the right to directly or indirectly dispose of, including an the basis of sale and purchase agreements, agreements on trusteeship, join activity, commission, lease and other transaction, either controlling block of shares or any other voting shares sufficient for having casting vote;

> - an agreement is concluded between two and more persons, whereby either party is entitled to determine conditions for running business of one or several parties to such an agreement or to function as their executive body;
> - a person has the right to appoint more than 50% of the Board or Supervisory body of two and more legal entities. For the purposes of this Law a group of persons is considered a single (unified) subject of entrepreneurial activity.

According to the Charter of a Foreign Enterprise "ROZ Trading Ltd," as registered by the Ministry of Justice of RU on September 14, 1999 (protocol No. 472) its founders are: "ROZ Trading Ltd" (Cayman Islands) and "ROZ Securities LLK" (Cayman Islands). "ROZ Trading Ltd" share in the Charter fund of EP "ROZ Trading Ltd" consist of 99,99%. Accordingly, "ROZ Trading Ltd" and EP "ROZ Trading Ltd" who are founders of the JV "Coca-Cola Ichimligi Toshkent Ltd," are deemed to be a group of persons. This fact was not however taken into account when the State Property Committee issued its Orders and the Ministry of Justice registered the amendments to the bylaws of the JV " Coca-Cola Ichimligi Toshkent Ltd."

In accordance with Article 12 of the Civil Code of the Republic of Uzbekistan (hereinafter "GK RU") as act of a state body which does not comply with the legislation and violates the

civil rights and interests of a citizens and legal entity which are subject to protection, may be held to be invalid.

Since the Orders of the State Property Committee No. 242k-PR of 12.31.1997; No. 49k-PR of 04.24.1998 and No. 78k-PR of 04.17.2001, as well as protocols of the Ministry of Justice of RU related to the registration of the amendments to the bylaws of JV "Coca-Cola Ichimligi Toshkent Ltd" are not in conformity with the law, they are subject to invalidation.

Taking into consideration all the above stated facts, court of the first instance adopted a decision to satisfy in full all of the stated claims. Also, the court issued a private determination which entrust the State Property Committee of RU to audit the shares of the cofounders in the charter fund of the JV and to bring them in conformity to the factual circumstances.

But the court of first instance when it issued its decision did not consider that "Coca-Cola Export Corporation" obtained the consent of the Antimonopolistic Agency for the purchase of a share of "Roz Trading Ltd." in the charter fund of the JV in the amount of 9,884% and subsequently to increase the share of the "Coca-Cola Export Corporation" to 42,882%. That is why the court of the appeal instance lawfully changed the decision of the Economic Court of October 17, 2001. The decision of the court in part where it acknowledges as invalid orders of the GKI RU and protocols of Minuyst RU on issues addressing changes of the amount of shares (in percentage distribution) of the "Coca-Cola Export Corporation" in the charter fund of "Coca-Cola Ichimligi Toshkent Ltd" is reversed. The remainder of the decision was left without changes.

To the claims of the "Coca-Cola Export Corporation" to restore the state registration of the general amount of the charter fund of the JV in the amount of 14,807,000 USD, it should be noted that on this question, the court of the first instance has issued a private determination entrusting the State Property Committee of the RU to audit the charter fund of the JV, therefore, this question will be decided by GKI of the RU together with the co-founders, in the established by law order, during the execution of the private determination of the court of October 17, 2001.

Arguments of "Coca-Cola Ichimligi Toshkent Ltd" about the worsening of the condition of investing can not be taken into consideration because petitioning the Antimonopolistic Agency for consent can not be a circumstance that will worsen the condition of investing.

The protocols of the Ministry of Justice on the registration of the bylaws and making amendments to it creates specific rights and obligations for the registered enterprise, its co-founders and third parties (tax agencies, state statistical bureau etc.), that is also why the

decision of the regional Khokim on registration of the entity is an act of the state agency. Therefore, the arguments of the JV that the protocols of the Ministry of Justice should not be considered as an act of a state agency can not be taken into consideration by the court.

Arguments about expiration of the statute of limitations are unsupported because according to Article 154 GK RU the statute of limitations begins to run from the day the person discovered or should have discovered the violation of his rights.

Therefore, cassation complaints of the JV "Coca-Cola Ichimligi Toshkent Ltd" and "Coca-Cola Export Corporation" are denied, the decision of the appeal instance of the Economic Court of Tashkent City of December 4, 2001 stands without change. Judicial expenses should be forwarded to the petitioners of the complaints.

Based on the above stated and governed by Articles 187 and 189 of the Economic Procedure Code of the RU, judicial college

## DETERMINED:

Decree of the appeal instance of the Economic Court of Tashkent City of December 4, 2001 on case number 2494/01-t stands without changes, cassation complaints of the JV "Coca-Cola Ichimligi Toshkent Ltd" and "Coca-Cola Export Corporation" are left without satisfaction.

This decree shall be in force from the moment of its adoption and is not subject to appeal.

Chairman                     Ubaidulloev K. E.
Judges                       Zakirova L.G.
                             Anortaiv I.A.



**УЗБЕКИСТОН РЕСПУБЛИКАСИ**
**ОЛИЙ ХУЖАЛИК СУДИ**
*700097, Тошкент ш., Чупонота к., 6*
*т : 77-82-61*

**SUPREME ECONOMICAL COURT**
**OF THE REPUBLIC OF UZBEKISTAN**
*700097, Tashkent city, Choponota st., 6*
*tel : 77-82-61*

# П О С Т А Н О В Л Е Н И Е

05 февраля 2002г.              г.Ташкент              Дело № 2494/01-т

Судебная коллегия Высшего хозяйственного суда Республики Узбекистан в составе председательствующего Убайдиллоева К.И., судей Закировой Л.Г. и Анортаева И., при участии представителей сторон: от истца – начальник управления Дубровская В.К. и юрист Султанов Ж.Н.; от ответчиков: Министерство юстиции РУ – главный консультант Фариков Ф.Г.; Госкомимущество РУ – начальник договорно-правового управления-Гугнин В.И. и начальник инспекции Имомалиев А.М.; СП "Кока-Кола ичимлиги Тошкент ЛТД" - адвокаты Третьякова С.Е. и Черкашина Т.Е.; Компания «Кока Кола Экспорт Корпорейшн» – представитель Аскаров Д.А., рассмотрев в судебном заседании кассационные жалобы Компании «Кока Кола Экспорт Корпорейшн» (США) и СП «Кока Кола ичимлиги Тошкент ЛТД» на решение от 17.10.2001г. и постановление апелляционной инстанции хозяйственного суда г.Ташкента от 04.12.2001г. по делу № 2494/01-т по заявлению Государственного комитета Республики Узбекистан по демонополизации и развитию конкуренции к Министерству юстиции Республики Узбекистан, Госкомимуществу Республики Узбекистан и СП "Кока-Кола ичимлиги Тошкент ЛТД" о признании недействительным акта государственного органа,

у с т а н о в и л а :

Государственный комитет Республики Узбекистан по демонополизации и развитию конкуренции обратился в хозяйственный суд г.Ташкента с заявлением к Госкомимуществу Республики Узбекистан (далее ГКИ РУ), Министерству юстиции Республики Узбекистан (далее Минюст РУ) и СП "Кока-Кола ичимлиги Тошкент ЛТД" о признании недействительными приказов ГКИ РУ № 242 к-ПР от 31.12.1997г., № 49 к-ПР от 24.04.1998г. и № 78 к-ПР от 17.04.2001г., а также признании недействительными протоколов Миноста РУ № 318 от 17.03.1998г. и № 638 от 19.04.2001г. в части внесения изменений в учредительные документы СП "Кока-Кола ичимлиги Тошкент ЛТД".

Решением суда от 17.10.2001г. (судья Таджиев И.И.) заявленные требования удовлетворены в полном объеме. Также судом в адрес ГКИ РУ вынесено частное определение, которым поручено Госкомимуществу

проинвентаризировать доли учредителей в Уставном фонде СП в соответствиии с принятым решением.

Постановлением апелляционной инстанции от 04.12.2001г. (председательствующий Умаров А.К., судьи Боймаков Б.М. и Данилова И.Е.) решение изменено. Решение суда в части признания недействительными Приказов ГКИ РУ и Протоколов Минюста РУ по вопросам касающихся изменений доли (в процентном отношении) Компании «Кока Кола Экспорт Корпорейшн» в Уставном фонде СП «Кока Кола ичимлиги Тошкент ЛТД» отменено. В остальной части решение оставлено без изменения.

Не согласившись с решением и постановлением апелляционной инстанции Компания «Кока Кола Экспорт Корпорейшн» (США) и СП «Кока Кола ичимлиги Тошкент ЛТД» обратились в Высший хозяйственный суд с кассационными жалобыми, где СП «Кока Кола ичимлиги Тошкент ЛТД» просит отменить состоявшиеся по делу судебные акты и полностью отказать истцу в иске, а Компания «Кока Кола Экспорт Корпорейшн» (США) просит детализировать резолютивную часть постановления апелляционной инстанции, а именно какие части Приказов ГКИ РУ и Протоколов Минюста РУ признаны постановлением апелляционной инстанции недействительными.

Судебная коллегия, заслушав доклад судьи Закировой Л.Г., выслушав пояснения представителей сторон, изучив материалы дела, обсудив доводы кассационных жалоб, считает жалобы необоснованными и не находит оснований для отмены состоявшихся судебных актов.

Как усматривается из материалов дела, 25 августа 1993г. ГКИ РУ был издан Приказ № 545 к-ПР о создании на базе Ташкентского завода прохладительных напитков совместно с Фирмами "Кока-Кола Экспорт Корпорейшн" (США) и "РОЗ Трейдинг ЛТД" (Каймановы острова, Великобритания) Совместного предприятия по производству, розливу, оптовой реализации и продаже безалкогольных напитков в форме товарищества с ограниченной ответственностью. На основании данного Приказа Ташкентским заводом прохладительных напитков, Фирмами "Кока-Кола Экспорт Корпорейшн" (США) и "РОЗ Трейдинг ЛТД" (Каймановы острова, Великобритания) было подписано Соглашение о создании СП "Кока-Кола ичимлиги Тошкент ЛТД" и утвержден Устав, согласно которого размер Уставного фонда определен в сумме 5.307.000 долларов США, распределенный между участниками СП в равных долях (т.е. по 33,33%). Учредительные документы вновь созданного СП были зарегистрированы Министерством финансов Республики Узбекистан 8 октября 1993г.

На основании обращений Фирмы "РОЗ Трейдинг ЛТД" от 30.07.97г. и Ассоциации "Пищепром" от 04.09.97г. № 6/10-182, а также протоколов собраний учредителей СП от 06.04.95г., 30.01.96г. и 23.17.96г. ГКИ РУ 31.12.1997г. был издан Приказ № 242 к-ПР, которым было выражено согласие на увеличение размера Уставного фонда СП до 14.807.000 долларов США и было принято к сведению, что доли учредителей в Уставном фонде СП "Кока-Кола ичимлиги Тошкент ЛТД" распределены следующим образом:

-   Ассоциация "Пищепром"                            -   11,947%;
-   Фирма "Кока-Кола Экспорт Корпорейшн"   -   32,998%;
-   Фирма "РОЗ Трейдинг ЛТД"                         -   55,055%.

Пунктом 3 данного Приказа было поручено реализовать часть государственной доли в Уставном фонде СП в размере 9,947% дочернему предприятию компании «ROZ TRADING LTD» Иностранному предприятию "РОЗ Трейдинг ЛТД" Узбекистан, являющемуся юридическим лицом, зарегистрированному и действующему по законодательству Республики Узбекистан, а также пунктом 6 этого же приказа было установлено, что после реализации части государственной доли, распределение долей в Уставном фонде СП будет составлять:

-   Ассоциация "Пищепром"                            -   2%;
-   Фирма "Кока-Кола Экспорт Корпорейшн"   -   32,998%;
-   Фирма "РОЗ Трейдинг ЛТД"                         -   65,002%.

Следовательно, согласно приказа № 242 к-ПР доля Иностранного предприятия "РОЗ Трейдинг ЛТД" Узбекистан (в размере 9,947%) включена в долю Фирмы "РОЗ Трейдинг ЛТД" и составила всего 65,002%.

В соответствии с указанным Приказом участниками СП 9 марта 1998г. было проведено общее собрание, где принято решение о внесении изменений в учредительные докумены СП. На данном собрании было принято решение об увеличении размера Уставного фонда СП до 14.807.000 долларов США, который распределен следующим образом:

-   Ассоциация "Пищепром"         -   2% (или 296.140 дол.США);
-   Фирма "Кока-Кола
    Экспорт Корпорейшн"          -   32,998% (или 4.886.014 дол.США);
-   Фирма "РОЗ Трейдинг ЛТД"   -   65,002% (или 9.624.846 дол.США).

На данном собрании Ташкентский завод прохладительных напитков был заменен на Ассоциацию "Пищепром".

Изменения в учредительные документы СП были зарегистрированы Министерством юстиции Республики Узбекистан 17 марта 1998г. (протокол № 318).

