## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ───────────────────────────── ) | |
| MANSUR MAQSUDI, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Case No. 1:07-CV-01252 RJL |
| ) | |
| v. ) | |
| ) | |
| GLOBALOPTIONS, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ───────────────────────────── ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT
## ZEROMAX GMBH'S MOTION TO DISMISS THE COMPLAINT

CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

*Attorneys for Mansur Maqsudi, Farid Maqsudi,*
*and Abdul Rauf Maqsudi*

November 30, 2007

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................................ii

INTRODUCTION ............................................................................................1

BACKGROUND OF CLAIMS ..........................................................................3

ARGUMENT ..................................................................................................10

I.  THIS COURT MAY PROPERLY EXERCISE PERSONAL
JURISDICTION OVER ZEROMAX GMBH ..................................10

    A.  Zeromax Transacted Business In The District of Columbia When It
Contracted With GlobalOptions To Harm The Plaintiffs.........................10

    B.  The Purposeful Actions Of Zeromax In Washington, D.C. Caused
Injury To Plaintiffs Here.......................................................14

II.  PLAINTIFFS HAVE STATED VIABLE CLAIMS FOR DEFAMATION
AND FALSE LIGHT INVASION OF PRIVACY............................16

    A.  Plaintiffs' Complaint Is Within The Statute of Limitations ....................17

    B.  Plaintiffs' Claims Are Not Barred By The Fair Reporting Privilege........18

III.  THE ACT OF STATE DOCTRINE DOES NOT BAR THIS CASE ..............26

    A.  The Act of State Doctrine Does Not Apply Where Adjudication of
Plaintiffs' Claims Does Not Require The Court To Invalidate Any
Official Act .......................................................27

    B.  The Policies Underlying The Act Of State Doctrine Do Not Justify
Its Application In This Case ....................................31

    C.  The Act of State Doctrine Does Not Apply Where the Alleged
"Act" Was Orchestrated By Zeromax ...................................32

CONCLUSION.........................................................................................35

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                        **Page(s)**

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004) ................................................... 33

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976) ..................... 27

*Ampac Group, Inc. v. Republic of Honduras*, 797 F. Supp. 973 (S.D. Fla. 1992) ........... 27

*In re Application of Roz Trading Ltd.*, 469 F. Supp. 2d 1221 (N.D. Ga. 2006) ................ 5

*Arista Records, Inc. v. Sakfield Holding Co. S.L.*, 314 F. Supp. 2d 27 (D.D.C. 2004) ..... 13

*Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995) ............................................... 29

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2001) ..................................................... 27

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) ................................................... 13

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) ............................................. 29

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ................................................ 16, 17

*Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985), cert. denied,
        476 U.S. 1141 (1986) ............................................................................................. 20

*DeRoburt v. Gannett Co., Inc.*, 733 F.2d 701 (9th Cir. 1984) cert. denied, 469 U.S. 1159
        (1985) ................................................................................................................ 30, 31

*Dominicus Americana Bohio v. Gulf & Western Industries, Inc.*, 473 F. Supp. 680
        (S.D.N.Y. 1979) ...................................................................................................... 30

*El-Hadad v. Embassy of the UAE*, No. 96-1943, 2006 U.S. Dist. LEXIS 21491 (D.D.C.
        March 29, 2006) ...................................................................................................... 17

*Evans v. District of Columbia*, 391 F. Supp. 2d 160 (D.D.C. 2005) ................................. 3

*Friedman v. Israeli Labour Party*, 957 F. Supp. 701 (E.D. Pa. 1997) ............................. 21

*Galu v. SwissAir*, No. 86 Civ. 5551, 1987 WL. 15580 (S.D.N.Y. Aug. 3, 1987) ............. 34

*Glen v. Club Mediterranee S.A.*, 450 F.3d 1251 (11th Cir. 2006) ................................... 29

*Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995) ................................. 15

*Harris v. Ladner*, 127 F.3d 1121 (D.C. Cir. 1997) .......................................................... 16

*Hatfill v. Foster*, 401 F. Supp. 2d 320 (S.D.N.Y. 2005)...................................................24

*Hilton v. Guyot*, 159 U.S. 113 (1895)..............................................................................29

*Houlahan v. World Wide Association of Specialty Programs & Schools*, No. 04-01161, 2006 U.S. Dist. LEXIS 71858 (D.D.C., Mar. 28, 2006)...........................................25

*Industrial Investment Development Corp. v. Mitsui & Co.*, 594 F.2d 48 (5th Cir. 1979) .............................................................................................27

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) .........................................14

*Jankovic v. International Crisis Group*, 429 F. Supp. 2d 165 (D.D.C. 2006).................16

*Jankovic v. International Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007).......................18

*Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003)).............16

*Kline v. Williams*, No. 05-01102, 2006 WL. 758459 (D.D.C. March 23, 2006).......14, 15

*Kroger v. Legalbill.com LLC*, No. 04-2189, 2005 WL. 4908968 (D.D.C. April 7, 2005) .....................................................................................11, 13

*\*Lee v. Dong-A Ilbo*, 849 F.2d 876 (4th Cir. 1988) ..........................................18, 20, 22

*Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980)......................................26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................................15

*Mallinckrodt Medical, Inc. v. Sonus Pharms., Inc.*, 989 F. Supp. 265 (D.D.C 1998)...............................................................................................14, 15

*\*Manifold v. Wolf Coach*, 231 F. Supp. 2d 58 (D.D.C. 2002).........................................13

*\*OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005)...............................................................................20, 21, 22, 23, 25

*Oceanic Exploration Co. v. Conocophillips, Inc.*, No. 04-332, 2006 WL. 2711527 (D.D.C. Sept. 21, 2006) .........................................................................................29

*Olinger v. American Savings and Loan Association*, 409 F.2d 142 (D.C. Cir. 1969) ......19

*In re Philippine National Bank*, 397 F.3d 768 (9th Cir. 2005).......................................29

*Radtke v. Caschetta*, No. 06-2031, 2007 WL. 2071700 (D.D.C. July 17, 2007).............13

*Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986) ..................................... 27

*Republic of the Philippines v. Westinghouse Electric Corp.*, 774 F. Supp. 1438
(D.N.J. 1991) ................................................................................................. 31, 33

*\*Schwartz v. CDI Japan*, 938 F. Supp. 2d 1 (D.D.C. 1996) ..................................... 11, 12

*\*Sharon v. Time,* 599 F. Supp. 538 (S.D.N.Y. 1984) ....................................................... 28

*Timberlane Lbr. Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597
(9th Cir.1976)) ............................................................................................... 31, 32

*United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004) ...................... 16

*United States v. Merit*, 962 F.2d 917 (9th Cir. 1992) ...................................................... 29

*United States v. Sisal Sales Corp.*, 274 U.S. 268 (1927) ................................................. 32

*Virtual Defense and Development v. Republic of Moldova*, 133 F. Supp. 2d 1
(D.D.C. 1999) ....................................................................................................... 31

*W.S. Kirkpatrick, & Co., Inc. v. Environmental Tectonics Corp., International*,
493 U.S. 400 (1990) ......................................................................................... 27, 29

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ....................................... 17

*White v. Fraternal Order of Police*, 707 F. Supp. 579 (D.D.C. 1989) ................ 19, 20, 25

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ............................... 18

*World Wide Minerals, Ltd. v. Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002) ............. 29, 31

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ................................. 13

*Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131 (D.D.C. 2005) .............................. 16

## STATE CASES

*Beeton v. District of Columbia*, 779 A.2d 918 (D.C. 2001) ............................................ 25

*DeAngelis v. Hill*, 847 A.2d 1261 (N.J. Sup. Ct. 2004) ................................................... 17

*Klayman v. Segal*, 783 A.2d 607 (D.C. 2001) ............................................................ 16, 17

*Maqsudi v. Maqsudi*, 830 A.2d 929 (N.J. Super. Ch. 2002) ......................................... 4, 30

*Oparaugo v. Watts*, 884 A.2d 63 (D.C. 2005) ....................................................... 3, 20, 25

*Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78 (D.C. Cir. 1980) .................. 20, 25

*Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000) ................................ 13

## DOCKETED CASES

*GlobalOptions Inc. v. Livingstone*, Civ. A. No. 1:07-cv-00608 (PLF) .............................. 8

*Roz Trading Ltd., et al. v. Zeromax Group Inc., et al.*, Civ. A. No. 1:06-cv-01040
   (CKK) ............................................................................................................................ 5, 8

## FEDERAL AUTHORITIES

22 C.F.R. § 208.800(d) (2003) ........................................................................................ 16

28 U.S.C. § 1782 ............................................................................................................... 5

## STATE STATUTES

D.C. Code § 12-301(4) (2001) ......................................................................................... 17

D.C. Code § 13-423(a)(1) (2001) ..................................................................................... 11

D.C. Code § 13-423(a)(3) .......................................................................................... 14, 15

D.C. Code § 13-423(a) .............................................................................................. 11, 12

D.C. Code § 13-423(a)(3) ................................................................................................ 14

## OTHER AUTHORITIES

Restatement (Second) of Torts §§ 568(1) & 568A ......................................................... 17

Restatement (Second) of Torts § 611 cmt. d (1977) ....................................................... 20

**INTRODUCTION**

This case seeks damages arising from a series of deliberate, secretive and willful tortious actions *by Defendant Zeromax GmbH* acting *in this jurisdiction* that were specifically intended to harm *these Plaintiffs* and which in fact *caused them damage here and elsewhere*.  On that basis, the Zeromax Motion to Dismiss ("Motion") should be denied and the case should proceed to discovery and trial.

