# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
MANSUR MAQSUDI, *et al.*,          )
)
        *Plaintiffs*,      )
)
     v.             )      1:07-CV-01252 RJL
)
GLOBALOPTIONS, INC., *et al.*,   )
)
        *Defendants*.    )
_____)

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ZEROMAX GMBH'S MOTION TO DISMISS THE COMPLAINT

**WHITE & CASE** LLP

Carolyn B. Lamm (D.C. Bar No. 221325)
Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Nicole E. Erb (D.C. Bar No. 466620)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

Kevin T. Baine (D.C. Bar No. 238600)
Jonathan Kravis (D.C. Bar No. 973780)
**Williams & Connolly LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5010
Facsimile: (202) 434-5018

December 20, 2007             *Attorneys for Defendant Zeromax GmbH*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.  THE ACT OF STATE DOCTRINE BARS PLAINTIFFS' CLAIMS ............................... 2

    A.  Adjudication Of Plaintiffs' Claims Would Directly Impact Acts Of State ............ 3

        1.  Plaintiffs Cannot Prove Falsity Or Actual Malice Without
            Attacking Acts of State ......................................................................... 3

        2.  The Website Discloses That Its Statements Are Based On Official
            Acts Of Uzbekistan Taken Pursuant To Its Inherent Police Power ............ 6

        3.  Certain Website Statements Also Trace To Uzbek Judicial
            Decisions, Decrees And State Orders ......................................................... 8

        4.  Plaintiffs Do Not Allege Any Conduct Of Zeromax That Is
            Severable From The Acts Of State At Issue ............................................... 9

        5.  Plaintiffs Cannot Distinguish *Galu v. SwissAir* ....................................... 12

    B.  The Legal Standard Governing The Enforcement Of Foreign Judgments
       Has No Bearing On The Application Of The Act Of State Doctrine .................. 13

    C.  The Policies Underlying The Act Of State Doctrine Support Application
       Of The Doctrine Here ........................................................................................ 14

II.  PLAINTIFFS' CLAIMS ARE BARRED BY THE FAIR REPORT PRIVILEGE ......... 17

    A.  The Fair Report Privilege Applies To Non-Media Defendants ........................... 17

    B.  The Fair Report Privilege Should Extend To Official Documents Of
       Foreign Governments ........................................................................................ 18

    C.  The Website Was A Fair And Accurate Account Of The Official Acts And
       Documents Of The Uzbek Government .............................................................. 21

    D.  The Website Informed The Public As To A Matter Of Public Concern .............. 23

    E.  The Fair Report Privilege Is Not Defeated By A Showing Of Actual
       Malice ................................................................................................................ 24

III.  PLAINTIFFS HAVE FAILED TO CURE THE STATUTE OF LIMITATIONS
     DEFICIENCIES IN THE COMPLAINT ......................................................................... 27

IV.  PLAINTIFFS HAVE FAILED TO CURE THE JURISDICTIONAL
     DEFICIENCIES IN THE COMPLAINT ......................................................................... 28

## TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>                                                                                                    <u>Page(s)</u>

*Amway Corp. v. Procter & Gamble Co.*, 346 F.3d 180 (6th Cir. 2003) ........................17

*\*Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*,
    297 F. Supp. 2d 165 (D.D.C. 2003) ...................................................28

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003) ........................29

*\*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ...............................13, 15

*\*Barrett v. Lombardi*, 239 F.3d 23 (1st Cir. 2001) ........................................28

*Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323 (11th Cir. 2003) ...........................7

*Bell v. Domino's Pizza Inc.*, No. Civ. A. 99-2376 (PLF/JMF),
    2000 WL 1780266 (D.D.C. Nov. 21, 2000) ........................................11

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) .............................5

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*,
    293 F. Supp. 892 (S.D.N.Y. 1968) ...............................................13

*City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20 (D.D.C. 2007) ..................28-29

*Clayco Petroleum Corp. v. Occidental Petroleum Corp.*,
    712 F.2d 404 (9th Cir. 1983) ....................................................14

*Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*,
    686 F.2d 322 (5th Cir. 1982) ....................................................14

*Credit Suisse v. U.S. Dist. Ct. for the Cent. Dist. of California*,
    130 F.3d 1342 (9th Cir. 1997) ...................................................15

*Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985) ...................*passim*

*DeRoburt v. Gannett Co.*, 548 F. Supp. 1370 (D. Haw. 1982) ...................................15

*DeRoburt v. Gannett Co.*, 733 F.2d 701 (9th Cir. 1984) ...............................14, 15, 16

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) ....................17-18

*El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996) ................................14

*\*First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375 (D.C. Cir. 1988) .................28, 29, 30

*Friedman v. Israel Labour Party*, 957 F. Supp. 701 (E.D. Pa. 1997) ...........................19

Page(s)

*Galu v. Swissair, No. 86 Civ. 5551 (CSH),
    1987 WL 15580 (S.D.N.Y. Aug. 3, 1987) ......................................................4, 12

Garrison v. Louisiana, 379 U.S. 64 (1964) ................................................. 4-5, 24

*Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) ...............................................4

Harper v. Walters, 822 F. Supp. 817 (D.D.C. 1993) .......................................25,26

Hunt v. Mobil Oil Corp., 550 F.2d 68 (2d Cir. 1977) .........................................13

Indus. Inv. Dev. Corp. v. Mitsui & Co., 594 F.2d 48 (5th Cir. 1979) ..........................9

In re Philippine Nat'l Bank v. U.S. Dist. Ct. for the Dist. of Haw.,
    397 F.3d 768 (9th Cir. 2005) ....................................................................15

Jerome B. Grubart, Inc.  v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995)...................29

Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92 (2d Cir. 2000)............................18

*Lee v. Dong-A Ilbo, 849 F.2d 876 (4th Cir. 1988)....................................18, 19, 20

*Liberty Lobby, Inc. v. Dow Jones & Co, 838 F.2d 1287 (D.C. Cir. 1988) ..............................26

Lohrenz v. Donnelly, 350 F.3d 1272 (D.C. Cir. 2003) ..........................................5

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ..........................................29

Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine,
    311 F.3d 488 (2d Cir. 2002)......................................................................14

Morgan Distrib. Co. v. Unidynamic Corp., 868 F.2d 992 (8th Cir. 1989) ...............................28

Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264 (1974) ......................................5

*New York Times Co. v. Sullivan, 376 U.S. 254 (1964) ..........................................4

*OAO Alfa Bank v. Ctr. for Pub. Integrity, 387 F. Supp. 2d 20 (D.D.C. 2005)......................5, 19

Oceanic Exploration Co. v. ConocoPhillips, Inc.,
    Civ. A. No. 04-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ......................................9, 14

ROZ Trading Ltd. v. Zeromax Group, Inc., Civ. No. 06-01040 (CKK),
    2007 WL 2812760  (D.D.C. Sept. 28, 2007). .............................................................9

Sharon v. Time, Inc., 599 F. Supp. 538 (S.D.N.Y. 1984) ........................................7

St. Amant v. Thompson, 390 U.S. 727 (1968)........................................................5

Page(s)

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) ...................................................3, 5

*Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*,
   421 F. Supp. 2d 87 (D.D.C. 2006) ...........................................................13

*Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597 (9th Cir. 1977) ...............9, 10

*United States v. Merit*, 962 F.2d 917 (9th Cir. 1992) .................................................13

*\*Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ...........................5

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ................................22, 23, 26

*\*World Wide Minerals, Ltd. v. Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002)...................... *passim*

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400 (1990) .................9, 10

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*,
   433 F.3d 1199 (9th Cir. 2006) ..............................................................15

*Yohe v. Nugent*, 321 F.3d 35 (1st Cir. 2003) .........................................................27


STATE CASES

*Chesapeake Publ'g Corp. v. Williams*, 661 A.2d 1169 (Md. 1995) ...............................27

*Johnson v. Johnson Publ'g Co.*, 271 A.2d 696 (D.C. 1970) ........................................25

*Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321 (Minn. 2000)...................................27

*Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990) .........................................................5

*Oparaugo v. Watts*, 884 A.2d 63 (D.C. 2005) .............................................17, 25, 26

*Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78 (D.C. 1980)................................21, 23, 25

*Rosenberg v. Helinski*, 616 A.2d 866 (Md. 1992) ......................................................17

*Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825 (Ill. 2006).......................................27


FEDERAL STATUTES

Fed. R. Civ. P. 12(b)(6)...............................................................................11, 28

