# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MANSUR MAQSUDI, *et al.,* | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | 1:07-CV-01252RJL |
| | ) | |
| GLOBALOPTIONS, INC., *el al,* | ) | |
| | ) | |
| *Defendant.* | ) | |

## DEFENDANT GLOBALOPTIONS, INC.'S MOTION TO DISMISS THE COMPLAINT

Defendant GlobalOptions, Inc. ("Global"), a Delaware corporation with business activities in the District of Columbia, respectfully moves this Court for an order dismissing with prejudice Plaintiffs' Complaint in its entirely pursuant to (i) the act of state doctrine; (ii) Rule I2(b)(6) for failure to state a claim upon which relief may be granted; and (iii) the statute of limitations bars the claims at issue.

In support of its motion, Global respectfully submits the accompanying memorandum of points and authorities, and exhibits thereto.

Dated: January 3, 2008
Washington, D.C.


Respectfully submitted,

/s/ Morton S. Taubman
Morton S. Taubman
DC Bar No. 316604
Leser, Hunter, Taubman & Taubman
1201 15th Street, N.W.
Second Floor
Washington, D.C. 20005
(202) 347-9090 Telephone
(202) 659-2679 (Facsimile)
E-Mail: mtaubman@isiwdc.com

/s/ Mark David Hunter
Mark David Hunter
DC Bar No. 974569
Leser, Hunter, Taubman & Taubman
1515 North Federal Highway,
Suite 300
Boca Raton, FL 33432
(561) 394-8886 Telephone
(561) 392-9901(Facsimile)
Email: mdhunter@lhttlaw.com

Attorneys for the Defendant Global.

**UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA**

MANSUR MAQSUDT, *el al.*,      )
                                         )
          *Plaintiffs,*         )
                                         )
       v.                     )       1:07-CV-01252RJL
                                         )
GLOBALOPTIONS, INC., *et at.*,    )
                                         )
          *Defendants.*       )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT GLOBAL'S MOTION TO DISMISS THE COMPLAINT**

Respectfully submitted,

/s/ Morton S. Taubman           /s/ Mark David Hunter
Morton S. Taubman               Mark David Hunter
DC Bar No. 316604              DC Bar No. 974569
Leser, Hunter, Taubman & Taubman   Leser, Hunter, Taubman & Taubman
1201 15th Street, N.W,          1515 North Federal Highway,
Second Floor                    Suite 300
Washington, D.C. 20005        Boca Raton, FL 33432
(202) 347-9090 Telephone       (561) 394-8886 Telephone
(202) 659-2679 (Facsimile)      (561) 392-9901  Facsimile
E-Mail: mtaubman@isiwdc.com    Email: mdhunter@lhttlaw.com

Attorneys for the Defendant Global

## TABLE OF CONTENTS

INTRODUCTION...................………………………………………………………….......  1

BACKGROUND.................................................................................................  2

I.   THE CLAIMS IN THIS CASE  QUESTION THE VALIDITY OF OFFICIAL

     ACTS OF THE STATE OF UZKEKISTAN……………………… ......................  3

ARGUMENT...................................................................................................  6

I.   THE ACT OF STATE DOCTRINE BARS PLAINTIFFS' CLAIMS........... ...............…  6

II.  PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE

     GRANTED...............................................................................……  9

     A.   The Complaint Fails To State Claims For Defamation And False Light

          Invasion Of Privacy ............................................................ .......  10

     B.   Plaintiffs' Claims Are Barred By The First Amendment.........  11

     C.   Plaintiffs' Claims Are Barred By The Fair Report Privilege.......  13

     D.   The Complaint Is Barred By The Statute Of Limitations...............  16

CONCLUSION....................................................................................……  17

**TABLE OF AUTHORITIES**

FEDERAL CASES                                                          Page

*Ahmad Chalabi, et al., v. The Hashemite Kingdom of Jordan, et al.,*

503 F.Supp.2d 267, (D.C. 2007)…………………………………………·                      7

*Banco National de Cuba v.Sabbatino,* 376 U.S. 398 (1964) .......................... 7

*Bao Ge v. LiPeng,* 201 F. Supp. 2d 14 {D.D.C. 2000)…………………………………            7

*Beg v. Islamic Republic of Pakistan,* 353 F.3d 1323 (11th Cir. 2003)………… ……………  7,8

*Bell Atlantic Corp. v. Twombly,* 127S.O. 1955 (2007) .........................……10

*Browning v. Clinton,* 292 F.3d 235 (D.C. Cir. 2002) …………………………….....10

*Carry v. Brown, 447 U.S. 455, 467 (1980)*……………………………………… 12

*Coles v. Washington Free Weekly, Inc.,* 881 F. Supp. 26 (D.D.C. 1995)……………… 14

*DeRoburt v. Gannett,* 548 F. Supp. 1370 (D. Haw. 1982)……………………………   9,10

*El-Fadl v. Cent. Bank of Jordon* 75 F. 3d 668 (D.C. Cir. 1996)…………………… ….9

*First Merchants Co/lection Corp. v. Republic of Argentina,*
    190 F. Supp. 2d 1336 (S.D. Fla. 2002)………………………………………… …8

*Friedman v. Israel Labour Party,* 957 F. Supp. 701 (E.D. Pa. 1997)……………    15

*Galu v. SwissAir,* No. 86 Civ. 5551 (CSH),

1987 WL 15580 (S.D.N.Y. Aug. 3, 1987)……………………………… …………   9,10

*Gregorian v. Izveslia,* 871 F.2d 1515 (9th Cir. 1989)……………………………………,… …..9

*Grosjean v. Am. Press Co.,* U.S. 233, (1936)………………………………………  10

*Harper v. Walters,* 822 F. Supp. 817 (D.D.C. 1993)……………………………………… .14

*Kowal v. MCI Commc'ns Corp.,* 16 F. 3 d 1271 (D.C. Cir1994}……………………………… .10

McFarlane v. Sheridan Sq, Press 91 F. 3d 1501,1515(D.C.Cir.,1996)………..…………   13

*New York Times Co. v. United States* 403 U.S. 713 (1971)……………………………   11

*OAO Alfa Bank v. Cir. for Pub. Integrity,* 387 F. Supp. 2d 20 (D.D.C.2005)…………… 12, 13,14

*Philippine Nat'l Bank v. U.S. Dist. Ct. of Hawaii,* 397 F.3d 768 (9th Cir. 2005) ……………  ……… 8

*Phonix Enter., LLC v. Shirley Highway Distr. Ctr. ,LLC,* No. 07

-1011-SMT, 2007 WL 260104......................................................5,11

*ROZ Trading, Lid. v. Zeromax Group, Inc.,* Civ. No. 06-1040 (CKK),
2007 WL 2812760 (D.D.C. Sept. 28, 2007)............................. .... 1,3

*Saudi Arabia v. Nelson,* 507 U.S. 349 (1993),............................... .... 8


*Tavoulareas v. Piro,* 817 F.2d 762 (D.C. Cir. 1987)........................ ... 7

*Times v. Sullivan,* 376 U.S. 254, 270 (1964)...............................12

*Trotterv. Jack Anderson Enters.,* 818 F.2d 431, 435 (5th Cir.1987)......................... 16

*United States* v. *Merit,* 962 F.2d 917 (9th Cir. 1992)......................... 8

*White v. Fraternal Order of Police,* 909 F.2d 512 (D.C. Cir.1990)...........…........... 11,14

*Wiggins v. Philip Morris, Inc.,* 853 F. Supp. 458 (D.D.C. 1994)............................... ..17

*World Wide Minerals, Ltd. v. Kazakhstan,* 296 F.3d 1154 {D.C. Cir 2002)............. 7,10,21

*Zerilli v. Smith,* 656 F 2d 705 (D.C. Cir. 1981).......................... 12

## STATE CASES
*DeAngelis v. Hill,* 847 A 2d 1261 (N.J. Sup. Ct. 2004)...................10

*Klayman v. Segal,* 783 A.2d 607 (D.C. 2001) ........................ 10

*Orso v. Goldberg,* 665 A.2d 786, (N.J. Super. Ct. App. Div. 1995) ...........................14

*Philips v. Evening Star Newspaper Co.,* 424 A.2d 78 (D.C. 1980)........................ 14

## FEDERAL STATUTES
Fed. R. Civ.P.12(b)(6).................................................. 5,10

28U.S.C.§ 1605 (2002)................................................. 9

## STATE STATUTES
D.C. Code § 12-301 (2001)............................................. .....16

OTHER AUTHORITIES

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1309 (1990) ...............17

Restatement (Second) of Torts § 611 (1977)................................................. ....................24,25

## **INTRODUCTION**

This case arises from a longstanding dispute between, the Plaintiffs, and the government of the Republic of Uzbekistan ("Uzbekistan"). The dispute concerns Uzbekistan's alleged expropriation of Plaintiffs' interest in an Uzbek joint venture, Coca-Cola Bottlers Uzbekistan Ltd. ("CCBU"), and Uzbekistan's related investigation into alleged criminal activities committed by Plaintiffs in Uzbekistan. Plaintiffs' interest in CCBU was held through their off-shore companies ROZ Trading Ltd. ("ROZ Trading"), a Cayman Islands company, and ROZ Trading Ltd. (Uzbekistan) ("ROZ(U)"), a company organized, located, and liquidated in Uzbekistan (collectively "ROZ"). Through these companies, Plaintiffs have pursued separate litigation and arbitration proceedings arising from their dispute with Uzbekistan against a number of defendants, including Uzbekistan and Uzpislicheprom Association ("Uzpishcheprom"), an Uzbek State-owned entity; The Coca-Cola Export Corporation ("TCCEC"); Defendant Zeromax, a Swiss-registered company with business activities in Uzbekistan; and various dissolved U.S. Zeromax affiliates. *See Roz Trading, LTD. v. Zeromax Group, Inc.,* Civ. No. 06-01040 (D.D.C.) (the "Roz Litigation"); *Roz Trading Ltd. v. Coca-Cola Export Corp., Uzbekistan, Uzpishcheprom Assoc., and Zeromax Group, Inc.* Case No. SCH-4986 (Int'l Arbitral Centre of the Austrian Fed. Econ. Chamber.)(the "Vienna Arbitration").

This Case involves claims that Plaintiffs have been defamed by a website allegedly posted in 2006 containing reports of the criminal charges leveled against them and ROZ by Uzbekistan in or around 2001 and 2002. Complaint ("Compl.") ¶¶ 15-17, 34-36.

The website in question, merely documents (i) official Uzbek government acts and official documentation substantiating the 2001-2002 criminal and tax charges at issue; and (ii) quotes from certain reports of said charges authored by various reputable news organizations, including the *Associated Press, Financial Times, Forbes Magazine,* and *The New York Times* (to name but a few). Plaintiffs conveniently ignored in their Complaint that for more than four years before the website was established, the Plaintiffs were the subject of countless press

1

articles covering the same or similar alleged criminal activity, however, no action was taken by the Plaintiffs against the authors or publishers of such articles.

The Complaint must be dismissed in its entirety[1] for several independent reasons: (i) the act of state doctrine bars Plaintiffs' claims because they require this Court to inquire into the validity of the charges made by the Uzbek government within Uzbekistan against Plaintiffs and their companies; (ii) the Complaint fails to state a claim upon which relief may be granted wherein the website at issue is absolutely protected by the First Amendment and/or common-law fair report privilege because it provided a fair and accurate account of official governmental acts and criminal proceedings concerning Plaintiffs that have been in the public domain for years — complete with full disclosure of sources with no editorial comments by the author of the website; and (iii) the statute of limitations bars the claims at issue.

## BACKGROUND

The website in question consists of  Uzbek official government documents incorporated therein by reference, and numerous widely published news reports pre-dating the alleged posting of the website. To assist the Court, Global hereby submits a copy of website of http://www.mansurmaqsudi.net and its source documentation cited therein. See Declaration of Morton S. Taubman, dated January 3, 2008, Exhibit A[2]

The website at issue in this case functions to provide the public with true and accurate information, without editorial comments, regarding the Plaintiffs and their business dealings within Uzbekistan. Nowhere contained in the website did the author take any editorial liberties but merely made an effort to either accurately copy or summarize the contents of the

---

[1] See Rule 12(b)(6) under the Fed. Rules of Civil Procedure

[2] In addition, the Declaration of Morton S. Taubman includes Exhibits B and C, which include (i) true and correct copies of press reports and documents included as references in the website; and (ii) true and correct copies of selective press reports available in the public domain, respectively.

Uzbek official government documents which have been previously reported in many news articles.

In each of the three aforementioned proceedings (Roz Litigation, Vienna Arbitration and this Case), Plaintiffs, individually or through ROZ, allege that the government of Uzbekistan "targeted" the Maqsudi family's commercial business in Uzbekistan through "sham judicial proceedings" and investigations intended to harass Plaintiffs that resulted in the removal of ROZ's interest in CCBU (Compl. ¶12).

On the basis of these allegations Plaintiffs have pursued claims for monetary and equitable relief against Defendant Zeromax in this Court and in the Vienna Arbitration. They now seek additional relief against Global as a result of the website at issue here, which merely documents fairly the sovereign acts of Uzbekistan. Nowhere does the Complaint state nor could it contend that the Uzbek government criminal proceedings against the Plaintiffs within Uzbekistan did not in fact take place.

To further assist this Court, Global submits copies of numerous other widely published news articles that predate the alleged posting of the website, demonstrating that reports of this dispute and the allegations of Plaintiffs' criminal activity have long been in the public domain. *See* Taubman's Declaration. Ex. B &C.

## THE CLAIMS IN THIS CASE QUESTION THE VALIDITY OF OFFICIAL ACTS OF THE STATE OF UZBEKISTAN

Plaintiffs allege that the website http://www.mansurmaqsudi.net (and certain other domain names linking to that site) posted purportedly false and defamatory statements relating to Plaintiffs' alleged involvement in criminal activities within Uzbekistan in or around 2001 and 2002. Compl. ¶ 36.  The Plaintiffs, however admit that the alleged defamatory statements are from the Uzbek government documents (*id.* ¶ 35). The Plaintiffs do not claim or allege that Global fabricated the assertions contained in the Uzbek official government documents.

Further, the Plaintiffs clearly omitted from the Complaint the extensive language from the website that expressly attributes its content to specific official Uzbek government sources. Thus, the statements from the website that form the basis of this suit (See Compl. ¶ 36) are each documented to Uzbek official acts of state identified, quoted or reproduced on the website. Specifically, website statements regarding (i) "criminal Code Violations" (Compl. ¶ 36(e)-(f)) track to the Resolution of the Office of the Attorney General of Uzbekistan (Ex. A at A-8) and the letter form the Office of the Public Prosecutor of Uzbekistan to the U.S. Attorney General John Ashcroft (Ex. A at A-13); (ii) "Illegal Registration of Roz Company" (Compl. ¶ 36(g)-(h)) tracks to the Ashcroft Letter (Ex A at A-13); (iii) "Charter Fund Fraud" (Compl. ¶ 36(i) –(k)) tracks to the Resolution set forth in Ex A at A-8); (iv) "Fraudulent Parallel Trading" (Compl ¶ 36(l)-(r)) tracks to the letter from the State Taxation Committee of Uzbekistan to the U.S. Internal Revenue Service (Ex. A at A-18); (v) "Illegal Profit Making" (Compl. ¶ 36(s)-(v) tack to the Resolution and the Ashcroft Letter (Ex. A at A-13 and A-8); (vi) "Embezzlement" (Compl. ¶ 36(w)-(x)) track to the Resolution and the Ashcroft Letter (Ex. A at A-13 and A-8); (vii) "Profit Siphoning" (Compl. ¶ 36(y)-(aa)) track to the Resolution and the Ashcroft Letter (Ex. A at A-13 and A-8); (viii) "Tax Evasion" (Compl. ¶ 36(bb)-(dd)) track to the Resolution, the Ashcroft Letter and the Taxation Committee Letter (Ex. A at A-8, A-13, and A-18); (ix) "Smuggling Cash Out of Uzbekistan" (Compl. ¶ 36 (ee)) tracks to the letter from Uzbek Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli (Ex. B at B-65); (x) "Oil Embargo Violations" (Compl. ¶ 36 (ff)-(hh)) tracks to the letter from the Deputy Attorney General of the Republic of Uzbekistan to the Minister of Justice of the United Arab Emirates (Ex. A at A-31); (xi) "Selling Sugar on the Black Market" (Compl. ¶ 36 (ii)-(jj) track to the Resolution and the Khamrakulov Letter (Ex. A at A-8 and A-31); and (xii) "Bribery" (Compl. ¶ 36(kk)) tracks to the Ashcroft Letter (Ex. A at A-13).

4

As is evident from the face of the website, the statements published therein are extensively noted and attributed to, if not directly quoted from, various official Uzbek government documents and news reports from reputable media sources that themselves report on the same government documents and actions. Further, the website uses italicized and non-italicized text to differentiate between "the author's comments" — which often explicitly identify their source both in the text of the website and in the footnotes — and "direct quotation from official documents and public information sources." Ex. A. All statements on the website relate to Uzbekistan's exercise of its sovereign police power to investigate and initiate proceedings relating to the alleged criminal activities of the Plaintiffs and ROZ within Uzbekistan and to enforce its own laws.

The reputable news media sources similarly sourced, quoted or linked on the website include the Associated Press, *Insight Magazine, Forbes, Financial Times,* and *The New York Times.* The news articles range in date from 1995 to 2003 — years before the alleged publication of the website — and report on the removal of Plaintiffs' interest in CCBU and the Uzbek government's criminal proceedings against Plaintiffs and ROZ. Significantly, the news media sources do not report their own findings, but describe the findings of the government of Uzbekistan—that Plaintiffs were involved in criminal activities including, *inter alia,* misappropriating funds, fraudulent parallel trading, profit siphoning, evading taxes, and using CCBU to purchase embargoed oil products from Iraq and Iran. *See, e.g.,* Paul Klebnikov, *Coke 's Sinful World,* Forbes Magazine, Dec. 22, 2003, available at http://www.forbes.com/forbes/2003/1222/086.print.html ("Coke has watched a well-funded bottler that was to be its gateway to central Asia wither amid charges of misappropriated funds, tax dodges and cozy inside deals.") ( Ex. A); Douglas Burton, *Divorce Drama Goes International,* UPI Insight Magazine, Sept. 1, 2003, at 50 (reporting on allegations by the government of Uzbekistan that "the Maqsudis violated international sanctions by using the Coca-Cola Bottling

Co. in Tashkent to purchase embargoed oil products from Iraq and Iran in 2001 and then exported them elsewhere"). (Ex. B). Thus, the statements that Plaintiffs allege to be false and defamatory are reports of official Uzbek government actions.

## ARGUMENT I.

### THE ACT OF STATE DOCTRINE BARS PLAINTIFFS' CLAIMS

Plaintiffs allege that Republic of Uzbekistan and its legal system are flawed and rely fundamentally upon the premise that the information on the website "relate[s] to or [is] part of the sham audits and investigations initiated by Uzbekistan" (Compl. ¶ 35), and that the criminal charges described on the website are false. *See, e.g., id.* ¶ 34 (alleging that the website "falsely portray[s] Plaintiffs as being involved in … criminal and disreputable activities"); Compl. ¶35 ("Many of the website's statements cite to highly unreliable documents issued by the Uzbek government. . . .").

In order to establish this claim, the Plaintiffs must challenge the legitimacy of Uzbekistan's criminal proceedings against them for criminal code violations, company registration violations, charter fund fraud, fraudulent parallel trading, illegal profit-making, embezzlement, profit siphoning, tax evasion, cash smuggling, oil embargo violations, selling sugar on the black market, and bribery. *See* Compl. ¶¶ 36(a)-(kk). Adjudication of Plaintiffs' claims would require Plaintiffs to prove, and this Court to pass judgment upon, the validity of the Uzbek criminal charges and proceedings and therefore the lawfulness of Uzbekistan's exercise of its sovereign police power forming the basis of the allegedly defamatory website statements. *See, e.g., Tavoulareas v. Piro,* 817 F.2d 762, 783 (D.C. Cir. 1987) (finding that plaintiff "was required to prove falsity at trial in order to prevail").

The act of state doctrine, however, "precludes the courts of this country from

inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *World Wide Minerals, Ltd. v. Kazakhstan,* 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco National de Cuba v. Sabbatino,* 376 U.S. 398, 401 (1964)); and *Ahmad Chalabi, et al., v. The Hashemite Kingdom of Jordon, et al.,* 503 F. Supp. 2d 267. Premised on principles of "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations," *World Wide Minerals,* 296 F. 3d at 1164 (quoting *Sabbatino,* 376 U.S. at 408), the act of state doctrine is not simply a doctrine of abstention. Rather, it serves as *"a rule of decision for the courts of this country, which requires that in the process of deciding a case, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." World Wide Minerals,* 296 F.3d at 1165.

The exercise of state police power and regulatory authority is at the heart of this case — i.e., the Uzbek government's criminal proceedings against Plaintiffs in Uzbekistan and the removal of Plaintiffs' interest in CCBU — represent quintessential sovereign acts of state. *See Saudi Arabia v. Nelson,* 507 U.S. 349, 361 (1993) ("[A] foreign state's exercise of the power of its police has long been understood ... as peculiarly sovereign in nature."); *Philippine Nat'l Bank v, U.S. Dist .Ct. of Hawaii,* 397 F.3d 768, 772-73 (9th Cir. 2005) (finding forfeiture action by Philippine government to recover property allegedly stolen from state treasury an act of state requiring application of act of state doctrine); *Beg v. Islamic Republic of Pakistan,* 353 F.3d 1323, 1326 (11th Cir. 2003) (holding that a government's regulation of the market, use of police power or other activities requiring state authority are public acts); *United States v. Merit,* 962 F.2d 917, 921 (9th Cir. 1992) (holding act of state doctrine precluded examination of South Africa's failure to issue a warrant under its extradition statute, because "[e]ven if the Republic did disregard its own laws in failing to issue a warrant of extradition, this court cannot question the validity of South Africa's domestic actions"}; *Bao Ge v. Li Peng,* 201 F. Supp. 2d 14, 24 n.8

(D.D.C. 2000) (finding it "clear that the Act of State doctrine would apply to the actions of the Chinese government defendants" in case "aris[ing] out of an alleged abuse of China's police power"); *First Merchants Collection Corp. v. Republic of Argentina*, 190 F, Supp. 2d 1336, 1337, 1340 (S.D. Fla. 2002) (holding pursuant to act of state doctrine that court was "precluded from inquiring into the validity of Argentina's actions" where law enforcement officials had confiscated merchandise "pursuant to a criminal investigation").

The United States has recognized the Republic of Uzbekistan as a sovereign state since December 25, 1991, following the breakup of the Soviet Union. *See, e.g., Background Note: Uzbekistan,* U.S. Department of State, Bureau of South and Central Asian Affairs (March 2007), *available at* http://www.state.gov/r/pa/ei/bgn/2924.htm. Thus, the issue of the Act of State Doctrine would include the Republic of Uzbekistan, notwithstanding any argument that its criminal procedure may be flawed. See *Beg v. Islamic Republic of Pakistan,* 353 F.3d 1323, 1326 (11th Cir. 2003). Thus, the Plaintiffs submission of an expert declaration explaining the "Uzbekistani judiciary lacks independence" is irrelevant in their Opposition to Defendant Zeromax's Motion to Dismiss ("Opp'n") at 22.[3]

The Act of State Doctrine applies equally to the law of defamation, wherein this Court would be precluded from inquiring into or making any determination as to the truthfulness or falsity of the Uzbek criminal charges and documents at issue in this case. *See, e.g.. Galu v. SwissAir,* No. 86 Civ. 5551 (CSH), 1987 WL 15580, at *3 (S.D.N.Y. Aug. 3, 1987) (holding defamation plaintiff "precluded by the act of state doctrine from denying in this Court the truth of

---

[3] Scott Horton declaration. Courts have rejected such type of reports as not constituting credible evidence of corruption or bias even if such evidence was relevant under the act of state. See *El-Fadl v. Cent. Bank of Jordon, 75 F. 3d 668, 678 (D.C. Cir. 1996),* (holding plaintiff's "repeated reliance on a State Department report expressing 'concern about the impartiality of the Jordanian court system'" was unavailing in *forum non conveniens* context).

[a] condemnation by Swiss authority" and dismissing defamation claim where SwissAir employees called plaintiff a "criminal" in reliance upon government expulsion order describing "criminal investigation" against her); *DeRoburt v. Gannett,* 548 F. Supp. 1370, 1384 (D. Haw. 1982) (dismissing libel action because "proof of the elements of the libel cause of action invariably would require the court, with the finder of fact, to inquire into areas that would violate the policies of the act of state doctrine").[4]

Indeed, under the Act of State Doctrine, this Court must deem valid the official acts of the Uzbek government carried out within its own sovereign territory, since the Plaintiffs' claims would then require Plaintiffs to prove, and this Court to find, that the criminal investigations, judicial proceedings, official decrees and documents executed by the Uzbek government in the exercise of its sovereign police power and regulatory authority were a fabricated "sham." *See World Wide Minerals,* 296 F.3d at 1164; *Galu,* 1987 WL 15580, at *3; *DeRoburt,* 548 F. Supp. at 1384.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is appropriate when, as here, the complaint fails to state any claim for which relief may be granted. *See Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 5276 (D.C. Cir. 1994). In determining whether Plaintiffs have stated a claim, the Court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *See*

---

[4] The application of the act of state doctrine in the defamation context is consistent with the preservation of immunity of foreign states for claims arising out of libel or slander and those based upon the exercise of a discretionary function of a government official. *See* 28 U.S.C. § 1605(a)(5)(A)-(B); *Gregorian v. Izvestia,* 871 F.2d 1515, 1522 (9th Cir. 1989) (affirming dismissal of libel claim against foreign sovereigns under § 1605(a)(5)(B)).

*Bell Atlantic Corp. v. Twombly.* 127 S. Ct. 1955, 1966 (2007) ("[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.'") .

### A.    The Complaint Fails To State Claims For Defamation And False Light Invasion Of Privacy

Plaintiffs purport to allege three causes of action against Global: (i) defamation; (ii) *libel per se;* and (iii) false light invasion of privacy.

To state a claim for defamation and *libel per se*, a plaintiff must plead: (i) the assertion of a false and defamatory statement made by defendant concerning plaintiff; (ii) the unprivileged publication of that statement to a third party; and (iii) fault amounting at least to negligence by the publisher. *Klayman v. Segal,* 783 A.2d 607, 613 n.4 (D.C. 2001); *DeAngelis v. Hill,* 847 A. 2d 1261, 1267-68 (N.J. Sup. Ct. 2004).

To state a claim for false light invasion of privacy, a plaintiff must demonstrate that: (i) the false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (ii) the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed. *DeAngelis,* 847 A. 2d at 1271.

Plaintiffs' claims of both defamation, libel *per se* and false light invasion of privacy fail because the Complaint (i) is barred by the First Amendment; and (ii) is barred by the fair report privilege (*See Browning v. Clinton, 292* F3d 235 (D.C. Cir. 2002) (finding that the privileges and defenses applicable to defamation also apply to false light invasion of privacy claims) (citing *White v. Fraternal Order* of Police, 909 F.2d 512. 518 (D.C. Cir. 1990)) .

In order to claim defamation (and libel *per se*) and false light invasion of privacy, Plaintiffs must demonstrate a clear false statement(s) or untruths. It is a fact, and the Plaintiffs cannot deny, that the Plaintiffs were charged with the crimes in Uzbekistan as set forth in the website. Accordingly, the website was merely a fair and accurate reporting of official government acts of the

Uzbek government. [5]

**B.    Plaintiffs' Claims Are Barred By the First Amendment**

The Complaint, as stated above, admits the website contains the official Uzbek government documents, however, alleges the contents of such documents are a sham. The Complaint further alleges that Global defamed the Plaintiffs by posting such official Uzbek information on the website. The Complaint does not allege that Global fabricated any of the information contained or posted on the website.

The Plaintiffs in the Complaint outline their other legal actions against Defendant Zeromax, as well as Coca-Cola, Uzbek government, and Uzbek government agencies (Roz Litigation and Vienna Arbitration) (Compl.¶ 4), and as a result thereof many news articles reflecting the same Uzbek official acts as reflected in the website have been written about the Plaintiffs in connection with the subject matter of such litigation years before the website was posted (See Ex B & C).

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." See U.S. Const. amend. I. The First Amendment protections for the press embodied in this Amendment are designed to "preserve an untrammeled press as a vital source of public information," *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936), ensuring that the press "could bare the secrets of government and inform the people," *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971).

The Supreme Court has long recognized that expression about public issues rests

---

[5] This Court in a Rule 12(b)(6) motion to dismiss should only look to the four corners of the complaint and any documents contained in the complaint. See *In re Phoenix Enter,. LLC v. Shirley Highway Distrib. Ctr., LLC*, No. 07-10011-SMT, 2007 WL 260104, at *3 n. 7.

"on the highest rung of the hierarchy of First Amendment values."[6]   Therefore, in addressing challenges under the First Amendment, courts must keep in mind that *"debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."* [7] Further, "[w]ithout an unfettered press, citizens would be far less able to make informed political, social, and economic choices." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981).

While Judge Bates in this Court denied the defendants in *OAO Alfa Bank, supra,* the defense of Fair Report Privilege (discussed below), he however, ruled that since there was no claim of fabrication of the article in question, the defendants, despite their poor reporting ethics, were granted protection under the First Amendment. Judge Bates further stated that "[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." Furthermore, Judge Bates stated that the "Plaintiffs no doubt have the wherewithal to respond to erroneous publications through persuasion rather than litigation. The First Amendment demands that they pursue such path." See.*OAO Alfa Bank, supra*  at ¶155 &156.

If Westlaw reported the Uzbek government documents on its website, would Westlaw then therefore be subject to a claim of defamation by the Plaintiffs, merely because they posted official decisions by the Uzbek court? The answer would be of course not, due to the protection provided under the First Amendment. Global merely provided a service to post relevant Uzbek official government documents to enable the public to participate in a public debate regarding the litigation matters initiated by the Plaintiffs.

---

[6] *Carey v. Brown*, 447 U.S. 455,467 (1980)
[7] *Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)(citing *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)

Accordingly, this Court must dismiss this action as provided under the Constitution where the Complaint clearly admits that the alleged defamation is from the website postings and further admits such defamation results from official Uzbek documents accurately sited and reported on the website.

###    C.    Plaintiffs' Claims Are Barred By The Fair Report Privilege

While it is believed the First Amendment, as discussed above, would cause this Court to dismiss this matter, the fair report privilege, which provides an exception to the common-law republication rule, also requires dismissal. This privilege is based upon the requirement for the public to have the right and the need to know what is being done and said in government. *See Coles v. Washington Free Weekly, Inc.,* 881 F. Supp. 26, 31 (D.D.C. 1995). In particular, the privilege "extends broadly to the report 'of any official proceeding or agency of government.'" *White.* 909 F.2d at 527 (quoting Restatement (Second) of Torts § 611 cmt. d (1977)); *Sec/ore v. Recorder Pub/'g Co.,* 716 A.2d 1196, 1204 (N.J. Super. Ct. App. Div. 1998) (noting same). Further, once a report is "deemed 'official,' an accurate publication of its contents is privileged, regardless of their veracity." *Harper v. Walters,* 822 F. Supp. 817, 824 (D.D.C. 1993); *Orso v. Goldberg,* 665 A.2d 786, 790 (N.J.Super. Ct. App. Div. 1995) (requiring only that the report provides a "substantially correct account"); *see also* Restatement § 611 cmt. f (noting same).

The issue before us is whether the D.C. Courts will address the privilege for a government report outside the borders of the United States. As stated above, in *OAO Alfa Bank, supra,* this Court ruled that a Foreign intelligence report containing various allegations of misconduct concerning the plaintiffs in that case, would not be extended such privilege. While, in the *OAO Alfa Bank* case appears at first blush to be square on point on the question of fair report privilege, it fails to analyze the relevant law to arrive at such conclusion. More importantly, in that case, it

was clear from the facts that the foreign report in question was not a document that could be construed as an official act of the government of Russia. Moreover, the report in question was merely an investigation report by the successors of the Russian KGB, and such report would not be comparable to the underlying Uzbek official government documents in this case. Finally, Judge Bates, as discussed above, easily decided that case under the First Amendment.

It appears that this Court must recognize the privilege, in our growing global economy. The website was a fair and accurate account of the official acts of the Uzbek government. The privilege can only be defeated if the statements at issue are not a fair and accurate report of the official proceeding. See *Philips v. Evening Star Newspaper Co.,* 424 A. 2d 78, 88 (D.C. 1980).

More importantly, other Courts have recognized that the privilege should apply in cases as in this Case, because the public's need to be informed of such official acts or proceedings is no less great when those acts or proceedings are those of a foreign sovereign government. *See Friedman v. Israel Labour Party,* 957 F. Supp. 701, 712-13 (E.D. Pa. 1997) (applying fair report privilege to reports that the Israeli government had barred U.S. citizens from entering Israel because the public interest was served in "learning important matters" of legitimate public concern). The court in *Friedman* held that the policy rationales underlying the privilege supported its application to fair and accurate reports of foreign governmental acts. *Friedman, 957* F. Supp. at 712-713. The court found that the public supervision rationale (i.e., the public's ability to potentially play a large role in the affairs of a foreign government through indirect supervision) and the informational rationale "loomed large" where, in that case, the disputed articles detailed official acts of a foreign government against U.S. citizens based on their alleged illegal conduct. *Id.* at 713. These policy rationales apply equally in this Case where Plaintiffs, U.S. citizens, are the subject of detailed criminal charges involving their alleged corrupt activities in a foreign country.

Here, the website's allegedly defamatory statements are protected by the fair report

privilege because they are a fair account of official acts of the Uzbek government in connection with alleged illegal activities within Uzbekistan. Those official governmental acts and proceedings include: (i) investigation of Plaintiffs' alleged illegal business activities and resulting criminal charges; (ii) the initiation and prosecution of judicial proceedings to redress charter fund fraud by Plaintiffs' company, ROZ, resulting in the ultimate removal by the State of ROZ's interest in CCBU; and (iii) requesting U.S. assistance to apprehend Plaintiffs.

Although the Complaint conspicuously omits the actual sources of the disputed website statements, replacing them in some instances demonstrates that website's author directly attributed its reports of the official government acts at issue to various Uzbek officials, including the Uzbek Deputy Foreign Minister Sadyk Safayev, Uzbek Ambassador Shavkat Khamrakulov and the Uzbek Deputy Attorney General Rashitijon Kadirov, as well as to Uzbek government documents. Indeed, not only were the website author's foreign sources disclosed, but they were included as pages in the website that could be accessed and directly downloaded by the public. Furthermore, the author cited and quoted reputable news organizations, including *Forbes Magazine, Insight Magazine* and the Associated Press, which themselves had reported the Uzbek governmental acts and proceedings involving Plaintiffs' alleged illegal activities in Uzbekistan.

Application of the fair report privilege to foreign documents is particularly appropriate in this case. Here, the foreign governmental acts involve criminal charges against U.S. citizens in a newly formed country for foreign investment doing business with a multi-million dollar American company, Coca-Cola, which has "attained an important place in American culture." *Trotter v. Jack Anderson Enters., Inc.,* 818 F.2d 431, 435 (5th Cir. 1987) (holding labor disputes at Coca-Cola bottling plant in Guatemala were of public concern in context of "limited public figure" analysis); *see also Friedman, 957* F. Supp. at 712 ("Information concerning a United States citizen who is allegedly planning 'illegal activities in Israel' is of legitimate and significant interest to the American public.").

Moreover, the public interest element is heightened when the foreign government in

question, like Uzbekistan in this case, has sought the assistance of U.S. branches of government in connection with said criminal charges.

### D.    The Complaint Is Barred By The Statute Of Limitations

As pleaded, Plaintiffs' claims are untimely and must be dismissed. Defamation, libel and false light invasion of privacy claims are governed by a one-year statute of limitations in the District of Columbia. See D.C. Code § 12-301(4) (2001) (prescribing one-year for libel claims); *Jankovic v. Int'l Crisis Group,* 494 F.3d 1080, 1086 (D.C. Cir. 2007) (applying D.C. one-year statute of limitations to defamation and false light claims) (quoting *Mittleman v. United States,* 104 F.3d 410, 415 (D.C. Cir. 1997)); *see also* N.J.S.A. 2A: 14-3 (2000) (one-year limitations periods for libel).

The District of Columbia, like most common-law jurisdictions, has adopted the "single publication" rule regarding the accrual of libel claims. *Jankovic,* 494 F.3d at 1087 (citing *Mitllin* v. *Washington Free Weekly, Inc.,* 785 A.2d 296, 298 (D.C. 2001) ("Defamation occurs on publication, and the statute of limitations runs from the date of publication.")); *Churchill v. New Jersey,* 876 A.2d 311, 319 (N.J. Super. Ct. App. Div. 2005) (same). That is, "'for purposes of the statute of limitations in defamation claims, a book, magazine, or newspaper has one publication date, the date on which it is first generally available to the public.'" *Jankovic,* 494 F.3d at 1087 (internal quotations omitted). This rule applies to Internet publications. *Id; Churchill,* 876 A.2d at 483 (holding that Internet defamation claims were barred by one-year statute of limitations under the single publication rule).

Accordingly, to plead a claim for libel, the Complaint must allege the time and place of publication. *See Wigging v. Philip Morris, Inc.,* 853 F. Supp. 458, 465 (D.D.C. 1994) ("All defamation averments must be pled with particularity.")[8]. Here, the Complaint fails to allege any date of publication and should be dismissed on this basis. Furthermore, the news media as stated

---

[8] See also 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § n1309 (1990)("In libel and slander suits, the time and place of the publication should be specifically stated in the complaint.")

above has reported the actions of the Uzbekistan government against the Plaintiffs years before the date of the website was first posted, and accordingly, the website did not report any additional information that was not previously reported in the media. Thus, it cannot be stated that the information regarding the Uzbekistan actions that was fairly and accurately reported in the Website created any additional and/or new information regarding the Uzbekistan charges against the Plaintiffs within one year of the filing of the Complaint.

## CONCLUSION

For the foregoing reasons, the Court should grant Global's motion and dismiss the Complaint in its entirety with prejudice.

Dated:  January 3, 2008                   Respectfully submitted,
        Washington, D.C.

/s/ Morton S. Taubman                      /s/ Mark David Hunter
Morton S. Taubman                          Mark David Hunter
DC Bar No. 316604                          DC Bar No. 974569
Leser, Hunter, Taubman & Taubman           Leser, Hunter, Taubman & Taubman
1201 15th Street, N.W,                     1515 North Federal Highway,
Second Floor                               Suite 300
Washington, D.C. 20005                     Boca Raton, FL 33432
(202) 347-9090 Telephone                   (561) 394-8886 Telephone
(202) 659-2679 (Facsimile)                 (561) 392-9901  Facsimile
E-Mail: mtaubman@isiwdc.com                Email: mdhunter@lhttlaw.com


*Attorneys/or Defendant GlobalOptions, Inc.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF
COLUMBIA

MANSUR MAQSUDL, *et al..*                )
                                         )
            *Plaintiffs,*                )
                                         )
        v.                               )        1:07-CV-01252RJL
                                         )
GLOBALOPT1ONS, INC., *el a/.,*           )
                                         )
            *Defendants.*                )

## DECLARATION OF MORTON S. TAUBMAN

I, Morton S. Taubman, declare as follows:

1. I am an attorney with the law firm Leser, Hunter, Taubman & Taubman, located in Washington, D.C., and counsel for Defendant GlobalOptions, Inc. ("Global"). I submit this declaration in support of the Memorandum of Points and Authorities in Support of Global's Motion to Dismiss the Complaint in this case.

2. Attached hereto as Exhibit A is a true and correct copy of the inactive website http://www.mansurmaqsudi.net, as accessed on October 24, 2006 (exhibit pages A-1 to A-36).

3. Included as part of Exhibit A are true and correct copies of the following documents, which were included as pages of the website that could be accessed and downloaded directly:

    i. Resolution on Placement in Custody and Announcement on Search for Mansur Maqsudi from the Office of the Attorney General of the Republic of Uzbekistan dated November 6, 2002 (exhibit pages A-8 to A-1 1);

    ii. Letter from the Office of the Public Prosecutor of the Republic of Uzbekistan to U.S. Attorney General John Ashcroft dated November 18, 2002 (exhibit pages A-13 to A-14);

      iii.   Letter from the State Taxation Committee of the Republic of Uzbekistan to the U.S. Internal Revenue Service (exhibit pages A-l 8 to A-l 9); and

      iv.   Letter from the Deputy Attorney General of the Republic of Uzbekistan to the Minister of Justice of the United Arab Emirates dated February 8, 2003 (exhibit pages A-31 to A-32).

4.      Also included as part of **Exhibit** A is a true and correct copy of the following

magazine article to which the website provided a direct link:

      i.   Paul Klebniko v, *Coke 'v Sinful World* FORBFS MAGAZINE, Dec. 22, 2003, *available at* http://www.forbes.com/forbes/2003/1222/086.print.html (exhibit pages A-20 to A-23).

5.      Attached hereto as **Exhibit B** are true and correct copies of press reports and

documents that are referenced as sources on the website http://www.mansurmaqsudi.net:

      i.   Patricia Kranz, *Uzbekistan's Strongman Means Business - Karimov Offers Foreign Companies Stability and Perks,* BUSINESSWEEK, June 19, 1995, at 27, *available at* 1995 WLNR 3471600 (exhibit pages B-l to B-3);

      ii.   Douglas Burton, *Divorce Drama Goes International,* UPI INSIGHT MAGAZINE, Sept. 1, 2003, at 50. *available at* 2003 WLNR 13925870 (exhibit pages B-4 to B-8);

      iii.   The Embassy of Afghanistan, *Afghan Businessmen Raise $20 Million for Rebuilding Afghanistan,* Oct. 3, 2005, *available at* hup://www.embassyofafghanistan.org/embpress/pre7.htmI (exhibit pages B-1 to B-10);

      iv.   Website for the Afghanistan Reconstruction Company, LLC, *available at* http://www.afghanrc.com (exhibit pages B-11 to B-52);

      v.   Valeriy Shokhin, *American-Uzbek Swindlers are Wanted by Uzbekistan Authorities,* NOVAYA GAZETA, July 31, 2003, *available at* http://forum.arbuz.com/showthread.php?t=9518 (exhibit pages B-53 to B-55);

      vi.   The Associated Press, *Family Feud in Uzbekistan Hurls Coca-Cola.* Nov. 20, 2002 (exhibit pages B-56 to B-57);

    vii.   David Stern, *Uzbekistan Ojjers Rich Pickings for Leader '.s Uaughier,* FIN. TIMES, Aug. 19, 2003 at 8, *available at* 2003 WLNR 8157409 (exhibit pages B-58 to B-62);

    viii.   Richard Lezin Jones, *Judge Sets U.S. Court ax Venue in International Custody Cane,* N.Y. TIMES, Sept. 13, 2002, *available at* http://nytimes.com (exhibit pages B-63 to B-64); and

    ix.   Letter from Uzbekistan Ambassador Shavkal Khamrakulov to U.S. Senator Robert Torricelli dated August 29, 2001 (exhibit pages B-65 to EI-66).

6.    Attached hereto **as Exhibit C are true** and correct copies of a selection of press reports available in the public domain:

    i.   Kevin Done, *Coca-Cola Flam Asian Fizz,* FIN. TIMES MANDATE, Feb. 26, 1997, *available at* 1997 WLNR 4766488 (exhibit page C1);

    ii.   Richard C. Paddock, *Uzbekistan Villagers Still Waiting for the State to Save Them,* **L.A.** TIMES, June 20, 2000 at 8, *available at* 2000 WLNR 8388234 (exhibit pages C-2 to C-5);

    iii.   *When the Cola Wars Came to Uzbekistan,* WALL ST..!., Aug. 30, 2001, *available at* http://archivc.muslimuzbekistan.com/eng/ennews/200l/08/ennews3008200l.html (exhibit pages **C-6** to C-9);

    iv.   David Stern, *Marital Strife Leaves Coca-Cola Flat,* FIN. TIMES, July 19, 2002, *available at* 2002 WLNR 6747683 (exhibit pages C-10 to C-12);

    v.   David Stern, *Marital Strife Leaves Coca-Cola Flat,* FIN. TIMES U.K., July 20, 2002, *available at* 2002 WLNR 6788640 (exhibit pages C-13 to C-15);

    vi.   Richard Lezin Jones, *Love Divorce and the Hague Treaty; New Jersey Case is Really an International Dispute,* N.Y. TIMES, Sept. 12, 2002, *available at* http://nylimes.com (exhibit pages C-16 loC-18);

    vii.   Margaret Coker, *Family Feud in Uzbekistan Entraps Coke,* ATLANTA J. & CONST., Nov. 20, 2002 at Al, *available at* 2002 WLNR 4666067 (exhibit pagesC-19toC-22);

    viii.   Associated Press, *Caught Up in a Feud,* COLUMBUS LEDGER-ENQUIRER, Nov. 21, 2002 at B9, *available at* 2002 WLNR 1917264 (exhibit pages C-23 to C-24);

    ix.   Margaret Coker, *Divorce Takes Fizz Out of Coke in Uzbekistan,* PALM BEACH POST, Nov. 24, 2002 at 3F, *available at* 2002 WLNR 1984883 (exhibit pages C-25 to C-28);

    x.   Margaret McHugh, *Maqsudi Keeps International Custody Fight Alive,* THE STAR LEDGER, Jan. 5, 2004, *available at* http://archive.muslimuzbekistan.com/eng/ennews/2004/01/ennews050120 04a.html (exhibit pages C-29 to C-32);

    xi.   Mary Dejevsky, *The Runaway Princess,* HAMILTON SPECTATOR, Jan. 10, 2004, at 1, *available at* 2004 WLNR 5998354 (exhibit pages C-33 to C-42);

    xii.   Peter Baker, *Battle Royal,* THE WASH. POST, Apr. 13, 2004, at C01, *available at* http://www.washingtonpost.com/ac2/wp-dyn/A6874-2004Aprl2?language=printer (exhibit pages C-43 to C-49);

    xiii.   Julian Conan, *Bitter Divorce Threatens Unlikely Alliance at the Heart of War on Terror,* TELEGRAPH NEWS, Apr. 18, 2004, *available at* http://www.telegraph.co.uk (exhibit pages C-50 to C-52);

    xiv.   Edward Alden, *Coke ix Accused of Being Too Cosy with the Karimovs,* FIN. TIMES, June 13, 2006, *available a!* 2006 WLNR 10300924 (exhibit pages C-53 to C-57);

    xv.   Edward Alden & Andrew Ward, *Coca-Cola Ai-cit.wd Over Uzbek Venture,* FIN. TIMES U.K., June 14, 2006, *available at* 2006 WLNR 10170402 (exhibit pages C-58 to **C-60);**

    xvi.   *Coca-Cola Accused of Conspiring with Uzbek Government,* TIMES CENT. ASIA, June 15, 2006,' *available at* 2006 WLNR 10383577 (exhibit pages C-61 toC-62);and

    xvii.   Margaret McHugh, *Coke Accused of Abandoning Exec,* THE STAR LEDGER, June 21, 2006 at 19, *available at* 2006 **WLNR** 10710397 (exhibit pages C-63 to C-66).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of January 2008, in Washington, D.C.

                            /s/ Morton S. Taubman

## UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF
## COLUMBIA

MANSUR MAQSUDT, *el al.*,                    )
                                             )
                              *Plaintiffs,*   )
                                             )
            v.                               )            1:07-CV-01252RJL
                                             )
GLOBALOPTIONS, INC., *et at.*,               )
                                             )
                              *Defendants.*   )

## <u>ORDER</u>

     Having reviewed and considered Defendant GlobalOptions, Inc.'s ("Global")

Motion to Dismiss the Complaint and the papers filed in support thereof, Plaintiff's papers

filed in opposition thereto, and the entire record herein, it is hereby

     ORDERED, that Global's Motion to Dismiss is GRANTED, and the Complaint is

Dismissed in its entirety with prejudice.

     SO ORDERED this ___ day of _____, 2008.


_____
Richard J. Leon
United States District Judge

# TAUBMAN DECLARATION

# Exhibit A



# Mansur Maqsudi

Home

Family
Members

*This website contains information on Mansur Maqsudi and other members of the Maqsudi family. It documents the Maqsudi family's criminal activities according to official documents and public information sources.*

*Everything in italics on this website is the author's comments. Everything else is a direct quotation from official documents and public information sources.*

## Criminal Violations

- *Introduction*
- *Criminal Code Violations*
- *Roz Company Illegally Registered*
- *Charter Fund Fraud*
- *Fraudulent Parallel Trading*
- *Illegal Profit-Making*
- *Embezzlement*

## Text Information from
## Actual Interpol Warrant



# Wanted

Mansur Maqsudi Interpol Warrant

Page 2 of 3

- *Profits Siphoned Off*
- *Tax Evasion*
- *Cash Smuggled Out of Uzbekistan*
- *Oil Embargo Violations*
- *Selling Sugar on Black Market*
- *Bribery*
- *Size of Criminal Activity*
- *Money Conversion Violations*

**Mansur Maqsudi**
6 November 2002

### Legal Status

Present Family Name: MAQSUDI
Forename: MANSUR MAQSUDI
Sex: Male
Date of birth: 6 February 1967 (39 years old)
Place of birth: Republic of Afghanistan
Language spoken: Russian, English, Uzbek
Nationality: USA

### Physical Description

Height: n/a
Weight: n/a
Colour of eyes: n/a
Colour of
Hair: n/a

### Offences

Categories of Offences:

**Abuse one's power or official proxy committed with tl of the particularly great damage. The official forgery, committed on large scale. The plundering by appropri embezzlement. The illegal trade or mediation activity violation of the trade and service rules. The evasion fi payment of taxes or other payments. The legalisation received by the criminal activity. The extortion.**

Arrest Warrant Issued by:
Republic of Uzbekistan

### IF YOU HAVE ANY INFORMATION CO

YOUR NATIONAL OR LOCAL POLICE

http://www.mansurmaqsudi.net/

10/24/2006

A-2



Home

Family
Members

# Family Members

*Mansur Maqsudi's brother is Farid Maqsudi and their father is Abdul Rauf Maqsudi.*

*Farid was the Vice President of Maqsudi Corporation and Chairman of the Coca-Cola Bottlers of Uzbekistan.[1] Farid is also a founding member and Vice Chairman of the Afghan Investment Company (AIC)[2] and President of the Afghanistan Reconstruction Company, LLC (ARC).[3]*

**"All of them are wanted by Interpol. The Uzbek authorities accuse the [former] owners of Roz Trading Ltd. on money laundering, extortion, office forgery, deliberate evasion from taxes, large-scale bribery and organizing of system of illegal transactions with the largest American companies by imitation of export of their production to Uzbekistan."[4]**

*According to Insight magazine,* **"the elder Maqsudi rose to riches on the tide of the Soviet invasion of Afghanistan in 1979. A. Zulfiqar, an opponent of the Karimov regime, published an op-ed in the newspaper ERK for Jan. 16, 1994, charging that Abdurauf Maqsudi had a long history of fraud and embezzlement. He allegedly was imprisoned in Afghanistan in 1972 for misusing funds lent to him by the government of Afghanistan and later allegedly stole millions of dollars from the regime installed in Kabul after the Soviet takeover in 1979."[5]**

**"According to Zulfiqar, Abdurauf Maqsudi began exporting fruit to the Soviet Union in the 1960s and after a time came under the wing of former Afghan prime minister Hoshim Sharq, who was believed to have ties to the Russian KGB. Maqsudi was installed by the Soviets as chairman of the Afghan-Soviet Council during the regime of Babrak Karmal, and in this capacity traveled frequently to Moscow, according to Zulfiqar's report and other sources contacted by Insight."[6]**

**"Zulfiqar claims the Soviets granted Maqsudi a bank credit worth $3 million with which he was supposed to purchase replacement parts for light machinery. They allegedly were left empty-handed when Maqsudi relocated to the United States and opened an electronic-equipment store in New York City."[7]**

**Click here to go back**

---

1. "Uzbekistan's Strongman Means Business." *Business Week.* June 19, 1995.
2. "Afghanistan Businessmen Raise $20 Million for Rebuilding Afghanistan." The Embassy of Afghanistan. October 3, 2005.
3. **www.afghanrc.com.**

A-3

4. "American-Uzbek Swindlers Are Wanted by Uzbekistan Authorities." Novaya Gazeta. July 31, 2003.
5. "Divorce Drama Goes International." Insight. September 1, 2003.
6. "Divorce Drama Goes International." Insight. September 1, 2003.
7. "Divorce Drama Goes International." Insight. September 1, 2003.

# Mansur Maqsudi

Home

Family
Members

# Introduction

*Coca-Cola Bottling Uzbekistan (CCBU), established on 25 August 1993, was originally a joint venture involving three entities, each owning 33.3 percent of the company:*

1. *Roz Trading, Ltd - Mansur Maqsudi, Farid Maqsudi, and Ralf Abdul Maqsudi.*
2. *Coca-Cola Export Corporation.*
3. *Pishprom, an Uzbek state property committee.*

*Around April 2001, government auditors began to uncover illegal schemes involving CCBU and Roz Trading. As explained by Uzbekistan Ambassador Shavkat Khamrakulov, during a "routine regular audit" of Coca-Cola Bottlers Uzbekistan Ltd. (CCBU) and Roz Trading, Ltd. "serious violations of the law [were] revealed by Uzbekistan's tax agencies."[1]*

*According to Uzbek Deputy Foreign Minister Sadyk Safayev, the Maqsudis "committed lots of misdeeds, like violations of tax law, violations in sales regulations, and violations of human rights in the plant here."[2]*

*On 6 November 2002, Interpol issued a warrant for the arrest of Mansur Maqsudi.*

*For failing to pay back taxes and other offences, the joint venture was terminated in April 2005 and the remaining assets were liquidated.*

**Click here to continue to Criminal Code Violations**

**Return to go back**

---

1. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.
2. "Family Feud in Uzbekistan Hurts Coca-Cola." Associated Press. 20 November 2002.

A-5



Home

Family
Members

# Criminal Code Violations

*The Maqsudis were convicted of the following criminal violations of the Criminal Code of the Republic of Uzbekistan:*

- **Larceny By Embezzlement** (Article 167, Part 3, Point A) - "Larceny by way of embezzlement of property entrusted to or transferred to disposition of a guilty person shall be punished with a fine from one hundred to three hundred minimum monthly wages or correctional labour for up to two years or confinement for up [to] five years." Point A is Larceny by embezzlement in a "large amount."
- **Taxes or Other Payment Evasion** (Article 184, Part 3) - "Intentional concealment or understatement of profit (income) or other taxable objects as well as other evasion from taxes, duties, or other payments, established by the State, in large amount, after infliction shall be punished with fine up to one hundred and fifty minimum ... to three hundred minimum monthly wages, or correctional labour from two to three years, or imprisonment up to three years." Part 3 refers to a "large amount."
- **Legalization of Revenue from Criminal Activities** (Article 243) - "Legalization of revenue received from criminal activities that is a transfer, conversion, or exchange of property, which has been obtained [as a] result of criminal activities, as well as non-disclosure or concealment of original nature, source, location, way of disposal, movement, genuine rights in relation to the property or ownership thereof in the instance if such property has been obtained as a result of criminal activity shall be punished with imprisonment from ten to fifteen years.
- **Forgery in Office** (Article 209, Part I) - Forgery in office, that is, entering knowingly false information and notes to official documents, falsification or making and issuance of knowingly false documents from mercenary or other motives, result[ing] in significant damage to the rights or legitimate interests of individuals, or to [the] state or public interests shall be punished with [a] fine from one hundred to three hundred minimum monthly wages, or deprivation of certain rights up to five years, or correctional labour up to two years, or imprisonment up to three years.
- **Acceptance of Bribe** (Article 210, Part 3, Point A) - Acceptance of [a] bribe, that is, knowingly illegal acceptance of tangible valuables by an official, personally or through an intermediate person, or acquisition of pecuniary benefit for performance or nonperformance of certain action, which he must or could have officially performed, in the interests of the person giving a bribe shall be punished with imprisonment from five to ten years. Point A refers to the acceptance of a bribe of an "especially large amount."
- **Extortion** (Article 165, Part 3, Point A) - "Extortion, that is demand to transfer someone's property or the right to someone's property, or to provide property preferences, or to commit actions related to property under the threat of application of violence over a victim or his immediate persons, or of damage or destruction of property, or of disclosure of information which the victim and the said persons want to keep undisclosed, or by making the situation that compels the victim to transfer his property or the right thereto shall be punished with imprisonment from ten to fifteen years".[3]

A-6

*Mansur Maqsudi also committed the following crimes, according to the Deputy Attorney General of the Republic of Uzbekistan.*[4]

- **<u>Abuse of Power or Office</u>** (Article 205, Part 2, Points A, B, C) - "Abuse of power or office, that is, intentional use of office by an official, which caused large damage or significant damage to the rights or legally protected interests of individuals or to the state or public interests shall be punished with fine from three hundred to six hundred minimum monthly wages, or imprisonment up to five years and deprivation of certain rights." Point A is "with causing especially large damage." Point B is "in the interests of an organized group." And Point C is "by an authorized official."
- **<u>Fraud</u>** (Article 168, Part 3, Points A, B) - "Fraud, that is, acquisition of someone's property or the right thereto by deception or abuse or confidence shall be punished with fine from three hundred to six hundred minimum monthly wages, or correctional labour up to three years, or imprisonment from five to ten years. Point A is "in large amount" and Point B "by a special dangerous recidivist."
- **<u>Illegal Trading or Intermediary Activity</u>** (Article 188, Part 3, Points A, B) - "Performance of trading or intermediary activity with evasion from registration in compliance with the established procedures with the purpose of obtaining uncontrollable profit (income) committed: [Point] A in especially large amount; [Point] B by an organized group or in its interests - shall be punishable with fine from three hundred to six hundred minimum monthly wages and deprivation of certain right up to three years, or imprisonment for up to five years."

**Click here to continue to Roz Company Illegally Registered**

**Click here to go back**

---

3. Federal Criminal Code and Rules (1995 Edition).

4. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Click here to download full text**

A-7

Placement in custody and .
on search for Maqsudi Mansur Ahmed

« Sanctioned"

by the Deputy Attorney General of the
Republic of Uzbekistan
Legal adviser
_____ H.H.

November 06  20

## RESOLUTION
/on placement in custody and announcement on search /

November 6, 2002                                        city of Tashkent

Murodov O.B., the investigator of the Department on crimes investigations under the Office of Public Prosecutor of the Republic of Uzbekistan, the 2-d class lawyer has examined the materials of the criminal case N 119, and

### Decided:

Maqsudi Mansur Ahmed, the citizen of the USA, working since 01.01.1993 at the Foreign Enterprise "ROZ Trading LTD" (Republic of Uzbekistan) as a Chairperson, has joined the sustainable group organized by his father, Maqsudi Abdul Rauf, with intent to make illegal business.

Maqsudi Mansur Ahmed, knowing wittingly that according to the legislation of the Republic of Uzbekistan foreign enterprises with 100% of foreign investment are granted by considerable privileges on taxation, coverted to use that right with the intent of personal illegal enrichment, on May 12,1993 Maqsudi Mansur Ahmed together with his father Maqsudi Abdul Rauf and his brother Maqsudi Farid Ahmed presented forged documents of the Foreign Enterprise "ROZ Trading LTD" registered at offshore area at Cayman Island (United Kingdom) that had not yet been registered with the office of the Governor of Cayman Island at the moment of establishment the office.

Using these forged documents the above mentioned Foreign Company became a founder of a branch of foreign enterprise "ROZ Trading LTD" in the city of Tashkent. In constitutive documents on creation of enterprise Maqsudi Mansur Ahmed indicated the charter fund at an especially large scale of 500.000 US dollars.

During the period of his criminal activity Maqsudi Mansur Ahmed, from 1995 to 2000 as a member of the organized criminal group, without creation of a charter fund in the amount of 500.000 USD used the privileges of the foreign economic entity and within the indicated period intentionally evaded paying taxes in the amount of 438.032.000 sum having the commodity turnover in the amount of 24.518.190.000 sum, i.e. in an especially large volume.

On January 5,1994 an import contract on consignment terms for the delivery of consumer goods for the amount of 200 million USD was concluded between "ROZ

A-8

Trading LTD" (Cayman Island, United Kingdom) located in the offshore zone of "ROZ Trading LTD" (Uzbekistan). It was signed by Maqsudi Mansur Ahmed on behalf of "ROZ Trading LTD" (Uzbekistan) and on behalf of "ROZ Trading LTD" (Cayman Island, United Kingdom) it was signed by his brother, Maqsudi Farid Ahmed who in his turn afterwords signed additional agreements for the delivery of macaroni products, sugar, flour, chocolate products, children's nourishment, tea, cigarettes, chewing gum and other consumer goods in this case on behalf of "ROZ Trading LTD" (Uzbekistan). In accordance with the contract all payments for goods bought by "ROZ Trading LTD" (Uzbekistan) were made by money transfer to the account of "ROZ Trading LTD" (Cayman Island, United Kingdom) at the Credit Swiss Bank (Switzerland). During contract period lasted from 1995 till 1997 the consumer goods for sum total of 106.020,6 thousand US dollars were delivered into Uzbekistan.

"ROZ Trading LTD" (Uzbekistan) possessed a license that provides the right of priority conversion of hard currency and the certificate of the participant of the foreign economic activity N EP-A/587 issued on July 7, 1993, and with the intent of embezzlement of property that was entrusted to the guilty and was at his possession, i.e. illegal profit-making from state budget money that was converted in the Republic of Uzbekistan for importing consumer goods, Maqsudi Mansur Ahmed used his official position and showed in a cargo customs declaration overestimated prices of imported goods of "ROZ Trading LTD" (Uzbekistan) at the rate of 15%-34% over the fixed prices indicated in the invoices for rendering the marketing services supposedly which factually were not carried out and served as a method of embezzlement of property.

Therefore, within the specified period by overestimating prices in the CCD by 34% 2.822,04 thousand USD had been stolen out of the received import goods in the the amount of 11.122,16 thousand USD. By means of overstating prices of goods in the customs declarations by 15 % 12.242,31 thousand USD had been stolen out of received import goods in the amount of 93.857,76 thousand USD. In total 15.064,35 thousand USD or 994.247.000 sum, i.e. in especially large size, was embezzled from the state resources.

On August 12, 1999 Maqsudi Mansur Ahmed, being a member of the above mentioned organized criminal group, used defraud means and concluded a credit trade contract № 2/99 for consumer goods in the amount of 6.000.000 USD between "ROZ Trading LTD" (Cayman Island, United Kingdom) and the Foreign Enterprise "ROZ Trading LTD" (Uzbekistan) with the intent of converting to his possession the property in especially large value and in the interests of the organized criminal group. On September 13,1999 this contract was registered at the Ministry of Foreign Economic Relations of the Republic of Uzbekistan under № 21902294.

In 2000 and the first half of 2001 according to the above mentioned contract and under the pretext of satiation of the market of the Republic of Uzbekistan by consumer goods, Maqsudi Mansur Ahmed imported 41.328.600 kgs of sugar in the amount of 14 459 500 USD (4.255.358.700 sum) into the Republic of Uzbekistan. The retail prices for the indicated sugar were at the rate of 161,62 – 294,02 sum and fixed by the administration of the Foreign Enterprise "ROZ Trading LTD"(Uzbekistan).

On summer 2000 Maqsudi Mansur Ahmed, developed a criminal plan to sell the above mentioned sugar at overestimated prices by defraud and abuse of clients

not created factually by the founders and agreed share in the ~~~~ resources and other property was not brought into the Republic.

On November 26, 2001 the activity of Foreign Enterprise "ROZ Trading LTD" was terminated by the decision of the Economic Court and the procedure on its elimination was appointed.

According to the decision of tax department dated December 29, 2001, due to violation of tax and currency regulations in the course of its registration and activity from 1995 till 2001, an additional tax payments and financial penalties in the amount of 12.459.842,2 thousand sum were charged extra, from which   6 mln.138 thousand USD was concealed. In accordance with the legislation of the Republic of Uzbekistan similar violations are qualified as tax evasion by mean of concealment of income by an economic entity.

According to the decisions of the Economic Court dated, April 24, 2002 and June 3, 2002 the Foreign Enterprise "ROZ TRADING LTD" was adjudged bankrupt and with purpose of paying off its obligations with budget and other creditors the share of "ROZ TRADING LTD" (Cayman Island), the founder of the Joint Venture "Coca Cola Ichimligy Uzbekistan LTD", in the amount of 23,416% (9.877.069,7 thousand sum) was separated from the property of the Joint Venture "Coca Cola Ichimligy Uzbekistan LTD" for the benefit of "ROZ TRADING LTD" (Uzbekistan). On October 22, 2002 the decisions on this  share redistribution of the Charter fund of the Joint Venture "Coca Cola Ichimligy Uzbekistan LTD" was adopted by the General Meeting of its founders, including representatives of "Coca Cola Corporation" (Atlanta, USA). Later procedure of corresponding reregistration of  constituent documents at the Ministry of Justice of the Republic of Uzbekistan was conducted.

According to the materials  of investigation Abdul Rauf Maqsudi being a member of the criminal group organized by himself and by means of. fraud, bribe taking and extortion converted to his possession  the amount of 1,6 billion sum or 3 million 933 thousand USD.

Besides, the members of the Maqsudi family purposefully oversetimated the cost of contracts for delivery of consumer goods to Uzbekistan  by including the expenditures for marketing and teaching services which factually were not carried out. By those contracts they illegally received hard currency in the amount of 33 million 992 thousand USD.

In the course of investigation of illegal activity of the Foreign Enterprise "ROZ TRADING LTD" it was found that while doing  multiple transactions with firm "VALUELINK FZE" registered at a free economic zone Jabel Ali Free Zone P.O.Box 17502 Dubai, UAE, through that firm trade transactions of oil products and cotton lint in the sum of 15.938.572,82 USD and 4.594.224,97 USD correspondingly were made. As a  result  of accomplished operations in the

A-10

By his actions, Maqsudi Mansur Ahmed committed crimes stipulated by art. 205, part 2, points "A,B and C"; Art. 209,part 1; Art. 210, part 3, point "A",Art. 168, part 3, points "A,B", Art.167, part 3, points "A,B", Art.188, part 3, points "A,B", Art.189, part 3, Art.184, part 3, Art.243, Art.165, part 3, points "A,B"of the Criminal Code of the Republic of Uzbekistan.

Taking into the consideration the fact that Maqsudi Mansur Ahmed has committed serious crimes and is absconding, guided by articles 36, 236, 237, 240, 242-244, 365 of the Criminal Procedure Code of the Republic of Uzbekistan

## RESOLVED:

1. To choose placement in custody and announcement on search as a measure of restraint regarding Maqsudi Mansur Ahmed, born in 1967, Republic of Afghanistan, Uzbek by nationality, citizen of the USA, married, has higher education, has not previous criminal record, hold position of a Chairperson of the Foregin Enterprise "Roz Trading Ltd", private address: 3 Manchester, Denvil New Jersey 07834, USA.

2. The Ministry of Internal Affairs shall be responsible for the implementation of search measures according this Resolution.

3. To deport an accused Maqsudi Mansur Ahmed from the time of detention to UYA-64/IZ-1 GUIN of the Ministry of Internal Affairs of the Republic of Uzbekistan.

4. To send a copy of the present resolution to the Attorney General of the Republic of Uzbekistan.

The investigator of crimes investigation under the Office of of the Republic of Uzbekistan    O.B.Murodov

I am informed about the content of the resolution on_____2002

Accused                                    Maqsudi Mansur Ahmed



Home

Family
Members

# Roz Company Illegally Registered

*Mansur Maqsudi, Rauf Abdul Maqsudi, and Farid Maqsudi are charged by Uzbekistan authorities with the violation of Article 209, Part I regarding "official forgery."*

*On 12 May 1993, the Maqsudis falsely registered Roz Trading, Ltd. as a foreign enterprise in Uzbekistan.[5]*

*As explained by the Uzbekistan Office of Public Prosecutor, when registering the company, the Maqsudis* "presented forged documents to the authorities of Uzbekistan on the parent enterprise that had not yet been registered in the territory of Cayman Islands by that time. Thus, the listed persons registered the foreign enterprise in the Republic of Uzbekistan by false statement."[6]

**Click here to continue to Charter Fund Fraud**

**Click here to go back**

---

5. "Divorce Drama Goes International." Insight Magazine. 1 September 2003.

6. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002. **Click here to download full text**

A-12

From: the Office of Public Prosecutor
of the Republic of Uzbekistan
Uzbekistan, Tashkent Post code 700000,
66, Academic Gulamov Street

Attn.: Mr. John Ashcroft,
Attorney General of the USA

Re: Addition to the solicitation on                  November _18_ ", 2002
rendering legal assistance on criminal              N 18/5-2002
case N 119, dated December 25,2001
registered under N18/5

Dear Mr.Ashcroft,

    The Office of Public Prosecutor of the Republic of Uzbekistan expresses its respect to the Office of Attorney General of the United States of America. In addition to the earlier solicitation N18/5, dated December 25,2001 on rendering legal assistance the Office of Public Prosecutor of the Republic of Uzbekistan would like to inform about the results of the criminal case investigation against citizens of the USA, namely: Abdul Rauf Maqsudi, Mansur Ahmed Maqsudi, Farid Ahmed Maqsudi, against Article 167, part 3, point "A" (misappropriation by organized group of property intrusted to guilty by appropriation and embezzlement in especiall large value), Article 168, part 3, point "A" (conversion of property to his own possession in especially large value by fraud), Article 184, part 3 (intent tax evasion in especially large value), Article 243 (legalization of profit received by criminal way), Article 209, part 1 ( official forgery), Article 210, part 3, point "A" (bribe taking in especially large value), Article 165, part 3, point "A" (extortion in especially large value) of the Criminal Code of the Republic of Uzbekistan. According to the Federal Criminal Code and Rules (1995 Edition, supersedes 1994 Edition and Supplement), crimes therebefore correspond to the crimes stipulated by Title 18 – Crimes and Criminal Procedure, Chapter 25 – Counterfeiting and Forgery, Sec. 495, 513; Chapter 31 – Embezzlement and Theft, Sec. 643,647,648,654,660

    In the course of investigation it was determined that the citizens of the USA, namely: Abdul Rauf Maqsudi, Mansur Ahmed Maqsudi, Farid Ahmed Maqsudi doing business in the Republic of Uzbekistan, while registrating the Foreign Enterprise "ROZ TRADING LTD" presented forged documents to the authorities of Uzbekistan on the parent Enterprise that had not yet been registered in the territory of Cayman Island by that time. Thus, the listed persons registered the Foreign Enterprise in the Republic of Uzbekistan by false statement.

    Furthermore, according to the Charter of the Enterprise set up in Uzbekistan the size of its constituent fund was defined in the sum of 500,000 USD but it

A-13

We would be very much obliged if the representative enforcement agencies of the USA in the course of interrogation of Abdul Rauf Maqsudi, Mansur Ahmed Maqsudi, Farid Ahmed Maqsudi received the answers to the qestions put in the earlier solicitation, as well as explanations as concerns the above mentioned facts related to the activity of the Foreign Enterprize "ROZ TRADING LTD" beyond the territory of the Republic of Uzbekistan that would be a priceless assistance in investigation of the present criminal case.

Availing myself of this opportunity, I would like to express the confidence in further strengthening and development of mutual cooperation between the law enforcement agencies of our states.

Yours sincerely,

Attorney General                                         Rashitjon Kadirov
of the Republic of Uzbekistan

(Please, find) enclosed

A-14



Home

Family
Members

# Charter Fund Fraud

*Foreign investors in Uzbekistan are granted favourable privileges on taxation. When the Maqsudis registered Roz Trading Ltd., they listed the amount of the charter fund at "$500,000." However, the fund was never created. As explained by Uzbekistan authorities, the necessary resources and other property were not brought into the Republic.[7]*

*ROZ Trading Ltd. thus fraudulently reneged on its legal obligations to invest $500,000 in its start-up ventures.[8]*

*As explained by O.B. Murodov, Deputy Attorney General of the Republic of Uzbekistan, from 1995 to 2000, Roz Trading Ltd. failed to create a charter fund totalling $500,000. Thus the company did not qualify for the tax privilege.[9]*

**Click here to continue to Fraudulent Parallel Trading**

**Click here to go back**

---

7. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002. **Click here to download the full text**

8. "Divorce Drama Goes International." Insight Magazine. 1 September 2003.

9. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Click here to download the full text**

A-15



Home

Family
Members

# Fraudulent Parallel Trading

*Roz Trading and its affiliated company Valuelink FZE in Dubai, UAE, defrauded their multinational partners, chiefly Proctor & Gamble and Alberto Culver, by contracting to sell personal-care products in Uzbekistan and then re-labelling the products and reselling them for larger profits in the U.S., United Kingdom, UAE, and African countries, according to Uzbek Deputy Prosecutor General Khamidjon Nematov.[10] The fraudulent activity is known as "parallel trading."*

*The Uzbekistan State Taxation Committee uncovered the fraudulent activity by the Maqsudis and alerted U.S. authorities in a letter sent to the U.S. Internal Revenue Service (IRS) and to then Attorney General John Ashcroft.*

*Roz Trading received up to a 30-percent discount on goods from its multinational partners, according to Uzbekistan Attorney General Rashitjon Kadirov.[11]*
*Using false documents, the Taxation Committee explained the goods below were supposed to be shipped to Tashkent for distribution in Uzbekistan and were instead shipped to the United States and sold in New Jersey, New York, and California:*

- *Alberto Carvel, Revlon, and Duracell, through distributors in Singapore and Russia.*
- *Crazy Glue in Ohio.*
- *Biore facial cream.*

*The shipment of Crazy Glue never left a U.S. port and was sold through Maqsudi's firms in New York and New Jersey, the Taxation Committee stated.[12]*

*Without the knowledge of manufacturers, the goods were also distributed to other CIS countries and Russia.[13]*

*When representatives of American companies wanted to personally view how their products were being sold, they were taken to Tashkent where samples of their products were hurriedly scattered onto stalls in the central market, news articles reported. The foreign visitors were pleased by what they saw and did not know they were "witnesses of a well-staged show."[14]*

*The news report said Procter & Gamble, its largest partner, and Gillette terminated their relationship with the Maqsudis and Roz Trading because of the fraudulent parallel trading activities.[15]*

*Uzbek authorities allege that from 1998 to 2001, "almost $100 million was wired from Uzbekistan to Maqsudi affiliates" that include ValueLink FZE. [16]*

**Click here to continue on to Illegal Profit-Making**

A-16

**Click here to go back**

---

10. "Divorce Drama Goes International." Insight Magazine. 1 September 2003.

11. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002. **Download the full text**

12. Letter from State Taxation Committee of the Republic of Uzbekistan to the Internal Revenue Service. 7 August 2001 **Download the full text**

13. "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003.

14. "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003.

15. "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003.

16. "Coke's Sinful World." **www.forbes.com/forbes/2003/1222/086_print.html.**



ŌZBEKISTON                                              RESPUBLIKASI
DAVLAT          SOLIQ                                   QOMITASI
ГОСУДАРСТВЕННЫЙ                                         STATE TAXATION
НАЛОГОВЫЙ КОМИТЕТ                                       COMMITTEE OF THE
РЕСПУБЛИКИ УЗБЕКИСТАН                                   REPUBLIC OF UZBEKISTAN

700195, Toshkent shahri, Abay kochasi 4. Tel.: (3712) 417697, Faks: (3712) 418220, 418215, 417802.
Ozbekiston Respublikasi Tashqi iqtisodiy faoliyat milliy bankining Markaziy amaliyot bolimi, MFO 00852, Hisob-kitob raqami 20204000700600317001

№ _1413-4027_                                           4. Abay str., 700195, Tashkent
200___ yil « _08. 07_ » son

To: Internal Revenue Service
of the Ministry of Finance of the
United States of America

The State Tax Committee of the Republic of Uzbekistan expresses its respects
to Internal Revenue Service of the Ministry of Finance of the United States of
America and according to Paragraph 2 of Article XIV "Consultations" of the
Agreement of Trade Relations between the Republic of Uzbekistan and USA
from 5 of November, 1993, asks you to assist on below-mentioned questions.
We ask you to check up completeness of payment of the taxes by the citizens
of USA: Maqsudi Mansur, Maqsudi Abdul Rauf, Maqsudi Farid, Maqsudi
Mehnaz, having commercial activity in territory of Republic of Uzbekistan
and representing the private  companies "ROZ Trading LTD" (Cayman
Islands), "ROZ Trading LTD" (Tashkent) and "Value Link " (Dubai, Jebel Ali
Free Zone).
The following moments of activity of these persons can be presented as the
information for check:
a) registration of transit of the goods in wholesale trade, which ostensibly,
should be directed through USA, for example, to Africa, and in a reality the
sale them was carried out in New Jersey, New York and California through the
firms in USA (Sours for Value);
. b) order of the goods in Dubai , Singapore and other countries through the
firms, for example "Value Link ", and shipment of these goods in USA, that is
illegal inflow washing up of means;

А:ПТПК-3-ю-К-2749-1500-2003 г.

A-18

c) abusing by presence numerous distributor's rights on various kinds of the goods, which were made out on "ROZ Trading LTD" (Tashkent). So, the goods of such firms as "Alberto Carvel", "Revlon", "Duracell" (through the distributors in Singapore and Russia), "Crazy Glue" (Ohio), production of "Biore", were shipped under the false documents to Tashkent, but actually any delivery was made not in Uzbekistan and the goods by containers were shipped in USA, partially to Dubai. In this connection according to the checked information there were also rough infringements in registration of the goods, for example, production Crazy Glue under the documentation of the firm - manufacturer should be made out under export to Uzbekistan, but coming in New York, did not leave port of departure, and was realized through firms Maqsudi in New York and New Jersey, about what the manufacturer in Ohio did not know.

d) the special moment is connected to the accounts in Greece and Turkey where the means not having relations to official business under a kind anywhere of not reflected interests were forwarded, or transfer them to the name of the suppliers of share parts of production of drinks of "Coca-Cola", about what the head company "Coca-cola" had no the information. as the production management "Coca-Cola" in Uzbekistan in the private coordination was transferred to Maqsudi's family.

Established by the State large export of the discounted cash means abroad Uzbekistan by the members of Maqsudi's family, causes the special fear in the conditions which have received a wide circulation of world experience of washing up of a cash, including the terrorist actions appeared in a world. The sum of the not brought in taxes and payments in the State budget of Uzbekistan of firm "ROZ Trading LTD" (Tashkent) makes more than 13 billion Uzbek soums or equivalent 17,6 million US dollars.

It is necessary especially to take into account, that family Maqsudi - peasant of birth from Afghanistan and, on the informal data, always supported commercial contacts with various including informal groupings of former military Afghanistan.

It was established that the members of Maksudi's family for the period of their activity in infringement of the tax laws of Republic of Uzbekistan illegally had received the large money resources which were transferred in various foreign banks. On the informal data only on the accounts in various banks of Greece, Dubai, Singapore, Cyprus, Lithuania and others banks the sums of total over hundred millions US dollars in Credit Swiss Bank Place Bel Air № 21711 Geneva 2 Switzerland is present 52519,9 thousand US dollars.

In this connection we ask you to give the official information on conducting IRS about the sizes taxable base of the members of Maqsudi's family .

A-19



Companies, People, Ideas

# Coke's Sinful World

Paul Klebnikov, 12.22.03

**Islamic fundamentalists, cozy ties to strongman dictators, rogue bottlers--this is a growth opportunity?**

**By the Numbers**
**The Red Empire**
Coca-Cola is the most ubiquitous brand in history.

9 million  Estimated retail outlets worldwide served by Coke (not including bars and restaurants).

1.2 billion  Number of 8-oz. servings of Coca-Cola soft drinks consumed daily around the world.

18%  Coke's share of the global nonalcoholic, ready-to-drink beverage market.

$60 billion  Estimated global sales of Coca-Cola and all of its bottling partners.

Coca-Cola Co. has "arguably the strongest and most pervasive marketing and distribution system in the world," Chairman Douglas Daft told investors at the annual shareholder meeting in April. And it does. The Coke empire stretches to more parts of the globe than any other enterprise in the world. The soda is served in more than 200 nations; it's easier to list the markets where Coke isn't:Myanmar, Cuba, Iraq and Syria. Everywhere else--including such tricky markets as Pakistan, Cambodia, Liberia, Zimbabwe and Colombia--Coke is a beloved consumer staple. Nine million stores sell Coke, serving up some 1.2 billion servings a day around the world.That's why overseas sales account for two-thirds of Coke's revenue (expected to total $21 billion this year) and three-quarters of operating income (forecast at $5.8 billion total) and over 90% of the giant brand's profit growth. After a rough patch from 1998 to 2001 Coke is back. In the first nine months of this year Coke has reported a robust 4% rise in volume (the most-watched indicator of the company's health), a 6% increase in revenue and a 12% rise in net income--numbers as good as any Coke has posted since 1997.

But here's the part Douglas Daft left out: Building business overseas requires dealing with the devil and other questionable characters--relatives of dictators in the Middle East, Latin American bottlers who allegedly work with assassination squads and Marxist rebels in Colombia.

Coke has had to endure that and more as it expands relentlessly into the globe's last nooks and crannies. Since 1999 it has taken charges totaling upward of a billion dollars related to overseas markets and deals gone awry. In February the company was shaken by the murder of a Coke executive by rebels in Colombia. It has been sued in a class action accusing it of forcing "unneeded" beverage concentrate on bottlers to stoke its growth numbers. And Coke has watched a well-funded bottler that was to be its gateway to central Asia wither amid charges of misappropriated funds, tax dodges and cozy inside deals.

Coke's chief executive, Daft, declined to be interviewed for this story, and the company refused to make other top executives available. Yet Coke has little choice but to keep prospecting overseas. In the U.S. decades of market dominance have made Coke a low-growth staple: The ten-year compound annual unit-case growth in the U.S. is only 4%.

Foreign markets are less flooded with the syrupy soda. The North Africa and Eurasia/Middle East divisions now are among Coke's fastest-growing units, with sales rising two to three times as rapidly as in the U.S. Coke now has hundreds of bottlers outside the U.S. (it doesn't have an exact figure). Historically, it has tried to merge its smaller partners into big "anchor" bottlers, but its success in under-developed markets often depends on small local outfits that know the terrain.

And with each such partner it embraces, Coke risks tarnishing its clean-cut image by associating with businesses that may partake in local traditions that can include bribing local officials, paying retailers to shun rival brands and resorting to other unorthodox tactics. "Both Coke and Pepsi try to do business as ethically as possible, but when you have local partners who are not subject to the same governance and scrutiny as in the U.S., then sometimes local behaviors take place," says one former Pepsi executive who worked in Latin America.

So far the main thing sparing Coke from a true debacle is the strength of the brand itself. Even the anti-American

A-20

backlash that swept the Islamic world in recent years has hardly stymied Coke's onward march. French Muslims roll out a politicized anti-Coke called Mecca-Cola, to no noticeable effect on sales. Egypt is swept by a bizarre rumor that the Coca-Cola label (read backwards in Arabic) says "No to Mohammad, No to Mecca." Coke counters by getting the grand mufti of Egypt to issue a fatwa declaring that this is nonsense. And the brand has survived just fine after blows that might have killed another: reports in 1999 in Belgium that a batch of Coke products was giving kids headaches and nausea; and worries in India last August about supposedly high levels of pesticide in the drink.

It seems that people who curse the U.S. and condemn it to eternal damnation still want to take time out from politics for the pause that refreshes. The company's fizzy foreign expansion touches thousands of small private businesses--from bottlers and distributors (whom it helps to equip and capitalize) to local grocery stores and roadside vendors (whom it supplies with coolers, shiny display cases and signs).

But the linchpin of the success of the business is the far-flung network of independent bottlers who make up the "Coke system." Coke is almost wholly dependent on the bottlers for its own results. They buy secret concentrate from Coca-Cola Co. and add water and sugar to turn it into the world's best-known soda, distributing it in cans and bottles across the world's next developing markets.

The biggest bottlers aren't subsidiaries of Coke, nor are they completely independent. Coke effectively controls them by maintaining big equity stakes and a heavy presence on their boards, and by providing their main source of business. Yet it keeps its stakes in the bottlers below 50%, thereby avoiding getting hit with their piles of debt and any unpleasant liabilities.

In Brazil price wars are so cutthroat that Coke competes with itself: Its local bottlers use independent distributors that undercut one another to raid retail accounts. It's why a 2-liter bottle of Coke sells for half the price that it does in Mexico. Meanwhile, Pepsi has filed a government complaint in Brazil against Coke for allegedly bugging local Pepsi planning meetings, among other supposed misdeeds. An earlier accusation that a Coke-affiliated brewer had bribed Brazilian antitrust officials to block the merger of two Pepsi-affiliated breweries was never substantiated--because it was never investigated.

In Colombia the company has become unwillingly involved in the long-running civil war between the government and Marxist rebels. Coke's Colombian bottlers have allegedly conspired with right-wing death squads to target six trade union activists at their plants--one was actually assassinated--and intimidate dozens more since 1990. That accusation is laid out in a lawsuit filed in 2001 in U.S. court in Miami by the Colombian food-and-drink union, Sinaltrainal. Earlier this year the judge dismissed the charges against Coca-Cola Co. but allowed the suit against the bottlers to proceed. In February Luisa Fernanda Solarte, a marketing manager for Coke, was killed in a terrorist bombing.

In Coke's Eurasia/Middle East division, successful market entry has often meant teaming up with the cronies of the local political boss. When Coke entered Iran in 1990, it teamed up with a relative of Iranian president Ali Akbar Hashemi Rafsanjani. Entering the Israeli-occupied West Bank in 1998, Coke jumped into bed with Yasir Arafat's Palestinian Authority.

And in Uzbekistan, the historic centerpiece of Central Asia and its most densely populated market, Coke teamed up with a son-in-law of strongman President Islam Karimov--and came to regret it. Coke saw the former Soviet state as its gateway to the entire region. So in 1993 it signed a deal with one Mansur Maqsudi, an Afghan-American living in New Jersey. He had no previous bottling experience--but he was married to the Uzbek president's eldest daughter, Gulnara Karimova. Together they opened Coca-Cola Bottlers Uzbekistan (CCBU), owned in equal parts by Coke's export subsidiary, Coca-Cola Export Corp., a Maqsudi family trading company and the government of Uzbekistan.

Maqsudi brought in his older brother to help run the operation. CCBU, headquartered in Tashkent, found all doors open to it. Pepsi, which had owned the market in Soviet times, was pushed out, and all of Uzbekistan was soon covered with red Coke logos. In the next eight years CCBU invested over $100 million in new bottling plants, warehouses and a nationwide distribution network. By 1997 the operation was raking in $118 million in sales and recording net profit margins of 29%. CCBU was twice selected by Coke as "Bottler of the Year" for the Eurasia/Middle East region.

Then in the summer of 2001 things began to fall apart. Maqsudi's marriage broke up. His estranged wife left New Jersey and took their two children back to Uzbekistan. Maqsudi, still president of CCBU, remained in New Jersey. In August 2001 the Uzbek tax police came calling, unearthing the disturbing fact that CCBU conducted almost all

A-21

its transactions through companies owned by the Maqsudi brothers.

Most of the goods CCBU imported (sugar, bottling equipment, plastic preforms, labels, caps, etc.) went through the Maqsudi-owned companies. And while Coke was paid, often late, in wobbly Uzbek currency that couldn't be taken out of the country, Maqsudi's properties got preferential treatment; they were paid in hard currency, often in advance. From 1998 to 2001, while Coke was struggling to get paid, almost $100 million was wired from Uzbekistan to Maqsudi affiliates, including a Dubai-based trading firm, Valuelink FZE, and various offshore affiliates of Roz Trading (the Maqsudi company that held the family's CCBU stake), according to Uzbek Central Bank records.

The Uzbek prosecutor general's office now claims that by overcharging for these imports and taking straightforward trading commissions, the Maqsudis siphoned off much of CCBU's profits and stashed it in offshore accounts to avoid tens of millions of dollars in taxes. In 2002 the Uzbek authorities confiscated the Maqsudis' equity share in CCBU.

Mansur Maqsudi counters that he and his family are victims of a political vendetta launched by his ex-wife. He says his companies never made any profits on the Coca-Cola venture and that they played an indispensable role in keeping the CCBU operation afloat. Since CCBU became engulfed in scandal, however, its business has slowed down; this summer it finally stopped altogether. That has hurt Coke's business in Uzbekistan, which had anchored its sales in the entire region.

From a purely financial perspective, however, Coke's downside was minuscule, in part because the Uzbek business was tiny on the soda giant's $20 billion-a-year scale. From 1997 to 2000 CCBU made $82 million in net profits, letting Coke add a mere $27 million to its own bottom line. But most of Coke's equity income was reinvested in CCBU, and as much as $40 million was left in an Uzbek bank account, mired in nonconvertible Uzbek *soums*. "We simply didn't know what to do with the money; we had no place else to put it," says Maqsudi.

An internal Coke report compiled by PricewaterhouseCoopers that was rushed out in two weeks pegged Coke's "quantifiable loss" in the Uzbek affair at a mere $3 million, but said the real sum could be much higher; it also made note of possible attempts by a CCBU official to impede the investigation.

But Coke continued to do business with CCBU. Maqsudi cites the company's need to keep posting respectable growth. "The pressure at Coke was huge for every division to keep volumes growing, and they understood that this is what they had to do to make their numbers," he says. By the time he left CCBU in 2001, "we had a year's worth of concentrate in stock," recalls Maqsudi. By contrast, Coke bottlers in the U.S. rarely keep more than a few weeks' supply of concentrate in stock; in remote markets, up to three months' worth is the norm.

Similar allegations of channel-stuffing emerged in Japan, which accounts for nearly a fifth of Coke's total worldwide sales, and elsewhere. Some of the details came to light in a shareholder lawsuit filed in U.S. District Court in Atlanta in October 2000. Suing on behalf of several pension funds, lawyers at Milberg Weiss Bershad Hynes & Lerach charged that Coke inflated its 1999 revenue by $600 million and boosted pretax earnings by $400 million by overloading bottlers in Japan, the U.S., Europe and South Africa with "unneeded" concentrate. The lawsuit was filed after Coke reported $1.5 billion in writeoffs and, in the first quarter of 2000, recorded its first quarterly loss in memory.

In August the U.S. District Court in Atlanta dismissed the channel-stuffing charges but allowed other parts of the lawsuit to proceed. The law firm has since submitted a much more detailed complaint about channel-stuffing, which the judge is now considering. (The Justice Department is also investigating the matter.)

The suit contends Coke induced its Japanese bottlers to take $233 million worth of "excess, unwanted and unneeded" concentrate in 1999; it compensated them with rebates and extra funds to cover marketing and the installation of thousands of new vending machines in underserved locations. Instead of including these payments as a cost in the income statement, Coke spread out the cost over a longer period, classifying it as an investment in retailing assets. In 1999 Coke wrote off its "impaired" Japanese assets. It denies all charges of channel-stuffing.

Today signs of a Coke rebound continue on its long march to conquer the world. Coke has built its booming overseas business by teaching thousands of bottlers, distributors and retailers how to sell the world's best-known soda. Now if only the company could teach its overseas partners a thing or two about ethics.

**I'd Like to Buy the World a Coke...**

A-22

Even though Coke is everywhere, the soft drink titan is counting on emerging markets to provide most of its future growth.

Per capita annual consumption of Coca-Cola beverages (in 8-oz. servings)

| | |
|---|---|
| Mexico (pop. 103 million) | 487 |
| United States (pop. 291 million) | 436 |
| Britain (pop. 59 million) | 203 |
| Japan (pop. 127 million) | 170 |
| Brazil (pop. 175 million) | 146 |
| France (pop. 59 million) | 112 |
| Africa (pop. 794 million) | 34 |
| Eurasia/Middle East (pop. 700 mil, est.) | 18 |
| China (pop. 1.3 billion) | 10 |
| India (pop. 1.1 billion) | 6 (est.) |

*Sources: United Nations Monthly Bulletin of Statistics; Coca-Cola; Forbes estimates.*

**Sidebars**
Pepsi's Chinese Torture

A-23



Home

Family
Members

# Illegal Profit-Making

*Roz Trading Ltd. (Uzbekistan) violated Article 243 - the "legalization of profit received by criminal way."[17] According to Uzbek Attorney General Rashitjon Kadirov, the company is guilty of "illegal profit-making from state budget money that was converted in the Republic of Uzbekistan for importing consumer goods."[18]*

*On 5 January 1994, an import contract was signed between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan) on the delivery of $200 million of consumer goods.*

*Mansur Maqsudi signed the document on behalf of the Uzbekistan company and Farid Maqsudi signed the contract on behalf of the Cayman Islands company. The consumer goods included macaroni products, sugar, flour, chocolate products, children's nourishment, tea, cigarettes, chewing gum, among others. All payments related to the contract were made through the Credit Swiss Bank in Switzerland. From 1995 to 1997, only "106,020,6 thousand U.S. dollars were delivered into Uzbekistan" [$106,020.60?], the Attorney General stated.[19]*

*On 12 August 1999, Mansur Maqsudi concluded a credit trade contract (No. 2/99) for consumer goods for "6.000.000 USD" [$6 million] between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan). The contract was registered (No. 21902294) with the Ministry of Foreign Economic Relations of the Republic of Uzbekistan on 13 September 1999.[20]*

**Click here to continue to Embezzlement**

**Click here to go back**

---

17. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002. **Download the full text**

18. Attorney General of the Republic of Uzbekistan Rashitjon Kadirov. Resolution. 6 November 2002

19. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Download the full text**

20. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002.

A-24



**Home**

**Family Members**

# Embezzlement

*The Maqsudi family embezzled funds, according to Rashitjon Kadirov, Attorney General of the Republic of Uzbekistan.* "The members of the Maqsudi family," *he stated,* "purposefully overestimated the cost of contracts for delivery of consumer goods in Uzbekistan by including the expenditures for marketing and teaching services which factually were not carried out. By those contracts, they illegally received hard currency in the amount of 33 million 992 thousand USD."[21]

*From 1995 to 1997 the total amount of imported goods was* "11.122.06 thousand USD [$11.1 million]," *Attorney General Kadirov said. Of this amount, Maqsudi overestimated prices* "in the CCD" *by 34 percent or* "2,822.04 thousand USD [$2.8 million]." *In other words, this amount was* "stolen" *from the important goods.*"[22]

*Maqsudi overstated the price of goods on customs declarations by 15 percent or* "12.242,31 thousand USD" *[$12.2 million]. The total amount of imported goods was* "93.857,76 thousand USD" *[$93.8 million].*[23]

*In total, Attorney General Kadirov stated that* "15.064,35 thousand USD [$15 million] or 994.247.000 sum ... was embezzled from the state resources."[24]

**Click here to continue to continue to Profits Siphoned Off**

**Click here to go back**

---

21. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18 November 2002.

22. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Download the full text**

23. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002.

24. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002.

A-25



Home

Family
Members

# Profits Siphoned Off

*The Maqsudis had the controlling interest in the Coca-Cola Bottlers Uzbekistan (CCBU). They overcharged for imported goods and took straightforward trading commission to "siphon off" much of the profits of the company and stashed the money in "offshore accounts to avoid tens of millions of dollars in taxes," according to the Uzbek prosecutor general's office.*[25]

*The Maqsudis, news reports stated, also funnelled money under the "pretext of investments" through dummy firms, "as a strategy to limit profit payments to other founders of CCBU."*[26]

*Uzbek Ambassador Shavkat Khamrakulov said the Maqsudis additionally smuggled a "tremendous amount of undeclared dollars out of Uzbekistan." During an inspection of Roz Trading Ltd., an "undeclared cash amount of $199,900 was discovered."*[27]

**Click here to continue to Tax Evasion**

**Click here to go back**

---

25. "Coke's Sinful World." Forbes. 23 December 2003.

26. "American-Uzbek Swindlers are Wanted by Uzbekistan Authorities." Robert Evans. Novaya Gazetta. Issue #55. 31 July 2003.

27. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

A-26



**Home**

**Family Members**

## Tax Evasion

*Roz Trading was involved in numerous schemes to avoid paying taxes to the governments of Uzbekistan and the United States, according to Uzbek authorities.*

*Roz Trading "continuously and for quite a long time" failed to pay taxes on tens of millions of dollars, stated Uzbek Ambassador Shavkat Khamrakulov. "Moreover," he asserted, "the company, having been engaged in illegal business activities, concealed its sales income from taxation."[28]*

*Because Roz Trading Ltd. did not set up a charter fund totalling $500,000, the company also failed to qualify for tax privileges it was taking, according to O.B. Murodov, Deputy Attorney General of the Republic of Uzbekistan.[29]*

*Roz Trading Ltd. also sold sugar on the "black market" in which it failed to pay a profit of 7 billion soms or approximately $6 million, according to Uzbekistan Ambassador Shavkat Khamrakulov.[30]*

*From 1995 to 2000, Roz Trading evaded paying taxes in the amount of 438,032,000 soms [$5.1 million] based on a "commodity turnover in the amount of 24,519,190,000 soms [$287.6 million]."[31]*

*Due to violations of tax and currency regulations in the course of its registration and activity from 1995 until 2001, Attorney General Rashitjon Kadirov stated "additional tax payments and financial penalties" were levied.[32]*

*Overall, the Maqsudis evaded taxes worth $17.6 million, according to Utkir Kamilov, Uzbekistan's top tax officer.[33]*

**Click here to continue to Cash Smuggled Out of Uzbekistan**

**Click here to go back**

---

28. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

29. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Download the full text**

30. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

31. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002.

32. Uzbekistan Attorney General Rashitjon Kadirov Letter to then U.S. Attorney General John Ashcroft. 18

A-27

Tax Evasion | Mansur Maqsudi Interpol Warrant

November 2002. **Download the full text**

33. "Uzbekistan Offers Rich Pickings for Leader's Daughter." Financial Times. 19 August 2003.

A-28

Cash Smuggled Out of Uzbekistan | Mansur Maqsudi Interpol Warrant     Page 1 of 1



Home

Family
Members

# Cash Smuggled Out of Uzbekistan

*Uzbekistan Ambassador Shavkat Khamrakulov stated that,* "according to preliminary data, the Maqsudis...have smuggled a tremendous amount of undeclared cash dollars out of Uzbekistan."[34]

*During an inspection of Roz Trading's office in Uzbekistan,* "an undeclared cash amount of $199,000 was discovered," the Ambassador disclosed.[35]

**Click here to continue to Oil Embargo Violations**

**Click here to go back**

---

34. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.
35. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

**A-29**



Home

Family
Members

# Oil Embargo Violations

*Uzbekistan Deputy Attorney General Khamidjon Nematov disclosed that Valuelink purchased oil products* "from Middle Eastern countries, which are under economic sanctions by the World community."[36] Insight magazine reported the countries that supplied the oil in 2001 were "Iraq and Iran."[37]

*Attorney General Nematov conveyed the information in a letter to UAE Minister of Justice Muhammad al-Zaheri on 8 February 2003. Attorney General Nematov also declared that Valuelink falsified documents to conceal the true origin of the oil products by stating the country of origin for the oil was Uzbekistan.*[38]

*Among others, the oil was sold to the following buyers:*

- Bakaitechnologies GMBH (Germany).
- AO PHS "Farvarding" (Latvia).
- KP "Signal P" (Riga).
- "Elited Oil" 9 Dubai.
- Petrobart Ltd. (Switzerland).
- Interlik Overseas Corporation" (Great Britain).

*A total of 150,920 tons of oil products was illegally sold through Valuelink at a cost of $15,938,572.82, according to Attorney General Nematov.*[39]

**Click here to continue to Selling Sugar on Black Market**

**Click here to go back**

---

36. Letter from Uzbekistan Deputy Attorney General to UAE Minister of Justice Muhamman al-Zaheri. 8 February 2003. **Download the full text**

37. "Divorce Drama Goes International." Insight Magazine. 1 September 2003.

38. Letter from Uzbekistan Deputy Attorney General to UAE Minister of Justice Muhamman al-Zaheri. 8 February 2003.

39. Letter from Uzbekistan Deputy Attorney General to UAE Minister of Justice Muhamman al-Zaheri. 8 February 2003.

**A-30**

Office of the Attorney General
Of the Republic of Uzbekistan
Uzbekistan, Tashkent Post code 700000
66, Academic Gulamov Street

08 February 2003

Minister of Justice
Of the United Arab Emirates
Honorable Muhammad al-Zaheri

Dear Mr. Muhammad al-Zaheri!

The Office of Public Prosecutor of the Republic of Uzbekistan expresses its respect to the Ministry of Justice of the United Arab Emirates and asks to revisit the issue about rendering legal assistance with the criminal case processed by the department of criminal investigations of the General Prosecutor Office of the Republic of Uzbekistan.

During the investigation of illegal activities of the foreign firm "Roz Trading Ltd" it was discovered that during numerous joint operations with the firm "Valuelink FZE" registered in the free economic zone Jabel Ali Free Zone P.O. Box 17502 Dubai, UAE, 150920 tons of oil products totaling $15 938 572, 82 US dollars were sold through this company.

A previous petition on this issue was filed for legal assistance with investigation of the above mentioned company's activities beyond Uzbekistan and collection from company "Valuelink FZE" taxes in the amount of $2087695 US Dollars unpaid on the territory of the Republic of Uzbekistan.

At the present time, it is it is determined that Director General of "Valuelink FZE" Mike Mustafa provided power of attorney to the employee of JV "Coca Cola Ichimligi Uzbekistan Ltd" Farhod Ahmedov, who from August 2000 through February 2001 resold oil products to various buyers ( "Bakaitechnologies GMBH" ( Germany), AO PHS "Farvarding" ( Latvia) , KP "Signal P" ( Riga) , "Elite Oil" 9 Dubai), Petrobart Ltd" ( Switzerland), "Interlik Overseas Corporation" ( Great Britain), and so on.

According to available information, simultaneously with the abovementioned operations, company "Valuelink" purchased oil products from Middle Eastern countries, which are under economic sanctions by the World community. With the purpose of concealment of the true origin the oil products, by falsification of documents, Uzbekistan was identified as the country of origin.

A-31

Based on the above, we are persuasively asking you to provide assistance with receiving response to earlier request for thorough investigation of the firm "Valuelink FZE" by the authorities of the United Arab Emirates and taking appropriate actions in regards to this company.

Taking this opportunity, I am expressing my gratitude and certainty in further strengthening of mutual cooperation between our countries.

Sincerely,

Deputy Attorney General                                Khamidjon Nematov
Of the Republic of Uzbekistan

A-32



## Home

## Family Members

# Selling Sugar on Black Market

"[S]ince 1997, the Roz Trading company has sold sugar through the 'black market' and not paid profit tax for 7 billion soms (local currency), which is approximately $6 million."[40]

*In the summer of 2000, Mansur "developed a criminal plan" to sell the sugar at "overestimated prices" to clients...[41]*

**Click here to continue to Bribery**

**Click here to go back**

---

40. Letter from Uzbekistan Ambassador Shavkat Khamrakulov to former U.S. Senator Robert Torricelli. 29 August 2001.

41. Resolution by Deputy Attorney General of the Republic of Uzbekistan regarding Mansur Maqsudi. 6 November 2002. **Download the full text**

**A-33**

10/24/2006



Home

Family
Members

# **Bribery**

*Article 167, part 3, point* "A" - "misappropriation by organized group of property intrusted (sic) to guilty by appropriation and embezzlement in especially (sic) large value). *Article 168, part 3, point* "A" - "conversion of property to his own possession in especially large value by fraud). *Article 209, part 1* - "official forgery." *Article 210, part 3, point* "A" - "bribe taking in especially large value."[42]

**Click here to continue to Size of Criminal Activity**

**Click here to go back**

---

42. Office of Public Prosecutor letter to then Attorney General John Ashcroft. 18 November 2002. **Download the full text**

A-34



Home

Family
Members

## Size of Criminal Activity

"According to the material of investigation of Abdul Rauf Maqsudi, being a member of the
criminal group, organized by himself and by means of fraud, bribe taking, and extortion,
converted to his possession the amount of 1,6 billion sum or 3 million 933 thousand USD."[43]

**Click here to continue to Money Conversion Violations**

**Click here to go back**

43. Letter. Uzbekistan Office of Public Prosecutor to then Attorney General John Ashcroft. 18 November 2002.
**Download the full text**

A-35



**Home**

**Family Members**

## Money Conversion Violations

"Most of the goods [Coca-Cola Bottling Uzbekistan] imported (sugar, bottling equipment, plastic performs, labels, caps, etc.) went through the Maqsudi-owned companies," *according to a Forbes article.*

*While Coke made payment*s, "often late, in wobbly Uzbek currency that couldn't be taken out of the country, Maqsudi's properties got preferential treatment; they were paid in hard currency, often in advance. From 1998-2001, while Coke was struggling to get paid, almost $100 million was wired from Uzbekistan to Maqsudi affiliates, including a Dubai-based trading firm, Valuelink FZE, and various offshore affiliates of Roz Trading...according to Uzbek Central Bank records."[44]

*In late 2001,* "the Maqsudi family lost control of the Coca-Cola plant, the government ordered liquidation of the other business [ROZ Trading Group, Ltd.], and two cousins and an uncle of Mr. Maqsudi's were convicted on tax-violation and money-conversion charges."[45]

**Click here to return to the homepage**

---

44. "Coke's Sinful World." Forbes. 23 December 2003.
45. "Judge Sets U.S. Court as Venue in International Custody Case." The New York Times. 13 September 2002.

A-36

# TAUBMAN DECLARATION

# Exhibit B

Westlaw.

6/19/95 BUSWK 27

NewsRoom

Page 1

6/19/95 Bus. Wk. 27
1995 WLNR 3471600

BusinessWeek
Copyright 1995 The McGraw-Hill Companies

June 19, 1995

Issue 3429

### UZBEKISTAN'S STRONGMAN MEANS BUSINESS
Karimov offers foreign companies stability and perks

By Patricia Kranz in Tashkent

In the dusty, mineral-rich state of Uzbekistan, there's only one boss: President Islam A. Karimov. He rules like a khan, repressing opponents and dispensing favors to allies. Ordinary citizens need no reminder of who runs the show. In the sprawling capital of Tashkent, traffic cops stand on every corner and the secret police are as active as the Soviet-era KGB.

Karimov certainly won't win any human-rights awards. But foreign investors are beginning to notice the regime's stability. ``Karimov is definitely in control and definitely committed to a free market,'' says John Selby, finance director of BAT Central Asia Ltd. Last November, London-based BAT Industries bought control of the state tobacco company. Like BAT, plenty of other multinationals are now moving into Uzbekistan, making it one of the hottest investment areas in the former Soviet Union.

TAX HOLIDAY. Taking a cue from China's leaders, Karimov is trying to create a market economy from the top down. He supports a go-slow approach, hoping to avoid the economic chaos that has gripped neighboring Russia. Few state enterprises have been privatized yet, but the government is constructing hundreds of buildings to lease out to private retailers. And Karimov has already mandated laws to attract foreign investment, including a five-year tax holiday on profits. As a result, joint ventures generated some $610 million in business in 1994.

To be sure, companies such as Newmont Mining Corp. and BAT would not bother with Uzbekistan unless it had something to offer. The Central Asian country is one of the world's largest producers of gold and cotton and has deep reserves of oil and gas. But Karimov's iron grip gives investors a degree of confidence that the rules of the game won't be changed overnight, as they can be in Russia, Kazakhstan, or Ukraine. Newmont and others have even persuaded the government to codify the terms of their joint venture in presidential decrees. Says Steve Edds, Newmont's controller: ``In Russia, you can't get a meeting with a high-level official to negotiate a decree, and if you do, a lower branch of government might not re-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**B-1**

spect it."

Karimov has ensured that he plays the leading role in shaping policy. The top Communist official at the time of the Soviet Union's breakup, he was recently reelected president in a referendum that offered no other candidates. Karimov has banned the opposition party, whose leaders, according to Moscow papers, were imprisoned on charges of plotting a coup. He also sits on the press, but many Uzbeks support him for his swift executions of gangsters.

SECOND THOUGHTS. Karimov sometimes nudges deals along himself. When BAT wanted a controlling stake in the tobacco monopoly, company managers balked. But Karimov, who hoped to use the $300 million BAT deal as an investment showpiece, persuaded them to change their minds. Says Selby: ``With (Karimov's) support, we pushed through a number of sticking points."

It's no surprise that relationships are vitally important for new businesses here. Lonrho PLC, the London-based mining company, has hired the son of former Uzbek Communist boss Sharaf Rashidov to head its Tashkent office. ``He understands the business culture here, so he's a huge asset to us," says Darren Stock, Lonrho's financial manager. The Coca-Cola Co. franchise in Tashkent also has good connections. Mansur Maqsudi, president of the venture, is married to Karimov's daughter, while Mansur's brother, Farid, is chairman. Sounds quite cozy, but Farid swears he does not get special favors. To start up a Coca-Cola business, ``it took us 18 months to negotiate and finalize the deal," he says.

With Uzbekistan so steady, even cautious bankers and insurance companies are moving in. The European Bank for Reconstruction & Development and Barclays Bank PLC arranged a $135 million syndicated loan for Newmont's gold project. And the American International Group has formed a joint venture to provide commercial risk insurance in Uzbekistan.

However, potential investors would do well to remember that in Uzbekistan, you cross the authorities at your peril. One foreign engineering company was booted out of the country after two of its employees went drinking and picked a fight with some policemen. No one, Uzbek or Westerner, is exempt from Karimov's law and order.

UZBEKISTAN AT A GLANCE

POPULATION 21.5 million

GDP GROWTH Down 17%

since 1991

GOLD RESERVES 4,000 tons

OIL RESERVES 350 million tons

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

DATA: REPUBLIC OF UZBEKISTAN

photograph:Photograph: TASHKENT MOSQUE: Uzbeks applaud the crackdown on organized crime

PHOTOGRAPH BY GAMMA-LIAISON

photograph:Photograph: KARIMOV: Reelection was a snap; no opponents

CHIP HIRES/GAMMA-LIAISON

---- INDEX REFERENCES ----

COMPANY: LONRHO PLC ADR; BARCLAYS BANK PLC; COCA COLA CO (THE); AMERICAN INTERNA-TIONAL GROUP INC; NEWMONT MINING CORPORATION HOLDING CO; LONRHO AFRICA PLC

NEWS SUBJECT:  (World Organizations (1IN77); CIS (1CI65))

REGION:  (United Kingdom (1UN38); Central Asia (1CE93); Europe (1EU83); England (1EN10); Eastern Europe (1EA48); Russia (1RU33); Western Europe (1WE41); Asia (1AS61); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (AMERICAN INTERNATIONAL GROUP; BARCLAYS BANK PLC; BAT; BAT CENT-RAL ASIA LTD; CENTRAL ASIAN; CHIP; COCA COLA; COCA COLA CO; EUROPEAN BANK FOR RE-CONSTRUCTION DEVELOPMENT; GDP; GLANCE; KGB; LIAISON; LONRHO; LONRHO PLC; NEWMONT; NEWMONT MINING CORP; PHOTOGRAPH; UZBEK; UZBEK COMMUNIST)  (Darren Stock; Farid; Islam A. Karimov; John Selby; Karimov; Mansur Maqsudi; Ordinary; Selby; Sharaf Rashidov; Sounds; Steve Edds)  (Business Week International Editions: Internation-al Business: UZBEKISTAN)

Word Count: 938
6/19/95 BUSWK 27
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                    **B-3**

Westlaw.

9/1/03 INSGHT 50

9/1/03 Insight Mag. 50
2003 WLNR 13925870

UPI Insight Magazine
Copyright 2005 News World Communications

September 1, 2003


Section: THE WORLD

### Divorce Drama Goes International

Douglas Burton, INSIGHT

A nasty domestic dispute between a wealthy immigrant to the United States and the daughter of Uzbekistan's president could complicate matters in the war on terror.

For two years a long-running divorce battle between a mega-wealthy New Jersey immigrant and the daughter of the president of Uzbekistan has intrigued readers of the East Coast tabloids as a case of "Daddy's Money vs. Daddy's Government." But this War of the Roses domestic dispute now has emerged as a sensitive foreign-policy and international criminal matter with potentially significant implications both for the United States and an exotic region still in turmoil but vital in the war against terrorism.

Scant attention was given to such geopolitical matters when Mansur Maqsudi won a custody battle in a New Jersey court to claim custody of his two children and divorce the daughter of the president of Uzbekistan, Islam Karimov.

Maqsudi had been the president and majority shareholder of the Coca-Cola Bottling Co. in Tashkent. But when the marriage started to break up in the summer of 2001, the one-time golden eagle for Coke in Central Asia seemed to have become an albatross around the company's neck, with repeated visits from the Uzbek tax police preceding a shutdown of the Coca-Cola plant there for four months in 2002 as top management fled the country.

In the meantime stories about the domestic warfare between the Uzbek couple have included accounts, real or imagined, of a foreign government's retribution against a rich man whose spurned former wife has excited the full fury of descendants of the Mongol chiefs of Tamerlane, including the wrath of her father, the president of Uzbekistan. Indeed, an investigation by Insight has uncovered allegations of corruption, tax evasion, international oil deals and the bilking of millions of dollars of investments through phony transactions and shady deals virtually on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-4**

all sides.

From Maqsudi's side, which refuses to go tit for tat on Uzbekistan's allegations, are claims of money laundering, extortion and corruption, including allegations against the Karimov family and government. He promised full details though not by Insight's deadline.

On the other side, Uzbekistan's attorney general, Rashitjon Kadirov, claims that Maqsudi owes millions in taxes, cheated his U.S. suppliers of consumer products he had contracted to sell in Uzbekistan but didn't and traded for oil from Saddam Hussein's Iraq to name but a few of the charges underpinning an Interpol arrest warrant for Maqsudi, his brother and his father.

The charges have caught the attention of Rep. Curt Weldon (R-Pa.), a leader on the House Armed Services Committee. He tells Insight he wants Attorney General John Ashcroft to cooperate with the Uzbek government's request to question Maqsudi in connection with a growing assortment of allegations of criminal conduct, including alleged Uzbek tax dodging equivalent to $17 million. Weldon says flatly, "I would support the Department of Justice's investigation of the business dealings of Mr. Maqsudi, and I have shared my position on the matter with Attorney General Ashcroft. The allegations brought to my attention that I believe warrant a thorough investigation range from extremely troubling business practices to fraud and tax evasion."

Weldon is a congressional leader for normalizing trade relations with Russia and other former members of the Soviet Union and is cochairman of the recently formed U.S.-Uzbekistan Congressional Working Group.

But the wealthy Maqsudi, a naturalized U.S. citizen, has his own friends on Capitol Hill. In August 2001, then-senator Robert Torricelli (D-N.J.) wrote to President Karimov to complain about reports that Maqsudi's parents had been harassed and strip-searched by government agents at the airport as they fled Uzbekistan. And Maqsudi has hired former New Jersey congressman Richard Zimmer, a well-connected Republican, to represent his side in publicity wars surrounding the divorce struggle.

Maqsudi tells Insight in a brief telephone interview that "all those actions taken against me are because I divorced the president's daughter." And, he says, in an Uzbeki equivalent of so's your old man: "All the things the [Karimov] government accuses me of doing is what they are doing themselves."

Although he won a court order from a New Jersey judge granting him custody of his two children in January, they remain with their mother in Tashkent where he cannot get them. Maqsudi tells Insight that at least 21 U.S. congressmen and senators have sent letters on his behalf to Karimov. Several of these letters provided to this magazine by Maqsudi's attorneys are from congressmen urging Karimov to release three of Maqsudi's relatives from jail and to help resolve his child-custody dispute with Karimov's daughter, Gulnara.

Zimmer tells Insight that all the charges against his client are phony or otherwise trumped up by a corrupt and dictatorial government. He also says that while officials of the U.S. Department of Justice did request that his client

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-5**

cooperate with the Uzbek investigation, "We responded that we were not going to cooperate, and they did not pursue it." Zimmer's law firm wrote to the Justice Department in February declaring that its clients "are victims of a vicious terror campaign by Uzbek authorities, who have targeted the Maqsudis ever since Mansur Maqsudi's marriage to Uzbekistan President Islam Karimov's daughter collapsed."

But Uzbekistan's top tax officer, Utkir Kamilov, claims Maqsudi evaded taxes worth $17.6 million. And documents from the Justice Ministry in Uzbekistan charge that Maqsudi concealed various trades and deals while running the Coca-Cola bottling plant and unrelated companies by trading upon his family relationship with the Uzbek president until government auditors uncovered the alleged illegal schemes around April 2001. Uzbek officials sent an official request to Ashcroft in late 2001 asking for formal Justice Department assistance to question Maqsudi, his father Abdurauf and his elder brother Farid on a wide range of questions relating to their company ROZ Trading Ltd., which was the major partner in the Coca-Cola venture.

A year later, the Uzbek government sent an addendum to the request, shortly after it had issued an Interpol arrest warrant for all three. A Justice Department spokesman tells Insight that its communications with foreign governments are privileged and that it cannot comment on whether or how it may have complied with the official Uzbek petition to Ashcroft.

Documents and interviews obtained by Insight nevertheless show there has been much behind-the-scenes activity churning charges and countercharges of fraud, deception and corruption. For example: Depositions by former managers of ROZ Trading and a letter from the attorney general of Uzbekistan to the minister of justice of the United Arab Emirates allege that the Maqsudis violated international sanctions by using the Coca-Cola Bottling Co. in Tashkent to purchase embargoed oil products from Iraq and Iran in 2001 and then exported them elsewhere.

The deputy prosecutor general of Uzbekistan, Khamidjon Nematov, states in one letter to the minister of justice of the United Arab Emirates that, "by falsification of documents, Uzbekistan was identified as the country of origin" for said oil products exported to Germany, Latvia, Switzerland and the United Kingdom.

According to an undated deposition given by Farhod Inogambaev, a ROZ Group manager from 1994 to 2001, the Maqsudis violated the trade license of their company, known as Valuelink FZE and based in Dubai, by using the firm to trade for oil, some of which was purchased from Saddam Hussein's Iraq. Inogambaev further stated in his deposition to Uzbek authorities: "The oil/petroleum-products operations included the purchase of Uzbek oil products from Coca-Cola Bottlers in Uzbekistan Ltd. and exported outside Uzbekistan. To my knowledge the company was buying diesel of Iraqi origin."

Nematov tells Insight that, "Financial crimes have become the mechanism of exporting worldwide terror, and we are pleased with the cooperation we have received from the U.S. government [the Justice Department and the IRS] on the case of Mansur Maqsudi, a U.S. citizen who is a wanted criminal in Uzbekistan for international financial crimes." Nematov adds: "It is our hope that, with the cooperation of the United States, Mr. Maqsudi will soon be brought to justice."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-6**

The letters from the Uzbek justice ministry and the tax office further claim that ROZ Trading Ltd. fraudulently chartered ROZ Trading Ltd. in Uzbekistan and reneged on its legal obligation to invest $500,000 in its startup ventures. Nematov claims ROZ defrauded its multinational partners, chiefly Procter & Gamble and Alberto Culver, by contracting to sell personal-care products in Uzbekistan, then relabelling the products and reselling them for larger profits in the United States, the United Kingdom, the United Arab Emirates and African countries. This is a largely illegal practice known as "parallel trading."

Maqsudi denies all these charges and claims they have been fabricated by the Uzbek government at the instigation of his former wife. He tells Insight in a faxed statement: "My family and our business scrupulously complied with the laws of Uzbekistan. The criminal charges against us are false. They are the direct result of an outrageous vendetta by my ex-wife and her father that has brutally victimized my extended family and our business associates." He continues: "No wrongdoing has ever been alleged against us by the government of the United States of which we are citizens and in which we have lived and done business for more than 20 years."

So who are these people around whom all this international intrigue is whirling? Until the divorce battle surfaced two years ago, they kept a low profile in their elegant family compounds in New Jersey. Most were born in Afghanistan of Uzbek ethnicity. Mansur's father, Abdurauf Maqsudi, 71, reportedly was born a peasant in Uzbekistan and moved with his family to Afghanistan where he helped his own father and other family members run a shop until the mid-1960s. The family patriarch reportedly has a fifth-grade education but today presides over a multinational financial empire based in the Cayman Islands, the United Arab Emirates, the United States and, until two years ago, Uzbekistan.

Sources contacted by Insight claim that the elder Maqsudi rose to riches on the tide of the Soviet invasion of Afghanistan in 1979. A. Zulfiqar, an opponent of the Karimov regime, published an op-ed in the newspaper ERK for Jan. 16, 1994, charging that Abdurauf Maqsudi had a long history of fraud and embezzlement. He allegedly was imprisoned in Afghanistan in 1972 for misusing funds lent to him by the government of Afghanistan and later allegedly stole millions of dollars from the regime installed in Kabul after the Soviet takeover in 1979.

According to Zulfiqar, Abdurauf Maqsudi began exporting fruit to the Soviet Union in the 1960s and after a time came under the wing of former Afghan prime minister Hoshim Sharq, who was believed to have ties to the Russian KGB. Maqsudi later was installed by the Soviets as chairman of the Afghan-Soviet Trade Council during the regime of Babrak Karmal, and in this capacity traveled frequently to Moscow, according to Zulfiqar's report and other sources contacted by Insight.

Zulfiqar claims the Soviets granted Maqsudi a bank credit worth $3 million with which he was supposed to purchase replacement parts for light machinery. They allegedly were left empty-handed when Maqsudi relocated to the United States and opened an electronic-equipment store in New York City. Mansur Maqsudi emigrated to the United States with his siblings and parents in 1979; that same year his elder brother Farid entered college in the United States. Mansur met his future wife in Tashkent in 1991 and the two were married that same year. Both earned graduate degrees from Harvard University.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B-7

All this is as fascinating as it is byzantine. But, whatever the truth, this divorce drama has wide implications for the newfound U.S.-Uzbek alliance in the war on terror. Uzbekistan emerged in early 2002 as a prized U.S. ally in its war on the Taliban in Afghanistan. President Karimov, the former Communist Party boss of Uzbekistan when it was part of the Soviet Union, welcomed U.S. troops onto his nation's air bases, where many still are stationed today. And Karimov widely is regarded as the foremost friend of the United States among the so-called "-stans" of Central Asia, as attested by his meeting with President George W. Bush last year at the White House.

As this twisted story of Dynasty on the high plains of Central Asia unfolds, it is apparent the ties that once bound a power couple at Harvard have devolved into a Gordian knot for U.S. officials who assuredly do not need further complications in that part of the world.

Douglas Burton is an associate editor for Insight magazine.

---- INDEX REFERENCES ----

COMPANY: PROCTER AND GAMBLE CO (THE); COCA COLA BOTTLING COMPANY CONSOLIDATED

NEWS SUBJECT: (Legal (1LE33); Social Issues (1SO05); Divorces (1DI23); Police (1PO98); Judicial (1JU36); Legislation (1LE97); Government (1GO80); Personal & Family Law (1PE02); World Organizations (1IN77); CIS (1CI65))

INDUSTRY: (Consumer Packaged Goods (1CO27); Personal Care & Beauty Aids (1PE87); Security (1SE29); Consumer Products & Services (1CO62))

REGION: (North America (1NO39); Europe (1EU83); Russia (1RU33); Eastern Europe (1EA48); Iraq (1IR87); Arab States (1AR46); Western Asia (1WE54); Afghanistan (1AF45); Central Asia (1CE93); Americas (1AM92); New Jersey (1NE70); United Arab Emirates (1UA66); Asia (1AS61); Uzbekistan (1UZ71); Middle East (1MI23); USA (1US73))

Language: EN

OTHER INDEXING: (AFGHAN; AFGHAN SOVIET TRADE COUNCIL; AFGHANISTAN; BABRAK KARMAL; COCA COLA; COCA COLA BOTTLING CO; DEPARTMENT OF JUSTICE; ERK; FZE; HARVARD; HARVARD UNIVERSITY; HOUSE ARMED SERVICES COMMITTEE; INSIGHT; IRAQ; IRS; JUSTICE DEPARTMENT; JUSTICE MINISTRY; MAQSUDIS; MONGOL CHIEFS OF TAMERLANE; PROCTER GAMBLE; REPUBLICAN; ROSES; ROZ; ROZ GROUP; ROZ TRADING LTD; SADDAM HUSSEIN; SADDAM HUSSEINS IRAQ; SOVIETS; TRADING; TRADING LTD; US UZBEKISTAN CONGRESSIONAL WORKING GROUP; US DEPARTMENT OF JUSTICE; UZBEK; UZBEKISTAN; UZBEKISTAN LTD; VALUELINK; WHITE HOUSE) (A. Zulfiqar; Abdurauf; Abdurauf Maqsudi; Alberto Culver; Ashcroft; Curt Weldon; Daddy; Douglas Burton; Drama; Farhod Inogambaev; George W. Bush; Gulnara; Hoshim Sharq; Inogambaev; Islam Karimov; John Ashcroft; Karimov; Khamidjon Nematov; Mansur; Mansur Maqsudi; Maqsudi; Nematov; Rashitjon Kadirov; Richard Zimmer; Robert Torricelli; Scant; Utkir Kamilov; Weldon; Zimmer; Zulfiqar)

Word Count: 2612
9/1/03 INSGHT 50
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-8**

The Embassy of Afghanistan, Washington, DC



*The Embassy of Afghanistan*
WASHINGTON DC

**Media Center**

Embassy Press Releases

Government Press Releases

Embassy in the News

Contacts for Media

your email here



**Embassy Press Releases**

**Afghan Businessmen Raise $20 Million for Rebuilding Afghanistan**
**The Embassy of Afghanistan**

10/03/2005

Washington, D.C. – Members of the Afghan Business Council-Dubai, Afghan-American Chamber of Commerce, and Afghanistan International Chamber of Commerce met on September 26, 2005 in Dubai to invest personally in the economic future of Afghanistan. The participants endorsed investment in the economic opportunities of Afghanistan by creating a company which will issue stock for the price of $500,000 per share. The "founding members" adopted the name, Afghan Investment Company (AIC), to be registered in Afghanistan. With enormous enthusiasm, an initial equity capital of $20 million was raised to bring large scale investment into Afghanistan.

The founding members have elected prominent international businessmen Nassrullah Rahmat as Chairman, Farid Maqsudi and Sherkhan Farnood as Vice Chairmen, and Mahmood Karzai as the Spokesman of AIC for the first year of operation. Chairman Rahmat said, "We just decided that certain things needed to happen were not happening and that we needed to do them quickly." "We appreciate the work of the donor nations, NGOs and the government, but it is difficult for them to move fast and Afghanistan does not have time to spare," he added.

The establishment of the Afghan Investment Company has already attracted over 80 Afghan businessmen investing a minimum of $500,000 each for economic development in Afghanistan. Spokesman Karzai stated: "We have just started. Our goal is a $100 million fund. That's already a lot of private money for Afghanistan." He added, "If one begins to consider the leveraging effect of that money with banks and international financial institutions, the final investment could be well over $500 million dollars."

The Afghan Investment Company's first decision is to stimulate investment of over $100 million in two related areas: coal mining and cement. It will build the first modern and high-capacity cement plant in Afghanistan. The coal would fuel the cement plant. Currently almost all cement and coal are imported as Afghanistan is in the midst of a construction boom.

Contact:
M. Ashraf Haidari

The Embassy of Afghanistan, Washington, DC

(202) 483-6410, (Ex-811)
Haidari@embassyofafghanistan.org

# # #

Home | Contact Us | Sitemap

© 2006 Embassy of Afghanistan and GlobeScope Inc. All Rights Reserved.

ARC: About Us

**ARC** Afghanistan Reconstruction Company, LLC

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

## Working to Rebuild Afghanistan

Afghanistan Reconstruction Company, LLC ("ARC") is bringing international resources together with Afghan business and nonbusiness leaders to help rebuild Afghanistan's economy. ARC has attracted a core of experienced businessmen committed to reconstructing Afghanistan's physical infrastructure and reviving Afghan business and commercial institutions. ARC is currently establishing an extensive network throughout the country founded on maximizing local Afghan participation.

ARC is controlled by several members of the Afghan diaspora in USA, Europe and Middle East with a distinguished Afghan heritage. ARC has already deployed a large amount of capital through several projects. ARC fully intends to deploy additional capital of its own and to attract both public and private capital to the rebuilding task ahead.

- **ARC CONSTRUCTION COMPANY, LLC.**
  Together with one of Turkey's largest construction companies, ARC has established ARC Construction Company LLC to perform infrastructure reconstruction throughout Afghanistan. ARC Construction has a wide range of heavy construction equipment as well as stone crushing plants, asphalt plant, concrete batching plants, and trained personnel in Afghanistan and is currently engaged in major projects including the Kabul-Kandahar road project. Together with local contractors, ARC Construction aims to bridge local content with global resources by using its extensive country knowledge and capability. ARC Construction is committed to bringing the expertise and resources necessary during the reconstruction process.

- **AFGHANISTAN INTERNATIONAL BANK.**
  Afghanistan International Bank has commenced operations in March 2004 out of its headquarters in Kabul. Dutch bank **ING** is managing Afghanistan International Bank (AIB) and is providing senior management executives. An ARC affiliated project, AIB has initially been capitalized at US $10 million and is comprised of a consortium of Afghan and American investors. The **Asian Development Bank (ADB)** has also shown interest to take a stake as a potential partner in the bank. Afghanistan International Bank is one of the first home-grown Afghan commercial banks to be set up in the last 23

years. The bank aims to become a model bank in Afghanistan, established and managed in accordance with international best practices. Afghanistan International Bank expects to evolve into a fully operational commercial bank, and initially will provide trade finance services, payment transfers and take deposits from small and medium sized enterprises. The bank will also introduce lending products for both foreign corporations and local small and medium sized enterprises.

• **LIA GROUP INTERNATIONAL**
ARC has joined forces with Limak and Ictas, both recognized industry leaders to form LIA Group International, it's most recent project, includes the Kabul- Doshi road, of which LIA will repair the section from Salang - Doshi. Repair work on the 175 kilometer Kabul- Doshi road has started under the World Bank- financed **Emergency Transport Rehabilitation Project.** Under the project, which will be largely completed by the end of October, 2004, and fully completed by February 2005, around 800 Afghans including engineers and laborers will find employment opportunities.

These are only examples of the projects currently being pursued by ARC. Afghanistan's economy and infrastructure have been largely destroyed and virtually everything needs to be rebuilt. ARC therefore intends to undertake projects across a broad spectrum. In carrying out its activities, ARC will seek to employ and train Afghan citizens and help build viable local institutions that can contribute to the goals of a peaceful and democratic Afghan society.

ARC : Management

# ARC Afghanistan Reconstruction Company, LLC.

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

## Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team brings strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

**President:** Farid Maqsudi
**Executive Vice President:** M. Zaher Yaqubie
**Vice President:** Glenn Simpson
**Business Development Director:** Gokhan Erkal

B-13

ARC: Projects



**ARC** Afghanistan Reconstruction Company, LLC

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

ARC Projects



Kabul-Kandahar
Highway Project



Asphalt Plant



Stone Crushing
Plant




ARC Foundation

Afghanistan
International Bank

Kabul-Doshi
Highway Project



ARC: Foundation

**ARC Foundation** values the opportunity to participate in the rebuilding of Afghanistan and to serve the communities in which ARC Companies operate. At ARC, helping to rebuild for the future is one of the founding principals of our company, and our involvement with the communities that surround our projects and offices is a critical component of our work.

Investments in our communities and education started with the inception of our company, and with the creation of ARC Foundation have continued to grow. We are proud of our employee's participation in efforts to help local Afghan

communities through the volunteering of their time and knowledge, as well as with the support of resources from ARC Foundation. We consider it a privilege to serve our communities and invite you to learn more about our community involvement programs that include **Education Partnerships and Gifts for Higher Education, Youth Recreational Projects, Clean Water Initiatives, Community Development & Public Infrastructure Improvement Programs.**

**Education:**

- ARC at the very beginning of it's inception recognized that a quality education ushers a lifetime of opportunities, and that Afghanistan's educational institutions would be the main factor in making sure that Afghanistan would be able to help it's own people rebuild and sustain long term development. ARC has taken an active role, contributing to assist the Ministry of Higher Education to strengthen development for teachers and build the capacity of schools, universities and communities to educate the citizens and workforce of tomorrow.

- As construction was first started on the Kabul- Kandahar highway near the town of Durani, ARC recognized that a ARC Construction and the local Afghan community would both be able to work together to help in the reconstruction process. The current ARC camp site was built at Durani and features a new building with 11 rooms, modern facilities w/ kitchens and bathrooms, and at the close of project completion is to be been donated to the local school district to be used as a girl's school.

**Youth Recreational Projects:**

- Three main high schools in Kabul are currently undergoing improvements to it's recreational facilities, with the addition of new equipment and sports facilities. ARC Foundation recognizes the importance of helping to assist Afghanistan's educational institutions, and at the same time is happy to implement projects that will allow kids to just "have fun". Improvements such as basketball courts or playgrounds will allow the youth attending these schools to have access to facilities previously unavailable.

**Clean Water Initiatives:**

- Clean Drinking water continues to be a major concern in Kabul and surrounding areas of Afghanistan that have recently faced years of drought. ARC foundation has committed to assist local communities to address this problem, with work beginning in a local village in Kabul on a new deep well with pumps to provide a clean and reliable source of water.

- Local Villages throughout Afghanistan, a clean and reliable source of water is vital to the well being of individuals. Along areas of the Kabul- Kandahar highway, ARC Foundation is pleased to be able to assist in the cleaning and rehabilitation of natural streams that are used by local villages.

**Community Development and Public Infrastructure Programs:**

- A wide range of activities are taking place to help communities in Afghanistan unite and to assist with highly needed improvements to surrounding public infrastructure. These activities include the construction or renovation of mosques, to educate and take a role as community centers in areas close to ARC locations in Kabul as well as near the highway construction site,

- The construction of a new sewage septic tank for waste water and bath houses in the Microyan neighborhood of

Kabul, with construction completion expected through summer.

* Paving and rehabilitation of sections of road in Kabul, expected to begin and continue through the summer season, allowing ARC to use it's expertise and facilities to help in the improvement of the public infrastructure,

* Renovations and Painting to buildings or sections of buildings in Kabul.

ARC Foundation will continue with it's best efforts to practice a proactive philanthropy that develops innovative, pace-setting programs that have an unlimited multiplier effect, and continues to see innovative ways to respond to pressing needs that deliver tangible results. Please free feel to contact us at contact@afghanrc.com to discuss any ideas or opportunities to help in any of the above mentioned fields or to discuss working with ARC Foundation in any other activities that will assist to make communities stronger in Afghanistan and all over the world.

**B-17**

ARC : Images

ARC Afghanistan Reconstruction Company, LLC

Images of ARC Activities in Afghanistan



About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

B-18





ARC : News

**ARC** Afghanistan Reconstruction Company, LLC

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

News

## US Agency for International Development (USAID) -

Date: 10 Nov 2002

### ...for Kabul-Kandahar-Herat highway reconstruction project

Kabul, AFGHANISTAN - On Sunday, November 10, Afghanistan's President Hamid Karzai and U.S. Ambassador Robert P. Finn officiated a ground breaking ceremony to mark the first day of construction of Afghanistan's main highway, known as Highway 1, from Kabul to Kandahar to Herat. U.S. Agency for International Development (USAID) Mission Representative in Kabul, Elisabeth Kvitashvili, attended, as well as representatives of co-funding partners Saudi Arabia and Japan will attend.

Reconstruction of the more than 1,000 kilometer highway will take an estimated 36 months to complete and will employ thousands of Afghans. The project will cost an estimated $250 million; $180 million has been pledged to date from the United States, Japan and Saudi Arabia.

### The U.S. Commitment

The United States will provide $80 million through the USAID. This includes USAID funding for de-mining efforts along the highway, which will be carried out by the United Nations Mine Action Center.

"We'll help develop a modern infrastructure so that Afghan entrepreneurs will be able to move products from one city to the next, and so that people will be able to find work, they'll be able to put food on the table," pledged U.S. President George Bush. Afghan President Hamid Karzai has stated that reconstruction for the country's principal road system is key to Afghanistan's economic recovery.

The U.S. - supported reconstruction begins south of Kabul. When winter weather conditions require suspension of work on the Kabul to Kandahar portion, USAID will commence work on the Kandahar to Herat portion. This will allow for year-round construction.

*Engineering design and supervision services are provided by the Louis Berger Company. Afghan Reconstruction Company (ARC) is responsible for construction of the initial 49 kilometers of the road.*

**B-20**

ARC :: News

**A Collaborative Effort**

In collaboration with the Islamic Transitional Government of Afghanistan, the United States, Japan, and the Kingdom of Saudi Arabia agreed in September to reconstruct the highway. The Japanese government is expected to contribute $50 million and the Kingdom of Saudi Arabia $50 million. The Japanese government will begin its reconstruction operations from Kandahar to Kabul by the end of the year.

*For more information on USAID activities in Afghanistan, please visit www.usaid.gov/afghanistan.*

*The U.S. Agency for International Development has provided economic and humanitarian assistance worldwide for more than 40 years.*

Contact: USAID Press Office
WASHINGTON, DC 20523
(202) 712-4320

--------------------

**Afghanistan hopes new road will boost trade, discourage bandits**

Associated Press
November 10, 2002
By Todd Pitman

Kabul, Afghanistan - Construction of a major new road linking Afghanistan's capital to the far west of the country began Sunday - a long-awaited project President Hamid Karzai said was expected to boost regional trade and discourage banditry.

The United States has pledged $80 million to help rebuild the 745-mile road from Kabul to the southern city of Kandahar and on to Herat in the west. Saudi Arabia and Japan pledged $50 million each.

Rebuilding Afghanistan's highways, along with providing electricity and education, has been a government priority ever since international donors pledged $4.5 billion in January, Karzai said.

"The strongest of these priorities was the reconstruction of highways, and I'm glad that we've done something today about that," Karzai said under a tent set up by the roadside at Durani, 26 miles from Kabul.

"It will take less time for people to travel, and the bandits won't have time to stop the cars or rob them," Karzai said.

The road, known as Highway 1, is expected to take three years to complete and cost a total of $250 million. The government is hoping donors will chip in the remaining $70 million.

**The Afghan Reconstruction Company** *is responsible for building the first 30 miles of the road, while the Louis Berger Group, a U.S. engineering firm, will provide engineering design and supervision services.*

Diplomats from the United States, Saudi Arabia and Japan, along with Finance Minister Ashraf Ghani, attended Sunday's ceremony, held under tight security.

U.S. Ambassador Robert P. Finn said America has repaired 2,360 miles of roads in Afghanistan since December, shortly after the Taliban regime was overthrown in the U.S.-led war on terror.

"Over the next three years, this project will employ thousands of Afghans and improve the lives of millions more," Finn said. "The different parts of the Afghan family will draw closer together and opportunities for trade, communication and industry will increase."

The Kabul-to-Herat road was repaved 36 years ago. But it was destroyed in fighting that began with the Soviet invasion in 1979, Finn said.

Roads are of particular importance to Afghanistan because the country is landlocked and has no other way to trade with its neighbors.

Italy pledged $50 million to rebuild a key road from Kabul to the central city of Bamiyan, and the European Union has started work on a road from Kabul to Jalalabad in the east, Karzai said.

Iran was building a road that runs west from Herat toward the Iranian border, while the Asian Development Bank was helping to finance a road from Kandahar to Spinboldak on the Pakistan border, Karzai said.

ARC : Links

**ARC** Afghanistan Reconstruction Company, LLC

As part of ARC's ongoing commitment to assisting in the rebuilding of Afghanistan, we have compiled a list of some resourceful links.

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

## U.S. Government
Council of Foreign Relations
Overseas Private Investment Corporation
U.S. Agency for International Development
U.S. Department of State
U.S. Trade and Development Agency
Export - Rebuilding Afghanistan
Export-Import Bank of the United States
Afghanistan Engineer District

## Afghan Government
A New Constitution, A New Challenge
Afghan Assistance Coordination Authority
Embassy of Afghanistan in Washington, DC
Ministry of Communications

## International Organizations
Asian Development Bank
World Bank
United Nations Development Programme

## News
Afgha Press Agency
e-Ariana

**B-23**

Afghan Daily
Afghan News Channel
CNN - Rebuilding Afghanistan
The Washington Post - Afghanistan

**Maps**

Afghanistan Maps, Geography, and Data
Afghanistan Refugee and Migration Map
City, country, thematic maps of Afghanistan

**Other**

U.S.-Afghan Women's Council - *The Council seeks to help reintegrate women into Afghan society and to prepare them for positions of management and leadership. "new"*

Development Gateway - Afghanistan Reconstruction - *Includes a comprehensive database on projects in Afghanistan and links to resources about Afghanistan.*

ARC : Employment Opportunities

**ARC** Afghanistan Reconstruction Company, LLC

**Employment Opportunities**

Finance Manager - Kabul Afghanistan - International
HR Manager - Kabul Afghanistan - International
COO - Kabul Afghanistan - International

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

**B-25**

Contact Information

**ARC** Afghanistan Reconstruction Company, LLC

About Us
Management
Projects
ARC Foundation
 Images
 News
 Links
Employment
Contact Us

Contact Us

**Main Office:**
Afghanistan Reconstruction Company, LLC.
230 Park Ave., Suite 1525
New York, NY 10169

tel:     212.682.9130
fax:     212.682.9133
email:   contact@afghanrc.com

**Kabul Office:**
ARC Construction Company, LLC.
Wazir Akbar Khan
Street 10, House 53
Kabul, Afghanistan

tel:     (93)20.210.0035
fax:     (93)20.210.0036

*Mr. Zaher Yaqubie - Executive Manager*
*tel:     (93)70.27.9512*
*e-mail:   Zaher.Yaqubie@afghanrc.com*
*Mr. Gokhan Erkal - Business Development Director*
*tel: (93).70.28.9942*
*e-mail: Gokhan.Erkal@afghanrc.com*

http://www.afghanrc.com/id22.htm10/11/2007 10:58:51 AM

**B-26**

ARC :: Bank Project :: 1



ARC Afghanistan Reconstruction Company, LLC

back

**AIB** managed by ING 🦁 AFGHANISTAN INTERNATIONAL BANK

## ING Says Afghanistan International Bank Starts Operations

DOW JONES NEWSWIRES
Edited Press Release
AMSTERDAM -- Dutch bank and insurer ING Groep NV (ING) said Friday that the Afghanistan International Bank has commenced operations after receiving an approved business licence on March 22, 2004. The bank is managed by ING-IGA on behalf of the consortium.

Operating from its headquarters in Kabul, the bank will initially provide facilities for inward and outward remittances as well as cashier services, current account and checking facilities. Within a few months, the bank intends to make available trade finance and short/medium term loans to corporate clients. In the second half of this year, customers will be able to access their accounts through an ATM network and enjoy e-banking facilities.

John Haye, Chief Executive Officer of the Afghanistan International Bank, stated: "We will be managing the bank according to international best practice and the highest standards of corporate governance. In providing exclusive services such as lending and e-banking to our local customers, in addition to the more traditional banking products, the Afghanistan International Bank is looking not only to support multilateral and international agencies operating in Afghanistan and the local business community, but also provide for the financing needs of overseas-based Afghan nationals, as they look to repatriate money from around the world."

ING-IGA is mandated to manage the bank for an initial three-year period, providing senior management executives, including a Chief Executive Officer and Chief Operating Officer. Initially capitalised at US$10 million, the consortium of Afghan and American business group operating investors includes Afghanistan Reconstruction Companies, Rahmat Group, and Mohib Group, while the Asian Development Bank is also interested in taking an equity stake in the bank. The Overseas Private Investment Corporation is currently in negotiations with the Afghanistan

ARC : Bank Project : 1

International Bank to provide a supporting role to the bank's operations.
Company website: http://www.ing.com

## Dutch bank sets up shop in Kabul
BBC NEWS
*Dutch banking group ING has become the third foreign bank to open a branch in the Afghan capital, Kabul.*
ING is setting up and managing the Afghanistan International Bank on behalf of a consortium of Afghan and US investors. Initially the AIB will provide current account services and offer remittances, adding a further legal channel for Afghans to receive money from abroad.

Pakistan National Bank and Standard Chartered already operate in Kabul.

"AIB is looking not only to support multilateral and international agencies and the local business community, but also provide for the financing needs of overseas-based Afghan nationals as they look to repatriate money from around the world," said John Haye, the bank's chief executive.

The bank opened its doors on 26 March, having received a licence earlier that week.

## Plans
ING's initial responsibility to the investors - who are capitalising the AIB at $10m with the possibility of further money from the Asian Development Bank - is a three-year commitment to running the bank and providing senior executives.

Later in 2004, the bank hopes to open ATMs and offer online banking facilities, which may again reduce the demand for informal hawaladars, or remittance merchants. After the first year, the plan is to add further branches outside Kabul, although that may depend on the security situation.

ING has long experience of running banks on behalf of governments and other bodies in developing countries, via its Institutional and Government Advisory Group. The group is already working in Indonesia, Mongolia and Vietnam, among other countries.

**B-28**

ARC : Management

**ARC** Afghanistan Reconstruction Company, LLC

back    Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team brings strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

**Dr. M. Ishaq Nadiri, Chairman** : emigrated from Afghanistan to the United States at the age of 19 and received his B.S. from the University of Nebraska, and his M.A. and Ph.D. from the University of California, Berkeley. He has taught at UC Berkeley, Northwestern University, University of Chicago, and Columbia University. He joined New York University in 1970 and has been the chairperson of the Economics Department and director of the C. V. Starr Center for Applied Economics. He is currently a Jay Gould Professor of Economics at New York University. Professor Nadiri was a signatory of the 2001 Bonn meetings where the interim government of Afghanistan was created; a participant in the Tokyo meetings focused on funding Afghanistan's reconstruction, the White House and UN Security Council meetings during Hamid Karzai's visit in January 2002, and the Loya Jirga in Kabul in June 2002 that resulted in Hamid Karzai's election as president. Professor Nadiri serves as Senior Economic Advisor to President Karzai.
email:    INadiri@ARCcompanies.com

**Mr. Timothy M. Lane, Vice Chairman** : is an experienced international businessman, having served as CEO of PepsiCo Restaurants International for Asia and the Middle East, a business which he expanded from $200 million to $2.5 billion from the late 80's to the mid 90's. Later he served as CEO of Holiday Inn Worldwide.
e-mail: TLane@ARCcompanies.com

**Farid A. Maqsudi, President** : is an Afghan-born, naturalized American citizen with an MBA from the University of Chicago. Mr. Maqsudi has over 18 years of business experience in the US and developing countries. For the past decade, he has run a successful Central Asian trading and investment company.
e-mail: FMaqsudi@ARCcompanies.com

**B-29**

M. Zaher Yaqubie, Executive Vice President : is an Afghan born, naturalized American citizen. For the past 20 years, Mr. Yaqubie has been able to compliment Eastern business philosophy with Western resources to successfully manage a diversified international trading company. In addition to the vast global business experience, Mr. Yaqubie is also a well-respected member of the greater Afghan population. He serves on the Board of several organizations, including a non-profit organization promoting greater cultural awareness for Afghan-Americans.

e-mail: ZYaqubie@ARCcompanies.com

Glenn Simpson, Vice President : has 20 years of financial and executive management experience with six years in Central Asian and Russia. Mr. Simpson was Vice President and Chief Financial Officer of ZCorum, Inc. an internet technology company in Atlanta, Georgia. Prior to this Mr. Simpson was Vice President and Chief Financial Officer of Coca-Cola Bottlers and its holding company, ROZ Group, in Uzbekistan. Mr. Simpson, a Certified Public Accountant, received an MBA from Columbia University.

e-mail: GSimpson@ARCcompanies.com

Gokhan Erkal, Business Development Director : has a good banking and finance experience in financial institutions in London, emerging markets, particularly Central Asia and Middle East. He is specialized in project finance and development. He worked as a consultant in CIS for international banking and development projects with institutions like EBRD, TACIS and has good understanding of emerging markets. He also worked in London, Luxembourg as banker. He was a vice president for Project Finance at Garanti Bank before joining ARC and worked closely with construction companies, investors and international institutions. He graduated from French high school and has a civil engineering degree and MBA degree on finance and marketing.

email:     GErkal@ARCcompanies.com

tel: +93 70289942
int. mobile: +90 532 5666342
dubai mobile: +971 505521347

**B-30**

ARC : Management

**B-31**

ARC : Management

**ARC** Afghanistan Reconstruction Company, LLC

back     Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team brings strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

**Dr. M. Ishaq Nadiri, Chairman** : emigrated from Afghanistan to the United States at the age of 19 and received his B.S. from the University of Nebraska, and his M.A. and Ph.D. from the University of California, Berkeley. He has taught at UC Berkeley, Northwestern University, University of Chicago, and Columbia University. He joined New York University in 1970 and has been the chairperson of the Economics Department and director of the C. V. Starr Center for Applied Economics. He is currently a Jay Gould Professor of Economics at New York University. Professor Nadiri was a signatory of the 2001 Bonn meetings where the interim government of Afghanistan was created; a participant in the Tokyo meetings focused on funding Afghanistan's reconstruction, the White House and UN Security Council meetings during Hamid Karzai's visit in January 2002, and the Loya Jirga in Kabul in June 2002 that resulted in Hamid Karzai's election as president. Professor Nadiri serves as Senior Economic Advisor to President Karzai.
email:     INadiri@ARCcompanies.com

**Mr. Timothy M. Lane, Vice Chairman** : is an experienced international businessman, having served as CEO of PepsiCo Restaurants International for Asia and the Middle East, a business which he expanded from $200 million to $2.5 billion from the late 80's to the mid 90's. Later he served as CEO of Holiday Inn Worldwide.
e-mail: TLane@ARCcompanies.com

**Farid A. Maqsudi, President** : is an Afghan-born, naturalized American citizen with an MBA from the University of Chicago. Mr. Maqsudi has over 18 years of business experience in the US and developing countries. For the past decade, he has run a successful Central Asian trading and investment company.
e-mail: FMaqsudi@ARCcompanies.com

B-32

ARC : Management

M. Zaher Yaqubie, Executive Vice President : is an Afghan born, naturalized American citizen. For the past 20 years, Mr. Yaqubie has been able to compliment Eastern business philosophy with Western resources to successfully manage a diversified international trading company. In addition to the vast global business experience, Mr. Yaqubie is also a well-respected member of the greater Afghan population. He serves on the Board of several organizations, including a non-profit organization promoting greater cultural awareness for Afghan-Americans.
e-mail: ZYaqubie@ARCcompanies.com

Glenn Simpson, Vice President : has 20 years of financial and executive management experience with six years in Central Asian and Russia. Mr. Simpson was Vice President and Chief Financial Officer of ZCorum, Inc. an internet technology company in Atlanta, Georgia. Prior to this Mr. Simpson was Vice President and Chief Financial Officer of Coca-Cola Bottlers and its holding company, ROZ Group, in Uzbekistan. Mr. Simpson, a Certified Public Accountant, received an MBA from Columbia University.
e-mail: GSimpson@ARCcompanies.com

Gokhan Erkal, Business Development Director : has a good banking and finance experience in financial institutions in London, emerging markets, particularly Central Asia and Middle East. He is specialized in project finance and development. He worked as a consultant in CIS for international banking and development projects with institutions like EBRD, TACIS and has good understanding of emerging markets. He also worked in London, Luxembourg as banker. He was a vice president for Project Finance at Garanti Bank before joining ARC and worked closely with construction companies, investors and international institutions. He graduated from French high school and has a civil engineering degree and MBA degree on finance and marketing.
email:     GErkal@ARCcompanies.com

tel: +93 70289942
int. mobile: +90 532 5666342
dubai mobile: +971 505521347

**B-33**

ARC : Management

**B-34**

ARC : Management

**ARC** Afghanistan Reconstruction Company, LLC

<u>back</u>   Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team brings strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

Dr. M. Ishaq Nadiri, Chairman : emigrated from Afghanistan to the United States at the age of 19 and received his B.S. from the University of Nebraska, and his M.A. and Ph.D. from the University of California, Berkeley. He has taught at UC Berkeley, Northwestern University, University of Chicago, and Columbia University. He joined New York University in 1970 and has been the chairperson of the Economics Department and director of the C. V. Starr Center for Applied Economics. He is currently a Jay Gould Professor of Economics at New York University. Professor Nadiri was a signatory of the 2001 Bonn meetings where the interim government of Afghanistan was created; a participant in the Tokyo meetings focused on funding Afghanistan's reconstruction, the White House and UN Security Council meetings during Hamid Karzai's visit in January 2002, and the Loya Jirga in Kabul in June 2002 that resulted in Hamid Karzai's election as president. Professor Nadiri serves as Senior Economic Advisor to President Karzai.
email:    <u>INadiri@ARCcompanies.com</u>

Mr. Timothy M. Lane, Vice Chairman : is an experienced international businessman, having served as CEO of PepsiCo Restaurants International for Asia and the Middle East, a business which he expanded from $200 million to $2.5 billion from the late 80's to the mid 90's. Later he served as CEO of Holiday Inn Worldwide.
e-mail: <u>TLane@ARCcompanies.com</u>

Farid A. Maqsudi, President : is an Afghan-born, naturalized American citizen with an MBA from the University of Chicago. Mr. Maqsudi has over 18 years of business experience in the US and developing countries. For the past decade, he has run a successful Central Asian trading and investment company.
e-mail: <u>FMaqsudi@ARCcompanies.com</u>

http://www.afghanarc.com/id67_simpson.htm (1 of 3)10/11/2007 10:58:54 AM

**B-35**

M. Zaher Yaqubie, Executive Vice President : is an Afghan born, naturalized American citizen. For the past 20 years, Mr. Yaqubie has been able to compliment Eastern business philosophy with Western resources to successfully manage a diversified international trading company. In addition to the vast global business experience, Mr. Yaqubie is also a well-respected member of the greater Afghan population. He serves on the Board of several organizations, including a non-profit organization promoting greater cultural awareness for Afghan-Americans.
e-mail: ZYaqubie@ARCcompanies.com

Glenn Simpson, Vice President : has 20 years of financial and executive management experience with six years in Central Asian and Russia. Mr. Simpson was Vice President and Chief Financial Officer of ZCorum, Inc. an internet technology company in Atlanta, Georgia. Prior to this Mr. Simpson was Vice President and Chief Financial Officer of Coca-Cola Bottlers and its holding company, ROZ Group, in Uzbekistan. Mr. Simpson, a Certified Public Accountant, received an MBA from Columbia University.
e-mail: GSimpson@ARCcompanies.com

Gokhan Erkal, Business Development Director : has a good banking and finance experience in financial institutions in London, emerging markets, particularly Central Asia and Middle East. He is specialized in project finance and development. He worked as a consultant in CIS for international banking and development projects with institutions like EBRD, TACIS and has good understanding of emerging markets. He also worked in London, Luxembourg as banker. He was a vice president for Project Finance at Garanti Bank before joining ARC and worked closely with construction companies, investors and international institutions. He graduated from French high school and has a civil engineering degree and MBA degree on finance and marketing.
email:   GErkal@ARCcompanies.com
tel: +93 70289942
int. mobile: +90 532 5666342
dubai mobile: +971 505521347

**B-36**

**B-37**

http://www.afghanrc.com/id67_simpson.htm (3 of 3)10/11/2007 10:58:54 AM

**ARC** Afghanistan Reconstruction Company, LLC

back

## Management Team

ARC is a Delaware limited liability company, established in November 2001. Its initial management team brings strong skills to its business and it fully intends to expand staff in the US, Afghanistan and elsewhere as necessary to support the business opportunities which present themselves.

**Dr. M. Ishaq Nadiri, Chairman :** emigrated from Afghanistan to the United States at the age of 19 and received his B.S. from the University of Nebraska, and his M.A. and Ph.D. from the University of California, Berkeley. He has taught at UC Berkeley, Northwestern University, University of Chicago, and Columbia University. He joined New York University in 1970 and has been the chairperson of the Economics Department and director of the C. V. Starr Center for Applied Economics. He is currently a Jay Gould Professor of Economics at New York University. Professor Nadiri was a signatory of the 2001 Bonn meetings where the interim government of Afghanistan was created; a participant in the Tokyo meetings focused on funding Afghanistan's reconstruction, the White House and UN Security Council meetings during Hamid Karzai's visit in January 2002, and the Loya Jirga in Kabul in June 2002 that resulted in Hamid Karzai's election as president. Professor Nadiri serves as Senior Economic Advisor to President Karzai.
email:    INadiri@ARCcompanies.com

**Mr. Timothy M. Lane, Vice Chairman :** is an experienced international businessman, having served as CEO of PepsiCo Restaurants International for Asia and the Middle East, a business which he expanded from $200 million to $2.5 billion from the late 80's to the mid 90's. Later he served as CEO of Holiday Inn Worldwide.
e-mail:  TLane@ARCcompanies.com

**Farid A. Maqsudi, President :** is an Afghan-born, naturalized American citizen with an MBA from the University of Chicago. Mr. Maqsudi has over 18 years of business experience in the US and developing countries. For the past decade, he has run a successful Central Asian trading and investment company.
e-mail:  FMaqsudi@ARCcompanies.com

**B-38**

M. Zaher Yaqubie, Executive Vice President : is an Afghan born, naturalized American citizen. For the past 20 years, Mr. Yaqubie has been able to compliment Eastern business philosophy with Western resources to successfully manage a diversified international trading company. In addition to the vast global business experience, Mr. Yaqubie is also a well-respected member of the greater Afghan population. He serves on the Board of several organizations, including a non-profit organization promoting greater cultural awareness for Afghan-Americans.
e-mail: ZYaqubie@ARCcompanies.com

Glenn Simpson, Vice President : has 20 years of financial and executive management experience with six years in Central Asian and Russia. Mr. Simpson was Vice President and Chief Financial Officer of ZCorum, Inc. an internet technology company in Atlanta, Georgia. Prior to this Mr. Simpson was Vice President and Chief Financial Officer of Coca-Cola Bottlers and its holding company, ROZ Group, in Uzbekistan. Mr. Simpson, a Certified Public Accountant, received an MBA from Columbia University.
e-mail: GSimpson@ARCcompanies.com

Gokhan Erkal, Business Development Director : has a good banking and finance experience in financial institutions in London, emerging markets, particularly Central Asia and Middle East. He is specialized in project finance and development. He worked as a consultant in CIS for international banking and development projects with institutions like EBRD, TACIS and has good understanding of emerging markets. He also worked in London, Luxembourg as banker. He was a vice president for Project Finance at Garanti Bank before joining ARC and worked closely with construction companies, investors and international institutions. He graduated from French high school and has a civil engineering degree and MBA degree on finance and marketing.
email:    GErkal@ARCcompanies.com

tel: +93 70289942
int. mobile: +90 532 5666342
dubai mobile: +971 505521347

**B-39**

ARC : Projects : Kabul-Kandahar Highway Project

**ARC** Afghanistan Reconstruction Company, LLC

About Us
Management
\* Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

## Kabul Kandahar Highway Project

Work has begun on the road construction, with grading and compacting, as well as base preparation under way that has already significantly reduced travel times and are essential parts to completing and delivering a high quality road for the use of the Afghan people. We can also say that much needed infrastructure equipment that did not previously exist in Kabul, such as state of the art Asphalt Plants and Stone Crushing Plants have been recently assembled and will be an integral part to allow road construction to progress and be completed, and also to assist in the long term development of road infrastructure in Afghanistan with the plants providing much needed capacity to be able to produce stones for road bases and asphalt for surfaces.

Essential road preparation works will continue for ARC's portion of the 1st 49 kilometers of the Kabul Kandahar highway and asphalting progress during the summer and be completed by the end of 2003.



ARC : Projects : Asphalt Plant

**ARC** Afghanistan Reconstruction Company, LLC

Asphalt Plant



About Us
Management
* Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

http://www.afghanrc.com/id72.htm10/11/2007 10:58:56 AM

**B-42**

ARC : Projects : Asphalt Plant

Afghanistan Reconstruction Company, LLC

Stone Crushing Plant



About Us
Management
* Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

http://www.afghanrc.com/id122.htm10/11/2007 10:58:57 AM

**B-43**

ARC : Bank Project : 1



**ARC** Afghanistan Reconstruction Company, LLC

back

managed by ING

AFGHANISTAN INTERNATIONAL BANK

**ING Says Afghanistan International Bank Starts Operations**

DOW JONES NEWSWIRES
Edited Press Release

AMSTERDAM – Dutch bank and insurer ING Groep NV (ING) said Friday that the Afghanistan International Bank has commenced operations after receiving an approved business licence on March 22, 2004. The bank is managed by ING-IGA on behalf of the consortium.

Operating from its headquarters in Kabul, the bank will initially provide facilities for inward and outward remittances as well as cashier services, current account and checking facilities. Within a few months, the bank intends to make available trade finance and short/medium term loans to corporate clients. In the second half of this year, customers will be able to access their accounts through an ATM network and enjoy e-banking facilities.

John Haye, Chief Executive Officer of the Afghanistan International Bank, stated: "We will be managing the bank according to international best practice and the highest standards of corporate governance. In providing exclusive services such as lending and e-banking to our local customers, in addition to the more traditional banking products, the Afghanistan International Bank is looking not only to support multilateral and international agencies operating in Afghanistan and the local business community, but also provide for the financing needs of overseas-based Afghan nationals, as they look to repatriate money from around the world."

ING-IGA is mandated to manage the bank for an initial three-year period, providing senior management executives, including a Chief Executive Officer and Chief Operating Officer. Initially capitalised at US$10 million, the consortium of Afghan and American business group operating investors includes Afghanistan Reconstruction Companies, Rahmat Group, and Mohib Group, while the Asian Development Bank is also interested in taking an equity stake in the bank. The Overseas Private Investment Corporation is currently in negotiations with the Afghanistan

**B-44**

ARC :: Bank Project :: 1

International Bank to provide a supporting role to the bank's operations.
Company website: http://www.ing.com

Dutch bank sets up shop in Kabul
BBC NEWS
*Dutch banking group ING has become the third foreign bank to open a branch in the Afghan capital, Kabul.*
ING is setting up and managing the Afghanistan International Bank on behalf of a consortium of Afghan and US investors. Initially the AIB will provide current account services and offer remittances, adding a further legal channel for Afghans to receive money from abroad.

Pakistan National Bank and Standard Chartered already operate in Kabul.

"AIB is looking not only to support multilateral and international agencies and the local business community, but also provide for the financing needs of overseas-based Afghan nationals as they look to repatriate money from around the world," said John Haye, the bank's chief executive.

The bank opened its doors on 26 March, having received a licence earlier that week.

**Plans**
ING's initial responsibility to the investors – who are capitalising the AIB at $10m with the possibility of further money from the Asian Development Bank - is a three-year commitment to running the bank and providing senior executives.

Later in 2004, the bank hopes to open ATMs and offer online banking facilities, which may again reduce the demand for informal hawaladars, or remittance merchants. After the first year, the plan is to add further branches outside Kabul, although that may depend on the security situation.

ING has long experience of running banks on behalf of governments and other bodies in developing countries, via its Institutional and Government Advisory Group. The group is already working in Indonesia, Mongolia and Vietnam, among other countries.

**B-45**



ARC : Projects : Kabul-Doshi Highway Project

Afghanistan Reconstruction Company, LLC

About Us
Management
* Projects
ARC Foundation
Images
News
Links

Employment
Contact Us

## Kabul-Doshi Highway Project

Repair work on the 175 kilometer Kabul- Doshi road has started under the World Bank- financed **Emergency Transport Rehabilitation Project.** The road from Kabul through the Salang pass to Doshi covers a critical section of the highway that connects Kabul and the southern provinces with eight northern provinces, and connects the country of Afghanistan to both Uzbekistan via Hairatan port and Tajikistan via Sher Khan Bander port. The road to the north and north-east through Doshi is one of Afghanistan's six international links to its neighboring countries that can enhance economic and social recovery through improved physical access to goods, markets, and administrative and social services.

The project is estimated to be largely completed by the end of October, 2004, and fully completed by February 2005. ARC along with partners in LIA Group International will repair a 75 kilometer section of the road, from Wolang- Doshi.

http://www.afghanrc.com/id161.htm10/11/2007 10:58:58 AM

**B-46**

ARC : Finance Manager - Kabul Afghanistan - International

 Afghanistan Reconstruction Company, LLC.

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

## Finance Manager - Kabul Afghanistan - International

Company Profile:

ARC Companies is bringing international resources together to rebuild Afghanistan's economy. ARC has attracted a core of experienced businessmen committed to reconstructing Afghanistan's physical infrastructure and reengineering Afghan business and commercial institutions into world class entities.

## PROFESSIONAL/PERSONAL SKILL REQUIREMENTS

- Six years of financial management experience preferable in an international environment and or public accounting
- Good understanding of mid range accounting and control programs like Great Plains
- Established track record of building teams and processes with the finance and accounting area
- Ability to direct internal audits and work closely with major CPA firms
- Demonstrated academic and professional achievement with an advanced degree and CPA or Chartered Accountant designation

## Personal characteristics/management style

- Business-minded with strong analytical and problem solving skills
- Demonstrated comfort in asking tough questions to achieve compliance and profit targets

## The right candidate will:

- Report directly to the Managing Director-Kabul and the CFO-NYC
- Establish effective decision processes for capital expenditures and new business activities
- Improve audit practices and reporting mechanisms
  - Lead financial and operations performance initiatives

**B-47**

ARC : Finance Manager - Kabul Afghanistan - International

- Oversee annual financial and operational audits
- Provide independent financial advice
- Mange capital structure and risk
- Improve financial department skills

**B-48**

ARC : HR Manager - Kabul Afghanistan - International

Afghanistan Reconstruction Company, LLC

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

## HR Manager - Kabul Afghanistan - International

Company Profile:

ARC Companies is bringing international resources together to rebuild Afghanistan's economy. ARC has attracted a core of experienced businessmen committed to reconstructing Afghanistan's physical infrastructure and reengineering Afghan business and commercial institutions into world class entities.

### PROFESSIONAL/PERSONAL SKILL REQUIREMENTS

- Five years of human resource management experience preferable in an international environment and or public accounting
- Good understanding of organization development and staffing methods
- Established track record of recruiting
- Ability to develop compensation and benefit programs
- Demonstrated academic and professional achievement

### Personal characteristics/management style

- Business-minded with strong analytical and problem solving skills as well as people skills
- Demonstrated comfort in making difficult decisions

### The right candidate will:

- Report directly to the Managing Director-Kabul
- Establish human resource polices and procedures including compensation levels
- Recruit and develop programs to retain key staff
- Have as strong desire to work in challenging international markets
  - Leading the HR team

http://www.afghanrc.com/id127.htm (1 of 2)10/11/2007 10:59:48 AM

**B-49**

ARC : HR Manager - Kabul Afghanistan - International

- Oversee learning programs
- Provide independent HR advice
- Mange all staffing needs Improve
- Manage employment contract process
- Farsi language skills a plus

**B-50**

ARC : COO - Kabul Afghanistan - International

About Us
Management
Projects
ARC Foundation
Images
News
Links
Employment
Contact Us

**ARC** Afghanistan Reconstruction Company, LLC

## COO - Kabul Afghanistan - International

Company Profile:

ARC Companies is bringing international resources together to rebuild Afghanistan's economy. ARC has attracted a core of experienced businessmen committed to reconstructing Afghanistan's physical infrastructure and reengineering Afghan business and commercial institutions into world class entities.

## PROFESSIONAL/PERSONAL SKILL REQUIREMENTS

- Ten years of increasing management experience five of which should have been in the construction industry preferable in an international environment
- Ability to recruit and develop  staff to sustain projected growth rates
- Ability to provide significant input into the develop compensation and benefit programs
- Demonstrated academic and professional achievement

### Personal characteristics/management style

- Business-minded with strong analytical and problem solving skills as well as people skills
- Demonstrated comfort in making difficult complex decisions

### The right candidate will:

- Report directly to the Managing Director-Kabul and the President New York
- Direct all construction projects in Afghanistan
- Recruit and develop programs to retain key staff
- Have as strong desire to work in challenging international markets
  - Manage all construction projects
  - Have significant input into the purchase of heavy construction equipment

**B-51**

- Manage an organization with very high growth

ARC : COO - Kabul Afghanistan - International

http://www.afghanrc.com/id129.htm (2 of 2)10/11/2007 10:59:48 AM

📄 08-01-2003, 10:29 AM                                                                    #2

**Valeriy Shokhin**



NO AVATAR

Gender not set
Posts: n/a

American-Uzbek swindlers are wanted by Uzbekistan authorities

/Valeriy Shokhin, Novaya Gazeta, Issue #55, July 31, 2003/

A new scandal is about to happen in the United States - some the largest American companies, such as Coca-Cola, Philip Morris, Procter&Gamble, and others have fallen a victim to swindle. However, Europeans are also in the list of victims. For example, Swiss company Nestle.

Heads of the export-import company Roz Trading Ltd., - US citizens of the Uzbek origin: Mr. Abdul Rauf Maqsudi and his sons - Mansur Akhmed and Farid Akhmed. Now, all of them are wanted by Interpol. The Uzbek authorities accuse the owners of Roz Trading Ltd. on money laundering, extortion, official forgery, deliberate evasion from taxes, large-scale bribery and organizing of system of illegal transactions with the largest American companies by imitation of export of their production to Uzbekistan. Official documents on this criminal case are handed to the US Attorney General.

One of the used swindle schemes is rather interesting, though it is simple. Operating as a purely Uzbek company, Roz Trading Ltd. made favorable contracts with the American companies on delivery of their production to Uzbekistan. In doing so they managed to achieve very serious discounts: transnational "giants" traditionally give a price reduction for the new or developing markets. Further, without the knowledge of manufacturers, the consignments successfully passed by Uzbekistan, getting in other Republics of the former USSR, Dubai, or were sold directly on a place, in territory of the United States. And discounts left to the Maqsudis.

According to the Uzbek Office of Prosecutor, fraud was a basis of the Maqsudis' business. One could only imagine, how this business prospered when Roz Trading Ltd. was receiving up to 30% discounts for top saleable goods. When representatives of the American companies wanted to be personally convinced on how their goods are sold, they were carried to Tashkent where samples of production of the appropriate companies were in an extra hurry scattered on stalls of the central market. Foreign visitors usually were very pleased and didn't guess at all that they became witnesses of well-staged show.

The interesting information on violations of the clan was given with the letter of Ahmet Bozer, Director of the Eurasia and Near East branch of Coca-Cola, addressed to the Uzbek Prime Minister (the editors has

**B-53**

a copy of letter). The letter - as a matter of fact, is the respond to inquiry of the Uzbek authorities concerning Roz Trading Ltd. activity, which was the holder of a controlling packet of shares of American - Uzbek JV Coca-Cola Bottlers of Uzbekistan.

The information of Mr. Bozer sheds light on how business has been done in Coca-Cola Bottlers of Uzbekistan. It was found out that as soon as Roz Trading Ltd. set up a joint venture with Coca-Cola in Uzbekistan and Mr. Mansur Maqsudi became its manager, an American partner was regularly deceived. After receiving control packet of shares Maqsudis almost completely pushed their partners out of the business management and started to control it almost solely. Americans had to hire an audit company that discovered a number of violations in activities of the major shareholder. Now Coca-Cola is alienating itself from the scandal motivating this that it did not have a chance to influence activities the JV.

It proves to be true by the words of the Coca-Cola Bottlers of Uzbekistan company's employee Irina, who in telephone conversation with our correspondent has told that the Maqsudis were always stating that it was their family business, but not business of Coca-Cola. Under a pretext of reinvestments through dummy firms they took the most part of the profit to themselves, and other founders practically did not get any profit. Irina asked us not to publish her surname because, according to her words, the Maqsudis have informers in Uzbekistan. She said that all employees were afraid of them, they were very tough and any violation of rules were punished, even if it was highly skilled professional.

Deputy General Prosecutor of Uzbekistan, Mr.Khamidjan Nematov in interview given to our correspondent stated that the Uzbek side is ready to cooperate with anyone who suffered from activities of the Maqsudis - both father and brothers. The list includes not only Americans, we already mentioned Swiss company Nestle. In Deputy General Prosecutor's opinion the Maqsudis clan have used all types of fraud invented and disseminated on the territory of the former USSR.

The investigation in Uzbekistan steadily brings more and more interesting results. Recently ex-employee of Roz Group Mr. Farkhod Inogambaev stated that fraud was the aim of company's founders. He added that the "lofty words about the strategy of the company appeared to be false... they affirmed that the major aim of the company was to deliver high quality goods to the people of Uzbekistan, but in reality they illegally re-exported those goods to the neighboring countries. It was the only reason why Procter&Gamble, their biggest partner, ceased relationship with them...

**B-54**

Lately, the cooperation with Gillette also came to an end".

Similar situation occurred in the other companies owned by the Roz Group, especially Valuelink. In Valuelink, there was well-developed system of parallel trading according to which goods ordered for Uzbekistan were sold in Dubai, US and even Africa. When representatives of producing companies (like "Colgate", "Alberto-Culver") wanted to visit Uzbekistan to investigate marketing outlets, Valuelink and Roz played well-prepared show.

In another statement Mr. Inogambaev insists that large amounts of cash that was illegally taken out of Uzbekistan to Dubai, Roz Group purchased goods for re-export to the United States, in that way laundering all the illegal cash.

Authorities declared an international inquiry for the Maqsudis (farther and both brothers) and looking forward for their fast capture and extradition to Uzbekistan. Anyway, if the clan decided to disappear, it's necessary to search for them not only in a country of their citizenship - the United States, but rather in the United Arab Emirates or in Republics of former Soviet Union.



**B-55**

Westlaw.

11/20/02 APWORLD 00:00:00

11/20/02 AP Worldstream 00:00:00
AP WORLDSTREAM
Copyright © 2004 The Associated Press. All rights reserved.

**November 20, 2002**

**Family     feud   in   Uzbekistan     hurts    Coca - Cola**

ATLANTA (AP) -- A divorce within the first family of Uzbekistan led to a four-month shutdown of Coca-Cola production and a takeover of Coke's bottling company in this central Asian country.

Atlanta-based Coca-Cola had a partnership with Mansur Maqsudi, the son-in-law of Uzbek President Islam Karimov. But the president's daughter, Gulnora Karimova, filed for divorce this year and Coke became ensnared in the fight.

Uzbek authorities jailed some members of Maqsudi's family and deported others to their native Afghanistan in apparent retaliation for the humiliation suffered by the president's daughter.

Maqsudi fled to the United States, where he has lived for much of the previous decade.

As word of the divorce spread, the Uzbek government announced that Maqsudi owed $9 million in taxes. Maqsudi denied it, but the government went after his assets, including his minority stake in Coca-Cola Bottlers of Uzbekistan.

The company's other two owners are the government of Uzbekistan and Coca-Cola.

The incident halted Coke production for months, partly because Maqsudi had managed the bottling operation and it had difficulty operating without him.

Coke spokesman Steve LeRoy refused to comment on the Maqsudi matter. While acknowledging production problems, he said he was optimistic about Coke's future in Uzbekistan.

"We believe that if the Uzbek government opens up to the U.S., that will only create more transparency, a favorable business climate and create a more level playing field," LeRoy told The Atlanta Journal-Constitution in a phone interview from his offices in Vienna.

Having confiscated Maqsudi's shares in the plant, the Uzbek government possessed a majority. In September, the Uzbeks installed new management at the plant -- officers widely believed to have ties to business rivals of Maqsudi.

Uzbek Deputy Foreign Minister Sadyk Safayev said in September that the new management would ensure "smooth sailing" for Coke in the future.

"The previous management of Coke committed lots of misdeeds, like violations of tax law, violations in sales regulations and violations of human rights in the plant here," Safayev said. "Both Coke and the Uzbek government lost out because of these misdeeds. We are sure the new team will clear up these things. We are doing our utmost to make sure Coke won't have any more problems."

Coke spokesman LeRoy said Safayev's allegations of misdeeds are untrue.

Coca-Cola jumped into the Uzbek market after the Soviet empire dissolved in 1991. The company hoped an extensive bottling and distribution system in Uzbekistan, the most populous Central Asian country, could serve as a launching pad to

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

11/20/02 APWORLD 00:00:00                                    Page 2


neighboring countries.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (World Organizations (1IN77); CIS (1CI65))

INDUSTRY:  (Beverages (1BE22); Non-Alcoholic Beverages (1NO38); Soft Drinks (1SO77);
Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); USA (1US73); Americas (1AM92); North America
(1NO39); Asia (1AS61); Georgia (1GE15); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (COCA; COCA COLA; COKE; COLA; UZBEK DEPUTY FOREIGN)  (Gulnora
Karimova; Islam Karimov; LeRoy; Mansur Maqsudi; Maqsudi; Sadyk Safayev; Safayev;
Steve LeRoy; Uzbek)

Word Count: 538
11/20/02 APWORLD 00:00:00
END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. US Gov. Works.

**B-57**

Westlaw.

NewsRoom

8/19/03 FTI 8

Page 1

8/19/03 Fin. Times 8
2003 WLNR 8157409

Financial Times UK
Copyright (c) 2003 Financial Times Ltd. All rights reserved.

August 19, 2003

Section: ASIA-PACIFIC

**ASIA-PACIFIC: Uzbekistan offers rich pickings for leader's daughter** : SPECIAL INVESTIGATION: Her father is a key ally in George W. Bush's war on terror, but the US has a warrant out for her arrest. David Stern examines how Gulnora Karimova has become wealthy in a very poor country

DAVID STERN

Diversified Industrials, Diversified Industrials

Gulnora Karimova has a lot going for her.

Prodigiously rich, tall with striking looks, a blackbelt in martial arts and a degree from Harvard Business School, Ms Karimova has one other invaluable attribute: she is the elder daughter of Islam Karimov, president of Uzbekistan.

At 31, she is considered one of the most powerful business people in the strategically pivotal ex-Soviet central Asian republic that neighbours Afghanistan. But the origins of her wealth and extent of her influence have remained shrouded in speculation.

Now the Financial Times has uncovered evidence that Ms Karimova has over the past two years acquired a business empire far more substantial than previously known. It includes key stakes in the country's largest mobile telephone provider and a big cement factory, as well as property and trading activities.

The investigation provides the first real glimpse into the inner workings of one of the ruling clans that came to power across central Asia following the break-up of the Soviet Union. It also raises uncomfortable questions about the nature of some of her deals and about western, especially US, support for the Uzbek ruling family.

Mr Karimov, who has dominated Uzbekistan since it became independent in 1991, is believed to be seriously ill. According to Martha Brill Olcott, a central Asia

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-58**

8/19/03 FTI 8                                                           Page 2

expert with the Carnegie Foundation, the expansion of Ms Karimova's business
empire could be viewed as an attempt to smooth the family's exit as her father
departs the political scene. Or it could be a means of holding on to power.

If the intention is to create a Karimov dynasty, says Ms Olcott, this would be
"potentially very disturbing", as the possibility of instability in the country of
25m people could be high.

In spite of resources including gold and oil, the country is one of the poorest in
the former Soviet Union. Most Uzbeks get by on less than Dollars 30 (Euros 27,
Pounds 19) a month while doctors and teachers make as little as Dollars 10.

Ms Karimova's upbringing was comfortable rather than opulent. Though her father
held a series of high posts in Soviet-era Uzbekistan, including finance minister
and head of the state planning commission, he rose to the republic's top job only
in 1989.

At her 19th birthday party in July 1991 she met Mansur Maqsudi, scion of a
prominent Uzbek-Afghan family that resides in New Jersey. They married that
November, a month before her father was elected president of independent
Uzbekistan.

Twelve years on, the marriage is over and a custody battle over her two children
with her now ex-husband, a US citizen, means she is unable to travel to most
western countries.

A US court has issued an arrest warrant against her for defying a court order to
return her two children. Ms Karimova was awarded custody of the children by an
Uzbek judge, but Mr Maqsudi sued in a New Jersey court and this year won his own
claim. Last month the New Jersey judge issued the warrant for Ms Karimova for
non-compliance with its decision. Ms Karimova risks detention and loss of her
children if she travels to any country enforcing deportation agreements with the
US.

That a US court has called for the arrest of the eldest daughter of one of
Washington's closest allies has caused much embarrassment between the two
countries. But officials on both sides say relations are strong enough to override
such setbacks. The Uzbeks, US officials say, are discreet enough not to mention
the matter in their discussions.

For their part, the Uzbek authorities say they have extensive documentation
proving illegal activities by the Maqsudis. The family, which ran Roz Trading, an
import-export business, allegedly failed to pay some Dollars 12m in taxes as well
as committing other economic crimes. Mr Maqsudi denies the accusations.

In August 2001, shortly after Mr Maqsudi announced he wanted a divorce,
authorities descended on the offices of Coca-Cola Bottlers Uzbekistan, in which
the family had a 55 per cent stake. The Uzbek government subsequently liquidated
Roz Trading's interest to pay the back taxes, and arrested or expelled members of
the Maqsudi family.

After the marital break-up Ms Karimova recruited as a top aide Farhod Inogambayev,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-59**

who was working for Mr Maqsudi in the United Arab Emirates but was summoned to
Tashkent by the president's daughter.

Soon afterwards, Mr Inogambayev and Ms Karimova travelled to the UAE and in
November 2001 set up Revi Holdings in the Sharjah free trade zone, which would act
as parent company for Ms Karimova's various businesses and collect the revenues
from their activities.

Registration documents and share certificates for Revi, since renamed Camfed, list
Ms Karimova as owner and single stock holder. Enquiries also reveal that Ms
Karimova is director of a London offshoot called Revi UK, located in New Bond
Street and incorporated in October 2001.

Mr Inogambayev was established as Ms Karimova's main representative in Dubai. Soon
afterwards, he says, "large amounts of funds in US dollars started arriving to the
companies' accounts from Uzbekistan".

Some of the money arrived from Uzdunrobita, Uzbekistan's largest mobile telephone
company. According to an internal company report, Ms Karimova acquired controlling
interest of the mobile operator in two stages at the beginning of 2002. Revi
Holdings received first 20 per cent from International Communications Group, a
Georgia, US-based shareholder, and then 31.4 per cent from the Uzbek government.

Bekhzod Akhmedov, Uzdunrobita's general director, describes Ms Karimova's interest
in the company as "just a rumour". However, Dun and Bradstreet, the independent
business research group, confirms Revi's interest in the company.

Later, Uzdunrobita made a bank transfer to Revi Holdings for Dollars 330,000 for
"consultation services of the contract without number on 31.07.2002", according to
documents seen by the FT.

Mr Inogambayev, who has left Ms Karimova's employment, says Revi was also the
final recipient of Dollars 1m from Huawei Technologies, a Chinese
telecommunications company that had been engaged by Uzdunrobita to create a GSM
network outside Tashkent.

As part of the contract, Huawei hired Global Communications, a Caribbean offshore
company, paying it just over Dollars 1m for GSM equipment. Global, however, turned
around and hired Revi, depositing the same amount into Revi's bank account.

Bank documents show the amount being passed on in November 2002, first from Huawei
to Global's Citibank account in Dubai, and then to Revi Holdings. Huawei
representatives declined to comment.

Most recently, Ms Karimova, through another Sharjah offshore company, United
International Group (Uning), acquired at least a 44.5 per cent interest in Quvasay
Cement Factory, one of the country's prime industrial assets. For that holding,
documents show that on March 12 this year she paid a modest Dollars 172,853.

After Mr Inogambayev stopped working with Ms Karimova, he kept a suitcase of
documents detailing her financial dealings. The former Revi general director took
with him scores of Ms Karimova's bank transfers and credit card statements, which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-60**

8/19/03 FTI 8                                                          Page 4

provide a glimpse of the large sums of money the president's daughter enjoys at
her personal disposal.

Transactions include:

* Two transfers to her Citibank account on March 25 and April 13 2002, for Dollars
950,000 and Dollars 800,000 respectively for "consultancy fees".

* An HSBC account in Jersey receiving Dollars 362,000 on March 10 2002.

* An account established at HSBC in the name of Islam Karimov, her 10-year-old
son, with a balance of Dollars 1.4m.

Ms Karimova was not available for comment, though numerous attempts were made to
reach her. A spokesman for the Uzbek foreign ministry - where Ms Karimova works as
adviser to Sadiq Safayev, foreign minister - likewise declined to comment, saying
the ministry did not maintain information on the holdings of its employees.

Western diplomats and business people have become increasingly concerned over Ms
Karimova's expanding business empire. For some, it is possible evidence that
Uzbekistan is finally preparing to liberalise its Soviet-style economy. Ms
Karimova, according to this version, wants to be well placed when long-standing
currency restrictions are removed and western investors arrive in greater numbers.

Others, however, say she is accumulating what she can while her father is still in
power. A recent law passed by the country's parliament, granting the president and
his family immunity from prosecution should he step down, is also seen as
suggesting his imminent departure.

To this can be added Ms Karimova's purchase of a three-storey apartment in Moscow
for more than Dollars 1m. Russia is one of the few countries she can travel to
without risking arrest.

The US has remained cautiously supportive of the Tashkent regime, thanking
Uzbekistan regularly for its support for the war on terrorism, but at the same
time drawing attention to its atrocious record on human rights.

Washington bases some 1,800 troops at an air base near the southern Uzbek city of
Karshi for operations in Afghanistan. In May, a 38- year-old Karshi resident died
while in police custody, apparently a victim of torture.

He was the eighth known death in official custody in the past 10 months, say human
rights groups. A United Nations special rapporteur called the practice of torture
in the country "systematic and widespread".

Still, for some the most striking fact is that Ms Karimova is one of the few to
have prospered in post-Soviet Uzbekistan. Multilateral agencies say the country is
becoming more impoverished by the day.

                        ---- INDEX REFERENCES ----

COMPANY: HSBC HOLDINGS PLC; HONGKONG AND SHANGHAI BANKING CORPORATION LTD (THE);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-61**

HONGKONG AND SHANGHAI BANKING CORP (THE); HUAWEI TECHNOLOGIES; HSBC BANK PLC

NEWS SUBJECT: (Business Management (1BU42); Business Strategy (1BU97); United Nations (1UN54); Corporate Strategy & Strategic Planning (1XO03); World Organizations (1IN77); CIS (1CI65); Mergers & Acquisitions (1ME39); Corporate Groups & Ownership (1XO09))

INDUSTRY: (Theoretical Analysis (1TH79); Banking (1BA20); I.T. in Banking (1IT59); Financial Services (1FI37); I.T. in Financial Services (1IT24); I.T. (1IT96); Science & Engineering (1SC33); Networking Markets (1NE31); Business Theory (1BU14))

REGION: (North America (1NO39); Europe (1EU83); Gulf States (1GU47); Eastern Europe (1EA48); Russia (1RU33); Arab States (1AR46); Western Asia (1WE54); Afghanistan (1AF45); Central Asia (1CE93); Sharjah (1SH72); Americas (1AM92); New Jersey (1NE70); United Arab Emirates (1UA66); Asia (1AS61); Uzbekistan (1UZ71); Middle East (1MI23); Dubai (1DU43); USA (1US73))

Language: EN

OTHER INDEXING: (Karimova, Gulnora) (CARNEGIE FOUNDATION; COCA COLA BOTTLERS UZBEKISTAN; FT; GLOBAL; GLOBAL COMMUNICATIONS; GSM; HARVARD BUSINESS SCHOOL; HSBC; HUAWEI; HUAWEI TECHNOLOGIES; INTERNATIONAL COMMUNICATIONS GROUP; ISLAM KARIMOV; KARSHI; MARTHA BRILL OLCOTT; SHARJAH; UAE; UNITED INTERNATIONAL GROUP; UNITED NATIONS; UZBEK; UZBEKISTAN; UZBEKS) (Bekhzod Akhmedov; Bradstreet; Cement Factory; David Stern; Diversified Industrials; Dun; Enquiries; Farhod Inogambayev; George W. Bush; Gulnora Karimova; Inogambayev; Islam Karimov; Karimov; Karimova; Mansur Maqsudi; Maqsudi; Maqsudis; Multilateral; Olcott; Prodigiously; Registration; Revi; Revi Holdings; Revi UK; Roz Trading; Sadiq Safayev; Transactions; Western) (Government News (GN); International Affairs (GN08)) (United States of America (US); Uzbekistan (UZ); Americas (QA); Commonwealth of Independent States (XV); Former USSR (QC); North America (XB); Pacific Rim (QG))

PRODUCT: International Affairs; Management of Companies & Enterprises; Private Households

NAICS CODE: 92812; 55111; 81411

EDITION: London Ed1

Word Count: 1916
8/19/03 FTI 8
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-62**

The New York Times
nytimes.com

September 13, 2002

# Judge Sets U.S. Court as Venue In International Custody Case

**By RICHARD LEZIN JONES**

A State Superior Court judge ruled today that an international custody dispute between a New Jersey man and his wife in Uzbekistan should be decided in an American courtroom.

The ruling set the stage for formal divorce and custody proceedings for the man, Mansur Maqsudi, and his wife, Gulnara Karimova-Maqsudi, who fled with the couple's two children in July 2001 to her native Uzbekistan, where her father, Islam Karimov, is president.

Mr. Maqsudi, 35, a naturalized American citizen of Uzbek descent, had sought to have the case heard in an American court because, he said, the Uzbek court system would be biased in favor of his wife.

In court testimony here this summer, Mr. Maqsudi testified that officials with President Karimov's authoritarian regime had closed one of his businesses there, ordered the liquidation of another and sentenced three of Mr. Maqsudi's relatives to jail terms for what was termed corporate corruption. Those actions, he testified, were retaliation after the announced plans for divorce.

In her ruling, Judge Deanne M. Wilson ordered that Ms. Karimova-Maqsudi, 32, return with the children to the United States within the next month so that the case could proceed. "This custody matter must be resolved by this court expeditiously," Judge Wilson said.

The judge also ordered that Ms. Karimova-Maqsudi allow telephone contact between the children -- Islam, 9, and Iman, 4 -- and their father within the week and allow them to talk at least every other day until she and the children returned to the United States. The ruling also rejected an October finding by an Uzbek court that granted Ms. Karimova-Maqsudi a divorce and full custody of the children. The judge said Mr. Maqsudi had not received proper notification that proceedings would be held in Uzbekistan.

Enforcement of Judge Wilson's ruling may be difficult, legal experts said, because Uzbekistan is not among the 61 nations that have agreed to cooperate with one another on matters of international civil law under the Hague conventions.

**B-63**

Judge Sets U.S. Court as Venue In International Custody Case - New York Times

"This could be a Pyrrhic victory," said Lynne Z. Gold-Bikin, a divorce lawyer in Norristown, Pa., and a past president of the American Bar Association's family law division. "She could totally disregard all this because the law, unfortunately, doesn't stretch to her home country."

Pyrrhic or not, Mr. Maqsudi's legal team welcomed Judge Wilson's ruling. Edward J. O'Donnell, Mr. Maqsudi's lawyer, would not entertain the possibility that Ms. Karimova-Maqsudi might refuse to return to the United States. "I'm hopeful that Gulnara is going to do what's right and what's in the best interests of the children," Mr. O'Donnell said.

John P. Paone Jr., Ms. Karimova-Maqsudi's lawyer, said he and his client would discuss whether to appeal the judge's ruling. He said he had not yet told Ms. Karimova-Maqsudi of the ruling.

Mr. Paone, who argued that the case should have been heard in Uzbekistan because that is where the children have lived most of the past two years, said, "Ultimately, we're left with a standoff unless the parties can resolve this matter amicably."

Copyright 2007 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | | Help | Contact Us | Work for Us | Back to Top

http://query.nytimes.com/gst/fullpage.html?res=9800EFDB1031F930A2575AC0A9649C8B63&sec=&spon=&pagewanted=pr...    10/10/2007

**B-64**

FRI 14:28 FAX 202 228 0367          SEN. TORRICELLI                                    図002



O'ZBEKISTON ELCHIXONASI

EMBASSY OF THE REPUBLIC OF UZBEKISTAN
TO THE UNITED STATES OF AMERICA

1746 Massachusetts Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 887-5300
Fax: (202) 293-6804

ELCHI

AMBASSADOR

August 29, 2001

The Honorable Robert Torricelli
Senator
The United States Senate
113 Dirksen Senate OB
Washington, DC 20510

Dear Mr. Senator,

First of all, I would like to express my gratitude for your interest in Central Asia
and Uzbekistan in particular, as you wrote in your letter dated August 23. While being
well aware of the role and significance of the United States Senate in shaping and
implementing the American foreign policy and being deeply interested in
strengthening the relations between our countries, the Government of Uzbekistan
welcomes and highly appreciates the dialogue with such a prominent US politician as
you, Mr. Senator.

Both our nations have a lot of common concerns and problems that necessitate
advanced cooperation. Among those is the fight against international terrorism, Islamic
extremism, narco-aggression, i.e. transnational threats taking root from the regions
neighboring Central Asia. There is no doubt that, as future chairman of the
Subcommittee on Central Asia, your personal role in developing this cooperation with
the region of tremendous geopolitical significance is invaluable. In this respect, I
sincerely hope to be in continuous contact with you.

Mr. Senator,

In your letter you touched upon an issue of the activities of the Coca-Cola
Bottlers Uzbekistan, Ltd. and the Roz Trading, Ltd. companies. During a routine
regular audit of these enterprises' activities serious violations of the law have been
revealed by Uzbekistan's tax agencies. In this connection, I am forwarding you a
preliminary information on these violations.

**B-65**

14:29 FAX 202 225 0367          SEN. TORRICELLI

I would like to particularly note that the representatives of the Coca-Cola Company's regional office have been closely collaborating with the government agencies of Uzbekistan, and share their position that the current audit of the joint venture's documentation is lawful and that the violations of the law by the joint venture's administration, being conducted by the Maksudis, have, indeed, took place.

Despite the Coca-Cola Bottlers Uzbekistan administration's sabotage of the official audit, and also its attempts to cease the production, the Coca-Cola company has insisted on keeping the factory line working and taken all measures, due to which the factory continues to work properly.

As apparent from the presented materials, the Roz Trading company has continuously and for quite a long time not been paying profit tax for tens of millions of US dollars. Moreover, the company, having been engaged in illegal business activities, concealed its sales income from taxation. For instance, since 1997 the Roz Trading company has sold sugar through the "black market" and not paid profit tax for 7 billion soms (local currency), which is approximately $6 million.

According to preliminary data, the Maksudis, who you mentioned in your letter, have smuggled a tremendous amount of undeclared cash dollars out of Uzbekistan.

During the inspection of the Roz Trading's branch office, an undeclared cash amount of $199.900 was discovered.

The examination of the both companies' financial activities is yet under way. I would like to assure you, Mr. Senator, that the examination is being conducted in accordance with the law and international norms. We keep close contact with the headquarters of the Coca-Cola Company, and you should have no doubts of Uzbekistan Government's sincere interest in having the company continue working in our country.

Dear Mr. Senator, I hope that your experience will allow you to come to an unbiased knowledge of the situation and cut short any attempts of all appealing citizens to falsify the information and politicize this issue.

Thanking you in advance, I rely on your understanding and your further assistance.

Sincerely,

Shavkat Khamrakulov

**B-66**

# TAUBMAN DECLARATION

# Exhibit C

Westlaw.

NewsRoom

2/26/97 FINTMAND (No Page)

Page 1

2/26/97 Fin. Times Mandate (Pg. Unavail. Online)
1997 WLNR 4766488

Financial Times Mandate
Copyright © 2004 Financial Times Business Limited. All rights reserved.

February 26, 1997

News: World Trade:  **Coca - Cola    plans    Asian**  fizz: World Trade News Digest

By KEVIN DONE  **Coca - Cola    plans    Asian**  fizz

 Coca-Cola, the world's largest soft drinks producer, is accelerating its capital
investment in Uzbekistan, the most populous country in central Asia. The group,
together with its local bottling partners, will have spent around Dollars 130m in
the four years from 1994 to the end of 1997 as part of a programme to create a
modern soft drinks production and distribution system throughout the central Asia
and Caucasus region. Coca-Cola Bottlers Tashkent, its local Uzbek joint venture,
is investing Dollars 55m to build a greenfield bottling and distribution facility
at Koyluk, near Tashkent.

 Construction will begin next month and is expected to be completed by the end of
the year. The plant will triple Coca-Cola's soft drinks production in Uzbekistan
and will create around 550 jobs.

 The Uzbek joint venture, Coca-Cola Bottlers Tashkent, is majority owned and oper-
ated by ROZ Trading, controlled by the Maqsudi family, with a shareholding of 55
per cent. Coca-Cola Export Corporation holds 33 per cent and Pishprom, a local
state company, 12 per cent. The group, which opened its first plant in Tashkent in
1994, inaugurated its third bottling plant in Uzbekistan last week. Kevin Done,
East Europe Correspondent Page 6; Edition International Edition 1; Copyright 1997:
Financial Times Group

---- INDEX REFERENCES ----

COMPANY: COCA COLA EXPORT CORP

NEWS SUBJECT:  (Finance Management (1FI66); World Organizations (1IN77); CIS
(1CI65); International Issues (1IN59); World Trade (1WO85); Economics & Trade
(1EC26))

INDUSTRY:  (Beverages (1BE22); Non-Alcoholic Beverages (1NO38); Soft Drinks
(1SO77); Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Asia (1AS61); Uzbekistan (1UZ71))

Language:  EN

Westlaw.                                                          NewsRoom

6/20/00 LATIMES 8                                                 Page 1

6/20/00 L.A. Times 8
2000 WLNR 8388234

Los Angeles Times
Copyright 2000 Los Angeles Times

June 20, 2000

Section: Main News

**Uzbekistan Villagers Still Waiting for the State to Save Them**
Central Asia: Soviet-era mentality lives on in hamlet, where residents scratch out
a living amid soaring inflation and dwindling resources.
RICHARD C. PADDOCK
TIMES STAFF WRITER

SHAMURAD, Uzbekistan Legend has it that the powerful emir of Bukhara, desperate to
have a son, came to this desert village hundreds of years ago to visit a woman
famous for her fertility.

The emir, following the superstition of the day, sat under her dress for several
minutes, according to the legend. Returning to his walled city, he was soon
blessed with a son he named Shakh Murad. The village took the same name, and when
the prince became emir, he exempted the village from taxes forever.

Today, that tax exemption is long gone, but life here goes on much as it always
has. The Muslim villagers herd sheep in the desert and live in houses made of mud.
Women fetch water from the village spring and burn cow dung for cooking.

No longer favored by the government--any government--the lonely village of 400
people is struggling to survive in a changing society. Uzbekistan gained independ-
ence with the 1991 collapse of the Soviet Union but is mired in poverty and isol-
ated from the outside world. Its prolonged economic slump has taken the greatest
toll in rural areas.

The same pattern has been repeated across the former Soviet Union, where communit-
ies built up in remote regions under communism are no longer economically viable.
The end of state subsidies has triggered an exodus over the past decade from im-
poverished villages and distant outposts in Siberia, the Far East and the extreme
north.

"With each year, there are fewer and fewer sheep that run in our flock," said Es-
tam Umarzakov, 40, who has lived in Shamurad all his life. "If this continues, the
whole village will go bankrupt. I don't know how people will survive. I just try
not to think about it."

Uzbekistan, an authoritarian Central Asian state headed by former Communist leader Islam Karimov, has proved unable to build a successful market economy. Many of its Soviet-era factories have closed, output has fallen, and unemployment has risen. Inflation, according to official statistics, is running about 25% a year.

The average monthly salary is the equivalent of $12. Pensions amount to as little as $3.50 a month. Villagers migrate to the cities in search of employment. Some leave Uzbekistan to find work in other countries.

"The economic situation in the republic is so dire that many people go to North Korea in search of jobs and a better life," said Vitaly Ponomarev, a Moscow-based expert on Central Asia.

Uzbekistan, the largest nation in the region with 25 million people, is in a tough neighborhood. It shares borders with the totalitarian state of Turkmenistan as well as Afghanistan and Tajikistan, both plagued by civil wars with Muslim extrem- ists.

Local businessmen say the economy is tightly controlled by the autocratic Karimov. For example, a Coca-Cola bottling plant that has a near-monopoly on nonalcoholic drinks is run by the president's son-in-law, Mansur Rauf Maqsudi.

Uzbeks call their nation "doubly landlocked" since goods must pass through at least two countries in any direction to reach an international port.

Uzbekistan also is hampered by a currency that is not convertible--stifling its prospects for foreign investment. The government has set an official value of 233 sums to the dollar, but few places are willing to exchange money at that rate. The true value of the sum, as determined by the black market, is about 700 to the dol- lar.

During the years of independence, inflation has been so high that the biggest bill in circulation, a 200-sum note, is now worth less than 30 cents. Changing $100 in- to sums can easily mean carrying around a wad of 500 worn and tattered bills- -giving new meaning to the term "lump sum."

The village of Shamurad, where donkeys outnumber cars by more than 10 to 1, illus- trates some of the difficulties facing the country.

During Soviet times, the government adopted a policy of subsidizing far-flung vil- lages such as Shamurad whether they were economically viable or not. The village's business of sheepherding was taken over by a collective farm, and whatever indi- vidual initiative that existed was stamped out.

The Communists brought a school, electricity and television to Shamurad--although phone service never arrived. Many such villages grew so large that they could not support themselves without government assistance.

With the breakup of the Soviet Union, the subsidies ended, and rural areas were

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

largely left to their own devices--a pattern repeated from Armenia to the Bering Strait. The population of Shamurad, once greater than 500, has fallen by more than 20% as families move out in search of work.

"There's quite a number of villages that have been abandoned by people moving to the cities because life has become impossible," said Mahmudkul Shodiyev, 47, the village chief.

More trouble lies ahead for Shamurad. Its flock of sheep has shrunk from a high of 86,000 in Soviet times to 7,000 today.

Villagers say the decline is largely due to mismanagement after the breakup of the collective farm. Thinking only of short-term survival, the villagers sold many of the sheep and ate the rest--indeed, the men of Shamurad look as if they haven't missed a meal in some time. At the current rate, however, the village's main asset will soon vanish.

"In the past, under the Soviets, life was much better," said Umarzakov, a hefty man in tattered pants who was attempting to repair the gearbox of a dilapidated 15-year-old Zil truck.

"Under Soviet rule, the state farm organized our work," he said. "With the collapse of the Soviet Union, everything fell apart."

The village has been declared a hardship area by the Karimov government, but that means only a few extra sums for the handful of people lucky enough to hold government jobs. Teachers at the village school are paid the most--the equivalent of $10 a month.

The spring is the center of life in the village. People come throughout the day to fetch water in buckets, wash their hands or let their animals drink. The supply of water is sufficient to grow some fruits and vegetables but not to plant crops in any great quantity.

"There's enough to drink, so we don't die, but there's not enough to farm," Shodiyev said.

The village is a closed society, locked in a tradition of multi-generational households where women do much of the hard work. One of the women's jobs is to make kizyak, a fuel of cow dung mixed with straw and wheat chaff that is pressed and then dried in the sun. There are stacks of it all over the village.

The last time a foreigner visited was three years ago, when a group of Americans explored the possibility of a joint cattle-raising venture. Nothing ever came of the idea.

Most of the men wear clothes that are torn and frayed. A boy carries his prize possession: a soccer ball that lost its leather cover long ago and is now only rags.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.          C-4

The Russian language is fading into the past because villagers prefer to speak Uzbek. The people are Muslim but not deeply religious--the village has no mosque.

Thanks to communism, however, the villagers have televisions. They get three stations--two state-controlled channels from Uzbekistan and one from Russia. When someone arrives with a new video, the villagers gather to watch it in one of the three homes that have a VCR.

On the wall of the school, in cracked and fading paint, is a saying of the president: "Uzbekistan will become a powerful state in the future."

Even after eight years of independence, the people of the village have not shaken their Soviet mentality--they still count on the government to save them.

"We hope that finally the country will rise to its feet and the state will find an opportunity to help its people who live in need like this," said Shodiyev, the village chief. "It doesn't depend on the people. It depends on the state."

---- INDEX REFERENCES ----

COMPANY: COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Religion (1RE60); World Organizations (1IN77); CIS (1CI65); Social Issues (1SO05); Islam (1IS02))

INDUSTRY:  (Agriculture (1AG63); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Europe (1EU83); Eastern Europe (1EA48); Russia (1RU33); Western Asia (1WE54); Asia (1AS61); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (AFGHANISTAN; COCA COLA; COMMUNIST; COMMUNISTS; MUSLIM; UZBEK-ISTAN; **UZBEKISTAN VILLAGERS**; ZIL)  (Central Asian; During; Estam Umarzakov; Islam Karimov; Karimov; Local; Mahmudkul Shodiyev; Mansur Rauf Maqsudi; Pensions; Re-turning; Shodiyev; Teachers; Umarzakov; Uzbeks; Vitaly Ponomarev)

KEYWORDS: UZBEKISTAN -- ECONOMY; STANDARD OF LIVING; QUALITY OF LIFE; RURAL AREAS; UZBEKISTAN -- INDUSTRY

EDITION: Home Edition

Word Count: 1541
6/20/00 LATIMES 8
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.    **C-5**

::: "WHEN THE COLA WARS CAME TO UZBEKISTAN..." :::



# Muslim Uzbekistan
### The political and cultural Islamic site

Arabic  Russian  Uzbek

▦ Domestic & Regional News

**August 30, 2001**

## "WHEN THE COLA WARS CAME TO UZBEKISTAN..."

The Wall Street Journal
December 21, 2001.

When the cola wars came to Uzbekistan in the mid-1990s, Coca-Cola Co. emerged the big winner. Many Uzbeks and foreigners concluded that the reason was a not-so-secret weapon: a partnership with the son-in-law of President Islam Karimov.

But last month, the president's 29-year-old daughter, Gulnora Karimova-Maqsudi, separated from her husband, Mansur Maqsudi, 34, president of Coke's local bottling company. And since then, the cola giant's fortunes in Uzbekistan have abruptly changed. Tax inspectors, fire inspectors, customs inspectors, and even an antinarcotics official, have descended on Coke's malbottling plant in the Uzbek capital of Tashkent. A week ago, authoritis detained the bottling company's local general manager for 24 hours, while investigators tore through his office and that of the manager of the Maqsudi family's trading company in Tashkent, according to officials with the two companies.

Government investigators have taken away piles of documents from the companies and questioned about 10 current and former employees of the bottling concern, company officials said. The authorities also have temporarily detained some local Coke truck drivers and verbally harassed some merchants selling the soft drink, bottling company officials added. The Tashkent offices of Coca-Cola itself, a separate entity from the bottler, have been undisturbed.

Coke officials at the company's Atlanta headquarters are trying to be diplomatic, stressing their desire to cooperate with the sudden, sweeping investigation. It remains to be seen whether the Uzbek government comes up with evidence of wrongdoing, but the Maqsudi family has already concluded that something else is driving the government's behavior.

"You have a powerful [woman] who, rather than following traditional divorce proceedings in court, is exerting her power in government," said Patrizia Zita, a family friend and New Jersey public-relations executive to whom the Maqsudis have referred all questions.

Mansur Maqsudi, who lives in New Jersey, where his family's trading company has an office, declined to comment. Ms. Karimova-Maqsudi, who had been living in New Jersey with her husband and two children until shortly before the

**C-6**

::: "WHEN THE COLA WARS CAME TO UZBEKISTAN..." :::

separation, couldn't be reached for comment.

Officials with the Uzbek Foreign Ministry and state news agency, which serves as the official conduit for all press inquiries, didn't respond to more than a dozen requests for comment on the government investigation and the status of the Maqsudi-Karimova marriage. In private conversations with foreign diplomats, Uzbek officials have strongly denied the investigation has any connection to Mr. Maqsudi's relationship with the president's daughter, according to the diplomats.

However it is resolved, Coke's predicament illustrates the route to success that many local and foreign businesses have taken in the former Soviet Union -- a partnership with top government officials or people close to them. And if there is indeed a connection between the Maqsudi-Karimova separation and the government investigation, Coke's experience also demonstrates one potential peril of that strategy.

Not long after the 1991 Maqsudi-Karimova marriage, Mr. Maqsudi and his older brother, Fareed, approached Coca-Cola, offering to bottle the company's products in Uzbekistan. Coke at the time considered the possibility that a partnership with an in-law of the top Uzbek leader could be risky, according to a person close to the company.

But that worry was outweighed by the company's eagerness to establish itself in a region long known as a stronghold of rival PepsiCo Inc. With 25 million people, Uzbekistan is the largest nation in Central Asia, although it is poor, and its cotton- and gold-based economy has been declining. Critics say that President Karimov's brutal crackdown against alleged Muslim extremists has led to a broadened insurgency by guerillas based in Afghanistan. The Maqsudis, ethnic Uzbeks who had emigrated to the U.S. from Afghanistan, are unusual in having both substantial capital and an intimate knowledge of this dicey market.

Apart from their Uzbek interests, the brothers operated a family electronics-export company in Manhattan. After their wedding in Tashkent, Mansur Maqsudi and his bride had flown to a reception in New York for their American friends, according to the family spokeswoman, Ms. Zita. Coke and the Maqsudis formed a joint venture in 1994, investing about $1.7 million each. Mansur Maqsudi was named president of the new company, Coca-Cola Bottlers Uzbekistan. Through the family-owned Roz Trading Group Ltd., the Maqsudis eventually acquired a controlling 55% share of the venture, with Coke owning the rest.

Ahmet Bozer, president of Coca-Cola's Eurasian division, said Coke never received any special favors because of its ties to the president's family. "The relationship with the government has been kept at arm's length and has always been pure," he said.

The new venture was bad news for Pepsi, though. The Uzbek government ended a multiyear relationship with the Coke rival in 1994 and gave Coke access to the only big bottling plant in Tashkent that met the American companies' standards. Coke quickly became a consumer hit with Uzbeks, and Pepsi soon ceased production in the country. A Pepsi spokesman declined to comment.

Since 1994, Coca-Cola has invested more than $100 million in Uzbekistan, making it one of the country's largest foreign investors. Coke and other Coca-Cola soft drinks, such as Fanta, Sprite and an apple-flavored version of Fresca,

C-7

::: "WHEN THE COLA WARS CAME TO UZBEKISTAN..." :::

Page 3 of 4

appeared on store shelves there. The bottler, run day-to-day by Maqsudi- employed managers, expanded production to three plants. In 1998, Ms. Karimova-Maqsudi entered a masters-degree program in Central Asian studies at Harvard University in Cambridge, Mass., while her husband simultaneously enrolled at Harvard's Kennedy School of Government. Described as glamorous and intelligent by former classmates, Ms. Karimova-Maqsudi encountered skepticism on the generally liberal Ivy League campus about her father's human-rights and political policies. "She is very savvy" and skillfully defended those policies, said one classmate, Jonathan Phillips.

At some point, the marriage hit the rocks. The couple officially separated in July, according to Ms. Zita, the family spokeswoman. A few days after word of the separation spread in Tashkent, a government official there telephoned the bottling company to postpone a concert of foreign and local entertainers the company had planned to sponsor in early September, bottling-company managers said. Police also began stopping Coca-Cola trucks for no apparent reason, the company officials said. Then, last Monday at about 6 p.m., men from the Uzbek intelligence and security agency, known as the SNB, arrived at the Maqsudis' Roz Trading office in Tashkent and announced there would be a search, according to company officials. Four hours later, the security men returned with an official letter, authorizing an examination of the company's books and the confiscation of company property. The SNB took away most of the office's 20 computers, said a company official who witnessed the scene.

Meanwhile, a small army of government officials arrived at the main bottling plant in another part of Tashkent. Tax inspectors led the plant's top two managers away. Other inspectors carted off files from the company's finance, procurement and purchasing departments, according to executives who were there.

Managers of the two companies telephoned the U.S. and British embassies. (Roz Trading is registered in the Cayman Islands, a British colony.) Company employees also alerted the Maqsudi brothers, who from their Montville, N.J., office launched a lobbying blitz. The Maqsudis contacted local congressmen and the State epartment.

Separately, a Coke lobbyist in Washington met with the Uzbek ambassador to the U.S., Sharvkat Khamrakulov, and phoned the State and Commerce departments. Last Tuesday, U.S. diplomats in Tashkent delivered a message to the Uzbekistan Foreign Ministry that the U.S. was concerned about the situation and expected the government not to hold any of the detainees for long periods, according to people familiar with the situation.

Within 36 hours of being detained, the Maqsudi employees were released.

But the scrutiny continued. An officer with the national antinarcotics force even examined the cola syrup at the plant, suggesting that he was looking for some kind of drug contamination, company officials said. Managers shut down production for about 24 hours at one point, having decided they couldn't operate under such conditions. By Friday, production had resumed, and the multifaceted inspection was continuing during normal working hours. At the Roz Trading office in Tashkent, though, the government men left the company's ransacked computers in a heap. One senior Maqsudi employee said the officials told him they were conducting a criminal investigation but weren't more specific.

Coca-Cola officials said the American company in recent days has received a letter from Uzbek tax authorities, officially informing Coke that the bottler's books would be audited for evidence of possible violations of law. The Coke officials stressed their desire to accommodate the Uzbek probe.

**C-8**

::: "WHEN THE COLA WARS CAME TO UZBEKISTAN..." :::

"Uzbekistan is an important country for us," said the company's Mr. Bozer. "We have a good relationship with the Uzbek government, and I don't see what has happened as taking away from that."

‹ ‹ ‹ Home                           ‹ ‹ ‹ Top                           Next ▶ ▶ ▶

About site

Mirror: www.ummah.com/uzbekistan

Copyright ©2000-2002 "Muslim Uzbekistan". All rights reserved.

webmaster@muslimuzbekistan.com | mail@muslimuzbekistan.com | uzbekistan786@yahoo.com

http://archive.muslimuzbekistan.com/eng/ennews/2001/08/ennews30082001.html

C-9

Westlaw.

NewsRoom

7/19/02 FTCOM (No Page)

Page 1

7/19/02 Fin. Times - FT.com (Pg. Unavail. Online)
2002 WLNR 6747683

FT.com
Copyright (c) 2002 Financial Times Ltd. All rights reserved.

July 19, 2002

Marital strife leaves Coca-Cola flat

DAVID STERN

20020719 190937 Divorce can be costly. Coca-Cola is finding out the hard way that in Uzbekistan even a global drinks giant can become like the child trapped in a custody battle while the estranged parents fight it out.

The saga began last year, when Coca-Cola's main Uzbek partner, **Mansur    Maqsudi** , separated from his wife of 10 years, Gulnora Karimova. Perhaps that would hardly have mattered had she not been the daughter of Islam Karimov, the Uzbek president.

Coca-Cola International, along with Mr Maqsudi's company, Roz Trading, and the Uzbek state property committee were co-owners of Coca-Cola Bottlers Uzbekistan, the bottling and distribution enterprise.

The break-up of Mr Maqsudi and Ms Karimova was by all accounts acrimonious. In a development that Uzbek authorities said was not related to the divorce, Mr Maqsudi was said to owe the government $9m in back taxes. Mr Maqsudi resides in the US and has said he will not return to Uzbekistan, for fear of prosecution.

As the atmosphere soured, Coca-Cola was paid visits by the tax police, fire inspectors and other government officials. The heat became so intense that the general manager left the country.

The Uzbek government then sought to take over Roz Trading's share of the company in lieu of the taxes allegedly owed by Mr Maqsudi, leading to the company's multi-million-dollar state-of-the-art factory outside the capital Tashkent ceasing operations for four months. The bottling company was at one point liquidated, although Coca-Cola appealed against the ruling.

"Coca-Cola thought that they had the ultimate 'in' with the government, which would smooth the way for their business here. Unfortunately they didn't take into account the president's daughter divorcing their contact," said one western businessman. Or, as one western diplomat familiar with the case, put it: "Hell hath no fury like a woman scorned."

The case occurs at a sensitive moment. The Uzbek government, which provided the US with extensive military facilities during the war in Afghanistan, has promised the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-10

7/19/02 FTCOM (No Page)                                              Page 2

International Monetary Fund to liberalise its Soviet-style economy. Paul O'Neill, the US treasury secretary, lauded President Karimov this week for undertaking necessary reforms.

But the Coca-Cola affair, which many say shows the true side of business in Uzbekistan, has now taken another twist. The US company is threatening to close down the factory again - the first voluntary shutdown in the multinational's history.

Coca-Cola resumed operations at the beginning of the year after the closure but soon found that because of Uzbekistan's draconian restrictions on hard currency exchanges it could not buy enough raw materials to produce its soft drinks. Supplies will last until July 31, officials say.

So far Uzbek authorities have refused to grant Coca-Cola a sufficient quota of hard currency. As a result it is sitting on perhaps as much as $30m in sum, the local currency. "We have probably more sum than the Uzbek government," says Peter Rosema, head of Coca-Cola's Uzbekistan representative office.

Those familiar with the case say that Uzbek authorities are trying to press Coca-Cola into taking their side in the dispute with the Maqsudi family. Uzbek officials were not available for comment.

---- INDEX REFERENCES ----

COMPANY: COCA COLA CO (THE); COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (World Organizations (1IN77); CIS (1CI65); Financially Distressed Companies (1FI85); Bankruptcies (1BA08))

INDUSTRY:  (Consumer Packaged Goods (1CO27); Consumer Products & Services (1CO62); Beverages (1BE22); Non-Alcoholic Beverages (1NO38); Soft Drinks (1SO77); Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Western Asia (1WE54); Asia (1AS61); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (COCA COLA; COCA COLA BOTTLERS UZBEKISTAN; COCA COLA INTL; INTERNATIONAL MONETARY FUND; ISLAM KARIMOV; MARITAL; UZBEK; UZBEKISTAN)  (Karimova; Mansur Maqsudi; Maqsudi; Paul O'Neill; Peter Rosema; Roz Trading; Supplies) (Uzbekistan (UZ); Commonwealth of Independent States (XV); Former USSR (QC))

COMPANY TERMS: COCA COLA CO Company Number: (CALAB00000)

PRODUCT: Executive Offices

NAICS CODE: 92111

Word Count: 649

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                    C-11

7/19/02 FTCOM (No Page)




7/19/02 FTCOM (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                    **C-12**

Westlaw.

NewsRoom

7/20/02 FTI 4

Page 1

7/20/02 Fin. Times 4
2002 WLNR 6788640

Financial Times UK
Copyright (c) 2002 Financial Times Ltd. All rights reserved.

July 20, 2002

Section: INTERNATIONAL ECONOMY & THE AMERICAS

INTERNATIONAL ECONOMY & THE AMERICAS: Marital strife leaves Coca-Cola flat: The drinks giant's Uzbek operation suffers from a family's conflict, writes David Stern

DAVID STERN

Beverages, Soft Drinks

Divorce can be costly. Coca-Cola is finding out the hard way that in Uzbekistan even a global drinks giant can become like the child trapped in a custody battle while the estranged parents fight it out.

The saga began last year, when Coca-Cola's main Uzbek partner, **Mansur    Maqsudi** , separated from his wife of 10 years, Gulnora Karimova. Perhaps that would hardly have mattered had she not been the daughter of Islam Karimov, the Uzbek president.

Coca-Cola International, along with Mr Maqsudi's company, Roz Trading, and the Uzbek state property committee were co-owners of Coca-Cola Bottlers Uzbekistan, the bottling and distribution enterprise.

The break-up of Mr Maqsudi and Ms Karimova was by all accounts acrimonious. In a development that Uzbek authorities said was not related to the divorce, Mr Maqsudi was said to owe the government Dollars 9m in back taxes. Mr Maqsudi resides in the US and has said he will not return to Uzbekistan, for fear of prosecution.

As the atmosphere soured, Coca-Cola was paid visits by the tax police, fire inspectors and other government officials. The heat became so intense that the general manager left the country.

The Uzbek government then sought to take over Roz Trading's share of the company in lieu of the taxes allegedly owed by Mr Maqsudi, leading to the company's multi-million-dollar state-of-the-art factory outside the capital Tashkent ceasing operations for four months. The bottling company was at one point liquidated, although Coca-Cola appealed against the ruling.

"Coca-Cola thought that they had the ultimate 'in' with the government, which

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

would smooth the way for their business here. Unfortunately they didn't take into account the president's daughter divorcing their contact," said one western businessman. Or, as one western diplomat familiar with the case, put it: "Hell hath no fury like a woman scorned."

The case occurs at a sensitive moment. The Uzbek government, which provided the US with extensive military facilities during the war in Afghanistan, has promised the International Monetary Fund to liberalise its Soviet-style economy. Paul O'Neill, the US treasury secretary, lauded President Karimov this week for undertaking necessary reforms.

But the Coca-Cola affair, which many say shows the true side of business in Uzbekistan, has now taken another twist. The US company is threatening to close down the factory again - the first voluntary shutdown in the multinational's history.

Coca-Cola resumed oper-ations at the beginning of the year after the closure but soon found that because of Uzbekistan's draconian restrictions on hard currency exchanges it could not buy enough raw materials to produce its soft drinks. Supplies will last until July 31, officials say.

So far Uzbek authorities have refused to grant Coca-Cola a sufficient quota of hard currency. As a result it is sitting on perhaps as much as Dollars 30m in sum, the local currency. "We have probably more sum than the Uzbek government," says Peter Rosema, head of Coca-Cola's Uzbekistan representative office.

Those familiar with the case say that Uzbek authorities are trying to press Coca-Cola into taking their side in the dispute with the Maqsudi family. Uzbek officials were not available for comment.

---- INDEX REFERENCES ----

COMPANY:  COCA COLA CO (THE); COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Economic Policy & Policymakers (1EC69); World Organizations (1IN77); CIS (1CI65); Financially Distressed Companies (1FI85); Economics & Trade (1EC26); Bankruptcies (1BA08))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Food & Beverage Production (1FO79); Consumer Packaged Goods (1CO27); Consumer Products & Services (1CO62); Beverages (1BE22); Soft Drinks (1SO77); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Asia (1AS61); Uzbekistan (1UZ71); Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (COCA COLA; COCA COLA BOTTLERS UZBEKISTAN; COCA COLA INTL; INTERNATIONAL MONETARY FUND; ISLAM KARIMOV; UZBEK; UZBEKISTAN) (David Stern; INTERNATIONAL ECONOMY; Karimova; Mansur Maqsudi; Maqsudi; Paul O'Neill; Peter Rosema; Roz

7/20/02 FTI 4                                              Page 3

Trading; Soft Drinks; Supplies)  (Company Management (CN02); Company News (CN);
Government News (GN); Taxation (GN16))  (United States of America (US); Uzbekistan
(UZ); Americas (QA); Commonwealth of Independent States (XV); Former USSR (QC);
North America (XB); Pacific Rim (QG))

COMPANY TERMS: COCA COLA CO Company Number: (CALAB00000)

PRODUCT: Soft Drink Mfg

NAICS CODE: 312111

EDITION: USA Ed2

Word Count: 649
7/20/02 FTI 4
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.    **C-15**

The New York Times
nytimes.com

September 12, 2002

# Love, Divorce and the Hague Treaty; New Jersey Custody Case Is Really an International Dispute

By RICHARD LEZIN JONES

Between them, there seemed to be love enough for two weddings. First, Gulnara Karimova and Mansur Maqsudi were married in their native Uzbekistan. Then it was off to New York for another ceremony.

After their union more than a decade ago, their lives -- both in the United States and in Uzbekistan -- were filled with children and country clubs, PlayStation and Pokémon. And when Mr. Maqsudi wanted to open a new Coca-Cola bottling plant in Uzbekistan, well, it didn't hurt that his father-in-law was Islam A. Karimov, the nation's president.

Didn't hurt, that is, until Mr. Maqsudi filed for divorce.

Since then, he has testified at court hearings over the last two months, his wife has fled to Uzbekistan with their two children, one of his family's businesses in his homeland has been lost and another is in limbo, and three of his relatives have been sentenced to jail terms as long as 10 years for what the Uzbek authorities say was corporate corruption.

Now, Mr. Maqsudi, who had settled with his family in nearby Mendham, has asked a New Jersey Superior Court judge here to assume jurisdiction in the case so that he can pursue a custody claim for their children. In Uzbekistan, he says, he would not get a fair hearing because of the influence of his wife and father-in-law. A ruling is expected on Thursday.

The case has unfolded in court here as a drama that mixes Eastern-bloc intrigue with the melodrama of a daytime soap opera, the intricacies of the Hague conventions governing international law and a bitterness that transcends even the normal rancor of custody disputes. The backdrop is just as complicated: the collision between democratic strivings, capitalistic ambitions and lingering authoritarianism in a former Soviet republic.

C-16

Neither Mr. Maqsudi, 35, who is an American citizen, nor Ms. Karimova-Maqsudi, 30, who has a green card, would agree to be interviewed. But according to court testimony, Mr. Maqsudi said that after one fight too many, he told his wife in July 2001 that he wanted a divorce, and she left for Uzbekistan the next day with their children, Islam, 9, and Iman, 4.

Mr. Maqsudi testified that on Aug. 1, his parents notified him from Uzbekistan that she was demanding that $5.5 million be deposited in her Swiss bank account, and that she be given half the proceeds from the sale of their Mendham home and full ownership of their home in the Uzbek capital, Tashkent. If those demands were met, he testified, she had offered to work out a joint custody arrangement for the children.

What would she do if they were not met? In court papers, Mr. Maqsudi cited the end of a largely apologetic note that Ms. Karimova-Maqsudi left for him before she returned to Uzbekistan. "There's an interesting movie," she wrote, listing the day, channel and time. "I hope you'll get a chance to see it again."

The film? "The War of the Roses," the 1989 film about a contentious divorce that culminates with the couple's death.

To Mr. Maqsudi, the threat was obvious. "Destroy the Maqsudi family, destroy the Maqsudi businesses," he testified, "and she did that."

Mr. Maqsudi went ahead and filed for divorce, anyway, last October.

But what he characterized as ransom, her lawyer described as nothing more than the kind of monetary settlement and financial distribution that couples commonly discuss in divorce proceedings.

"I think what what he's trying to do is utilize the economic aspects of this case and turn it into a ransom demand, which is something we categorically deny," said the lawyer, John P. Paone Jr. "It's just that he controls all the assets and any final settlement would likely include a payment."

Mr. Paone also said that any wounds suffered by Mr. Maqsudi's two businesses in Uzbekistan were largely self-inflicted. Mr. Paone said that the businesses -- Coca-Cola Bottling Uzbekistan and the ROZ Trading Group Ltd., a related company -- were the subject of legitimate investigations by the Uzbek authorities. Late last year, Mr. Paone said, the Coca-Cola family lost control of the Coca-Cola plant, the government ordered liquidation of the other business, and two cousins and an uncle of Mr. Maqsudi's were convicted on tax-violation and money-conversion charges.

Mr. Paone said Mr. Maqsudi was using the custody issue as a way to pressure President Karimov's administration into allowing him to reopen his businesses.

Although Mr. Maqsudi contends that his wife took their children illegally when she returned to Uzbekistan in July 2001, Mr. Paone said that she had merely gone home on a previously planned trip.

C-17

"He's trying to portray that as abduction," he said. "In my view, she went back to Uzbekistan with her children. He chose not to come."

Mr. Maqsudi has not returned to Uzbekistan, his wife has not returned to this country, and the couple cannot agree on a neutral meeting site.

The legal issues at play are not subject to Hague conventions governing international civil law because Uzbekistan is not one of the 61 nations that have signed the Hague treaty. Even if Judge Deanne M. Wilson rules that her court has jurisdiction in the case, Mr. Maqsudi's victory may be an empty one because the court may later decide to grant custody to his wife, anyway.

Still, he has appealed to the New Jersey court because he feels his chances of receiving equal treatment under Uzbekistan's law are slim -- especially in the turbulent political atmosphere since the Sept. 11 attacks.

Uzbekistan, a nation of 25 million that borders Afghanistan, has become a valuable ally of the United States in its war on terrorism. The authoritarian regime of President Karimov has frequently drawn the ire of human rights groups; one of them, Humans Rights Watch, says that over the last several years more than 7,000 Muslims have been arrested by the government.

"I don't think that President Karimov would like to admit it, but I think that in a case with such a high profile, the courts would try to ensure a favorable outcome for his daughter," said John S. Schoeberlein, director of the Program on Central Asia and the Caucasus at Harvard University.

Mr. Maqsudi's lawyer, Edward J. O'Donnell, said that 19 members of Congress had written letters to the Uzbek government on his client's behalf, seeking information on the charges against Mr. Maqsudi's relatives and seeking help in arranging a meeting between Mr. Maqsudi and his children. Mr. O'Donnell said that after months of negotiations, State Department officials were allowed to see the children in Uzbekistan last spring, but that Mr. Maqsudi had not seen them for more than a year.

Professor Schoeberlein said that Uzbekistan's recent moves toward democratization had often butted up against its despotic past. And, he suggested, Mr. Maqsudi may be trying to beat a system of which he was once part.

"It's widely held that the government acted in retaliation against him after the divorce," Professor Schoeberlein said. "But the other side of the story is that he may not have been able to do business there without his connection to the president. In a sense, then, he gained by the same mechanism with which he lost."

Copyright 2007 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | | Help | Contact Us | Work for Us | Back to Top

http://query.nytimes.com/gst/fullpage.html?res=9A06EFDC1331F931A2575AC0A9649C8B63&sec=&spon=&pagewanted=p...    10/10/2007

C-18

Westlaw.

11/20/02 ATLNTAJC A1

NewsRoom

Page 1

11/20/02 Atlanta J. - Const. A1
2002 WLNR 4666067

Atlanta Journal and Constitution (GA)
Copyright 2002 Atlanta Newspapers Inc.

November 20, 2002

Section: News

FAMILY FEUD IN UZBEKISTAN ENTRAPS COKE

MARGARET COKER; Cox Moscow Correspondent

Tashkent, Uzbekistan --- Coca-Cola has learned a painful lesson in this former Soviet bastion: Blood is thicker than soda.

What started as a quiet dispute within the first family of Uzbekistan escalated to jailings, deportations, a bill for $9 million in back taxes and a four-month shutdown of Coca-Cola production.

Before that unfortunate turn of events, Coke appeared to have a textbook recipe for international business success: Strike a partnership with the Uzbek president's son-in-law to gain government access, smooth the start-up process and gain quick market penetration.

But after President Islam Karimov's daughter filed for divorce this year, Coke's partnership became a nightmarish liability.

Last month, in a soap-opera-style takeover, the government ousted Coke's ally and installed new management at the bottling plant.

Uzbekistan long has been regarded as unfriendly to foreign business. But the shake-up in plant management has raised doubts among Western business leaders in the region about whether the Florida-sized country, which borders Afghanistan, deserves to be praised by Washington as a prized ally in the war against terrorism.

''Rewarding a government like this?" said a longtime U.S.-based investor in Central Asia. "It's not the usual American way.''

When the divorce drama between first daughter Gulnora Karimova and **Mansur Maqsudi** got nasty, Coke quickly became ensnarled.

In apparent retaliation for the humiliation suffered by the president's daughter, authorities jailed some members of Maqsudi's family and deported others to their native Afghanistan.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-19

The timing of the deportations helped twist the knife: They occurred last autumn, while fighting raged between U.S.-backed Afghan forces and the Taliban.

Saying he was afraid for his life, Maqsudi fled to the United States, where he had lived for much of the previous decade.

As often happens in the rough-and-tumble economies of the former Soviet republics, the personal dispute spilled over into business. As word of the divorce hit the bustling streets of the Uzbek capital of Tashkent, the government announced that Maqsudi owed $9 million in taxes.

Maqsudi denied it, but the government went after his assets, including his minority stake in the Coca-Cola Bottlers of Uzbekistan. The company's other two owners are Uzbekistan's government and Coca-Cola.

The power grab halted Coke production for months, partly because Maqsudi had managed the bottling operation and it had difficulty operating without him.

"Coke thought that they had the ultimate 'in,' " said a Western diplomat based in Tashkent. "They never figured that the president's daughter would divorce their man."

Coke spokesman Steve LeRoy refused to comment on the Maqsudi matter. While acknowledging production problems, he expressed optimism about Coke's future in Uzbekistan.

''We believe that if the Uzbek government opens up to the U.S., that will only create more transparency, a favorable business climate and create a more level playing field,'' LeRoy said in a phone interview from his offices in Vienna.
Closed business culture

Uzbekistan was shunned by businessmen and human rights groups alike for the past decade. Karimov, a former Communist Party boss, has run the country as a personal fiefdom since the days when it was part of the Soviet Union. He muscles opponents and critics at will.

Only the largest multinational companies even considered trying to crack Uzbekistan's business culture after the Soviet empire dissolved in 1991.

But Coca-Cola jumped into the market, hoping that an extensive bottling and distribution system in Uzbekistan --- with about 30 million people, the most populous Central Asian country --- could serve as a launching pad to neighboring countries.

The soft drink giant chose Karimov's son-in-law as a local partner, offering co-ownership in the bottling plant to the Uzbek government and Maqsudi's company, Roz Trading.

Uzbekistan was never considered a place to get rich easily. The International

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Monetary Fund and Western business leaders have routinely criticized Karimov for subsidizing favorite industries and enforcing a draconian foreign currency conversion law that penalizes international companies by making them keep profits in local currency.

But the Sept. 11 terrorist attacks drastically changed Uzbekistan's international profile. A month later, Karimov agreed to provide the Pentagon with a base from which to launch its military campaign and covert operations in neighboring Afghanistan. In return, the White House in May signed a mutual defense agreement with Karimov that said any threat to his regime would be met as a threat to the United States.

In July, during a trip to Tashkent to continue the cheerleading campaign for the new U.S. ally, Treasury Secretary Paul O'Neill praised Karimov for ''turning the corner'' on economic reform, despite the fact that a long-promised repeal of the foreign currency law had not been implemented.
One shutdown averted

At the time of O'Neill's visit, Coke had warned that another shutdown was possible because the currency laws were preventing it from importing materials it needed to manufacture more soft drinks.

The summer shutdown was averted, but only after intense discussions with the government, company officials said.

The problems did not end there.

Having confiscated Maqsudi's shares in the plant, the Uzbek government possessed a majority of the shares. In September, after long negotiations with Coke, the Uzbeks installed new management at the plant --- officers widely believed to have ties to business rivals of Maqsudi.

But the new management would ensure ''smooth sailing'' for Coke in the future, Deputy Foreign Minister Sadyk Safayev assured in a September interview.

''The previous management of Coke committed lots of misdeeds, like violations of tax law, violations in sales regulations and violations of human rights in the plant here," Safayev said. "Both Coke and the Uzbek government lost out because of these misdeeds. We are sure the new team will clear up these things. We are doing our utmost to make sure Coke won't have any more problems.''

Coke spokesman LeRoy said Safayev's allegations of misdeeds are untrue.

U.S. Embassy officials in Tashkent, meanwhile, said that while they were concerned with the treatment of Coke in the past, they were confident that the enhanced U.S.-Uzbek relationship would help implement economic reforms in the country.

Photo

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Map

The divorce of Uzbek President Islam Karimov's daughter turned a Coke deal flat.
 Map shows location of Uzbekistan; inset map shows area of detail / DALE E. DODSON
/ Staff

ILLUST:
Photo Map

                    ---- INDEX REFERENCES ----

COMPANY: PENTAGON LTD; COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Government (1GO80); World Organizations (1IN77); CIS (1CI65))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Food & Beverage Production (1FO79);
Consumer Packaged Goods (1CO27); Consumer Products & Services (1CO62); Beverages
(1BE22); Soft Drinks (1SO77); Agriculture, Food & Beverage (1AG53))

REGION:  (Afghanistan (1AF45); Central Asia (1CE93); Americas (1AM92); North Amer-
ica (1NO39); Asia (1AS61); Uzbekistan (1UZ71); USA (1US73); Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (AFGHANISTAN; COCA COLA; COMMUNIST PARTY; PENTAGON; TREASURY; US
EMBASSY; UZBEK; UZBEKS; WHITE HOUSE)  (Coke; DALE E. DODSON; FAMILY FEUD; Gulnora
Karimova; Islam Karimov; Karimov; LeRoy; Mansur Maqsudi; Maqsudi; O'Neill; Paul
O'Neill; Roz Trading; Sadyk Safayev; Safayev; Steve LeRoy)

EDITION: Home

Word Count: 1350
11/20/02 ATLNTAJC A1
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-22

Westlaw.

NewsRoom

11/21/02 LEDGERENQ B9

Page 1

11/21/02 Columbus Ledger-Enquirer (GA) B9
2002 WLNR 1917264

Columbus Ledger-Enquirer, Ga
Copyright (c) 2002, R. W. Page Corp.

November 21, 2002

Section: BUSINESS

CAUGHT UP IN A FEUD

Associated Press

ATLANTA - A divorce within the first family of Uzbekistan led to a four-month
shutdown of Coca-Cola production and a takeover of Coke's bottling company in the
central Asian country.

Atlanta-based Coca-Cola had a partnership with **Mansur   Maqsudi** , the son-
in-law of Uzbek President Islam Karimov. But the president's daughter, Gulnora
Karimova, filed for divorce this year and Coke became ensnarled in the fight.

Uzbek authorities jailed some members of Maqsudi's family and deported oth-
ers to their native Afghanistan in apparent retaliation for the humiliation
suffered by the president's daughter.

Maqsudi fled to the United States, where he has lived for much of the previ-
ous decade.

As word of the divorce spread, the Uzbek government announced that Maqsudi
owed $9 million in taxes. Maqsudi denied it, but the government went after his as-
sets, including his minority stake in Coca-Cola Bottlers of Uzbekistan.

The company's other two owners are the government of Uzbekistan and Coca-
Cola.

The incident halted Coke production for months, partly because Maqsudi had
managed the bottling operation and it had difficulty operating without him.

Coke spokesman Steve LeRoy refused to comment on the Maqsudi matter. While
acknowledging production problems, he said he was optimistic about Coke's future
in Uzbekistan.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (World Organizations (1IN77); CIS (1CI65))

INDUSTRY:  (Beverages (1BE22); Non-Alcoholic Beverages (1NO38); Soft Drinks

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-23

(1SO77); Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); USA (1US73); Americas (1AM92); North America (1NO39); Asia (1AS61); Uzbekistan (1UZ71))

Language:  EN

OTHER INDEXING:  (CAUGHT; COCA; COCA COLA; COKE; COLA)  (Gulnora Karimova; Islam Karimov; Mansur Maqsudi; Maqsudi; Steve LeRoy; Uzbek)

EDITION: LEDGER-ENQUIRER

Word Count: 267
11/21/02 LEDGERENQ B9
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.       **C-24**

Westlaw.

NewsRoom

11/24/02 PALMBCHPST 3F

Page 1

11/24/02 Palm Beach Post 3F
2002 WLNR 1984883

Palm Beach Post (FL)
Copyright (c) 2002, The Palm Beach Post

November 24, 2002

Section: BUSINESS

## DIVORCE TAKES FIZZ OUT OF COKE IN UZBEKISTAN

MARGARET COKER Palm Beach Post-Cox News Service

TASHKENT, UZBEKISTAN It sounded like a textbook recipe for international business success: Strike a partnership with a family member of a nation's leader to ensure government access, smooth the start-up process and gain quick market penetration.

Yet this strategy left Coca-Cola's business in Uzbekistan flat after the daughter of President Islam Karimov filed for divorce earlier this year from her husband, one of Coke's partners in its local bottling company. Then, last month, the government installed new management at the plant.

Call it a hostile takeover, soap-opera style.

Uzbekistan has long been regarded as unfriendly to foreign business. But the move to install new plant management has raised doubts among some Western business leaders in the region about whether the Florida-sized country, which borders Afghanistan, should be touted by Washington as a highly-prized ally in the war against terror.

"Rewarding a government like this? It's not the usual American way," said a longtime U.S.-based investor in Central Asia.

The divorce drama between Gulnora Karimova and **Mansur Maqsudi** started last year as a quiet family dispute - albeit one that involved the powerful first family of this former Soviet bastion. It quickly got nasty.

In apparent retaliation for the scorn and humiliation suffered by the first daughter, authorities jailed some members of Maqsudi's family and deported others to their native Afghanistan.

The timing of the deportations helped twist the knife: They occurred at the same time that fighting raged last autumn between U.S.-backed Afghan forces and the Taliban. Saying he was afraid for his life, Maqsudi fled to the United States, where he had been living for much of the previous decade with the benefit of a green card.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

As often happens in the rough-and-tumble economies of the former Soviet Union, personal revenge quickly spilled over into business. As word about the divorce hit the bustling street markets around the Uzbek capital of Tashkent, the government announced that Maqsudi owed $9 million in taxes - an accusation that Maqsudi denied.

To satisfy the alleged debt, the government went after the divorced man's assets, including his minority stake in the Coca-Cola Bottlers of Uzbekistan. The Uzbek company's other two owners, which also held minority stakes, include Uzbekistan's government and Coca-Cola.

The power grab caused a four-month shutdown in production, in part because the Coca-Cola operation had difficulty functioning once Maqsudi, who managed the bottling plant, was forced out.

"Coke thought that they had the ultimate 'in.' They never figured that the president's daughter would divorce their man," said one Western diplomat based in Tashkent. "The scandal has been terrible PR for a country that already has a full plate of bad PR."

Coke spokesman Steve LeRoy refused to comment on issues related to Maqsudi. While acknowledging production problems, he expressed optimism about Coke's future performance in Uzbekistan.

"We believe that if the Uzbek government opens up to the U.S., that will only create more transparency, a favorable business climate and create a more level playing field," said LeRoy in a phone interview from his offices in Vienna, Austria.

For the past decade, Uzbekistan was shunned by businessmen and human rights groups alike. A former Communist Party boss, Karimov has run the country as a personal fiefdom since the days when it was part of the Soviet Union, muscling opponents and critics at will.

Only the largest multinational companies even considered trying to crack Uzbekistan's insider business culture after the Soviet empire dissolved in 1991. Coca-Cola International jumped into the market, hoping that an extensive bottling and distribution system in Uzbekistan, the most populous Central Asian country with about 30 million people, could serve as a launching pad to neighboring countries.

The soft drink giant chose Karimov's son-in-law as a local partner, offering co-ownership in the bottling plant to the Uzbek government and Maqsudi's company, Roz Trading, which also acted as management at the facility.

Uzbekistan was never considered a place to get rich easily. The International Monetary Fund and Western businessmen have routinely criticized Karimov for subsidizing favorite industries and enforcing a Draconian foreign currency conversion law that penalizes international companies by making them keep profits in local currency but helps Uzbek companies buy hard currency cheaply.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-26**

11/24/02 PALMBCHPST 3F                                                    Page 3

But the Sept. 11 attacks drastically changed Uzbekistan's international pro-
file. A month after the terrorist attacks, Karimov agreed to provide the Pentagon
with a base from which to launch its military campaign and covert operations in
neighboring Afghanistan. In return, the White House in May signed a mutual defense
agreement with Karimov that said any threat to his regime would be met as a threat
also to the U.S.

In July, during a trip to Tashkent to continue the cheerleading campaign for
the new ally, Treasury Secretary Paul O'Neill praised Karimov for "turning the
corner" on economic reform, despite the fact that a long-promised repeal of the
foreign currency law had not been implemented.

At the time of O'Neill's visit, Coke had warned that another shutdown was pos-
sible because the currency laws were preventing it from importing materials it
needed to manufacture more soft drinks.

The summer shutdown was averted, but only after intense discussions with the
government, company officials said.

Problems did not end there. Having confiscated Maqsudi's shares in the plant,
the Uzbek government possessed a clear majority of shares. In September, after
long negotiations with Coke, the Uzbeks installed new management at the plant, of-
ficers that were widely believed to have ties to business rivals of Maqsudi.

The new management would ensure "smooth sailing" for Coke in the future, Deputy
Foreign Minister Sadyk Safayev said.

Photo
Map
1. ANVAR ILYASOV/The Associated Press\Islam Karimov is the president of Uzbek-
istan. The soft drink giant chose his son-in-law as a local partner - which worked
swell until the divorce.\2. STAFF GRAPHIC\Location of Bukhara, Samarkand, and
Tashkent, Uzbekistan.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (HR & Labor Management (1HR87); Legal (1LE33); Social Issues
(1SO05); Business Management (1BU42); Divorces (1DI23); Strikes & Work Stoppages
(1ST12); Personal & Family Law (1PE02); World Organizations (1IN77); CIS (1CI65))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Consumer Packaged Goods (1CO27);
Beverages (1BE22); Soft Drinks (1SO77); Food & Beverage Production (1FO79); Con-
sumer Products & Services (1CO62); Agriculture, Food & Beverage (1AG53))

REGION:  (North America (1NO39); Western Europe (1WE41); Austria (1AU39); Europe
(1EU83); Central Europe (1CE50); Russia (1RU33); Eastern Europe (1EA48); Western
Asia (1WE54); Afghanistan (1AF45); Central Asia (1CE93); Americas (1AM92); Asia
(1AS61); Uzbekistan (1UZ71); USA (1US73))

C-27

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Language:  EN

OTHER INDEXING:  (AFGHANISTAN; ANVAR; COCA COLA; COKE; COMMUNIST PARTY; DIVORCE;
PENTAGON; STAFF; TREASURY; UZBEKS; WHITE HOUSE)  (Gulnora Karimova; Islam Karimov;
Karimov; LeRoy; Mansur Maqsudi; Maqsudi; O'Neill; Paul O'Neill; Roz Trading; Sadyk
Safayev; Steve LeRoy)

EDITION: FINAL

Word Count: 1251
11/24/02 PALMBCHPST 3F
END OF DOCUMENT

**C-28**

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

::: MAQSUDI KEEPS INTERNATIONAL CUSTODY FIGHT ALIVE :::



# Muslim Uzbekistan
The political analytical Islamic site

Arabic    Russian    Uzbek



▢ **Analysis & Facts**

::: Analysis & Facts :::

**January 5, 2004**

## MAQSUDI KEEPS INTERNATIONAL CUSTODY FIGHT ALIVE

***By: Margaret McHugh***
*Uploaded/Updated: 07/17/2005 08:29:28*

### Lobbies State Department to return his children from Moscow

When Mansur Maqsudi first met Gulnara Karimova in 1991, he was immediately drawn to the tall, red-haired young woman with the powerful father.

She was 19 and the daughter of Islam Karimov, the Communist leader of Uzbekistan who went on to become the former Soviet republic's president. Maqsudi was 24 and the New Jersey-raised scion of a prominent Uzbek family.

Maqsudi and Karimova married four months later and spent the next decade living the moneyed life of an international power couple, dividing time between New Jersey and Tashkent, the Uzbek capital.



Mansur Maqsudi with
his son and daughter
*Photo: Centrasia.Ru*

But for Maqsudi, the good life ended 2 1/2 years ago, when he told Karimova he wanted a divorce and she left New Jersey with their son, Islam, 11, and daughter, Iman, 5. He has not seen the children since.

So began a custody case of international legal and political scope. Sixteen months ago, a Morris County judge ordered the children returned to Maqsudi. Karimova continues to defy that order from her home in Moscow, where she lives with the children under the shield of diplomatic immunity.

Maqsudi is lobbying the U.S. State Department for help in getting his children returned to Mendham Township and the $2.3 million home they once shared as a family.

::: MAQSUDI KEEPS INTERNATIONAL CUSTODY FIGHT ALIVE :::

Maqsudi has preserved his children's bedrooms as they were the day they left, with neatly made queen- sized beds, and toys and books in place.

"This home is the memory they have of their childhood," said Maqsudi, who wants a custody-sharing arrangement with his ex-wife. "If it's in two years, if it's in seven years, if they have no connection to New Jersey, to Mendham, they'll walk into their rooms and remember."

But a speedy return of the children is unlikely.

Although a Morris County judge has ordered Karimova's arrest for failing to return the children, it is an unenforceable order.

Karimova, a karate black-belt with a Harvard degree, recently became an Uzbek diplomat in Moscow and is immune from arrest in Russia, which has no treaty with the United States on child custody matters.

Maqsudi's one hope is that the criminal charge filed in Morris County could lead to his wife's inclusion on Interpol's wanted list. If that were to happen, Karimova could be arrested if she were to travel to a country that has an extradition treaty with the U.S.

"In a way, she's in a box," Maqsudi said. "She loves to travel. She loves the luxurious lifestyle."

Maqsudi, a venture capitalist who came to New Jersey with his family in 1979, is also on the Interpol list. After he filed for divorce, Uzbek officials alleged he and his father and brother cheated that government of $12 million in taxes and committed other financial crimes. Maqsudi denies the charges, and a U.S. State Department official told a congressional hearing the listing was politically motivated.

Soon after Karimova took the children, Maqsudi said his assets in Uzbekistan were seized by the government, 25 relatives were expelled and two uncles and a cousin were sentenced to long prison terms.

One of his wife's former financial advisers, Farhod Inogambaev, said Karimova has amassed more than $100 million in assets since leaving New Jersey.

In addition, Karimova now controls a Coca-Cola bottling plant in Uzbekistan, which Maqsudi won rights to operate in 1994 and built into the nation's biggest employer.

Maqsudi has won over at least one powerful ally in Washington in his quest to get his children back: New Jersey Rep. Chris Smith (R-4th Dist.), the vice chairman of the House Committee on International Relations.

Smith wants to ensure that the State Department is willing to use diplomatic pressure to intervene in Maqsudi's case, if necessary. He intends to make the Maqsudi case the focus of a congressional hearing on Uzbekistan next month, and then raise it at an international winter conference on security in Vienna.

C-30

::: MAQSUDI KEEPS INTERNATIONAL CUSTODY FIGHT ALIVE :::

Smith says Uzbekistan is guilty of human rights abuses and systemic government corruption. The Islamic nation, which borders Afghanistan, has received more than $300 million since Sept. 11, 2001, and has been lauded by the Bush Administration as a crucial ally in the war on terror.

Smith and others have appealed directly to President Karimov and asked Secretary of State Colin Powell to intervene. An assistant secretary last month discussed the case with the Uzbek foreign minister while in that country, the State Department confirmed.

Although Karimova could not be reached by telephone or fax in Moscow, Maqsudi said he sometimes receives angry phone calls from his former wife.

He won't change his telephone number, though, because it is the one his son knew.

"I'm hoping that one day, he's going to call," Maqsudi said. "I know it's a matter of time."

*Margaret McHugh covers the Morris County courts. She can be reached at mmchugh@starledger.com or (973) 539-7119.*

*This article was originally appeared on **Star-Ledger***

Read also:

- Karimov's daughter under fire in child custody case
- Uzbekistan: the mean business of Karimov's daughter
- Uzbek gold in "reliable hands" of Islam Karimov
- Safe h(e)aven for Uzbek strongman's daughter
- Rich pickings for Uzbek leader's daughter
- Things are moving or dark tricks in the White Palace of Uzbek President
- Will the conjugal unit with top diplomat guarantee diplomatic immunity to the daughter of Uzbek president?
- Details to Portrait of Uzbek "Princess" Gulnora Karimova
- Arrest Warrant for Karimov's Kin
- Is the next step for Karimov's daughter arrest?
- Karimov's shameless daughter
- Uzbek mom not immune, court rules
- Karimova "unable to deal with her environment"
- Judge gives Karimov's daughter one last chance
- Stay denied to Uzbek mother
- Uzbek mom partially fills court order
- Maqsudi fearful of his father-in-law's dictatorship
- Karimov's daughter must return kids
- Judge to rule on jurisdiction in custody case

::: MAQSUDI KEEPS INTERNATIONAL CUSTODY FIGHT ALIVE :::

Contact Us

^ ^ ^

Home || Analysis || Genocide || Human Rights || Links || Archive

Copyright ©2000-2004 "Muslim Uzbekistan". All rights reserved.

About site

C-32

Westlaw.

NewsRoom

1/10/04 HAMILTONSPEC 1

Page 1

1/10/04 Hamilton Spectator 1
2004 WLNR 5998354

Hamilton Spectator
Copyright © 2004 TDNG Inc. All rights reserved.

January 10, 2004

Section: Focus

The Runaway Princess; She's the jet-setting daughter of Uzbekistan's notorious dictator and married into one of the nation's wealthiest families. But her bitter divorce could even have repercussions for the U.S. war on terror.

Mary Dejevsky

The Independent

Focus

She's known as the Uzbek Princess, a powerful businesswoman tipped by many to succeed her father as ruler of the largest country in Central Asia.

But Gulnara Karimova has been branded a harridan, a wicked witch, a dragon lady.

Her bitter divorce has spiralled into an international scandal, involving accusations of kidnapping, corruption and dirty politics. It may even have significant implications for the United States' "war against terrorism."

When I meet her in the café of a smart Moscow hotel, the 31-year-old seems an unlikely source of such controversy. She wishes to reply to her critics, she tells me. Yet she appears quiet, almost shy, but very beautiful.

In a city full of new-rich exhibitionists, she is modestly dressed, with almost no make-up and her hat pulled far down over her forehead.

But this fugitive from U.S. justice, accused of "kidnapping" her children, is determined to set the record straight.

"It is all a terrible mess," she says. "I didn't want it to turn out like this. I just wanted a normal, civilized divorce."

Karimova's predicament derives from an extraordinary set of circumstances that reflect extraordinary times. A Harvard-educated martial-arts black belt, she's the elder daughter of Islam Karimov, the former Communist Party leader and now President of Uzbekistan -- the United States' key strategic foothold in Central Asia.

Many would describe Karimov as a dictator. With a population of 25 million, the

former Soviet state has an estimated 6,000 political prisoners and in 2002 a UN investigator found that the use of torture there was "systemic."

At the age of 19, the president's daughter was married to a man she scarcely knew.

**Mansur Maqsudi** was the brother of a family friend, from a wealthy clan of long-time Uzbek emigrants who lived and made money in the United States.

She had met him, aged 19, when she was working as a conference interpreter in the Uzbek capital, Tashkent.

After their marriage in 1991, she lived the life of a minor jetsetter, dividing her time between studies in New York and Boston and homes in New Jersey and Tashkent.

Meanwhile, her husband's business enterprises flourished. He established a local bottling plant for Coca-Cola in the Uzbek capital. And it was here that Karimova gave birth to her first child, a boy called Islam. Six years later, after a spell working at the UN in New York, she had a girl, Iman.

By 2000, though, the marriage was in difficulty; the couple was spending more and more time apart and the following summer, her husband announced that he wanted a divorce. At this point Karimova took off for Tashkent with the children and the trouble really began.

Maqsudi filed for divorce in the U.S. courts, claiming he would not receive a fair hearing in Uzbekistan. The New Jersey Superior Court agreed to proceed and ordered Karimova to return before the hearing.

She describes this as a period of round-the-clock torment: the days spent studying the small print of lawyers' letters and faxes, the nights -- because of the time difference -- in anguished phone calls with her now estranged husband, arguing over custody and finances.

"It was all such a mess," she says again. "After a while, I just decided not to react."

In his legal submissions to the divorce court, Maqsudi claims that, following his split from his wife, his business interests in Uzbekistan were crippled.

A month after their separation, a series of raids began on Coca-Cola's local bottling plant -- by tax inspectors, fire inspectors, customs inspectors, and even an anti-narcotics official. It culminated in a four-month shut-down.

Uzbekistan's attorney general also issued a warrant for the arrest of Maqsudi, his brother and his father, accusing them of tax evasion, corruption and trading oil for Saddam Hussein. The Uzbeki authorities deny that there was any connection between these actions and the divorce proceedings of the President's daughter.

In the summer of 2002, the couple's case was heard in New Jersey.

Maqsudi was awarded sole custody of the children. Karimova, still in Tashkent, did not attend the court or comply with the custody order; a warrant was then issued for her arrest, although this remains unenforceable in Uzbekistan as the necessary international agreements are not in place.

"I didn't ignore the court," she said, "but physically I wasn't capable of going. For a civilized country and a civilized court, I found it very strange that they did not take this into account."

Karimova said that she considered appealing. But "there was a question about where to get the huge sums needed to pay the lawyers".

With a wry smile, she added: "It doesn't matter whose daughter you are. You still have to be transparent about where you got the money."

If she had the necessary $300,000 to spare, she said, she would rather spend it on her children than on U.S. lawyers.

Karimova's detractors, behind whom she sees her ex-husband and his lawyers, claim she is an extravagantly wealthy woman who has made a fortune on the back of privatization and public contracts in Uzbekistan obtained through her family connections.

They claim that her assets include $6 million Cdn worth of jewellery, $15 million in bank and investment holdings in Geneva and Dubai, a $13-million retail complex, nightclubs worth $5.5 million and a $17-million resort in Uzbekistan.

She denied this angrily: "All this stuff about a fortune, with hotels, complexes, etc., is rubbish. Yes, I have a lot of friends who have things like restaurants and hotels and who restore buildings. But that does not mean that these things are mine."

She claims two interests of her own: a major share in Uzdunrobita, the country's main mobile-phone company, which she claims she personally built up to 150,000 subscribers, and jewellery design, which she says she does largely as a hobby and which brings in little money.

Maqsudi has asserted that his wife sought $8 million of his own considerable fortune as a divorce settlement, but Karimova insists she doesn't want a penny of his money: "I felt that if you even touch something that doesn't belong to you, it will stain you for good."

If he wants to send money to the children, she said, that must be between him and them. "The two things must run on separate scripts." Karimova said that she has jewellery and personal effects still in the United States that cannot be sent to her until a final settlement is agreed. After the formal divorce proceedings were over, she said, "they cancelled all my credit cards. Ten years of marriage was

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.          C-35

over, as though it had never been.

"I had maybe $2,700 in my account. Basically, I had no money."

The divorce and its aftermath became a political issue in the United States that even found its way to Congress.

"His is a big family," she said, "and if you cross it, you're not just an enemy of the family, but of the whole community, the clan."

She said they made representations to the congressional committees concerned with human rights in Uzbekistan with a view to getting the children sent to the United States. She suspects, too, that they were instrumental in having her diplomatic passport cancelled, and with it her immunity from prosecution while outside Uzbekistan.

A further complication is the U.S. military presence in Uzbekistan following the intervention in Afghanistan and the war in Iraq. Uzbekistan borders Afghanistan and is strategically important to the Americans who have the use of a former Soviet air base there.

This, she hazards, may eventually work to her advantage. With its troops stationed in the region, the U.S. administration does not want to get mixed up in anything that could cause friction with the Uzbek leadership -- which means Gulnara's father.

And President Karimov, who has no son to anoint as his successor, is staunchly behind his daughter. "He told me that no daughter of his would be put in a position where she would have to take money from a man," she said of her marriage break up, adding that he encouraged her in her incipient diplomatic career.

"He said you've got to take the knocks and build an independent career and see what you can do." Since her time at the UN in New York, she has worked on disarmament at the Uzbek mission to the UN in Geneva and is now at her country's embassy in Moscow.

"It was very hard at the start, but he told me: "Don't disappoint me by running away.'"

Gulnara's bond with her father is clearly stronger than that with her mother, whom she describes as a traditional wife and mother.

The elder of two sisters, she sees herself as her father's daughter. "He is a fighter," she said, "a professional, and he gave me his sense of family. He is my life's mentor."

He is also one reason why she did not apply, as she could have done, for a U.S. green card and U.S. citizenship after her marriage.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-36**

"In my position, it would have been difficult. It might have embarrassed my father."

She has travelled enough to be well aware of his, and her country's, dubious reputation.

"Yes, he has made mistakes," she said, "and you can disagree with some things and with some of the people he chooses, and maybe we take different approaches on some things."

She said human rights is a difficult area -- "I have my own view of these issues" -- but she insisted that with the triple threat of Islamic fundamentalist violence, the illicit arms trade and drugs, the situation in Uzbekistan is complicated, and any leader of the fledgling nation has a tightrope to walk.

=

 The Independent

Focus

She's known as the Uzbek Princess, a powerful businesswoman tipped by many to succeed her father as ruler of the largest country in Central Asia.

But Gulnara Karimova has been branded a harridan, a wicked witch, a dragon lady.

Her bitter divorce has spiralled into an international scandal, involving accusations of kidnapping, corruption and dirty politics. It may even have significant implications for the United States' "war against terrorism."

When I meet her in the café of a smart Moscow hotel, the 31-year-old seems an unlikely source of such controversy. She wishes to reply to her critics, she tells me. Yet she appears quiet, almost shy, but very beautiful.

 In a city full of new-rich exhibitionists, she is modestly dressed, with almost no make-up and her hat pulled far down over her forehead.

But this fugitive from U.S. justice, accused of "kidnapping" her children, is determined to set the record straight.

"It is all a terrible mess," she says. "I didn't want it to turn out like this. I just wanted a normal, civilized divorce."

Karimova's predicament derives from an extraordinary set of circumstances that reflect extraordinary times. A Harvard-educated martial-arts black belt, she's the elder daughter of Islam Karimov, the former Communist Party leader and now President of Uzbekistan -- the United States' key strategic foothold in Central Asia.

Many would describe Karimov as a dictator. With a population of 25 million, the former Soviet state has an estimated 6,000 political prisoners and in 2002 a UN

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.          **C-37**

investigator found that the use of torture there was "systemic."

At the age of 19, the president's daughter was married to a man she scarcely knew.

**Mansur Maqsudi** was the brother of a family friend, from a wealthy clan of long-time Uzbek emigrants who lived and made money in the United States.

She had met him, aged 19, when she was working as a conference interpreter in the Uzbek capital, Tashkent.

After their marriage in 1991, she lived the life of a minor jetsetter, dividing her time between studies in New York and Boston and homes in New Jersey and Tashkent.

Meanwhile, her husband's business enterprises flourished. He established a local bottling plant for Coca-Cola in the Uzbek capital. And it was here that Karimova gave birth to her first child, a boy called Islam. Six years later, after a spell working at the UN in New York, she had a girl, Iman.

By 2000, though, the marriage was in difficulty; the couple was spending more and more time apart and the following summer, her husband announced that he wanted a divorce. At this point Karimova took off for Tashkent with the children and the trouble really began.

Maqsudi filed for divorce in the U.S. courts, claiming he would not receive a fair hearing in Uzbekistan. The New Jersey Superior Court agreed to proceed and ordered Karimova to return before the hearing.

She describes this as a period of round-the-clock torment: the days spent studying the small print of lawyers' letters and faxes, the nights -- because of the time difference -- in anguished phone calls with her now estranged husband, arguing over custody and finances.

"It was all such a mess," she says again. "After a while, I just decided not to react."

In his legal submissions to the divorce court, Maqsudi claims that, following his split from his wife, his business interests in Uzbekistan were crippled.

A month after their separation, a series of raids began on Coca-Cola's local bottling plant -- by tax inspectors, fire inspectors, customs inspectors, and even an anti-narcotics official. It culminated in a four-month shut-down.

Uzbekistan's attorney general also issued a warrant for the arrest of Maqsudi, his brother and his father, accusing them of tax evasion, corruption and trading oil for Saddam Hussein. The Uzbeki authorities deny that there was any connection between these actions and the divorce proceedings of the President's daughter.

In the summer of 2002, the couple's case was heard in New Jersey.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.          **C-38**

Maqsudi was awarded sole custody of the children. Karimova, still in Tashkent, did not attend the court or comply with the custody order; a warrant was then issued for her arrest, although this remains unenforceable in Uzbekistan as the necessary international agreements are not in place.

"I didn't ignore the court," she said, "but physically I wasn't capable of going. For a civilized country and a civilized court, I found it very strange that they did not take this into account."

Karimova said that she considered appealing. But "there was a question about where to get the huge sums needed to pay the lawyers".

With a wry smile, she added: "It doesn't matter whose daughter you are. You still have to be transparent about where you got the money."

If she had the necessary $300,000 to spare, she said, she would rather spend it on her children than on U.S. lawyers.

Karimova's detractors, behind whom she sees her ex-husband and his lawyers, claim she is an extravagantly wealthy woman who has made a fortune on the back of privatization and public contracts in Uzbekistan obtained through her family connections.

They claim that her assets include $6 million Cdn worth of jewellery, $15 million in bank and investment holdings in Geneva and Dubai, a $13-million retail complex, nightclubs worth $5.5 million and a $17-million resort in Uzbekistan.

She denied this angrily: "All this stuff about a fortune, with hotels, complexes, etc., is rubbish. Yes, I have a lot of friends who have things like restaurants and hotels and who restore buildings. But that does not mean that these things are mine."

She claims two interests of her own: a major share in Uzdunrobita, the country's main mobile-phone company, which she claims she personally built up to 150,000 subscribers, and jewellery design, which she says she does largely as a hobby and which brings in little money.

Maqsudi has asserted that his wife sought $8 million of his own considerable fortune as a divorce settlement, but Karimova insists she doesn't want a penny of his money: "I felt that if you even touch something that doesn't belong to you, it will stain you for good."

If he wants to send money to the children, she said, that must be between him and them. "The two things must run on separate scripts." Karimova said that she has jewellery and personal effects still in the United States that cannot be sent to her until a final settlement is agreed. After the formal divorce proceedings were over, she said, "they cancelled all my credit cards. Ten years of marriage was over, as though it had never been.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.              C-39

"I had maybe $2,700 in my account. Basically, I had no money."

The divorce and its aftermath became a political issue in the United States that even found its way to Congress.

"His is a big family," she said, "and if you cross it, you're not just an enemy of the family, but of the whole community, the clan."

She said they made representations to the congressional committees concerned with human rights in Uzbekistan with a view to getting the children sent to the United States. She suspects, too, that they were instrumental in having her diplomatic passport cancelled, and with it her immunity from prosecution while outside Uzbekistan.

A further complication is the U.S. military presence in Uzbekistan following the intervention in Afghanistan and the war in Iraq. Uzbekistan borders Afghanistan and is strategically important to the Americans who have the use of a former Soviet air base there.

This, she hazards, may eventually work to her advantage. With its troops stationed in the region, the U.S. administration does not want to get mixed up in anything that could cause friction with the Uzbek leadership -- which means Gulnara's father.

And President Karimov, who has no son to anoint as his successor, is staunchly behind his daughter. "He told me that no daughter of his would be put in a position where she would have to take money from a man," she said of her marriage break up, adding that he encouraged her in her incipient diplomatic career.

"He said you've got to take the knocks and build an independent career and see what you can do." Since her time at the UN in New York, she has worked on disarmament at the Uzbek mission to the UN in Geneva and is now at her country's embassy in Moscow.

"It was very hard at the start, but he told me: "Don't disappoint me by running away.'"

Gulnara's bond with her father is clearly stronger than that with her mother, whom she describes as a traditional wife and mother.

The elder of two sisters, she sees herself as her father's daughter. "He is a fighter," she said, "a professional, and he gave me his sense of family. He is my life's mentor."

He is also one reason why she did not apply, as she could have done, for a U.S. green card and U.S. citizenship after her marriage.

"In my position, it would have been difficult. It might have embarrassed my father."

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-40**

She has travelled enough to be well aware of his, and her country's, dubious repu-
tation.

"Yes, he has made mistakes," she said, "and you can disagree with some things and
with some of the people he chooses, and maybe we take different approaches on some
things."

She said human rights is a difficult area -- "I have my own view of these issues"
-- but she insisted that with the triple threat of Islamic fundamentalist viol-
ence, the illicit arms trade and drugs, the situation in Uzbekistan is complic-
ated, and any leader of the fledgling nation has a tightrope to walk.

Karimova is also aware that she has a similarly thin line to tread personally.
"I'm an independent person," she said. "I'm not a typical Arab woman, sitting in
Tashkent, afraid to open my mouth. I'm educated, I have a career. But my husband
could pursue me from country to country."

Her immediate concern is that if the court order is not rescinded soon, her hopes
of sending her elder child to public school in Britain could be thwarted. She
fears her ex-husband might try to "kidnap" him back.

Make of Gulnara Karimova's story what you will.

You can see her as a privileged brat whose life fell apart when it crashed into
harsh reality.

You can see her as an aggrieved mother, sheltering her children, or as a manipu-
lative go-getter, exploiting her contacts for financial gain.

Or you can see her as an innocent at large, marooned between a host of competing
expectations and ambitions -- her own and those of her father, her family and her
former husband.

There is probably truth in all these versions. What is certain is that Karimova is
the product of a unique moment in history, her fate caught up between two ages and
cultures: between Soviet Communism and its chaotic, free-market successor, between
Asia and the West.

Photo: SPECIAL TO THE SPECTATOR / Gulnara Karimova ... her bitter divorce has
spiralled into an international scandal with accusations of kidnapping and dirty
politics.; Photo: Alexander Zemlianichenko, / Uzbek President Islam Karimov, shown
in this Oct. 11, 1998 photo, rules the largest country in Central Asia, daughter
Gulnara, tipped to succeed him, is caught in a bitter divorce dispute.

Copyright © 2004 TDNG Inc., All Rights Reserved

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Divorces (1DI23); Forecasts (1FO11); Parents & Parenting (1PA25);

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.       **C-41**

Health & Family (1HE30); Women's Businesses (1WO64); Personal & Family Law
(1PE02); CIS (1CI65); Legal (1LE33); Social Issues (1SO05); Judicial (1JU36); Pop-
ulation Demographics (1PO77); Islam (1IS02); Religion (1RE60); Legislation
(1LE97); Government (1GO80); World Organizations (1IN77))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Aerospace & Defense (1AE96); Consumer
Packaged Goods (1CO27); Defense (1DE43); Beverages (1BE22); Soft Drinks (1SO77);
Military Forces (1MI37); Food & Beverage Production (1FO79); Consumer Products &
Services (1CO62); Agriculture, Food & Beverage (1AG53))

REGION:  (Western Europe (1WE41); Europe (1EU83); Eastern Europe (1EA48); New York
(1NE72); United Arab Emirates (1UA66); Asia (1AS61); Uzbekistan (1UZ71); Massachu-
setts (1MA15); USA (1US73); North America (1NO39); Central Europe (1CE50); Russia
(1RU33); Iraq (1IR87); Arab States (1AR46); Western Asia (1WE54); Afghanistan
(1AF45); Central Asia (1CE93); Americas (1AM92); New Jersey (1NE70); New England
(1NE37); Middle East (1MI23); Dubai (1DU43); Switzerland (1SW77))

Language:  EN

OTHER INDEXING:  (COCA; COCA COLA; COLA; CONGRESS; HARVARD; INC; ISLAM; ISLAM
KARIMOV; KARIMOV; NEW JERSEY SUPERIOR COURT; SADDAM HUSSEIN; SPECTATOR; UZBEK;
UZBEK PRESIDENT ISLAM KARIMOV; UZBEK PRINCESS; UZBEKI)  (Basically; Focus; Gul-
nara; Gulnara Karimova; Karimova; Mansur Maqsudi; Maqsudi; Ten)

EDITION: Final

Word Count: 4114
1/10/04 HAMILTONSPEC 1
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-42

washingtonpost.com: Battle Royal

Advertisement



**washingtonpost.com**

# Battle Royal

The Daughter of Uzbekistan's President Took Her Children and Ran, Opening a Custody War That Has Entangled Two New Allies

By Peter Baker
Washington Post Foreign Service
Tuesday, April 13, 2004; Page C01

MOSCOW

The day she left for good, she packed up her things and decamped from their New Jersey home with her two children, two nannies, two bodyguards and a driver.

On a table she left a note for her husband. She mentioned an old movie playing on cable -- "The War of the Roses," the 1989 dark comedy featuring Michael Douglas and Kathleen Turner as hate-driven spouses whose divorce turns into an orgy of revenge. She jotted down the time the show would air and pointedly suggested he watch.

Whether that was prophecy or threat, a war soon broke out. It turns out that divorcing Gulnora Karimova, known as "the Uzbek princess," is no simple matter. Her father is Islam Karimov, president of Uzbekistan and autocrat nonpareil, who rules over a repressive Central Asian country where prisoners have been boiled alive. He also happens to be a key ally in America's war on terrorism.

Karimova took the kids in 2001 and has been ducking an arrest warrant issued by a New Jersey judge ever since, hiding out in Moscow, where she knows officials won't cross her father. As for her husband, Mansur Maqsudi, an Afghan American businessman, he has learned the price of crossing his powerful father-in-law. Since Maqsudi and his wife split up, the Uzbek government has effectively taken away his Coca-Cola bottling plant, imprisoned three of his relatives and deported 24 more of them at gunpoint to war-torn Afghanistan.

"She said if I do divorce her she was going to destroy my family, destroy my business and make sure I could never see my kids," Maqsudi, 37, says by telephone from New Jersey. "And if you look at it, that's exactly what happened."

Karimova, 31, offers the mirror-opposite interpretation. She only stayed with Maqsudi so long, she says, because she feared he would use a breakup against her family politically. "He said that it would be a huge scandal and all this would come to your father and his name would be abused," she says. "I never want to disappoint my father."

**C-43**

This tabloid drama threatens to complicate U.S. relations with its important new friend in a volatile region. The State Department, Justice Department, Internal Revenue Service, Interpol and various courts, embassies and congressional committees have all been drawn into the fray. Teams of American lobbyists have been recruited to fight the ground war. As New Jersey Superior Court Judge Deanne M. Wilson said at a court hearing last year, "This is not just a garden-variety custody case."

The allegations fly back and forth -- kidnapping, tax evasion, forgery, smuggling, embezzlement, blackmail, money laundering and fraud. She accuses him of illegally selling Saddam Hussein's oil. He accuses her of shipping Uzbek girls to prostitution rings in Dubai. She describes him as a moralistic Muslim who once warned her she would burn in Hell for wearing a bikini. He depicts her as a spoiled rich girl who partied until the middle of the night, stumbling home drunk.

"It was a simple question of divorce," she says, in a considerable understatement, "but it was politicized from the very beginning."

**No Fairy-Tale Romance**

She slips into the restaurant, statuesque and fashion-model thin, wearing boots a bit too stylish for the Russian snow and a skirt a bit too short for the Russian winter. Her bodyguard, tall and imposing, checks out the room in an instant, then discreetly disappears.

She rarely does interviews. Only after months of negotiations brokered by her father's foreign minister does she finally agree to talk, in hopes of rebutting the most sensational allegations flying around Washington that can only hurt her father's ties with the world's only superpower.

In person, Gulnora Karimova does not come across as the hardhearted, domineering figure her husband's partisans depict. "That's not me," she insists over tea. Speaking softly, she presents herself as a Harvard-educated diplomat and businesswoman, albeit one with a black belt in karate. She tells the story of her marriage and its collapse from the standpoint of a hurt woman.

The two met at her birthday party in Tashkent, the Uzbek capital, in July 1991. Karimova was turning 19. "The world had just opened up for me," she recalls. "I'd just graduated from school and started the university, and everything was sort of pink skies." Mansur Maqsudi was 24, an Afghan native who immigrated to the United States as a child and became a naturalized citizen. "He was from a different world," he spoke a different language," she says.

It wasn't much of a romance. They met in person only one other time before they got married, the night he asked for her hand. Maqsudi insisted their parents negotiate the marriage, she recalls, and declined at first to share a drink to celebrate. They married in Tashkent a month later, in November 1991, followed by a reception she now describes as "quite boring." A week later, they went to New Jersey, where they married again.

As she was starting a new life, so was her homeland. Uzbekistan was emerging from the wreckage of the Soviet Union as an independent state, and her father, the republic's Communist boss, made a seamless transition to president of the new nation within weeks of Karimova's wedding.

washingtonpost.com: Battle Royal

An arid, cotton-producing country where Tamerlane once ruled a mighty empire, Uzbekistan with its 25 million people is the most populous and politically muscular of the five Central Asian states. Tashkent still feels Soviet, a well-ordered, uninspiring capital filled with drab, boxy apartment buildings and barely a taste of the dynamic new economy of far-away Moscow.

Under President Karimov, it has also become a terrifying place for some people, particularly observant Muslims who eschew government-controlled mosques. While Gulnora Karimova was at Harvard in 1999, a radical group called the Islamic Movement of Uzbekistan set off bombs in Tashkent that killed 16 people. Her father's secular government cracked down on political Islam, targeting even ordinary Muslims whose only crime appeared to be wearing a beard as a sign of faith.

About 7,000 people remain in prison for political or religious beliefs, and often they are beaten, choked, raped and punished with electric shocks, according to the State Department's human rights report. A U.N. special rapporteur has concluded that "torture or similar ill treatment is systematic." Human Rights Watch has found "human rights abuses on a massive scale."

At the notorious Jaslyk prison camp, built for religious prisoners in a desert where temperatures rise to 120 degrees, two men were submerged in boiling water and killed in 2002. The 62-year-old mother of one was arrested after protesting her son's death and sentenced to six years of hard labor for "attempted encroachment on the constitutional order." After an international outcry, Uzbekistan released her in February just hours before a visit by Secretary of Defense Donald Rumsfeld.

Rather than snuff out Islamic extremism, however, Karimov's tactics may have only radicalized more young Muslims. A series of suicide bombings and other attacks two weeks ago left 47 people dead, a wave of violence tied by the government to al Qaeda-trained Uzbeks.

Karimova offers no apologies for her father. "He came from the strong old system with his own views, with his own standpoint and with his own rules of the game. So you can argue about new vision, new ability, but he is a professional and I prefer to think about him as a professional," she says. "Some people might like it, some people might not. But in the situation where we are geopolitically and geographically . . . you have to be strong to be able to rule."

**Meet the In-Laws**

The newlyweds split their time between New Jersey and the presidential residence in Tashkent. A year after the wedding they had a son, Islam, named for his grandfather. A few years later, a daughter, Iman, came along.

Maqsudi's place in the presidential family certainly didn't hurt his expanding business empire. Soon he was running the lucrative Coca-Cola bottling factory in Uzbekistan as well as other enterprises.

But from the beginning, there were problems with the in-laws.

Two or three times a week, she says, they would go to his mother's house, where Karimova found traditional Afghan family life stultifying.

C-45

"It was really difficult because I was from a small family and used to more open relations, and in their family it's more like, if this one talks, you are not supposed to talk, that one is a relative of this relative, you are not supposed to speak with the aunt."

At New Year's, the most festive holiday in former Soviet republics, the Maqsudis barely celebrated. "They sat on the floor and ate on the floor," she says. When midnight came and no one got excited, "I sat and cried next to the TV."

If she found his family too quiet, he found hers too noisy. "When you argued with him," Maqsudi says, referring to President Karimov, "the loudest would win the argument. It wasn't about facts, it wasn't about arguments. It was about who could shout the loudest."

As he describes it, the Karimovs were flush with power and money. In the office next to the president's bedroom, Maqsudi says, was a five-foot safe. He walked in once, Maqsudi says, and "I saw the first lady sitting on the floor counting a lot of cash."

During a trip to London, he says, Karimova decided to buy $230,000 worth of jewels. "I told Gulnora this is very expensive," he says. "She said she could buy them herself. . . . She unzipped her bag and pulled out a few hundred thousands dollars, cash. I was shocked. I asked her, 'Where did you get this?' She said, 'Oh, it's from my mother.' "

For all the money, Karimova grew restless. "I was crying nonstop," she says. "Imagine, you sit all day alone, and with my very active life, when I used to go not just to the university but for languages, sport -- I was dying." That's not how Maqsudi remembers it. "She would come home at 3 in the morning, sometimes drunk. Sometimes she wouldn't remember where she was."

Finally, she enrolled in Harvard for graduate studies on Central Asia. She says she had to persuade him to let her go back to school. He says he hoped "it would have a positive impact" and end her partying ways, but it didn't. They fought over other things. "I was not supposed to swim in the pool with my son because I was in a separate swimming suit," she says, meaning a bikini. "And he was, like, 'If you ever enter this swimming pool, you are not my son. And she will be burnt [in Hell] and you be burnt.' . . . He would make my son swim in a T-shirt."

Maqsudi angrily denies this. "Was she drunk that morning when you saw her?" he asks. "Was she sober? Honestly, these comments are so ridiculous, they don't deserve a reply." He says he objected to his wife's skimpy swimwear only when the hired help was around. "Gulnora was swimming with a G-string, not even a bathing suit, and these two bodyguards were lying there sunbathing."

But he rejects the implication that he is a religious fundamentalist. To prove it, Maqsudi e-mails pictures of his son scampering around outside without a shirt and another showing his wife in a virtually see-through shirt, noting her visible nipples. "I go to tailgate parties on Sundays to New York Jets football games," Maqsudi adds. "That should cover that."

In the summer of 2001, they were in Tashkent and preparing to head back to New Jersey, but the end was near. "The last months we were completely leading our own lives," she says. "It was clear that we were strangers by that time."

"That," he says, "was when all hell broke loose."

**The Breakup**

Maqsudi knew it was serious when his wife's bodyguards had him pinned against the wall. It was July and Karimova was furious. She had taken the children to Six Flags Great Adventure amusement park in New Jersey in a chauffeured car from the Uzbek U.N. delegation, only to discover at the ticket booth that her husband had canceled her credit cards. "When I came back home, he was there having tea as always in a big room with a happy face looking at us," she recalls. "I said that we could not carry on. That was the end."

Maqsudi acknowledges suspending the credit cards. "Every time Gulnora and I would have an argument, her retaliation -- I guess she learned it from watching TV -- she would put $20,000 to $30,000 in shopping charges on the credit cards."

As the fight escalated, he says, her bodyguards blocked him from leaving.  "They had me cornered in a room and Gulnora was threatening, saying whatever she could at the time. She was throwing things around the room." He managed to bolt, spent the night at his mother's house and came home for a few hours the next morning to play with the children while Karimova slept. "That was the last time I saw the kids," he says. A few hours later, she telephoned from the airport as she and the children were leaving the country.

He says it was child abduction and a New Jersey court agrees. She denies it. "He knew perfectly that I was leaving with the kids," she says. He considered her note about "The War of the Roses" a threat. She says she only meant they should avoid the craziness that consumed the movie characters. "I wrote it with tears," she says. "It was a very personal letter."

Within days, Maqsudi's Afghan emigre family in Tashkent felt repercussions. A cousin and an uncle were arrested and thrown into prison. Maqsudi's businesses were raided, workers at his Coke plant harassed, the firms eventually confiscated. By October 2001, another uncle was behind bars. His parents were strip-searched at the airport.

Then one night in December, security forces raided three family houses and rounded up 24 relatives at gunpoint, including Maqsudi's 85-year-old grandmother, an Uzbek citizen. The relatives, nearly all women and children, were driven 13 hours to the Afghan border and dumped on the other side.

"They said, 'None of you will live in this country. This is our country,' " Maqsudi says.

Karimova denies any involvement and says that officials may have simply taken advantage of the moment because Maqsudi's family had long flouted passport requirements. "Most of his relatives -- and there were a lot of them -- did not have proper papers," she says. If it were her choice, she added, "I could have deported them later. I would have been much more sophisticated."

Both of the estranged spouses went to court. An Uzbek judge granted Karimova a divorce, while a New Jersey jurist granted one to Maqsudi. Maqsudi faces arrest if he sets foot in Uzbekistan and Karimova if she sets foot in the United States. Since both warrants are filed with Interpol, neither can safely travel to Europe. "A civilized divorce," Danny DeVito's character says in "The War of the Roses," "is a contradiction in terms."

**The Larger Relationship**

In recent months, both sides in the Uzbek divorce war have enlisted lobbyists and lawmakers in Washington to hurl charges and deflect countercharges. Karimova's camp accuses Maqsudi's firms of import-export shenanigans and various illegal practices. The most sensational allegation is that Maqsudi family companies shipped oil from Iraq while Saddam Hussein was in charge.

One key witness for Karimova, however, was former Maqsudi employee Farhod Inogambaev, who has since fled Uzbekistan and recanted his statements. "Everything was lies," he says now in an interview from New Jersey.

After her separation from her husband, Karimova sent for him, Inogambaev says, and told him, "Forget about Mansur. Now let's do business together." Afraid for his family, he says, he went to work for her. She sent over men to have him swear out affidavits against her estranged husband. "I blindly signed, I blindly typed whatever they said. I just wanted them to leave me."

Not only does Inogambaev now disavow the charges, he also alleges that Karimova siphoned tens of millions of dollars out of Uzbekistan through various channels, including her own Citibank account. And he claims that she took over a tourism firm that arranges visas for Uzbek travelers and used it to control the flow of Uzbek prostitutes to Dubai.

Karimova dismisses the allegations, calling them "more than crazy and more than stupid," and contends that Inogambaev only "says that for money."

Maqsudi's Washington lobbyists, led by Richard A. Zimmer, a Republican former congressman from New Jersey, have gained some traction. Rep. Shelley Berkley (D-Nev.) raised the Interpol arrest warrant against Maqsudi during an October hearing, calling it "an abuse of power by the Uzbek president." In February, Rep. Christopher Smith (R-N.J.) asked Secretary of State Colin Powell to look into the prostitution allegations, saying, "We ought to be following it up very rigorously."

On the other side, Rep. Curt Weldon (R-Pa.) has taken up Karimova's cause, requesting that Attorney General John Ashcroft investigate allegations made against Maqsudi in Uzbekistan.

Asked about the case in private, uncomfortable U.S. officials decline to say much. For the record, they call it "an international child abduction case" and say they have told Tashkent "that these issues are unnecessary irritants in the U.S.-Uzbek relationship," according to a written State Department response to congressional inquiries last year.

Uzbek officials appear no more eager to talk about it. "It's a very complicated issue, and I think we should be very sensitive in touching this very delicate issue," Foreign Minister Sadyk Safayev said in an interview in Tashkent last fall. The two countries' relationship has burdens enough. The United States wants to keep the military base it opened in Uzbekistan after the terrorist attacks of Sept. 11, 2001. Yet under increasing pressure from human rights groups, the Bush administration warned recently that it may cut off financial aid if Karimov's record does not improve.

It's possible the question may ultimately fall to his daughter. Analysts in Tashkent suspect that the 66-year-old president is ill and speculate that Karimova is positioning herself to succeed him. Others assume she is setting herself up in business with assets abroad in case the family has to flee.

Maqsudi believes that his ex-wife has the ambition to try to take over the country. "She's tasted power and what power can bring in Uzbekistan," he says. "At times I would say to her, when we would have arguments, 'You're drunk with your father's power.' They don't want to relinquish or give up the power they have."

© 2004 The Washington Post Company

# Bitter divorce threatens unlikely alliance at the heart of war on terror

By Julian Coman in Washington
Last Updated: 12:20am BST 18/04/2004

Divorce is never easy. But divorcing the daughter of one of the world's most notorious dictators throws up unusual challenges, as Mansur Maqsudi, a 37-year-old Afghan-American businessman, can testify.

Thirteen years ago, Mr Maqsudi married the beautiful Gulnora Karimova, daughter of Islam Karimov, the president of Uzbekistan, after meeting her during a business trip to Tashkent. Since divorcing her in 2001, he has become the subject of an international arrest warrant, signed by President Karimov, and faces never seeing his two children again, despite winning a custody order in an American court.

Mr Karimov's strong-arm style is well-documented. Human rights groups say prisoners of his regime have been boiled alive and a United Nations report judged that under his rule, "torture or similar ill treatment is systematic". His attitude towards erring sons-in-law has been only a little less severe.

About 24 of Mr Maqsudi's relatives have been deported from Uzbekistan. Three members of his family are now in prison. His Coca-Cola bottling plant in Tashkent has been taken over. Mr Maqsudi's elderly parents, before fleeing to the United States, were humiliated by strip-searches at Tashkent Airport.

"The treatment of this American citizen by the Uzbeki regime has been vindictive," said Dick Zimmer, a former Republican congressman. Although the case has become something of a cause celebre on Capitol Hill, few hold out hopes of concessions from Tashkent.

"The war on terror," said Mr Zimmer, and "Uzbekistan's key place in it, makes it difficult to place too much pressure on Karimov." The US sees the Uzbeks as vital allies. Uzbekistan was one of the first countries in Central Asia to offer practical help to President Bush when he attacked the Taliban regime in Afghanistan.

American troops were sent into Afghanistan from the Khanabad base in the Uzbekistan desert in 2001 and US aid to the country rose to almost $90 million a year soon after.

The country's leading role in the war on terror has also inflamed Islamic hardliners within Uzbekistan. Last month, at least 42 people died in suicide bomb attacks.

Mr Maqsudi has offered glimpses of life as the dictator's son-in-law, telling the Washington Post: "When you were arguing with him, the loudest would win the argument. It wasn't about facts, it wasn't about arguments. It was about who could shout the loudest." Otherwise he is refusing to speak to the media.



President Islam Karimov

http://www.telegraph.co.uk/core/Content/displayPrintable.jhtml;jsessionid=5I0KJ4DAI0NFHQFIQMFSFFWAVCBQ0IV0?x...    10/10/2007

C-50

A close friend of Mr Maqsudi, Farhod Inogambaev, told the Telegraph: "I think that he wishes he had done some things differently now."

In 1991, for any up-and-coming entrepreneur, the 18-year-old Ms Karimova was undoubtedly the most attractive marriage prospect in Uzbekistan. The Soviet Union was collapsing and Ms Karimova's father was the local communist strongman, perfectly placed to seize regional power.

President Karimov has ruled ever since, but, much to his indignation and anger, his daughter's marriage did not last as long. Mansur and Gulnora stayed together for 10 years and had a daughter, Imman, and a son, Islam. Both were brought up in the US, although the family spent long periods in Tashkent.

Ms Karimova, 31, claims that her ex-husband tried to impose an oppressive Muslim way of life on her, even objecting when she wore a bikini in her own swimming pool. "I was not supposed to swim in the pool with my son because I was in a separate swimming suit [bikini]," she told the Washington Post. He disputes her version of events and offers his own, in which his objection to her wild living and excessive spending caused the break down.

The final straw came in the summer of 2001, when Ms Karimova was furious to discover, on taking the children to an amusement park in New Jersey, that her husband had cancelled their joint credit cards. In the row which followed, Mr Maqsudi found himself pinned against the wall by his wife's bodyguards. "They had me cornered in a room and Gulnora was threatening," he said.

The next morning he played with his children for what turned out to be the last time: a few hours later, Gulnora telephoned him from the airport to say that she was leaving the country with the children. Whatever the truth of their disagreements, it has been no ordinary separation. The Uzbeki arrest warrant issued in Mr Maqsudi's name, which cites "import-export fraud", has been described by one congressman as "an abuse of power by the Uzbek president".

The US State Department - one of a string of American government departments sucked into the dispute - says that the fall-out from the separation is an "unnecessary irritant in the US-Uzbek relationship".

Meanwhile, Mr Maqsudi has not been allowed to speak to his children. "He has been told by Gulnora that the harassment will continue, unless he stops seeking custody," said Mr Inogambaev.

Three years ago, a New Jersey district court awarded custody in Mr Maqsudi's favour. But Ms Karimova had already moved to Uzbekistan and then on to Moscow. An international arrest warrant in her name, this time American, is also filed with Interpol. Meanwhile, their allegations against each other have escalated: she says that he illegally sold Saddam Hussein's oil, while he accuses her of shipping Uzbek girls to Dubai to work in prostitution rings. Both deny the claims.

Mr Inogambaev, who has worked as an employee for both Mr Maqsudi and Ms Karimova, has seen the aftermath of the couple's divorce at first hand. "The behaviour has been malevolent," said Mr Inogambaev, who has only spoken out since fleeing Uzbekistan for the US. "But the Karimovs care only about power and money, and they will never give up their power in any situation. It must have been very, very difficult to spend years inside this family."

Page 3 of 3

"I think that Mr Maqsudi knew that the presidential family would retaliate if he instigated a break-up, but it would have been wrong to carry on in the marriage because of that."

Information appearing on telegraph.co.uk is the copyright of Telegraph Media Group Limited and must not be reproduced in any medium without licence. For the full copyright statement see Copyright

C-52

Westlaw.

6/13/06 FTCOM (No Page)

**News**Room

Page 1

6/13/06 Fin. Times - FT.com (Pg. Unavail. Online)
2006 WLNR 10300924

FT.com
Copyright 2006 Financial Times Ltd.

June 13, 2006

Coke is accused of being too cosy with the Karimovs

Edward Alden in Washington

20060613 182014 For nearly a decade, Coca-Cola's bottling plant in Uzbekistan was
a shining example of the successful strategy that has seen the company expand into
more than 200 countries around the world.

The plant on the outskirts of the capital Tashkent, set up in 1992 and run under a
joint venture with ties to the family of Islam Karimov, the Uzbek strongman, was
twice selected as Coke's "bottler of the year" in its Eurasia and Middle East re-
gion and was highly profitable, with volume growth of about 10 per cent annually.

But all that began to unravel five years ago, when the marriage between **Mansur
Maqsudi**, Coke's main partner in the plant, and Gulnora Karimova, the president's
Harvard-educated daughter, fell apart  in recriminations that are still being felt
by the couple, their children and the Coca-Cola company.

Mr Maqsudi last week filed for binding arbitration at an Austrian tribunal, under
a provision of the original joint-venture agreement with Coke, seeking more than
$100m (GBP54m, ?79m) in damages from the company. He alleges that it "undertook to
conspire with Uzbekistan" to strip him of his share in the plant. Coke insists it
did not collaborate with the government, saying the arbitration will vindicate
that.

At the heart of the case is the question of what obligations a multinational faces
in operating in countries where human rights abuses are common and there are few
legal protections. The issue of what Coke should or should not have done in Uzbek-
istan will also focus fresh scrutiny on the company's conduct around the world and
provide new ammunition for its numerous critics.

Coke is already facing a US lawsuit brought by labour rights groups over allega-
tions that it turned a blind eye to the murder of union leaders at its bottling
plants in Colombia by rightwing paramilitaries. A similar case was filed last year
in Turkey involving the alleged intimidation and beating of union activists at a
Coke bottling plant.

The company denies wrongdoing in both cases but the allegations, together with

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-53

6/13/06 FTCOM (No Page)                                          Page 2

claims of environmental abuses in India, have fuelled a student boycott against
Coke in the US and Europe. New York University and Rutgers in New Jersey are among
several campuses where Coke products have been banned.

The suit comes at an awkward time, when Coke is seeking to improve its image by
rebutting allegations of wrongdoing more strongly and trumpeting initiatives to
make it a better corporate citizen. In March, the company signed up to the United
Nations Global Compact, a voluntary code of conduct for international businesses,
designed to promote human rights, protect the environment and tackle corruption.
"This is a natural evolution of our company's long-held commitment to responsible
corporate citizenship," said Neville Isdell, Coke's chief executive.

The Maqsudi story is one the company would rather went away. The son of a wealthy
Afghan family of Uzbek descent, Mr Maqsudi is a naturalised US citizen. The fam-
ily had business and political connections in Uzbekistan, cemented by his 1991
marriage to Ms Karimova, and he was a logical partner for Coca-Cola as it eyed
markets in the former Soviet Union.

But in August 2001, it all went badly awry after the marriage disintegrated and Ms
Karimova returned to Uzbekistan from the US with the couple's two children. In a
telephone interview Mr Maqsudi said that, despite winning a custody order from
courts in New Jersey, where he lives, he has not seen his children again.

The arbitration claim alleges that following the separation "Ms Karimova and her
father directed the full power of the government of the Republic of Uzbekistan at
destroying Mr Maqsudi's investment in Uzbekistan", particularly his majority stake
in the Coke bottling operation. Within 10 months of the relationship breaking up,
the Uzbek courts confiscated Mr Maqsudi's share in the plant, to liquidate debts
allegedly owed by Roz Trading, his Cayman Islands company that held 55 per cent of
the bottling operation. Much of that stake would later end up in the hands of com-
panies with close ties to Ms Karimova, who has built a business empire since her
return.

Coke endured an 18-month shutdown of the plant that ended only last year but, des-
pite attempts by the Uzbek government to gain control of its share as well, the
company has managed to retain its stake in the operation. The filing alleges that,
rather than coming to the aid of its joint-venture partner, the company collabor-
ated with the Uzbek government and discouraged US authorities from intervening on
Mr Maqsudi's behalf.

"Coke made a corporate decision that they were going to save their interests in
Uzbekistan," says Stuart Newberger of Crowell & Moring, the lead lawyer on the
case. Allan Gerson, a Washington lawyer who led the first suit against Libya on
behalf of victims of the Lockerbie bombing and is also counsel on the case, says
the company should have helped Mr Maqsudi. "Coca-Cola fully understood this was
vengeance," he adds.

Coca-Cola denies those charges and says in a statement that "there was no collab-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                    C-54

6/13/06 FTCOM (No Page)                                             Page 3

oration and we are confident this will be upheld in any court or arbitration pro-
ceedings". Throughout the dispute, Coca-Cola Export Corporation, its export arm,
has been a minority shareholder and "is not responsible for the dispute between
Roz Trading and the government of Uzbekistan".

The Uzbek government, the third shareholder in the plant, is also named as a party
to the arbitration claim. It did not respond to calls to its embassy in Washing-
ton. In a response last month to notification that a claim might be filed at the
Vienna tribunal, the Uzbek government told Mr Maqsudi's lawyers: "Your statement
that your client's participation in management was effectively impeded and also
that any actions against your client have been performed illegally was a surprise
for us."

Mr Karimov, a former Communist party boss, has ruled Uzbekistan since 1991. Human
Rights Watch has called the regime's record "disastrous", citing torture and
crackdowns on human rights groups.

In the aftermath of the September 11 attacks, the US government overlooked that
record because Mr Karimov was seen as an important ally. He allowed the US to use
an air base in the country as a staging ground for the war in Afghanistan. But re-
lations have deteriorated since the government suppressed an uprising in the town
of Anizhan last year, killing hundreds. Mr Karimov recently banned many western
non-governmental organisations and expelled some US troops.

Coke says in its statement that it has "a strict Code of Business Conduct that is
applicable everywhere we do business", adding that it "adheres to the local laws
and regulations of each country as well as applicable US laws".

The case alleges that the company, while it may have obeyed local laws, violated
its joint-venture obligations to Mr Maqsudi in order to protect its investment.
Mr Newberger says he believes the decision was made at the highest levels of
Coke's management in Atlanta.

A 2004 US Supreme Court decision in a case involving Intel opened the door to
plaintiffs demanding documents from the headquarters of American companies for
cases involving foreign proceedings. Mr Maqsudi's lawyers may thus be able to get
their hands on minutes of directors' meetings and other internal correspondence to
try to demonstrate Coke's complicity.

One key to making that case will be an exchange of letters in September 2001,
which appears to show that top management and directors at Coke were well aware of
the dispute. Farid Maqsudi, Mansur's older brother and partner in Roz Trading,
wrote to Douglas Daft, then Coke's chairman and chief executive, following a raid
on the plant that came just days after Ms Karimova returned home.

The letter said that agents of the Uzbekistan government "systematically detained,
harassed, interrogated and terrorised the management and employees" at the Coke
bottling operation. Nick Evangelopolous, the plant's general manager at the time,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C-55

was held for 24 hours by the police and later said he had fled the country in fear of his life.

In the letter to Mr Daft, Farid Maqsudi pleaded for the company to weigh in against the abuses, saying that "for the Coca-Cola company to sit by and permit these police-state tactics to victimise the employees of CCBU, let alone collaborate with the perpetrators, is to betray the business principles that have made Coca-Cola one of the world's most respected brands".

Two weeks later, Mr Daft wrote back expressing regret and saying that the Maqsudis' personal turmoil was "undoubtedly disheartening. . . However, I believe it is conducive to our long-term business interests to separate  the issues". In a later letter, the company called the dispute "a family matter in which we are not involved and do not wish to become involved". The Maqsudis' efforts to enlist Coke directors of the time, such as Warren Buffett, were similarly rebuffed.

Much of the case could turn on events shortly after the August 2001 raid on the plant. The suit includes a letter that appears to show that Coke, instead of challenging the raid and questioning the legitimacy of the tax audit, told the US embassy in Tashkent that the audit was legitimate. That reassurance helped to keep the US government from intervening at a time when, Mr Maqsudi says, pressure on the Karimov government might have been effective.

Coke is likely to argue that it was caught in the middle of a dispute between the Maqsudis and the Uzbek government.  Like many of Coke's bottling plants around the world, the Tashkent plant bought concentrate from Coca-Cola but largely managed its own affairs. The company also points out that it, too, suffered significant losses because of the shutdown of the bottling facility.

Sonya Soutus, vice-president of Coca-Cola International, says the group's reputation is being sullied by an affair over which it had little control. "Taking into account the difficulty of our situation, there is quite a bit of evidence that proves we did everything we possibly could in the best interests of our stakeholders and the business in Uzbekistan."

Yet whatever its outcome, as Coke seeks to present itself globally as a good corporate citizen, the dispute is likely to serve as a reminder to it and other multinationals of the perils of doing business with autocrats.

Additional reporting by Andrew Ward

                    ---- INDEX REFERENCES ----

COMPANY: COCA COLA CO (THE); INTEL CORP; COCA COLA EXPORT CORP; COCA COLA ENTER-
PRISES INC

NEWS SUBJECT:  (Legal (1LE33); Social Issues (1SO05); Business Lawsuits & Settle-
ments (1BU19); Business Litigation (1BU04); Judicial (1JU36); Arbitration & Medi-
ation (1AR68); Liability (1LI55); Financially Distressed Companies (1FI85); Bank-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.        C-56

ruptcies (1BA08); Government Litigation (1GO18); World Organizations (1IN77); CIS (1CI65))

INDUSTRY: (Non-Alcoholic Beverages (1NO38); Legal Services (1LE31); Beverages (1BE22); Accounting, Consulting & Legal Services (1AC73); Soft Drinks (1SO77); Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION: (North America (1NO39); Western Europe (1WE41); Austria (1AU39); Europe (1EU83); Central Europe (1CE50); Western Asia (1WE54); Afghanistan (1AF45); Central Asia (1CE93); Americas (1AM92); New Jersey (1NE70); Asia (1AS61); Uzbekistan (1UZ71); USA (1US73))

Language: EN

OTHER INDEXING: (CCBU; COCA COLA; COCA COLA EXPORT CORP; COCA COLA INTL; COMMUNIST; INTEL; ISLAM KARIMOV; NEW YORK UNIVERSITY; SUPREME COURT; UNITED NATIONS GLOBAL COMPACT; UZBEK) (Additional; Allan Gerson; Andrew Ward; Coke; Daft; Douglas Daft; Farid Maqsudi; Gulnora Karimova; Karimov; Karimova; Mansur; Mansur Maqsudi; Maqsudi; Maqsudis; Neville Isdell; Newberger; Nick Evangelopolous; Roz Trading; Sonya Soutus; Stuart Newberger; Warren Buffett) (Uzbekistan; Asia; Former USSR)

KEYWORDS: (Company News); (Formations); (Joint Ventures); (Strategy)

COMPANY TERMS: COCA COLA CO

PRODUCT: Executive Offices; Executive, Legislative, Public Finance & General Government; Public Administration; Soft Drink Mfg

NAICS CODE: 92111; 9211; 92; 312111

Word Count: 2060
6/13/06 FTCOM (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                **C-57**

Westlaw.

6/14/06 FTI 25

NewsRoom

Page 1

6/14/06 Fin. Times 25
2006 WLNR 10170402

Financial Times UK
Copyright 2006 Financial Times Ltd.

June 14, 2006

Section: COMPANIES THE AMERICAS

COMPANIES THE AMERICAS: Coca-Cola accused over Uzbek venture

By EDWARD ALDEN and ANDREW WARD

WASHINGTON and ATLANTA Coca-Cola has been hit with an arbitration claim seeking more than Dollars 100m in damages, alleging that the world's largest soft drinks maker conspired with the government of Uzbekistan against a joint venture partner who fell out of favour with the country's authoritarian ruler, Islam Karimov.

The claim was made by a company owned by **Mansur Maqsudi**, an American of Afghan descent who was married to Mr Karimov's daughter, Gulnora, until a messy separation in 2001.

It alleges that Coke "undertook to conspire with the government of Uzbekistan" to strip Mr Maqsudi's majority share in Coke's bottling facility in Tashkent, the largest incentral Asia.

The case was filed last week before an arbitration tribunal in Austria, under the terms of the 1992 joint venture between Coke, Mr Maqsudi's trading company ROZ Limited, and the Uzbek government.

Central Asia is among the world's least developed soft drink markets, but Coke is expanding aggressively in the region as it seeks fresh growth to offset slowing sales in the US and Europe.

The claim comes as the company is already trying to repair its image in the face of lawsuits from labour groups in the US over allegations that it turned a blind eye to human rights abuses at its bottling plants in Colombia and Turkey. Those charges have fuelled student boycotts in the US and Europe, and prompted Coke to rebut more aggressively charges of wrongdoing.

The Uzbek case will raise similar issues. "Coke did more than just stand by with arms folded," said Stuart Newberger of Crowell & Moring, the lead lawyer on the arbitration. "They were affirmatively working with the government of Uzbekistan."

Coke strongly denied the charge, saying in a statement that "this allegation is

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

categorically false. Unequivocally, there was no collaboration and we are confid-
ent this will be upheld in any court or arbitration proceedings."

Mr Maqsudi went into business with Coke in 1992 to help the company open its first
bottling plant in Tashkent. By 1997 the plant was generating Dollars 118m in annu-
al sales and was twice selected by Coke as its"bottler of the year."

But the relationship began to sour in 2001 following Mr Maqsudi's separation from
his wife, when she left their New Jersey home with the couple's two children and
later defied a court order to return.

Following the separation, agents for the country's national security service, the
successor to the KGB in Uzbekistan, raided the bottling plant under the guise of a
tax audit. Within 10 months, the Uzbek courts had stripped ROZ of its share in the
bottling plant.

---- INDEX REFERENCES ----

COMPANY: COCA COLA CO (THE); COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Legal (1LE33); Joint Ventures (1JO05); Business Lawsuits & Settle-
ments (1BU19); Business Litigation (1BU04); World Organizations (1IN77); CIS
(1CI65); Arbitration & Mediation (1AR68); Corporate Groups & Ownership (1XO09))

INDUSTRY:  (Legal Services (1LE31); Non-Alcoholic Beverages (1NO38); Food & Bever-
age Production (1FO79); Consumer Packaged Goods (1CO27); Consumer Products & Ser-
vices (1CO62); Beverages (1BE22); Accounting, Consulting & Legal Services (1AC73);
Soft Drinks (1SO77); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Asia (1AS61); Uzbekistan (1UZ71); Europe (1EU83);
Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (COCA COLA; KGB)  (Central Asia; Gulnora; Islam Karimov; Karimov;
Mansur Maqsudi; Maqsudi; Stuart Newberger; Unequivocally)  (United States of Amer-
ica; Uzbekistan; Americas; Commonwealth of Independent States; Former USSR; North
America; Pacific Rim)

KEYWORDS:  (Company News);  (Joint Ventures);  (Law & Legal Issues);
(Shareholdings);  (Strategy)

COMPANY TERMS: COCA COLA CO

PRODUCT: Soft Drinks; Soft Drink Mfg

SIC: 2086

NAICS CODE: 312111

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.        C-59

Case 1:07-cv-01252-RJL    Document 21-19    Filed 01/03/2008    Page 1 of 7

EDITION: London Ed1

Word Count: 512
6/14/06 FTI 25
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**C-60**

Westlaw.

NewsRoom

6/15/06 TIMESCTLASIA (No Page)

Page 1

6/15/06 Times Cent. Asia (Kyrg.) (Pg. Unavail. Online)
2006 WLNR 10383577

Times of Central Asia, The (Kyrgyzstan)
Copyright 2006 Asia Pulse Pte Ltd.

June 15, 2006

## Coca-Cola Accused of Conspiring with Uzbek Government

MOSCOW, June 15 (TCA): Coca-Cola has been hit with an arbitration claim seeking more than $100m in damages. The claim alleges that the world's largest soft drink maker conspired with the government of Uzbekistan against a joint venture partner who fell out of favor with the country's authoritarian ruler, Islam Karimov, The Financial Times reported Wednesday.

The claim was made by a company owned by **Mansur    Maqsudi** , an American of Afghan descent who was married to Karimov's daughter, Gulnora, until a messy separation in 2001.

The suit alleges that Coke "undertook to conspire with the government of Uzbekistan" to strip Maqsudi of his majority share in Coke's bottling facility in Tashkent, the largest in Central Asia.

The case was filed last week before an arbitration tribunal in Austria, under the terms of the 1992 joint venture between Coke, Maqsudi's trading company ROZ Limited, and the Uzbek government.

Central Asia is among the world's least developed soft drink markets, but Coke is expanding aggressively in the region as it seeks fresh growth to offset slowing sales in the US and Europe.

The claim comes as the company is already trying to repair its image in the face of lawsuits from labor groups in the US over allegations that it turned a blind eye to human rights abuses at its bottling plants in Colombia and Turkey. Those charges have fueled student boycotts in the US and Europe, and prompted Coke to refute more aggressive charges of wrongdoing.

The Uzbek case will raise similar issues. "Coke did more than just stand by its with arms folded," said Stuart Newberger of Crowell & Moring, the lead lawyer on the arbitration. "They were willingly working with the government of Uzbekistan."

Coke strongly denies the charge, saying in a statement that "this allegation is categorically false. Unequivocally, there was no collaboration and we are confident this will be upheld in any court or arbitration proceedings."

Maqsudi went into business with Coke in 1992 to help the company open its first

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Page 2

bottling plant in Tashkent. By 1997 the plant was generating $118m in annual sales
and was twice selected by Coke as its "bottler of the year."

But the relationship began to sour in 2001 following Maqsudi's separation from his
wife, when she left their New Jersey home with the couple's two children and later
defied a court order to return to the US.

Following the separation, agents for the country's national security service, the
successor to the KGB in Uzbekistan, raided the bottling plant under the guise of a
tax audit. Within 10 months, the Uzbek courts had stripped ROZ of its share in the
bottling plant.

(THROUGH ASIA PULSE)

15-06 2006

---- INDEX REFERENCES ----

COMPANY: COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Legal (1LE33); Joint Ventures (1JO05); Business Lawsuits & Settle-
ments (1BU19); World Organizations (1IN77); Business Litigation (1BU04); CIS
(1CI65); Arbitration & Mediation (1AR68); Corporate Groups & Ownership (1XO09))

INDUSTRY:  (Legal Services (1LE31); Non-Alcoholic Beverages (1NO38); Food & Bever-
age Production (1FO79); Beverages (1BE22); Accounting, Consulting & Legal Services
(1AC73); Soft Drinks (1SO77); Agriculture, Food & Beverage (1AG53))

REGION:  (Central Asia (1CE93); Asia (1AS61); Uzbekistan (1UZ71); Europe (1EU83);
Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (COCA; COCA COLA; COLA; KGB; UZBEK)  (Gulnora; Islam Karimov;
Karimov; Mansur Maqsudi; Maqsudi; Stuart Newberger; Unequivocally)

Word Count: 534
6/15/06 TIMESCTLASIA (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.                    **C-62**

Westlaw.

**News**Room

6/21/06 STLGRN 19

Page 1

6/21/06 Star-Ledger (Newark N.J.) 19
2006 WLNR 10710397

Star-Ledger, The (Newark, NJ)

Copyright 2006 The Star-Ledger. All Rights Reserved. Used by NewsBank with Permission.

June 21, 2006

Section: MORRIS

Coke accused of abandoning exec: Morris resident seeks $125 million for takeover by Uzbek regime

MARGARET McHUGH

A New Jersey businessman who helped bring Coca-Cola to Uzbekistan in the early 1990s charges the multinational beverage company left him flat when the authoritarian government seized his majority ownership in the three bottling plants.

Saying the Coca-Cola Co. conspired with Uzbekistan to steal his company's 55 percent share, **Mansur Maqsudi**, former son-in-law of Uzbekistan's president, is seeking more than $125 million through international arbitration.

"Coca-Cola stabbed their business partner in the back," said Maqsudi's attorney, Stuart Newberger. Newberger filed a claim June 6 with the International Arbitral Centre of the Austrian Federal Economic Chamber in Vienna.

Coca-Cola, Maqsudi's Roz Trading Ltd. and Uzbekistan agreed that disputes over their joint venture, Coca-Cola Bottlers Uzbekistan Ltd., would be resolved under Austrian law in English, Newberger said. Maqsudi says the Uzbekistan government began a campaign of retaliation right after he told his wife, Gulnara Karimova, he wanted a divorce in July 2001.

Karimova left the couple's 10,000-square-foot home in Mendham Township and took their children to Uzbekistan, a former Soviet republic in Central Asia ruled by her father, Islam Karimov. Though it is technically a republic, the U.S. State Department says Karimov holds almost absolute power.

Maqsudi, a naturalized U.S. citizen of Uzbek descent, has not seen his children since, despite New Jersey court rulings ordering Karimova to return them. Neither he nor his relatives can travel to Uzbekistan without risking their lives, the complaint said.

In August 2001, about 20 Uzbekistan National Security Service officers raided the Tashkent headquarters of Coca-Cola Bottlers Uzbekistan under the guise of an

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

audit, the complaint said. The company's managing director was held in isolation for 24 hours, while the deputy managing director was confined for two to three days, according to the complaint.

Afterward, relatives of Maqsudi's were sentenced to long prison terms, even though they had nothing to do with the business's day-to-day operations, Maqsudi said. Maqsudi's mother's home was demolished, and 25 relatives were expelled and left at the Afghan border in December 2001, during the U.S. invasion.

Shortly after the raid, Maqsudi's Roz Trading wrote to Douglas Daft, chairman and CEO of Coca-Cola, asking the company to condemn the abusive treatment of Coca-Cola Bottlers Uzbekistan employees, according to the complaint. Daft answered that the matter was "personal" and that Coca-Cola would not get involved.

While Maqsudi's company tried to get the U.S. government to intervene, the regional manager of Coca-Cola Eurasia Division "deliberately misled the U.S. Department of State by stating the nature of the audit was not unusual," the complaint said.

Coca-Cola "was well aware from previous tax audits that this tax audit was unlike the others in its scope, duration and treatment of CCBU employees," according to the complaint.

Coca-Cola's lack of support "emboldened Gulnara and her father to carry out these aggressive actions," Maqsudi said.

"It's clear . . . whose side they took. Had Coca-Cola stood up and defended the joint venture, if they had spoken up, the U.S. government would have gotten involved," he said.

Because the State Department didn't intervene for a year, "it cost me access to my children," Maqsudi said.

The Coca-Cola Export Corp., which continues to own a 43 percent share in Coca-Cola Bottlers Uzbekistan, denied the allegations.

"Unequivocally, there was no collaboration, and we are confident this will be upheld in any court or arbitration proceedings," the company said in a written statement.

Coca-Cola "is and has always been a minority shareholder of Coca-Cola Bottlers of Uzbekistan and is not responsible for the dispute between Roz Trading and the government of Uzbekistan," the statement also said.

Coca-Cola officials said the company "challenged the judicial process undertaken by the Uzbekistan government against CCBU at every level."

The Coca-Cola Export Corp. had urged the government to allow the Uzbekistan operation to continue in the interests of all stakeholders, including the employees

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.     **C-64**

and shareowners, but by May 2003, all three plants were shut down. One reopened in December 2004.

"What started as a family squabble morphed into a human rights issue and now into a commercial dispute," Newberger said.

Newberger noted Coca-Cola has tried to paint itself as a victim, but it continues to do business in Uzbekistan with the government. Coca-Cola operates in more than 200 countries.

Another company, Zeromax Group Inc., bought Roz Trading's shares in the bottling company from the Uzbekistan government in 2004. Zeromax, which Maqsudi claims in his court papers is affiliated with his ex-wife, also is named as a defendant.

Maqsudi has left the children's rooms in his home as they were five years ago. He and his family marked his daughter Iman's eighth birthday Saturday with a party, he said.

Maqsudi hopes news of what happened with his Uzbekistan business will reach his son, Islam, who is now 13.

"Maybe they (his children) will start asking questions . . . they'll understand that they were lied to," Maqsudi said. Hopefully, they will be able to reach out to me somehow."

---- INDEX REFERENCES ----

COMPANY: COCA COLA CO (THE); COCA COLA EXPORT CORP; COCA COLA ENTERPRISES INC

NEWS SUBJECT:  (Legal (1LE33); Business Management (1BU42); Major Corporations (1MA93); Joint Ventures (1JO05); Government (1GO80); World Organizations (1IN77); CIS (1CI65); Corporate Globalization (1XO29); Corporate Groups & Ownership (1XO09))

INDUSTRY:  (Non-Alcoholic Beverages (1NO38); Manufacturing (1MA74); Beverages (1BE22); Soft Drinks (1SO77); Food & Beverage Production (1FO79); Consumer Products & Services (1CO62); Agriculture, Food & Beverage (1AG53))

REGION:  (North America (1NO39); Western Europe (1WE41); Austria (1AU39); Europe (1EU83); Central Europe (1CE50); Western Asia (1WE54); Central Asia (1CE93); Americas (1AM92); New Jersey (1NE70); Asia (1AS61); Uzbekistan (1UZ71); USA (1US73))

Language:  EN

OTHER INDEXING:  (AUSTRIAN FEDERAL ECONOMIC CHAMBER; CCBU; COCA; COCA COLA; COCA COLA BOTTLERS OF UZBEKISTAN; COCA COLA BOTTLERS UZBEKISTAN; COCA COLA BOTTLERS UZBEKISTAN LTD; COCA COLA CO; COCA COLA EURASIA DIVISION; COCA COLA EXPORT CORP; COLA; ROZ TRADING; ROZ TRADING LTD; STATE DEPARTMENT; US DEPARTMENT OF STATE; US STATE DEPARTMENT; UZBEKISTAN; UZBEKISTAN NATIONAL SECURITY SERVICE; ZEROMAX; ZERO-

MAX GROUP INC)   (Coke; Daft; Douglas Daft; Gulnara; Islam; Islam Karimov; Karimov;
Karimova; Mansur Maqsudi; Maqsudi; Newberger; Stuart Newberger; Unequivocally)

EDITION: MORRIS

Word Count: 1056
6/21/06 STLGRN 19
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.          **C-66**