# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MANSUR MAQSUDI, *et al.*,  ) | |
| ) | |
| Plaintiffs,  ) | Case No. 1:07-CV-01252 RJL |
| ) | |
| v.  ) | |
| ) | |
| GLOBALOPTIONS, INC., *et al.*,  ) | |
| ) | |
| Defendants.  ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT
## GLOBALOPTIONS, INC.'S MOTION TO DISMISS THE COMPLAINT

CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

*Attorneys for Mansur Maqsudi, Farid Maqsudi, and Abdul Rauf Maqsudi*

January 28, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND OF CLAIMS ......................................................................................... 2

ARGUMENT ................................................................................................................... 4

    I.      PLAINTIFFS' COMPLAINT WAS FILED WITHIN THE
           STATUTE OF LIMITATIONS ................................................................................. 5

    II.     PLAINTIFFS HAVE STATED VIABLE CLAIMS FOR
           DEFAMATION AND FALSE LIGHT INVASION OF PRIVACY ...................... 7

           A.    Plaintiffs' Claims Are Not Barred By The First
                  Amendment ................................................................................................. 8

           B.    Plaintiffs' Claims Are Not Barred By The Fair Reporting
                  Privilege ..................................................................................................... 10

    III.    THE ACT OF STATE DOCTRINE DOES NOT BAR THIS
           CASE ........................................................................................................................ 13

CONCLUSION ............................................................................................................... 19

## **TABLE OF AUTHORITIES**

**FEDERAL CASES**                                                          **Page(s)**

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004) ..............................................17

*Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995) ...........................................16

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) ..........................................16

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ......................................................7

*Dominicus Americana Bohio v. Gulf & W. Industrial, Inc.*, 473 F. Supp. 680
   (S.D.N.Y. 1979)............................................................................................................15

*El-Hadad v. Embassy of the UAE*, No. 96-1943, 2006 U.S. Dist. LEXIS 21491
   (D.D.C. March 29, 2006)..............................................................................................8

*Galu v. SwissAir*, No. 86 Civ. 5551, 1987 WL. 15580 (S.D.N.Y. Aug. 3, 1987) .........18

*Gertz v. Welch*, 418 U.S. 323 (1974)........................................................................9, 10

*\*Harper v. Walters*, 822 F. Supp. 817 (D.D.C. 1993)...............................................13, 14

*Harris v. Ladner*, 127 F.3d 1121 (D.C. Cir. 1997)........................................................7

*Hilton v. Guyot*, 159 U.S. 113 (1895).........................................................................16

*Holman v. Williams*, 436 F. Supp. 2d 68 (D.D.C. 2006)................................................7

*Industrial Investment Development Corp. v. Mitsui & Co.*, 594 F.2d 48
   (5th Cir. 1979) ............................................................................................................15

*Jankovic v. International Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007)......................6

*\*Lee v. Dong-A Ilbo*, 849 F.2d 876 (4th Cir. 1988) ......................................................11

*Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980) ...................................14

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988)......................6

*McFarlane v. Esquire Magazine*, 1994 U.S. Dist. LEXIS 9497, 41-42 (D.D.C.)...........13

*\*OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20
   (D.D.C. 2005) ....................................................................................................9, 10, 11

*Oceanic Exploration Co. v. Conocophillips, Inc., Civ. A. No. 04-332,
2006 WL 2711527 (D.D.C. Sept. 21, 2006)........................................................16

Republic of the Philippines v. Westinghouse Electric Corp.,
774 F. Supp. 1438 (D.N.J. 1991)........................................................................17

Rosenblatt v. Baer, 383 U.S. 75 (1966)........................................................................8

St. Amant v. Thompson, 390 U.S. 727 (1968) .............................................................10

Tavoulares v. Piro, 763 F.2d 1472 (D.C. Cir. 1985)....................................................10

Timberlane Lumber Co. v. Bank of America, N.T. & S.A., 549 F.2d 597
(9th Cir. 1976) ....................................................................................................17

United States ex rel. New v. Rumsfeld, 350 F. Supp. 2d 80 (D.D.C. 2004) ...................7

United States v. Sisal Sales Corp., 274 U.S. 268 (1927).............................................17

Virtual Defense and Development International, Inc. v. Republic of Moldova,
133 F. Supp. 2d 1 (D.D.C. 1999).......................................................................17

*W.S. Kirkpatrick, & Co., Inc. v. Environmental Tectonics Corp., International,
493 U.S. 400 (1990) .....................................................................................15, 16

Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287 (D.C. Cir. 1980) ................10

Weyrich v. New Republic, Inc., 235 F.3d 617 (D.C. Cir. 2001) .....................................8

White v. Fraternal Order of Police, 707 F. Supp. 579 (D.D.C. 1989)..........................12

## STATE CASES

DeAngelis v. Hill, 847 A.2d 1261 (N.J. Sup. Ct. 2004)..................................................8

Klayman v. Segal, 783 A.2d 607 (D.C. 2001)............................................................7, 8

*Oparaugo v. Watts, 884 A.2d 63 (D.C. 2005)...................................................8, 12, 13

Phillips v. Evening Star Newspaper Co., 424 A.2d 78 (D.C. Cir. 1980) ......................12

## DOCKETED CASES

*GlobalOptions Inc. v. Livingstone*, Civ. A. No. 1:07-cv-00608 (PLF) ...........................................3