Приказом Госкомимущества Республики Узбекистан № 49к-ПР от 24.04.98г. был принят к сведению Договор купли-продажи, заключенный между Ассоциацией "Пищепром", Госкомимуществом и Иностранным

предприятием "РОЗ Трейдинг ЛТД", по выкупу государственной доли в размере 9,947% в Уставном фонде СП "Кока-Кола ичимлиги Тошкент ЛТД" и Ассоциации "Пищепром" совместно с учредителями СП рекомендовано внести соответствующие изменения в учредительные документы СП.

В последующем, решением общего собрания учредителей СП "Кока-Кола ичимлиги Тошкент ЛТД" от 27 марта 2001г. часть доли Фирмы "РОЗ Трейдинг ЛТД" в Уставном фонде СП в размере 9,884% была продана Фирме "Кока-Кола Экспорт Корпорейшн", а также в состав учредителей введено ИП "РОЗ Трейдинг ЛТД" (Узбекистан) с долей в Уставном фонде СП в размере 9,947%, которая была выкуплена у Ассоциации "Пищепром".

На основании данного протокольного решения учредителей 17 апреля 2001г. Госкомимуществом Республики Узбекистан был издан Приказ № 78 к-ПР «О внесении изменений в приказы ГКИ от 31.12.1997г. № 242 к-ПР и от 24.04.1998г. № 49 к-ПР», которым принято к сведению, что Уставной фонд СП "Кока-Кола ичимлиги Тошкент ЛТД" распределен следующим образом:
- Ассоциация "Пищепром"          - 2% (или 296.140 дол.США);
- Фирма "Кока-Кола
  Экспорт Корпорейшн"         - 42,882% (или 6.349.538 дол.США);
- Фирма "РОЗ Трейдинг ЛТД"  - 45,171% (или 6.688.470 дол.США);
- ИП "РОЗ Трейдинг ЛТД"      - 9,947% (или 1.472.852 дол.США).

Данные изменения в учредительные документы СП были зарегистрированы Минюстом РУ 19 апреля 2001г. (протокол № 638).

Считая, что указанные акты Госкомимущества и Министерства юстиции Республики Узбекистан об изменении долей в Уставном фонде СП "Кока-Кола ичимлиги Тошкент ЛТД" изданы без согласования с Госкомитетом по демонополизации и развитию конкуренции, в нарушение ст.15 Закона Республики Узбекистан "О конкуренции и ограничении монополистической деятельности на товарных рынках", антимонопольный орган обратился в суд с требованием о признании их недействительными.

Согласно статьи 15 Закона Республики Узбекистан "О конкуренции и ограничении монополистической деятельности на товарных рынках" с предварительного согласия антимонопольного органа и на основании ходатайства хозяйствующего субъекта осуществляются:
- приобретение лицом, группой лиц акций, долей с правом голоса в уставном капитале хозяйствующего субъекта, при котором такое лицо, группа лиц получает право распоряжаться более чем 35% указанных акций, долей;

-приобретение лицом, группой лиц прав, в том числе посредством соглашений, договоров, поручений, контрактов или иным способом, позволяющих определять условия ведения хозяйствующим субъектом его предпринимательской деятельности либо осуществлять функции его исполнительного органа.

При издании Госкомимуществом Республики Узбекистан Приказов № 242 к-ПР от 31.12.97г., № 49 к-ПР от 24.04.98г. и № 78 к-ПР от 17.04.2001г., а также при регистрации Министерством юстиции Республики Узбекистан изменений в учредительные документы СП "Кока-Кола ичимлиги Тошкент ЛТД" не были учтены требования вышеуказанного Закона и не затребовано согласие антимонопольного органа, т.к. доли Фирмы "Кока-Кола Экспорт Корпорейшн" и Фирмы "РОЗ Трейдинг ЛТД" в Уставном фонде СП "Кока-Кола ичимлиги Тошкент ЛТД" составили более 35%.

В соответствии со статьёй 3 Закона Республики Узбекистан "О конкуренции и ограничении монополистической деятельности на товарных рынках" группой лиц признаётся совокупность лиц, применительно к которым выполняется одно или несколько следующих условий:
- лицо или несколько лиц совместно в результате соглашения или согласованных действий имеют право прямо или косвенно распоряжаться, в том числе на основании договоров купли-продажи, доверительного управления имуществом, совместной деятельности, поручения, аренды или иных сделок, контрольным пакетом акций или таким количеством голосов, которое достаточно для оказания решающего влияния;
- между двумя или более лицами заключен договор, в силу которого получено право определять условия ведения предпринимательской деятельности одного или нескольких участников договора или иных лиц, либо осуществлять функции их исполнительного органа;
- лицо имеет право назначения более 50% состава исполнительного органа и (или) совета органа и (или) совета директоров (наблюдательного совета) двух и более юридических лиц.
Для целей настоящего Закона группа лиц рассматривается как единый хозяйствующий субъект.

Согласно Устава Иностранного предприятия "РОЗ Трейдинг ЛТД", зарегистрированного Министерством юстиции Республики Узбекистан 14 сентября 1999г. (протокол № 472), его учредителями являются Фирма "РОЗ Трейдинг ЛТД" (Каймановы острова) и Фирма "РОЗ секьюритез ЛЛК" (Каймановы острова). Доля Фирмы "РОЗ Трейдинг ЛТД" в Уставном фонде ИП "РОЗ Трейдинг ЛТД" составляет 99,99%. Соответственно, Фирма "РОЗ Трейдинг ЛТД" и ИП "РОЗ Трейдинг ЛТД",

являющиеся учредителями СП "Кока-Кола ичимлиги Тошкент ЛТД", признаются группой лиц. При издании Приказов Госкомимуществом и регистрации Министерством юстиции изменений в учредительные документы СП "Кока-Кола ичимлиги Тошкент ЛТД" данное обстоятельство не было принято во внимание.

В соответствии со статьёй 12 Гражданского кодекса Республики Узбекистан (далее ГК РУ) акт государственного органа, не соответствующий законодательству и нарушающий гражданские права и охраняемые интересы гражданина или юридического лица, может быть признан судом недействительным.

Поскольку Приказы Госкомимущества №242к-ПР от 31.12.97г., № 49 к-ПР от 24.04.98г. и № 78 к-ПР от 17.04.2001г., а также протоколы Министерства юстиции Республики Узбекистан о регистрации изменений в учредительные документы СП "Кока-Кола ичимлиги Тошкент ЛТД" не соответствуют законодательству, они подлежат признанию недействительными.

Принимая во внимание изложенное, судом первой инстанции было принято решение о полном удовлетворении заявленных требований. Кроме того, судом вынесено частное определение, которым поручено Госкомимуществу РУ проинвентаризировать доли учредителей в Уставном фонде СП и привести их в соответствие с фактическими обстоятельствами.

Однако, судом первой инстанции при вынесении решения не было учтено то, что Компанией «Кока Кола Экспорт Корпорейшн» на приобретение доли Фирмы «РОЗ Трейдинг ЛТД» в Уставном фонде СП в размере 9,884% и соответственно на увеличение доли Компании «Кока Кола Экспорт Корпорейшн» до 42,882% было получено согласие антимонопольного органа. Поэтому судом апелляционной инстанции решение хозяйственного суда от 17.10.2001г. правомерно изменено. Решение суда в части признания недействительными Приказов ГКИ РУ и Протоколов Минюста РУ по вопросам касающихся изменений доли (в процентном отношении) Компании «Кока Кола Экспорт Корпорейшн» в Уставном фонде СП «Кока Кола ичимлиги Тошкент ЛТД» отменено. В остальной части решение оставлено без изменения.

Касательно требований Компании «Кока Кола Экспорт Корпорейшн» о восстановлении государственной регистрации общего размера Уставного фонда СП на уровне 14.807.000 долларов США необходимо отменить, что по данному вопросу судом первой инстанции вынесено частное определение, которым поручено Госкомимуществу РУ проинвентаризировать Уставной фонд СП, в связи с чем, этот вопрос будет решаться ГКИ РУ совместно с учредителями в установленном

законом порядке    при исполнении частного определения суда от 17.10.2001г.

Доводы СП «Кока Кола ичимлиги Тошкент ЛТД» об ухудшении условий инвестирования не могут быть приняты во внимание, т.к. обращение к антимонопольному органу за получением согласия не может являться обстоятельством, ухудшающим условия инвестирования.

Протокол Министерства юстиции о регистрации учредительных документов и внесений в них изменений порождает определенные права и обязательства для зарегистрированного предприятия, его учредителей и третьих лиц (налоговые службы, статорганы и др.), в связи с чем, также как и Решение Хокима района о регистрации предприятий, является актом государственного органа. Следовательно, доводы СП о том, что «протокол Министерства юстиции не относится к актам государственных органов», суд не может принять во внимание.

Доводы о пропуске срока исковой давности также необоснованны, т.к. согласно ст.154 ГК РУ течение срока исковой давности начинается со дня, когда лицо узнало или должно было узнать о нарушении своего права.

Таким образом, кассационные жалобы СП «Кока Кола ичимлиги Тошкент ЛТД» и Компании «Кока Кола Экспорт Корпорейшн» подлежат отклонению, постановление апелляционной инстанции хозяйственного суда г.Ташкента от 04.12.2001г. - без изменения. Судебные расходы надлежит отнести на заявителей жалоб.

На основании изложенного и руководствуясь статьями 187, 189 Хозяйственного процессуального кодекса РУ, судебная коллегия

## П О С Т А Н О В И Л А :

Постановление апелляционной инстанции хозяйственного суда г.Ташкента от 4 декабря 2001г. по делу № 2494/01-т оставить без изменения, а кассационные жалобы СП «Кока Кола ичимлиги Тошкент ЛТД» и Компании «Кока Кола Экспорт Корпорейшн» - без удовлетворения.
Постановление вступает в силу с момента его принятия и обжалованию не подлежит.

Председательствующий    Убайдиллоев К.И.
Судьи    Закирова Л.Г.
Анортаев И.А.

Fayzullaev Declaration

Exhibit G

Unofficial Translation

Fayzullaev Decl., Ex. G

SUPREME ECONOMIC COURT
OF THE REPUBLIC OF UZBEKISTAN

700097, City of Tashkent, 6 Choponota St.
Fax: 775984

Case № 10-0207/1409
September 11, 2002

DECISION

A court panel of the Supreme Economic Court of the Republic of Uzbekistan comprising the
Chairman, A.B. Dustbabayev, and members, I.K. Soliyev and E.K. Esiyazov, with the
participation of U.I. Tukhtamishev, an assistant to the Attorney General of the Republic of
Uzbekistan, having reviewed, in response to an appeal by Coca-Cola Export Corporation
(USA), the decision of the Economic Court of the City of Tashkent, dated 06/03/2002
pertaining to case № 10-0207/1409 related to a claim of the liquidation commission of the
foreign enterprise "ROZ Trading LTD" (Uzbekistan) to JV "Coca-Cola I Ichimligi
Uzbekiston LTD", the "Pischeprom Association," "Coca-Cola Export Corporation," and
"ROZ Trading Limited" (Cayman Islands, Great Britain) for release of the share of "ROZ
Trading LTD" from the property of JV "Coca-Cola Ichimligi Uzbekiston LTD," with the
involvement of the State Property Committee (Goskomimushchestvo) of the Republic of
Uzbekistan in the capacity of a 3rd party not presenting independent claims in relation to the
dispute,

Established the following:

Pursuant to the decision of the Economic Court of the City of Tashkent (justice
I.E. Danilova) of 06/03/2002, the claim was satisfied, and the share of ROZ Trading LTD"
(Cayman Islands" in the property of "Coca-Cola Ichimligi Uzbekiston LTD" JV was released
in the amount of 23.416% which equals 9,877,069,709.00 soum, the levying execution on the
said amount in favor of the foreign enterprise "ROZ Trading LTD."

"Coca-Cola Export Corporation" did not agree with the above decision and filed an appeal.
However, the appeal was returned to the petitioner pursuant to paragraph 3 of Article 162 of
the Economic Code of RU, due to the fact that the appeal did not contain enclosures of
documents evidencing due payment of stamp duty in the amount due, or a bank certificate of
inability to pay stamp duty as per the court definition of 07/03/2002. The newly filed appeal
of "Coca-Cola Export Corporation" was returned pursuant to the court decision of
07/15/2002 due to the lapse in of the allowed period such filing.

In its appeal № 17/677-1/LD-1H of August 2, 2002, the claimant asks to void the court
decisions of July 3rd and 15th of 2002, and to accept the appeal for prosecution.

The court panel considers the court decisions of July 3rd and 15th of 2002 pertaining to the
return of the appeal to be appropriately made in accordance with the requirements of
economic procedural law, and finds no grounds for voiding the above decisions.

Considering that the claimant simultaneously filed an appeal for the acceptance of which all
the requirements were met, the court panel finds that the claimant's appeal № 17/777/ID-1H
of August 2, 2002 that raises the question of voiding the court decision of June 3rd, 2002 and

of the court decision of May 10th 2002 pertaining to the acceptance of the case for prosecution, to be sufficient for the acceptance and review of the matter at hand.