Initially*,* there is no dispute that the Complaint was filed in a timely manner, as the record discussed below makes clear.  Moreover, at no point will the Court "pass judgment" on the official "state acts" of the Government of Uzbekistan in order to resolve the merits of these tort claims that arose in this jurisdiction.  Nor can Zeromax present itself as some sort of bona fide news/media organ that can immunize its damaging conduct in this jurisdiction by characterizing it as "fair reporting" of public events and issues.  Indeed, the despotic, undemocratic and brutal nature of the Government of Uzbekistan undermines the very "fair reporting" defense raised here by Zeromax as a possible sanctuary for its harmful activities.  In any event, the claims in this case arise from *Zeromax's own conduct* – not the official acts of the Government of Uzbekistan – almost all of which either took place within the District of Columbia, and/or had a damaging effect on Plaintiffs within this jurisdiction, and elsewhere.

The Motion submitted by Defendant Zeromax attempts to entirely recast and indeed mischaracterizes the facts presented in this case – and even ignores the actual allegations in the Complaint – by portraying this dispute as somehow arising "ultimately from the alleged sovereign acts of Uzbekistan."  Motion at 3.  But a plain reading of the Complaint, as supplemented by materials on the record, makes clear that the effort to re-write the allegations (or simply ignore them when inconvenient) borders on the frivolous.

As discussed below, Zeromax is a large Swiss company that purposely came to Washington, D.C. to engage GlobalOptions, a Washington security firm, to "investigate" the Plaintiffs, whose only "crime" was that they and their firm had initiated legal proceedings in this Court, (as well as in the Northern District of Georgia and Vienna, Austria) arising from the destruction of a valuable soft-drink joint venture enterprise in Uzbekistan.  In coming to Washington, Zeromax engaged this well-known security firm to create a website, **mansurmaqsudi.net**, which posted false and defamatory statements about the Plaintiffs. Moreover, the website at issue was made accessible through multiple domain names that actually carried the names of the Plaintiffs, Mansur Maqsudi (mansurmaqsudi.com), Farid Maqsudi (faridmaqsudi.net, faridmaqsudi.com) and Abdul Rauf Maqsudi (abdulraufmaqsudi.com).  The website and domain names that resulted directly from Zeromax's decision to come to Washington and hire GlobalOptions had a very deliberate and clear purpose – to damage the reputations of the Plaintiffs.

Nor is there any serious question that in hiring GlobalOptions, Zeromax clearly intended to harm the Plaintiffs simply because they had initiated various lawsuits and arbitrations against Zeromax.  Indeed, the decision to come to Washington for this purpose took place shortly after – and in response to – these cases being prosecuted.

Not satisfied with these efforts, Zeromax – through its agent GlobalOptions – later made specific threats to the physical safety of Plaintiffs, again because they had the temerity to rely on the rule of law to vindicate their rights.  It is noteworthy that Zeromax does not mention these allegations in its Motion, and for obvious reasons.  Such allegations – accepted as true under Rule 12 – doom every aspect of their Motion.

Accordingly, Zeromax's Motion to Dismiss must be denied.

## BACKGROUND OF CLAIMS

Plaintiffs provide here a brief summary of the facts leading up to and giving rise to this case, detailed further in the Complaint and the record.  *See* Complaint ("Compl.") at ¶¶ 1-63; Exhibits A-S.[1]

On June 16, 1993, ROZ Trading Ltd. ("ROZ"), a company in which Plaintiffs Farid Maqsudi and Mansur Maqsudi are officers and directors, entered into a commercial Joint Venture Agreement ("JVA") with The Coca-Cola Export Corporation ("TCCEC"), a wholly-owned subsidiary of The Coca-Cola Company, and with the Republic of Uzbekistan.  Compl. at

---

[1]    Plaintiffs note here corrections to certain dates referenced in its Complaint at ¶¶ 14, 16. Search results for the domain names at issue from the Network Solutions website (www.networksolutions.com/whois) demonstrate the dates on which the domain names at issue were created.  *See generally* Network Solutions Reports (attached as Exhibits F-J, O, and P).  In evaluating a Rule 12(b)(6) motion to dismiss, "documents outside the pleadings can be considered without converting the motion to one for summary judgment … when 'a document is referred to in the complaint and is central to plaintiff's claim . . . .' In that case, the defendant may present an authentic copy to the court without converting the motion to one for summary judgment."  *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005); *see also Evans v. District of Columbia*, 391 F. Supp. 2d 160, 165 (D.D.C. 2005).  Plaintiffs' Complaint refers to the Network Solutions search results (at ¶¶ 14, 16), and the results are central to Plaintiffs' claims in that they demonstrate that the claims were brought within the statute of limitations.

- The correct date in Paragraph 14 of the Complaint should be September 6, 2006 (rather than June 9, 2006).  Paragraph 14 should read as follows:  On September 6, 2006, the domain names "mansurmaqsudi.net" and "faridmaqsudi.net" were registered to an unidentified individual through Katz Global Domain Registration ("Katz"). Katz is a company that advertises complete privacy and anonymity for those who wish to register and manage websites but do not wish to be identified by Network Solutions, the company through which website domain registrations may be searched."

- The correct date in Paragraph 16 of the Complaint should be July 11, 2006 (rather than July 6, 2006).  Paragraph 16 should read as follows:  On July 11, 2006, the domain name "mansurmaqsudi.com" was registered to an unidentified individual through Domains by Proxy, Inc. ("Domains by Proxy").  Like Katz, Domains by Proxy guarantees its clients complete privacy from the Network Solutions database.  "Mansurmaqsudi.com" also automatically directed viewers to the "mansurmaqsudi.net" website containing the defamatory statements.

¶¶ 1, 2, 12.  The name of the joint venture was Coca-Cola Bottlers of Uzbekistan Ltd. ("CCBU").  The joint venture was financially successful, as indicated in the 2000 annual audit, which valued CCBU assets in excess of $100 million.  Compl. at ¶ 12.

During the formation and early years of the joint venture, Plaintiff Mansur Maqsudi, the Managing Director of ROZ, was married to Gulnora Karimova ("Karimova"), the daughter of Islam Abduganievich Karimov, the President of the Republic of Uzbekistan (and former Communist Party chief during the Soviet era).  In July 2001, while living in New Jersey, Mansur Maqsudi told Karimova that he was ending the marriage.  This sparked a vicious and extreme reaction from Karimova which included kidnapping their two young children from their home in New Jersey and taking them to Uzbekistan.

In September 2002, the Superior Court of New Jersey found that it had jurisdiction under the Uniform Child Custody Jurisdiction Act to hear the custody dispute over the Maqsudi children.  After hearing the case, the court ordered Gulnora Karimova to return the two children to New Jersey and to arrange immediate telephone contact between the children and their father.  *See Maqsudi v. Maqsudi*, 830 A.2d 929 (N.J. Super. Ch. 2002).  To this day, Gulnora Karimova has refused to comply with these court orders.  As a result, Mansur Maqsudi has had no contact with his children – by phone, in person, or otherwise – since the court's decision.

Once Mansur Maqsudi informed her of his intention to divorce her, Karimova also began to attack members of the Maqsudi family in Uzbekistan and further attempted to extort money from Mansur Maqsudi.  She also influenced her father's government agencies to target the Maqsudi family's commercial business through office raids and sham judicial proceedings – all of which caused serious physical and emotional harm to the Maqsudi family and eliminated ROZ's ability to exercise its contractual rights to manage and control the joint venture.  Through

unlawful means and its association with Karimova, Zeromax illegally acquired ROZ's interest in the beverage joint venture. It is understood that Zeromax is controlled by Karimova. Compl. at ¶ 7; *Roz Trading Ltd., et al. v. Zeromax Group Inc., et al.*, Civ. A. No. 1:06-cv-01040-CKK, Amended Complaint ("Am. Compl.") at ¶¶ 39-46 (attached as Exhibit E); Decl. of Mr. Farhod Inogambaev ("Inogambaev Decl.") (*Roz Trading* Case) at ¶¶ 11, 20 (attached as Exhibit C). Ms. Karimova had worked with Zeromax prior to placing the control of CCBU with Zeromax. Am. Compl., Ex. E at ¶ 43; *see also* Inogambaev Decl. (*Roz Trading* Case), Ex. C at ¶¶ 12-13. And during the course of these events, she made explicit her intention to take over ROZ's interest in CCBU and place that interest in the hands of one of her companies – which, it ultimately became clear, was Zeromax. *See* Inogambaev Decl. (*Roz Trading* Case), Ex. C at ¶¶ 11, 20.