Fed. R. Civ. P. 44.1 ...................................................................................8, 11

Page(s)

STATE STATUTES

D.C. Code § 13-423(b) (2001) ................................................................................29


OTHER AUTHORITIES

Restatement (Second) of Torts §§ 585-592 (1977).................................................24

Restatement (Second) of Torts §§ 593-610 (1977).................................................24

Restatement (Second) of Torts § 600 (1977) ...........................................................5

*Restatement (Second) of Torts § 611 (1977) ................................................... *passim*

## INTRODUCTION

At the heart of Plaintiffs' defamation claims — and this motion — is the allegation that "the courts and governmental agencies of Uzbekistan lack independence and are wholly subservient to the corrupt government headed by President Karimov and his family" — in a word, that the official Uzbek proceedings upon which the website in question reported were a "sham."  Compl. ¶¶ 35, 41.  Plaintiffs claim that Zeromax GmbH ("Zeromax") defamed them by posting a website containing false and defamatory statements concerning the acts taken against them by the Uzbek government.  *See, e.g.*, *id.* ¶¶ 34-35.  As the face of the website reveals, all of the disputed statements were an accurate reflection of, and were supported by, official documents of the government of Uzbekistan.  As demonstrated below, the allegation that the Uzbek proceedings in question were a sham is central to Plaintiffs' contentions that (i) the charges upon which the Uzbek government acted were false; (ii) the defendants knew the charges were false and thereby acted with actual malice; and (iii) the privilege to report on governmental proceedings should not apply in this case.  Thus, to decide Plaintiffs' claims, the Court would need to determine the validity of the official acts of Uzbekistan.

It is precisely this kind of allegation — of the illegitimacy of official acts and proceedings of a foreign government — that triggers the application of the act of state doctrine.  Under that doctrine, a court must "deem[] valid" the "acts of foreign sovereigns taken within their own jurisdiction."  *World Wide Minerals, Ltd. v. Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).  Plaintiffs' case requires a court or jury to conclude that the acts of the government of Uzbekistan were not only invalid, but were so clearly a sham that the website authors must have known that the charges upon which they were based were false.  Quite apart from the difficulties of proof that such issues would present, the desired outcome would be just the sort of affront to the sovereignty of a foreign nation that the act of state doctrine commands U.S. courts to avoid.

Moreover, even if the act of state doctrine did not bar this claim, the privilege to report on governmental proceedings would. While the law on this point is unsettled, there is no reason not to apply this privilege to fair and accurate reports of the official proceedings of a foreign government. In today's interconnected world, the public has a strong interest in the official actions of foreign governments — especially actions such as the ones at issue in this case, which involve the alleged expropriation of a private company's ownership interest in a Coca-Cola bottling plant, based on charges of illegal activity. Even if, as Plaintiffs allege, the official proceedings were unfair or unreliable, that does not diminish the public's interest in knowing about them. The public has as much interest — if not a greater interest — in knowing of allegedly unjust governmental actions as it has in knowing of just ones, for the only way to reform unjust systems is to bring them to light.

For these and other reasons explained below, the Complaint must be dismissed in its entirety.

## ARGUMENT

### I.    THE ACT OF STATE DOCTRINE BARS PLAINTIFFS' CLAIMS

Fatal to Plaintiffs' contention that the act of state doctrine does not apply in this case (Opp'n at 26) is their concession that their defamation claims involve a direct challenge to the validity of the acts of state reported on the website. Indeed, Plaintiffs' Complaint makes abundantly clear that this lawsuit, at bottom, is premised on the unreliability of those acts of state:

> The Uzbek documents referenced on the "mansurmaqsudi.net" website relate to or are part of the sham audits and investigations initiated by Uzbekistan to intimidate and harass the Maqsudis and ROZ. It is well-documented that the courts and governmental agencies of Uzbekistan lack independence and are wholly subservient to the corrupt government headed by President Karimov and his family.

Compl. ¶ 35.  Plaintiffs' attempts to retreat from this position in their Opposition brief (at 26) are unavailing.

### A.    Adjudication Of Plaintiffs' Claims Would Directly Impact Acts Of State

#### 1.    Plaintiffs Cannot Prove Falsity Or Actual Malice Without Attacking Acts of State

Plaintiffs' contention that the act of state doctrine does not apply (Opp'n at 26) fails because their allegation that the actions of the Uzbek government were invalid is central to two essential elements of their defamation and false light claims: ***falsity*** and ***actual malice***.[1]  *See Tavoulareas v. Piro*, 817 F.2d 762, 783 (D.C. Cir. 1987) (holding that plaintiff "was required to prove falsity . . . in order to prevail" on defamation claim).

Plaintiffs' allegation of falsity runs headlong into the act of state doctrine because the disputed website statements report nothing more than Uzbek official determinations that are acts of state protected by the doctrine.[2]  *See* Zeromax GmbH's Motion to Dismiss the Complaint ("Mot.") at 9-10.  In other words, to prove falsity here, Plaintiffs must demonstrate that the Uzbek government proceedings themselves were sham proceedings that produced invalid results. Indeed, Plaintiffs have already claimed as much in their Complaint and Opposition.  *See* Compl. ¶ 41 (alleging that website sources are "a result of the sham judicial proceedings triggered by Karimova"); Opp'n at 32 ("The Maqsudis are arguing that the statements published by Zeromax

---

[1] As discussed below, the allegation of invalid or "sham" proceedings is also central to Plaintiffs' argument that the privilege to report on official proceedings does not apply.

[2] Contrary to Plaintiffs' assertions (Opp'n at 27 n.22), it is of no consequence to the application of the act of state doctrine that the website cites to newspaper articles, because it also cites directly to — and reprints — the official documents that reflect the Uzbek acts of state.  The newspaper articles simply report upon those same State acts.  *See* Erb Decl. Exs. A-B (attaching copy of the website, including directly accessible official documents, and press reports otherwise referenced therein).

are false **"because they did not commit the acts reported on."**") (emphasis added).[3]  The act of

state doctrine necessarily precludes this Court from reaching such a conclusion.  *See World Wide*

*Minerals*, 296 F.3d at 1164 (holding that the act of state doctrine "precludes the courts of this

country from inquiring into the validity of the public acts a recognized foreign sovereign power

committed within its own territory");[4] *Galu v. Swissair*, No. 86 Civ. 5551 (CSH), 1987 WL

15580, at *3 (S.D.N.Y. Aug. 3, 1987) (holding that plaintiff was "precluded by the act of state

doctrine from denying . . . the truth of that condemnation by Swiss authority").

Plaintiffs' allegation of actual malice likewise runs headlong into the act of state doctrine.

As public figures, Plaintiffs must prove by "clear and convincing" evidence that the defendants

acted with "actual malice" — that is, with knowledge of falsity or reckless disregard of the

truth.[5]  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Garrison v.*

---

[3] Plaintiffs attempt to challenge the application of the act of state doctrine by arguing that Zeromax "mischaracterizes" and "ignores" the allegations in the Complaint by portraying this case as "somehow arising" from the alleged sovereign acts of Uzbekistan.  *Id.* at 1.  Yet, inexplicably, the Opposition begins with a "brief summary of the facts **leading up to and giving rise to this case**" (*id.* at 3) (emphasis added) that details (i) Plaintiffs' participation in the CCBU joint venture "**with the Republic of Uzbekistan**" (*id.*); (ii) the actions **of Uzbek** "**government agencies**" to target the Maqsudi family's commercial business through office raids and sham judicial proceedings" (*id.* at 4) (emphasis added); and (iii) the website's "false and defamatory assertions of fact" concerning the very criminal charges leveled against Plaintiffs **by Uzbekistan** as part of **the State's** purportedly "sham" proceedings (*id.* at 6-7).  These references in the Opposition to the acts of Uzbekistan confirm what the Complaint makes clear — that the validity of Uzbekistan's official acts of state is central to this case.

[4] The United States has recognized Uzbekistan as a sovereign state since December 25, 1991. *See, e.g.*, *Background Note: Uzbekistan*, U.S. Department of State, Bureau of South & Central Asian Affairs (March 2007), *available at* http://www.state.gov/r/pa/ei/bgn/2924.htm.