*Roz Trading Ltd., et al. v. Zeromax Group Inc., et al.*, Civ. A. No. 1:06-cv-01040 (CKK) ...........2

## OTHER AUTHORITIES

Restatement (Second) of Torts §§ 568(1) & 568A.........................................................................8

Restatement (Second) of Torts, § 577(1), cmt. f (1977)................................................................4

Restatement (Second) of Torts § 577A cmt. d (1977)...................................................................6

Restatement (Second) of Torts § 578 (1977).................................................................................6

Restatement (Second) of Torts § 611 cmt. d (1977)...................................................................11

**INTRODUCTION**

Much like Defendant Zeromax GmbH, Defendant GlobalOptions, Inc. ("Global") seeks to avoid responsibility for its *own* wrongful actions by attempting to recast this case as one about the official actions of the state of Uzbekistan.   There is no denying, however, that it was Global – hired by Zeromax to be its agent in Washington, D.C. – that published defamatory statements about Plaintiffs which, in fact, caused Plaintiffs damage here and elsewhere.   In its Motion to Dismiss ("Global Motion"), Global reiterates the same legal defenses already raised by Zeromax's Motion to Dismiss ("Zeromax Motion").   Plaintiffs already have fully addressed these issues in their Opposition to Defendant Zeromax GmbH's Motion to Dismiss ("Plaintiffs' Opposition to Zeromax Motion"), which is incorporated by reference.

In what appears to be a "copy-cat" brief, Global repeats the same arguments as Zeromax (sometimes in the exact same words) with regards to application of the fair reporting privilege, the act of state doctrine, and the statute of limitations. *See* Global Motion at 6-9, 13-17; Zeromax Motion at 18-21, 24-32; Reply Memorandum of Points and Authorities in Support of Defendant Zeromax GMBH's Motion to Dismiss the Complaint ("Zeromax Reply") at 2-27. Global, however, adds that the First Amendment is somehow a bar to Plaintiffs' claims.  Global Motion at 11-13.  It also adds a variation to the statute of limitations defense, arguing that the libelous website is immune from liability because the news media reported on actions of the Uzbek government years before the date of the website was first posted.  Global Motion at 16-17.  How this excuses its own tortious conduct is not really explained, and for good reason.  It can not.

For reasons detailed below, Global's Motion to Dismiss lacks any basis in law or support in the record before the Court.  As with Zeromax's Motion, it should be denied and the case should proceed to discovery and trial.

## BACKGROUND OF CLAIMS

Plaintiffs provide here a brief summary of the facts giving rise to this case, which is detailed further in the Complaint and the record submitted by the parties. *See* Complaint ("Compl.") at ¶¶ 1-63; Plaintiffs' Opposition to Zeromax Motion.

Since Plaintiff Mansur Maqsudi's separation from Gulnora Karimova ("Karimova"), the President of Uzbekistan's daughter, his family and their businesses have been under a vicious attack. Global's publication – on behalf of Zeromax – of the "mansurmaqsudi.net" website (available by four additional domain names: "mansurmaqsudi.com", "faridmaqsudi.com", "faridmaqsudi.net" and "abdulraufmaqsudi.com") marks just one more assault against Plaintiffs Mansur Maqsudi, his brother, Farid Maqsudi, and their father, Abdul Rauf Maqsudi. In this assault, Global, a Washington, D.C. security firm plays an integral part. Hired by Zeromax expressly to carry out this work, Global posted the website at its client's deliberate direction, as confirmed in a January 3, 2007 meeting of ROZ's co-counsel, Dr. Allan Gerson, with Neil Livingstone, then-Chairman and CEO of Global. Compl. at ¶ 24; Plaintiffs' Opposition to Zeromax Motion at 7-8. It is not disputed that Zeromax is controlled by Mansur Maqsudi's ex-wife, Karimova. Compl. at ¶ 7; *Roz Trading Ltd., et al. v. Zeromax Group Inc., et al.*, Civ. A. No. 1:06-cv-01040-CKK, Amended Complaint ("Am. Compl.") at ¶¶ 39-46 (attached as Exhibit D); Decl. of Mr. Farhod Inogambaev ("Inogambaev Decl.") (*Roz Trading* Case) at ¶¶ 11, 20 (attached as Exhibit A).

Mr. Livingstone also made clear that the physical well-being of both Farid and Mansur Maqsudi was in serious jeopardy unless they dropped their lawsuit against his client, Zeromax (*Roz Trading Ltd., et al. v. Zeromax Group Inc., et al.*, Civ. A. No. 1:06-cv-01040 (CKK)) pending in this Court. Compl. at ¶ 24; Plaintiffs' Opposition to Zeromax Motion at 7-8. In a subsequent meeting on January 11, 2007, Mr. Livingstone confirmed the earlier threat posed

against the Plaintiffs by his client, urging Dr. Gerson to advise ROZ to drop its case against Zeromax or face grave consequences. Mr. Livingstone indicated that Zeromax is run by dangerous persons and that its owners were furious at the Maqsudis for suing them. He also described Zeromax's connections to Russian mob leaders, including ex-KGB agents on errant missions. He reiterated that Zeromax could make life miserable for the Maqsudis, and added that his client would only refrain from hostile acts if the Maqsudis dropped the suit and paid two million dollars to Zeromax. Compl. at ¶ 24; Plaintiffs' Opposition to Zeromax Motion at 7-8.