Having heard the presentation of Justice E.K. Yesniyazov and the clarifications of A. Voronin and D. Askarov, representatives of "Coca-Cola Esport Corporation," and those of I.G. Avtaykina and O.K. Nasyrov, representatives of "Coca-Cola Ichimligi Uzbekiston LTD" JV, O.P. Umnova of "Pischeprom," V.I. Gugnin of Tukhtamishev, assistant Attorney General of RU who maintained that decisions did not require to be changed, this court panel finds that the court decisions under the appeal are to be left unchanged for reasons outlined below.

As is evident from the materials of the case, on May 12th. 1993, the Ministry of Finance of the Republic of Uzbekistan registered a Foreign Enterprise in the form of a limited liability partnership, "ROZ Trading LTD" (reg. No. IP-28). The above partnership's Charter Capital was $500,000.00. On September 14th, 1999 (minutes No. 472), the charter documents of the said FE we re-registered with the Ministry of Justice of the Republic of Uzbekistan. According to the charter documents, the founders of FE "ROZ Trading LTD" are "ROZ Trading LTD" (Cayman Islands), whose share amounts to $499,950.00 (99.99%), and "ROZ Securities LLK" (Cayman Islands), whose share amounts to $50.00 (0.01%).

According to letter No. Ya-Kh-5729-13 of 11/09/2001 produced by the National Band for Foreign Economic Activities of the Republic of Uzbekistan, during the period between 1993 and 1999 there was no transfer of funds to the checking account of the established enterprise in the amount of $500,000.00 as a contribution to the Charter Capital. Therefore, the founder, "ROZ trading LTD," knew ahead of time thet this would have an unfavorable impact on the operation of the enterprise, and did not perform its obligations to make a contribution to the Charter Capital of FE "ROZ Trading LTD." Acting this way, the founder, "ROZ trading LTD," committed a serious breach of applicable Republic of Uzbekistan law pertaining to the statutory creation of charter capital, i.e. Article 59 of the Civil Code of RU, paragraph 6 of Directive No. PF-1625 of the President of the Republic of Uzbekistan dated 11/30/1996 "On Additional Incentives and Benefits Offered to Enterprises with Foreign Investments," and directive No. 327 dated 07/03/1999 of the Cabinet of Ministers of the Republic of Uzbekistan. As a result of these illegal actions of its founders, FE "ROZ Trading LTD" incurred a multi-billion debt to creditors and, from August 2001, ceased its financial and economic activities.

In these circumstances, on 04/29/2002, the Economic Court of the City of Tashkent declared FE "ROZ Trading LTD" bankrupt and initiated liquidation proceedings. As inventory was taken of the foreign enterprise's property it was determined that, as of 04/29/2002, FE "ROZ Trading LTD" had a total debt to creditors in the amount of 13,318,543,175.00 soum (including 13,225,407,704.00 soum to the state treasury). and assets in the amount of 1,045,921,600.00 soum.

Considering that the assets were insufficient to cover the debt to the creditors, the trustee of the liquidation commission of FE "ROZ Trading LTD" filed a court claim to release the share of "ROZ Trading LTD" (Cayman Islands) from the property of "Coca-Cola Ichimligi Uzbekiston LTD" JV in the amount of 23.416%, and to levy execution on it in favor of the foreign enterprise.

The decision of the court of the first instance to the satisfaction of claims presented by the liquidation commission is lawful and well-grounded because FE "ROZ Trading LTD" was driven into bankruptcy due to the fact that management of the enterprise's financial and

economic activities was conducted by an executive body comprising representatives of "ROZ Trading LTD" (Cayman Islands) who in the course of managing the enterprise, permitted unlawful actions that resulted in the development of multibillion soum of creditor indebtedness, which led to the declaration of the enterprise as bankrupt. Thus, pursuant to Article 48 of the Civil Code of RU, "ROZ Trading LTD," a founder of FE "ROZ Trading LTD," is to bear subsidiary (additional) liability for its obligations.

According to Article 48 of the Civil Code of RU, if the insolvency (bankruptcy) of a legal entity is caused by unlawful actions of a party acting as a founder (participant) of owner of the legal entity's property, entitled to give binding orders to this legal entity, such party, in the event of insufficiency of the legal entity's property, may bear subsidiary liability for its obligations. The founder (participant) or the owner of the legal entity's property has the right to give binding orders only if such right is provided for under the legal entity's constitutional documents.

Thus the liquidation commission of FE "ROZ Trading LTD" was justified in presenting its claims to "ROZ Trading LTD," the founder of FE "ROZ Trading LTD," because, pursuant to Article 227 of the Civil Code of RU, a creditor of a partner in a joint stock or shareholder enterprise may, in the event the said partner does not own any other property, file a claim for the release of the debtor's share in the common property for the purpose of levying execution on it.

In this case, "ROZ Trading LTD" has a share in the common property of the Joint Venture for the Production, Bottling and Wholesale Distribution and Sale of Soft Drinks in the form of a limited liability partnership, "Coca-Cola Ichimligi Uzbekiston LTD." The said joint venture was established based on the Tashkent Factory of Refreshment Beverages, jointly with "Coca-Cola Export Corporation" (USA) and "ROZ Trading LTD." According to the presented documents, the share of "ROZ Trading LTD" in the Charter Capital of "Coca-Cola Ichimligi Uzbekiston LTD" JV amounts to 32.416%.

According to the balance sheet of "Coca-Cola Ichimligi Uzbekiston LTD" JV presented to reflect the results of financial and economic operation in 2001, the charter capital comprises 395,193 thousand soum, and as of 05/01/2002, the total value of the joint venture's property, including accounts receivable, comprises 58,415,222,000 soum (including the charter capital of 395,193 soum), and, without accounts payable, the total value of the joint venture's property comprises 42,180,858,000 soum, of which the share of "ROZ Trading LTD" (Cayman Islands) in 23.416%, i.e., 9,877,069,709 soum.

Considering that the assets of FE "ROZ Trading LTD" amount to 1,336,167,660.74 soum, which is not sufficient to cover the accounts payable of 13,318,543,175 soum, of which 13,225,407,704 soum is the debt to the state Treasury, the filed claim to release the share of "ROZ Trading LTD" from the property of "Coca-Cola Ichimligi Uzbekiston LTD" JV and levy execution on it to cover the accounts payable is well grounded.

The arguments of the claimant with respect to the petition concerning the exact amount of the claim and to the need to pay stamp duty by the plaintiff are not legitimate because applicable law does not prohibit demands for the definition of a share as a percentage as well as its cash equivalent; further, pursuant to the Decree of the President of the Republic of Uzbekistan of 07/23/1999, trustees of enterprises declared bankrupt are exempt from upfront payment of stamp duty upon filing claims in economic courts. The arguments outlined in the appeal are unfounded and cannot serve as grounds for the repeal of the court's decision.

Under such circumstances, the decision made by the court of the first instance to satisfy the claim to release from the property of "Coca-Cola Ichimligi Uzbekiston LTD" (Cayman Islands) in the amount of 32.416%, which equals 9,877,069,709 soum, and to levy execution on said amount in favor of FE "ROZ Tradint LTD" to cover its accounts payable is lawful, and there are no grounds to void it.

Based on the above and pursuant to paragraphs 48, 59, 216, and 227 of the Civil Code of the Republic of Uzbekistan, and articles 187 and 189 of the Economic Procedural Code of the Republic of Uzbekistan, the court panel

### Decided:

To leave the decision of the Economic Court of the City of Tashkent of June 3rd, 2003 and the court determinations of July 3rd and 15th, 2002 unchanged, and the appeals filed by "Coca-Cola Export Corporation," without satisfaction.

This decision shall come into legal effect as of the moment it is made and shall not be subject to appeal.

| Chairman | [signature] | A. B. Dustbabayev |
| Panel members | [signature] | I. K. Soliyev |
| | [signature] | E. K. Esniyazov |

УЗБЕКИСТОН РЕСПУБЛИКАСИ
ОЛИЙ ХУЖАЛИК СУДИ

700097 Тошкент шахар, Чупоната кучаси,6
т : 775984 ( факс )



SUPREME ECONOMICAL COURT
OF THE REPUBLIC OF UZBEKISTAN

700097,Tashkent city, Choponota st..6
tel : 775984 ( fakx )

Дело № 10-0207/1409
2002 год 11 сентября

ПОСТАНОВЛЕНИЕ

Судебная коллегия Высшего хозяйственного суда Республики Узбекистан в составе председательствующего А.Б.Дустбабаева, членов коллегии И.К.Солиева и Е.К.Есниязова, при участии помощника Генерального прокурора РУ У.И.Тухтамишева, проверив по кассационной жалобе компании «Кока-Кола Экспорт Корпорейшн» (США) решение хозяйственного суда города Ташкента от 03.06.2002 года по делу № 10-0207/1409 по иску ликвидационной комиссии ИП "РОЗ Трейдинг ЛТД" (Узбекистан) к СП "Кока-Кола Ичимлиги Узбекистон ЛТД", ассоциации "Пищепром". компании "Кока-Кола Экспорт Корпорэйшн" и фирме "РОЗ Трейдинг ЛТД" (Каймановы острова, Великобритания) о выделе доли фирмы "РОЗ Трейдинг ЛТД" из имущества СП "Кока-Кола Ичимлиги Узбекистон ЛТД". с привлечением Госкомимущества Республики Узбекистан к участию в деле в качестве 3-го лица не заявляющего самостоятельные требования на предмет спора.

установила:

Решением хозяйственного суда города Ташкента (судья    Лашпаева Н.Г.) от 03.06.2002 года, иск удовлетворен, в имуществе СП «Кока-Кола Ичимлиги Узбекистон Лтд» выделена доля фирмы «РОЗ Трейдинг Лтд» (Каймановы острова) в размере 23,416%, что составляет в денежном выражении 9877069709 сум с обращением на неё взыскания в пользу ИП «РОЗ Трейдинг Лтд».

Не согласившись с принятым решением компания "Кока-Кола Экспорт Корпорэйшн" заявила апелляционную жалобу. Однако в связи с тем, что к жалобе не были приложены документы, подтверждающие уплату госпошлины в установленных порядке и размере и не приложена банковская справка об отсутствии возможности оплаты госпошлины судебным определением от 03.07.2002 года жалоба возвращена заявителю в соответствии с пунктом 3 статьи 162 ХПК РУ. Вновь поданная апелляционная жалоба компании "Кока-Кола Экспорт Корпорэйшн" возвращена судебным определением от 15.07.2002 года в связи с пропуском срока её подачи.

В кассационной жалобе от 2 августа 2002 года № 17/677-1/LD-IH заявитель просит отменить судебные определения от 3 и 15 июля 2002 года и принять апелляционную жалобу к производству.

Судебная коллегия считает судебные определения от 3 и 15 июля 2002 года о возврате апелляционной жалобы принятые в соответствии с требованиями хозяйственного процессуального законодательства правомерными и ,оснований для их отмены не имеется.

2

Учитывая, что заявителем одновременно подана кассационная жалоба для принятия которой все необходимые требования соблюдены, судебная коллегия считает, что кассационная жалоба заявителя от 2 августа 2002 года № 17/777/ LD-1H в которой ставится вопрос об отмене решения суда от 3 июня 2002 года, а также определения суда от 10 мая 2002 года о принятии дела к производству достаточной для принятия и рассмотрения по существу дела.

Судебная коллегия, заслушав доклад судьи Е.К.Еснязова, пояснения представителей компании «Кока-Кола Экспорт Корпорейшн» А.Воронина и Д.Аскарова, СП "Кока-Кола Ичимлиги Узбекистон ЛТД" – Автайкиной И.Г., Насырова О.К., ассоциации "Пищепром" – Умновой О.П., Госкомимущества Республики Узбекистан – Гугнина В.И., заключение помощника Генерального Прокурора РУ Тухтамишева У.И., полагавшего судебные акты оставить без изменения, обсудив доводы кассационных жалоб, проверив материалы дела, считает обжалуемые судебные акты подлежащими оставлению без изменения, по следующим основаниям.

Как усматривается из материалов дела, 12 мая 1993г. Министерством финансов Республики Узбекистан было зарегистрировано иностранное предприятие в форме общества с ограниченной ответственностью "РОЗ Трейдинг ЛТД" (рег. № ИП-28), с Уставным фондом в размере 500.000 долларов США. 14 сентября 1999г. (протокол № 472) учредительные документы ИП были перерегистрированы Министерством юстиции Республики Узбекистан. Согласно учредительным документам учредителями ИП "РОЗ Трейдинг ЛТД" являются фирма "РОЗ Трейдинг ЛТД" (Каймановы острова) доля которой составляет 499950 дол.США – 99,99% и фирма "РОЗ Секьюритез ЛЛК" (Каймановы острова) с долей 50 дол.США – 0,01%.