On June 6, 2006, ROZ filed a complaint in the United States District Court for the District of Columbia and simultaneously filed a Request for Arbitration with the International Arbitral Centre of the Austrian Federal Economic Chamber ("VIAC"), alleging damages arising from the events described above.[2]

Having availed themselves of their legal rights to initiate arbitration and litigation proceedings arising from the loss of their interest in the beverage JVA, Plaintiffs and their firm could not have expected the type of reaction from Zeromax that ensued. The initiation of such legal proceedings were by no means license for engaging in the type of secretive and injurious

---

[2]      On August 29, 2006, ROZ filed with the United States District Court for the Northern District of Georgia, a request for documents from Coca-Cola pursuant to 28 U.S.C. sec. 1782. After briefing by the parties, on December 19, 2006, that Court ordered Coca-Cola to produce responsive documents. *In re Application of Roz Trading Ltd.,* 469 F. Supp. 2d 1221 (N.D. Ga. 2006). After the District Court and the Eleventh Circuit denied Coca-Cola's request for an emergency stay pending appeal, Coca-Cola began producing thousands of pages of documents to ROZ. These documents reveal that Zeromax, Coca-Cola, and Uzbekistan worked closely together to destroy ROZ's business interests in Uzbekistan.

conduct initiated by Zeromax here.  Nonetheless, Plaintiffs later learned that in the immediate

months following these various filings, multiple domain names consisting of Plaintiffs' names

were registered.  On July 11, 2006, the domain name "mansurmaqsudi.com" was created and

registered anonymously through a company called "Domains by Proxy, Inc." ("Domains by

Proxy").  *See* Network Solutions Report for mansurmaqsudi.com, as viewed on October 26, 2006

(attached as Exhibit F).  On August 25, 2006, the domain names "faridmaqsudi.com" and

"abdulraufmaqsudi.com" were created and registered anonymously through Domains by Proxy.

*See* Network Solutions Report for faridmaqsudi.com, as viewed on October 6, 2006, and

abdulraufmaqsudi.com, as viewed on January 29, 2007 (attached as Exhibits G and H,

respectively).  On September 6, 2006, the domain names "mansurmaqsudi.net" and

"faridmaqsudi.net" were created and registered anonymously through a company called Katz

Global Domain Registration ("Katz").  *See* Network Solutions Report for mansurmaqsudi.net, as

viewed on October 6, 2006, and faridmaqsudi.net, as viewed on October 26, 2006 (attached as

Exhibits I and J, respectively).  Katz is a company that advertises complete privacy and

anonymity for those who wish to register and manage websites but do not wish to be identified

by Network Solutions, a company through which website domain registrations may be searched.

         None of this activity was known to Plaintiffs at the time, and the identity of the firms or

persons responsible for the creation and registration of these domain names was secret, as shown

below.

         All of the domain names directed viewers to the "mansurmaqsudi.net" website, which

published numerous false and defamatory assertions of fact concerning the Maqsudi family and

ROZ, a company they own and manage.  The statements falsely portrayed Plaintiffs as being

involved in the following activities: criminal code violations, illegal registration of ROZ, charter

fund fraud, fraudulent parallel trading, illegal profit-making, embezzlement, profit siphoning, tax evasion, smuggling cash out of Uzbekistan, oil embargo violations, selling sugar on the black market, bribery, and money conversion violations.  The false and defamatory statements published on the "mansurmaqsudi.net" website are detailed in the Complaint.  Compl. at ¶ 36.  Zeromax has also submitted what appear to be portions of the website as an exhibit.  Erb Decl. Ex. A. & Ex. B.  The Maqsudis first became aware of these websites in early October 2006.  But, as noted, it was impossible to determine who was responsible for the website and domain names given their anonymous registrations.

Further investigation into these websites led the Maqsudis to believe that GlobalOptions was the registrant of the domain names through Katz and Domains by Proxy.  On December 1, 2006, acting through counsel, Plaintiffs sent letters to Katz, Domains by Proxy and GlobalOptions informing them of the false and defamatory statements published on the websites hosted by or registered to them.  Plaintiffs' letters called for each of these websites, and any related websites, to be taken down immediately.  In addition, Plaintiffs informed them that the allegations published on the sites were unfounded and without any truth.  *See* Compl. at ¶¶ 21-23; Letters to Katz, Domains by Proxy and GlobalOptions (attached as Exhibit K).

Thereafter, Plaintiffs suspected that Defendant Zeromax likely had hired GlobalOptions to post the false and defamatory statements about Plaintiffs on the "mansurmaqsudi.net" website, which was made further accessible through four additional domain names: "faridmaqsudi.net"; "mansurmaqsudi.com"; "faridmaqsudi.com"; and "abdulraufmaqsudi.com".  This suspicion was confirmed on January 3, 2007 when ROZ's co-counsel, Dr. Allan Gerson, met with Neil Livingstone, then-Chairman and CEO of GlobalOptions, for the purpose of determining whether

or not Zeromax was responsible for the false website reports and, whether GlobalOptions had in fact played a role in posting those websites.

At that time, Mr. Livingstone confirmed to Dr. Gerson that GlobalOptions had indeed posted those websites at the express direction of Zeromax. Mr. Livingstone also made clear that the physical well-being of both Farid and Mansur Maqsudi was in serious jeopardy unless they dropped their lawsuit against his client, Zeromax (*Roz Trading Ltd., et al. v. Zeromax Group Inc., et al.*, Civ. A. No. 1:06-cv-01040 (CKK)) pending in this Court. Compl. at ¶ 24.

On January 11, 2007, Dr. Gerson and Mr. Livingstone met again. This meeting was also attended by Dr. Gerson's assistant. At this meeting, Mr. Livingstone confirmed the earlier threat posed against the Plaintiffs by his client by urging Dr. Gerson to advise ROZ to drop its case against Zeromax or face grave consequences. Mr. Livingstone indicated that Zeromax is run by dangerous persons and that its owners were furious at the Maqsudis for suing them. He also described Zeromax's connections to Russian mob leaders, including ex-KGB agents on errant missions. He reiterated that Zeromax could make life miserable for the Maqsudis, and added that his client would only refrain from hostile acts if the Maqsudis dropped the suit and paid two million dollars to Zeromax. Compl. at ¶ 24. Soon after the meetings with Mr. Livingstone, Plaintiffs' counsel contacted the Federal Bureau of Investigation to inform them about the threats to the Maqsudis' lives and personal safety, and the apparent attempt at extortion. Compl. at ¶ 25.

That Zeromax was a client of GlobalOptions during this relevant timeframe was reconfirmed in April 2007 by Mr. Livingstone's sworn affidavit in a lawsuit in this Court arising out of Mr. Livingstone's apparently unpleasant departure from GlobalOptions. In his affidavit, submitted in *GlobalOptions Inc. v. Livingstone,* Civ. A. No. 1:07-cv-00608 (PLF) (D.D.C.), Mr. Livingstone cited to and attached correspondence from an officer at GlobalOptions, stating that

Zeromax is a client of GlobalOptions.   Compl. at ¶ 26; *see* Decl. of Neil Livingstone

("Livingstone Decl.") at Attachment A (attached as Exhibit L).

On January 16, 2007, Plaintiffs finally received a response from Domains by Proxy

indicating that it had asked "its customer" to contact Plaintiffs' counsel to resolve the situation,

and that it gave its customer until January 19, 2007 to do so.   *See* January 16, 2007 Response

from Domains by Proxy (attached as Exhibit M).   The letter indicated that failure to make

contact by the deadline would result in the lifting of the privacy service for the three websites

registered to Domains by Proxy.   Neither Plaintiffs nor Plaintiffs' counsel were contacted by

Domains by Proxy's customer.   On January 26, 2007, Domains by Proxy informed Plaintiffs'

counsel that it had been unsuccessful in attempting to contact its customer.   Because it did not

respond to Domains by Proxy, the customer had violated the terms of service.   As a result,

Domains by Proxy canceled the privacy service for "mansurmaqsudi.com",

"abdulraufmaqsudi.com" and "faridmaqsudi.com".   *See* January 26, 2007 Correspondence from

Domains by Proxy (attached as Exhibit N).

Shortly thereafter, the Network Solutions database entries for these websites confirmed

that the true registrant of the websites was, in fact, GlobalOptions.   *See* Network Solutions

Reports for mansurmaqsudi.com, abdulraufmaqsudi.com, and faridmaqsudi.com, as viewed on

January 29, 2007 (attached as Exhibits O, H, and P, respectively).   To date, Plaintiffs have not

received any response from Katz regarding the websites registered through its privacy protection

service.

Starting February 2, 2007, none of the websites was functional for a brief period of time.

Accessing any one of them resulted in redirection to a website stating:  "This Account Has Been

Suspended.   Please contact the billing/support department as soon as possible."   However, the

false and defamatory statements posted by GlobalOptions and Zeromax were still accessible during this time.  The first result of a "Google" search on Mansur Maqsudi was the website "www.mansurmaqsudi.net" and a click on the link to "Cached" information displayed the website's entire first page with the exception of the pictures.

By March 2, 2007, all of the websites became fully functional again and remained functional until April 26, 2007.  Accessing the sites today results in a redirection to a website stating that the account has been suspended.

This case was then brought to hold Defendants responsible for their tortious actions in this jurisdiction which caused significant injury to Plaintiffs' reputations.

## ARGUMENT

### I.  THIS COURT MAY PROPERLY EXERCISE PERSONAL JURISDICTION OVER ZEROMAX GMBH

This Court's exercise of personal jurisdiction over Zeromax is proper under the District of Columbia's long-arm statute and the U.S. Constitution.

#### A.  Zeromax Transacted Business In The District of Columbia When It Contracted With GlobalOptions To Harm The Plaintiffs

As alleged in the Complaint, and as the record in this case makes clear, Zeromax deliberately came to Washington, D.C. to engage GlobalOptions specifically to carry out the tortious conduct giving rise to this case.  Under any legal standard, such activities subject Zeromax to personal jurisdiction in this Court.

The District of Columbia's long-arm statute provides this Court with specific personal jurisdiction over any claim arising out of a defendant's transaction of business within the District of Columbia – even if a plaintiff is not a party to the business transaction.  D.C. Code § 13-

423(a)(1) (2001).[3]  To establish personal jurisdiction, a plaintiff must show "(1) that the

defendant transacted business in the District; (2) that the claim arose from the business transacted

in the District and (3) that the defendant had minimum contacts such that the Court's exercise of

personal jurisdiction would not offend traditional notions of fair play and substantial justice."