[5] There is little doubt that Plaintiffs are limited purpose public figures for the purpose of reports on the public controversy over their alleged violations of Uzbek law and the government-ordered forfeiture of their interest in the Coca-Cola bottling business in Uzbekistan — a controversy that was reported in this country (and around the world) well before the publications that are the subject of this suit.  *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974) (concluding that unlike a private individual, public figures "voluntarily expose themselves to increased risk of

*Louisiana*, 379 U.S. 64, 74 (1964) (holding that "actual malice" or "reckless disregard" standard requires proof that the challenged statements were published with a "**high degree of awareness of their probable falsity**") (emphasis added); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("There must be sufficient evidence to permit the conclusion that the defendant **in fact entertained serious doubts** as to the truth of his publication.") (emphasis added); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 502 (1984) (same). Actual malice is not the same as old-fashioned common law malice, which "looks to ill will or enmity." *Moss v. Stockard*, 580 A.2d 1011, 1026 n.29 (D.C. 1990); *see also Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 281-82 ("[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard.").[6] Accordingly, Plaintiffs' allegation of actual malice is based, again, upon the

---

injury from a defamatory falsehood concerning them"); *Lohrenz v. Donnelly*, 350 F.3d 1272 , 1281 (D.C. Cir. 2003) (holding that female navy combat pilot was a public figure for the "limited purpose of the debate about whether and how women should be integrated into combat aviation roles"); *Tavoulareas*, 817 F.2d at (finding that the president and CEO of Mobile Oil was a limited public figure because he had "invited attention and comment with respect to public issues affecting his business dealings") (internal quotations omitted); *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1300 (D.C. Cir. 1980) (holding that the president and CEO of a consumer cooperative was a limited public figure); *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 43 (D.D.C. 2005) (concluding that defendants were limited public figures for purposes of the "public controversy involving corruption in post-Soviet Russia and future of Western aid and investment in that country"). *See also* Mot. at 12-13 (detailing widespread press coverage about the Maqsudis as early as 1995).

[6] Plaintiffs confuse "actual malice" and "common law malice" in arguing that the fair report privilege does not apply here because "Zeromax's malice towards Plaintiffs is palpable." Opp'n at 25. Plaintiffs' confusion regarding the applicable standard is underscored by their emphasis of the inflammatory allegations of purported threats by Neil Livingstone, formerly of GlobalOptions, to Plaintiffs' co-counsel. Compl. ¶ 24. Such allegations have no bearing on Plaintiffs' claims or Zeromax's defenses and should be disregarded. Even if the fair report privilege were qualified by actual malice (which, as discussed below, it is not), the malice required here is "actual malice" as that term has been defined in *New York Times* and its progeny. *See* Restatement (Second) of Torts § 600 (1977). Whether Zeromax bears ill will toward the Plaintiffs is therefore not the issue.

claim that the findings of illegality were the "result of the sham judicial proceedings" (Compl. ¶ 41) — precisely the sort of inquiry that is foreclosed by the act of state doctrine.

### 2. The Website Discloses That Its Statements Are Based On Official Acts Of Uzbekistan Taken Pursuant To Its Inherent Police Power

The categories of statements from the website that form the basis of this suit (*see* Compl. ¶ 36) are each directly linked to Uzbek official acts of state identified, quoted or reproduced on the website. Specifically, website statements regarding (i) "Criminal Code Violations" (*id.* ¶ 36(e)-(f)) trace to the Resolution of the Office of the Attorney General of Uzbekistan (Erb. Decl. Ex. A at A-8) and the letter from the Office of the Public Prosecutor of Uzbekistan to U.S. Attorney General John Ashcroft (*id.* Ex. A at A-13); (ii) "Illegal Registration of Roz Company" (Compl. ¶ 36(g)-(h)) trace to the Ashcroft Letter; (iii) "Charter Fund Fraud" (*id.* ¶ 36(i)-(k)) trace to the Resolution; (iv) "Fraudulent Parallel Trading" (*id.* ¶ 36(l)-(r)) trace to the letter from the State Taxation Committee of Uzbekistan to the U.S. Internal Revenue Service (Erb Decl. Ex. A at A-18); (v) "Illegal Profit-Making" (Compl. ¶ 36(s)-(v)) trace to the Resolution and the Ashcroft Letter; (vi) "Embezzlement" (*id.* ¶ 36(w)-(x)) trace to the Resolution and the Ashcroft Letter; (vii) "Profit Siphoning" (*id.* ¶ 36(y)-(aa)) trace to the Resolution; (viii) "Tax Evasion" (*id.* ¶ 36(bb)-(dd)) trace to the Resolution, the Ashcroft Letter and the Taxation Committee Letter; (ix) "Smuggling Cash Out of Uzbekistan" (*id.* ¶ 36(ee)) trace to the letter from Uzbek Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli (Erb Decl. Ex. B at B-65); (x) "Oil Embargo Violations" (Compl. ¶ 36(ff)-(hh)) trace to the letter from the Deputy Attorney General of the Republic of Uzbekistan to the Minister of Justice of the United Arab Emirates (Erb Decl. Ex. A at A-31); (xi) "Selling Sugar on the Black Market" (Compl. ¶ 36(ii)-(jj)) trace to the Resolution and the Khamrakulov Letter; and (xii) "Bribery" (*id.* ¶ 36(kk)) trace to the Ashcroft Letter. *See also* Mot. at 10-11.

All of these official documents evidence Uzbekistan's exercise of its sovereign police powers and regulatory authority, and thus constitute official acts of state. *See, e.g.*, *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326 (11th Cir. 2003) (holding that a government's regulation of the market, use of police power or other activities requiring state authority are public acts). Notably, Plaintiffs do not dispute this point. Instead, Plaintiffs argue that *Sharon v. Time, Inc.*, 599 F. Supp. 538 (S.D.N.Y. 1984), supports their illogical suggestion that their defamation claim can be adjudicated without consideration of the validity of the official Uzbek government acts that were the subject of the statements at issue. Opp'n at 28. Plaintiffs' reliance on *Sharon*, however, is unavailing. The *Sharon* court held that Time did not claim that General Sharon was authorized by Israel to carry out the massacre at issue in that case. *Sharon*, 599 F. Supp. at 544. Therefore, those acts could not be regarded as acts of state. *Id*. The court also held that, even if Sharon's alleged acts could be regarded as acts of state, a jury would not be required to "pass on the validity" of those acts because even Israel agreed that, if they indeed occurred, the acts were illegal and abhorrent. *Id*. at 545-46. In contrast, Plaintiffs do not deny that Uzbekistan carried out the official acts reported, but rather, acknowledge their occurrence and claim instead that such acts were a "sham." Compl. ¶ 35. Thus, unlike *Sharon*, this case would indeed require "pass[ing] on the validity" of the Uzbek acts in question because the information concerning Plaintiffs on the website can only be false if the Uzbek government acts are invalid. *See Sharon*, 599 F. Supp. at 545-46. For this reason, the cases cited by Zeromax (Mot. at 19-21) — and attacked by Plaintiffs as "inapposite" (Opp'n at 29, n. 24) — are directly on point because they all involve official State-sanctioned acts of state.

3.      **Certain Website Statements Also Trace To Uzbek Judicial Decisions, Decrees And State Orders**

In addition, many of the website statements also find authority in other acts of state, including the Uzbek judicial decisions, executive decrees and State orders rendered as part of the State-initiated liquidation and forfeiture actions against ROZ.  *See* Mot. at 6; *see also* Fayzullaev Decl. Exs. G-I (submitted as Erb Decl. Ex. F pursuant to Rule 44.1).  For example, the statements pertaining to "Charter Fund Fraud" (Compl. ¶ 36(i)) trace to the June 3, 2002 decision of the Uzbek Economic Court of Tashkent to liquidate ROZ(U) and remove ROZ Trading's interest in CCBU to pay ROZ(U)'s debt to the State Budget (as affirmed by the September 11, 2002 decision of the Uzbek Supreme Economic Court), as well as the Uzbek Cabinet of Ministers Decree No. 420, dated July 5, 2002, transferring ROZ's CCBU interest to the State. *See* Fayzullaev Decl. at ¶¶ 16, 19-20 & Exs. G, H.  The website merely reports the details of these acts of state.

Plaintiffs gloss over the fact that a ruling from this Court (that the Uzbek judicial proceedings and official decrees resulting in the removal of ROZ's interest in CCBU were a "sham") would have a domino effect on other acts of state carried out based on those proceedings and decrees.  Specifically, such a finding would call into question the validity of the privatization order of the State Committee of the Republic of Uzbekistan on Management of State Property dated September 12, 2004, approving the sale of the State's CCBU interest to an Uzbek-registered limited liability company, Muzimpex, a subsidiary of Zeromax GmbH.  *Id.* ¶¶ 21-25 & Ex. I.