That Zeromax was a client of Global during this relevant timeframe is undisputed, and was reconfirmed in April 2007 by Mr. Livingstone's sworn affidavit in a lawsuit in this Court arising out of Mr. Livingstone's apparently unpleasant departure from Global. In his affidavit, submitted in *GlobalOptions Inc. v. Livingstone,* Civ. A. No. 1:07-cv-00608 (PLF) (D.D.C.), Mr. Livingstone cited to and attached correspondence from an officer at Global, stating that Zeromax is a client of Global. Compl. at ¶ 26; *see* Decl. of Neil Livingstone ("Livingstone Decl.") at Attachment A (attached as Exhibit E). Moreover, once Domains by Proxy, a company facilitating private registration of domain names, lifted its privacy service, the true registrant of the three domain names registered through Domains by Proxy ("mansurmaqsudi.com", "abdulraufmaqsudi.com" and "faridmaqsudi.com") was revealed – and it was, in fact, GlobalOptions. January 16, 2007 Response from Domains by Proxy (attached as Exhibit F); *see* Network Solutions Reports for mansurmaqsudi.com, faridmaqsudi.com, and abdulraufmaqsudi.com, as viewed on January 29, 2007 (attached as Exhibits G, H, and I, respectively). Global is also believed to be the registrant of the domain names ("mansurmaqsudi.net" and "faridmaqsudi.net") registered through another company, Katz Global Domain Registration ("Katz"). Compl. at 14. By posting numerous statements defaming

Plaintiffs on the "mansurmaqsudi.net" website, Global has caused significant injury to Plaintiffs' reputations.

## **ARGUMENT**

As an initial matter, Plaintiffs note that Defendant Global and Defendant Zeromax have submitted to the Court many documents as exhibits that go beyond the Complaint. Given the factual record and procedural posture of the respective filings, it is clear that this case cannot be resolved at the Rule 12 stage since the allegations of the Complaint must be taken as true. Under that standard, Plaintiffs' recitation of the facts control the Court's analysis of the legal defense put forward by Defendants. Any effort by Defendants to expand the record beyond the Complaint and insert evidentiary support for their defenses goes against the appropriate Rule 12 standard.

It is also worth noting that Global does not raise a personal jurisdiction argument. This is significant with regards to both Defendants. Not only is Global conceding personal jurisdiction over itself, but in effect concedes that defense for its principal, Zeromax. Global does not dispute that it acted as the agent for Zeromax at all times relevant to this case. As a matter of law, this dooms Zeromax's argument that the Court does not have personal jurisdiction over it. Under the law, Zeromax cannot escape liability by hiring an agent to act on its behalf. RESTATEMENT (SECOND) OF TORTS, § 577(1), cmt. f (1977) ("One is liable for the publication of defamation by a third person whom as his servant, agent, or otherwise, he directs or procures to publish defamatory matter.").

Recognizing this concession, in its Reply Memorandum, even Zeromax does not really dispute that this Court is properly seized of personal jurisdiction. Putting form over function, Zeromax instead argues that Plaintiffs have failed to cure jurisdictional deficiencies in the

Complaint. Of course, the Complaint clearly makes this allegation and establishes this Court's personal jurisdiction over Zeromax. Compl. at ¶¶ 13, 24.

## I.   PLAINTIFFS' COMPLAINT WAS FILED WITHIN THE STATUTE OF LIMITATIONS

Like Zeromax, Global raises a patently frivolous statute of limitations argument. In repeating the exact arguments set forth by its client, Global completely disregards Plaintiffs' response to Zeromax's argument on the same issue. *See* Plaintiffs' Opposition to Zeromax Motion at 17-18. As Plaintiffs noted there, the "mansurmaqsudi.net" domain name was not even created until September 6, 2006, as demonstrated by its domain registration report.[1] Neither Defendant disputes the actual domain registration date, which is dispositive of this issue.[2] Indeed, it is undisputed that Defendants could not have posted or published the slanderous statements about Plaintiffs on this website prior to this date. Thus, the earliest date that the statute of limitations for Plaintiffs' claims could have commenced was September 6, 2006 (and it is not even clear that any statements were published on the website by that date). The Complaint was filed on July 11, 2007, well within a year of the publication of the defamatory statements – which could not have been any earlier than September 6, 2006.

---

[1]    A report of the domain registration for mansurmaqsudi.net (attached as Exhibit J), *available at* http://www.networksolutions.com/whois/results.jsp?domain=mansurmaqsudi.net demonstrates that the domain was created on September 6, 2006. This date was inadvertently misstated in the Complaint as June 9, 2006 – a fact that was corrected in Plaintiffs' Opposition to Zeromax's Motion and which is controlled by the actual document to which the Complaint refers.

[2]    In its Reply Memorandum, however, Zeromax asserts that Plaintiffs have failed to cure the statute of limitations deficiencies in the Complaint (Zeromax Reply at 27-28) as if the controlling document – which they do not contest – does not even exist. Frankly, this is a frivolous argument, and the Court should not condone such wasteful distractions.

Moreover, contrary to Global's argument, it is irrelevant that the websites referenced information initially published in different formats more than a year prior to the filing of the Complaint. Global Motion at 16-17. It is the date that libelous statements were posted on the website that triggers the statute of limitations – not the date of materials referenced in the newly-created website. If, as Global asserts, the date was triggered by the materials referenced, it would create a blanket immunity for anyone who published a defamatory website but included even a single reference to previously published material. This would be inconsistent with the existing law in the District of Columbia, and would substantially diminish the protections from defamation provided by the law.