Согласно письму Национального банка внешнеэкономической деятельности Республики Узбекистан от 09.11.2001г. № ЯХ-5729-13, в период с 1993г. по 1999г. денежные средства в размере 500 000 дол. США в качестве вклада в Уставной фонд на расчетный счет учрежденного предприятия не поступали. Следовательно, учредитель - фирма "РОЗ Трейдинг ЛТД" заведомо зная, что это влечет неблагоприятные последствия для деятельности предприятие, свои обязательства по внесению вклада в Уставной фонд ИП "РОЗ Трейдинг ЛТД" не выполнила. Тем самым, учредитель - фирма "РОЗ Трейдинг ЛТД" совершила грубое нарушение требований действующего законодательства Республики Узбекистан об обязательном сформировании уставного фонда, а именно статьи 59 ГК РУ, пункта 6 Указа Президента Республики Узбекистан от 30.11.1996г. № ПФ-1652 "О дополнительных стимулах и льготах, предоставляемых предприятиям с иностранными инвестициями", а также постановления Кабинета Министров Республики Узбекистан от 03.07.1999г. № 327. В результате подобных неправомерных действий учредителей у ИП "РОЗ Трейдинг ЛТД" образовалась многомиллиардная кредиторская задолженность и с августа 2001г. прекратилось осуществление финансово-хозяйственной деятельности.

При таких обстоятельствах, решением хозяйственного суда г.Ташкента от 29.04.2002г. ИП "РОЗ Трейдинг ЛТД" было признано банкротом и открыто ликвидационное производство. При проведении инвентаризации имущества ИП выявлено, что по состоянию на 29.04.2002г. ИП "РОЗ Трейдинг ЛТД" имеет общую кредиторскую задолженность в размере 13 318 543 175 сум (в том числе задолженность перед бюджетом - 13 225 407 704 сум) и имущество на сумму 1 045 921 600 сум.

3

Учитывая недостаточность имущества для погашения кредиторской задолженности, доверенное лицо ликвидационной комиссии ИП "РОЗ Трейдинг ЛТД" обратилось в суд с иском о выделении доли фирмы "РОЗ Трейдинг ЛТД" (Каймановы острова) из имущества СП "Кока-Кола Ичимлиги Узбекистон ЛТД" в размере 23,416% и обращения на нее взыскания в пользу ИП.

Решение суда первой инстанции об удовлетворении заявленных исковых требований ликвидационной комиссии является законным и обоснованным, поскольку ИП "РОЗ Трейдинг ЛТД" было доведено до банкротства вследствие того, что управление финансово-хозяйственной деятельностью предприятия осуществлялось исполнительным органом, сформированным из представителей фирмы «РОЗ Трейдинг ЛТД» (Каймановы острова), которые в ходе управления предприятием допустили неправомерные действия, в результате которых образовалась многомиллиардная кредиторская сумма, что повлекло за собой признание предприятия банкротом. Следовательно, фирма «РОЗ Трейдинг ЛТД» являющаяся учредителем ИП «РОЗ Трейдинг ЛТД», в соответствии со ст.48 ГК РУ обязана нести субсидиарную (дополнительную) ответственность по его обязательствам.

Согласно ст.48 ГК РУ, если несостоятельность (банкротство) юридического лица вызвана неправомерными действиями лица, выступающего в качестве учредителя (участника) или собственника имущества юридического лица, который имеет право давать обязательные для этого юридического лица указания, то на такое лицо, в случае недостаточности имущества юридического лица, может быть возложена субсидиарная ответственность по его обязательствам. Учредитель (участник) или собственник имущества юридического лица имеет право давать обязательные указания только в случае, когда это право предусмотрено в учредительных документах этого юридического лица.

Таким образом, ликвидационная комиссия ИП «РОЗ Трейдинг ЛТД» обоснованно заявила требования к фирме «РОЗ Трейдинг ЛТД» как учредителю ИП «РОЗ Трейдинг ЛТД», поскольку в соответствии со ст.227 ГК РУ кредитор участника долевой или совместной собственности при недостаточности у собственника другого имущества вправе предъявить требование о выделе доли должника в общем имуществе для обращения на нее взыскания.

В данном случае, фирма «РОЗ Трейдинг ЛТД» имеет долю в общем имуществе Совместного предприятия по производству, разливу, оптовой реализации и продаже безалкогольных напитков в форме товарищества с ограниченной ответственностью "Кока-Кола Ичимлиги Узбекистон ЛТД". Указанное СП было создано на базе Ташкентского завода прохладительных напитков, совместно с корпорацией "Кока-Кола Экспорт Корпорейшн" (США) и фирмой "РОЗ Трейдинг Лтд." Согласно представленным документам доля фирмы "РОЗ Трейдинг ЛТД" в Уставном фонде СП «Кока-Кола Ичимлиги Узбекистон ЛТД» составляет 23,416 %.

Согласно бухгалтерскому балансу СП "Кока-Кола Ичимлиги Узбекистон ЛТД" представленному по итогам финансово-хозяйственной деятельности за 2001 год размер уставного капитала составляет 395193 тыс.сум, а по состоянию на 01.05.2002г. общая стоимость имущества СП с учетом дебиторской задолженности составляют 58 415 222 000 сум (в том числе уставной капитал 395193 тыс.сум), а за вычетом кредиторской задолженности общая сумма имущества СП составляет - 42 180 858 000 сум, из них доля фирмы «РОЗ

4

Трейдинг ЛТД» (Каймановы острова) в размере 23,416% составляет 9 877 069 709 сум.

Учитывая, что активы ИП «РОЗ Трейдинг ЛТД» составляют 1 336 167 660-74 сум, что недостаточно для погашения имеющейся кредиторской задолженности в сумме 13 318 543 175 сум, из которых 13 225 407 704 сум задолженность перед бюджетом, заявленное исковое требование о выделе доли фирмы "РОЗ Трейдинг ЛТД" из имущества СП "Кока-Кола Ичимлиги Узбекистон ЛТД" и обращении на неё взыскания для погашения задолженности перед кредиторами является обоснованным.

Доводы заявителя относительно ходатайства о конкретизации суммы иска и необходимости уплаты истцом государственной пошлины являются неправомерными, поскольку действующее законодательство не запрещает требовать определение доли как в процентном отношении, так и сумовом эквиваленте, а в соответствии с Указом Президента Республики Узбекистан от 23.07.99г. доверенные лица предприятий, признанных банкротами, при обращении в хозяйственные суды с иском освобождаются от предварительной оплаты государственной пошлины. Доводы изложенные в кассационной жалобе являются необоснованными и не могут служить основанием для отмены решения.

При таких обстоятельствах, принятое судом первой инстанции решение об удовлетворении исковых требований о выделении в имуществе СП «Кока-Кола Ичимлиги Узбекистон Лтд» (в том числе в уставном капитале) доли фирмы «РОЗ Трейдинг Лтд» (Каймановы острова) в размере 23,416%, что составляет в денежном выражении 9877069709 сум с обращением на неё взыскания в пользу ИП «РОЗ Трейдинг Лтд» для погашения задолженности перед кредиторами является правомерным и оснований для его отмены не имеется.

На основании вышеизложенного и руководствуясь ст.ст.48, 59, 216, 227 Гражданского кодекса Республики Узбекистан, статьями 187, 189 Хозяйственного процессуального кодекса Республики Узбекистан, судебная коллегия

постановила:

решение хозяйственного суда города Ташкента от 3 июня 2002 года, определения от 3 и 15 июля 2002 года оставить без изменения, кассационные жалобы компании "Кока-Кола Экспорт Корпорэйшн" - без удовлетворения.

Постановление вступает в законную силу с момента его принятия и обжалованию не подлежит.

Председательствующий          А.Б.Дустбабаев

Члены коллегии                И.К.Солнев

                              Е.К.Есниязов

Fayzullaev Declaration

Exhibit H

**Unofficial Translation**                                    **Fayzullaev Decl., Ex. H**

## DIRECTIVE OF THE CABINET OF MINISTERS
## OF THE REPUBLIC OF UZBEKISTAN

July 5, 2002                    No. 420-F

For the purposes of having the Joint Venture "Coca-Cola Bottlers Uzbekistan Ltd" operate normally:

1.   To note that by decisions of the Economic Court of Tashkent City the foreign entity "Roz Trading Ltd" (Uzbekistan) has been declared bankrupt and, in order to repay its debts to the State Treasury and other creditors, the share of its founder, "Roz Trading Ltd" (Cayman Islands), equal to 23,416% (9,877,069,709 Soums) has been removed from the property of the Joint Venture "Coca-Cola Bottlers Uzbekistan Ltd" in favor of such bankrupt entity.

2.   To agree with the proposal of the State Property Committee, the Ministry of Finance, the Association "Pisheprom" and the liquidation committee of the foreign entity "Roz Trading Ltd" (Uzbekistan) on the transfer to the state of the 23,416% share of "Roz Trading Ltd" (Cayman Islands) removed from the property of the Joint Venture "Coca-Cola Bottlers Uzbekistan Ltd" pursuant to the resolution of the Economic Court of Tashkent City against the debts of the liquidated foreign entity "Roz Trading Ltd" (Uzbekistan) to the State Treasury, subject to further allocation of such share to increase the share in the charter fund of the Joint Venture "Coca-Cola Bottlers Uzbekistan Ltd".

3.   The Association "Pisheprom" shall, in cooperation with the foreign participant f the Joint Venture "Coca-Cola Bottlers Uzbekistan Ltd" and in conformity with the procedure established by law, amend the foundation documents accordingly and register such amendments with the Ministry of Justice of the Republic of Uzbekistan.

4.   The Consumer Goods Production and Trade Complex of the Cabinet of Ministers (M.Z. Usmanov) shall take additional measured to increase the efficiency of the financial and economic operation of the Joint Venture "Coca-Cola Bottlers Uzbekistan Ltd", to expand the production of goods and to improve their quality.

5.   The Ministry of Finance and the State Tax Committee of the Republic of Uzbekistan shall adjust the debt of the foreign entity "Roz Trading Ltd" (Uzbekistan) to the State Treasury by the amount of the removed share to be transferred to the state pursuant to this Directive.

6.   Supervision over the implementation of this Directive shall be exercised by U.K. Ismailov and M.Z. Usmanov, Deputies Prime Minister of the Republic of Uzbekistan.

Prime Minister of the Republic of Uzbekistan                    U. Sultanov

[Seal]

УЗБЕКИСТОН РЕСПУБЛИКАСИ
ВАЗИРЛАР МАҲКАМАСИНИНГ
**ФАРМОЙИШИ**



ўзбекистонлар
**уюшмасига**

**РАСПОРЯЖЕНИЕ**

КАБИНЕТА МИНИСТРОВ
РЕСПУБЛИКИ УЗБЕКИСТАН

5 июля № 2 к. г.    № 420-ф    Тошкент ш. — г. Ташкент

В целях обеспечения нормального функционирования совместного предприятия «Кока-Кола Ичимлиги Узбекистан Лтд»:

1. Принять к сведению, что в соответствии с решениями хозяйственного суда города Ташкента иностранное предприятие «Роз Трейдинг Лтд» (Узбекистан) признано банкротом и, в целях погашения его обязательств перед бюджетом и другими кредиторами, в пользу данного предприятия-банкрота из имущества совместного предприятия «Кока-Кола Ичимлиги Узбекистан Лтд» выделена доля его учредителя – фирмы «Роз Трейдинг Лтд» (Каймановы Острова) в размере 23,416% (9.877.069.709 сум).

2. Согласиться с предложением Госкомимущества, Министерства финансов, ассоциации «Пищепром» и ликвидационной комиссии иностранного предприятия «Роз Трейдинг Лтд» (Узбекистан) о передаче государству выделенной по решению хозяйственного суда города Ташкента доли фирмы «Роз Трейдинг Лтд» (Каймановы Острова) в имуществе СП "Кока-Кола Ичимлиги Узбекистан Лтд" в размере 23,416% в счет погашения задолженности ликвидируемого иностранного предприятия «Роз Трейдинг Лтд» (Узбекистан) перед бюджетом, с последующим направлением ее на увеличение государственной доли в уставном фонде СП "Кока-Кола Ичимлиги Узбекистан Лтд".

3. Ассоциации «Пищепром» совместно с иностранным участником СП "Кока-Кола Ичимлиги Узбекистан Лтд" в установленном законом порядке внести соответствующие изменения в учредительные документы и произвести их регистрацию в Министерстве юстиции Республики Узбекистан.

4. Комплексу производства потребительских товаров и торговли Кабинета Министров (М.З. Усманов) осуществить дополнительные мероприятия, направленные на повышение эффективности финансово-хозяйственной деятельности СП "Кока-Кола Ичимлиги Узбекистан Лтд", наращивание производства продукции и улучшение ее качества.

Б-844
5  07  2002

2

5.  Министерству финансов, Государственному налоговому комитету Республики Узбекистан скорректировать задолженность иностранного предприятия «Роз Трейдинг Лтд» (Узбекистан) перед бюджетом на сумму выделенной доли, передаваемой государству в соответствии с настоящим распоряжением.