*Kroger v. Legalbill.com LLC*, No. 04-2189, 2005 WL 4908968, at *5 (D.D.C. April 7, 2005)

(internal citations omitted); *see also Schwartz v. CDI Japan*, 938 F. Supp. 1, 4-5 (D.D.C. 1996).

        Plaintiffs have clearly established this Court's personal jurisdiction over Zeromax.

As alleged in the Complaint, and as admitted by the former CEO of GlobalOptions in this same

Court, Zeromax actively sought out and contracted with GlobalOptions here in Washington, D.C.

to post the defamatory websites at issue as well as to make the threats against Plaintiffs.  *See*

Compl. at ¶¶ 13, 24.  Moreover, it is clear from the record that Zeromax was a client of

GlobalOptions at all relevant times.  Compl. at ¶ 24; Livingstone Decl., Ex. L at Attachment A.

Because Zeromax transacted business with GlobalOptions, a D.C.-based company,[4] and

Plaintiffs' claims arise directly out of the business relationship between Zeromax and

GlobalOptions, personal jurisdiction is proper under D.C.'s long-arm statute and the U.S.

Constitution.

---

[3]      D.C. Code §13-423(a) provides that "[a] District of Columbia court may exercise
personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief
arising from the person's (1) transacting any business in the District of Columbia."

[4]      There is no dispute that GlobalOptions was acting within the District of Columbia.  For
instance, a January 2002 employment agreement between Neil Livingstone and GlobalOptions
lists the corporation's principal place of business at 1625 L Street, NW, Washington, D.C.
20036.  The agreement further states that Neil Livingstone "shall be based at the Company's
office in the Washington, D.C. metropolitan area."  *See* Employment Agreement filed in Case
1:07-cv-00608 (attached as Exhibit Q).

Moreover, the D.C. long-arm statute allows for personal jurisdiction whether the defendant acted directly or through an agent, where agency is determined by "mutual consent and a sufficient degree of control exercised by the principal." *Schwartz*, 938 F. Supp. 2d at 4; D.C. Code § 13-423(a). Plaintiffs have alleged that Zeromax both acted directly in this jurisdiction *and* hired and directed GlobalOptions to create the websites for the purpose of harming the Plaintiffs. Compl. at ¶¶ 13, 24. Therefore, this Court can properly exercise personal jurisdiction over Zeromax pursuant to the "agency" basis for jurisdiction under the long-arm statute.

The detailed allegations in this case make clear that Zeromax's effort to raise personal jurisdiction as a defense is frivolous. Specifically, Plaintiffs have alleged the facts necessary to show that personal jurisdiction over Zeromax is proper (contrary to Zeromax's bold assertion in its Motion, at 14, that "Plaintiffs have not alleged any specific acts connecting Zeromax to the District of Columbia."):

- "[GlobalOptions] has its principal place of business at 1615 L Street, NW, Suite 300, Washington, D.C. 20036. . . . GlobalOptions was hired by, and is an agent for, Defendant Zeromax GmbH." Compl. at ¶ 5.

- "Zeromax, working with Karimova, turned to Defendant GlobalOptions to further harm the business reputation and emotional well-being of the Maqsudis and their company, ROZ." Compl. at ¶ 13.

- "Mr. Livingstone [then CEO of GlobalOptions] confirmed to Mr. Gerson that GlobalOptions did indeed post those websites at the express direction of Zeromax." Compl. at ¶ 24.

- "Mr. Livingstone confirmed that Zeromax is a client of GlobalOptions. . . . Mr. Livingston cites to and attaches correspondence from Tom Ondeck, an officer at GlobalOptions, stating that Zeromax is a client of GlobalOptions." Compl. at ¶ 26. *See also* Livingstone Decl., Ex. L at Attachment A.

At the behest of Zeromax, GlobalOptions created and registered the defamatory websites, shortly after Zeromax was sued in this jurisdiction in a related case. Zeromax cannot

purposefully enter into business transactions with a D.C. company, and then claim it is unfair to be held accountable in this jurisdiction for the very harm intended by that business transaction. Exercising personal jurisdiction over Zeromax clearly comports with the Constitution's due process standards because Zeromax's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court" in the forum. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

This Court has exercised personal jurisdiction in similar cases where a defendant's transaction of business with a company in D.C. causes harm to a plaintiff. In *Manifold v. Wolf Coach*, for example, a plaintiff sued a Massachusetts corporation for personal injuries that resulted from a vehicle that the defendant had retrofitted for the plaintiff's employer. 231 F. Supp. 2d 58, 59 (D.D.C. 2002). In *Manifold*, the Court found that personal jurisdiction was proper because the defendant had a contract with a District-based company, and that transaction of business gave rise to the plaintiff's injuries. *Id.* at 62-63. Personal jurisdiction was proper even though the plaintiff was not a party to the contract.

In another case, this Court exercised personal jurisdiction over a nonresident corporate defendant when the claim of one plaintiff, who worked on contract entirely outside of the District, had a "discernable relationship to the business [that the Defendant] transacted in the District." *Radtke v. Caschetta,* No. 06-2031, 2007 WL 2071700 at *4 (D.D.C. July 17, 2007) (quoting *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 333 (D.C. 2000)).[5] Here, there is

---

[5]    *See also Kroger v. Legalbill.com LLC*, No. 04-2189, 2005 WL 4908968, slip op. at *5 (D.D.C. April 7, 2005) (finding personal jurisdiction based on a nonresident corporation's "interaction" with D.C. law firms); *Arista Records, Inc. v. Sakfield Holding Co. S.L.*, 314 F. Supp. 2d 27 (D.D.C. 2004) (exercising personal jurisdiction where the defendant's only contact with the District was its webpage); *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) (same).

more than a discernable relationship between Plaintiff's defamation claims and Zeromax's

contract with GlobalOptions in this forum.  Thus, exercising jurisdiction over Zeromax is

consistent with "traditional notions of fair play or substantial justice."  *See Int'l Shoe Co. v.*

*Washington*, 326 U.S. 310, 316 (1945) (internal citation omitted).

    **B.**    **The Purposeful Actions Of Zeromax In Washington, D.C. Caused**
            **Injury To Plaintiffs Here**

 Plaintiffs have also satisfied another, independent basis for personal jurisdiction – both

the wrongful act and resulting injury occurred here.  D.C. Code §13-423(a)(3).[6]  Zeromax's

statement to the contrary is simply wrong.  Motion at 16.

    First, there is no question that a tortious act occurred in the District.  Zeromax directed

GlobalOptions – a D.C. company hired by Zeromax – to harm Plaintiffs by creating, registering

and maintaining the defamatory websites at its D.C. address – as well as having its agent make

threats to their physical safety here in Washington.  Importantly, in the cases upon which

Zeromax relies, the defamatory websites were merely *accessible* in D.C., rather than created,

planned and designed here.  *See Mallinckrodt Med., Inc. v. Sonus Pharms., Inc.*, 989 F. Supp.

265, 272 (D.D.C 1998) (declining to exercise jurisdiction because "the message was not sent to

or from the District of Columbia" and that "the AOL posting [had] no connection to this

jurisdiction"); *Kline v. Williams*, No. 05-01102, 2006 WL 758459, at *4 (D.D.C. March 23,

2006) (declining to exercise jurisdiction, but noting that "in cases involving the posting of

infringing material on an Internet web site, courts have held that the tort occurs where the

website is created and/or maintained . . . .") (internal citation omitted).  Furthermore, neither of

---

[6]    D.C. Code § 13-423(a)(3) provides that "[a] District of Columbia court may exercise
personal  jurisdiction over a person, who acts directly or by an agent, . . . (3) causing tortious
injury in the District of Columbia by an act or omission in the District of Columbia."

the plaintiffs in the cases cited by Zeromax even asserted jurisdiction based on D.C. Code § 13-423(a)(3).[7]   In the cases cited by Zeromax, the websites were merely available in D.C.; whereas here, Zeromax hired GlobalOptions to create, register and maintain the websites in D.C. – among the other acts it committed here.

Second, Plaintiffs suffered injury in D.C.  In furtherance of their successful domestic and international businesses, Plaintiffs have substantial business in D.C. and meet regularly with federal government officials and private sector executives.[8]   In their Complaint, Plaintiffs note that Zeromax's action harmed their professional interests.[9]   Compl. at ¶¶ 46, 53, 54, 56, 57.  The attached declaration from Farid Maqsudi details some of the harm suffered in D.C.  Most notably, Mr. Maqsudi explains:

- "The websites have harmed my ability to conduct business in D.C., nationally, and internationally.  I have been forced to defend my integrity and honesty in almost all business transactions.  This has negatively influenced my reputation – which is critical

---

[7]      In contrast, the Plaintiffs in these cases relied primarily on § 13-423(a)(4) which allows jurisdiction when the tortious act occurs outside the District, but only in narrow circumstances. *Mallinckrodt* 989 F. Supp. at 272; *Kline v. Williams*, 2006 WL 758459, at *3.

[8]      Zeromax suggests (Motion at 17, fn. 6) that the Maqsudis have not engaged in any trade or business since 2001.  That is untrue.  The Maqsudi family owns and operates many businesses other than ROZ Trading.  One of these businesses does substantial work for the federal government and has significant contact with D.C.  Zeromax itself has attached a declaration from Mansur Maqsudi (*see* Erb Decl. Exh. H) explaining that he has business with USAID – a part of the federal government.