In short, a ruling passing judgment on the veracity of the charter fund fraud statements would require this Court to pass judgment on the validity of a series of official Uzbek acts of state.  The act of state doctrine bars precisely this type of judicial review.  *World Wide Minerals*,

296 F.3d at 1166 (dismissing claims on act of state grounds where claims required a determination of the validity of an official Kazakh decree and Kazakhstan's denial of an export license).  The application of the act of state doctrine in this context is currently squarely before Judge Kollar-Kotelly in *ROZ Trading Ltd. v. Zeromax Group, Inc.*, Civ. No. 06-01040 (CKK) (D.D.C.).

> ### 4. Plaintiffs Do Not Allege Any Conduct Of Zeromax That Is Severable From The Acts Of State At Issue

Plaintiffs further argue that the Court can decide this case without adjudicating acts of state even if such acts are implicated here.  Opp'n at 28-29, 32-34.  This argument involves nothing more than Plaintiffs' attempt to cram this case into the fact patterns presented in *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp. Int'l*, 493 U.S. 400 (1990), *Industrial Investment Development Corp. v. Mitsui & Co.*, 594 F.2d 48 (5th Cir. 1979), *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) and *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976).  Plaintiffs' cited authorities are inapplicable here because, in those cases, the defendants' alleged wrongful conduct (bribes of and/or conspiracy with foreign government officials) was carried out prior to or in conjunction with the sovereign acts in question, and was entirely severable from the acts of state at issue.  For example in *W.S. Kirkpatrick* and *Oceanic*, the defendants' participation in a conspiracy to acquire government contracts could be adjudicated without an inquiry into the validity of the act of state (i.e., the government contract itself).  493 U.S. at 406; 2006 WL 2711527, at *14-15.  Similarly, in *Industrial Investment Development Corp.*, the court was not

required to question the validity of acts of state because the action involved the acts of private conspirators, rather than the Indonesian government.  594 F.2d at 49.[7]

Here, Plaintiffs fail to identify what alleged conduct of Zeromax can be adjudicated, other than simple publication (which is not sufficient to state a claim for the torts alleged), without an adverse judgment as to the validity of the acts of state reported on the website.  In other words, they fail to explain how this Court can determine that the challenged statements were false and published with actual malice, without determining that the official proceedings of the government of Uzbekistan were, as alleged, a sham (i.e., false or invalid).

Plaintiffs cannot avoid this fatal problem by introducing for the first time in their Opposition the conclusory and speculative allegation — completely absent from the Complaint — that Zeromax "helped orchestrate the very 'sovereign acts' at issue."[8]  Opp'n at 27.  Through this assertion, Plaintiffs concede that acts of state are directly at issue in this case.  And unlike the plaintiffs in *W.S. Kirkpatrick* and its progeny, Plaintiffs here do not seek redress for Zeromax's purported acts of helping "orchestrate" the sovereign acts at issue.  Instead, Plaintiffs' claims (as they admit, Opp'n at 4, 6-7, 33) are based upon allegations that the reported official acts of state

---

[7] Moreover, in *Timberlane Lumber Co.*, unlike here, the alleged acts of state were private-initiated lawsuits to enforce security interests.  549 F.2d at 604-05.  The only official governmental action involved were those acts taken to aid the execution of those interests.  Thus, the acts of state were ancillary to the actual conduct in dispute — defendants' own efforts to cripple plaintiff's operations.

[8] This allegation directly contradicts ROZ Trading and ROZ(U)'s allegations in the action currently before Judge Kollar-Kotelly.  *See* ROZ Amended Complaint ¶ 45 (Erb. Decl. Ex. D).  In that case, ROZ alleges that Zeromax only became involved (albeit indirectly) in the alleged facts underlying this case in 2004 when Muzipmex, a subsidiary of Zeromax GmbH, acquired ROZ's former interest interest in the Coca Cola bottling plant from the State through a State privatization sale.  *Id.*

of Uzbekistan — i.e., the criminal charges, State-initiated judicial proceedings, decrees and orders — were themselves baseless.

Notwithstanding the foregoing, Plaintiffs contradict themselves by speculating (again, only in the Opposition) that it was Gulnora Karimova who "orchestrated" or who "masterminded" the sovereign acts at issue.[9] *Id.* at 33. Undeterred, Plaintiffs appear to attribute Gulnora Karimova's alleged wrongful conduct to Zeromax by alleging, without more, that Karimova purportedly "controls" Zeromax. *Id.* Even if Gulnora Karomiva controlled Zeromax, Plaintiffs fail to explain how her conduct could be attributed to Zeromax, an entity that was formed in July 2005, such that Zeromax procured the acts of state at issue here commencing in 2001 — a quite remarkable and illogical suggestion. Agency law operates to attribute an agent's conduct to its principal, not the other way around. *See, e.g.*, *Bell v. Domino's Pizza Inc.*, No. Civ. A. 99-2376 (PLF/JMF), 2000 WL 1780266, at *1 (D.D.C. Nov. 21, 2000) ("If one party controls or has the power to control the manner in which another party creates a good or

---

[9] In support of these statements, Plaintiffs (Opp'n at 33-34) cite to the Declaration of Farhod Inogambaev (Pls.' Ex. D at ¶¶ 26, 28) who claims to have been formerly employed by Gulnora Karimova. The Court may not properly consider this declaration on a Rule 12(b)(6) motion to dismiss. *See In re Phoenix Enter., LLC v. Shirley Highway Distrib. Ctr., LLC*, No. 07-10011-SMT, 2007 WL 2601014, at *3 n.7 (Bankr. D.D.C. Sept. 10, 2007) (noting that on a motion to dismiss "the court must limit its inquiry to the four corners of the [c]omplaint, as well as any documents incorporated by reference in the [c]omplaint or facts subject to judicial notice") (internal quotation omitted); *see also* Restatement (Third) of Foreign Relations Law § 443 cmt. i (1987) (noting that "[c]ourts in the United States may take judicial notice of a document evidencing an act of state"). The same applies to Plaintiffs' Exs. B, C, F-K, M-R, which likewise must be disregarded. The foregoing exhibits and the Inogambaev Declaration differ from the declarations of Uzbek law submitted by Zeromax because that material either was properly submitted pursuant to Rule 44.1, was incorporated by reference into the Complaint, or comprised undisputed public record material of which the Court may take judicial notice. Mot. at 6 n.5. In any event, the Inogambaev Declaration is replete with hearsay and subject to impeachment. More importantly, even taking his statements as true, whether Gulnora Karimova "masterminded" the acts of state at issue in this case is irrelevant because there is no "corruption" exception to the act of state doctrine. *See infra* at 13. In addition, Plaintiffs are not suing Gulnora Karimova in this action.

performs a service, the controlling party may be deemed the principal and the other party her agent, *and be held vicariously liable for the agent's acts*.") (emphasis added).

5.    **Plaintiffs Cannot Distinguish *Galu v. SwissAir***

Finally, and counter to Plaintiffs' assertions (Opp'n at 34), *Galu v. SwissAir*, is directly applicable to this case.   No. 86 Civ. 5551, 1987 WL 15580 (S.D.N.Y. Aug. 3, 1987).   *Galu* stands for the proposition that a defamation claim that would require the court to adjudicate the truth of an official criminal investigation by a foreign government runs afoul of the act of state doctrine.   1987 WL 15580, at *3-4.   Plaintiffs make a poor attempt to argue that *Galu* is inapposite because "there was no evidence that the defendant knew about the falsity of the Swiss expulsion order, let alone that they were involved in its fabrication," whereas Zeromax allegedly knew about the falsity of the website statements.   *See* Opp'n at 34.

First, as the court held in *Galu*, whether the SwissAir employees had inquired into the validity of the expulsion order (as they claimed to passengers they had) had no bearing on the application of the act of state doctrine, because the order was presumed valid.   *Galu*, 1987 WL 15580, at *3.   Thus, Galu's claim would still have failed even if the SwissAir employees lied about confirming the validity of the order.