"The common law of libel has long held that one who republishes a defamatory statement 'adopts' it as his own, and is liable in equal measure to the original defamer." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1298 (D.C. Cir. 1988). Although the "single publication" rule limits liability for further dissemination of an initial publication, the "republication rule" provides that publication of material in a new format, edition, or medium creates liability as of the date of the new publication. "[R]epublication in a new edition creates a new publication on the rationale that the intent is to reach a new audience." *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1087 (D.C. Cir. 2007); RESTATEMENT (SECOND) OF TORTS § 577A cmt. d, illus. 5-6 (1977); RESTATEMENT (SECOND) OF TORTS § 578 (1977). The creation of the websites clearly constitute republication of any previously created materials, in that they arrange and combine excerpts from previous materials to create a new format. Moreover, some of the materials included in the website were previously unavailable on-line, such as references to the letters from various officials. Making these materials available through the website is an attempt "to reach a new audience," and so should be considered a republication. *See, e.g., Jankovic* 494

F.3d at 1087 ("[I]n applying [a rule like the single publication or the republication rule] to the Internet, the court must be mindful of the rule's purpose."). Finally, the editorial comments, shown in italics on the website, are an *entirely new* publication as of the date the websites were created. Those statements did not exist until they were published on the website, and so the triggering date for the statute of limitations cannot be any earlier than the "mansurmaqsudi.net" website's date of registration. Plaintiffs' Complaint was thus timely filed within the statute of limitations.

## II.    PLAINTIFFS HAVE STATED VIABLE CLAIMS FOR DEFAMATION AND FALSE LIGHT INVASION OF PRIVACY

"A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure should not be granted unless a plaintiff can demonstrate no set of facts that support his claim entitling him to relief." *Holman v. Williams*, 436 F. Supp. 2d 68, 73 (D.D.C. 2006); *see Klayman v. Segal*, 783 A.2d 607, 612 (D.C. 2001); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88-89 (D.D.C. 2004). Furthermore, in evaluating the motion to dismiss the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Harris v. Ladner*, 127 F.3d 1121, 1123 (D.C. Cir. 1997); *Klayman*, 783 A.2d at 613-614.

Mimicking Defendant Zeromax's argument regarding the asserted failure to state a claim, Defendant Global does not genuinely dispute that Plaintiffs have alleged sufficient facts to adequately plead its claims for defamation and false light – as it cannot. Global Motion at 9-10; *see* Zeromax Motion at 23-24. Plaintiffs have properly plead the elements of their claims in the

Complaint.[3]  Moreover, at the 12(b)(6) stage, the Court must assume the falsity of any express or

implied factual statements at issue and that such statements were made with knowledge of their

falsity or reckless disregard for their truth.  *Oparaugo v. Watts*, 884 A.2d 63, 81-82 (D.C. 2005).

Rather than disputing that Plaintiffs have alleged sufficient facts to plead its claims, Defendant

Global seeks to interpose two defenses: (i) that the First Amendment bars Plaintiffs' claims and

(ii) that the fair reporting privilege bars Plaintiffs' claims.  Global Motion at 11-16.  Both of

these arguments must be rejected, as detailed below.

### A.      Plaintiffs' Claims Are Not Barred By The First Amendment

Contrary to Global's argument, the First Amendment is not a bar to properly plead

defamation claims.  Of course, First Amendment considerations must be balanced with "[t]he

right of a man to the protection of his own reputation from unjustified invasion and wrongful

hurt," which "reflects no more than our basic concept of the essential dignity and worth of every

human being – a concept at the root of any decent system of ordered liberty."  *Rosenblatt v.*

---

[3]      To state a claim for defamation, a plaintiff must plead: (1) that the defendant made a false
and defamatory statement concerning the plaintiff; (2) that the defendant published the statement
without privilege to a third party; (3) that the defendant's fault in publishing the statement
amounted to at least negligence; and (4) either that the statement was actionable as a matter of
law irrespective of special harm or that its publication caused the plaintiff special harm.
*Klayman*, 783 A.2d at 613 n.4; *DeAngelis v. Hill*, 847 A.2d 1261, 1267-68 (N.J. 2004).  Written
or broadcast defamation is known as libel.  *El-Hadad v. Embassy of the UAE*, No. 96-1943, 2006
U.S. Dist. LEXIS 21491, at *46 (D.D.C. March 29, 2006) (referencing RESTATEMENT (SECOND)
OF TORTS §§ 568(1) & 568A).  Libel is defamation per se, regardless of the nature of the false
and defamatory statements.  *Id.*  Plaintiffs properly plead these elements in their Complaint.  *See*
Compl. at ¶¶ 13, 16-17, 21, 23-24, 34-36, 38, 40-42, 45, 48, 51-52, 55, 59, 60.

To state a claim for false light invasion of privacy, a plaintiff must plead: (1) the
published material places appellant in a false light which would be highly offensive to a
reasonable person, and (2) the actor had knowledge of or acted in reckless disregard as to the
falsity of the publicized matter and the false light in which the other would be placed.  *Weyrich v.
New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001); *DeAngelis*, 847 A.2d at 1271.  Plaintiffs
properly plead both of these elements in their Complaint.  Compl. at ¶¶ 13, 24, 35, 36.