6.     Контроль за выполнением данного распоряжения возложить на заместителей Премьер-министра  Республики Узбекистан У. К. Исмаилова и М. З. Усманова.

Премьер-министр
Республики Узбекистан                                                    Х. Султанов

Fayzullaev Declaration

Exhibit I

=Letterhead=

**The State Committee of the Republic of Uzbekistan
on Management of State Property and Support of Entrepreneurship**

## O R D E R

Tashkent city

September 13, 2004

No. 120 k – no

Concerning the sale of 57,118 percent
of State owned participatory interest
in the Charter capital of "Coca-Cola Ichimligi
Uzbekiston Ltd" Uzbek-American JV

In compliance with the Law of the Republic of Uzbekistan on "Limited and Additional Liability Comapnies"; in order to ensure the execution of the directives of "Consumer Goods Production and Trade" body of the Cabinet of Ministers of the Republic of Uzbekistan dated August 13, 2004, No. 04/23-51and September 14, 2004, No. 04/23-31; in accordance with the letters of "MUZIMPEKS LTD" Uzbek-American JV dated August 9, 2004, No. 00072/18 and September 4, 2004, No. 00076/196; in consideration of an appraisal No. 115/1-2004 of "Real-estate and Investments Agency", privately held company; and for the purpose of recommencement of the production of "Coca-Cola Ichimligi Uzbekiston Ltd" Uzbek-American JV:

### I HEREBY ORDER:

1. Let it be known that proposal of "MUZIMPEKS LTD" Uzbek-American JV regarding the purchase of 57,118 percent of State owned participatory interest in the Charter capital of "Coca-Cola Ichimligi Uzbekiston Ltd" Uzbek-American JV has been approved through letters of "Consumer goods production and trade" body of the Cabinet of Ministers of the Republic of Uzbekistan dated August 13, 2004, No. 04/23-51 and September 14, 2004, No. 04/23-31.

2. In compliance with the appraisal of "Real-estate and Investments Agency" No. 115/1-2004, let the sale price of 57,118 percent of State owned participatory interest in the Charter capital of "Coca-Cola Ichimligi Uzbekiston Ltd" to "MUZIMPEKS LTD" be confirmed at 14 136 880,0 (fourteen million and one hundred thirty six thousand and eight hundred eighty) US dollars.

3. In order to acquire 57,118 percent of State owned participatory interest in the Charter capital of "Coca-Cola Ichimligi Uzbekiston Ltd", "MUZIMPEKS LTD" shall make a payment in the amount of 14 136 880,0 (fourteen million and one hundred thirty six thousand and eight hundred eighty) US dollars to a special bank account of the State Property Committee (21508000500600289001, MFO 00014, INN 201122696, central bureau of payments of the main Tashkent office of Central Bank of the Republic of Uzbekistan) in national currency "soum" at the exchange rate of the Central Bank of the Republic of Uzbekistan on the payment day as follows:

   • 2 000 000 US dollars of total purchase price shall be paid within 30 (thirty) banking days as of the date purchase-sale agreement is signed;

- remaining 12 136 880,0 US dollars shall be paid within 5-month period in equal monthly tranches (2 427 376,0 USD) following the initial payment date.

4. According to the terms stipulated in Article 3 of this Order, Messrs I. Yakovlev, First Deputy Chairman and A. Yuldashev, Head of "Consumer Goods Production and Privatization in the Sphere of Trade" department shall duly draft a purchase-sale agreement between the State Property Committee and "MUZIMPEKS LTD" for the sale of 57,118 percent of State owned participatory interest in the Charter capital of "Coca-Cola Ichimligi Uzbekiston Ltd".

5. The copies of this Order shall be submitted to: "Coca-Cola Ichimligi Uzbekiston Ltd"; "MUZIMPEKS LTD"; departments of the State Property Committee specializing in "Withdrawal from State's Ownership and Privatization", "Management of State Property, "Finance and Accounting", "Consumer Goods Production and Privatization in the Sphere of Trade", and "Regional Department of Tashkent".

6. Execution of this Order shall be controlled by Mr. I. Yakovlev, First Deputy Chairman.


**M. Askarov**
Chairman



**O'ZBEKISTON RESPUBLIKASI**
**DAVLAT MULKINI BOSHQARISH VA TADBIRKORLIKNI**
**QO'LLAB-QUVVATLASH DAVLAT QO'MITASI**

# BUYRUQ

Toshkent shahri

" _13_ " _Сентябрь_ 200 _4_ у.                                    № _1402-по_

Масъулияти чекланган жамияти шаклидаги "Кока-кола ичимлиги Ўзбекистон ЛТД" Ўзбекистон-Америка қўшма корхонаси устав фондининг 57,118 фоиз давлат улушини сотиш тўғрисида

Ўзбекистон Республикасининг "Масъулияти чекланган ҳамда қўшимча масъулиятли жамиятлар тўғрисида"ги Қонунига асосан, Ўзбекистон Республикаси Вазирлар Маҳкамаси Истеъмол товарлари ишлаб чиқариш ва савдо мажмуасининг 2004 йил 13 августдаги 04/23-51-сонли ва 2004 йил 4 сентябрдаги 04/23-3/сонли топшириқларни ижросини таъминлаш, "Muzimpex LTD" Ўзбекистон-Америка агросаноат қўшма корхонасининг 2004 йил 9 августдаги 00072/18-сонли ва 2004 йил 4 сентябрдаги 00076/196-сонли хатлари, "Кучмас мулк ва сармоялар агентлиги" ёпиқ акциядорлик жамиятининг 115/1-2004-сонли баҳолаш хулосасига ҳамда "Кока-кола ичимлиги Ўзбекистон ЛТД" Ўзбекистон-Америка қўшма корхонасининг ишлаб-чиқариш фаолиятини тиклаш мақсадида

## БУЮРАМАН:

1. Ўзбекистон Республикаси Вазирлар Маҳкамаси Истеъмол товарлари ишлаб чиқариш ва савдо мажмуасининг 2004 йил 13 августдаги 04/23-51-сонли ва 2004 йил 4 сентябрдаги 04/23-3/сонли хатлар орқали "Muzimpex LTD" агросаноат қўшма корхонасининг "Кока-кола ичимлиги Ўзбекистон ЛТД" қўшма корхонаси устав фондининг 57,118 фоиз давлат улушини сотиш тўғрисидаги таклифига розилик берилганлиги маълумот учун хабар қилинсин.

2. "Кучмас мулк ва сармоялар агентлиги" ёпиқ акциядорлик жамиятининг 115/1-2004-сонли хулосасига "Muzimpex LTD" агросаноат қўшма корхонасига сотилади ган "Кока-кола ичимлиги

Ўзбекистон ЛТД, қўшма корхонаси устав фондидаги 57,118 фоиз давлат улушининг қиймати 14 136 880,0 (ўн тўрт миллион бир юз ўттиз олти минг саккиз юз саксон) АҚШ доллари миқдорида тасдиқлансин.

3. "Muzimpex LTD" агросаноат қўшма корхонаси "Кока-кола ичимлиги Ўзбекистон ЛТД" қўшма корхонасининг устав фондидаги 57,118 фоиз давлат улушини сотиб олиш учун Давлат мулки қўмитасининг махсус ҳисоб рақами (21508000500600289001, МФО 00014, ИНН 201122696 Ўзбекистон Республикаси Марказий банкининг Тошкент шаҳар бош бошқармаси ҳисоб-касса марказига 14 136 880,0 АҚШ доллари миқдоридаги пул тўловларни Ўзбекистон Республикаси Марказий банкининг тўловлар амалга оширилдиган кундаги сумни АҚШ долларига белгиланган қийматда миллий валюта "сўмда" қуйидаги тартибда, яъни:

- умумий сотиб олиш нархидан 2 000 000,0 АҚШ долларини олди-сотди шартномаси имзоланган кундан бошлаб 30 (ўттиз) банк куни мобайнида;

- қолган 12 136 880,0 АҚШ доллари миқдордаги пул тўловларни биринчи тўлов амалга оширилгандан сўнг 5 ой мобайнида, ҳар ойда тенг улушларда (2 427 376,0 АҚШ доллардан) амалга оширсин.

4. Раиснинг биринчи ўринбосари (И. Яковлев) ва Истеъмол товарлари ишлаб чиқариш ва савдо соҳасида хусусийлаштириш бошқармаси (А. Юлдашев) Давлат мулки қўмитаси ва "Muzimpex ВНН" агросаноат қўшма корхонаси ўртасида "Кока-кола ичимлиги Ўзбекистон ЛТД" қўшма корхонасининг устав фондидаги 57,118 фоиз давлат улушини мазкур буйруқнинг 3-бандида келтирилган шартлари асосида сотиш бўйича белгиланган тартибда олди-сотди шартномасини тузсин.

5. Ушбу буйруқнинг нусхалари "Кока-кола ичимлиги Ўзбекистон ЛТД" Ўзбекистон-Америка қўшма корхонасига, "Muzimpex LTD" Ўзбекистон-Америка агросаноат қўшма корхонасига, Давлат мулки қўмитасининг Давлат тасарруфидан чиқариш ва хусусийлаштириш, Давлат мулкини бошқариш ҳамда Молия, ҳисоб ва ҳисобот бош бошқармаларига, Истеъмол товарлари ишлаб чиқариш ва савдо соҳасида хусусийлаштириш бошқармасига ва Тошкент шаҳар ҳудудий бошқармасига юборилсин.

6. Мазкур буйруқнинг бажарилишини назорат қилиш Раиснинг биринчи ўринбосари И. Яковлев зиммасига юклатилсин.



Раис                          М. Асқаров

# Erb Declaration

# Exhibit G

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROZ TRADING LTD., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | 1:06-CV-01040 (CKK) |
| | ) | |
| v. | ) | |
| | ) | |
| ZEROMAX GROUP, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL DECLARATION OF MANSUR MAQSUDI

Under penalty of perjury, Mansur Maqsudi states as follows:

1. My name is Mansur Maqsudi and I am over the age of 21 years, am of sound mind, and am competent to testify. The matters set forth herein are within my personal knowledge and are true and correct.

2. I am a citizen of the United States and I live in Mendham, New Jersey. I first moved to New Jersey in 1979 and have been living exclusively in New Jersey since 2001.

3. I am the Managing Director of ROZ Trading Ltd. ("ROZ") and have been at all times relevant to the acts at issue here. During my time at ROZ, I have also held other titles, including President, Officer, and Director.

4. Since 2001, when ROZ was illegally excluded from operating CCBU and its shares were ultimately transferred to the Zeromax entities, ROZ's primary business activities have focused on winding up its affairs and pursuing avenues to recover its assets in Uzbekistan. In addition, ROZ carries on a legacy function of providing treasury support for a group of foreign companies with which it is affiliated.

1

5. Both of these functions – recovery of stolen assets and treasury support – were directed from and carried out in New Jersey throughout 2006.

6. As part of ROZ's effort to recover its valuable stolen property, ROZ engaged counsel and consultants, including Gibson, Dunn & Crutcher LLP and Crowell & Moring LLP. ROZ's communications with counsel were directed to and from its office in New Jersey. Some of the many examples of the communications between the attorneys and ROZ are attached to this Declaration:

    a. Attached as Exhibit A is a true and accurate copy of a bill I received from Crowell & Moring LLP in or about May, 2006 (redacted).

    b. Attached as Exhibit B is a true and accurate copy of a letter I received from Gibson, Dunn & Crutcher LLP in or about April, 2005.

    c. Attached as Exhibit C is a true and accurate copy of a letter I received from Crowell & Moring LLP in or about August, 2005.

7. Working in my capacity as ROZ's Managing Director, I sent and received numerous communications to further ROZ's objective of enlisting assistance to protect our assets. I sent these letters from New Jersey, and I received such letters in New Jersey. Examples of these communications are attached to this Declaration:

    a. Attached as Exhibit D is a true and accurate copy of a letter I received from The Coca-Cola Export Corporation in or about March, 2002.

    b. Attached as Exhibit E is a true and accurate copy of a letter I sent to Senator Durbin in or about December, 2001.

    c. Attached as Exhibit F is a true and accurate copy of a letter I sent to Congressman Burton in or about June, 2002.

8. From New Jersey, I direct and coordinate the various litigations brought by ROZ's attorneys and consultants and I make all key legal and strategic decisions in that regard from New Jersey. I received documents relating to the lawsuits in New Jersey and virtually all of my decisions about litigation strategy took place in New Jersey. In sum, all significant decisions and actions taken by ROZ with regards to the pursuit of its stolen interest in CCBU – one of the main business activities of ROZ since its exclusion from CCBU – were conducted in New Jersey throughout 2006. These recovery efforts include cases in numerous jurisdictions, including (in addition to this case):

   a. International arbitration claims in the International Arbitral Centre of the Austrian Federal Economic Chamber (*Roz Trading Ltd. v. The Coca-Cola Export Corporation, et al.,* Case Number SCH-4986);

   b. Discovery proceedings before the U.S. District Court for the Northern District of Georgia (*In re Application of ROZ Trading Ltd.*, Case Number 1:06-cv-2305-WSD); and

   c. Defamation claims before the U.S. District Court for the District of Columbia (*Maqsudi et al., v. GlobalOptions, Inc. et al.*, Case Number 1:07-cv-1252-RJL).