[9]      In this case, still in its earliest stages, Plaintiffs have satisfied the pleading requirements and shown a basis for personal and subject matter jurisdiction.  Under the Federal Rules, a plaintiff need not come to court with evidence in hand.  This is true with respect to jurisdiction, just as with any other issue.  At the threshold, a plaintiff must simply show that it is, in good faith, asserting a legal and factual basis for personal and subject matter jurisdiction.  *See Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537 (1995) ("Normal practice permits a party to establish jurisdiction at the outset of a case by means of a nonfrivolous assertion of jurisdictional elements . . . ."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (party may support jurisdictional elements at each stage of the case according to the level of proof required at that stage).

for business opportunities in D.C. and elsewhere." Decl. of Farid Maqsudi ("F. Maqsudi Decl.") at ¶ 12 (attached as Exhibit A).

- "Potential investors and government contacts (including those in D.C.) conducted background research on me personally and about my businesses, and, as a result of viewing the websites, questioned my honesty and integrity. On a regular basis, these contacts confronted me about the statements on the websites." F. Maqsudi Decl., Ex. A at ¶ 13.[10]

In short, Plaintiffs were harmed in this jurisdiction by the actions of Zeromax, and have met the requirements of the long-arm statute.

## II.   PLAINTIFFS HAVE STATED VIABLE CLAIMS FOR DEFAMATION AND FALSE LIGHT INVASION OF PRIVACY

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. *Wyatt v. Syrian Arab Republic,* 398 F. Supp. 2d 131, 135 (D.D.C. 2005). Under the Federal Rules, the complaint "need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests." *Id.* (citing *Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1040 (D.C. Cir. 2003)). In ruling on a Rule 12(b)(6) motion, the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor. *See Harris v. Ladner*, 127 F.3d 1121, 1123 (D.C. Cir. 1997); *Jankovic v. Int'l Crisis Group,* 429 F. Supp. 2d 165, 170 (D.D.C. 2006). A complaint should not be dismissed for failure to state a claim unless it is beyond doubt that plaintiffs can prove no set of facts that would entitle them to relief. *See Klayman v. Segal*, 783 A.2d 607, 612 (D.C. 2001); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88-89 (D.D.C. 2004).

---

[10]    Notably, where a lack of business integrity is considered so serious and compelling as to effect a contractor's or grantee's present responsibility, it is cause for debarment from doing business with the U.S. Agency for International Development. 22 C.F.R. § 208.800(d) (2003).

Defendant does not dispute that Plaintiffs have alleged sufficient facts to adequately plead its claims for defamation[11] and false light.[12]   Rather, Defendant seeks to interpose two defenses: (i) that the claims are barred by the statute of limitations, and (ii) that the statements at issue are protected by the fair reporting privilege.   Motion at 24.   As detailed below, Plaintiffs' Complaint was timely filed under the relevant statute of limitations, and Defendant's false and defamatory statements are not privileged under the fair reporting doctrine.

A.   **Plaintiffs' Complaint Is Within The Statute of Limitations**

There is a one-year statute of limitations for defamation claims in the District of Columbia.   D.C. Code § 12-301(4) (2001); *Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002). Claims of false light invasion of privacy, for which there is no express limitation period in the District of Columbia, are subject to the same statute of limitations when such a cause of action is "intertwined" with a cause specified by the District of Columbia Code.   Thus, the one-year

---

[11]   To state a claim for defamation, a plaintiff must plead: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm. *Klayman,* 783 A.2d at 613 n.4; *DeAngelis v. Hill*, 847 A.2d 1261, 1267-68 (N.J. Sup. Ct. 2004). Written or broadcast defamation is known as libel.  *El-Hadad v. Embassy of the UAE*, No. 96-1943, 2006 U.S. Dist. LEXIS 21491, at *46 (D.D.C. March 29, 2006) (referencing Restatement (Second) of Torts §§ 568(1) & 568A).  Libel is defamation per se, regardless of the nature of the false and defamatory statements.  *Id*.  Plaintiffs properly plead these elements in their Complaint.

[12]   To state a claim for false light invasion of privacy, a plaintiff must plead: (1) the published material places appellant in a false light which would be highly offensive to a reasonable person, and (2) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.  *Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001); *DeAngelis,* 847 A.2d at 1271.  Plaintiffs properly plead both of these elements in their Complaint.  Compl. at ¶¶ 13, 24, 35, 36.

statute of limitations for defamation claims has been applied to claims for false light invasion of privacy. *Jankovic v. Int'l Crisis Group,* 494 F.3d 1080, 1086 (D.C. Cir. 2007).

Plaintiffs' Complaint was filed within one year of the publication of the statements at issue. The "mansurmaqsudi.net" domain name was not even created until September 6, 2006.[13] *See* Ex. I. Thus, Defendants could not have posted or published statements about Plaintiffs on this website prior to this date. The Complaint was filed on July 11, 2007, within one year of the publication of the defamatory statements. The additional domain names simply rerouted viewers to the mansurmaqsudi.net website, and thus, their registration dates are essentially irrelevant to determining first publication – which triggers the start of the statute of limitations.[14] Plaintiffs' Complaint was thus timely filed within the prescribed statute of limitations.

### B. Plaintiffs' Claims Are Not Barred By The Fair Reporting Privilege

As Zeromax acknowledges, the fair reporting privilege is an *exception* to the general republication rule. Motion at 24. "Under the republication rule, one who repeats a defamatory statement is as liable as the original defamer." *Lee v. Dong-A Ilbo*, 849 F.2d 876, 878 (4th Cir. 1988) (internal citations omitted). This is so because "[t]he republisher of a defamation is deemed to have adopted the underlying defamatory statements as its own." *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990) (internal citation omitted). Accordingly, the

---

[13]     As noted above, at 3, a report of the domain registration for mansurmaqsudi.net (Ex. I), *available at* http://www.networksolutions.com/whois/results.jsp?domain=mansurmaqsudi.net, demonstrates that the domain was created on September 6, 2006. This date was inadvertently misstated in the Complaint as June 9, 2006. Compl. at ¶ 14.

[14]     In any case, none of the domain names at issue was even registered or created (let alone publishing statements about Plaintiffs) more than a year prior to the date of the filing of Plaintiffs' Complaint. *See* Ex. F, Ex. G, Ex. H, and Ex. J (showing the registration dates of the domain names as follows:  mansurmaqsudi.com – July 11, 2006; faridmaqsudi.com – Aug. 25, 2006; abdulraufmaqsudi.com – Aug. 25, 2006; and faridmaqsudi.net – Sept. 6, 2006).

common law rule in the District of Columbia, as stated by the court in *White v. Fraternal Order of Police*, is that:

> [t]he law affords no protection to those who couch their libel in the form of reports or repetition. . . . [T]he repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement.

707 F. Supp. 579, 596 (D.D.C. 1989) (citing *Olinger v. American Savings and Loan Ass'n,* 409 F.2d 142, 144 (D.C. Cir. 1969)).  Defendant trumpets that Plaintiffs "fail to describe the extent to which the website attributes its content to government and media sources. . . . As a result, the Complaint erroneously suggests, implicitly, if not explicitly, that the website author is directly responsible for the statements in question.  This simply is not the case."  Motion at 9-10. Zeromax is mistaken.  Under the governing republication rule, this is *exactly* the case.

Zeromax argues that its defamatory statements are immunized from suit under the fair reporting privilege – essentially because it asserts that it was simply "republishing" certain governmental and private-sourced information about the Plaintiffs.  Putting aside that the websites are not verbatim republications and have their own independent comments and editing, (see below), as a matter of law its reliance on this privilege lacks any basis.

Critically, the fair reporting privilege recognizes a limited exception to liability to protect the fair and accurate public accounting of those governmental proceedings so vital to our democratic system.  *See White v. Fraternal Order of Police*, 707 F. Supp. 579, 596 (D.D.C. 1989).[15]  Accordingly, it is intended to extend to "the report of any official proceeding, or any

---

[15]    In *White,* 707 F. Supp. at 596, two media defendants, the Washington Post Company and the National Broadcasting Company, Inc. asserted the fair reporting privilege.  In *Phillips v. Evening Star Newspaper Co.*, the defendant asserting the privilege was also a member of the media industry.  424 A.2d 78, 87 (D.C. Cir. 1980) (recognizing "in the case of the *media* two occasions for a qualified privilege to defame when a public official is not involved. . . . [T]hese
(continued…)

action taken by any officers or agency of the government of the United States, or of any State or

of any of its subdivisions." *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20,

42 (D.D.C. 2005) (citing RESTATEMENT (SECOND) OF TORTS § 611 cmt. d (1977)).  For the

privilege to apply, the report must be: "(a) accurate and complete, or a fair abridgment of what

has occurred, and (b) published for the purpose of informing the public as to a matter of public

concern." *White*, 707 F. Supp. at 596 (citing *Phillips*, 424 A.2d 78 at 88 (D.C. Cir. 1980)).

Furthermore, the privilege is a qualified one that is overcome by a showing of malice.  *Oparaugo*

*v. Watts*, 884 A.2d 63, 81 (D.C. 2005); *Phillips*, 424 A.2d at 87 (describing the fair reporting

privilege as a qualified privilege); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739

(D.C. Cir. 1985), cert. denied, 476 U.S. 1141 (1986).

      Defendant's false and defamatory statements about Plaintiffs are not protected by the fair

reporting privilege for multiple reasons, as detailed below.