Second, as discussed above, there is not a single factual allegation in the Complaint that Zeromax influenced or was otherwise involved in the Uzbek acts of state at issue in this case and to claim otherwise would be disingenuous.   In any event, such a factual allegation, if one existed, would be insufficient to avoid the act of state doctrine because it would be directly contradicted by ROZ's allegations in the Amended Complaint in the action pending before Judge Kollar-Kotelly.   *See* ROZ Complaint ¶ 45 (Erb. Decl. Ex. D) (alleging that Zeromax, indirectly through Muzimpex, only became associated with ROZ's former CCBU interest through the State

privatization sale in 2004 — two years after the completion of the acts of state removing ROZ Trading's interest in CCBU as a result of ROZ(U)'s charter fraud).

> **B.     The Legal Standard Governing The Enforcement Of Foreign Judgments Has No Bearing On The Application Of The Act Of State Doctrine**

Plaintiffs try to uproot the basic tenets of the act of state doctrine by asserting that this Court should apply the legal standard for the enforcement of foreign judgments. Opp'n at 30-31. As stated, under the act of state doctrine, a court must "deem[] valid" "acts of foreign sovereigns taken within their own jurisdictions." *World Wide Minerals*, 296 F.3d at 1165. The question of whether to recognize or enforce a foreign judgment simply does not arise in the act of state context. *See Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87, 98-99 (D.D.C. 2006) (holding that earlier enforcement of judgment decision improperly relied on act of state case, and explaining that "the policy bases behind enforcing foreign court judgments — reciprocity, avoiding forum shopping, and avoiding duplicative litigation — are not relevant in the context" of the act of state doctrine).

Moreover, in spite of Plaintiffs' protestations to the contrary, it is well-settled that concerns over a foreign state's due process protections have no place in an act of state analysis. *See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F. Supp. 892, 914 (S.D.N.Y. 1968) (holding that the act of state doctrine differs from comity because it disregards "our own concept of due process and fundamental fairness" and stating "[t]here is no authority for the proposition that the act of state doctrine applies only to foreign acts that would pass muster under our Constitution; on the contrary, foreign laws inimical to our constitutional principles have been recognized, e.g., *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)"); *see also United States v. Merit*, 962 F.2d 917, 921 (9th Cir. 1992) (holding act of state doctrine precluded examination of South Africa's failure to issue an extradition warrant

"[e]ven if the Republic did disregard its own laws in failing to issue a warrant of extradition");

*Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 73 (2d Cir. 1977) (applying act of state doctrine to Libya's

expropriation of plaintiff's property where seizure was expressly declared a political reprisal to

United States). Thus, to condition the act of state defense on due process considerations would

controvert the very purpose of the act of state doctrine and, indeed, nullify it.[10]

Also contrary to Plaintiffs' suggestions (Opp'n at 30-31), there is no "corruption"

exception to the act of state doctrine, as Plaintiffs' own cited case law from this jurisdiction

makes clear. *See Oceanic Exploration Co.*, 2006 WL 2711527, at *8 (rejecting a "corruption

exception" to the act of state doctrine); *see also Compania de Gas de Nuevo Laredo, S.A. v.

Entex, Inc.*, 686 F.2d 322, 326 (5th Cir. 1982) (same); *Clayco Petroleum Corp. v. Occidental

Petroleum Corp.*, 712 F.2d 404, 408-09 (9th Cir. 1983) (same).

### C. The Policies Underlying The Act Of State Doctrine Support Application Of The Doctrine Here

Plaintiffs also claim that the policies underlying the act of state doctrine do not justify its

application in this case (Opp'n at 31), yet fail to identify any "[underlying] policies" or any

prohibitive circumstances unique to this case. Plaintiffs' ambiguous references to the doctrine's

flexibility and the need for due consideration of its application do not qualify as "[underlying]

policies." *Id*. The sole "critical element" they do identify is "the potential for interference with

---

[10] In this regard, the declaration submitted by Plaintiffs' expert Scott Horton, explaining that the "Uzbekistani judiciary lacks independence" (Opp'n at 22), is irrelevant. *See* Pls.' Ex. B (Horton Report) ¶¶ 13, 15-17; *see also* Pls.' Ex. D (attaching State Department Country Report). Indeed, courts have rejected reports, such as those relied on by Mr. Horton, as not constituting credible evidence of corruption or bias. *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996); *Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002) (rejecting State Department Reports as "a basis for any conclusion that the courts of Ukraine constitute an inadequate forum").

our foreign relations," which decidedly favors Zeromax in this case.  Opp'n at 31 (citing *DeRoburt v. Gannett Co.*, 733 F.2d 701, 702 (9th Cir. 1984)).

It is hard to imagine a greater affront to foreign relations than a U.S. court's determination that a foreign sovereign's criminal proceedings, State-initiated liquidation and forfeiture proceedings (and the resulting Court decisions), State decrees and privatization orders were the invalid product of sham proceedings.  *See Banco Nacional de Cuba*, 376 U.S. at 432 ("Piecemeal dispositions of this sort involving the probability of affront to another state could seriously interfere with negotiations being carried on by the Executive Branch and might prevent or render less favorable the terms of an agreement that could otherwise be reached."); *World Wide Minerals*, 296 F.3d at 1166 (dismissing conversion claim based on the act of state doctrine because it required a determination of the validity of an official Kazakh decree transferring shares in dispute to state-owned entity); *In re Philippine Nat'l Bank v. U.S. Dist. Ct. of Haw.*, 397 F.3d 768, 772-73 (9th Cir. 2005) (holding that act of state doctrine barred claims requiring adjudication of foreign forfeiture order); *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1226-28 (9th Cir. 2006) (holding that district court did not have authority to second-guess French court orders and should have deferred to the Executive Branch to assess consequences of France's broad policy against hate speech); *Credit Suisse v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 130 F.3d 1342, 1346-1347 (9th Cir. 1997) (holding that plaintiffs' claims were barred by the act of state doctrine because the relief sought would "render nugatory" Switzerland's Executive Order and cantonal freeze orders issued in an attempt to render legal assistance to the Republic of Philippines in garnering Marcos Estate assets).

Moreover, Plaintiffs' reliance on *DeRoburt* is fundamentally misplaced.  Opp'n at 31-32. The district court in that case ***dismissed*** DeRoburt's defamation claims as alleged on act of state

grounds. *DeRoburt v. Gannett*, 548 F. Supp. 1370 (D. Haw. 1982). DeRoburt, the president of the Republic of Nauru, had alleged in a third amended complaint that the newspaper publisher falsely accused Nauru of "secretly backing the separation of the Marshall Islands from Micronesia, of making an illegal loan to Marshall Islands in 1974 and falsely accused [DeRoburt] of making secret and illegal loans to the Marshall Islands . . . . " *DeRoburt*, 733 F.2d at 703. The Ninth Circuit ruled that the dismissal of that complaint on act of state grounds was ***"necessary and correct."*** *Id*. (emphasis added). The Ninth Circuit's reversal was **strictly limited** to the district court's denial of leave to file a fourth amended complaint. *Id*. In that proposed complaint, DeRoburt narrowly tailored his claim to the fact that it was someone else, and not he, who had made an illegal loan — an action "more akin to a misidentification situation." *DeRoburt*, 733 F.2d at 704. Thus, at least based on the face of the fourth amended complaint, the court was not required to pass judgment on the validity of the foreign sovereign's motivations. *Id.* (reversing dismissal but noting that "trial or pretrial . . . may get so deeply involved in the affairs of state that the trial judge on his own motion might be able to terminate the proceeding").

Plaintiffs here have made no effort to tailor their claims in the manner described above, nor can they. On the contrary, like DeRoburt's ***dismissed*** allegations, Plaintiffs' allegations involve precisely the types of "serious intrusion into the propriety of the acts and policies of a foreign state," as well as the "motivation" behind such acts. *Id*. Thus, *DeRoburt* is of no avail to Plaintiffs and, in fact, supports application of the act of state doctrine in this case.

*       *       *

Plaintiffs' contention that this case does not involve "the Uzbek government's criminal proceedings against Plaintiffs in Uzbekistan and the removal of Plaintiffs' interest in CCBU"

(Opp'n at 29, n.23 (quoting Mot. at 19)) simply fails to reflect what they have alleged in the Complaint and what their defamation claim requires them to prove. If Plaintiffs are not alleging and seeking to prove that the acts of state that are the subject of their defamation claims were the illegitimate product of "sham" proceedings (*see* Compl. ¶¶ 35, 41), then they cannot allege and prove the elements of a defamation claim (i.e., that the publication of those acts and decisions was false and defamatory).