*Baer*, 383 U.S. 75, 92 (1966) (Stewart, J. concurring).  For this reason, the Supreme Court has refused to provide complete immunity for publishers, and even "public figures" are not deprived of civil remedies for the harm to their reputation.  *Gertz v. Welch*, 418 U.S. 323, 341 (1974). Recognizing the importance of public debate regarding public figures, the law does require that "public figure" plaintiffs show that defamatory statements were made with actual malice, whereas private figures are required to show only fault amounting to negligence.  *Id.* at 347.

In arguing that the First Amendment bars Plaintiffs' claims as a matter of law, Global completely fails to recognize the distinction between public and private figures.  Global simply assumes that Judge Bates' explanation of the standards for the limited public figures in *OAO Alfa Bank v. Center for Public Integrity* apply to the plaintiffs here, without so much as stating, let alone arguing, that the Plaintiffs are public figures.  387 F. Supp. 2d 20 (D.D.C. 2005).  Judge Bates spent at least 12 pages describing the history of the plaintiffs' involvement in the economic and political affairs of their nation, the extensive news coverage of the plaintiffs, the ability of the plaintiffs to influence public debate, and the nature of the public controversy in which the plaintiffs were involved before reaching the conclusion that the plaintiffs were limited public figures.  *Id.* at 23-29, 42-48.  The *OAO Alfa Bank* plaintiffs had, "at critical points in Russia's history, . . . stepped forward to direct the course of the nation's events" and "assumed an unforeseen level of prominence and influence in the economic and political affairs of their nation."  *Id.* at 26-27.  Global cannot simply assume, with no analysis of any of these factors, that the standards applicable to the plaintiffs in *OAO Alfa Bank* likewise apply here.[4]

---

[4]     Similarly, in its Reply Memorandum, Defendant Zeromax assumes for the first time that Plaintiffs are limited public figures.  Zeromax Reply Memorandum at 4, n.5.

The mere fact that Plaintiffs have been the focus of media attention will not suffice to demonstrate they are limited public figures. Neither Global nor Zeromax has shown that there is a controversy which has "foreseeable and substantial ramifications for nonparticipants," *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980), nor has either shown that the Plaintiffs voluntarily "thrust themselves to the forefront" of the controversy at issue. *Gertz*, 418 U.S. at 345.

Even assuming that Plaintiffs are public figures for purposes of this case, Plaintiffs need not allege that Global itself fabricated information on the website, as Global incorrectly argues. Plaintiffs must allege only that Global, in publishing the false and defamatory statements, acted "with reckless disregard for the truth." *Tavoulares v. Piro*, 763 F.2d 1472, 1474 (D.C. Cir. 1985). Evidence of actual malice includes publication despite obvious reasons to doubt the accuracy of the person from whom the information is obtained. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). The statements made by Mr. Livingstone, the former CEO of Global, to Mr. Gerson, the co-counsel of ROZ, clearly demonstrate that Global had abundant reasons to question the truth of the information provided to them for publication on the website. Compl. at ¶ 24 . Publishing information about the Maqsudis at the direction of a company run by dangerous people who are furious with the Maqsudis demonstrates "a high degree of awareness of . . . [the] probable falsity" of any information from Zeromax regarding the Plaintiffs. *OAO Alfa Bank*, 387 F. Supp. 2d at 48 (citations omitted). Given that Plaintiffs' Complaint alleges actual malice (see ¶ ¶40, 50, 62), at the very least, the question of actual malice is one for the jury to decide. *Id.*

**B.      Plaintiffs' Claims Are Not Barred By The Fair Reporting Privilege**

Global's argument that Plaintiffs' claims are barred by the fair reporting privilege is unavailing. As Plaintiffs have addressed the issues raised by Global in their Opposition to

Zeromax's Motion, Plaintiffs incorporate those arguments here (*see* Opposition to Zeromax's Motion at 18-26 and corresponding Exhibits) and provide only a brief summary of the main points below.

As a threshold matter, the fair reporting privilege does not extend to official reports of foreign governments under D.C. law. *OAO Alfa Bank,* 387 F. Supp. 2d at 41; *Lee v. Dong-A Ilbo,* 849 F.2d 876 (4th Cir. 1988) (declining to extend the privilege to a United States news agency report of a South Korean government press release); RESTATEMENT (SECOND) OF TORTS § 611 cmt. d (1977). It is irrelevant that Global "directly attributed" its republication of the official government acts at issue to "various Uzbek officials . . . as well as to Uzbek government documents." Global Motion at 15. Moreover, the news articles referenced by Global are in no way "official reports" that would potentially be subject to the fair reporting privilege. *See* Opposition to Zeromax's Motion at 18-26. There is no reason why the Court should extend the fair reporting privilege to allow reliance on Uzbek government documents, particularly given the widespread and well-documented examples of government corruption in Uzbekistan. *See, e.g.,* State Department Country Reports on Human Rights Practices 2006 (attached as Exhibit K); *see* Expert Report of Scott Horton at ¶ 2 (attached as Exhibit C); *see also* Decl. of Mr. Farhod Inogambaev ("Inogambaev Decl.") (VIAC), at ¶¶ 21, 27-30 (attached as Exhibit B)[5] (discussing Karimova's orchestration of the actions of the Uzbek government, including her reviewing and editing of Uzbek court decisions).