9. In addition to pursuing and managing these claims, ROZ provided treasury functions for its group of affiliated companies outside of the United States. These functions were also directed by me from New Jersey since ROZ was effectively ousted from Uzbekistan in 2001. As Managing Director of ROZ, I was responsible for managing the funding needs of the various members of the group and typically reviewed business plans, operating budgets, and cash flow projections for these companies from our office in New Jersey. I did all of those things in New Jersey throughout 2006.

10. I also wish to make one point of clarification from my prior declaration. In paragraph 7 of my December 7, 2006, Declaration, I testified that "Currently ROZ works with multinational companies such as Colgate and Gillette to distribute consumer goods throughout much of Central Asia and the Middle East. In addition, ROZ is involved in the reconstruction of Afghanistan as a contractor for USAID." To be more precise, I should note that the distribution of consumer goods and other operational work was carried on by companies with which ROZ is affiliated. For these operations, ROZ carried on the centralized treasury function from New Jersey at my direction.

I declare under penalty of perjury and that the foregoing is true and correct.

_9/26/07_
Date

_Mansur Maqsudi_
Mansur Maqsudi

4

# EXHIBIT A



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595
p202 624-2500 ■ f202 628-5116

May 15, 2006

Invoice Number: 1191768
Proforma Number: 274714
Matter: 101579.0000001

Re: Vienna Arbitration

*Billing Instructions:*

**For Services Rendered Through April 30, 2006:**

Total Professional Services
Total Other Services and Expenses

TOTAL

Less: Unallocated Amount Applied
Less: Retainer/Trust Amount Applied

TOTAL BALANCE DUE

**Write-Down Amounts:**
Professional Services
Other Services and Expenses

TOTAL WRITE-DOWN







P.O. Box 75509
Baltimore, MD 21275-5509
Taxpayer ID # 52-1150358

May 15, 2006


ROZ Trading Ltd
ROZ Group, Inc
P.O. Box 9068
Morristown, NJ 07963


Matter: 101579____0001
Invoice: 1191768

_____

Statement of Account

RE: Vienna Arbitration


Professional Services Rendered Through April 30, 2006
Other Services and Expenses Incurred for your Account


Total Services & Expenses


Total Due This Invoice

| Wire/ACH payments to: | Bank Address is: | |
|---|---|---|
| Bank Name: Wachovia Bank, N.A. | Wachovia Bank, N.A. | Please reference Our Ref. |
| Swift Code: PNBPUS33 | 1525 West WT Harris Blvd. | Number and Debit Number |
| Account No. 2000026603531 | Charlotte, NC 28288 | in the REMARK section. |
| ABA Number: 054001220 | | |



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595
p202 624-2500 ■ f202 628-5116

May 15, 2006

ROZ Trading Ltd
ROZ Group, Inc
P.O. Box 9068
Morristown, NJ 07963

Matter: 101579.0000001
Invoice: 1191768

Statement of Account

RE: Vienna Arbitration

**Professional Services:**

**Total Professional Services**     

**Other Services & Expenses:**

| Description | Amount |
|---|---|
| Express Delivery | |
| Comp. Library Research | |
| Inhouse Duplicating | |
| Inhouse Color Copying | |
| Telephone | |
| **Total Other Services & Expenses** |  |

Statement Number: 1191768
Page #: 2

**Total Due this Invoice**



# EXHIBIT B

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

2029 Century Park East  Los Angeles, California 90067-3026
(310) 552-8500
www.gibsondunn.com

mlevine@gibsondunn.com

### April 11, 2005

Direct Dial                                                                                      Client No.
(310) 557-8098                                                                      C 79558-00001
Fax No.
(310) 552-7098

Mr. Mansur Maqsudi
6 Queens Court
Morristown, New Jersey 07960

Dear Mansur:

Enclosed you will find our statement dated April 4, 2005, for legal services and disbursements rendered for the period ending March 31, 2005.

If you have any questions, please give me a call.

Warmest best wishes.

Sincerely,

Mel Levine
of Gibson, Dunn & Crutcher LLP

ML/rls
20155318_1.DOC

# EXHIBIT C

# crowell **(** moring

1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

Stuart H. Newberger
202-624-2649
snewberger@crowell.com

August 5, 2005

101579.0000001

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Zeromax Group, Inc.
1725 I Street, NW
Suite 300
Washington, DC 20006

                    Re:    Coca-Cola Bottlers Uzbekistan, Ltd.

Ladies and Gentlemen:

        Our firm represents ROZ Trading Ltd., a limited liability company organized under the laws of the Cayman Islands, United Kingdom and its wholly owned subsidiary, ROZ Trading Ltd. (Uzbekistan), an Uzbek limited liability company (hereinafter together "ROZ"). In or about 1993, our client entered into a Joint Venture Agreement with Coca-Cola and the Republic of Uzbekistan (through its agency, Pishprom Association ("Pishprom")) under which the parties formed and operated the Coca-Cola Bottlers Uzbekistan, Ltd. ("CCBU"). Our clients continued to operate CCBU profitably until actions by Uzbekistan and Coca-Cola, beginning in 2001 and continuing today, precluded our clients from further participation and management in the joint venture and its operations.

        Accordingly, on April 11, 2005, ROZ provided the known parties to the joint venture with a copy of the enclosed Notice of Termination. We have just received Pishprom's response in which it alleges that it no longer holds shares in the joint venture, but does not identify the present owner. We have reason to believe that Zeromax now owns and/or controls the shares in the joint venture that formerly belonged to Uzbekistan (most of which were unlawfully taken from ROZ). Consequently, at a minimum, Zeromax now shares in Uzbekistan's obligations and liabilities under the joint venture agreement.

        While we believe that the Notice of Termination has already effectively terminated the joint venture, as a courtesy, we are providing you a copy directly and

Zeromax Group, Inc.
August 5, 2005
Page 2

this opportunity to ensure ROZ is fully compensated for its significant interest in the joint venture, the value of which was largely created by ROZ's efforts, as well as for other damages sustained by ROZ as a result of the other wrongful acts related to the joint venture agreement.

Please call me if you wish to discuss this matter.

Very Truly Yours,

for Stuart H. Newberger

Enclosures

cc:     The Coca-Cola Company (w/o encl.)
        c/o L. Joseph Loveland, Esq.
            King & Spaulding LLP

        B. Kholmukhamedov, Chairman (w/o encl.)
        OzigOvkatSanoat

        Managing Director (w/encl.)
        Coca-Cola Bottlers Uzbekistan, Ltd.

bcc:    Mansur Maqsudi

        Allan Gerson, Co-Director
        Institute for Peacebuilding and Development

        Alyssa Gsell, Esq.
        Sobia Haque, Esq
        Alan W.H. Gourley, Esq.

# EXHIBIT D

13/03 02  WED 19 06 FAX                                        ☐001

## The Coca-Cola Export Corporation
COCA-COLA PLAZA
ATLANTA, GEORGIA

ADDRESS REPLY TO
P C DRAWER 1734
ATLANTA GA 3030
404 676 2 31

Mr  Mansur Maqsudi
3 Manchester Drive
Denville, NJ 07834
U.S.A.

By fax (+1 973 335 5504) and by e-mail

March 13, 2002

Re. a) Your letter dated February 20, 2002
    b) Your letter dated March 12, 2002

Dear Mansur,

With reference to (a) above, I would like to emphasize once more that the insinuations and accusations you continue to direct to us are totally untrue and unjustified, as repeatedly answered in our earlier correspondence with you and other Roz representatives and consultants. We hereby reserve our rights with respect to the contents of your letter  Your insistence on using such a tone of correspondence is worsening our relationship as joint venture partners instead of improving it  We do not see any point in continuing this line of negative correspondence which is not at all conducive to better our relationship or to negotiate a mutually acceptable position in these difficult circumstances. I am as always open to meeting with you to try to agree on pending matters related to the operation of the business but with respect to any further written correspondence I would request at this stage that it should be directed to our legal department, to Ms  Banu Pektas, Eurasia and Middle East Division Legal Counsel.

Regarding your requests contained in both of your above referenced letters, I have asked CCAR Legal Counsel to provide you with the documents you requested if they have not already been sent to you

Yours sincerely,

Ahmet C  Bozer

CC:    Mr. Cem Kozlu
       Mr  Farid Maqsudi (please copy)
       Mr. Selcuk Erden
       Ms. Banu Pektas

# EXHIBIT E

# MANSUR   MAQSUDI

The Honorable Richard Durbin
United States Senate
332 Dirksen Senate Office Building
Washington, DC 20510

December 28, 2001

Dear Senator Durbin,

I would respectfully like to draw your attention to my plight as a parent denied access to his children. As a defender of children's rights, you will certainly sympathize with my situation.

My name is Mansur Maqsudi, an American Citizen. I was married to Gulnora Karimova, the daughter of the President of Uzbekistan. We have two lovely children, Islam and Iman, ages 9 and 3 respectively. Both of my children were born in the United States, thus citizens of this great nation. I am very close to my children and love them dearly. I was, in my humble opinion, an excellent parent, deeply involved in their lives at least until July 29 of this year.

On that date, I separated from my wife, Gulnora Karimova. Out of spite for my decision, she left for Uzbekistan, taking both children without my consent. Since then, I have desperately tried to communicate with my children although without success. My wife refuses to let me have any contact with them.

As a parent, you can imagine my emotional state. All I can think of is what is going on in my children's mind. Do they think I have abandoned them? I have no idea what lies they have been told regarding me. I miss having dinners with my daughter and my son, just the three of us, as we often did in the past. I miss tucking my children into bed and hearing their tired voices saying goodnight to me.

No children should be punished so severely. This will only leave a deep lasting emotional scar, which will be beyond repair. Each child deserves the security a parent can provide, whether in one or separate homes.

I have exhausted all my options to reach my kids. I tried reasoning with my wife. I personally appealed to her parents, President Karimov and Mrs. Karimov. I reached out to the Uzbek Ambassador in Washington, D.C. and the Uzbek Ambassador to the United Nations in New York City, as well as the Deputy Prime Minister, Mr. Azimov and Deputy Foreign Minister, Mr. Safaev on their recent visit to the United States. All my efforts to communicate with my kids are met with rejections.

6 Queens Court * Morristown, NJ 07960

All I want is the right to see and be with my children. I have been rewarded temporary custody of my children by the Morris County Court in New Jersey, where we have a home. Her reaction to the court's decision has been to take greater revenge in Uzbekistan towards me, my extended family and my business interests.

Just two days ago, she sent her KGB people to my families' homes from 11:45pm to 2:30am, rounded them up, loaded them into a bus, in their pajamas and without their coats, and sent them to the border of Afghanistan. I would like to add of the 25 family members, 22 are women and children. My grandmother, in her eighties, was thrown into the bus as well. She wasn't even allowed to take her diabetic medications with her. Gulnora has abused their human rights, just to get back at me for my decision to divorce her.

Furthermore, 32% of my families' shares in Coca-Cola Bottlers Uzbekistan have been nationalized. Our trading company, ROZ Trading LTD, has been liquidated. All these illegal actions taken by the Uzbek government are carried out as per Gulnora's instructions.

As United States is developing a new relationship withUzbekistan, my plight must be heard. Gulnora Karimova, should not be allowed to abduct my children, abuse my family members, and liquidate my businesses, just because she is the daughter of the President of Uzbekistan.

In addition, President Karimov has decreed this year as the Year of the Family in Uzbekistan. Therefore, shouldn't President Karimov ask his own daughter to do the right thing for the best interest of Islam and Iman? Simply like any other child, they need access to their father. Just six days ago I called Islam for his ninth birthday but unfortunately I was not allowed to speak to him nor wish him a Happy Birthday.

I am personally appealing to you, Senator Durbin, as you are preparing to go to Uzbekistan in January, to assist me in resolving this matter. My interests, as an American Citizen, must be protected. Gulnora should not be allowed to take advantage of her father's position for carrying on her personal vendetta aimed at me, my family and my businesses.

I thank you in advance for taking time to hear my circumstance.

Sincerely,

Mansur Maqsudi

# EXHIBIT F

# Mansur Maqsudi

The Honorable Dan Burton
2185 Rayburn HOB
Washington, DC 20515

June 18, 2002

Dear Congressman Burton:

I just learned that on June 12 the House Government Reform Committee held a hearing entitled "Should the United States Do More to Help US Citizens Held Against Their Will in Saudi Arabia?" I was horrified to learn about Patricia Roush's loss of her daughters.

Regrettably, I am going through a similar situation that I hope you can help to resolve.

On July 29 of last year, my children were abducted by their mother, Gulnora Karimova, the daughter of the President of Uzbekistan, Islam Karimov. I had announced my intention to divorce her on July 28. Rather than follow legal procedures, Gulnora decided to take it upon herself to leave for Uzbekistan with our children from our home in New Jersey without my consent.