      First, the fair reporting privilege is unavailable to Zeromax because, as this Court has

held, it does not extend to the official reports of the actions of a foreign government, especially

one as brutal and corrupt as Uzbekistan.  *OAO Alfa Bank*, 387 F. Supp. 2d at 41.  The Fourth

Circuit has also refused to extend the fair reporting privilege to the actions of a foreign

government.  *Lee*, 849 F.2d at 876 (declining to extend the privilege to a United States news

agency report of a South Korean government press release).  As referenced in *OAO Alfa Bank*,

the Restatement also explicitly limits the bounds of the fair reporting privilege to reports of the

proceedings or actions of "the government of the United States, or of any State or of any of its

---

(…continued)

privileges distill to 'fair comment on matters of public interest' and 'reports of official
proceedings and public meetings.'" (emphasis added).

subdivisions." *OAO Alfa Bank,* 387 F. Supp. 2d at 42 (citing RESTATEMENT (SECOND) OF TORTS § 611 cmt. d (1977)).

Of note, Zeromax merely cites to Judge Bates' seminal decision in *OAO Alfa Bank* without discussion, and relies on the dissent in the *Lee* case, rather than the Fourth Circuit's actual holding.  This tacit recognition that the law does not favor its assertion of the fair reporting privilege in the context of this case underscores the weakness of Zeromax's Motion.

Thus, as a matter of law, the fair reporting privilege does not extend to official reports of foreign governments.[16]  It is irrelevant that the firm responsible for the creation of the website – Zeromax – "directly attributed" its republication of the official government acts at issue to "various Uzbek officials . . . as well as to Uzbek government documents."  Motion at 28.  Moreover, the news articles that Zeromax cites to support various statements[17] are in no way "official reports" that would potentially be subject to the fair reporting privilege.  To the extent that the referenced news articles report on Uzbek government acts and proceedings, as Zeromax asserts, the website statements citing the news articles are also not privileged since, as noted, there is no underlying privilege that applies to reports of foreign governments.  Motion at 28-29.

Moreover, contrary to Zeromax's argument, this Court should not extend the contours of the fair reporting privilege to include official reports of foreign governments.  As discussed by

---

[16]   A Pennsylvania court extended the fair reporting privilege to apply to a report by a foreign government (Israel).  However, the privilege was applied to media defendants,  Globe Newspaper Company and Jerusalem Post Publications.  *Friedman v. Israeli Labour Party*, 957 F. Supp. 701 (E.D. Pa. 1997).  The fair reporting privilege has never been extended to apply to a report of a foreign government where the defendant responsible for the defamatory statements was not a mass media company or bona fide journalist, especially one like Zeromax, which deliberately kept secret its identity.

[17]   *See* Motion at 11 and Erb Decl. Ex. I, identifying Associated Press, *Insight Magazine*, *Forbes*, *Financial Times* and *New York Times* articles as sources.

the Fourth Circuit, a primary consideration weighing against extending the privilege is "the

nature of the relationship we share with our own government."  In particular,

> We are familiar with the workings of our government and consider
> it to be open and reliable. We can also hold our own government
> accountable for its actions. Foreign governments, like
> nongovernmental sources of information, are not necessarily
> familiar, open, reliable, or accountable.  Therefore, we think it
> unwise to provide a blanket privilege to those who report the
> activities of foreign governments.

*Lee,* 849 F.2d at 879; *see also OAO Alfa Bank*, 387 F. Supp. 2d at 41-42 (following the reasoning

of the Fourth Circuit).[18]  This consideration similarly weighs against extending the fair reporting

privilege in this case.  The workings of the Uzbek government are far from "open" and

"reliable."  There are widespread and well-documented examples of government corruption in

Uzbekistan.  *See, e.g.,* State Department Country Reports on Human Rights Practices 2006

(attached as Exhibit R).  As noted in the Expert Report of Scott Horton:

> [T]he general consensus in the international community [is] that
> the Uzbekistani judiciary lacks independence. . . .  [O]ne of the
> hallmarks of its legal culture is the subordination of legal
> formalism to the autocratic whim of its leader, Islam Karimov.  If a
> matter arises in which the Uzbekistani autocrat takes a personal
> interest, he will dictate the outcome, whatever the nation's legal
> rules suggest.

Expert Report of Scott Horton at ¶ 2 (attached as Exhibit B); *see also* Decl. of Mr. Farhod

---

[18]     Defendant suggests that the rejection of the fair reporting privilege "simply because
foreign governments are 'not necessarily familiar, open, reliable or accountable' to the American
public" is speculative and unsupported.  Motion at 26.  This is hardly the case.  Indeed, a similar
rationale applies with respect to enforcement of foreign country judgments.  It has long been the
law of the United States that a foreign judgment cannot be recognized or enforced if it was
obtained in a manner that did not accord with the basics of due process.  *See infra* at 28.

Inogambaev ("Inogambaev Decl.") (VIAC), at ¶¶ 21, 27-30 (attached as Exhibit D)[19] (discussing Ms. Karimova's orchestration of the actions of the Uzbek government, including her reviewing and editing of Uzbek court decisions).  In light of these factors, the fair reporting privilege should not be extended to apply here.  *See OAO Alfa Bank*, 387 F. Supp. 2d at 42 (finding Russia to be lacking the "showing of 'openness and reliability' one would presumably look for in extending the privilege.").

There is another reason why the false and defamatory statements about Plaintiffs do not fall within the protections of the fair reporting privilege – the statements were neither: (a) accurate and complete, or a fair abridgment of what occurred, or (b) published for the purpose of informing the public as to a matter of public concern.

Zeromax has published multiple statements that do not accurately and completely report even their referenced sources.   For example, the website stated that "[o]n 12 May 1993, the Maqsudis falsely registered ROZ Trading, Ltd. as a foreign enterprise in Uzbekistan" and cited an *Insight Magazine* article as its source.  Erb Decl. Ex. A-12.  In fact, the article did *not* report that the Maqsudis falsely registered ROZ as a foreign enterprise in Uzbekistan.  Instead, it stated that "The letter from the Uzbek justice ministry and the tax office *further claim* that ROZ Trading Ltd. fraudulently chartered ROZ Trading Ltd. in Uzbekistan."  Douglas Burton, *Divorce Drama Goes International*, UPI Insight Magazine, Sept. 1, 2003.  Erb Decl. Ex. B-4 at B-7 (emphasis added).

---

[19]     As noted in footnote 2, Plaintiffs have obtained a large number of documents from Coca-Cola for use in the Vienna arbitration.  Those documents are subject to a Confidentiality Agreement and accordingly, are not submitted herein.  Consistent with that Agreement, small portions of Mr. Inogambaev's statement (and accompanying exhibits) that was submitted in the Vienna arbitration have been redacted.

Similarly, Zeromax made the following statement on the website: "ROZ Trading Ltd. thus fraudulently reneged on its legal obligation to invest $500,000 in its start-up ventures." Erb Decl. Ex. A-15. This statement was attributed to the same *Insight Magazine* article, which actually stated that: "*The letter from the Uzbek justice ministry and the tax office further claim that ROZ Trading Ltd.* fraudulently chartered ROZ Trading Ltd. in Uzbekistan and reneged on its legal obligation to invest $500,000 in its startup ventures." Erb Decl. Ex. B-4 at B-7 (emphasis added). There is a significant difference between these two statements – the first source *alleges* wrongful conduct by the Plaintiffs while the website *concludes* that such conduct occurred. The difference in the statements is dramatic, and Zeromax clearly had only one purpose in creating a different statement on the website – to harm the reputation of the Plaintiffs beyond the otherwise improper "disinformation" campaign of the Uzbek government. Thus, Zeromax did not fairly and accurately report even the sources it cited for its statements, as a review of the record makes clear.[20] *See* Chart of Website Misstatements (attached as Exhibit S) for additional examples of inaccurately cited statements. On that basis, the fair reporting privilege has no application here.

Moreover, Zeromax cannot avail itself of the protections of the fair reporting privilege because its statements do not meet the second requirement of the privilege: that the statements be published for the purpose of informing the public as to a matter of public concern. Zeromax specifically hired GlobalOptions to post defamatory statements about Plaintiffs as a way to intimidate, harass and further harm the business reputation and emotional well-being of the Maqsudis and their company, ROZ. Compl. at ¶¶ 13-24. Indeed, Zeromax kept secret its role in

---

[20]    *Hatfill v. Foster*, 401 F. Supp. 2d 320, 328-29 (S.D.N.Y. 2005) (finding that since plaintiff had not been charged with any crime, the articles at issue could not be described as
(continued…)

creating the websites and it was only as the result of Plaintiffs' due diligence that the trail of

responsibility led back to its door through its agent, GlobalOptions.   Thus, Zeromax's actions

belie its assertion that it published statements about Plaintiffs with the public interest at heart.

Indeed, the malicious and secretive nature of its role in creating the websites (made clear by Mr.

Livingstone's later threats to Plaintiffs' physical safety) is the antithesis of the principles

underlying the fair reporting privilege.   Zeromax is no more of a bona fide news or media outlet

than the Uzbekistan secret police who have harassed Plaintiffs' family and business.   Its effort to

drape itself in such a commendable public role offends every element of this important public

privilege.