## II. PLAINTIFFS' CLAIMS ARE BARRED BY THE FAIR REPORT PRIVILEGE

### A. The Fair Report Privilege Applies To Non-Media Defendants

Contrary to Plaintiffs' assertions, the fair report privilege is applicable to non-media defendants. Opp'n at 25, 19 n.15, 21 n.16. Plaintiffs do not cite any authority in support of their assertion, and in fact, their own case law contradicts it. *See Oparaugo v. Watts*, 884 A.2d 63, 81 (D.C. 2005) (demonstrating that the court was willing to extend the fair report privilege to a non-media defendant). Indeed, § 611 of the Restatement (Second) of Torts notes that the privilege "extends to ***any person*** who makes an oral, written or printed report to pass on the information that is available to the general public." Restatement (Second) of Torts § 611 cmt. c (1977) (emphasis added).

Applying the fair report privilege to non-media defendants alongside traditional media acknowledges the changing roles of news dissemination advanced by the Internet — itself a form of mass media. In this regard, courts have had little difficulty in extending defamation privileges to non-media defendants. *See, e.g.*, *Amway Corp. v. Procter & Gamble Co.*, 346 F.3d 180, 187 (6th Cir. 2003) (finding that an Internet posting by a non-media defendant was within Michigan's fair report privilege); *Rosenberg v. Helinski*, 616 A.2d 866, 874 (Md. 1992) (holding the fair report privilege applicable to non-media defendants, because "the public's interest in obtaining reports of court matters remains the same irrespective of the reporter's identity" and

such is "consistent with the principle that the law generally treats journalists and non-journalists alike in the context of defamation actions"); *see also Dun & Bradstreet, Inc., v. Greenmoss Builders, Inc.*, 472 U.S. 749, 773 (1985) (White, J., concurring) ("[T]he First Amendment gives no more protection to the press in defamation suits than it does to other exercising their freedom of speech"); *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 101 (2d Cir. 2000) (noting in the context of the neutral reportage privilege that "there is no reason . . . why the Constitution should be construed to provide greater protection to the media in defamation suits than to others exercising their freedom of speech") (internal citation and quotation omitted).

### B. The Fair Report Privilege Should Extend To Official Documents Of Foreign Governments

Plaintiffs ignore the strong policy reasons advanced by Zeromax (Mot. at 25-29) that militate in favor of extending the fair report privilege to reports of official foreign acts and proceedings — an issue the D.C. Circuit has never addressed. The "basis of the privilege is the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings." *See Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985) (quoting Restatement § 611 cmt. a) (internal citation omitted). In this interconnected world, the public has a strong interest in the official actions of foreign governments, as well those of the U.S. government. The public certainly has an interest in governmental actions, based on findings of illegal activity, resulting in the alleged expropriation of an interest in a joint venture with a major American company.

Plaintiffs misunderstand the basis of the privilege by arguing (1) that it should never apply to acts of foreign governments because foreign governments are not "necessarily familiar, open, reliable or accountable," Opp'n. at 22 (quoting *Lee v. Dong-A Ilbo*, 849 F.2d 876, 879 (4th Cir. 1988), or (2) that at a minimum, the privilege should not apply in this case because the

Uzbek government in particular is not open and reliable, *id.*  However, the fair report privilege protects reports of official proceedings not because those proceedings are necessarily more likely to produce truthful or accurate outcomes, but rather because "the public has both the right and the need to know what is being done and said in government — even if some of that is defamatory."  *Dameron*, 779 F.2d at 739.  Accordingly, the alleged or potential unreliability of a foreign government provides no basis to limit the privilege.[11]  The official acts of an allegedly closed or unreliable government are no less important to the public than the official acts of open and reliable governments.  Indeed, informing the public about the outcome of government proceedings that are not open and reliable itself serves an important supervisory function, for it is only by exposing such proceedings that there can ever be any hope of reforming them — or, in the meantime, that those considering travel to or investment in such countries can make informed decisions.  *See, e.g.*, *Friedman v. Israel Labour Party*, 957 F. Supp. 701, 711-12 (E.D. Pa. 1997) (noting that the "supervisory interest represents the benefit to the public, in terms of effective self-government, of exposure to and information about the conduct of government.").  And if, as Plaintiffs allege, the reports of corruption in Uzbekistan are "widespread" and "well-documented," (Opp'n. at 22), then, as Judge Kaufman noted in *Lee*, the Plaintiffs are unlikely to

---

[11] Plaintiffs would have this Court reject the fair report privilege as inapplicable to reports of acts of foreign official proceedings as if such a rejection were a principle of well-settled law.  In fact, the dearth of case law — three solitary decisions and only one opinion by a Circuit Court of Appeals — demonstrates the underdeveloped nature of this important issue.  Moreover, the solitary case on this issue from this Court, *OAO Alfa Bank*, did not examine the policy considerations behind the fair report privilege at any length.  *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 41 (D.D.C. 2005) (stating without elaboration that foreign governments are not "necessarily familiar, open, reliable, or accountable").  Moreover, that decision is certainly not binding on this Court.  In any event, the *OAO Alfa Bank* court ultimately found for defendants because plaintiffs failed to demonstrate that defendants published the alleged defamatory article with actual malice, even though the court found the defendants had engaged in "bad journalism."  *Id.* at 56 (finding that evidence of "bad journalism" and "lapses in ethics" were not enough to demonstrate actual malice) (internal quotation omitted).

suffer any real injury from publication of accounts of official Uzbek proceedings. 849 F.2d at 882 (Kaufman, J., dissenting) ("[M]any American readers will often tend to discredit whatever a foreign government has to say when that government source is perceived in this country as not treating its citizens fairly by American standards").

Moreover, Plaintiffs' argument — that the privilege should not apply in this case because proceedings of the Uzbek government are not reliable — runs afoul of the act of state doctrine that Plaintiffs struggle to avoid. Despite Plaintiffs' repeated assertions that "[t]he sham nature of Uzbekistan's criminal proceedings is not what this case is about," Opp'n at 29, Plaintiffs invite this Court to hold the fair report privilege inapplicable in this case on the ground that "[t]he workings of the Uzbek government are far from 'open' and 'reliable'" *id.* at 22. However, this argument would inevitably require this Court to "inquir[e] into the validity of the public acts of" Uzbekistan, by deciding for example whether Uzbek criminal proceedings are corrupt and tainted by a lack of independence. *World Wide Minerals*, 296 F.3d at 1164. It is precisely that sort of inquiry that the act of state doctrine requires courts to avoid.

Accordingly, outright rejection of a privilege to report on the official actions of foreign governments would be inconsistent with the important purposes of the privilege. Moreover, an evaluation of the applicability of the privilege based on a prior determination of the reliability and openness of the Uzbekistan government would run afoul of the act of state doctrine. The better rule, and the rule that this Court should apply here, is that when, as in this case, there is an undeniable public interest in the official actions of a foreign government, the privilege should be applied to protect fair and accurate reports of those official actions. *See Lee*, 849 F.2d at 881 (Kaufman, J., dissenting) (opining that outright rejection of the privilege simply because foreign

governments are "not necessarily familiar, open, reliable or accountable" to the American public unacceptably suppresses the public's right to know of the acts of foreign governments).[12]

### C. The Website Was A Fair And Accurate Account Of The Official Acts And Documents Of The Uzbek Government

The website was a fair and accurate account of the official acts and proceedings of the Uzbek government in connection with Plaintiffs' alleged illegal activities in Uzbekistan.[13]  In an effort to dispute the accuracy and fairness of the website, Plaintiffs point to purported discrepancies between certain statements on the website and the content of an *Insight Magazine* article cited in support of those statements.  *See* Opp'n at 23.  But those alleged discrepancies are entirely irrelevant to the applicability of the fair report privilege.  That privilege is defeated if the statements at issue are not a fair and accurate report *of the official proceeding*.  *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C. 1980).  Thus, so long as the website fairly and accurately reported on the official proceedings of the Uzbek government, the privilege applies, even if the Plaintiffs could show that the website mischaracterized or incorrectly cited the *Insight Magazine* article.[14]

---

[12] Indeed, if Plaintiffs' assertion that the fair report privilege should not extend to foreign official documents were accepted, then even media articles like those that were published in Forbes and Insight Magazine, which likewise cite to the Uzbek official proceedings, would also be exposed to potential defamation liability.  Such a result is illogical and would have an undesirable chilling effect on the freedom of the press.