---

[5]     As noted in footnotes 2 and 19 of Plaintiffs' Opposition to Zeromax's Motion, small portions of Mr. Inogambaev's statement (and accompanying exhibits) that was submitted in the Vienna arbitration have been redacted pursuant to a Confidentiality Agreement with Coca-Cola.

Even if Global had relied on U.S. government documents instead of Uzbek documents (which it did not), its statements would not be privileged because the statements were neither (a) fair and accurate, nor (b) published for the purpose of informing the public as to a matter of public concern, as required for the privilege to apply. *Oparuago v. Watts*, 884 A.2d 63, 81 (D.C. 2005); *White v. Fraternal Order of Police*, 707 F. Supp. 579, 596 (D.D.C. 1989) (citing *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C. Cir. 1980)); *see* Plaintiffs' Opposition to Zeromax Motion at 23.[6]  As detailed in the attached Chart of Website Misstatements (attached as Exhibit L), Global inaccurately cited many statements, sometimes converting reports of *allegations* (as in the source) to *conclusions* that such conduct occurred (on their website). *See* Ex. L.  Clearly, this type of "reporting" is neither fair nor accurate.  Nor did Global undertake its "reporting" for the purpose of informing the public about matters of public concern.  Global posted the statements because it was hired to do so by its client, Zeromax, a company run by Mansur Maqsudi's ex-wife that communicated threats to Plaintiffs' personal safety through Global.  Compl. at ¶ 24.  Like Zeromax, Global's effort to present itself as undertaking a commendable public role is not only disingenuous, but offensive to every element of this important public privilege.

---

[6]     Zeromax's argument that there is no requirement that the statements be published for the purpose of informing the public as to a matter of public concern is wrong.  Zeromax Reply at 23-24.  The *Oparaugo* Court made clear, as recently as 2005, the fair reporting privilege has been described as follows:

> [d]efamatory matter concerning another in a report of any official proceeding or any meeting open to the public which deals with matters of public concern is published on a conditionally privileged occasion if the report is (a) accurate and complete, or a fair abridgement of what has occurred, and (b) published for the purpose of informing the public as to a matter of public concern."

*Oparuago*, 884 A.2d at 81 (citations omitted).

Finally, the fair reporting privilege, even if it were to apply, is overcome by a showing of malice[7] – clearly present in this case (as discussed on page 10). For reasons briefed here, and detailed in Plaintiffs' Opposition to Zeromax Motion, the fair reporting privilege simply has no place in this case.

## III.    THE ACT OF STATE DOCTRINE DOES NOT BAR THIS CASE

Like Zeromax, Global seeks to end-run the inapplicability of the fair reporting privilege by asserting the act of state doctrine as a separate bar to Plaintiffs' claims. However, this defense must fail for a fundamental reason – it is the actions of Global – and Zeromax – that are at issue here, and *not* the acts of the Uzbek state. Global (along with Zeromax) is directly responsible for the websites defaming Plaintiffs – not the government of Uzbekistan (which as far as Plaintiffs can tell, did not come to Washington and create and disseminate the website, and otherwise harm the Plaintiffs).[8]

---

[7]    Zeromax attempts to argue in its Reply that the fair reporting privilege is not a qualified one that is overcome by malice. It characterizes the law as "unsettled" on this issue and states that "cases since *White* have done little to clarify the issue." Since the *White* decision in 1990, however, D.C. courts have eliminated any doubt (if there ever was one) that the privilege is a qualified one, as the cases even cited by Zeromax demonstrate. *See* Zeromax Reply at 26, footnote 16. Indeed, in 1993, the court in *Harper v. Walters*, 822 F. Supp. 817, 824 (D.D.C. 1993), found the fair reporting privilege to be waived if published with actual malice, as did the court in *McFarlane v. Esquire Magazine* in 1994. 1994 U.S. Dist. LEXIS 9497, 41-42 (D.D.C.). More recently, in 2005, the court in *Oparaugo*, 884 A.2d at 81, also stated that the fair reporting privilege is "defeated by the presence of malice."

[8]    If the Government of Uzbekistan had in fact come to Washington to hire GlobalOptions and commit these tortious acts, the act of state doctrine would not protect it from a suit for damages. Courts have declined to apply the act of state doctrine where doing so would immunize the tortious conduct of a foreign government which caused harm in this country. *See Letelier v. Republic of Chile*, 488 F. Supp. 665, 674 (D.D.C. 1980) (refusing to apply the act of state doctrine to protect Chile from civil liability "if the actions of its alleged agents resulted in tortious injury in this country").

To the extent that Global relies on the fact that some (but not all) of the defamatory statements it published also appear or are mentioned in official Uzbek government documents, this is actually just a recast assertion of the fair reporting privilege – which as noted above clearly does not apply in this case.[9] Because this case concerns the actions of Global and Zeromax here in Washington, D.C., there are no Uzbek "acts of state" at issue, and thus the act of state doctrine simply has no has application to this case. It is that simple.

Moreover, an analysis of the act of state doctrine itself demonstrates why it cannot apply to bar Plaintiffs' claims. As Plaintiffs' analysis has already been detailed in their Opposition to Zeromax's Motion (at 26-34 and corresponding Exhibits), Plaintiffs provide only a brief summary of the main arguments here.