I am a citizen of the United States, as are both of my children.

Congressman Burton, not only has Gulnora taken my children's Constitutional rights away from them, she has used her father's power to abuse, harass and torture my parents, extended family and employees and destroy my business interests in Uzbekistan.

I was married to Gulnora Karimova in November 1991 in ceremonies in both Uzbekistan and the United States. Our two children, Islam and Iman, ages 9 and 4 respectively, were both born in New Jersey. All their lives they have held and traveled with US passports.

To this date, I have been unable to communicate with them. I am continuously forced to miss out on important events in their lives – birthdays, holidays, special events at school and extracurricular events. My daughter, Iman, turned 4 years old yesterday and I was unable to wish my own child a happy birthday, nor was I able to talk to my son on his ninth birthday.

On August 1 in Uzbekistan, Gulnora threatened my father, also an American citizen, that if he and my family did not meet her demands within seven days, she would destroy the Maqsudi family and their businesses. In the last eleven

6 Queens Court * Morristown, NJ 07960 * 973.979.1653

months, I have watched this woman carry out every threat of hers against my parents, my extended family and my business interests.

Due to Gulnora's threats, my parents were forced to leave Uzbekistan. After their departure, Gulnora focused all her attention on my extended family, who are not American citizens. Since September 12, she has imprisoned three of my family members for eight to ten years for fabricated economic crimes and "causing harm to the state". All three of these relatives have serious health conditions requiring medical attention.

On December 26, Gulnora sent KGB officers to my family's homes from 11:45pm to 2:30am, rounded them up at gunpoint, loaded them into a bus, in their pajamas and without their coats, and dropped them off at the border of Afghanistan. Of the 25 family members who were subjected to this treatment, 22 are women and children. My grandmother, an Uzbek national and in her eighties, was thrown into the bus as well. She wasn't even allowed to take her diabetic medications with her. What explanations does Gulnora have for that inhuman act?

She is also on a crusade to destroy my businesses. Thirty-two percent of my family's shares in Coca-Cola Bottlers Uzbekistan have been illegally nationalized. Our trading company, ROZ Trading Ltd, has been liquidated. She has harassed, threatened and driven out of Uzbekistan my expatriate and local employees.

I am appealing to you to personally assist me in resolving this matter amicably and diplomatically. I have sought the assistance of several governmental agencies; but it seems that their hands are tied due to the new-found relationship between the United States and Uzbekistan. Everyone I have spoken to in the US government acknowledges Gulnora's wrongdoing and sympathizes with me; however, it seems to me that they are unwilling to act for fear of insulting her father, the President of Uzbekistan.

I have repeatedly been instructed to seek action in the Uzbek courts, even though our own State Department has documented that the Uzbek judicial system is under the direct influence of the Executive Branch, in other words, President Karimov and his family. I would never have due process in Uzbekistan.

I can not stand by and just watch my children's rights as United States citizens be taken away from them – not by Gulnora, nor the Uzbek Government, and certainly not by Department of State.

Gulnora should not have the ability to abuse her father's power. Nor should she be immune to internationally accepted laws, as a diplomat or the daughter of a president. She should be treated like any other human being who has broken the law.

6 Queens Court * Morristown, NJ 07960 * 973.979.1653

Most important, I need to be with my children in accordance with the temporary custody order I have been granted by the New Jersey courts. I don't want to miss any more special milestones in their lives. As innocent American children, their Constitutional rights should be preserved.

I would welcome an opportunity to discuss these issues with you personally. Thank you for your time.

Sincerely,

Mansur Maqsudi

# Erb Declaration

# Exhibit H

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| ROZ TRADING, LTD., et al. ) | |
| ) | |
| Plaintiffs, ) | 1:06-CV-01040 CKK |
| ) | |
| v. ) | |
| ) | |
| ZEROMAX GROUP, INC., et al. ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF MANSUR MAQSUDI

Under penalty of perjury, Mansur Maqsudi states as follows:

1. My name is Mansur Maqsudi and I am over the age of 21 years, am of sound mind, and am competent to testify. The matters set forth herein are within my personal knowledge and are true and correct.

2. I was born in 1967 in Afghanistan.

3. I am a naturalized citizen of the United States of America, and I live in Mendham, New Jersey.

## ROZ Trading

4. Currently, I am the Chairman and Chief Executive Officer of ROZ Trading, Ltd. ("ROZ").

5. My family created ROZ in 1992 for the purpose of distributing consumer goods throughout Central Asia.

6. The company is organized under the laws of the Cayman Islands, but the business is managed in New Jersey. All key business decisions are made at our office in New Jersey. Meetings of ROZ's Board occur in New Jersey, and many corporate records are kept in New Jersey.

7. Currently ROZ works with multinational companies such as Colgate and Gillette to distribute consumer goods throughout much of Central Asia and the Middle East. In addition, ROZ is involved in the reconstruction of Afghanistan as a contractor for USAID.

**My Relationship with Gulnora Karimova**

8. In November 1991, I married Gulnora Karimova, the daughter of Islam Karimov, the President of Uzbekistan. We set up a home in New Jersey and had two children, named Islam and Iman.

9. Beginning in 2001, our marriage took a turn for the worse. As a result, on July 28, 2001, I told Ms. Karimova that I wished to separate from her.

**Ms. Karimova's Behavior Toward my Family**

10. The night after I told her I wished to separate from her, Ms. Karimova kidnapped our children and fled to Uzbekistan.

11. In early August 2001, I received word that some of my relatives living in Uzbekistan had been threatened or detained by the National Security Service – the Uzbekistani equivalent of the KGB. To this day, I have not seen my children and several of my relatives remain missing.

12. Around the same time, I attempted to make contact with Ms. Karimova to make sure that our children were safe. She gave me no assurances about their safety and did not permit me to speak with them.

13. In one telephone conversation, Ms. Karimova told me that she would release my family members and allow me to see my children only if I paid her millions of dollars.

14. As part of the divorce proceedings, the Superior Court in New Jersey ordered Ms. Karimova to return the children to me and to arrange immediate telephone contact so that I could talk to them. She has refused to do so and continues to defy the court order to this

day. Because of her failure to comply with this court order, a warrant has been issued for her arrest.

**Hostility Toward CCBU and ROZ**

15. Several senior executives at Coca-Cola Bottlers Uzbekistan ("CCBU") have described to me what transpired in Uzbekistan soon after I told Ms. Karimova that I wished to separate from her. Several managers were taken into custody by the National Security Service and held for periods ranging from hours to days. Many of these managers were forced to leave Uzbekistan and were threatened with imprisonment or violence.

16. I was also told that agents of the National Security Service descended on CCBU's offices in Tashkent and carted off dozens of boxes of documents and many desktop computers. CCBU managers told me that these agents claimed that this ransacking was part of a routine tax audit. As the President of CCBU, I had been through tax audits before, and the activities that transpired in 2001 were nothing like a routine tax audit.

**Trying to Find out What Happened**

17. During this time period, I spent most of my time trying to locate and save my employees and relatives and to see my children.

18. Under normal circumstances, I could have called my colleagues at CCBU to get information immediately about what was happening, but they had all fled the country out of fear of imminent imprisonment or death. Because I was not in Uzbekistan, it was impossible for me to get any information about what was taking place.

19. I learned that Uzbekistan had initiated court proceedings against ROZ, but I could not participate in them. ROZ's lawyers were denied visas by the Uzbekistani government. ROZ had one lawyer helping it in Uzbekistan, but she was given very limited information,

some of which was in a language that the court knew she – like many lawyers and citizens of Uzbekistan – could not speak or read.

20. I suspected that my ex-wife, Gulnora Karimova, and Coca-Cola were involved in the hostility toward my family and ROZ.

21. I heard that meetings were called regarding the ownership and management of CCBU, but I could not attend, because the meetings were taking place in Tashkent, and I had strong reason to believe that I would be killed if I traveled there. I continue to believe that I will be killed if I travel to Uzbekistan, because my family and I frequently receive death threats.

22. I do know that ROZ was accused of failing to pay required charter funds and failing to comply with certain laws. As the Chief Executive Officer of ROZ, I personally made sure that the Company followed all laws, including payment of the required amount into the charter fund. Years later, having finally learned a bit about these cases against ROZ and its affiliates, I know that the allegations of wrongdoing are false.

23. Nonetheless, ROZ's interest in CCBU was stolen and it has never received any sort of compensation.

24. It was not until sometime in 2004 that I learned about what my ex-wife and Zeromax had done to steal ROZ's interest in CCBU.

I declare under penalty of perjury that the foregoing is true and correct.

_12/7/06_
Date

_Mansur Maqsudi_

4

# Erb Declaration
# Exhibit I

Erb Decl. Ex. I

# CHART OF WEBSITE STATEMENTS
## AND SOURCE DOCUMENTS

**Website Text In Bold Omitted From Complaint**
*Website Text In Italics Reflects Website Author's Comments*
Non-Italicized Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(a) | *Around April 2001, government auditors began to uncover illegal schemes involving CCBU and Roz Trading.* | "Divorce Drama Goes International." Insight Magazine. 1 September 2003 | A-5 |
| ¶ 36(b) | *As explained by* **Uzbekistan Ambassador Shavkat Khamrakulov,** *during a* "routine regular audit" *of Coca-Cola Bottlers Uzbekistan Ltd. (CCBU) and Roz Trading, Ltd.* "serious violations of the law [were][3] revealed by Uzbekistan's tax agencies." | Letter from Uzbekistan Ambassador Shavkat Khamrakulov to then-U.S. Senator Robert Torricelli. 29 August 2001 | A-5 |
| ¶ 36(c) | *According to Uzbek Deputy Foreign Minister Sadyk Safayev, the Maqsudis* "committed lots of misdeeds, like violations of tax law, violations in sales regulation, and violation of human rights in the plant here." | "Family Feud in Uzbekistan Entraps Coca-Cola." Associated Press. 20 November 2002 | A-5 |

[1] As accessed on October 24, 2006.

[2] Sources are drawn from footnoted documents on the website and documents otherwise referred to on the website.

[3] All brackets, parentheses and ellipses in this document are as provided on the website, as accessed on October 24, 2006.

Website Text In Bold Omitted From Complaint
*Website Text In Italics Reflects Website Author's Comments*
Plain Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(d) | *For failing to pay back taxes and other offences, the joint venture was terminated in April 2005 and the remaining assets were liquidated.* | "Family Feud in Uzbekistan Entraps Coca-Cola." Associated Press. 20 November 2002<br><br>"Uzbekistan Offers Rich Pickings for Leader's Daughter." Financial Times. 19 August 2003 | A-5 |
| ¶ 36(e) | *The Maqsudis were convicted of the following criminal violations of the Criminal Code of the Republic of Uzbekistan.[4]* | Uzbekistan Attorney General Rashitjon Kadirov Letter to then-U.S. Attorney General John Ashcroft. 18 November 2002 | A-6 |
| ¶ 36(f) | *Mansur Maqsudi also committed the following crimes, according to the Deputy Attorney General of the Republic of Uzbekistan.[5]* | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002 | A-7 |
| ¶ 36(g) | *On 12 May 1993, the Maqsudis falsely registered Roz Trading, Ltd. as a foreign enterprise in Uzbekistan.* | "Divorce Drama Goes International." Insight Magazine. 1 September 2003 | A-12 |
| ¶ 36(h) | ***As explained by the Uzbekistan Office of Public Prosecutor,*** *when registering the company, the Maqsudis* "presented forged documents to the authorities of Uzbekistan on the parent enterprise that had not yet been registered in the territory of Cayman Islands by that time. Thus, the listed persons registered the foreign enterprise in the Republic of Uzbekistan by false statement." | Uzbekistan Attorney General Rashitjon Kadirov Letter to then-U.S. Attorney General John Ashcroft. 18 November 2002 | A-12 |

---

[4] This statement goes on to list various crimes as provided for under the Criminal Code of the Republic of Uzbekistan.

[5] This statement goes on to list various crimes as provided for under the Criminal Code of the Republic of Uzbekistan.