Finally, the fair reporting privilege, even if it were to apply, is a qualified one that is

overcome by a showing of malice.   *Oparaugo*, 884 A.2d at 81 (D.C. 2005); *Phillips*, 424 A.2d at

87.   A demonstration that the defendant has a grudge against the plaintiff bolsters the plaintiff's

claim that defendant acted with actual malice.   *See Houlahan v. World Wide Ass'n of Specialty*

*Programs & Schools*, No. 04-01161, 2006 U.S. Dist. LEXIS 71858, at *22  (D.D.C., Mar. 28,

2006) (citing *Beeton v. District of Columbia*, 779 A.2d 918, 925 (D.C. 2001)).   In this case,

Zeromax's malice towards Plaintiffs is palpable, so much that it had its agent threaten the

physical safety and well-being of Farid Maqsudi and Mansur Maqsudi.   *See* Compl. at ¶ 24.   In

light of the malice underlying its actions, the fair reporting privilege simply cannot apply to any

of the statements published by Zeromax about Plaintiffs.

Where Plaintiffs' reputations have been seriously damaged as a result of the website,

Zeromax should not be able to escape liability by doing exactly what the law of defamation seeks

---

(…continued)

accurate reports of charges of wrongdoing).

to prevent – the "couching" of libel in the form of reports or repetition.  *See White*, 707 F. Supp. at 596.  Accordingly, the fair reporting privilege has no place in this case.

## III.    THE ACT OF STATE DOCTRINE DOES NOT BAR THIS CASE

As discussed above, it is clear that Zeromax cannot escape liability for the harm it has inflicted on Plaintiffs by relying on the fair reporting privilege, which Judge Bates has specifically held does not extend to the actions of a foreign government.  *OAO Alfa Bank*, 387 F. Supp. 2d at 41.  Perhaps recognizing that the fair reporting privilege will not save the day, Zeromax attempts to sidestep the parameters and policies of the privilege by asserting the act of state doctrine as a separate bar to Plaintiffs' claims.  There is one over-arching problem with this approach – it is Zeromax's acts that are at issue here – and *not* the acts of the Uzbek state. Zeromax itself is directly responsible for the websites defaming Plaintiffs – not the government of Uzbekistan (which as far as Plaintiffs can tell, did not come to Washington to hire GlobalOptions, create and disseminate the website, and otherwise harm the Plaintiffs).[21]

To the extent that Zeromax relies on the fact that some (but not all) of the defamatory statements it published also appear or are mentioned in official Uzbek government documents, this is actually just a recast assertion of the fair reporting privilege – which as noted above clearly does not apply in this case.  Because this case concerns the actions of Zeromax here in Washington, D.C., there are no Uzbek "acts of state" at issue, and thus the act of state doctrine simply has no has application here.

---

[21]     If the Government of Uzbekistan had in fact come to Washington to hire GlobalOptions and commit these tortious acts, the act of state doctrine would not protect it from a suit for damages.  Courts have declined to apply the act of state doctrine where doing so would protect a foreign government which caused  harm in this country.  *See Letelier v. Republic of Chile*, 488 F. Supp. 665, 674 (D.D.C. 1980) (refusing to apply the act of state doctrine to protect Chile from civil liability "if the actions of its alleged agents resulted in tortious injury in this country.").

In any event, an analysis of the act of state doctrine itself demonstrates why it cannot apply to Plaintiffs' claims.[22] *First*, the act of state doctrine does not apply since the invalidation of a government act is neither sought nor required. *Second*, this is not a case where the policies underlying the doctrine justify its application. *Finally*, even if the act of state doctrine were applicable, it cannot be invoked by Zeromax as a shield from liability where it helped orchestrate the very "sovereign acts" at issue.

A.   **The Act of State Doctrine Does Not Apply Where Adjudication of Plaintiffs' Claims Does Not Require The Court To Invalidate Any Official Act**

Under the act of state doctrine, "courts in the United States will generally refrain from examining the validity of a taking by a foreign state of property within its own territory, or from sitting in judgment on other acts of a governmental character done by a foreign state within its own territory and applicable there." Restatement (Third) of Foreign Relations Law § 443 (1987). The burden of establishing the doctrine's applicability to a particular dispute rests with the party that invokes it. *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 453 (2d Cir. 2001); *Republic of Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir. 1986); *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 694 (1976). It is a narrow doctrine, to be "applied sparingly, and only where the validity of a foreign sovereign is at issue." *Ampac Group, Inc. v. Republic of Honduras*, 797 F. Supp. 973, 978 (S.D. Fla. 1992).

---

[22]   Of course the act of state doctrine cannot insulate Zeromax from liability for its statements that cite to *private* news sources (*see* Motion at 11 and Erb Decl. Ex. I, identifying Associated Press, *Insight Magazine*, *Forbes*, *Financial Times*, and *New York Times* articles as sources) rather than the five *official* Uzbek government documents that Defendant references on the website (*see* Motion at 10-11 and Erb Decl. Ex. I, identifying official Uzbek government documents).

Courts have held that when the defendant's conduct can be judged without deciding the legality of the acts of the foreign government, the act of state doctrine should not be applied. *W.S. Kirkpatrick, & Co., Inc. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (holding that "[r]egardless of what the court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit, and there is thus no occasion to apply the [act of state doctrine]" in a case where finding a U.S. businessman guilty of bribing a Nigerian official in order to secure a contract would not require invalidation of the underlying contract.); *Industrial Inv. Dev. Corp. v. Mitsui & Co.*, 594 F.2d 48, 48 (5th Cir. 1979) (in an antitrust action "the mere fact that members of the Indonesian government were to play a part in the alleged scheme does not insulate defendants' accountability for conduct which might prove to be prohibited by our antitrust laws.").

This concept has been applied in the context of a defamation claim.  In *Sharon v. Time*, 599 F. Supp. 538, 543-47 (S.D.N.Y. 1984), the court held that the act of state doctrine could not be applied to dismiss a libel claim by an Israeli official since the alleged acts that were the basis of the claimed libel were not acts of the government.  The court went on to note that even if the alleged acts were considered "acts of state," the doctrine would not apply since the claim did not involve a challenge to the validity of any act of a state.  599 F. Supp. at 545 ("[E]ven assuming that Sharon's alleged acts or the Commission's findings are acts of state, the issues in this case do not require the jury to pass on the validity of these acts." ).

Zeromax argues otherwise, stating that "adjudication of Plaintiffs' claims would require Plaintiffs to prove, and this Court to pass on, the falsity of the Uzbek criminal charges and proceedings and therefore the unlawfulness of Uzbekistan's exercise of its sovereign police

power forming the basis of the allegedly defamatory website statements." Motion at 18.[23]

Adjudication of this case does not, in any way, require Plaintiffs to prove the "falsity of the

Uzbek criminal charges and proceedings." The sham nature of Uzbekistan's criminal

proceedings is not what this case is about. The actions underlying this suit are Zeromax's

publication of statements on a website here in Washington D.C. about Plaintiffs that it *knew* were

false and defamatory and caused injury to Plaintiffs. Plaintiffs' claims against Zeromax, like

those of the plaintiff in *Kirkpatrick*, do not seek or require the invalidation or undoing of any

action by Uzbekistan, but simply seek damages from the party causing the harm. *Kirkpatrick*,

493 U.S. at 407 (declining to apply the act of state doctrine where the plaintiff "was not trying to

undo or disregard the governmental action, *but only to obtain damages from private parties who*

*had procured [the contract])."* (emphasis added); s*ee Oceanic Exploration Co. v.*

*Conocophillips, Inc.,* No. 04-332, 2006 WL 2711527, at **14-15 (D.D.C. Sept. 21, 2006)

(applying *Kirkpatrick* and finding act of state did not apply where case focused on the non-

sovereign defendant's conduct and resulting harm).[24]

---

[23]     Contrary to Zeromax's assertion, "the Uzbek government's criminal proceedings against
Plaintiffs in Uzbekistan and the removal of Plaintiffs' interest in CCBU" are not at the heart of
this case. Motion at 19. Moreover, the removal of Plaintiffs' interest in CCBU is not the subject
of this case at all, but rather is the subject of their firm's action before Judge Kollar-Kotelly and
the Vienna arbitration (in which a former member of this Court is an arbitrator).

[24]     The cases Zeromax cites in its Motion are inapposite to this litigation. Motion at 19-21.
This Court is not being asked to resolve the effect of the Uzbek government's actions by
restoring the Maqsudi's interest in ROZ. *Cf. Glen v. Club Mediterranee S.A.,* 450 F.3d 1251
(11th Cir. 2006). Nor is the validity of Uzbekistan's domestic action or the actions of its
officials at stake. *Cf. United States v. Merit*, 962 F.2d 917 (9th Cir. 1992); *In re Philipine
National Bank*, 397 F.3d 768 (9th Cir. 2005). Furthermore, Zeromax acted on its own accord in
posting defamatory statements about Plaintiffs. *Cf. World Wide Minerals, Ltd. v. Kazakhstan*,
296 F.3d 1154, 1165 (D.C. Cir. 2002) (the transfer and alleged conversion at issue were
accomplished pursuant to an official decree of Kazakhstan).

In any event, it is not Plaintiffs who are seeking to invalidate Uzbek acts in this case, so much as it is Zeromax seeking to have this Court enforce or recognize some of the Uzbek documents that it references for the truth of the matters they assert.  For the same reasons underlying the limits of the fair reporting privilege, foreign country judgments cannot be recognized or enforced by U.S. courts if they were obtained in a manner that did not accord with the basics of due process.  *See Hilton v. Guyot,* 159 U.S. 113, 205-206 (1895); *Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) (refusing to enforce Liberian judgment because courts in Liberia are not impartial tribunals); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995) (declining to enforce default judgment obtained in Iran by Iranian banks against Shams Pahlavi (the Shah's sister) in California due to failure of due process in Iranian courts); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES 482(1)(a) (1987) ("A court in the United States may not recognize a judgment of a court of a foreign state if: (a) the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law. . . .").