[13] Plaintiffs' insinuation that Zeromax somehow misrepresented or mischaracterized the facts of this case by submitting what Plaintiffs contend "appear to be portions of the website" (Opp'n at 7) is disingenuous, given Plaintiffs' failure to offer any other version of the website for the Court to consider.

[14] In any event, the website did not mischaracterize the *Insight* magazine article.  Both the article and the website make clear that they were reporting the contents of official Uzbek government documents.  *See* Erb Decl. at A-1, B-4 to B-5.

Plaintiffs' further effort to challenge the accuracy of the website's report of official proceedings in Exhibit S fares no better — Exhibit S is nothing more than a hyper-technical listing that is irrelevant to the fair report privilege.  *See, e.g.*, *White v. Fraternal Order of Police*, 909 F.2d 512, 525 (D.C. Cir. 1990) (applying fair report privilege to the Washington Post and finding that it should not have been "required to report the results of investigative journalism with a precision establishing an exhaustive, literal picture of what transpired").  For instance, Plaintiffs claim that one website statement links illegal activities to the "Maqsudis," whereas the press report upon which it relies refers to "the previous management of Coke."  Pl. Ex. S. at 36(c).  Plaintiffs' argument is without merit, as the article makes clear that the Maqsudis were the previous management of Coke and even refers to the allegations as "***the Maqsudi matter***."  *See* Erb. Decl. Ex. B at B-56 (emphasis added).

In yet another instance, Plaintiffs try to make much of the fact that certain statements on the website had no source, or in some cases, were not sourced correctly.  *See* Pl. Ex. S at ¶ 36(d)(d) (alleging that neither article speaks to the statement).  Yet, even in those cases, the sentence corresponds to documents otherwise available and previously sourced on the website.  *See* Letter from State Taxation Committee of the Republic of Uzbekistan to the United States Internal Revenue Service (Aug. 7, 2001), Erb Decl. Ex. A. at A-18 (a website-linked document which contains the exact allegation, accurately described).  Finally, Plaintiffs argue that mere paraphrasing, or the failure to qualify certain statements with words such as "allege," or "claim," are enough to defeat the fair report privilege.  *See* Pls.' Ex. S at ¶¶ 36(a), 36(d), 36(g) and 36(j).  Plaintiffs are incorrect.  In viewing the website in context, it is evident that those statements were meant to pass along allegations made by the Uzbek government as reflected in the prosecutor's letter and other official documents that were included as part of the actual website.  *See, e.g.*,

*White,* 909 F.2d at 525 (finding that alleged omissions "were immaterial because the same impressions would have been created if the omitted material had been included"). Indeed, page after page of the website provides the source of the statement, either in the text of the statement itself (e.g., "according to Uzbek authorities"), in footnotes or in the documents included in the website. *See* Erb Decl. Ex. A.[15]

To defeat the privilege, Plaintiffs must show that the website was presented as a "matter of historical fact without any indication that the statements were intended as a summary of an official document." *See, e.g., White,* 909 F.2d at 289. This simply is not the case here. Indeed, here the website author's sources were fully disclosed, and the relevant official Uzbek documents were actually included as pages of the website that could be accessed directly and downloaded by the public. *See* Erb Decl. ¶ 3. Because the website fairly and accurately reported the content of public documents and official statements the fair report privilege bars Plaintiffs' claims. *See, e.g., Dameron v. Washington Magazine, Inc.,* 779 F.2d 736, 740 (D.C. Cir. 1985) (determining that for the fair report privilege to apply, "[i]t must be apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings").

### D.    The Website Informed The Public As To A Matter Of Public Concern

Plaintiffs also contend that the fair report privilege does not apply to the statements at issue in this case because they were not published "for the purpose of informing the public as to a matter of public concern." *Phillips,* 424 A.2d at 88 (quoting a Tentative Draft, Restatement

---

[15] Plaintiffs claim that it is "irrelevant" (Opp'n at 21) that the website, as submitted and described by Zeromax, directly attributed its statements to various Uzbek government and news media sources — but offer no explanation as to why every purportedly "irrelevant" source attribution on the website (but one) was purposefully omitted from the Complaint through selective quotations and ellipses.

(Second) of Torts ¶ 611).   The quoted language, however, is from a Tentative Draft of the Restatement, was not included in the final version, and has not been the basis for any decision in this jurisdiction.   There is, in any event, no doubt that the publication in this case did inform the public on a matter of public concern, and that it was intended to have that effect.   Whether there was, as Plaintiffs allege, some other purpose as well is simply irrelevant.

### E.   The Fair Report Privilege Is Not Defeated By A Showing Of Actual Malice

Contrary to Plaintiffs' blanket assertions (Opp'n at 20, 25), the fair report privilege is not defeated by a showing that the defendant acted with actual malice — that is, that the defendant made the statements at issue with knowledge that the statements were false or with "a high degree of awareness of their probable falsity."   *Garrison*, 379 U.S. at 74.   The Restatement (Second) of Torts, adopted by the courts in this jurisdiction, recognizes three categories of privilege:   (1) absolute privileges, such as the privilege of judges, lawyers and witnesses, providing blanket, unqualified protection, Restatement §§ 585-592; (2) conditional privileges, such as the privilege to make a statement in the interest of the speaker, which can be defeated by a showing of actual malice, *id.* §§ 593-610; and (3) the "special" privilege to report on official proceedings, *id.* § 611.   Though it is not an "absolute privilege," this "special privilege" is "somewhat broader in its scope than the conditional privileges," insofar as "***the privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false***."   *Id.* at cmt. a (emphasis added).   The fair report privilege can be defeated only if "the publisher does not give a fair and accurate report of the proceeding."   *Id.*   Therefore, actual malice is irrelevant.

Both the D.C. courts and this Court have adopted the Restatement's formulation of the fair report privilege.   *See, e.g.*, *Oparaugo*, 884 A.2d at 81; *Phillips v. Evening Star Newspaper*

*Co.*, 424 A.2d 78, 88 (D.C. 1980); *Harper v. Walters*, 822 F. Supp. 817, 823-24 (D.D.C. 1993). Indeed, no court in this jurisdiction has ever expressed or even implied disagreement with Restatement § 611.

To be sure, some D.C. cases suggest that the fair report privilege can be defeated by a showing of malice. But those statements are, for the most part, *dicta*, and they exist side-by-side with citations to Restatement § 611, which makes clear that the fair report privilege is not defeated by a showing that the publisher acted with knowledge that the underlying statement was false. As explained below, some D.C. cases reflect confusion of this "special" privilege with the other "qualified" privileges, and are best understood as establishing only that the fair report privilege is not absolute.

In the case that has generated much of the confusion, *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 698 (D.C. 1970), the Court of Appeals, after reversing a judgment on other grounds, ruled that on remand the jury should be instructed on the fair report privilege, which it said could be defeated by malice. However, that statement appeared without citation, and one can infer from the opinion that the issue was not even briefed. Ten years later, in *Phillips*, 424 A.2d at 87, the Court of Appeals distinguished between the "absolute" privileges and "conditional or qualified" privileges that can be "defeated upon a showing of malice." But the Court then cited and adopted the Restatement § 611 statement of the privilege, which makes clear that the fair report privilege is defeated by a showing that the proceeding was not accurately described, and ***not*** by a showing that the publisher knew that anything contained in the official report or proceeding was false.

Eight years after *Phillips*, the D.C. Circuit stated unequivocally that an accurate report of an official proceeding is "absolutely privileged," regardless of actual malice. *Liberty Lobby v.*

-25-

*Dow Jones, Inc.*, 838 F.2d 1287, 1302 (D.C. Cir. 1988). "The mental state" of the author, the Court emphasized correctly, "is irrelevant" to application of the privilege. In a subsequent case, however, the D.C. Circuit noted that those statements in *Liberty Lobby* were "not essential to our holding" in that case, and characterized the state of the law on this point as "unsettled." *White v. Fraternal Order of Police*, 909 F.2d 512, 528 (D.C. Cir. 1990). The cases since *White* have done little to clarify the issue.[16]

It is simply not possible to read the D.C. cases as definitively rejecting the Restatement's position that the fair report privilege is not defeated by a showing of actual malice. Indeed, the Restatement rule is the only rule that is consistent with the purpose of the privilege, as articulated by the D.C. Circuit. The privilege exists, after all, to enable the public to learn "what is being done and said in government." *Dameron*, 779 F.2d at 739. And that purpose is served when what has been done and said in government is reported accurately, regardless of whether the author of the report believes what was said to be true. In fact, the purpose of the privilege would be defeated if persons hesitated to report what was being said or done in government merely because they had doubts about whether what was said was true.