*First*, the act of state doctrine does not apply since the invalidation of a government act is neither sought nor required. Adjudication of this case does not, in any way, require Plaintiffs to

---

[9]     In its Reply, Zeromax argues that Plaintiffs cannot prove falsity or actual malice without calling into question the validity of Uzbek government actions. Zeromax seeks to rely on the Uzbek documents at issue for the truth of the matters that they assert. This is not the aim of the fair reporting privilege. While some degree of reliability of the underlying government documents is required (*see* Plaintiffs' Opposition to Zeromax's Motion at 21-22), it is not sufficient to render a government document reliable for the truth of its content. This was explained by the court in *Harper v. Walters*, 822 F. Supp. 817, 826 (D.D.C. 1993) (emphasis added) as follows:

> No support exists . . . for . . . [the] contention that the fair reporting privilege requires the same degree of reliability as that required to establish that a document is 'inherently reliable' under the hearsay rule. The two rules are unrelated. In fact, the reliability (established through quasi-judicial due process) required for hearsay purposes must be substantially more rigorous, since a statement admitted as an exception to the hearsay rule is admitted for the truth of its content. *No such assumption of veracity applies to official government documents under the fair reporting privilege, where the purpose is not to establish truth* but simply to disseminate information about government proceedings.

prove the falsity of the Uzbek criminal charges and proceedings.[10]  The sham nature of

Uzbekistan's criminal proceedings is not what this case is about (although it certainly

demonstrates why the fair reporting privilege does not apply to the actions of a foreign

government).  Rather, the actions underlying this suit are *Defendants'* publication of statements

on a website here in Washington D.C. about Plaintiffs that it *knew* were false and defamatory and

caused injury to Plaintiffs.[11]  Plaintiffs' claims against Global, like those of the plaintiff in

*Kirkpatrick*, do not seek or require the invalidation or undoing of any action by Uzbekistan, but

simply seek damages from the party causing the harm – in this case, Global and Zeromax.

*Kirkpatrick*, 493 U.S. at 407 (declining to apply the act of state doctrine where the plaintiff "was

not trying to undo or disregard the governmental action, *but only to obtain damages from private*

*parties who had procured [the contract])*." (emphasis added); *see Oceanic Exploration Co. v.*

*Conocophillips, Inc.,* Civ. A. No. 04-332, 2006 WL 2711527, at **14-15 (D.D.C. Sept. 21,

---

[10]     Courts have held that when the defendant's conduct can be judged without deciding the
legality of the acts of the foreign government, the act of state doctrine should not be applied.
*W.S. Kirkpatrick, & Co., Inc. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 406 (1990)
(holding that "[r]egardless of what the court's factual findings may suggest as to the legality of
the Nigerian contract, its legality is simply not a question to be decided in the present suit, and
there is thus no occasion to apply the [act of state doctrine]" in a case where finding a U.S.
businessman guilty of bribing a Nigerian official in order to secure a contract would not require
invalidation of the underlying contract.);  *Industrial Inv. Dev. Corp. v. Mitsui & Co.,* 594 F.2d
48, 48 (5th Cir. 1979) (in an antitrust action "the mere fact that members of the Indonesian
government were to play a part in the alleged scheme does not insulate defendants'
accountability for conduct which might prove to be prohibited by our antitrust laws.").

[11]     Moreover, this Court cannot preclude adjudication of Plaintiffs' claims on the basis that
the statements published by GlobalOptions must be true if they also appear in the referenced
Uzbek documents. *See Dominicus Americana Bohio v. Gulf & W. Indus., Inc.,* 473 F. Supp. 680,
690 (S.D.N.Y. 1979) (declining to extend act of state doctrine due to allegations that
"government actions were procured by fraud and coercion").

2006) (applying *Kirkpatrick* and finding act of state did not apply where case focused on the

non-sovereign defendant's conduct and resulting harm).

In any event, it is not Plaintiffs who are seeking to invalidate Uzbek acts in this case, so

much as it is Global seeking to have this Court enforce or recognize some of the Uzbek

documents that it references for the truth of the matters they assert. For the same reasons

underlying the limits of the fair reporting privilege, foreign country judgments cannot be

recognized or enforced by U.S. courts if they were obtained in a manner that did not accord with

the basics of due process. *See Hilton v. Guyot,* 159 U.S. 113, 205-206 (1895); *Bridgeway Corp.*

*v. Citibank,* 201 F.3d 134 (2d Cir. 2000) (refusing to enforce Liberian judgment because courts

in Liberia are not impartial tribunals); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995)

(declining to enforce default judgment obtained in Iran by Iranian banks against Shams Pahlavi

(the Shah's sister) in California due to failure of due process in Iranian courts); RESTATEMENT

(THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES 482(1)(a) (1987) ("A court in

the United States may not recognize a judgment of a court of a foreign state if: (a) the judgment

was rendered under a judicial system that does not provide impartial tribunals or procedures

compatible with due process of law. . . .").[12]

*Second*, the act of state doctrine is a flexible doctrine that allows courts to decline to

apply it where "the policies underlying the act of state doctrine may not justify its application."

*Republic of the Philippines v. Westinghouse Elec. Corp.,* 774 F. Supp. 1438, 1466 (D.N.J. 1991)

(citations omitted). Moreover, "a court should be mindful that the decision to deny judicial relief

---

[12]     In its Reply, Zeromax argues that the legal standard governing the enforcement of foreign judgments has no bearing on the application of the act of state doctrine. Zeromax Reply at 13. By seeking to have this Court enforce or recognize some of the Uzbek documents referenced on

(continued...)

to a party should not be made lightly." *Virtual Def. and Dev. Int'l, Inc. v. Republic of Moldova,* 133 F. Supp. 2d 1, 8 (D.D.C. 1999).