2

Website Text In Bold Omitted From Complaint
*Website Text In Italics Reflects Website Author's Comments*
Plain Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(i) | *When the Maqsudis registered Roz Trading Ltd., they listed the amount of the charter fund at "$500,000." However, the fund was never created.* **As explained by Uzbekistan authorities,** *the necessary resources and other property were not brought into the Republic.* | Uzbekistan Attorney General Rashitjon Kadirov Letter to then-U.S. Attorney General John Ashcroft. 18 November 2002 | A-15 |
| ¶ 36(j) | *ROZ Trading Ltd. thus fraudulently reneged on its legal obligations to invest $500,000 in its start-up ventures.* | "Divorce Drama Goes International." Insight Magazine. 1 September 2003 | A-15 |
| ¶ 36(k) | *As explained by* **O.B. Murodov, Deputy Attorney General of the Republic of Uzbekistan,** *from 1995 to 2000, Roz Trading Ltd. failed to create a charter fund totaling $500,000. Thus the company did not qualify for the tax privilege.* | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002 | A-15 |
| ¶ 36(l) | *Roz Trading and its affiliated company Valuelink FZE in Dubai, UAE, defrauded their multinational partners, chiefly Proctor & Gamble and Alberto Culver, by contracting to sell personal-care products in Uzbekistan and then re-labelling the products and reselling them for larger profits in the U.S., United Kingdom, UAE, and African countries,* **according to Uzbek Deputy Prosecutor General Khamidjon Nematov.** *The fraudulent activity is known as "parallel trading."* | "Divorce Drama Goes International." Insight Magazine. 1 September 2003 | A-16 |
| ¶ 36(m) | *Roz Trading received up to a 30-percent discount on goods from its multinational partners, according to Uzbekistan Attorney General Rashitjon Kadirov.* | "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazeta. Issue #55. 31 July 2003 Uzbekistan Attorney General Rashitjon Kadirov Letter to then-U.S. Attorney General John Ashcroft. 18 November 2002 | A-16 |

3

Website Text In Bold Omitted From Complaint
*Website Text In Italics Reflects Website Author's Comments*
Plain Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(n) | *Using false documents,* **the Taxation Committee explained the** *goods below were supposed to be shipped to Tashkent for distribution in Uzbekistan and were instead shipped to the United States and sold in New Jersey, New York, and California: Alberto Carvel, Revlon, and Duracell, through distributors in Singapore and Russia. Crazy Glue in Ohio. Biore facial cream.* | Letter from State Taxation Committee of the Republic of Uzbekistan to the Internal Revenue Service. 7 August 2001 | A-16 |
| ¶ 36(o) | *The shipment of Crazy Glue never left a U.S. port and was sold through Maqsudi's firms in New York and New Jersey,* **the Taxation Committee stated.** | Letter from State Taxation Committee of the Republic of Uzbekistan to the Internal Revenue Service. 7 August 2001 | A-16 |
| ¶ 36(p) | *Without the knowledge of manufacturers, the goods were also distributed to other CIS countries and Russia.* | "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003 | A-16 |
| ¶ 36(q) | *When representatives of American companies wanted to personally view how their products were being sold, they were taken to Tashkent where samples of their products were hurriedly scattered onto stalls in the central market,* **news articles reported.** *The foreign visitors were pleased by what they saw and did not know they were "witnesses of a well-staged show."* | "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003 | A-16 |
| ¶ 36(r) | **The news report said** *Procter & Gamble, its largest partner, and Gillette terminated their relationship with the Maqsudis and Roz Trading because of the fraudulent parallel trading activities.* | "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003. | A-16 |
| ¶ 36(s) | *ROZ Trading Ltd. (Uzbekistan) violated Article 243 – the* "legalization of profit received by criminal way." | Uzbekistan Attorney General Rashitjon Kadirov Letter to then-U.S. Attorney General John Ashcroft. 18 November 2002 | A-24 |

4

**Website Text In Bold Omitted From Complaint**
*Website Text In Italics Reflects Website Author's Comments*
Plain Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(t) | **According to Uzbek Attorney General Rashidjon Kadirov, the company** is guilty of "illegal profit-making from state budget money that was converted in the Republic of Uzbekistan for importing consumer goods." | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002 | A-24 |
| ¶ 36(u) | *On 5 January 1994, an import contract was signed between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan) on the delivery of $200 million of consumer goods.*<br><br>*Mansur Maqsudi signed the document on behalf of the Uzbekistan company and Farid Maqsudi signed the contract on behalf of the Cayman Islands company. The consumer goods included macaroni products, sugar, flour, chocolate products, children's nourishment, tea, cigarettes, chewing gum, among others. All payments related to the contract were made through Credit Swiss Bank in Switzerland. From 1995 to 1997, only "106,020,6 thousand U.S. dollars were delivered into Uzbekistan"* [$106,020.60?], **the Attorney General stated.** | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002 | A-24 |
| ¶ 36(v) | *On 12 August 1999, Mansur Maqsudi concluded a credit trade contract (No. 2/99) for consumer goods for "6,000,000 USD"* [$6 million] *between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan). The contract was registered (No. 21902294) with the Ministry of Foreign Economic Relations of the Republic of Uzbekistan on 13 September 1999.* | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002 | A-24 |

5

**Website Text In Bold Omitted From Complaint**
*Website Text In Italics Reflects Website Author's Comments*
Plain Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(w) | *The Maqsudi family embezzled funds, according to Rashitjon Kadirov, Attorney General of the Republic of Uzbekistan.* **"The members of the Maqsudi family,"** *he stated,* "purposefully overestimated the cost of contracts for delivery of consumer goods in Uzbekistan by including the expenditures for marketing and teaching services which factually were not carried out. By those contracts, they illegally received hard currency in the amount of 33 million 992 thousand USD." | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002<br><br>Uzbekistan Attorney General Rashitjon Kadirov Letter to then-U.S. Attorney General John Ashcroft. 18 November 2002 | A-25 |
| ¶ 36(x) | *From 1995 to 1997 the total amount of imported goods was* "11,122.06 thousand USD [$11.1 million]," **Attorney General Kadirov said.** *Of this amount, Maqsudi overestimated prices* "in the CCD" *by 34 percent or* "2,822.04 thousand USD [$2.8 million]." *In other words, this amount was* "stolen" *from the important goods.*<br><br>*Maqsudi overstated the price of goods on customs declarations by 15 percent or* "12,242.31 thousand USD' [$12.2 million]. The total amount of imported goods was "93,857.76 thousand USD" [$93.8 million].<br><br>*In total,* **Attorney General Kadirov stated that** "15,064.35 thousand USD [$15 million] or 994,247.000 sum . . . was embezzled from the state resources." | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002 | A-25 |
| ¶ 36(y) | *They overcharged for imported goods and took straightforward trading commission to* "siphon off" *much of the profits of the company and stashed the money in* "offshore accounts to avoid tens of millions of dollars in taxes," *according to the Uzbek prosecutor general's office.* | "Coke's Sinful World." Forbes Magazine. 22 December 2003 | A-26 |

Website Text In Bold Omitted From Complaint
*Website Text In Italics Reflects Website Author's Comments*
Plain Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(z) | *The Maqsudis,* **news reports stated, also** *funneled money under the* "pretext of investments" *through dummy firms,* "as a strategy to limit profit payments to other founders of CCBU." | "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazeta. Issue #55. 31 July 2003 | A-26 |
| ¶ 36(aa) | **Uzbek Ambassador Shavkat Khamrakulov said** *the Maqsudis additionally smuggled a* "tremendous amount of undeclared dollars out of Uzbekistan." *During an inspection of Roz Trading Ltd., an* "undeclared cash amount of $199,900 was discovered." | Letter from Uzbekistan Ambassador Shavkat Khamrakulov to then-U.S. Senator Robert Torricelli. 29 August 2001 | A-26 |
| ¶ 36(bb) | *Roz Trading was involved in numerous schemes to avoid paying taxes to the governments of Uzbekistan and the United States,* **according to Uzbek authorities.** | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002<br><br>Uzbekistan Attorney General Rashitjon Kadirov Letter to then-U.S. Attorney General John Ashcroft. 18 November 2002<br><br>Letter from State Taxation Committee of the Republic of Uzbekistan to the Internal Revenue Service. 7 August 2001 | A-27 |
| ¶ 36(cc) | *From 1995 to 2000, Roz Trading evaded paying taxes in the amount of 438,032,000 soms [$5.1 million] based on a* "commodity turnover in the amount of 24,519,190,000 soms [$287.6 million]." | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002 | A-27 |

7

Website Text In Bold Omitted From Complaint
*Website Text In Italics Reflects Website Author's Comments*
Plain Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(dd) | *Overall, the Maqsudis evaded taxes worth $17.6 million, according to Utkir Kamilov, Uzbekistan's top tax officer.* | "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003 — "Uzbekistan Offers Rich Pickings for Leader's Daughter." Financial Times. 19 August 2003 | A-27 |
| ¶ 36(ee) | **Uzbekistan Ambassador Shavkat Khamrakulov stated that,** "according to preliminary data, the Maqsudis . . . have smuggled a tremendous amount of undeclared cash dollars out of Uzbekistan." During an inspection of Roz Trading's office in Uzbekistan, "an undeclared cash amount of $199,000 was discovered," **the Ambassador disclosed.** | Letter from Uzbekistan Ambassador Shavkat Khamrakulov to then-U.S. Senator Robert Torricelli. 29 August 2001 | A-29 |
| ¶ 36(ff) | **Uzbekistan Deputy Attorney General Khamidjon Nematov disclosed that** Valuelink purchased oil products "from Middle Eastern countries, which are under economic sanctions by the World community." | Letter from Uzbekistan Deputy Attorney General to UAE Minister of Justice Muhamman al-Zaheri. 8 February 2003 | A-30 |
| ¶ 36(gg) | **Attorney General Nematov also declared that** Valuelink *falsified documents to conceal the true origin of the oil products by stating the country of origin for the oil was Uzbekistan.* | Letter from Uzbekistan Deputy Attorney General to UAE Minister of Justice Muhamman al-Zaheri. 8 February 2003 | A-30 |
| ¶ 36(hh) | *A total of 150,920 tons of oil products was illegally sold through Valuelink at a cost of $15,938,572.82, according to Attorney General Nematov.* | Letter from Uzbekistan Deputy Attorney General to UAE Minister of Justice Muhamman al-Zaheri. 8 February 2003 | A-30 |

Website Text In Bold Omitted From Complaint
*Website Text In Italics Reflects Website Author's Comments*
Plain Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(ii) | "[S]ince 1997, the Roz Trading company has sold sugar through the 'black market' and not paid profit tax for 7 billion soms (local currency), which is approximately $6 million." | Letter from Uzbekistan Ambassador Shavkat Khamrakulov to then-U.S. Senator Robert Torricelli. 29 August 2001 | A-33 |
| ¶ 36(jj) | *In the summer of 2000, Mansur "developed a criminal plan" to sell the sugar at 'overestimated prices' to clients . . .* | Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002 | A-33 |
| ¶ 36(kk)[6] | **Bribery —** <br><br> *Article 167, part 3, point "A" – "misappropriation by organized group of property entrusted (sic) to guilty by appropriation and embezzlement in especially (sic) large value. Article 168, part 3, point "A" – "conversion of property to his own possession in especially large value by fraud). Article 209, part I – "official forgery." Article 210, part 3, point "A" – "bribe taking in especially large value."* <br><br> (cont'd) | Uzbekistan Attorney General Rashitjon Kadirov Letter to then-U.S. Attorney General John Ashcroft. 18 November 2002 <br><br> "Coke's Sinful World." Forbes Magazine. 22 December 2003 | A-34-36 |

---

[6] Paragraph 36(kk) of the Complaint does not specifically identify any website statement, and instead provides generally: "That the Maqsudis engaged in bribery, misappropriation, conversion, official forgery, and bribe taking."

9

Website Text In Bold Omitted From Complaint
*Website Text In Italics Reflects Website Author's Comments*
Plain Website Text Reflects Direct Quotation

| Complaint Reference | STATEMENT (AS PUBLISHED ON WEBSITE)[1] | SOURCE[2] | Website Page(s) |
|---|---|---|---|
| ¶ 36(kk) | **Money Conversion Violations —** <br><br> "**Most of the goods [Coca-Cola Bottling Uzbekistan]** imported (sugar, bottling equipment, plastic performs, labels, caps, etc.) went through the Maqsudi-owned companies," *according to a Forbes article.* <br><br> *While Coke made payments,* "often late, in wobbly Uzbek currency that couldn't be taken out of the country, Maqsudi's properties got preferential treatment; they were paid in hard currency, often in advance. From 1998-2001, while Coke was struggling to get paid, almost $100 million was wired from Uzbekistan to Maqsudi affiliates, including a Dubai-based trading firm, Valuelink FZE, and various offshore affiliates of Roz Trading . . . according to Uzbek Central Bank records." <br><br> *In late 2001,* "the Maqsudi family lost control of the Coca-Cola plant, the government ordered liquidation of the other business [ROZ Trading Group, Ltd.], and two cousins and an uncle of Mr. Maqsudi's were convicted on tax-violation and money-conversion charges." | "Coke's Sinful World." Forbes Magazine. 22 December 2003 <br><br> "Judge Sets U.S. Court as Venue in International Custody Case." N.Y. Times. 13 September 2002. | A-36 |

10

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| MANSUR MAQSUDI, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | 1:07-CV-01252 RJL |
| | ) | |
| GLOBALOPTIONS, INC., *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

---

## **ORDER**

Having reviewed and considered Defendant Zeromax GmbH ("Zeromax")'s Motion to Dismiss the Complaint and the papers filed in support thereof, Plaintiffs' papers filed in opposition thereto, and the entire record herein, it is hereby

ORDERED, that Zeromax's Motion to Dismiss is GRANTED, and the Complaint is Dismissed in its entirety with prejudice.

SO ORDERED this __ day of _____, 200__.

_____
Richard J. Leon
United States District Judge