That principle is directly applicable here.  In a case involving Plaintiff Mansur Maqsudi, for instance, a New Jersey court declined to enforce an Uzbek divorce decree, finding that Mr. Maqsudi was not afforded "fundamental indicia of due process—notice and opportunity to be heard."  *Maqsudi,* 830 A.2d at 931 (repeatedly referencing Ms. Karimova's undue influence over the Uzbek government, her questionable tactics in procuring the Uzbek divorce and child custody decisions against Mr. Maqsudi, and false testimony presented to the Uzbek courts by Ms. Karimova).  Similarly, this Court cannot legitimize the decisions and statements by the Uzbek government that are referenced by Zeromax, as it would by precluding adjudication of Plaintiffs' claims on the basis that the statements published by Zeromax must be true if they also

appear in the referenced Uzbek documents.  *See Dominicus Americana Bohio v. Gulf & Western Industries, Inc.,* 473 F. Supp. 680, 690 (S.D.N.Y. 1979) (declining to extend act of state doctrine due to allegations that "government actions were procured by fraud and coercion").

**B.      The Policies Underlying The Act Of State Doctrine Do Not Justify Its Application In This Case**

The act of state doctrine is a non-jurisdictional "prudential doctrine designed to avoid judicial action in sensitive areas."  *DeRoburt v. Gannett Co., Inc*., 733 F.2d 701, 702 (9th Cir. 1984) cert. denied, 469 U.S. 1159 (1985) (internal citations omitted).  It is "not compelled by the nature of sovereignty, by international law, or by the text of the Constitution."  *Id*. at 703. Rather, it is a "consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs."  *World Wide Minerals,* 296 F.3d at 1165 (internal citations omitted).

It is a flexible doctrine that allows courts to decline to apply it where "the policies underlying the act of state doctrine may not justify its application."  *Republic of the Philippines v. Westinghouse Elec. Corp.,* 774 F. Supp. 1438, 1466 (D.N.J. 1991).  As summarized by the Ninth Circuit in *DeRoburt*:

> [I]t is a balancing test with the critical element being the potential for interference with our foreign relations. *See Timberlane, supra,* 549 F.2d at 607. As such, the courts should seek to avoid passing on the validity of foreign acts and similarly abstain from "challeng[ing] ... the wisdom of its policy, or the integrity and motivation of its action." *Id.* at 607.

*DeRoburt,* 733 F.2d at 703 (citing *Timberlane Lbr. Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 605 (9th Cir.1976)).  Moreover, "a court should be mindful that the decision to deny judicial relief to a party should not be made lightly."  *Virtual Def. and Dev. v. Republic of Moldova,* 133 F. Supp. 2d 1, 8 (D.D.C. 1999).

In *DeRoburt*, the court applied this balancing analysis and upon review of the plaintiff's amended complaint held that the balance tipped in favor of the plaintiff and against application of the act of state doctrine.  733 F.2d at 701 (partially overturning the lower court's decision, relied upon by Defendant in its Motion, at 21).  In his amended complaint, the plaintiff, the President of a country, argued simply that he did not commit the acts reported upon.  Similarly, in this case, the Maqsudis are arguing that the statements published by Zeromax are false because they did not commit the acts reported upon.  Likewise, application of the balancing analysis to this case requires that this Court not deny Plaintiffs judicial relief.

### C.  The Act of State Doctrine Does Not Apply Where the Alleged "Act" Was Orchestrated By Zeromax

Zeromax asserts that the act of state doctrine applies because this Court must pass judgment on Uzbekistan's exercise of its sovereign police power which, it says, form the basis of the defamatory website statements.  Motion at 18.  As noted above, this reasoning fails here as a resolution of Plaintiffs' tort claims in this case would not invalidate any Uzbek official acts.  To the contrary, applying the doctrine here would conveniently allow Zeromax to insulate itself from its own wrongful conduct – both in Uzbekistan and here in Washington.  Accordingly, the act of state doctrine "does not bestow a blank-check immunity upon all conduct blessed with some imprimatur of a foreign government."  *Timberlane,* 549 F.2d at 606 (superseded by statute).

For example, in *Timberlane*, the defendants were charged with having conspired to deprive the plaintiff of the opportunity to mill lumber and export it to the United States.  The defendants raised an act of state defense claiming that plaintiff's injuries resulted from acts of the government of Honduras, principally in connection with the enforcement of certain financial security interests.  *Id.* at 605.  The conspirators also caused an employee of the plaintiff to be

- 32 -

falsely arrested and imprisoned and were responsible for the publication of defamatory articles about the plaintiff in the Honduran press. *Id.* The Ninth Circuit held that "[e]ven if the coup de grace to Timberlane's enterprise in Honduras was applied by official authorities, we do not agree that the doctrine necessarily shelters these defendants. . . . *[M]ere governmental approval or foreign governmental involvement which the defendants had arranged does not necessarily provide a defense.*" *Id.* at 605-06 (emphasis added); *see also United States v. Sisal Sales Corp.*, 274 U.S. 268 (1927) (Mexican legislation solicited by American banks was not act of state because foreign governmental activity was arranged by defendants rather than independently conceived); *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 59 (D.D.C. 2004) (no act of state in inquiry casting doubt on integrity of acts of Saudi officials in detaining the plaintiff, but not requiring Court to declare invalid or illegal any such act); *Republic of Philippines v. Westinghouse Elec. Corp.*, 774 F. Supp. 1438 (D.N.J. 1991).

Thus, where the defendant is involved with procuring the government actions that it later asserts as "official acts" barring adjudication of claims against it, the act of state doctrine does not apply. That is exactly what took place in this case. The record before this Court demonstrates that Gulnora Karimova, a private citizen who controls Zeromax, masterminded the Uzbek "proceedings" against Plaintiffs upon which Zeromax now relies for its act of state defense. Inogambaev Decl. (VIAC), Ex. D at ¶ 26 ("She was responsible for, among other things, the false charges and subsequent court proceedings that took away ROZ's interest in CCBU and the imprisonment of Mansur's relatives."), at ¶ 28 ("[S]he orchestrated every detail of the court proceedings against ROZ. . . . [S]he told the prosecutors precisely what charges to bring and how to prosecute the case. Ms. Karimova knew that there was no merit to these charges."). Ms. Karimova was even involved in reviewing and editing the draft court decisions relating to

- 33 -

ROZ, CCBU and Mansur Maqsudi.  Inogambaev Decl. (VIAC), Ex. D at ¶ 29 ("Ms. Karimova

often wrote substantial portions of the decisions herself to make sure that they contained the

exact language and ordered the precise outcome she desired.").  Zeromax, controlled by

Karimova, then hired GlobalOptions to create a website that published the false Uzbek

statements – albeit changing the language, tone and import of the false statements so that they

were more damaging, and more false, than those issued at the direction of Ms. Karimova.

Compl. at ¶¶ 13, 24; *see* Ex. S.

On this record, this case is more comparable to *Timberlane* than *Galu v. SwissAir,* No. 86

Civ. 5551, 1987 WL 15580 (S.D.N.Y. Aug. 3, 1987), upon which Zeromax relies.   Motion at 20.

In *Galu*, there was no evidence that the defendant Swiss Air employees knew about the supposed

falsity of the Swiss expulsion order, let alone that they were involved in its fabrication.

Moreover, in *Galu* there was no evidence of pervasive corruption in the Swiss government,

whereas in this case, it is well established that the Uzbek government is riddled with corruption

and its judicial system lacks due process.  *See, e.g.,* Ex. R, Ex. B.  And that corruption is tied

directly to the very facts giving rise to this case.  *See* Inogambaev Decl. (VIAC), Ex. D at ¶¶ 23-

20 (detailing Ms. Karimova's use of government agencies to inflict harm on the Maqsudis); *see*

Inogambaev Decl. (*Roz Trading* Case), Ex. C at ¶¶ 11-16, 20-21 (discussing Ms. Karimova's

control over Zeromax).

Accordingly, Zeromax cannot raise the act of state doctrine as a defense here, since there

is no question that it helped create the very false "acts" upon which it now relies for immunity.

## CONCLUSION

For the foregoing reasons, Zeromax's Motion to Dismiss must be denied in its entirety.

Respectfully submitted,

_____/s/_____
Stuart H. Newberger, DC BAR #294793
Alan W.H. Gourley, DC BAR #358300
Crowell & Moring LLP

1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
E-mail: snewberger@crowell.com
          agourley@crowell.com

Attorneys for Plaintiffs

Dated:  November 30, 2007

Of Counsel:

Dr. Allan Gerson
2131 S Street, NW
Washington, DC 20008
Telephone:  (202) 966-8557
E-mail: gerson@gilgintl.org

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

_____
                                        )
MANSUR MAQSUDI, *et al.*,                )
                                        )
                    Plaintiffs,         )          Case No. 1:07-CV-01252 RJL
                                        )
v.                                      )
                                        )
GLOBALOPTIONS, INC., *et al.*,           )
                                        )
                    Defendants.         )
_____)

## PROPOSED ORDER

Upon consideration of Defendant Zeromax GmbH's Motion to Dismiss, dated October

30, 2007, and Plaintiffs' response thereto, IT IS HEREBY ORDERED, that Defendant Zeromax

GmbH's Motion to Dismiss be denied;

IT IS SO ORDERED.


_____
Judge Richard J. Leon
United States District Court