This point is best illustrated by considering how the privilege applies to reports of the testimony of witnesses. If the privilege could be defeated by a showing that the publisher did not

---

[16] In *Harper*, 822 F. Supp. at 824, this Court quoted Restatement § 611 for the proposition that the fair report privilege "protects the publisher 'even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false.'" However, that opinion then went on to state that the privilege "is waived if the report was published with actual malice." *Id.* at 824. Similarly, *Oparaugo v. Watts*, 884 A.2d 63 (D.C. 2005) stated in *dicta* that the fair report privilege "can be defeated by the presence of malice," *id.* at 81 (citing *Harper*, 822 F. Supp. at 824), but also noted that for purposes of this privilege, "accuracy is not determined by comparing the official record with the actual facts; it is judged by comparing the publisher's report with the official record," *id.* at 82 n.14, an observation more in line with the Restatement rule.

believe the statement at issue to be true, then the privilege would not permit the publisher to report conflicting testimony — the privilege might require him to report only the testimony he believed to be true and to omit the testimony he believed to be false. Quite obviously, that would defeat the purpose of the privilege.

"Abuse of the privilege takes place," therefore, not when the publisher doubts the accuracy of what was said in a government proceeding, but "when the publisher does not give a fair and accurate report of the proceeding." Restatement § 611, cmt. a; *see also Dameron*, 779 F.2d at 739 ("The privilege's underlying purpose . . . suggests a natural limit to its application," namely that "if the reports are . . . unfair or inaccurate, the privilege does not apply.") Cases from other jurisdictions confirm this point. *See, e.g.*, *Yohe v. Nugent*, 321 F.3d 35, 44 (1st Cir. 2003) ("[I]t is well established that the fair report privilege should not be forfeited even if the party making the report knew the statement to be false.") (citing Restatement § 611) (internal quotations omitted); *Solaia Tech. v. Specialty Publ'g Co.*, 852 N.E.2d 825, 843 (Ill. 2006) (quoting Restatement § 611); *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 333 (Minn. 2000); *Chesapeake Publ'g Corp. v. Williams*, 661 A.2d 1169, 1175 (Md. 1995).

In sum, Plaintiffs cannot defeat application of the fair report privilege in this case based on a showing of actual malice.

## III.   PLAINTIFFS HAVE FAILED TO CURE THE STATUTE OF LIMITATIONS DEFICIENCIES IN THE COMPLAINT

Plaintiffs effectively concede that a statute-of-limitations defense is established on the face of the Complaint. Opp'n at 3 n.1. Plaintiffs admit in a footnote in their Opposition that the Complaint contains inaccurate date information pertaining to the registration of the first website. *Id.* Plaintiffs simply argue in their Opposition that the correct dates (as shown in unauthenticated print-outs of Network Solutions WHOIS data attached to their Opposition) place this action

within the statute of limitations.  Opp'n at 17-18 & Pls.' Ex. I.  This is insufficient to cure the defects in the Complaint.

A Rule 12(b)(6) motion "tests the legal sufficiency of the Complaint," thus, "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Arbitraje Casa de Cambio S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 168, 170 (D.D.C. 2003) (dismissing plaintiffs' complaint where it stated claims for expired torts, holding that it could not be supplemented by opposition brief's new allegations for viable contract claims); *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) ("To hold otherwise would mean that a party could unilaterally amend a complaint at will . . . even without filing an amendment, and simply by raising a point in a brief.").  Accordingly, Plaintiffs have failed to cure the Complaint's statute-of-limitations deficiencies.

## IV.    PLAINTIFFS HAVE FAILED TO CURE THE JURISDICTIONAL DEFICIENCIES IN THE COMPLAINT

Likewise, Plaintiffs' attempt to amend the Complaint's jurisdictional allegations through their Opposition brief (Opp'n at 2, 10-16) is improper.  *See, e.g.*, *Barrett v. Lombardi*, 239 F.3d 23, 27 (1st Cir. 2001) ("In order to defeat a motion to dismiss for want of *in personam* jurisdiction, a plaintiff must . . . verify the facts alleged through materials of evidentiary quality. Thus, allegations in a lawyer's brief or legal memorandum are insufficient, even under the relatively relaxed prima facie standard, to establish jurisdictional facts.").  Plaintiffs do not contest that they bear the burden of "alleg[ing] specific acts connecting [Zeromax] with the forum" for purposes of personal jurisdiction.  *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988); *accord City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 32 (D.D.C. 2007).  Instead, seeming to recognize the inherent jurisdictional deficiencies in their Complaint, Plaintiffs inundate their Opposition with new, more detailed allegations

purporting to connect Zeromax to the forum.[17]  *See, e.g.*, Opp'n at 2 ("Zeromax . . . purposely *came to Washington, D.C.* to engage GlobalOptions . . . .") (emphasis added); at 11 ("Zeromax actively sought out and *contracted with GlobalOptions here in Washington, D.C.* to post the defamatory websites at issue as well as to make the threats against Plaintiffs.") (emphasis added); at 14 ("Zeromax directed GlobalOptions . . . to harm Plaintiffs by *creating, registering and maintaining the defamatory websites at its D.C. address* — as well as having its agent make threats to their physical safety here in Washington.") (emphasis added).  *None* of these allegations of conduct undertaken specifically within the District by Zeromax (or its purported agent GlobalOptions) is contained in the Complaint.[18]

---

[17] Despite the numerous new jurisdictional allegations in their Opposition, Plaintiffs contend that the Complaint has "satisfied the pleading requirements and shown a basis for personal and subject matter jurisdiction" as required at the "earliest stages" of the case.  Opp'n at 15 n.9.  Curiously, Plaintiffs rely for this argument only on cases addressing admiralty subject-matter jurisdiction and standing.  *Id.* (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537 (1995) (admiralty jurisdiction); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (standing)).  Indeed, the Complaint relies largely (and improperly) on the bare allegation of GlobalOptions's principal place of business in the District — sufficient perhaps for the exercise of general jurisdiction over GlobalOptions — to assert specific jurisdiction over Zeromax.  *See Atlantigas Corp. v. Nisource Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003) ("Plaintiff bears the burden of establishing personal jurisdiction over each individual defendant.").  Plaintiffs' jurisdictional burden as to Zeromax is not met by assuming that the alleged acts giving rise to their claims took place in the District simply because GlobalOptions is headquartered there.  *See First Chicago Int'l*, 836 F.2d at 1378 (holding plaintiffs "must allege specific acts connecting the defendant with the forum").

[18] Moreover, to the extent that Plaintiffs' supplemented jurisdictional allegations in the Opposition relate to threats purportedly made by Neil Livingstone, they are irrelevant.  Plaintiffs do not, and cannot, argue that these purported threats, allegedly made at the direction of Zeromax, gave rise to their defamation claims.  *See* D.C. Code § 13-423(b) (requiring for specific jurisdiction that claims "aris[e] from" alleged contacts with the District of Columbia).  In addition, the Opposition introduces entirely new allegations of Plaintiffs' purported business interests and injury in the District.  *See, e.g.*, Opp'n at 15 (alleging that Plaintiffs "have substantial business in D.C." and "suffered injury in D.C.").  Again, the appearance of these allegations for the first time in the Opposition only underscores the absence of any such allegation — as to any Plaintiff — in the Complaint.  In support of their newfound allegations of business contacts and tortious injury in the District, Plaintiffs submit a declaration by Plaintiff

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety with prejudice.

Dated: December 20, 2007
      Washington, D.C.

Respectfully submitted,

**WHITE & CASE** LLP

/ s / Carolyn B. Lamm
Carolyn B. Lamm (D.C. Bar No. 221325)
Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Nicole E. Erb (D.C. Bar No. 466620)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

Kevin T. Baine (D.C. Bar No. 238600)
Jonathan Kravis (D.C. Bar No. 973780)
**Williams & Connolly LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5010
Facsimile: (202) 434-5018

*Attorneys for Defendant Zeromax GmbH*

---

Farid Maqsudi. *See* Pls.' Ex. A. However, the declaration is limited on its face to a discussion of the alleged D.C. business and injury of Farid Maqsudi alone, and does not purport to support any such allegations as to Plaintiffs Mansur Maqsudi or Abdul Rauf Maqsudi — which remain wholly conclusory and without any alleged factual support in the Complaint or otherwise.