*Finally*, even if the act of state doctrine were applicable, it cannot be invoked by Global as a shield from liability where its client, Zeromax, helped orchestrate the very "sovereign acts" at issue. Contrary to what Global and Zeromax argue, the act of state doctrine "does not bestow a blank-check immunity upon all conduct blessed with some imprimatur of a foreign government." *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 606 (9th Cir. 1976) (superseded by statute). Where the defendant is involved with procuring the government actions that it later asserts as "official acts" barring adjudication of claims against it, the act of state doctrine does not apply. *See United States v. Sisal Sales Corp.,* 274 U.S. 268 (1927) (Mexican legislation solicited by American banks was not act of state because foreign governmental activity was arranged by defendants rather than independently conceived); *Abu Ali v. Ashcroft,* 350 F. Supp. 2d 28, 59 (D.D.C. 2004) (no act of state in inquiry casting doubt on integrity of acts of Saudi officials in detaining the plaintiff, but not requiring Court to declare invalid or illegal any such act); *Republic of Philippines,* 774 F. Supp. at 1438. That is exactly what took place in this case. The record before this Court demonstrates that Gulnora Karimova, a private citizen who controls Zeromax, masterminded the Uzbek "proceedings" against Plaintiffs upon which Zeromax now relies for its act of state defense. Inogambaev Decl. (VIAC), Ex. B at ¶ 26 ("She was responsible for, among other things, the false charges and subsequent court proceedings that took away ROZ's interest in CCBU and the imprisonment of Mansur's relatives."), at ¶ 28 ("[S]he orchestrated every detail of the court proceedings against

_____

(...continued)

the "mansurmaqsudi.net" website for the truth of the matters they assert, Zeromax has placed the

(continued...)

ROZ. . . . [S]he told the prosecutors precisely what charges to bring and how to prosecute the case. Ms. Karimova knew that there was no merit to these charges."). Karimova was even involved in reviewing and editing the draft court decisions relating to ROZ, CCBU and Mansur Maqsudi. Inogambaev Decl. (VIAC), Ex. B at ¶ 29 ("Ms. Karimova often wrote substantial portions of the decisions herself to make sure that they contained the exact language and ordered the precise outcome she desired."). Zeromax, controlled by Karimova, then hired Global to create a website that published the false Uzbek statements – albeit changing the language, tone and import of the false statements so that they were more damaging, and more false, than those issued at the direction of Karimova. Compl. at ¶¶ 13, 24; *see* Ex. L.

On this record, this case is more similar to *Timberlane* than to the circumstances in *Galu v. SwissAir,* No. 86 Civ. 5551 (CSH), 1987 WL 15580 (S.D.N.Y. Aug. 3, 1987), upon which Global and Zeromax rely. Global Motion at 8; Zeromax Reply at 12. In *Galu* – unlike here – there was no evidence that the defendant Swiss Air employees knew about the supposed falsity of the Swiss expulsion order, let alone that they were involved in its fabrication. Moreover, in *Galu* there was no evidence of pervasive corruption in the Swiss government, whereas in this case, it is well established that the Uzbek government is riddled with corruption and its judicial system lacks any independence or due process. *See, e.g.,* Ex. K, Ex. C. Indeed, the judiciary's subservience to the Karimov family is simply further evidence of the orchestrated attack on the Maqsudis' integrity and character through both institutions and private parties such as Zeromax and GlobalOptions. *See* Inogambaev Decl. (VIAC), Ex. B at ¶¶ 23-20 (detailing Karimova's use of government agencies to inflict harm on the Maqsudis); *see* Inogambaev Decl. (*Roz Trading*

_____

(...continued)
enforcement of foreign judgments standard squarely at issue.

Case), Ex. A at ¶¶ 11-16, 20-21 (discussing Karimova's control over Zeromax).  Accordingly,

GlobalOptions cannot raise the act of state doctrine as a defense here, since there is no question

that its client helped create the very false "acts" upon which it now relies for immunity.

## CONCLUSION

For the foregoing reasons, GlobalOptions, Inc.'s Motion to Dismiss must be denied in its

entirety.

Respectfully submitted,

/s/
Stuart H. Newberger, DC BAR #294793
Alan W.H. Gourley, DC BAR #358300
Crowell & Moring LLP

1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
E-mail: snewberger@crowell.com
          agourley@crowell.com

Attorneys for Plaintiffs

Dated:  January 28, 2008

Of Counsel:

Dr. Allan Gerson
2131 S Street, NW
Washington, DC 20008
Telephone:  (202) 966-8557
E-mail: gerson@gilgintl.org

- 19 -

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Mansur Maqsudi, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Case No. 1:07-CV-01252 RJL |
| ) | |
| v. ) | |
| ) | |
| GlobalOptions, Inc., *et al.*, ) | |
| ) | |
| Defendants. ) | |

### PROPOSED ORDER

Upon consideration of Defendant GlobalOptions, Inc.'s Motion to Dismiss, dated January 3, 2008, and Plaintiffs' response thereto, IT IS HEREBY ORDERED, that Defendant GlobalOptions, Inc.'s Motion to Dismiss be denied;

IT IS SO ORDERED.


_____
Judge Richard J. Leon
United States District Court